**Marquis & Aurbach**
Albert G. Marquis, Esq.
Nevada State Bar No. 1919
Craig R. Anderson, Esq.
Nevada State Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711
Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DONALD HINTON, DAVID HINTON and JOHN REYES, | Case No.    CV-S-03-0057-PMP-PAL |
| Plaintiffs, | |
| vs. | |
| CLARK COUNTY, NEVADA, a political subdivision, acting by and through the LAS VEGAS METROPOLITAN POLICE DEPARTMENT; JOHN DOES 1-30 and ROE ENTITIES 1-10, | |
| Defendants. | |

**FILED SEPARATELY**

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Las Vegas Metropolitan Police Department and Clark County (hereinafter "Defendants"), by and through their counsel of record, Marquis & Aurbach, move this Court for Summary Judgment on all claims pursuant to Federal Rule of Civil Procedure 56. This Motion is made and based upon all papers, pleadings and records on file herein, the attached Points and Authorities, and such oral argument, testimony and evidence as the Court may entertain.

MARQUIS & AURBACH

By: _____
Craig R. Anderson, Esq.
Nevada State Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145

Page 1 of 31

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION

On January 15, 2003, the Plaintiffs filed their Complaint. The gravamen of the Plaintiffs' Complaint is that the Defendants executed and performed an unconstitutional search on Plaintiffs' residence on January 16, 2002.  The search occurred after LVMPD narcotics officers obtained information from a confidential informant that methamphetamine was being sold from the residence. As a result of the information, the LVMPD officers obtained a search warrant signed by a magistrate. In the Complaint, the Plaintiffs claim that LVMPD obtained the warrant through false statements and that LVMPD unreasonably executed the warrant. Specifically, the Plaintiffs claim that pursuant to 42 USC § 1983 the Defendants violated Plaintiffs' (1) Fourth Amendment rights "to be free from unreasonable searches and seizures" (First Claim for Relief – subpart "A"); (2) Fifth Amendment due process rights by taking the Plaintiffs "into custody without due process of law, and without probable cause or other legal justification for doing so, and deprived them of their liberty for a significant amount of time. . [and] destroyed and/or badly damaged substantial amounts of personal property. . . [and] seized personal property . . . without legal justification" (First Claim for Relief – subpart "B"); (3) Sixth Amendment rights by "prevent[ing] Plaintiffs from obtaining and reviewing evidence that is critical to defending themselves in any criminal action" (First Claim for Relief – subpart "C"); (4) Second Amendment Rights by seizing firearms "belonging to [Plaintiffs] Donald and David Hinton" (First Claim for Relief – subpart "D").

The Plaintiffs also seek recovery sounding in state law tort against the Defendants. Specifically, the Plaintiffs alleged actions Defendants include: (1) violation of Plaintiffs' state constitutional right to be free from unreasonable search and seizure and bear arms (Second Claim for Relief); (2) false imprisonment (Third Claim for Relief); (3) battery (Fourth Claim for Relief); (4) trespass (Fifth Claim for Relief); and (5) conversion (Sixth Claim for Relief). The Defendants now seek summary judgment on all federal and state law claims made against them by the Plaintiffs.

## II.  STATEMENT OF FACTS

On January 16, 2002, the Plaintiffs Donald Hinton ("Donald"), David Hinton ("David"), and John Reyes ("Reyes") resided at a home located at 1919 Hallwood Drive in Las Vegas, Nevada. The

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

M&A:05166-104 288385.1 1215041102

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711   FAX: 382-5816

1 home was owned by Donald.  (*See* Compl. ¶ 8) All three Plaintiffs were present when LVMPD

2 SWAT and narcotics officers executed a search warrant on January 16, 2002.  The following

3 paragraphs address LVMPD's obtaining of the search warrant, the execution of the search warrant,

4 and the events after service of the warrant.

5 **A.    THE CONTROLLED BUY AND SEARCH WARRANT**

6 On January 4, 2002, LVMPD narcotics detective Shane Witham ("Det. Witham") met with

7 a confidential informant ("CI") at a Pizza Hut in Las Vegas.  (*See* Deposition of Det. Witham,

8 attached hereto as Exh. "A" at pg. 29) Det. Witham had used the CI on several previous occasions

9 and the CI proved reliable in providing tips on illegal drug and firearm sales. (*See* id. at pgs. 36, 37,

10 and 43) In the Pizza Hut parking lot, the CI informed Det. Witham that David sold him [the CI]

11 methamphetamine during the previous year and that David also sold illegal firearms. (*See* id. at pg.

12 56) The CI further informed Det. Witham that David had recently been involved in the robbery of two

13 Walgreens stores and an attempted robbery at an ATM located at the intersection of Spencer and

14 Tropicana.  Det. Witham learned from the CI that David may have kept a ripped $20 bill after the

15 failed ATM robbery. (*See* Exh. "A" at pg. 55; *see also* Det. Witham's Officer's Report dated January

16 4, 2002, attached hereto as Exh. "B"[1])

17 In order to confirm this information, Det. Witham performed a controlled buy with the

18 assistance of the CI.  (*See* Exh. "A" at pg. 74) On January 4, 2002, around 5:00 p.m., Det. Witham

19 and the CI traveled to 1919 Hallwood Drive to perform the controlled buy.  In addition to Det.

20 Witham, LVMPD officers Ryan Kraft, Jordan Harrison and Michael Beckler were present during the

21 controlled buy. (*See* id. at pg. 79) Prior to the buy, Det. Witham searched the CI to make sure he did

22 not possess any controlled substances, money or property.  (*See* Det. Witham's Application and

23 Affidavit for Search Warrant, attached hereto as Exh. "C" at pg. 2[2]) Det. Witham provided the CI

24 with $100 to purchase methamphetamine. (*See* Exh. "A" at pg. 2, Exh. "B"; and Exh. "C" at pg. 2)

25

26

_____

27 [1]The authenticity of this document was verified by Det. Witham during his deposition. (*See* Exh. "A" at pg. 71)

28 [2]The authenticity of this document was verified by Det. Witham during his deposition. (*See* Exh. "A" at pgs. 109-114)

M&A:05166-104 288385.1 1215041102

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711   FAX: 382-5816

1   Det. Witham dropped off the CI near the 1919 Hallwood address. The three on-scene officers

2   watched the CI walk directly to the 1919 Hallwood residence and meet with "an unknown subject

3   between a barred gate in front of the front door." (*See* Exh. "B" at pg. 2) The CI entered the residence

4   and remained inside for twenty-one (21) minutes. (*See* Exh. "A" at pg. 87; *see also* Exh. "B" at pg.

5   2) During this time, two of the on-scene officers remained stationary while the third officer drove past

6   the house in an unmarked police car. (*See* Exh. "A" at pgs. 82 and 86) Eventually, the CI exited the

7   house and walked directly back to Det. Witham. The CI handed Det. Witham "a clear plastic baggy

8   containing an off white crystal substance" that Det. Witham believed "resembled methamphetamine."

9   (*See* Exh. "B" at pg. 2) Det. Witham conducted another search of the CI to confirm the absence of

10  any additional contraband. (*See* Exh. "C" at pg. 3) Det. Witham then performed an in-field chemical

11  test that "tested positive for methamphetamine." (*See* Exh. "A" at pgs. 11-13; *see also* Exh. "B" at

12  pg. 2) A later test performed at the narcotics lab also showed positive for methamphetamine. (*See*

13  Exh. "A" at pgs. 11-14; *see also* Exh. "B" at pg. 4)

14      Based upon the information supplied by the CI and the successful controlled buy, on January

15  6, 2002, Det. Witham submitted an Application and Affidavit for Search Warrant for the 1919

16  Hallwood address (hereinafter "Application").   Because the controlled buy only produced

17  methamphetamine, Det. Witham concluded that probable cause existed to seek a warrant only for

18  methamphetamine. He did not seek a search warrant for guns or evidence of robberies. (*See* Exh.

19  "A" at pg. 64) Specifically, the Application sought: (1) methamphetamine, (2) paraphernalia, and (3)

20  limited items of personal property that established possible drug trafficking. (*See* Exh. "C" at pg. 1)

21  It also noted that, "[i]t is your affiant's experience that persons who sell narcotics frequently carry

22  guns on their person and at the locations used for selling narcotics to protect their money and

23  narcotics." (*See* Exh. "C" at pg. 4)

24      On January 6, 2002, Judge Tony Abbatangelo, after placing Det. Witham under oath, signed

25  the search warrant for the 1919 Hallwood address. The warrant allowed for service "at anytime day

26  or night, and if the property is there to seize it, prepare a written inventory of the property seized, and

27  make a return to me within ten days." (*See* Search Warrant attached hereto as Exh. "D" at pg. 2) (It

28  is important to note that the warrant is dated "06 day of Jan., 2001." However, the body of the

1  Application and police reports make clear that all the activity occurred in January 2002 – it is clear

2  that this is simply the commonly made typographical error made at the first of every new year.)

3  **B.    SWAT'S SERVICE OF THE SEARCH WARRANT**

4  The search warrant was legally served ten days later on January 16, 2002 by the LVMPD

5  SWAT team.  Sgt. Willie Graham and assistant team leader Darrell Hixson were in charge.  (*See*

6  Deposition of Sgt. Willie Graham, attached hereto as Exh. "E" at pg. 9, and Deposition of Ofc.

7  Darrell Hixson, attached hereto as Exh. "F" at pg. 4) As with any search, the duty of the SWAT team

8  is to gain access to the identified premises and clear the premises of any unsafe or dangerous

9  conditions (including individuals).  After the SWAT team clears the premises, SWAT turns the

10  premises over to the narcotics officers to search for any items specified in the warrant. (*See* Exh. "F"

11  at pg. 179)

12  With respect to the 1919 Hallwood search,  the SWAT team first received notice of the

13  potential search around January 9, 2002. (*See* Exh. "F" at pg. 59) According to SWAT officer Kevin

14  Warren, he received notice from Det. Witham of the impending search and he began preparing

15  SWAT's "raid package." (*See* Deposition of Kevin Warren, attached hereto as Exh. "G" at pg. 18)

16  (According to SWAT, it is not uncommon to receive a "heads up"telephone call on an upcoming

17  search prior to SWAT actually receiving a copy of the actual warrant from the obtaining LVMPD

18  agency.  (*See* Exh. "F" at pgs. 10-11))   On January 9, 2002, Officers Manny Rivera and Kevin

19  Warren were assigned as reconnaissance officers.  These two officers received orders to scout out the

20  search location, identify any potential hazards/problems, and generally determine the best plan to

21  enter for entry. (*See* Exh. "F" at pg. 51) Officer Warren prepared a SWAT Warrant Service Planning

22  Sheet detailing the results of the reconnaissance mission. (*See* Service Warrant Planning Sheet

23  attached hereto as Exh. "H")  On January 16, 2002, Det. Witham faxed Ofc. Warren an official

24  "Request for SWAT Warrant Service" on the 1919 Hallwood address (hereinafter "Request"). (*See*

25  Fax Cover Sheet and Request for SWAT Warrant Service dated January 16, 2002 (actual warrant

26  omitted), attached hereto as Exh. "I"[3])

27  _____

28  [3]Authenticity of these documents verified by recipient Ofc. Warren in his deposition. (*See* Exh. "G" at pgs. 16-18)

M&A:05166-104 288385.1 1215041102

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711   FAX: 382-5816

1    Det. Witham's Request listed the warrant as a "Class 4." A "Class 4" warrant is a high-risk

2    warrant due to a suspect's "history of violence; known to be armed and highly dangerous; and areas

3    likely to be heavily fortified." (*See* Exh. "I") Det. Witham classified the warrant as high risk due to

4    the fact that the 1919 Hallwood address was heavily fortified with bars and gates.[4] Furthermore, Det.

5    Witham had reviewed David's criminal history via his SCOPE printout. David's criminal history

6    included arrests (no convictions) for burglary, battery/domestic violence, carrying a concealed

7    weapon, two separate possessions of an unregistered firearm, possession of drug paraphernalia, and

8    possession of a controlled substance. (*See* David Hinton's SCOPE Printout as of January 3, 2002,

9    attached hereto as Exh. "J[5]") This information was made available to SWAT prior to the search. (*See*

10   Exh. "F" at pgs. 42-45; *see also* Officer Hixson's Officer's Report dated January 16, 2002 attached

11   hereto as Exh. "K" at pg. 1)

12        Despite Det. Witham's request that the warrant be treated as "Class 4," SWAT team leader,

13   Sgt. Graham, reduced the warrant to a "Class 3." Sgt. Graham and Ofc. Hixson agree that the

14   residence was heavily fortified with bars and fences and that David had "priors for burglaries,

15   carrying concealed weapons, possession of unregistered firearms" and various drug-related offenses.

16   (*See* Exh. "K" at pg. 1 and Exh."F" at pgs. 100-105) However, because SWAT did not possess a

17   "definite history on David Hinton showing the history of violence. . .Sgt. Graham listed the warrant

18   as a class 3 and possibly even a class 2." (*See* Exh. "K"; *see also* Exh. "F" at pgs. 103-104, and Exh.

19   "E" at pgs. 59-69) A "Class 3" warrant indicates that "[s]uspects have a history of violence or are

20   capable of violence; known to have or probably have access to weapons and are armed; and are

21   considered dangerous." (*See* Exh. "I" at pg. 2) The crucial difference in the classification of a warrant

22   is the amount of time the SWAT officers allow after they knock and announce until they force entry.

23   (*See* Exh. "F" at pgs. 132-137) For a "Class 4" warrant, the SWAT team generally allows 5-15

24   seconds before entry; for a "Class 3" warrant the team waits about 30-45 seconds before entering.

25

26   _____

27   [4]According to Ofc. Hixson, a building is considered fortified if there is "anything [on the building] to deny people access. . ." It could be a block wall, Rolladen shutters, bars on the windows, steel doors, or anything making access difficult. (*See* Exh. "F" at pg. 38; *see also* Exh. "E" at pgs. 71-72)

28   [5]Ofc. Hixson authenticated this document during his deposition. (*See* Exh. "F" at pgs. 40-45)

M&A:05166-104 288385.1 1215041102

1 │ (*See* id.)

2 │ On January 16, 2002, the SWAT team served the warrant at 1919 Hallwood. Prior to service,

3 │ the SWAT team held a planning meeting to determine how to best serve the warrant. (*See* Exh. "E"

4 │ at pgs. 50-53) A total of twenty SWAT officers participated in service of the warrant. (*See* Exh. "H")

5 │ Each SWAT team member dressed in LVMPD-issued uniforms that included police identification

6 │ badges. (*See* Exh. "E" at pgs. 16-24; Exh. "F" at pgs. 160-64) According to Ofc. Hixson, the SWAT

7 │ team lined up outside the home and performed a "knock and announce." (*See* Exh. "K" at pg. 1; *see*

8 │ *also* Exh. "F" at pgs. 136-38) At the same time the SWAT team announced in unison "Police–Search

9 │ Warrant," two explosive distracts were thrown to the side of the house. (*See* Exh. "K" at pg. 1; Exh.

10 │ "F" at pg. 151) According to Ofc. Hixson, the team waited at least 15 seconds but not more than 40

11 │ seconds before the signal was given to ram the door. Ofc. Hixson timed the wait time with a stop

12 │ watch. (*See* Exh. "K" at pg. 1; Exh. "F" at pgs. 152-56)

13 │ According to Plaintiff Donald, at around 11:30 p.m., he had just sat down in his living room

14 │ after baking cookies when he heard "two very loud noises." (*See* Deposition of Donald Hinton

15 │ attached hereto as Exh. "L" at pg. 28) Donald walked to the front door and opened the door. Upon

16 │ opening the door he recalls seeing a group of men identically dressed in dark uniforms. Donald

17 │ asked, "Who the hell are you?" and yelled for his son to get down. (*See* id. at pgs. 35 and 37) Donald

18 │ claims the next thing he recalls is hearing a shot gun blast that caused him to step backward. (*See* id.

19 │ at pgs. 35 and 37) He also recalls that "something came ramming through" the door and just missed

20 │ his leg. (*See* id. at pgs. 40-41) Donald was pulled outside and escorted through the SWAT team

21 │ members and taken to his neighbor's yard. (*See* id. at pgs. 42-43)

22 │ David testified that he was in his bedroom at the time of service of the warrant. According

23 │ to David, he was "fooling around" with a girl whose name he does not recall. (*See* Deposition of

24 │ David Hinton attached hereto as Exh. "M" at pgs. 26-27) He recalls hearing "loud banging sounds

25 │ and people coming through my gate." (*See* id. at pg. 26) David heard individuals yelling "Get

26 │ down." He hurriedly dressed, left his girlfriend, and ran to the hallway to see what was happening.

27 │ (*See* id. at pgs. 28-29) As he reached the hallway, he saw "people yelling at my dad to get down" and

28 │ telling him [David] to walk down the hallway and go outside. (*See* id. at pg. 29) David exited the

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711 FAX: 382-5816

M&A:05166-104 288385.1 1215041102

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711   FAX: 382-5816

1   house wearing blue jeans, a gray shirt, and shoes. (*See* id. at pg. 30) He was also escorted to his

2   neighbor's yard where he was searched and placed next to his father. (*See* id. at pgs. 30-33) David

3   does not know what happened to the girl – only that eventually she was standing next to him.

4       Reyes testified that at 11:00 p.m. he was in his bedroom when he heard explosions and saw

5   his windows light up. (*See* Deposition of John Reyes, attached hereto as Exh. "N" at pg. 28) He

6   recalls Donald yelling "Get down" and hearing other voices outside. (*See* id. at pgs. 30-31) Reyes

7   walked down the hallway where the officers told him to walk backwards toward them, which he did.

8   (*See* id. at pg. 32) Reyes was escorted through the SWAT officers, handcuffed, and also taken to the

9   neighbor's yard where Donald, David, and the girl were already present. (*See* id. at pgs. 35-37)

10   **C.**    **SWAT'S PROTECTIVE SWEEP OF THE RESIDENCE**

11       After escorting all of the occupants outside, SWAT proceeded to conduct a "slow methodical

12   search of the house" to ensure that no other individuals were hiding within the house. (*See* Exh."K")

13   The SWAT team entered the house at 9:30 p.m. and exited the residence at 10:35 p.m. (*See* Exh. "E"

14   at pg. 93) The protective search took a long time because the house was extremely cluttered with

15   boxes and debris. (*See* Exh. "L" at pg. 106; Exh. "N" at pgs. 70-71; and Exh. "F" at pgs. 177-78)

16       Eventually, a K-9 dog under the supervision of Ofc. John Jenkins entered the house to ensure

17   no individuals were hiding within the house. The K-9 made a "hit up on the attic" area. (*See* Exh.

18   "K" at pg. 2) This concerned Ofc. Hixson because during the delay in entering the house (while the

19   Plaintiffs were being called out) an individual could have entered the attic through the attic access

20   to hide. Ofc. Hixson testified that "It's common for people to lay in the attic and they put insulation

21   over them" and that he has "seen that happen and I have found people hiding [in attics] numerous

22   times" during his 13-year stint with SWAT. (*See* Exh. "F" at pg. 180) Therefore, Ofcs. Hixson, M.

23   Fowler, J. Sheahan, and the K-9 entered the attic to perform a safety sweep.

24       Upon entering the attic, Ofc. Hixson noticed that the insulation "was disturbed" in a couple

25   areas. Believing that individuals may be hiding, he looked under the insulation and discovered 21

26   rifles. (*See* id. at pgs. 181-83) Ofc. Hixson found the fact that 21 guns were hidden in the attic to be

27   "very unusual" and "very unsafe." (*See* id. at pg. 186) Ofc. Hixson called down to a narcotics

28   detective, informed the detective of the rifles, and recommended the rifles be transferred down for

M&A.05166-104 288385.1 1215041102

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711   FAX: 382-5816

1   safety reasons as the SWAT officers were not finished clearing the attic of individuals. (*See* id. at

2   pgs. 182-85) After receiving instructions to send the weapons down, Ofc. Hixson used his discretion

3   to conclude that it would be best to hand the weapons directly down to the ground floor.  As a

4   weapons instructor for the LVMPD, Ofc. Hixson knew better than to "handle a weapon in an attic,

5   wearing 70 pounds of equipment and having a hard time to breathe." Also, the weapons were located

6   a substantial distance from the attic access and Ofc. Hixson would have had to crawl with each

7   weapon to the access. (*See* Id. at pg. 182)

8        According to narcotics Det. Witham, he supported the transfer of the weapons from the attic

9   to the ground floor because, while interviewing the Plaintiffs, he learned that the owner of the home,

10   Donald, was an ex-felon.  Therefore, it was illegal for Donald to have any firearms in the residence.

11   (*See* Exh. "A" at pgs.106-07) (It is important to note that all of the Plaintiffs denied any knowledge

12   of or any ownership interest in the firearms. (*See* Exh. "L" at pg. 67; Exh. "M" at pg. 58; and  Exh.

13   "N" at pg. 74)).  Excepting the firearms found in the attic, SWAT did not handle any other evidence

14   and did not search for any of the items listed in the warrant. (*See* Exh. "K" at pg. 2; Exh. "F" at pg.

15   179)

16   **D.     THE NARCOTICS TEAM SEARCH OF THE RESIDENCE**

17        After SWAT cleared the residence, the Plaintiffs were brought back into the home and placed

18   in the living room.  The Plaintiffs estimate they were outside for about 45 minutes to one hour. (*See*

19   Exh. "L" at pgs. 50 and 56; Exh. "M" at pg. 37; and Exh. "N" at pg. 45) The Plaintiffs were present

20   as the narcotics officers searched the house.

21        During the search phase, 3.6 grams of marijuana was located in a bedroom by Det. Witham.

22   A vial containing what Det. Witham believed resembled methamphetamine was also found. (*See* Det.

23   Witham's Service of Search Warrant Officer's Report dated January 16, 2002, attached hereto as Exh.

24   "O" at pg. 7)[6] David's and Donald's bedrooms yielded five (5) firearms – one of which proved to be

25   stolen and another that had its serial number defaced.  (*See* id.; *see also* Exh. "A" at pg. 107)

26   According to Donald, none of the handguns were registered. (*See* Exh. "L" at pg. 69) Inside a safe

27

28
_____

   [6]  Authenticated by Det. Witham (*See* Exh. "A" at pgs. 104-05)

M&A:05166-104 288385.1 1215041102

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

1  in David's bedroom, Det. Witham found a "torn $20 bill" as predicted by the CI. (*See* Exh. "A" at

2  pg. 107) Finally, when searched at the jail, LVMPD officers contacted Det. Witham because Reyes

3  was found "to be in possession of (3) clear plastic baggies containing 2.1 grams of ODV positive

4  METHAMPHETAMINE in his socks. . ." (*See* Exh. "O" at pg. 7; *see also* Exh. "A" at pgs. 104-05)

5       A records check revealed that David had "an outstanding warrant" for carrying a concealed

6  weapon. Furthermore, Donald volunteered that he was a convicted felon who "was convicted and

7  did prison time for robbery." (*See* Exh. "O" at pg. 7) Because LVMPD was unable to verify this fact,

8  Donald was not arrested at that time as an ex-felon in possession of a firearm. David, Donald, and

9  Reyes were all arrested and booked into the Clark County Detention Center for: (1) possession of

10  stolen property – stolen firearm; (2) possession of firearm with altered/defaced serial number; and

11  (3) possession of controlled substance – marijuana. (*See* Exh. "O" at pg. 8; *see* also Exh. "N" at pg.

12  76) All Plaintiffs were bailed out within hours. For unknown reasons, the district attorney never

13  pursued criminal charges against any of the Plaintiffs. (*See* Exh. "L" at pgs. 105-110; Exh. "M" at

14  pgs. 79–80; and "N" at 73-74)

15      **E.**    **DAMAGE TO THE RESIDENCE**

16       According to Ofc. Hixson, the condition (i.e., messy and cluttered) of the house and the

17  thorough nature of the search led to some "extensive damage to the ceiling and some of the doors of

18  the residence." (*See* Exh. "K" at pg. 2) According to Donald, the house incurred $2,800 in damage.

19  (*See* Exh. "L" at pg. 96) Specifically, Donald testified that his residence incurred the following

20  damage: (1) a hole in his garage door; (2) front gate pulled from its anchor bolt; (3) screen door was

21  "shot up" from the SWAT team entry; (4) the front panel of the front door was missing due to the

22  SWAT ramming of the door; (5) hole in the hallway ceiling (where the officers handed the rifles

23  down); (6) small indent in the wall of the living room; (7) David's closet door "was beaten up pretty

24  good;" (8) scratches on the living room table that Donald polished out; (9) "foot size" hole next to

25  the attic access where an officer accidently stepped through; and (10) hall closet door kicked in. (*See*

26  Exh. "L" at pgs. 85-89) The SWAT team took photographs of all the damage, the firearms, and the

27

28

1    suspects. (*See* Exh. "E" at pgs. 10 and 11; see also photographs attached hereto as Exh. "P"[7])

2    **III.    LEGAL ARGUMENT**

3         As a result of the above facts, the Plaintiffs are now suing the LVMPD for damages.  The

4    Plaintiffs are making federal claims pursuant to 42 USC § 1983, and state law constitutional and tort

5    claims.  The following legal argument first addresses the Plaintiffs' federal claims, then addresses

6    and the state law claims.  As set forth in the legal argument section, the Defendants are entitled to

7    summary judgment on all claims.

8         **A.     SUMMARY JUDGMENT STANDARD**

9         Fed. R. Civ. P. 56 allows this Court to enter summary judgment when there is no genuine

10   issue of material fact to be resolved, and the moving party is entitled to judgment as a matter of law.

11   Under a standard set by a trilogy of 1986 cases, the U.S. Supreme Court found that there is no longer

12   an issue for trial (i.e., genuine issue of material fact) if there is insufficient evidence to sustain a

13   judgment for the non-moving party. See Matsushita Elec. Indus. Co. v. Venus Radio Corp., 475 U.S.

14   574 (pa. 1986); Celotex Corp. v. Catrett, 484 U.S. 1066 (1986); and Anderson v. Liberty Lobby, Inc.,

15   477 U.S. 242 (1986).

16        The party moving for summary judgment has the initial burden of showing the absence of a

17   genuine issue of material fact.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970).

18   Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the

19   movant to a directed verdict at trial, the burden shifts to the respondent to set forth specific facts

20   demonstrating that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

21   250, 106 S. Ct. 2505, 2511 (1986).  The Court in Anderson also held that if the evidence presented

22   in the opposing affidavits is of insufficient caliber or quantity then no genuine issue of material fact

23   is raised.  Id. at 254.

24        Further, if the factual context makes the respondent's claim implausible, then the party must

25   come forward with more persuasive evidence than would otherwise be necessary to show there is a

26   genuine issue for trial.  Celotex Corp. V. Catrett, 477 U.S. 317, 323, 324, 106 S.Ct. 2548, 2552-53

27

28

---

[7]Authenticity of the photographs verified by Willie Graham in his deposition. (*See* Exh. "E" at pgs. 10-11)

M&A:05166-104 288385.1 1215041102

---

*Left margin (vertical):*

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

1  (1986). Parties seeking to defeat summary judgment cannot stand on their pleadings once the movant

2  has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate

3  personal knowledge are insufficient. British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir.

4  1978).

5      Finally, the opposing party's burden is not excused by the fact that evidence to oppose the

6  motion is in the possession of the moving part as long as there has been a full opportunity to conduct

7  discovery. Anderson, 477 U.S. at 249. It is insufficient to meet the non-moving party's burden,

8  where they have the burden of proof at trial, to show a mere metaphysical doubt as to the material

9  facts. Matsushita Elect. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). There must be

10  evidence on which the jury could reasonably find for the party opposing judgment. Anderson, 106

11  U.S. at 247.

**B.      ALL PLAINTIFFS' 42 USC § 1983 CLAIMS FAIL**

13      The Plaintiffs are only suing LVMPD and Clark County – both municipalities. The Plaintiffs

14  are not suing any individual officers. Therefore, federal municipal liability standards apply. 42 USC

15  § 1983 is not itself a source of substantive rights, but merely a procedural vehicle by which to

16  vindicate federal rights elsewhere conferred. See Albright v. Oliver, 510 U.S. 266, 271 (1994).

17  Originally, municipalities could not be sued under § 1983. However, in the landmark case of Monell

18  v. Dep't of Social Services, 436 U.S. 658 (1978), the Supreme Court authorized suits against

19  municipalities in limited circumstances.

20      In Monell, the Court held that when a municipal policy of some nature is the cause of the

21  unconstitutional actions taken by municipal employees, the municipality itself will be liable. Liability

22  only exists where the unconstitutional action "implements or executes a policy statement, ordinance,

23  regulation, or decision officially adopted and promulgated" by municipal officers, or where the

24  constitutional deprivation is visited pursuant to governmental "custom" even though such a "custom"

25  has not received formal approval. Monell, 436 U.S. at 690-91. The Court defined "custom" as

26  "persistent and widespread discriminatory practices by state officials." Id. at 691, *citing* Adickes v.

27  S.H. Dress & Co., 398 U.S. 144, 167-68 (1970).

28

M&A:05166-104 288385.1 1215041102

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711   FAX: 382-5816

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711   FAX: 382-5816

1    The Court held in <u>Monell</u> that there is no *respondeat superior* liability against municipalities

2    under § 1983. Thus, to impose liability against a municipality, the plaintiff must prove the existence

3    of a "policy" or "custom" of the municipality which caused the constitutional violation at issue. In

4    <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808 (1985), the Court held that a single incident was not

5    sufficient to establish liability against a municipal defendant. Furthermore, in addition to proof of

6    a policy or custom, the courts require proof of both causation and culpability to establish municipal

7    liability. Therefore, in order to establish municipal liability under § 1983 against LVMPD (or officers

8    in their official capacities), the Plaintiffs in this case must show:  (1) a violation of the Plaintiffs'

9    constitutional rights occurred; (2) the action of the Defendants was under color of law;(3) the action

10   was taken pursuant to a plan, policy or custom of the entity; and (4) the policy or custom was the

11   actual cause or moving force behind the alleged deprivation. <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159,

12   165 (1985); <u>West v. Atkins</u>, 487 U.S. 42 (1988); <u>City of Canton v. Harris</u>, 489 U.S. 378 (1989);

13   <u>Davis v. City of Ellenberg</u>, 869 F.2d 1230 (9th Cir. 1989).

14   Plaintiffs claim that the LVMPD violated several of their "rights, privileges, and immunities

15   secured by the Constitution and laws of the United States." (*See* Compl. ¶ 22) Specifically, the

16   Plaintiffs claim that the LVMPD violated their Second, Fourth, Fifth, Sixth, and Fourteenth

17   Amendment rights. (*See* <u>id.</u> at ¶ 23) During discovery the Plaintiffs failed to generate any evidence

18   supporting these federal claims. All of the Plaintiffs' claims are related to the single event at 1919

19   Hallwood. The Plaintiffs never plead (or imply) in their Complaint that the alleged unconstitutional

20   acts resulted from LVMPD policies, practices, or customs. Furthermore, during discovery the

21   Plaintiffs produced no evidence of other instances in which similar alleged constitutional violations

22   occurred. Thus, the Plaintiffs failed to both plead or prove a <u>Monell</u> violation and all federal claims

23   must be dismissed on this basis alone. In short, regardless of the particular facts of this case and

24   whether a constitutional violation occurred, summary judgment is mandated on all Plaintiffs' federal

25   claims as this is a single allegation of unconstitutional activity.

26   Finally, despite the pleading and evidence deficiencies with respect to the <u>Monell</u> claim, the

27   Plaintiffs produced no evidence of any individual constitutional violations. With respect to Plaintiffs'

28   Fourth and Fifth Amendment claims that the warrant was unconstitutionally obtained and executed,

M&A:05166-104 288385.1 1215041102

1    the evidence shows that the warrant was legally obtained and executed.  (*See* Section II(C)(2) *supra)*

2         Plaintiffs' Sixth Amendment claim fails as a matter of law.  The right to counsel attaches only

3    upon the initiation of adversarial judicial criminal proceedings, which include the "formal charge,

4    preliminary hearing, indictment, information, or arraignment" and other certain critical pretrial

5    proceedings at which the accused is confronted, just as at a trial.  Because criminal judicial

6    proceedings were never initiated, the Plaintiffs' Sixth Amendment right to counsel never attached.

7    See Rogala v. District of Columbia, 161 F.3d 44, 333 U.S. App. D.C. 143 (D.C. 1999).  Finally, there

8    is no evidence that the Defendants "have purposefully and deliberately secreted and/or destroyed all

9    records."  (*See* Compl. ¶ 28) The Defendants produced every file and known document during

10   discovery.

11        Finally, Plaintiffs' Second Amendment claim that their right to bear arms has been violated

12   is also untenable.  The Ninth Circuit has "squarely held that the Second Amendment guarantees a

13   *collective* right for the states to maintain an armed militia and offers no protection for the individual's

14   right to bear arms."  See Nordyke v. King, 319 F.3d 1185 (9th Cir. 2003).  Thus, this claim is also

15   untenable.

16   **C.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL
         PLAINTIFFS' STATE LAW CLAIMS**

17

18        The Plaintiffs, pleading pendant jurisdiction, also allege state law claims against LVMPD.

     The Plaintiffs' alleged actions against the Defendants include: (1) violation of their state
19
     constitutional right to be free from unreasonable search and seizure and bear arms (*see* ¶¶ 28 through
20
     30); (2) false imprisonment (*see* ¶¶ 31 through 35); (3) battery (*see* ¶¶ 36 through 40); (4) trespass
21
     (*see* ¶¶ 41 through 46); and (5) conversion (*see* ¶¶ 47 through 52). Summary judgment is appropriate
22
     on all claims. First, all the allegations against the Defendants involve discretionary acts. Nevada law
23
     provides civil immunity for government officials from liability for such acts.  Second, even if the
24
     Defendants are not immune, the evidence shows that the obtaining of the search warrant and its
25
     execution were reasonable and legal.
26

27

28

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

**MARQUIS & AURBACH**
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

## 1.      Defendants are Immune Pursuant to NRS 41.032

Essentially every state provides some form of tort immunity for governmental officers engaged in discretionary acts (as opposed to ministerial acts). Generally, these state statutes fall into two categories: (1) those that provide absolute immunity; and (2) those that provide a form of qualified immunity.[8] Nevada follows the majority and provides its governmental officials with absolute immunity for their discretionary acts.

Pursuant to NRS 41.032, officers are immune from suits resulting from their discretionary acts "*whether or not the discretion is abused.*" Id. (emphasis added)  The statute contains no words which qualify or modify this immunity.  Furthermore, Nevada case law states that this immunity is absolute.  In Ortega v. Reyna, 114 Nev. 55, 953 P.2d 18 (1998), the Supreme Court of Nevada specifically held that Nevada provides immunity "under NRS 41.032 for officials exercising discretion." Id.  In Scott v. Dep't of Commerce, 104 Nev. 580, 763 P.2d 341 (1988), the Supreme Court of Nevada stated that "[u]nder NRS 41.032(2), the state of Nevada has retained *its common law sovereign immunity* in all matters" involving discretionary functions.  Id. at 583 (emphasis added).  Common law "sovereign immunity" is absolute.  According to *Black's Law Dictionary*, the doctrine of sovereign immunity "precludes a litigant from asserting an otherwise meritorious cause of action against a sovereign or a party with sovereign attributes." See *Black's Law Dictionary* 1252 (4TH Ed. 1979).  Finally, every Nevada case interpreting NRS 41.032 indicates the immunity is absolute.  None of the cases modify the immunity in any manner or include any caveats for "good faith" or "reasonableness."  See, e.g., LaFever v. City of Sparks, 88 Nev. 282, 496 P.2d 750 (1972) (assignment of a traffic officer to an intersection was a discretionary function to which "sovereign immunity" was applicable under NRS 41.032); County of Esmeralda v. Grogan, 94 Nev. 723, 587 P.2d 34 (1978) (revocation of liquor license by county liquor board a discretionary act and, under NRS 41.032, county immune from all damages); Bruttomesso v. LVMPD, 95 Nev. 151, 591 P.2d 254

---

[8]States providing qualified immunity immunize governmental officers from lawsuits resulting from discretionary acts as long as the officer acted "reasonably" or in "good faith." See AZ ST §26-314 (immune from suit for discretionary functions unless officer acted with "wilful misconduct," gross negligence," or "bad faith"); ND ST 32-12.1-03 (officers immune from suit for discretionary acts unless officer acted with "gross negligence"); Ross v. Consumers Power Co., 363 N.W.2d 641 (Mich. 1984) (officers immune from civil liability for discretionary acts when acting in "good faith.")

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711 FAX: 382-5816

1   (1979) (decision by LVMPD not to provide security for film festival at the county library a

2   discretionary act and non-actionable under NRS 41.032; County of Washoe v. Second Judicial Court,

3   98 Nev. 456, 652 P.2d 1175 (1982) (Plaintiff's allegations that district attorney provided him with

4   erroneous advice and misrepresentations required dismissal on the grounds of immunity pursuant to

5   NRS 41.032); Parker v. Mineral County, 102 Nev. 593, 729 P.2d 491 (1986) (failure of sheriff's

6   department to respond to a report was a discretionary function and county was immune from liability

7   under NRS 41.032).

8        In addition, other jurisdictions with identical and similar statutes agree that the immunity

9   afforded is absolute. See Sims v. Barnes, 689 N.E.2d 834 (Ind. 1998) (public officials have absolute

10  immunity when performing discretionary functions pursuant to Ind. Code 34-4-16.5-3(6)); Soto v.

11  State, 56 Cal. App. 4th 196, 65 Cal. Rptr. 2d 11 (1997) (California Code § 8665 reading "[t]he state

12  or its political subdivisions shall not be liable for any claims based upon the exercise or performance,

13  or the failure to exercise or perform, a discretionary function or duty on the part of a state or local

14  agency or any employee of the state or its political subdivisions in carrying out the provisions of [the

15  California Emergency Act]" provides absolute immunity from suit); Brock v. Anderson Road

16  Association, 677 N.E.2d 985 (Ill. 1997) (Illinois governmental immunity statute reading "a public

17  employee serving in a position involving the determination of policy or the exercise of discretion is

18  not liable for an injury resulting from his act or omission . . . when acting in the exercise of such

19  discretion even though abused" provided government officials with absolute immunity); Selby v.

20  Cumberland County, 796 A.2d 678 (Me. 2002) (Maine Tort Claims Act reading "[p]erforming or

21  failing to perform any discretionary function or duty, whether or not the discretion is abused"

22  provides government officials with absolute immunity for discretionary acts).

23        The Ninth Circuit in Carey v. Nevada Gaming Control Board, 279 F.3d 873 (9th Cir. 2002),

24  affirmed a finding of immunity for false imprisonment and battery causes of action. The plaintiff

25  alleged that the agent arrested him without probable cause and a battery occurred when the agent

26  handcuffed him and detained him against his will. Id. at 878. The Ninth Circuit affirmed the

27  decision of this district court dismissing the state law claims based on NRS 41.032 because the arrest

28  "was not a prescribed act; rather it was an act resulting from the exercise of his own discretion." Id.

1  Interestingly, the Ninth Circuit (based on the same acts) found the arrest violative of the Fourth

2  Amendment and also found that there was no qualified immunity for the arrest. Id. at 881-82.

3  Based on the above, NRS 41.032 provides absolute immunity to governmental officials when

4  performing discretionary acts. Here, Det. Witham obviously used his discretion in preparing his

5  Affidavit and in obtaining the warrant. Furthermore, the officers who executed the warrant used their

6  discretion in how to carry out the warrant and how to most effectively serve the warrant. Thus,

7  because all Plaintiffs' allegations are based upon Defendants' discretionary acts, Defendants are

8  immune and the state law claims must be dismissed. However, even if the Defendants are not

9  immune, the Plaintiffs have not generated any evidence that allows them to survive summary

10  judgment.

11  **2.    LVMPD Acted Legally in Obtaining and Serving the Warrant**

12  Article 1 § 18 of the Nevada Constitution guarantees to citizens the right against unreasonable

13  searches and seizures. The Plaintiffs claim that the Defendants "made false representations to obtain

14  the search warrant that was issued on January 6, 2002, therefore, the search warrant was not based

15  on probable cause and was not lawfully obtained." Furthermore, the Complaint alleges that the

16  search warrant "was not executed until January 16, 2002; therefore, any information upon which the

17  warrant was obtained was stale even if it had been accurate." (See Compl. ¶ 28 § A) Based upon

18  these allegations, the Plaintiffs allege that "[a]ccordingly, there was not probable cause to conduct

19  the search that was conducted, and the search and seizure conduct pursuant to the stale search warrant

20  was an unlawful and unreasonable search." (See id.) Finally, the Plaintiffs claim that "the methods

21  utilized in conducting the search exceeded the scope of the warrant and all bounds of reasonable

22  police conduct, rendering the search unlawful." (See id.)

23  Although this is a state law claim, the analysis used by Nevada state courts is identical to that

24  used in federal courts for claims brought under the Fourth Amendment to the United States

25  Constitution. See United States v. Millan, 36 F.3d 886 (9th Cir. 1994); Elvik v. State, 114 Nev. 883,

26  965 P.2d 281 (1998); see also case notes following NRS 199.130 entitled "False affidavit or

27  complaint to effect arrest or search." Where the issuance of a search warrant pursuant to Nev. Art.

28  1, § 18 and NRS 179.045 is based upon information obtained from a CI, the proper standard for

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

M&A:05166-104 288385.1 1215041102

1  determining probable cause is whether, under a totality of the circumstances, there is probable cause

2  to believe that contraband or evidence is located in a particular place. See Keese v. State, 110 Nev.

3  997, 879 P.2d 63 (1994). According to Nevada law, probable cause exists if "slight evidence" exists

4  of a crime. Clark County v. Badillo, 95 Nev. 593, 594-95, 600 P.2d 221 (1979).

### a.   The Warrant was Not Stale

6       One of the Plaintiffs' allegations is that the search violated the state constitution because the

7  warrant was stale. The Plaintiffs claim the warrant was obtained on January 6, 2002 and executed

8  on January 16, 2002. Under Nevada law, a warrant "may be executed and returned only within 10

9  days after its date." See NRS 179.075. According to NRS 179.105,

> However, no search warrant shall be quashed by any magistrate or judge within this
> state nor shall any evidence based upon a search warrant be suppressed in any
> criminal action or proceeding because of mere technical irregularities which do not
> affect the substantial rights of the accused.

Here, the date line on the application and affidavit for search warrant, and the date line of the

search warrant itself are dated January 6, 2001. However, the body of the application and affidavit

for search warrant and police report concerning this investigation and application for the search

warrant make it clear that this was a typographical error. The body of the application and affidavit

clearly reflect that Det. Witham spoke with the CI on January 4, 2002, and that the controlled buy was

surveilled on January 4, 2002. (See Exhs. "A," "B," "C" and "D") Additionally, Det. Witham's

arrest report for this incident reflects the search warrant was obtained on January 6, 2002, and

executed on January 16, 2002. It seems clear that this is the type of typographical error commonly

made at the first of every new year and does not support a finding that the affidavit contains false

statements. As such, the fact that the warrant was misdated does make the warrant stale or prove a

false statement.

### b.   The Warrant Does Not Contain False Statements

The Plaintiffs also claim that Det. Witham made "false statements to obtain the search

warrant." In determining whether a warrant is constitutional, the Nevada Supreme Court has

followed the standards set by the United States Supreme Court in Franks v. Delaware, 438 U.S. 154

(1978). See Doyle v. State, 116 Nev. 148, 995 P.2d 465 (2000). In Franks, the Supreme Court

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711 FAX: 382-5816

M&A:05166-104 288385.1 1215041102

1  addressed at length whether a false statement by a government affiant invalidates a search warrant.

2  In Franks, the Court held that a criminal defendant could challenge a facially valid affidavit by

3  making a substantial preliminary showing that "(1) the affidavit contains intentionally or recklessly

4  false statements, and (2) the affidavit purged of its falsities would not be sufficient to support a

5  finding of probable cause."  See also Branch v. Tunnell, 937 F.2d 1382, 1387 (9th Cir. 1991).

6  According to Branch, a plaintiff alleging a civil judicial deception claim has a heightened pleading

7  standard to establish that a defendant knowingly or recklessly misled a magistrate. See id. at 1387.

8  Pursuant to Franks, "[t]here must be allegations of deliberate falsehood or reckless disregard for the

9  truth, and these allegations must be accompanied by an offer of proof." Franks, 438 U.S. at 171.

10      In the Branch case the 9th Circuit further noted that even if the plaintiff met this heightened

11  pleading standard in a complaint, the plaintiff must satisfy a still higher standard to survive summary

12  judgment. The plaintiff "alleging judicial deception 'must make a substantial showing of deliberate

13  falsehood or reckless disregard for truth' and establish that, but for the dishonesty, the challenged

14  action would not have occurred." See Branch, 937 F.2d at 1388 (quoting Snell v. Tunnell, 920 F.2d

15  673, 698 (10th Cir. 1990), cert. denied, 499 U.S. 976 (1991)); see also Hervey v. Estes, 65 F.3d 784

16  (9th Cir. 1995). In Hervey, the court held that a plaintiff can only survive summary judgment if he

17  establishes a "deliberate falsehood or reckless disregard and establish[es] that, without the dishonestly

18  included or omitted information, the magistrate would not have issued the warrant." See id. at 789.

19      In his responses to interrogatories, Donald was asked to identify each false statement in the

20  warrant. He answered "According to the police documents that have been produced, the police got

21  a search warrant on statements made by a detective to a judge that my son, David, sold

22  methamphetamine, at my house, to a confidential informant." (See Donald Hinton's Answers to

23  Interrogatories, attached hereto as Exh. "Q" at pgs. 7-8) In support of this statement, Donald simply

24  claims that "[m]y son has told me that he did not sell methamphetamine, on January 4, 2002, or any

25  other day, at my house or anywhere else to a confidential informant or anyone else." (See id.) David,

26  in his answers to interrogatories, echoes his father by claiming that the statements in the warrant were

27  false because "I did not sell methamphetamine, on January 4, 2002, or any other day, at my house or

28  anywhere else, to a confidential informant or anyone else." (See David Hinton's Answers to

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

M&A.05166-104 288385.1 1215041102

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711   FAX: 382-5816

1   Interrogatories, attached hereto as Exh. "R" at pg. 6) The Plaintiffs claim David was at work during

2   the alleged controlled buy. Thus, the alleged "false statements" complained of by the Plaintiffs are

3   Det. Witham's representation that methamphetamine was purchased from the residence on January

4   4, 2002.

5          Simply put, the Plaintiffs have not generated any evidence of any "deliberate falsehood or

6   reckless disregard" for the truth. The Plaintiffs simply claim that because they will testify that David

7   did not sell methamphetamine, the affidavit was false and misleading. The affidavit of Det. Witham

8   which supports the search warrant at issue here relies on information conveyed from a confidential

9   informant who implicated David in the sale of methamphetamine from the 1919 Hallwood address.

10   The CI told Det. Witham he had been buying methamphetamine from David for more than one year

11   and that he could go to the address on Hallwood and buy methamphetamine. The affidavit and Det.

12   Witham's deposition testimony indicate that on January 4, 2002, three officers surveilled the CI while

13   he made a controlled buy of methamphetamine from the 1919 Hallwood address. Other information,

14   including the officers' training and experience, was related to the magistrate to support probable

15   cause for the items for which the search warrant was requested.

16          There is no suggestion that the magistrate who signed the warrant abandoned his detached and

17   neutral role, or that the affidavit was so lacking in probable cause to render the official belief in its

18   existence entirely unreasonable, or that the warrant was so facially deficient in failing to particularize

19   the place to be searched or things to be seized that the executing officers could not reasonably

20   presume it to be valid. The record indicates that the Plaintiffs are arguing that the warrant did not

21   support the officers' conduct here because the issuing magistrate was misled by information in the

22   affidavit which was knowingly or recklessly false. To successfully attack a warrant on this ground,

23   the plaintiffs must, at a minimum, demonstrate by a preponderance of the evidence that the affidavit

24   used to procure the warrant contains intentionally or recklessly false statements. Plaintiffs' lone

25   argument that David was at work on January 4, 2002 does not meet this standard.

26          Det. Witham testified that the CI performed the controlled buy inside the residence and that

27   it was too dark to identify any of the participants. (*See* Exh. "A" at pgs. 95-97) Det. Witham further

28   testified that he never investigated the CI's claim that David sold the drugs because he [Det. Witham]

1  never intended to arrest on the controlled buy. Finally, he testified that regardless of who provided

2  the drugs, he still would have obtained the warrant because the CI emerged from the residence with

3  methamphetamine. (*See* id. at pgs. 138-42)

4        Lastly, it is important to remind the Court that the Defendants are immune from this claim.

5  There is simply no evidence that Det. Witham's affidavit or the warrant contain any false statements

6  – let alone intentional or recklessly false statements. Det. Witham used his discretion to believe the

7  CI and to seek the warrant. Whenever an officer uses his discretion, NRS 41.032 immunizes the

8  officer/department from liability even when the officer abuses his discretion. See NRS 41.032. The

9  Plaintiff simply has no evidence that Det. Witham lied or fabricated any portion of his Application

10  or Affidavit.

11                  **c.**      **The Search was Lawful**

12        The Plaintiffs next allege that the Defendants "destroyed and/or badly damaged substantial

13  portions of the home owned by Donald Hinton, and destroyed and/or badly damaged substantial

14  amounts of personal property all owned by Donald and David Hinton and John Reyes . . . without

15  legal justification." (*See* Compl. ¶28 § C)

16                  ***(1)***     ***Damage to the Structure of 1919 Hallwood***

17        Donald testified that his residence sustained the following damage: (1) a hole in his garage

18  door; (2) front gate pulled from its anchor bolt; (3) screen door "shot up" from the SWAT team entry;

19  (4) front panel of the front door missing due to the SWAT ramming of the door; (5) hole in the

20  hallway ceiling (where the officers handed the rifles down); (6) small indent in the wall of the living

21  room; (7) David's closet door "beaten up pretty good;" (8) scratches on the living room table that

22  Donald polished out; (9) "foot size" hole next to the attic access where an officer accidently stepped

23  through; and (10) hall closet door kicked in. (*See* Exh. "L" at pgs. 85-89) The SWAT team took

24  photographs of all the damage as well as the three Plaintiffs and girlfriend who were escorted from

25  the house. (*See* photographs attached hereto as Exh. "P"[9])

26

27

28

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

---

[9]Authenticity of the photographs verified by Willie Graham in his deposition. (*See* Exh. "E" at pgs. 10-11)

M&A:05166-104 288385.1 1215041102

1

### (a)   *Damage Committed During Entry*

2     First, the damage to the front gate, door, and screen was legally justified. As set forth in NRS

3   179.055 (3), "all reasonable and necessary force may be used to effect an entry into any building or

4   property or part thereof to execute a search warrant." Nevada courts hold that forcible unannounced

5   entries into residences are justified.  In <u>King v. State</u>, 116 Nev. 349, 998 P.2d 1172 (2000), the

6   Nevada Supreme Court cited with approval <u>United States v. Fox</u>, 790 F. Supp. 1487 (D. Nev. 1992).

7   In <u>Fox</u>, the federal court held when the police have a reasonable basis for believing that compliance

8   with "knock and announce" provisions of NRS 179.055 may place them in danger, noncompliance

9   with the statute is justified. <u>See</u> United States v. Fox, 790 F. Supp. 1487 (D. Nev. 1992), citing, <u>King</u>

10  <u>v. State</u>, 116 Nev. 349, 358, 998 P.2d 1172 (2000). <u>See also</u> <u>United States v. Banks</u>, 124 S. Ct. 521

11  (2003) (interval of 15 to 20 seconds from officers' knock and announcement of search warrant until

12  forced entry was reasonable, given exigency of possible destruction of evidence).

13     Here, the SWAT team knocked and announced their presence by yelling "Police – Search

14  Warrant."  The SWAT team then waited a minimum of 15 seconds and a maximum of 45 seconds

15  before shock-locking the gate and ramming the door. (*See* Exh. "F" at pgs. 137, 150-154) The SWAT

16  officers entering the residence knew that David had an arrest history of concealed weapons and that

17  the CI had told Witham firearms were sold from the residence.  In addition, the SWAT team knew

18  the search warrant sought methamphetamine – a substance easy to hide or to quickly dispose of. (*See*

19  Exh. "K")  Therefore, a delayed entry threatened not only their personal safety, but recovery of the

20  search items as well.  According to Sgt. Graham, he operated under the assumption that the team

21  would not be given consensual entrance into the residence.  He testified that "You plan for the worst

22  and hope for the best." (*See* Exh. "E" at pgs. 71-77) Again, it is important to recall that the decision

23  of how to enter the home is a discretionary act.  Therefore, even if the SWAT officers abused their

24  discretion, Nevada law immunizes them. <u>See</u> NRS 41.032. Therefore, any damage committed during

25  the entry phase is non-actionable.  Both NRS 179.055 and NRS 41.032 protect the Defendants from

26  liability.

27

28

M&A:05166-104 288385.1 1215041102

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

### *(b)    Damage Committed During the Search*

According to Donald, the Defendants violated his state constitutional rights by damaging personal property inside his house. Specifically, he complains of two holes in the ceiling and damage to two closet doors. (*See* Exh. "L" at pgs. 85-89) The damage is depicted in the photographs taken at the scene by the SWAT team. The first "foot sized" hole in the ceiling resulted from a SWAT officer stepping through the ceiling. The second hole in the ceiling resulted from Ofc. Hixson intentionally kicking the ceiling in so that the dangerous firearms could be handed down for safety reasons. The damage to the closets occurred due to the fact that the closet doors were locked.

The Plaintiffs argue that the Defendants unreasonably damaged their home in violation of the state constitution. In dealing with similar Fourth Amendment claims, the United States Supreme Court has stated that a warrant that is reasonably executed will withstand constitutional scrutiny. See Dalia v. United States, 441 U.S. 238, 257 (1979). So long as an officer's conduct remains within the boundaries of reasonableness, an officer has discretion over the details of how best to proceed with a search warrant's execution. See id. at 1693. Courts are well aware that such details may include damaging property, detaining residents, or taking actions to protect the searching officers. Id. at 258; Michigan v. Summers, 452 U.S. 692, 705 (1981). This reasonable determination is highly fact-dependent and can only be determined on a case-by-case basis. See Tarpley v. Greene, 684 F.2d 1, 9 (D.C. Cir. 1982).

First, with respect to the damage to the locked closet doors, the damage is clearly reasonable. The SWAT team had to examine the contents of the locked closets to ensure that no armed or dangerous individuals were hiding in these places or that no contraband was being hidden. See Lawmaster v. Ward, 125 F.3d 1341, 1349 fn. 3 (10th Cir. 1997).

Second, it is clear that the hole in the ceiling made by Ofc. Hixson was reasonable. Ofc. Hixson and his fellow SWAT team officers located about twenty (20) rifles in the attic while searching for individuals who may be hiding. Due to safety concerns, Ofc. Hixson used his discretion to kick a hole in the ceiling and hand the guns down rather than crawl through the attic on this belly in full uniform. Ofc. Hixson had no idea whether the weapons were loaded, properly functioning, or safe. Furthermore, he had no idea whether any individuals were hiding in the attic and had access to

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711   FAX: 382-5816

M&A:05166-104 288385.1 1215041102

1  the weapons.  As such, he used his discretion that it was in his best interests and the interests of the

2  other officers to hand the guns directly down.  (*See* Exh. "F" at pgs. 180-86, 203) In short, Ofc.

3  Hixson used his discretion to conclude that handing the weapons through a hole in the wall was the

4  most reasonable method of handling the weapons.  Because the decision required Ofc. Hixson to use

5  his discretion, the Defendants are immune from liability for his act.  See NRS 41.032

6                **3.      The Defendants Acted Legally in Seizing the Weapons/Property**

7          The Plaintiffs next claim that the Defendants "seized valuable items of personal property

8  belonging to Donald and David Hinton without due process of law and without legal justification for

9  doing so, and have kept and maintained possession of that property and have never returned that

10  property to Donald and David Hinton." (*See* Compl. at ¶ 28 § B) All the property seized during the

11  search is identified in Det. Witham's Officer's Report regarding service of the search warrant. (*See*

12  Det. Exh. "O" at pgs. 2-5[10]) The list includes:

13          (1)      3.6 grams of NIK Positive Marijuana

14          (2)      1 vial with white residue (methamphetamine)

15          (3)      $151 U.S. Currency

16          (4)      Paperwork and firearm blue cards

17          (5)      Torn $20 bill

18          (6)      Firearm ammunition

19          (7)      Crossbow

20          (8)      21 Firearms located in the attic

21          (9)      Bolt action rifle located in David Hinton's bedroom

22          (10)     Semi-auto rife located in David Hinton's bedroom

23          (11)     .38 Cal Revolver located in David Hinton's bedroom

24          (12)     Beretta Model 21, .22 Cal Pistol located in Donald Hinton's bedroom (records

25                   revealed this firearm was stolen)

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711   FAX: 382-5816

---

[10]Det. WItham authenticated this document during his deposition. (*See* Exh. "A" at pgs. 104-05)

M&A:05166-104 288385.1 1215041102

1  All of these items were impounded and placed in the LVMPD evidence vault.  The items currently

2  reside in the evidence vault, excepting the $151.00 which was deposited in LVMPD's General Fund

3  on January 23, 2002.  (*See* Defendants' Verified Answers to Interrogatories, attached hereto as

4  Exh."S")

5                 **a.**     **The Items Were Legally Seized**

6        The Plaintiffs claim that the Defendants exceeded the scope of the warrant by seizing the

7  above property. It is per se unreasonable to make a seizure without a warrant absent certain restrictive

8  exceptions. See United States v. Place, 462 U.S. 696 (1983). The United States Supreme Court has

9  held, in the context of a search being performed under a warrant, it is lawful to seize an item in plain

10  view that was clearly contraband, even though the discovery of that item was not inadvertent. Horton

11  v. California, 496 U.S. 128, 142 (1990). The Nevada Supreme Court also recognizes this "plain view

12  exception." See Luster v. State, 115 Nev. 431, 991 P.2d 466 (1995). In Luster, the court held that

13  seizure of property in plain view is "'presumptively reasonable, assuming that there is probable cause

14  to associate the property with criminal activity.'" See id. at 468, 681 P.2d at 50 (emphasis

15  omitted)(quoting Payton v. New York, 445 U.S. 573 (1980)).

16        In the instant case, there was probable cause to associate the evidence with criminal activity,

17  thus satisfying the "immediately apparent" requirement. With respect to the seized marijuana and

18  vial, there was probable cause to seize the items as they were clearly evidence of illegal activity. The

19  $151 and ripped $20 bill were seized pursuant to probable cause because the police had reasonable

20  information that the Plaintiffs were engaged in the selling of methamphetamine and the ripped $20

21  bill comported with information supplied by the CI regarding a failed ATM robbery.

22        Finally, probable cause existed to seize the firearms. The firearms located in the attic were

23  found when Ofc. Hixson saw that the insulation in the attic was disturbed. Believing that an

24  individual may be hiding under the insulation, Ofc. Hixson reasonably looked under the insulation

25  and located the weapons. Ofc. Hixson handed the weapons down to the ground floor for safety

26  reasons. After doing so, each of the Plaintiffs was questioned regarding ownership. All Plaintiffs

27  admit denying ownership or even knowledge of the weapons to the SWAT officers. (*See* Exh. "L"

28  at pg. 67; Exh. "M" at pg. 58; and Exh. "N" at pg. 74) Det. Witham testified that the weapons were

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711   FAX: 382-5816

M&A:05166-104 288385.1 1215041102

1  taken because:

2      Q:      Now why were all of these rifles seized?

3      A:      There was narcotics found in there, marijuana. I received, through talking to the elder
4              Hinton, that he was an ex-felon. I was not able to confirm that, but based on his
               information he had given to me and for follow-up investigation of ex-felon in
5              possession of firearm, they were taken. One of the firearms was stolen, one of the
               firearms had the serial number defaced. One of the suspects had [an outstanding]
6              warrant for carrying a concealed weapon, and we found a ripped up $20.00 bill from
               the robbery, which led to more evidence to the robbery that occurred that a firearm
7              was used in. And based on those circumstances, we took the firearms from the
               residence.

8  (*See* Exh. "A" at pgs. 106-07)

9  The lone fact that Donald admitted to being a convicted felon justified seizure of the weapons. See

10 NRS 202.360; see also State v. Wright, 104 Nev. 521, 763 P.2d 49 (1988) (arrest of defendants for

11 possession of firearms justified where defendants told officers they were ex-felons). Therefore, based

12 upon the fact that the firearms: (1) were located in plain view in the home of an ex-felon, (2) included

13 at least one weapon that was stolen (found in the bedroom of the ex-felon), and (3) included one

14 weapon with a defaced serial number, the general totality of the circumstances justified the seizing

15 the firearms. See also NRS 179.1164; 179.1165.

16              **b.      Return of the Property**

17      As set forth above, the Plaintiffs denied any knowledge or, more importantly, any ownership

18 interest in the firearms. Pursuant to NRS 179.105, the firearms remained in the possession of the

19 Defendants and each Plaintiff admits no attempt was every made to recover the property. (*See* Exh.

20 L" at pgs. 110-11 ; Exh. "M" at pgs. 80-81) According to NRS 179.085 a party must file a motion

21 for return of property seized during a search warrant. The Plaintiffs never did.

22      On October 21, 2002, the Defendants filed a Complaint for Forfeiture regarding the firearms

23 and ammunition. The Defendants supplied the District Attorney's office with identities of all three

24 Plaintiffs as potential claimants. The District Attorney served the complaint by publication on

25 November 6, 13, 20, 27 and December 4, 2002. On February 7, 2003, the Nevada District Court

26 entered a default judgment forfeiting the firearms. (*See* District Court's Judgment by Default and

27 related documents attached hereto as Exh. "T")

28

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

M&A:05166-104 288385.1 1215041102

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

### 4.   Right to Bear Arms

Plaintiffs creatively argue that their right to bear arms has been violated. Under NRS 202.360, it is a felony crime for a person previously convicted of a felony to possess a firearm. This statute has been ruled constitutional. See Hardison v. State, 84 Nev. 125, 437 P.2d 868 (1968). In addition, the Ninth Circuit has "squarely held that the Second Amendment guarantees a collective right for the states to maintain an armed militia and offers no protection for the individual's right to bear arms." See Nordyke v. King, 319 F.3d 1185 (9th Cir. 2003). Thus, this claim is untenable.

### 5.   False Imprisonment

According to Nevada law, an arrest made pursuant to probable cause is privileged and not actionable. Nelson v. City of Las Vegas, 99 Nev. 548, 552, 665 P.2d 1141 (1983); Hernandez v. City of Reno, 97 Nev. 429, 634 P.2d 668 (1981) (establishing a false arrest is the first step in a false imprisonment claim); Grover v. County of Clark, 97 Nev. 104, 625 P.2d 85 (1981). A false arrest is an integral part to a false imprisonment claim. Hernandez v. City of Reno, 97 Nev. 429, 433, 634 P.2d 638 (1981). According to Nevada law, probable cause exists even if based on "slight evidence." Clark County v. Badillo, 95 Nev. 593, 594-595, 600 P.2d 221 (1979) (The court held that the identification of one witness "is sufficient to establish probable cause to believe that [the arrestee] committed the offense" and that the "fact that his testimony is in direct conflict with that of another witness is of no import"). Finally, probable cause is determined by the information known by the officer at the time of the arrest.

Here it is undeniable that probable cause existed to arrest the Plaintiffs. Drugs and stolen firearms were all located at the residence. In addition, Donald admitted to being an ex-felon in a residence containing over 21 firearms. Furthermore, as set forth above, the Defendants are immune from this claim. In Ortega v. Reyna, 114 Nev. 55, 953 P.2d 18 (1998), the Nevada Supreme Court held that the decision of whether to arrest an individual is a discretionary act for which police officers enjoy absolute immunity -- even if the arresting officer abuses his discretion. In Ortega, the arrestee filed a complaint against a Nevada Highway Patrol trooper. The arrestee alleged both §1983 claims and "state law claims for false arrest, false imprisonment, intentional infliction of emotional distress, malicious prosecution, and negligent infliction of emotional distress." Id. at 56. The trooper filed

M&A:05166-104 288385.1 1215041102

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

1   a motion for summary judgment claiming immunity for the state law claims pursuant to NRS 41.032.

2   The court agreed.  The court held "[w]ith respect to appellant's state law claims, we conclude the

3   trooper is immune from suit here as well." The court found such, because the decision of whether to

4   arrest requires the officer to use "personal deliberation, decision, and judgment." Id. Travelers Hotel

5   v. City of Reno, 103 Nev. at 343, 345-46.  See also, Coty v. Washoe County, 108 Nev. 757, 762 fn.

6   7, 839 P.2d 97 (1992) (a decision to arrest is discretionary).  As a result, the Reyna court dismissed

7   all of the arrestee's state law claims.

8        Based on the above, it is clear that NRS 41.032 provides absolute immunity to governmental

9   officials when performing discretionary acts.  Thus, because the determination of probable cause and

10   the decision to arrest the Plaintiffs required discretion, immunity attaches and the Plaintiffs' claims

11   fail. See also Carey, 279 F. 3d 873.

12         **6.**    **Battery**

13        Plaintiffs allege that the Defendants battered them.  Against another private citizen, a plaintiff

14   need prove that he suffered an offensive touching that caused him damages in order to prevail on a

15   battery claim.  However, in a battery claim against a police officer, a plaintiff must prove the officer

16   used "unreasonable force" in effectuating the arrest. Yada v. Simpson, 112 Nev. 254, 913 P.2d 1261

17   (1996). This higher standard takes into account the special situation of a police defendant.  Police

18   officers are charged with acting affirmatively and using force as part of their duties because "their

19   right to make an arrest or investigatory stop necessarily carries with it the right to use some degree

20   of physical coercion or a threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 109 S. Ct.

21   1865 (1989).  Thus, police officers are not similarly situated to private citizens in claims of battery.

22        Plaintiffs' battery claims are based upon the they were handcuffed and transferred to jail. (See

23   Compl. ¶¶ 36-40)  In Maturi v. Las Vegas Metropolitan Police Dept., 110 Nev. 307, 309, 871 P.2d

24   932 (1994), the Nevada Supreme Court addressed a similar issue.  In that case, the police officers

25   detained the claimant for discharging a firearm in public.  According to claimant, he informed the

26   officers "he had suffered a serious back injury" and asked not to be handcuffed in the back. Id. at

27   308. Despite claimant's pleas, the officers handcuffed him behind his back and placed him in a police

28   vehicle for over one hour. Id. Claimant was eventually released from custody at the scene.  Claimant

1  filed suit alleging the handcuffing constituted excessive force and false imprisonment. Id. at 309.

2  The court ruled the officers were immune because the decision to handcuff "involved a very large

3  degree of discretion, based on such considerations as the prisoner's size, strength and, in the judgment

4  of the officer, the potential for violence or escape." Id. at 309-310; see also NRS 41.032.

5       Here, the decision to handcuff the Plaintiffs and detain them was legal and proper as it was

6  based upon probable cause. In addition, an officer is entitled to search and detain individuals present

7  when the warrant is served. See NRS 179.055(3). All of the Plaintiffs agree that they suffered no

8  injuries during the encounter. (See Exh. "L" at pg. 113; Exh. "M" at pg. 85; Exh. "N" at pg. 76)

9           **7.    Trespass**

10      Generally, one is subject to liability for trespass if he, without legal justification, invades the

11  property right of another. Lied v. County of Clark, 94 Nev. 275, 279, 579 P.2d 171, 173-74 (1978)

12  (citing Rivers v. Burbank, 13 Nev. 398 (1878)). The essence of a trespass claim is an "unauthorized

13  entry" onto the land of another. Miller v. National Broadcasting Co., 187 Cal. App. 3d 1463, 1480,

14  232 Cal. Rptr. 668, 677 (Cal. App. 2 Dist.,1986).

15      Here, the officers entered the property via a facially valid lawfully obtained search warrant.

16  As such, there can be no liability for trespass as the entry was both legal and authorized.

17          **8.    Conversion**

18      Plaintiffs' final claim is for conversion. Conversion is a distinct act of wrongful dominion

19  exerted over another person's personal property in denial of, or inconsistent with his title or rights

20  therein or in derogation, exclusion, or defiance of such title or rights. See Evans v. Dean Witter

21  Reynolds, Inc., 116 Nev. 598, 5 P.3d 1043 (2000). The property seized by the Defendants

22  immediately became subject to forfeiture. See NRS 179.1165. According to Nevada law, "[a]ll right,

23  title and interest in property subject to forfeiture vests in the [law enforcement agency]." See NRS

24  179.1169. Here, the Defendants properly filed a complaint for forfeiture. The Plaintiffs never

25  answered the complaint or filed a motion for return of the property as required by Nevada law. See

26  NRS 179.1171 and NRS 179.085. Therefore, Plaintiffs' claim for conversion fails.

27

28

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

M&A:05166-104 288385.1 1215041102

## IV.   CONCLUSION

Summary judgment is appropriate in favor of the Defendants on all of Plaintiffs' claims. First, Plaintiffs have failed to plead a cognizable Monell claim against the Defendants. All of the Plaintiffs' claims are specific to this occurrence. In addition, the Plaintiffs do not allege (or provide evidence) that Defendants acted pursuant to an unconstitutional policy, custom, or practice. With respect to the Plaintiffs' state law claims, summary judgment is appropriate because the Defendants are immune pursuant to NRS 41.032. Furthermore, the Plaintiffs generated no evidence that the warrant was not based on probable cause or that the search was performed unreasonably.

MARQUIS & AURBACH

By:
    Craig R. Anderson, Esq.
    Nevada State Bar No. 6882
    10001 Park Run Drive
    Las Vegas, Nevada  89145

M&A:05166-104 288385.1 1215041102

**CERTIFICATE OF MAILING**

I hereby certify that on December 15, 2004, I served a copy of the foregoing **Motion for Summary Judgment** upon each of the parties by depositing a copy of the same in a sealed envelope in the United States Mail, Las Vegas, Nevada, First-Class Postage fully prepaid, and addressed to:

> Bradley Booke, Esq.
> 9 Exchange Place, #700
> Salt Lake City, Utah 84111

and that there is a regular communication by mail between the place of mailing and the place(s) so addressed.

an employee of Marquis & Aurbach

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

M&A:05166-104 288385.1 1215041102

# REPORTER'S CERTIFICATE

STATE OF NEVADA   )
                  )  ss.
COUNTY OF CLARK   )

I, Lori M. Judd, CCR #233, RMR, a duly commissioned Notary Public, Clark County, State of Nevada, do hereby certify:

That I reported the taking of the deposition of SHANE WITHAM, on Tuesday, November 18, 2003, commencing at the hour of 1:00 p.m.

That prior to being examined, the witness was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth.

That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true and accurate transcription of my said shorthand notes taken down at said time.

I further certify that I am not a relative or employee of an attorney or counsel involved in said action, nor a person financially interested in said action.

**Lori M. Judd, CCR #233, RMR**

1          IN WITNESS WHEREOF, I have hereunto set

2  my hand and affixed my official seal in my office in

3  the County of Clark, State of Nevada, this 20th

4  day of _____December_____, 2003.

5

6

7

8

9

10

11

12

13

14                      LORI M. JUDD

15                      CCR #233, RMR

16

17

18                      LORI M. JUDD

19                      NOTARY PUBLIC
                       STATE OF NEVADA
                       APPT. No. 99-32530-1

20                      MY APPT. EXPIRES FEB. 02, 2007

21

22

23

24

25

**Lori M. Judd, CCR #233, RMR**

## DEPOSITION OF SHANE WITHAM

SHEET 1   PAGE 1

PAGE 1

```
1                 UNITED STATES DISTRICT COURT
2                      DISTRICT OF NEVADA
3
4    DONALD HINTON, DAVID HINTON )
     and JOHN REYES,             )
5                                )
          Plaintiffs,            )
6                                )
7    vs.                         ) CASE:  CV-S-03-0057
                                 )        PMP-PAL
8    CLARK COUNTY, NEVADA, a     )
     Political subdivision, acting)
9    By and through the LAS VEGAS)
     METROPOLITAN POLICE DEPARTMENT)
10   JOHN DOES 1-30 and ROE      )
     ENTITIES 1-10,              )
11                               )
          Defendants.            )
12
13
14
15
16            DEPOSITION OF SHANE WITHAM
17   Taken at the Law Offices of Bradley L. Booke, Esq.
          7251 West Lake Mead Blvd
18                Suite 530
19            Las Vegas, Nevada  89128
              Tuesday, November 18, 2003
20                    1:00 p.m.
21
22
23
24
25   REPORTED BY:  LORI M. JUDD, CCR #233, RPR, RMR
```

PAGE 2

WITHAM 2

```
1    APPEARANCES:
2    For the Plaintiffs:BRADLEY L. BOOKE, ESQ.
                        7251 W. Lake Mead Blvd.
3                       Suite 530
                        Las Vegas, Nevada  89128
4
5
     For the Defendants:CRAIG R. ANDERSON, ESQ.
6                       Marquis & Aurbach
                        10001 Park Run Drive
7                       Las Vegas, Nevada  89145
8
9                          INDEX
10
                        EXAMINATION
11   By Mr. Booke             3
     By Mr. Anderson        146
12
13   DEPOSITION EXHIBITS            IDENTIFIED
     Exhibit 5 - SWAT packet          116
14   Exhibit 7 - incident report      116
     Exhibit 13 - report               70
15   Exhibit 14 - document              8
     Exhibit 15 - document             10
16   Exhibit 16 - property report      22
     Exhibit 17 - document             28
17   Exhibit 18 - application for search warrant 111
18
19                 CERTIFIED QUESTIONS
20                       (NONE)
21
22              INFORMATION TO BE SUPPLIED
                        (NONE)
23
24
25
```

PAGE 3

WITHAM 3

```
1                      SHANE WITHAM,
2    called as a witness, and having been first duly sworn
3    to testify to the truth, the whole truth, and nothing
4    but the truth, was examined and testified as follows:
5
6                       EXAMINATION
7    BY MR. BOOKE:
8         Q.   Please state your name and spell your
9    name for the court reporter?
10        A.   Shane Witham, S-H-A-N-E, W-I-T-H-A-M.
11        Q.   What is your date of birth, sir?
12        A.   June 11, '68.
13        Q.   What is your social security number?
14        A.   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.
15        Q.   What is your present job?
16        A.   I'm a police officer with Metro.
17        Q.   What job do you have at Metro?
18        A.   Patrol.
19        Q.   How long have you been a patrol
20   officer?
21        A.   For the past year and a half.
22        Q.   What did you do before you became a
23   patrol officer?
24        A.   I was in narcotics.
25        Q.   How long were you in narcotics?
```

PAGE 4

WITHAM 4

```
1         A.   On and off, three and a half years.
2         Q.   What was the off part of that?
3         A.   I came back to patrol.
4         Q.   Were you continuously in the narcotics
5    division?
6         A.   I was in a federal task force for a
7    year and then I moved into the regular narcotics
8    section and then after about two and a half years I
9    started going through a divorce and I left there and
10   then after that was taken care of, I went back for
11   another year.
12        Q.   You started in narcotics work with the
13   Federal task force?
14        A.   Yes.
15        Q.   Did you work for the United States
16   government or for Metro?
17        A.   The FBI.  It was the FBI-Metro task
18   force.
19        Q.   And who was your employer?
20        A.   LVMPD, Metro.
21        Q.   And you did that about one year, did
22   you say?
23        A.   Yes.
24        Q.   And then you moved to the narcotics
25   detail?
```

DEPOSITION OF SHANE WITHAM

SHEET 2   PAGE 5

WITHAM   5

1   A.   Correct.
2   Q.   And how long did you do that before you
3   took a break?
4   A.   Approximately a year, a little over a
5   year.
6   Q.   And then how long were you out?
7   A.   About 18 months.
8   Q.   And did you not work at all during that
9   period of time?
10   A.   No, I was back in patrol at that time.
11   Q.   Okay, and then you went back to the
12   narc detail?
13   A.   Right.
14   Q.   And how long were you at it in that
15   second stint?
16   A.   Approximately a year.
17   Q.   And then you went to patrol?
18   A.   Then went back to patrol, yes.
19   Q.   After your -- well, I'll tell you what.
20   Let's see if we can assign some approximate years to
21   those various stints.
22   A.   Okay.
23   Q.   When did you begin with the FBI-Metro
24   task force?
25   A.   I think around October of '97,

PAGE 6

WITHAM   6

1   somewhere around there.
2   Q.   And then when did you move over to the
3   Metro narc detail?
4   A.   November of '98.
5   Q.   And then to patrol?
6   A.   January of 2000.
7   Q.   And then back to the narc detail?
8   A.   And back to the narc detail would be
9   about a year and a half after that one.
10   Q.   And about June of 2001?
11   A.   Yeah, I think.  I hope I got it right.
12   Q.   And then that would take you back to
13   patrol officer about January '03; is that about
14   right?
15   A.   I would have to really look at a
16   calendar to see, it's probably easier.  If I went
17   back from now, June '02 is when I came back to
18   patrol, and about August of -- actually, about June
19   of '01 I went back up to narcotics and I was out of
20   there from December or January of 2000.  So Metro
21   task force from '97 to '98 and then I went back to
22   patrol for 18 months, came back to narcotics in
23   January of 2000 -- I'm sorry.
24   Q.   I've got you.
25   A.   I went back to patrol in January of

PAGE 7

WITHAM   7

1   2000, stayed there until June of '01 and went back to
2   narcotics in June of 2001 and until June of 2002 was
3   in narcotics, and I went back to patrol in June of
4   '02.
5   Q.   And you have been continuously employed
6   in patrol from June 2002 to the present?
7   A.   Correct.
8   Q.   Why did you transfer out of the narc
9   detail to patrol in about January of 2000?
10   A.   In December of '99 I was involved in an
11   officer-involved shooting with my squad and I was
12   going through some marital problems and I left and
13   two weeks later I got in another one where I killed a
14   person.
15   MR. ANDERSON:  When you say "another one?"
16   THE WITNESS:  Another officer-involved shooting
17   and I was also going through a separation and
18   couldn't handle being in narcotics, which is 24
19   hours, seven days a week, and I needed to take care
20   of personal problems.
21   MR. BOOKE:
22   Q.   So the first officer-involved shooting
23   was December of '99, and the second one was January
24   of 2000?
25   A.   February.  February 5th there was

PAGE 8

WITHAM   8

1   another one that I was back-up to in between that.
2   Q.   A third, there was a third one in
3   between those two where you were a back-up?
4   A.   Yes.
5   Q.   Was your transfer from narcotics to
6   patrol a voluntary transfer?
7   A.   Yes.
8   Q.   And why did you transfer out of
9   narcotics in about June 2001?
10   A.   It was more personal problems in my
11   life and it stemmed from everything else.  I had
12   alcohol problems and just wanted to -- I had a leave
13   for a transfer to the northwest area command.
14   Q.   That was in June 2002, not June 2001;
15   is that correct?
16   A.   Correct.
17   Q.   Okay.
18   (Whereupon Deposition Exhibit
19   14 was marked for identification.)
20   MR. BOOKE:
21   Q.   Officer Witham, I want to show you
22   what's marked as Exhibit 14.
23   A.   Yes.
24   Q.   Which is a copy of page LVMPD 00001,
25   but the text that's on the page has been redacted out

Lori M. Judd, CCR #233, RMR

DEPOSITION OF SHANE WITHAM

WITHAM 9

1  of it, as you can see?
2      A.   Correct.
3      Q.   The reason that I redacted the text out
4  is that all I want to ask you about is the
5  information that appears at the top of the page;
6  okay?
7      A.   Okay.
8      Q.   This with the text redacted is the
9  front page of an officer's report that you prepared;
10 correct?
11     A.   Right.
12     Q.   Am I reading this report correctly to
13 reach the conclusion that -- well, let me just ask
14 the question a different way.  Does this report,
15 Exhibit 14, say that this report is about a
16 controlled buy that occurred on January 4, 2002 at
17 4:46 p.m.?
18     A.   Yes.
19     Q.   And does this report, Exhibit 14, say
20 that the controlled buy occurred at 1919 Hallwood
21 Drive in Las Vegas?
22     A.   Yes, it does.
23     Q.   The event number that appears in the
24 upper right-hand corner says 020104-2240, do you see
25 that?

WITHAM 10

1      A.   Correct.
2      Q.   When was that event number entered on
3  this report?
4      A.   It was entered on the report
5  January 5th, it looks like is the time that I
6  dictated the report.
7      Q.   At the bottom of Exhibit 14 where it
8  says date and time of report, where the time is
9  inserted 010502 1919 hours, does that represent the
10 time at which you dictated the report?
11     A.   Correct.
12     Q.   And in the lower right-hand corner
13 there is a P number blank where the number 4594 is
14 filled in.  Do you see that?
15     A.   Yes.
16     Q.   What is 4594?
17     A.   That's my personnel number.
18     Q.   Can you excuse me one second?
19         (Discussion off the record.)
20         (Recess taken.)
21         (Whereupon Deposition Exhibit
22         15 was marked for identification.)
23     MR. BOOKE:
24     Q.   Officer Witham, I'm showing you now
25 what's marked as Exhibit 15.  Take just a minute to

WITHAM 11

1  look at that, if you would, please.  Let me know when
2  you have had a chance to review that?
3      A.   Okay.
4      Q.   Are you okay?
5      A.   Yes.
6      Q.   Who conducted the field test that's
7  described on Exhibit 15?
8      A.   I did.
9      Q.   And who witnessed the field test that
10 is described on Exhibit 15?
11     A.   It looks like Joe Jones' signature.
12     Q.   Who is Joe Jones?
13     A.   Officer Detective Jones up in
14 narcotics.
15     Q.   Is Officer Jones still employed in
16 narcotics?
17     A.   Yes.
18     Q.   Where was the field test that is
19 described on Exhibit 15 conducted?
20     A.   That would be brought back to the
21 office and the initial one would be done on the
22 street to confirm our preliminary test and then
23 another one that would be witnessed and done at the
24 office for impounding would be done again with the
25 witness there and impounded at the office.

WITHAM 12

1      Q.   Where was the field test that is
2  described on Exhibit 15 conducted?
3      A.   Most likely the office, the office of
4  narcotics.
5      Q.   Where is that located?
6      A.   I don't know the specific address.
7  It's off of Sunrise over by the airport.
8      Q.   What are the closest cross streets?
9      A.   Sunrise and -- I'm trying to remember.
10 It's been -- Bermuda.  Yeah, Bermuda and Sunrise.
11     Q.   Is it Sunrise or Sunset, just out of
12 curiosity?
13     A.   You it may be -- Sunset.  It's in that
14 area.
15     Q.   Is there something on Exhibit 15 that
16 indicates where this test was conducted?
17     A.   No.
18     Q.   And how do you know that the test was
19 conducted at the Sunrise and Bermuda location?
20     A.   Well, in this particular case, I don't.
21 I believe I had Officer, or Detective Jones out with
22 me on the buy and it would more than likely have been
23 at the office.  I don't exactly recall, but I would
24 have suspected it would have been done at the office.
25 That's where a lot of our tests are done.

DEPOSITION OF SHANE WITHAM

WITHAM    13

1      Q.   And what office is it that's located at
2  the Sunrise and Bermuda, or Sunset and Bermuda?
3      A.   It's the LVMPD narcotics office, vice.
4      Q.   When it says on Exhibit 15 that Joe
5  Jones witnessed this field test, what does that mean?
6  What did he do?
7      A.   That he observed me do the narcotics
8  preliminary tests OTV test and checklist on the
9  suspected narcotics that we were testing.
10     Q.   Is there any field test report prepared
11 in this case other than Exhibit 15?
12     A.   No.
13     Q.   How much of an alleged controlled
14 substance is required to be used in order to make the
15 field test that is described on Exhibit 15 an
16 accurate test?
17     A.   Well, in the training for ODV it will
18 tell you that it just takes a spec trace amount.  You
19 are actually supposed to only put in a tiny amount of
20 the substance for the testing.
21     Q.   Well, in terms of the quantity required
22 for the test to be accurate, how much is required?
23     A.   I don't know specifically the amount.
24 There's a small scoop that comes with the test and
25 you just place that in the container holding the cold

WITHAM    14

1  substance and take out a very small amount, a spec
2  amount.  I don't know how else, there's not a
3  specific way.  It's a very small measurement to even
4  weigh.
5      Q.   Is there a measurement amount, a
6  measured amount that is supposed to go into the test?
7      A.   No.
8      Q.   In terms of volume, how much of the
9  alleged controlled substance is required in order to
10 make a test accurate?
11     A.   I would make a comparison of one or two
12 pieces of pepper out of a pepper container at a
13 dinner table.
14     Q.   And when is it that you learned that
15 that would give an accurate measurement?
16     A.   In seven of '98, July of '98 is when I
17 got ODV certified.
18     Q.   Is there some document or publication
19 that contains that information?
20     A.   I have a certificate through ODV for
21 the class.
22     Q.   Was there some written material
23 provided by the maker of the ODV field test that
24 identifies how much in quantity is required in order
25 to make the test accurate?

WITHAM    15

1      A.   I'm not aware of that.
2      Q.   How much of the alleged controlled
3  substance was actually used in performing the field
4  test that is described on Exhibit 15?
5      A.   In normal procedure, about as much as
6  of an example that I gave you.
7      Q.   Do you have a recollection about how
8  much of the alleged controlled substance was used in
9  this particular case?
10     A.   No, I don't.
11     Q.   How do you pronounce this reagent name?
12     A.   Marquis.
13     Q.   Marquis.  What was done with the
14 marquis reagent that was used in the field test after
15 the test was completed?
16     A.   It was disposed of.
17     Q.   Is that the procedure that you were
18 taught?
19     A.   Yes.
20     Q.   Is that the approved procedure?
21     A.   Yes.
22     Q.   Did you save any of the reagent?
23     A.   No.
24     Q.   What was done with the methamphetamine
25 reagent after the test was conducted?

WITHAM    16

1      A.   It was disposed of.
2      Q.   And is that also the procedure that you
3  were taught?
4      A.   Yes.
5      Q.   What was done with the alleged
6  controlled substance that was left over after the
7  field test was conducted?
8      A.   It was impounded into the Metro
9  evidence vault.
10     Q.   Did you do that yourself?
11     A.   Yes.
12     Q.   Describe how you physically
13 accomplished that?
14     A.   I placed the evidence, in this case the
15 controlled substance, in an envelope and you label
16 the envelope with specific information as to the
17 event number and suspects and your name, my name, my
18 personnel number and description of the evidence and
19 then seal up the envelope and deposit into the
20 evidence chute and log the date and time that's done.
21     Q.   Have you ever removed the alleged
22 controlled substance that is identified in Exhibit 15
23 from the Metro evidence vault?
24     A.   No.
25     Q.   Do you have any reason to believe that

## DEPOSITION OF SHANE WITHAM

WITHAM 17

1  the evidence that you placed into the Metro evidence
2  vault was ever removed?
3       A.   I have no information of that.
4       Q.   So as far as you know, the alleged
5  controlled substance that you field tested as
6  reflected on Exhibit 15 would still today be in the
7  Metro evidence vault?
8       A.   I assume so, unless the DA's office
9  submitted a packet of dismissal, and in this
10  particular case, which is typically done on
11  controlled buys, we do not pursue the charges on the
12  buy itself, although we could, but we typically do
13  not.  We use it for evidentiary value or probable
14  cause for a search warrant.
15       Q.   Well, you said a bunch of things there.
16  As far as you know, the alleged controlled substance
17  would still be in the evidence vault?
18       A.   As far as I know it would be.
19       Q.   What reason, if any that you would know
20  of, would there be for the evidence not still being
21  in the evidence vault?
22       A.   That there were no charges filed on
23  this particular controlled buy and if somebody up
24  there -- I have not been up there -- received a
25  document, which I don't know what it is, but there is

WITHAM 18

1  one from the evidence vault to be sent to the
2  detective bureau and if no case or no charges have
3  been filed on that, they may have asked for disposal
4  order or disposal of the evidence, and I don't know
5  if that would have occurred or not.
6       Q.   To your knowledge if the evidence was
7  disposed of under the circumstances that you just
8  described there would be a paper trail that would
9  reflect that?
10       A.   Yes.
11       Q.   Would the controlled substance that you
12  allegedly found per Exhibit 15 still be in the same
13  envelope that you put it in?
14       A.   Yes.
15       Q.   At the time you placed it there?
16       A.   Yes.
17       Q.   Looking at Exhibit 15 in the weight
18  section of the -- do you see that section?
19       A.   Yes.
20       Q.   What is the difference between net and
21  gross weight as it appears on Exhibit 15?
22       A.   Net weight would be the weight of the
23  controlled substance all by itself without packaging
24  and gross weight would be the weight of the
25  controlled substance with the packaging.

WITHAM 19

1       Q.   And when you use the word "packaging,"
2  what are you referring to?
3       A.   The packaging that those who sell the
4  controlled substance would put it in.  In this case I
5  believe it was a clear plastic small plastic baggy.
6       Q.   So it's what packaging, as you have
7  just used it, is whatever container the alleged
8  controlled substance was in?
9       A.   Correct.
10       Q.   When you seized it?
11       A.   Correct.
12       Q.   And in this case how large was the
13  plastic bag in which this alleged controlled
14  substance was contained?
15       A.   If I recall correctly, it would be a
16  small one inch by one inch plastic type baggy.
17       Q.   And was it a zip lock?
18       A.   I don't recall.
19       Q.   And when you say one inch by one inch,
20  you mean one inch wide, one inch tall?
21       A.   I don't recall the type -- the plastic
22  bag that it was in, it could have been a torn piece
23  of colored plastic from another baggy or a zip lock,
24  but I do recall seeing the substance through the
25  package and I don't recall specifically, with the

WITHAM 20

1  amount of controlled buys that I have done, if that
2  was particularly how that one was packaged.
3       Q.   You do not recall the size of the
4  container?
5       A.   I just remember a small baggy with the
6  substance in it and that's all I recall.
7       Q.   How long did take to perform the field
8  test that was described on Exhibit 15?
9       A.   Approximately about a minute and a
10  half.
11       Q.   What time was the field test that is
12  described on Exhibit 15 conducted?
13       A.   I don't recall.  The one conducted out
14  in the street, that's not documented.  It was done
15  immediately upon taking the property in.  The second
16  one is documented and I don't recall the time.
17       Q.   Why is there no documentation for the
18  first field test you performed?
19       A.   That is not the practice or policy of
20  LVMPD narcotics that we document that.
21       Q.   So there's no documentation of the
22  first field test that you performed because policy
23  does not require it?  Is that the reason?
24       A.   For the particular controlled buy I
25  personally, and I don't even know if everybody does

## DEPOSITION OF SHANE WITHAM

WITHAM 21

1   this, I personally test it myself for my personal
2   knowledge that it was what it was purported to be.
3   That does not stop me or preclude me from later on
4   doing one, per policy with a witness, done in the way
5   that we are required to.
6          Q.   And the first field test that you did
7   on the alleged controlled substance then was not
8   witnessed?
9          A.   No.
10         Q.   Did you carry with you field test kits
11  in your vehicle or on your person?
12         A.   Yes.
13         Q.   How many did you carry with you?
14         A.   I don't recall.  I carried boxes of
15  each type for each specific controlled substance.
16         Q.   Did the boxes of field test kits that
17  you carry with you have this checklist, the form that
18  is Exhibit 15?
19         A.   The form and the checklist and the
20  tests themselves are not really kept together.  I
21  kept these in a binder and the tests in a box.
22         Q.   Did you have the field test checklist
23  and results form with you in your vehicle at the time
24  of the controlled buy?
25         A.   I would assume I did.  I did not use

WITHAM 22

1   one in this particular case.  This particular test is
2   not something that was required.  This was just
3   satisfying my personal inquest if it was actually
4   narcotics or not.  I waited until I had a witness
5   present to do an official test which would accompany
6   the substance into evidence and therefore be used in
7   court, if need be.
8          Q.   Is the time at which you conducted the
9   test that is described on Exhibit 15 recorded
10  anywhere at Metro?
11         A.   No.
12         (Whereupon Deposition Exhibit
13         16 was marked for identification.)
14  MR. BOOKE:
15         Q.   I want to show you now what's marked as
16  Exhibit 16, which is a copy of a page that's numbered
17  LVMPD 00003.  This is called a property report?
18         A.   Yes, sir.
19         Q.   Who filled out this property report?
20         A.   I did.
21         Q.   Let me just take you back to Exhibit
22  15.  You are the one who filled out Exhibit 15?
23         A.   Correct.
24         Q.   There's not anyone else's handwriting
25  on 15, other than yours?

WITHAM 23

1          A.   Joe Jones is down at the bottom.
2          Q.   Other than that?
3          A.   Correct.
4          Q.   Is there anyone's handwriting on
5   Exhibit 16 other than yours?
6          A.   No.
7          Q.   Now I take it that the controlled buy
8   was already done and the field testing was complete
9   by the time you filled out Exhibit 16?
10         A.   The official testing may have not, if I
11  took time and started doing paperwork to accompany
12  the substance that I had, I may have.  And this, I
13  don't recall how that was done, but what I would do,
14  what I could do is take an envelope, place the
15  substance in it, begin to complete the property
16  report, slide that in it so I have the event number
17  and the evidence together until the, you know, final
18  testing and the impound is done later on at the
19  office.
20         Q.   Well, you don't carry a scale around
21  with you in your vehicle to weigh controlled
22  substances, do you?
23         A.   Yes.
24         Q.   You do?  When did you weigh the amount
25  of controlled substance, alleged controlled substance

WITHAM 24

1   reflected on Exhibit 15?
2          A.   I would have weighed it at the time of
3   doing the test with the paperwork.
4          Q.   And so this entry here on Exhibit 15,
5   01.8 grams you would have done at the time, you would
6   have made that measurement at the time you did the
7   test?
8          A.   Correct.
9          Q.   Did you enter the weight of the alleged
10  controlled substance at any time prior to weighing it
11  for the purpose of this test?
12         A.   I don't recall if I weighed and tested
13  the substance or did not, you know.  I don't remember
14  specifics on the initial part, other than I would
15  test the substance initially through my practice of
16  doing controlled buys to insure that I got the
17  substance, and there's reasons for that.
18         Q.   Well, I guess we know for sure that the
19  event number 2240 was assigned before 1800 hours;
20  correct?
21         A.   That may or may not be the case.
22         Q.   You don't know that either?
23         A.   It may or may not be the case.
24         Q.   Okay.  Well, how could you have entered
25  the event number 2240 on this document, Exhibit 16,

WITHAM   25

1  that says it's prepared at 1800 hours if you didn't
2  already have the event number?
3        A.  Well, as practice, there are times
4  where you may have an informant and conduct several
5  controlled buys and you can call up to records at a
6  subsequent time and get your event numbers. Through
7  obtaining your event numbers you don't give specific
8  addresses, because these things are covert and you
9  don't want people to know locations of where you may
10 anticipate a search warrant, even in our personal
11 records section. So there are times that you call up
12 after controlled buys are done and obtain the event
13 numbers. In this particular case I do not recall if
14 it was done prior, during, or after.
15       Q.  So all we know is that Exhibit 16 was
16 prepared at 6:00 p.m.?
17       A.  Yeah.
18       Q.  But what other steps you had completed
19 by the time you prepared Exhibit 16 you can't recall?
20       A.  That report there may have been
21 partially done to tie an address with the narcotics
22 that I had and held for later impounding where I may
23 have five or six other cases that I would be doing
24 the same thing and specifically individually do each
25 one and I have them contained in their envelope with

WITHAM   26

1  the paperwork for the impounding.
2        Q.  Do you see the section on Exhibit 16
3  that says "property physically impounded by" and
4  there's a signature there?
5        A.  Yes, sir.
6        Q.  Whose signature is that?
7        A.  That's mine.
8        Q.  So you wrote your name in as reporting
9  officer?
10       A.  Uh-huh.
11       Q.  Is that correct?
12       A.  Yes.
13       Q.  And then property physically impounded
14 by, did you write S slash?
15       A.  Same as above.
16       Q.  Oh, same as above. And the signature
17 below that is yours also?
18       A.  Correct.
19       Q.  Now Exhibit 16, at least the top two
20 lines were prepared at 6:00 p.m.; is that correct?
21       A.  Correct.
22       Q.  On January 4, 2002; correct?
23       A.  Yes.
24       Q.  And where were you physically located
25 when you prepared Exhibit 16?

WITHAM   27

1        A.  I don't recall. I was in my vehicle
2  somewhere.
3        Q.  How do you know that you weren't at the
4  narc vice office at Sunrise and Bermuda?
5        A.  To be honest with you, as far as this
6  particular case, I can't recall. There was numerous
7  controlled buys, I know that on this particular case
8  I had done at least one other controlled buy with
9  this informant and I don't recall if it was before or
10 after.
11            The report itself, the way that I know
12 how I did my investigations and controlled buys, so
13 that I would be able to contain evidence and
14 paperwork together, I typically do what I've
15 explained. Part of that report was done after the
16 buy and part of it was completed later when
17 everything, when all the paperwork was done. Not
18 everything was done always at one time.
19       Q.  How many controlled buys did you do on
20 January 4, 2002?
21       A.  I know I had done at least one other, I
22 don't recall.
23       Q.  With the same informant?
24       A.  Yes.
25       Q.  How would you go back through the

WITHAM   28

1  records at Metro and determine how many controlled
2  buys you did on January 4, 2002?
3        A.  Well, I would think that narcotics has,
4  they have all the reports that are transcribed and
5  they would be listed in, I believe, event number
6  order and they would be able to go back and see that
7  other events had occurred.
8        Q.  So if I were to request all of the
9  event numbers that begin 020104 for Shane Witham,
10 that ought to yield whatever you did on January 4,
11 2002?
12       A.  Correct.
13       Q.  Did you use any informants other than
14 the informant that you used in this case on January
15 4, 2002?
16       A.  I don't remember.
17           (Whereupon Deposition Exhibit
18           17 was marked for identification.)
19       MR. BOOKE:
20       Q.  I'm going to show you now what's marked
21 as Exhibit 17, which is a two-page document that's
22 numbered LVMPD 00001 and 02. That also has, as you
23 can see, some parts redacted from the first page of
24 Exhibit 17. Do you see the paragraph where it says
25 that you met at 1500 hours with a confidential

DEPOSITION OF SHANE WITHAM

SHEET 8  PAGE 29

WITHAM        29

1  informant?  It's the very first paragraph that
2  appears, it says on 1/4/02 at approximately --
3      A.  Yes.
4      Q.  You see that?
5      A.  Yes.
6      Q.  Now were you present at a meeting with
7  a confidential informant on January 4, 2002 as
8  described in Exhibit 17?
9      A.  Yes.
10     Q.  Where did that meeting take place?
11     A.  Pizza Hut at Sahara and Teddy, or
12  Sahara and Richfield.
13     Q.  What are the closest cross streets to
14  Richfield and Sahara?
15     A.  Richfield and Sahara.
16     Q.  What's the next main north/south
17  street?
18     A.  Valley View to the west and Rancho to
19  the east, the Pizza Hut over there.
20     Q.  On the south side of Sahara?
21     A.  Yeah.
22     Q.  And did the meeting take place at 1500
23  hours, or at 3:00?
24     A.  Yes.
25     Q.  Now your report, Exhibit 17, does not

PAGE 30

WITHAM        30

1  identify other police officers as being present.  Do
2  you see that?
3      A.  Yes.
4      Q.  Were there any other police officers
5  present?
6      A.  For a portion of it, no.  Then I think
7  it was Ryan Kraft that may have shown up a little bit
8  later, I do not recall.  Another officer did show up.
9      Q.  Was the confidential informant present
10  at the time that Kraft arrived?
11     A.  Yes.
12     Q.  Was there anyone else present at the
13  meeting with you and the informant?
14     A.  My informant's girlfriend and son were
15  not present during the meeting.  She was inside the
16  restaurant with the child and I was outside in the
17  parking lot.
18     Q.  So where did this meeting take place?
19     A.  In the parking lot of the Pizza Hut.
20     Q.  In a car or standing in the parking
21  lot?
22     A.  I think both.
23     Q.  Whose car?
24     A.  Mine, LVMPD's, my undercover vehicle.
25     Q.  Who set up the meeting with the

PAGE 31

WITHAM        31

1  informant?
2      A.  I don't recall.  He may have given
3  parts of the information, he may have called me or I
4  may have called him, I don't recall, but through a
5  conversation he let me know of somebody that he had
6  -- actually, an initial interview with the informant.
7  I obtained other names and a group of names and
8  suspects that this individual, or that the CI was
9  able to turn on to the police and this was one of
10  them and on this particular day we -- I don't
11  remember if we called a meeting to go out and
12  individually get this one or if he had talked to the
13  guy and called me up, I don't remember, but I had
14  privy of the Hinton address prior to this particular
15  day we were going to attempt to buy the narcotics
16  from them.
17     Q.  Why didn't you include any of the
18  information you just gave in any of the documents
19  that you filled out in this case?
20     A.  Some of the information that we have
21  for our informants on initial interviews, we have
22  informant contact sheets and so forth and we don't
23  put other things and other information in there
24  pertaining to other suspects.  Sometimes the identity
25  of the CI can be compromised just in the grouping

PAGE 32

WITHAM        32

1  that they are sharing with us and therefore just
2  concentrate on this particular case.
3      Q.  What's an informer contact sheet?
4      A.  There's a CI packet, and when the CI is
5  signed up with the police department, a CI file is
6  made and a culmination of papers are put in there
7  with the CI's identity, waivers, and information that
8  we put in there and contact sheets.  We may put in
9  there the names of some of the suspects that they are
10  trying to turn over to us.
11     Q.  So who set up the meeting between you
12  and this informant on January 4, 2002 at the parking
13  lot of the Pizza Hut?
14     A.  I don't recall if I called him or if he
15  called me.
16     Q.  And when did you call him or he called
17  you?
18     A.  Earlier in that day.
19     Q.  How do you know that?
20     A.  Well, my shift starts right at 3:00 and
21  for me getting over there and getting and meeting
22  him, I had been on my way prior to my work time and
23  it would have been the conversation before then for
24  our meeting time at my work time at that location.
25     Q.  Now, when you say that your shift

DEPOSITION OF SHANE WITHAM

WITHAM   33

1  starts at 3:00 p.m., you mean you are at your office
2  at 3:00 p.m.?
3       A.   There, or there's different locations
4  every day.  We start work at 3:00 and whether we're
5  meeting to dress out to serve a search warrant or if
6  somebody has a controlled buy or we meet at the
7  office for one of our meetings, that's my shift's
8  time start and depending on what is going on for that
9  particular day is where you are for the start of that
10  shift.
11       Q.   Did you have an unmarked vehicle?
12       A.   Yes.
13       Q.   And did you take that unmarked vehicle
14  home with you?
15       A.   Yes.
16       Q.   Where did your shift start on January
17  4, 2002?
18       A.   At the Pizza Hut.
19       Q.   And how do you know that?
20       A.   That was the first thing I did that
21  day.
22       Q.   Do you remember that or are you just
23  assuming that?
24       A.   That's the first thing I did that day.
25       Q.   And when your officer's report says

WITHAM   34

1  approximately 1500 hours, do you think that's likely
2  a little after 3:00 or is it 3:00 sharp?
3       A.   It could have been five or ten minutes
4  before or after.
5       Q.   Did you go inside the Pizza Hut?
6       A.   There was a point in time where I did.
7  Their child, if I remember, he was having problems
8  and wanted to be with his dad and he was trying to
9  hold him and talking and sent him in with the
10  girlfriend and they were in and out a couple times.
11  I even think that there's a bar that sits next to the
12  Pizza Hut and she wanted to go run and get cigarettes
13  but couldn't take the child in there.  So we were
14  watching the child for a moment while she ran across
15  and over to the bar to get cigarettes.
16       Q.   So the confidential informant had a
17  child with him during a part of your conversation
18  with him?
19       A.   The conversation into the elicit drug
20  activities did not occur in front of the child.  We
21  can talk about other things at the time, also.
22       Q.   How do you know when you spoke about
23  any particular subject with the confidential
24  informant?
25       A.   I wouldn't be doing that in front of

WITHAM   35

1  his child.
2       Q.   Do you record any of your conversations
3  with the informant?
4       A.   No.
5       Q.   Why not?
6       A.   It's not standard procedure.
7       Q.   Why didn't you do it, just because it's
8  not standard procedure?
9       A.   Yes.
10       Q.   Did you make any notes of your
11  conversation with the informant at the Pizza Hut
12  parking lot?
13       A.   I may have written down addresses and
14  descriptions and names and so forth that I would have
15  got out of him.  There's no standard.
16       Q.   What did you do with the notes that you
17  made during your meeting with the confidential
18  informant?
19       A.   I said I may have.  I don't recall if I
20  did or not, but if I'm doing an interview, I may have
21  a spiral notebook.
22       Q.   When you made notes of your meeting
23  with the confidential informant would you have thrown
24  those notes away?
25       A.   Most likely I would have.

WITHAM   36

1       Q.   And in this case do you remember
2  whether you made any notes of your conversations with
3  the confidential informant at the Pizza Hut?
4       A.   I don't remember.
5       Q.   How long did that conversation last?
6       A.   Approximately 20, 25 minutes.
7       Q.   And during that conversation in the
8  Pizza Hut parking lot the informant's child was in
9  and out of the conversation on a couple of occasions?
10       A.   I encountered all three of them
11  together.  She went into the restaurant with the
12  child.  I don't recall how we had gone in there, but
13  it had something to do with her wanting to get
14  cigarettes.  We went in there and waited, and she
15  came back out or came out and we continued our
16  conversations out by my vehicle.
17       Q.   And in addition, what did you talk
18  about with the confidential informant in the parking
19  lot at the Pizza Hut?
20       A.   He gave me information of David Hinton
21  and gave me his description and told me that he had
22  purchased narcotics and firearms from the residence.
23  The CI has been proven reliable on several other
24  occasions, including --
25       Q.   If you could stick with the question,

Lori M. Judd, CCR #233, RMR

DEPOSITION OF SHANE WITHAM

SHEET 12  PAGE 45

WITHAM   45

1  requirements?
2       A.  I can't remember the negotiations of
3  what I told him that we had to do.  A lot of times
4  we'll say, give him three, you want three, we
5  might get a quantity of narcotics, might give a
6  quantity of controlled buys or search warrants.
7  There is not really a standard that we were given, we
8  just, you know, we ask the judge and the defense
9  their case, if they are working off charges, what
10  would be suitable and whatever we had deemed suitable
11  for this individual he had accomplished.
12       Q.  What was the deal that you made with
13  this confidential informant?
14       A.  I can't remember how many cases we had
15  promised.  I do know I started to pay the informant
16  and at that time, it would have been the legal
17  requirement portion of it would be required,
18  therefore I was giving him money also.
19       Q.  I don't understand what you mean.
20       A.  Well, we pay informants to do narcotics
21  buys and there's different reasons that informants
22  become informants.
23       Q.  What was the deal with this informant?
24       A.  I don't recall.
25       Q.  Did you pay money to this informant?

PAGE 46

WITHAM   46

1       A.  Yes.
2       Q.  And you agreed to get the District
3  Attorney to reduce or dismiss criminal charges
4  against him?
5       MR. ANDERSON:  I'm just going to object that it
6  misstates testimony.
7       MR. BOOKE:  Let me change the question.
8       Q.  You requested that the District
9  Attorney reduce or dismiss criminal charges against
10  this informant?
11       A.  Correct, reduce or dismiss, yes, I
12  don't recall which.
13       Q.  And those would have been felony
14  charges?
15       A.  Yes.
16       Q.  How much did you pay the informant for
17  each buy he did?
18       A.  I don't recall, 40 to maybe $100.
19       Q.  How do you determine how much was paid
20  to the informant?
21       A.  The quantity or the capability of a
22  particular suspect or what we had gotten as a result
23  of the information that they supplied.
24       Q.  You mean more drugs, you paid more
25  money?  Is that what you mean?

PAGE 47

WITHAM   47

1       A.  Larger, large cases, larger suspects.
2       Q.  How much did you pay the confidential
3  informant for the buy that is alleged to have
4  occurred at 1919 Hallwood?
5       A.  I don't recall.  It's documented
6  though.
7       Q.  Where is it documented?
8       A.  In the CI packet.  If I even did for
9  that particular case, I don't recall.
10       Q.  Are all of the controlled buys that
11  this informant did documented in the CI packet?
12       A.  Yes.
13       Q.  When is the last time that you saw this
14  confidential informant?
15       A.  I don't remember.  January, February,
16  late January, February, maybe March.
17       Q.  Was the confidential informant an
18  active methamphetamine user the last time you saw
19  him?
20       A.  I don't know.
21       Q.  Had you used the confidential informant
22  to support an application for a search warrant before
23  January 4, 2002?
24       A.  I believe I did, yes.
25       Q.  How many times?

PAGE 48

WITHAM   48

1       A.  I can't remember some of the -- I can't
2  remember if some of these happened before or after
3  that date.
4       Q.  Would it be reflected in the CI packet
5  if you had used this informant to support an
6  application for a search warrant?
7       A.  Yes.
8       Q.  Do you remember whether you had ever
9  used this informant to support an application for a
10  search warrant prior to January 4, 2002?
11       A.  Yes, I did.
12       Q.  But the number of times you don't
13  remember?
14       A.  Correct.
15       Q.  Did you ever apply for a search warrant
16  using this informant as the underlying factual
17  support where the court refused to issue a warrant?
18       A.  No.
19       Q.  If that had occurred, would it be
20  reflected in the informant packet?
21       A.  I don't know.  I've never had that
22  occur.
23       Q.  When is the last time that any law
24  enforcement person used this confidential informant?
25       A.  I don't know.

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF SHANE WITHAM

WITHAM  49

1    Q.  When is the last time that you heard
2  anything at all about this informant?
3       A.  It would have been the same time frame,
4  January, February, March.
5       Q.  Do you know the confidential
6  informant's true name?
7       A.  Yes.
8       Q.  Do you know his first, middle and last
9  name?
10      A.  I know his first and last.
11      Q.  Does this confidential informant have
12 any aliases?
13      A.  I don't recall.
14      Q.  Would that fact be reflected in his
15 confidential informant packet?
16      A.  It might.
17      Q.  Do you know this confidential
18 informant's social security number?
19      A.  No.
20      Q.  Have you ever known his address?
21      A.  Yes.
22      Q.  Do you know his date of birth?
23      A.  No.
24      Q.  What is his age?
25      A.  I don't recall exactly, probably late

PAGE 50

WITHAM  50

1  twenties.
2       Q.  Did you ever research this confidential
3  informant's criminal record?
4       A.  I obtained a copy of it and placed it
5  in the CI packet.
6       Q.  Was this confidential informant ever
7  convicted of any crimes of dishonesty?
8       A.  Not that I'm aware of.  I would say
9  criminal activity is dishonest in itself.
10      Q.  So as far as you're concerned, all of
11 his convictions are crimes of dishonesty?
12      A.  I would imagine so.
13      Q.  If you used a confidential informant
14 and his information did not prove reliable, would you
15 put that information in the CI packet?
16      A.  I'm sorry?
17      Q.  If you used a confidential informant
18 and determined that his information was not accurate
19 or reliable, would you put that fact in his
20 confidential informer packet?
21      A.  Yeah, I actually, there was a sheet
22 called an undesirable informant sheet and if are
23 dishonest with us or in that kind of manner you
24 document that on there and put that in the CI packet.
25      Q.  Every time it happens?

PAGE 51

WITHAM  51

1       A.  There's an actual sheet for it.  We'll
2  all inform informants.  You catch them at times
3  slipping up and not telling the truth and in this
4  particular case I can't tell you that I recall any of
5  that, but there are small things and there's things
6  if they end up using or abusing during the portion of
7  time that they are working for us, they will be -- an
8  undesirable informant sheet will be put on them.
9  Part of the sheets, one of the sheets that they sign,
10 it is stipulated that they will not be engaged in any
11 criminal activity and that is an agreement that they
12 are signing to do this, and if they do something that
13 falls under the guidelines of that contract, then
14 they will be released and the undesirable informant
15 contact sheet will be placed in there and they won't
16 be able to be used not just for my personal reasons,
17 but in LVMPD as an informant ever again.
18      Q.  Did you make a written report into this
19 confidential informant's CI packet every time he lied
20 to you?
21      A.  No.
22      MR. ANDERSON:  I'm just going to object, I
23 think he testified he didn't recall him ever lying to
24 him.
25      MR. BOOKE:  I don't think he so testified.

PAGE 52

WITHAM  52

1       Q.  You said you couldn't remember whether
2  he lied to you or didn't?
3       A.  That's correct.  I don't recall if he
4  ever lied to me or didn't.
5       Q.  What was this informant wearing at your
6  meeting with him on January 4, 2002?
7       A.  I don't remember.
8       Q.  Do you know, what is the -- does the
9  confidential informant still work as a confidential
10 informant?
11      A.  I don't know.
12      Q.  What is his name?
13      MR. ANDERSON:  I'm just going to object under
14 privilege and privacy issues and instruct the
15 deponent not to answer that question.
16      MR. BOOKE:  You didn't tape-record anything that
17 was said at the meeting with the CI at the Pizza Hut?
18      A.  No.
19      Q.  Did anyone record the meeting with the
20 confidential informant?
21      A.  No.
22      Q.  And if you made any notes of the
23 meeting you didn't keep them?
24      A.  No.

## DEPOSITION OF SHANE WITHAM

WITHAM 53

1  Q.  Did Kraft make any notes of the meeting
2  with the confidential informant?
3  A.  No.
4  Q.  Why not?
5  A.  The information that I obtained from
6  the informant is still gathered in other -- in the
7  reports.  The suspect was identified, the suspect
8  address was identified, the information given has
9  been detailed in the reports and reoutlined in the
10  arrest report and officer report with the information
11  we located in the service of search warrant
12  corroborated with the information obtained during
13  that meeting.  The information is still documented
14  and the notes are no longer a necessity, being that
15  everything is documented here.
16  Q.  Is there any way to verify what
17  happened at your alleged meeting with the
18  confidential informant on January 4, 2002, other than
19  simply your saying that it happened?
20  A.  No.
21  Q.  Is there, were there other buys or
22  criminal activity discussed at this meeting on
23  January 4, 2002, other than just the Hallwood buy?
24  A.  I don't recall.  If we did do more than
25  one search warrant, which I think we did, or

WITHAM 54

1  controlled buy, then that would have been discussed
2  also.
3  Q.  Now looking at Exhibit 17, you said --
4  you wrote "CI stated to me CI was aware of an
5  individual who was actively involved in the sales of
6  controlled substance and firearms from his residence
7  at 1919 Hallwood, Las Vegas, Nevada." Do you see
8  that?
9  A.  Uh-huh.
10  Q.  Now are those the informant's words?
11  Did he say --
12  A.  No, he didn't say "I'm aware of," it's
13  not a quote.  It's not a quote.
14  Q.  And did the confidential informant
15  spell the suspect's name for you the way it appears
16  there in Exhibit 17?
17  A.  No.
18  Q.  Did he spell it at all?
19  A.  I don't recall.
20  Q.  Does the confidential informant say how
21  he became aware of what he claimed to know?
22  A.  I'm sure he did, from what I remember,
23  and this is just off of memory.  I don't remember if
24  it came off of this particular conversation or
25  another, but that he had been an acquaintance of the

WITHAM 55

1  suspect for some time and they had shared mutual
2  friends and knew the suspect's father quite well.
3  Q.  Did the informant tell you how he had
4  become aware of what he claimed to know about David
5  Hinton's activities?
6  A.  He had conversations with David, which
7  David would tell him of the activities.
8  Q.  Your testimony is that the confidential
9  informant told you that David Hinton told him of
10  these criminal activities?
11  A.  Correct.
12  Q.  You did not write down in your report
13  that these were statements made by David Hinton, do
14  you see that?
15  A.  What is indicated in this report is
16  information that I put in there that particularly I
17  was going to be looking for in the service of the
18  search warrant.  I knew that the individual was -- or
19  I had been told that the individual was selling
20  narcotics, that he had a large quantity of guns and
21  that he had a possible ripped up $20.00 bill from a
22  robbery.  And outside of the conversation, you know,
23  the conversation of any other suspects or any other
24  friends or acquaintances included in this report, the
25  purpose of this report was to document things that I

WITHAM 56

1  would later be able to corroborate through the
2  service of the search warrant and the probable cause
3  to obtain the search warrant for.
4  Q.  Did you write down in your report that
5  the confidential informant was saying that David
6  Hinton had admitted being involved in criminal
7  activity?
8  A.  He identified the white male adult as
9  Hinton and the CI admitted that he had recently been
10  involved in these three robberies.  Now I didn't say
11  that he had stated that he did it, he stated that he
12  was aware of it.
13  Q.  Why did you not write down that David
14  Hinton admitted to the informant that he was involved
15  in this criminal activity?
16  A.  The only thing I can say for that is
17  these are dictated reports with notes and however you
18  transcribe on the telephone, the report is what
19  sometimes comes out to be and certain words aren't
20  interjected where you may have had time writing it
21  down to replace.
22  Q.  Did the confidential informant say that
23  he had purchased controlled substances from David
24  Hinton?
25  A.  Yes.

DEPOSITION OF SHANE WITHAM

WITHAM 57

1  Q.  Why did you not write that down in your
2  report?
3       A.  I just indicated that he was aware of
4  him selling it and that's it.  That's what I was told
5  and I put it down there.
6       Q.  Why did you not write down that the
7  confidential informant had himself bought drugs from
8  David Hinton?
9       A.  Just -- I dictated the report off the
10 top of my head with the notes that I had and that's
11 what culminated in the report.
12      Q.  Did the confidential informant tell you
13 what drugs he bought from David Hinton?
14      A.  Methamphetamine.
15      Q.  You did not write down in your report
16 that the informant bought methamphetamine from David
17 Hinton, why not?
18      A.  I don't know.
19      Q.  Did the confidential informant tell you
20 when he bought drugs from David Hinton?
21      A.  No, I don't recall.
22      Q.  Did the confidential informant tell you
23 where he bought drugs from David Hinton?
24      A.  He told me that David Hinton had a
25 trailer recently to this date, and I don't know how

WITHAM 58

1  recent, but within I believe a month or two, and this
2  is just something that I recall, and I don't recall
3  it from this particular meeting or the meeting when I
4  initially met the informant or at any other time,
5  that David Hinton stayed in a trailer, and I don't
6  know what part of town that trailer was, but that it
7  had a lot of cash and a lot of guns in the trailer
8  and on the particular date of this controlled buy the
9  information I received was that now the guns
10 were over at this residence and not at the trailer no
11 longer.
12      And I think that now that I'm thinking
13 about that, we were initially trying to find David
14 Hinton and the trailer and the lack of my CI's
15 mobility, he was unable to do so in the preceding
16 weeks or months and therefore the CI finally got in
17 contact with him and found out where everything was,
18 which was at this residence.
19      Q.  You are saying that the confidential
20 informant told you that ordinarily David Hinton
21 stayed or lived in a trailer?
22      A.  Yes.
23      Q.  And the confidential informant told you
24 that David Hinton had a lot of guns in the trailer?
25      A.  Correct.

WITHAM 59

1       Q.  But then the confidential informant
2  told you that as of January 16th all of these guns
3  were going to be at 1919 Hallwood?
4       A.  That they were, that he had now gotten
5  in contact, recontacted -- I don't know, I can't
6  remember how, with Hinton and told me that the guns
7  were now over at this other address and now we had a
8  location where Hinton was and where the firearms
9  were.
10      Q.  And when did the confidential informant
11 tell you these things that you have just testified
12 to?
13      A.  Well, the Hinton, it was the individual
14 that was one of the people that we had discussed and
15 in preceding weeks, I don't remember, days or weeks
16 before we even attempted this.  But the lack of not
17 knowing where to locate them, through the course of
18 the weeks getting closer to January 4th, the CI ended
19 up re-establishing or recontacting with Hinton.  I
20 don't recall how or what happened, but the CI
21 understanding now that he was working in cooperation
22 with the police department and started to ask
23 questions, which is what he was asked to do and
24 through that friendship with Hinton, they found out
25 where the residence was and the firearms apparently

WITHAM 60

1  were over there.
2       Q.  When did you first have contact with
3  this confidential informant about David Hinton?
4       A.  You know, I can't place the name David
5  Hinton in any portion of the conversation up until I
6  know that we had discussed him and his name on that
7  date.
8       Q.  On January 4th?
9       A.  I will tell you that --
10      Q.  I'm sorry, is that correct?
11      A.  Yes, in preceding conversations this
12 informant had told me about people that he had known
13 that had firearms and were selling them and narcotics
14 and that kind of stuff and, you know, going through
15 that, I don't recall -- he couldn't contact this
16 particular person and I don't remember if it was, you
17 know, he knew he was -- if Hinton had a slang name,
18 if he was given that slang name or what, but he knew
19 that this person had a bunch of guns in a trailer and
20 that was all he was able to let me know at that time,
21 that he will work on it.
22      Meanwhile we worked on other cases and
23 he re-established himself with Hinton and located the
24 residence and he provided me with the updated
25 information on it.

DEPOSITION OF SHANE WITHAM

WITHAM 61

1 Q. So the first time that this informant
2 identified David Hinton by name was on January 4,
3 2002?
4 A. It very well could have been that day
5 or the preceding couple other days before then, and I
6 don't recall how that initial meeting got set up, but
7 the narcotics deals happen on the spur of a moment.
8 It could be a phone call and the next thing you know
9 you are debriefing or briefing somebody on a
10 situation and some of it is updated information from
11 a prior encounter that you had talked about. But I
12 do know that David Hinton's name was brought up with
13 the Hallwood address and the purchasing of narcotics
14 and location of firearms on that date.
15 Q. Based on conversations that you had
16 with the confidential informant before January 4,
17 2002, you understood that the confidential informant
18 to be telling you that David Hinton lived in a
19 trailer and had a bunch of guns in a trailer?
20 A. Right.
21 Q. But on January 4, 2002 the confidential
22 informant told you that David Hinton was the guy's
23 name and that all of the guns had now been moved to
24 the 1919 Hallwood address?
25 A. That they were over there at that

WITHAM 62

1 address, which is David's dad's house, is the way he
2 explained it to me.
3 Q. Did the confidential informant tell you
4 that he had bought guns or firearms from David
5 Hinton?
6 A. No, not that I recall.
7 Q. Did the confidential informant tell you
8 that David Hinton made or manufactured
9 methamphetamine at 1919 Hallwood?
10 A. No, not that I recall.
11 Q. Did the confidential informant tell you
12 that methamphetamine was made or manufactured at 1919
13 Hallwood?
14 A. No, not that I recall.
15 Q. Did the confidential informant tell you
16 how he was aware of the Walgreen robberies described
17 in Exhibit 17?
18 A. He told me that David told him that
19 stuff.
20 Q. You did not write in your officer's
21 report that David Hinton admitted or confessed the
22 Walgreen's robberies, did you?
23 A. No. The report, these reports,
24 officers reports are or have the ability to be public
25 knowledge, okay, through discovery and so forth. We

WITHAM 63

1 do the best we can at alleviating as much information
2 that would point out to an identity, without
3 admitting certain facts that would be of benefit to a
4 suspect, and I don't believe all these things that
5 we're talking about are detrimental to the suspect,
6 if I would have put them in there.
7 I omitted certain information at times
8 to not allow the identity of an individual to come
9 out prior to being able to. And the more knowledge,
10 if somebody is confessing to a robbery, and a
11 specific robbery at that, and I indicate that in a
12 report, that could be public knowledge. Mr. Hinton
13 may only have confessed this robbery to one person,
14 which would be able to ascertain the identity of the
15 informant. And therefore that's a lot of the reason
16 why some of the information is omitted, even though
17 it would be detrimental to the suspect and not the
18 police department.
19 Q. Is that the reason why you did not
20 write in your report that David Hinton admitted to
21 this confidential informant that he had committed two
22 robberies?
23 A. That reason why it's on there is
24 exactly why I put the probable cause and the
25 information that I want to get in there to establish

WITHAM 64

1 probable cause that I needed to obtain the search
2 warrant.
3 Q. Well, you weren't looking for a search
4 warrant for evidence of robberies, were you?
5 A. I actually was attempting to contact
6 officers in the robbery section to come up with
7 specific robberies at the location, and because of
8 whatever reasons I wasn't able to, but if I was able
9 to identify a particular incident at the time prior
10 to the search warrant that this was the robbery, this
11 is the ripped up torn dollar bill, the other half of
12 it would be in evidence and so forth, then I would
13 have definitely had enough evidence in there to list
14 items of evidence in the search warrant to seize.
15 I had an idea, for instance, that there
16 were a lot of guns in there, but I didn't establish
17 the probable cause to purchase a gun, but I did
18 indicate in there that that was there. The only
19 thing that I did indicate that I obtained probable
20 cause for was the purchase of the narcotics, and
21 therefore that is what the warrant was for, although
22 I had other areas that I had not yet confirmed in
23 obtaining that.
24 So initially the search warrant was for
25 the narcotics, and that's what the information for

## DEPOSITION OF SHANE WITHAM

WITHAM 65

1  the controlled buy I put in there and any lack of
2  anything else was to not ruin the identity of my
3  informant.
4       Q.   So I want to make sure that I
5  understand your testimony here. You did not write in
6  your report that David Hinton admitted committing
7  Walgreen's robberies because you were trying to
8  protect the identity of your informant?
9       A.   Correct.
10      Q.   And you did not write in your report
11 that David Hinton admitted attempting a robbery at an
12 ATM because you were trying to protect the identity
13 of your informant?
14      A.   Correct.
15      Q.   But you included that information about
16 the Walgreen's robberies and the ATM robbery because
17 you thought it would help you establish probable
18 cause to get a search warrant for methamphetamine?
19      A.   No.
20      MR. ANDERSON: Objection, misstates testimony.
21 Go ahead and answer.
22      THE WITNESS: A search warrant has other
23 indicators other than the probable cause. There's
24 classes of entry for the search warrant and we're
25 talking about information establishing a reason to

WITHAM 66

1  why the danger or safety level for this search
2  warrant, whether it be, i.e., needing to get a
3  nighttime clause, what kind of an entry we may use.
4  This is other information that can be used in the
5  search warrant, not for the probable cause to obtain
6  the items, per se, but for the other information to
7  satisfy the requirements of a search warrant to
8  gather other requirements.
9       MR. BOOKE:
10      Q.   Such as what?
11      A.   Nighttime clause, forced entry, no
12 knock and talks -- or no knock and announce, those
13 kind of -- to satisfy those kind of reasons.
14           So as bland as it seems, it puts in the
15 information needed for the probable cause and also
16 puts in the information to substantiate, you know,
17 the type of situation that we're going to encounter,
18 making the entry for the search warrant.
19      Q.   Did the confidential informant tell you
20 how he was aware of the attempted robbery at the ATM
21 that's described in Exhibit 17?
22      A.   He was told by David.
23      Q.   And again you say that David Hinton
24 admitted having attempted a robbery at an ATM?
25      A.   Yes.

WITHAM 67

1  Q.   Did the confidential informant tell you
2  which ATM or where the ATM was located, where the
3  attempted robbery occurred?
4       A.   No, but it was supposedly in the area
5  close to Hallwood, and I don't know, and by "close
6  to," I don't know if he meant two miles or two
7  blocks, but in the subsequent area of the residence.
8       Q.   Did the confidential informant tell you
9  what was stolen in the ATM robbery?
10      A.   I don't remember if there was a
11 quantity of money or just the $20.00 bill, and I
12 think in some of the other reports I think I
13 documented a little bit more, not too much more on
14 what had occurred.
15      Q.   Did the confidential informant tell you
16 when the acquaintance of David Hinton named Joker
17 shot himself with an AK-47?
18      A.   I think it was approximately two weeks
19 prior to the controlled buy that this person killed
20 himself.
21      Q.   Killed himself?
22      A.   Yes, and as far as testimony and
23 relevance to this, I don't recall if that
24 conversation came up because the gun came from that
25 house or not, but something, and that's just

WITHAM 68

1  something that I thought I remembered, but, you know,
2  that's why it was pertinent to bring that up, other
3  than the fact that they knew each other and had a
4  mutual friend kill himself.
5       Q.   Did the confidential informant tell you
6  who David Hinton had committed this ATM robbery with?
7       A.   No.
8       Q.   He just said a third party?
9       A.   I don't know. I can't recall if he did
10 give me a name.
11      Q.   Is there anything else about David
12 Hinton that the confidential informant told you there
13 at the Pizza Hut on January 4th that you did not
14 write down in your report, other than what you have
15 testified to?
16      A.   Not that I can remember now.
17      Q.   Did you see the confidential informant
18 between January 4, 2002 and the time the search
19 warrant was executed on January 16, 2002?
20      A.   I may have. I don't recall if I did
21 any controlled buys during that time with him or not
22 or met him, I don't recall.
23      Q.   Did the confidential informant tell you
24 when all of these guns had been moved from the
25 trailer that David Hinton stayed in to the residence

DEPOSITION OF SHANE WITHAM

WITHAM   69

1  at 1919 Hallwood?
2       A.   No, he didn't state exactly when.
3       Q.   Did the confidential informant tell you
4  where the guns were at the 1919 Hallwood location?
5       A.   I'm sorry, say that again?
6       Q.   Did the confidential informant tell you
7  where at the 1919 Hallwood house the guns were
8  located?
9       A.   No.
10      Q.   Did the confidential informant tell you
11 who owned the guns?
12      A.   No.
13      Q.   Did the confidential informant tell you
14 whether he had ever seen any of the guns?
15      A.   I can't remember.  I can't remember if
16 he saw them at the trailer or not.  Probably not
17 because I don't think he knew how to get to the
18 trailer, or he couldn't remember.
19      Q.   So all of the information that the
20 confidential informant gave you about guns was
21 hearsay that the confidential informant told you he
22 got from David Hinton; is that right?
23      A.   I thought you were talking about
24 getting the guns from David.  The information, yes,
25 he got from David, yes.

WITHAM   70

1       Q.   The confidential informant didn't give
2  you any firsthand observations about having seen any
3  guns?
4       A.   No.  I had another search warrant with
5  the CI with another individual who had 17, 18 guns
6  and that was corroborated to that search warrant and
7  the reliability on the CI at this point in time was
8  something that I trusted the information given.
9       Q.   Now your report, Exhibit 17 does not
10 state that the confidential informant ever bought
11 drugs from David Hinton, do you realize that?
12      A.   That's correct.
13      Q.   But you're testifying now, I just want
14 to be sure I'm correct, but you are testifying that
15 the confidential informant told you that he had, in
16 fact, purchased drugs from David Hinton?
17      A.   Yes, in the past, yes.
18      MR. ANDERSON:  I would like to enter a running
19 objection with respect to Exhibit 17 that it's not
20 his entire report, and parts are redacted from it.
21      MR. BOOKE:
22      Q.   Fair enough.  Let me give you a chance
23 to look at Exhibit 13, if you would, which is, in
24 fact, a complete copy of your report.  And take a
25 minute to look at that.

WITHAM   71

1       A.   What was the question?
2       Q.   You have now looked at a copy of your
3  complete report with nothing redacted; correct?
4       A.   (Witness nods.)
5       Q.   Is that correct?
6       A.   Yes.
7       Q.   Now your report does not state that the
8  confidential informant did tell you that he bought drugs
9  from David Hinton, does it?
10      A.   That's correct.
11      Q.   But you're testifying now that the
12 confidential informant did tell you that he had in
13 the past bought drugs from David Hinton?
14      A.   Yes.
15      Q.   Why did you not include in your report
16 or in your application for a search warrant that the
17 confidential informant told you he had bought drugs
18 from David Hinton?
19      A.   The search warrant, the application for
20 the search warrant has general information from the
21 controlled buy report.  The choice of the words
22 dictating, it just is a sentence that I didn't put in
23 there.  I don't recall if it was intentional, I don't
24 recall if it was forgotten.  It's not in there.  I
25 don't know why, but it's not.

WITHAM   72

1       MR. BOOKE:  Okay, let's take a break.
2       (Recess taken.)
3       MR. BOOKE:  Back on the record.
4       Q.   Take a look at Exhibit 13, please.  Do
5  you have that in front of you?
6       A.   Yes.
7       Q.   The third paragraph in the text says,
8  "to confirm the information supplied by the CI, a
9  controlled buy event of methamphetamine was
10 conducted."  Do you see that sentence?
11      A.   Yes.
12      Q.   Did you do anything to try to verify or
13 confirm the information that the informant had given
14 you, other than to allegedly conduct a controlled
15 buy?
16      A.   Records checks on -- when we set up a
17 surveillance, establish a surveillance, given we get
18 plate numbers of vehicles parked and try to locate
19 the identities of the people we have.  In this
20 particular case I don't believe that I had -- I can't
21 remember if I got any information back or could
22 identify them just through the name without the
23 birthday, and therefore with the information, with
24 just the name and the address we went ahead and did
25 the controlled buy with just the information that we

DEPOSITION OF SHANE WITHAM

WITHAM 73

1  had.  But you do want to do the best you can at
2  identifying the individuals of the house and getting
3  a background check on them, if you can, but in this
4  particular case we hit a dead-end.
5       Q.  I'm not sure that I understand your
6  answer.
7       A.  I don't recall if on this particular
8  case I had attempted to identify David Hinton through
9  the local records check and NCIC and scope.  And
10  therefore I don't recall if I had him positively
11  identified.
12       More often than not I always want to
13  get the individual identified at this particular
14  point and prior to sending somebody in there, and in
15  this particular case I don't recall if I had him
16  totally identified, but you are asking if there's
17  anything else to be done.  That's what I do before I
18  do a controlled buy, is try to identify the people
19  there, and I can't remember if I did it and I had the
20  identities, if I didn't do it or if I attempted to do
21  it with negative results on it.
22       Q.  Well, let's see if we can piece it
23  together.  On January 4, 2002 at approximately 3:00
24  you met with the confidential informant at the Pizza
25  Hut; is that correct?

WITHAM 74

1       A.  Yes.
2       Q.  And that meeting lasted, I think you
3  said, between 25 and 30, or 20 to 25 minutes; is that
4  correct?
5       A.  Yes.
6       Q.  So your meeting with the confidential
7  informant is over, or lasted until between 3:20 and
8  3:25; is that approximately correct?
9       A.  Uh-huh.
10       Q.  I'm sorry, is that a yes?
11       A.  Yes.
12       Q.  And your report indicates that the buy,
13  the controlled buy occurred between 5:00 and 5:21
14  p.m.?
15       A.  Yes.
16       Q.  So the question would be between,
17  whether between 3:20 or 3:25 and 5:00 you were able
18  to conduct any other sort of investigation about
19  David Hinton?
20       A.  Correct.
21       Q.  Because you had just learned David
22  Hinton's name for the first time between 3:00 and
23  3:25; correct?
24       A.  Correct.
25       Q.  So with that as your point of

WITHAM 75

1  reference, do you believe that you did any other
2  investigation at all about, to try to confirm the
3  information that the confidential informant had given
4  you between 3:00 and 3:25, other than to go conduct
5  the controlled buy?
6       A.  I don't recall.  David Hinton is not
7  the only person that this informant has got me in
8  contact with.  So to think that this particular
9  meeting and that particular time frame is solely
10  dedicated just to Hinton is incorrect.  There's other
11  individuals that we were doing.  And I don't know, do
12  you mind if I get into the other suspects?  I don't
13  think it's pertinent, but.
14       MR. ANDERSON:  He'll probably talk to you about
15  that.
16       MR. BOOKE:
17       Q.  We will, and let me just tell you, I'm
18  not assuming that the only thing that you and this
19  informant talked about at the Pizza Hut was David
20  Hinton, but it seems to me that given the fact that
21  you did talk about people and deals other than David
22  Hinton, it's even likely that you would have had
23  an opportunity to do anything other than just take
24  this informant's word for it about David Hinton?
25       A.  Right.

WITHAM 76

1       Q.  That's what happened, isn't it,
2  probably?
3       A.  Possibly.  See, I can't remember if I
4  tried to identify him.  I can't remember.  And I
5  can't remember if we attempted another buy in between
6  that from the information meeting, or if we did it
7  after this one, I can't recall.  It's very -- you
8  know, to testify to something that happened that long
9  ago and to not understand the kind of detective that
10  I am and as many -- I was -- I had very, very many
11  informants, very, very many cases and in that
12  particular short amount of time I'm remembering
13  specifics because on this case because I have been
14  able to review some of the reports, and through
15  talking was able to jar some of it.
16       But I can't remember if I went directly
17  to the Hinton residence from the meeting or if we
18  attempted to do a buy and the people weren't home and
19  then did it at that time, or were home and did it at
20  that time or returned later after, I just can't
21  remember.  And I know that I was very overwhelmed and
22  going off of knowing how I want to identify him, I
23  more than likely attempted to identify David and
24  could not do it.
25       But I can't remember.  So he was

~ DEPOSITION OF SHANE WITHAM ~

SHEET 20  PAGE 77

WITHAM 77

1 unidentified, as far as that particular, David
2 Hinton. All I have is a name and description and
3 reliable information from the past to indicate that I
4 should believe my informant for this. So that's what
5 I went over there with.
6      Q.   That's what I'm trying to ferret out.
7 When you went to David Hinton's house
8 you had a description of some kind given to you by
9 this informant, that's one thing you had; correct?
10     A.   Correct.
11     Q.   You had some information that the
12 informant had given you that was strictly hearsay
13 about guns; correct? Is that correct?
14     A.   Yes.
15     Q.   In other words, the informant did not
16 tell you that he had ever seen or touched any guns?
17     A.   Not that I can remember, right.
18     Q.   And the only thing that you had about
19 drugs was that the informant told you that he had
20 bought drugs; is that correct?
21     A.   Correct.
22     Q.   But you can't remember when the
23 informant said he had bought drugs or what he had
24 bought?
25     A.   Right.

PAGE 78

WITHAM 78

1      Q.   And would you have had to have gone
2 from the Pizza Hut back to a computer somewhere in
3 order to run a scope or do any other investigation on
4 David Hinton?
5      A.   No, I could have called on the phone.
6      Q.   If you had called on the phone would
7 there be some sort of a radio log of your request?
8      A.   I suppose. I can't remember at that
9 time, I don't know if -- we have gone through three
10 phone companies at the department since then. I
11 can't remember -- there would be, I mean the cell
12 phone bills would obviously be there.
13     Q.   Right.
14     A.   There would be no log from the records
15 clerk that they did it, I don't think they --
16     Q.   If somebody had run a scope on David
17 Hinton in that time between the meeting at the Pizza
18 Hut and the buy?
19     A.   Right.
20     Q.   There would have to be somebody's
21 P number on the scope report; right?
22     A.   Exactly. That would be there.
23     Q.   Looking at Exhibit 13, the bottom
24 section on page 00001 says that surveillance was
25 established at 1656 hours. Do you see that section?

PAGE 79

WITHAM 79

1      A.   Yes.
2      Q.   Now, did you conduct the surveillance
3 that is described in that paragraph?
4      A.   No.
5      Q.   Who conducted the surveillance that is
6 described in the paragraph on the last paragraph on
7 Exhibit 13?
8      A.   I think it was Officer Beckler and
9 Officer Kraft, and I think myself and the informant
10 did a drive-by on the residence also, just to confirm
11 what they believed to be the residence, and just to
12 conclude that they had the right observation on the
13 right house. And I had the CI drive me by it, so
14 somewhat I was included momentarily in the
15 surveillance.
16     Q.   How did you get from the Pizza Hut to
17 1919 Hallwood?
18     A.   I drove my police car.
19     Q.   And did you take the informant with you
20 in your police car?
21     A.   Correct.
22     Q.   And you are saying that you and the
23 informant drove by the address, but did not set up
24 surveillance?
25     A.   We gave the address from descriptors,

PAGE 80

WITHAM 80

1 or gave not the address, but a description of the
2 house with what the house looked like where it would
3 be placed on the block. The officers set up
4 surveillance and told us that they had identified a
5 house exactly what we described, no other one that
6 looked like it. They either asked us, or I wanted to
7 confirm it for myself that we had the right house, so
8 I had the informant drive me, show me exactly which
9 house it was to confirm for them that it was the
10 house that they had.
11     Q.   So you personally drove by the house
12 with the informant in your car?
13     A.   Correct.
14     Q.   And you saw the house with the
15 informant in your car?
16     A.   Correct.
17     Q.   But that's the only surveillance that
18 you did?
19     A.   Well, I mean when I drop off an
20 informant I have to keep an eye on them until a
21 location that I can observe them until the other
22 individuals pick them up on their part of the
23 surveillance.
24     Q.   I understand, but the only surveillance
25 that you did of the 1919 Hallwood address was one

*Lori M. Judd, CCR #233, RMR*

## DEPOSITION OF SHANE WITHAM

SHEET 21  PAGE 81

**WITHAM  81**

1  drive-by with the informant in your car?
2      A.  Correct -- well, are you talking about
3  for this initial buy?
4      Q.  For this buy that's described in
5  Exhibit 13?
6      A.  That's not the only time I have been by
7  the house.
8      Q.  But as of January 4, 2002, at the time
9  this buy happened at 5:00, that was the only time
10  that you had been by 1919 Hallwood?
11      A.  I just wanted to clarify.  There was
12  other times I went by the house.
13      Q.  That's correct, isn't it?
14      A.  Yes.
15      Q.  And then you dropped -- the next entry
16  says "CI was dropped from a near-by location?"
17      A.  Yes.
18      Q.  You are the one who dropped the
19  informant from a nearby location; correct?
20      A.  Yes.
21      Q.  What was the nearby location?
22      A.  It was a parking lot on the east --
23  there's a street, Hallwood runs east and west and I
24  can't remember if it's -- I don't remember what the
25  cross street is, but the cross street to the west, if

PAGE 82

**WITHAM  82**

1  you go just a little bit to the south, there's a
2  parking lot on the right-hand side, or on the
3  west-hand side of that road, and I parked in that
4  parking lot and dropped him off and had an
5  observation of him walking from south to north on the
6  cross street and then had him walking eastbound down
7  Hallwood until I lose site of him walking eastbound.
8      Q.  Okay.
9      A.  And the other officers pick him up as
10  soon as he turns eastbound.
11      Q.  Okay.  From the point where you dropped
12  the informant off to the front door at 1919 Hallwood,
13  there's no line of sight, is there?
14      A.  No.
15      Q.  So from your position when you dropped
16  off the informant, you could not see anything that
17  transpired in the course of this buy, could you?
18      A.  No.
19      Q.  So where your report on page two, the
20  top paragraph says "CI was observed to meet with an
21  unknown subject," you did not observe that, did you?
22      A.  No.
23      Q.  As you sit here today can you testify
24  whether it was Beckler or Kraft who observed the
25  informant meet with an unknown subject?

PAGE 83

**WITHAM  83**

1      A.  I can't remember exactly.  I thought
2  they were both on the street, both made the
3  observation.
4      Q.  Is there a reason why you did not write
5  down who made the observation of the informant
6  meeting an unknown subject?
7      A.  I just forgot during the dictation.
8  Not forgot who, forgot to do it.
9      Q.  So everything that appears in the
10  paragraph on page two of your report beside the entry
11  1700 hours, Officer Witham, those are observations
12  made by someone other than you; correct?
13      A.  True.
14      Q.  You did not observe the informant do
15  anything at the 1919 Hallwood address, did you?
16      A.  That's correct, no.
17      Q.  The informant got back to your location
18  west on Hallwood and south on the adjacent street at
19  5:21?
20      A.  Yes.
21      Q.  And between the time -- well, when
22  the -- I'm sorry, withdraw that question.
23          When the confidential informant walked
24  away from your vehicle when you dropped him off, was
25  the sun up?

PAGE 84

**WITHAM  84**

1      A.  I don't recall.  I would imagine it
2  would be during wintertime at that time, I can't
3  remember.
4      Q.  From where you were parked in the
5  parking lot where you dropped off the confidential
6  informant, did you have a line of sight to the
7  vehicle that Beckler and Kraft were in?
8      MR. ANDERSON:  I'm going to object.  I haven't
9  heard him testify that they were in the same vehicle
10  or if they were in a vehicle.
11      MR. BOOKE:  Fair enough, you're absolutely
12  right.
13      Q.  How did Beckler and Kraft conduct their
14  surveillance?
15      A.  They were each in their own individual
16  vehicles.
17      Q.  Okay, and once they conducted their
18  surveillance, where did they go?
19      A.  After the buy was done?
20      Q.  Did they stay for the whole buy?
21      A.  Yes.
22      Q.  Both of them?
23      A.  Yes.
24      Q.  You remember that?
25      A.  Yes.

## DEPOSITION OF SHANE WITHAM

SHEET 22   PAGE 85

```
                                    WITHAM   85
1        Q.   And where did Beckler and Kraft observe
2   whatever it is they observed from?
3        A.   One I know is east of the residence on
4   Hallwood, facing west, and because of the bars on the
5   front doorway they don't, it's very dark inside the
6   catwalk or corridor, bars to the front door are not
7   the ones that just lay over the very front, there's a
8   separation from a porch.   Then you enter the porch
9   way to get to the door.   And to get a good view one
10  of them was mobile and timing, once one saw movement
11  at the gate, another one would do a drive-by and try
12  to correlate, you know, their drive-by.   You can't
13  keep going up and down on the street, but.
14       Q.   Well, is the answer to your question
15  then that you don't know where they were?
16       A.   No.   One was east of the residence and
17  the other one was mobile.   I don't know if the one
18  that was mobile was coming east or west, or if he was
19  coming, because I don't have a view of Hallwood.   You
20  asked if I saw the officers during the surveillance,
21  one of them -- I don't remember which one -- was
22  driving down Hallwood, out of my sight.
23       Q.   When you say he was mobile, you mean
24  driving?
25       A.   Driving, yeah, and the other one was
```

PAGE 86

```
                                    WITHAM   86
1   stationary, east of the residence.
2        Q.   Both were in vehicles?   One was parked;
3   the other was moving?
4        A.   Correct.
5        Q.   From your point where you dropped off
6   the informant, could you see either of the Beckler or
7   Kraft's vehicle?
8        A.   I couldn't see the one that was
9   stationary.   The one that was mobile I could see
10  turning down the street, at the time that he was
11  given to be driving down the street.
12       Q.   And which vehicle was that, Beckler or
13  Kraft?
14       A.   I seem to think that Kraft was
15  stationary and Beckler was mobile, is what I believe
16  was going on.   I believe I remember, Beckler had a
17  black Blazer and Kraft had like a silver or a gold
18  Monte Carlo.
19       Q.   Looking on page two of Exhibit 13,
20  beside the entry that's marked 1721 hours, the first
21  sentence says "CI then exited and was surveilled to
22  walk directly back to myself, Detective Witham."   Do
23  you see that sentence?
24       A.   Yes.
25       Q.   Is that your observation, or is that
```

PAGE 87

```
                                    WITHAM   87
1   Beckler or Kraft's observation?
2        A.   The surveillance units on Hallwood
3   watching him exit out the front gate and as he
4   reached back toward the west end of Hallwood, I would
5   pick him up.
6        Q.   And the informant did not come into
7   your line of sight until he reached the intersection
8   of Hallwood and the cross street; is that correct?
9        A.   Correct, maybe a little bit east, not
10  much.
11       Q.   Did Kraft and/or Beckler come to where
12  you were parked?
13       A.   After the controlled buy?
14       Q.   Yes.
15       A.   No.
16       Q.   They simply departed the scene?
17       A.   I don't recall where they went and
18  where we went, but we do not sit there and stay
19  within a block and a half after a controlled buy, in
20  case they have counter surveillance or coincidentally
21  have to leave, and I picked up the CI and moved to
22  another location.   I can't remember what that was, to
23  debrief him and get the information and the narcotics
24  and so forth.   But it would have been fairly close.
25  I don't recall meeting up with them or the CI, if I
```

PAGE 88

```
                                    WITHAM   88
1   just dropped the CI off at that location that we had
2   met at or brought him back to the west side of town.
3        Q.   Well, at 5:21 you picked up the
4   confidential informant, according to your report;
5   correct?
6        A.   Correct.
7        Q.   And where did you take the confidential
8   informant?
9        A.   I can't remember where.
10       Q.   How long was it until you got the
11  alleged controlled substance from the confidential
12  informant?
13       A.   He handed it to me as soon as he got in
14  the car.   I think what we did is there's -- I can't
15  remember if it's Flamingo.   There's a major cross
16  street just west that parallels Hallwood, or south of
17  it, and there's a shopping center or restaurant
18  there, and I can't remember which.   And we went
19  inside the parking lot there and that's where I did
20  my signing of the CI paperwork and the initial
21  property stuff and took him back to the Pizza Hut.
22       Q.   And you don't recall talking with
23  Beckler or Kraft any further at that time?
24       A.   No, not pertaining to this particular
25  case.
```

## DEPOSITION OF SHANE WITHAM

```
                                         WITHAM    89
1          Q.   Did you talk to Beckler or Kraft at all
2    any further on January 4, 2001 -- or 2002, rather?
3          A.   Yes, I did because one of them remained
4    back -- I don't remember which one -- to get a legal
5    description of the residence for the search warrant,
6    and I just wanted to confirm everything that they saw
7    and observed and so forth.  So yes, I did.  I don't
8    recall if that was back when we got back to the
9    office, or if it was when, if we had another deal or
10   we went to or where the location was.
11         Q.   Did you have the confidential informant
12   with you when you went back to the Sunrise and
13   Bermuda office to fill out your property report?
14         A.   No.
15         Q.   And so if you picked the confidential
16   informant up at 5:21 and you filled out the property
17   report at 1800 hours, 6:00, at the Bermuda and
18   Sunrise location, you had already dropped off the
19   confidential informant at the Pizza Hut at Sahara and
20   Rancho?
21         A.   Yes.  As I stated before, those reports
22   get initially done at times and get completed later
23   at times.
24         Q.   Were there any photos taken of the
25   surveillance of the Hallwood residence?
```

```
                                         WITHAM    90
1          A.   No.
2          Q.   Were there any, or was there any video
3    taken of the Hallwood residence?
4          A.   No.
5          Q.   Was there any photograph or video taken
6    of the individual who allegedly came out to meet the
7    confidential informant outside the Hallwood house?
8          A.   No.
9          Q.   There is nothing -- oh, wait a second.
10   Did you personally search the informant before the
11   controlled buy?
12         A.   Yes, before and after.
13         Q.   You searched the informant after the
14   buy?
15         A.   Yes.
16         Q.   You personally did both of those
17   searches?
18         A.   Yes.
19         Q.   Where was the confidential informant
20   when you searched him before the buy?
21         A.   Pizza Hut.
22         Q.   How do you conduct the search?
23         A.   In front of, they brought a utility
24   vehicle to Pizza Hut and in front of that, which was
25   parked next to my car and the backside of it, the
```

```
                                         WITHAM    91
1    front of his vehicle was in a parking spot where
2    there's a wall and in between that wall and the front
3    of his vehicle.
4          Q.   How do you conduct the search?
5          A.   I searched his pockets, socks, shoes,
6    clothing.
7          Q.   With your hands?
8          A.   Yes.
9          Q.   Were you the only one that conducted
10   the search?
11         A.   Yes.
12         Q.   You didn't do a strip search?
13         A.   No.
14         Q.   You didn't do a body cavity search?
15         A.   No.
16         Q.   You just did a pat down?
17         A.   I got into his pockets and into the
18   clothing areas that you can hide stuff.
19         Q.   Did you ask the confidential informant
20   to take off any of his clothes?
21         A.   I don't recall if he had a coat,
22   probably did, it was cold.  I don't recall if I asked
23   him to take off everything or not.
24         Q.   What did you find in any of the
25   confidential informant's pockets?
```

```
                                         WITHAM    92
1          A.   I don't recall, but -- I don't recall
2    if I took any of his money out or I don't let them go
3    in with any of their own money, I hold on to that.  I
4    just want him to go in with the money that we give
5    them, and I can't remember if he had any money or
6    keys or wallets or whatever he had, but he didn't
7    have anything illegal.
8          Q.   Did you make a written inventory of
9    everything you found on the confidential informant
10   when you searched him?
11         A.   No.
12         Q.   Now, the report says that you gave the
13   confidential informant a $100 bill?
14         A.   Yes.
15         Q.   Where did you get the $100 bill?
16         A.   Impress funds.
17         Q.   Is there some record of you getting the
18   $100 bill?
19         A.   Yes.  I don't know if it would be
20   specifically to the serial number.  As a matter of
21   fact, I know it wouldn't be specifically to the
22   serial number, but we get -- we're issued impress
23   fund money through narcotics, which we sign for, for
24   the purposes of paying informants and for conducting
25   narcotic -- or for the narcotics buys themselves.
```

DEPOSITION OF SHANE WITHAM

SHEET 24   PAGE 93

WITHAM   93

1    Q.   Did you search for the $100 bill when
2  you did the bust on January the 16th?
3    A.   Yes.
4    Q.   Did you recover the $100 bill?
5    A.   No.
6    Q.   Officer Witham, from the time that you
7  left the Pizza Hut on Sahara between Rancho and
8  Valley View at about 3:25 or 3:30 p.m., went to the
9  Hallwood address, whatever went on at the Hallwood
10 address went on, the informant came back to your car
11 and you took the informant back to the Pizza Hut on
12 Sahara between Valley View and Rancho, you are the
13 only person that was in the company of the
14 confidential informant; is that right?
15   A.   Yes.
16   Q.   The confidential informant was not with
17 either Beckler or Kraft during that time?
18   A.   Correct.
19   Q.   How many other buys did you make on
20 January 4, 2002?
21   A.   I may have made one other, and I can't
22 remember if we went there and got it at that time or
23 if it was, they weren't home and had done it at a
24 prior time. That's why I can't remember if I saw the
25 same informant in that ten days prior to the service

PAGE 94

WITHAM   94

1  or if it was done that same evening. There's other
2  residences that I have been to back and forth on
3  several different occasions attempting to do the buys
4  and I can't place whether they were in that day or
5  prior to.
6    Q.   And just so that the record is clear,
7  you did not observe whoever it was that met the
8  confidential informant at 1919 Hallwood?
9    A.   No.
10   Q.   And there is no physical description at
11 all of the person who met the confidential informant
12 at 1919 Hallwood contained in your report, you are
13 aware of that?
14   A.   Correct.
15   Q.   Did Officer Beckler or Officer Kraft
16 give you a physical description of the person who met
17 the confidential informant at the door?
18   A.   They said it was too dark with the
19 bars, they couldn't identify or see who it was or
20 give a description of it.
21   Q.   Looking at the last paragraph of your
22 report that's a part of Exhibit 13, page 00002, did
23 the confidential informant tell you that he rang the
24 doorbell to the Hallwood house?
25   A.   I can't remember. If I could look at

PAGE 95

WITHAM   95

1  my report, if it's in there.
2    Q.   You go ahead.
3    A.   Yes.
4    Q.   Did the confidential informant tell you
5  that he met David at the front door to the Hallwood
6  house?
7    A.   Yes.
8    Q.   And did you understand that to be David
9  Hinton?
10   A.   Yes.
11   Q.   Did the confidential informant tell you
12 that David let him into the house?
13   A.   Yes.
14   Q.   And the confidential informant told you
15 that David's father was there in the house?
16   A.   Yes.
17   Q.   And the confidential informant told you
18 that David's father had just recently been released
19 from prison?
20   A.   That's what the informant told me.
21   Q.   Did the confidential informant tell you
22 how recently Hinton's father had been released from
23 prison?
24   A.   I don't recall if he told me the
25 specific time.

PAGE 96

WITHAM   96

1    Q.   Did he say when David's father was
2  released from prison?
3    A.   No, but from what I understand he
4  hadn't seen him for a while. He sat down and told me
5  that they were talking for the majority of time that
6  he was in there because he hadn't seen him for a long
7  time.
8    Q.   Meaning he, the informant had not seen
9  Hinton's father for a long time?
10   A.   That's correct.
11   Q.   And the confidential informant told you
12 that he, the informant, talked to Hinton's father
13 while he was inside the house?
14   A.   Right.
15   Q.   In fact, the confidential informant
16 told you that he talked to Hinton's father for the
17 next 20 minutes or for about 20 minutes; correct?
18   A.   Correct.
19   Q.   Did the confidential informant describe
20 or identify Hinton's father in any way?
21   A.   He told me he was an older guy, had
22 grey hair. He wasn't very descriptive on it. I
23 wasn't real concerned over, I was concerned over
24 David's involvement, I wasn't concerned over the
25 father's. The informant was apologetic for the time

## DEPOSITION OF SHANE WITHAM

SHEET 25   PAGE 97

WITHAM   97

1 length that it took for him to be in there and he
2 explained it as to the reason why because he hadn't
3 seen the father in a while and thought it would be an
4 awkward situation to go in there and walk out without
5 having a conversation with somebody that he hadn't
6 seen in a while, so he apologized for that.
7    Q.   So you had the impression that the
8 confidential informant knew David's father?
9    A.   Correct.
10    Q.   From prison?
11    A.   I don't know.
12    Q.   And from what I read on page two there
13 of your report, it sounds like the confidential
14 informant was telling you that at the end of his
15 conversation with David's father, David then went
16 down to the hall and came back with an alleged
17 substance?
18    A.   Correct.
19    Q.   And handed the substance to the
20 informant?
21    A.   Yes.
22    Q.   And the informant then ended his
23 conversation with David's father; correct?
24    A.   I would assume so.
25    Q.   And from how it's described, the

PAGE 98

WITHAM   98

1 confidential informant told you that David handed him
2 methamphetamine right in his father's presence?
3    A.   I didn't infer that from this. I don't
4 know if the transaction was done in the kitchen,
5 living room, hand to hand on the couch, I don't know.
6 I don't know if it was done in front of his father or
7 not.
8    Q.   Well, if you would look at the next to
9 the last sentence in the next to the last paragraph,
10 you write "CI gave Hinton $100 buy money and Hinton
11 proceeded down a hallway into an unknown room and
12 returned back with the purported amount of
13 methamphetamine and handed it to the CI"?
14    A.   Correct.
15    Q.   Now, you are saying you don't know
16 whether that occurred in the presence of Mr. Hinton,
17 Senior or not?
18    A.   Correct, I don't know.
19    Q.   Did you ask the informant if it
20 happened that way?
21    A.   No.
22    Q.   Why not?
23    A.   I don't know.
24    Q.   Now prior to January 4, 2002, you had
25 never arrested David Hinton before?

PAGE 99

WITHAM   99

1    A.   Correct.
2    Q.   You had never seen David Hinton before?
3    A.   Yes.
4    Q.   You had never spoken to David Hinton
5 before?
6    A.   Correct.
7    Q.   Prior to the events of January 4, 2002
8 you did not know anything at all about the 1919
9 Hallwood residence, did you?
10    A.   No.
11    Q.   You had never been there before?
12    A.   No.
13    Q.   You had never conducted a search there?
14    A.   No.
15    Q.   You had never seen or knew of any
16 transactions, drug transactions going on there?
17    A.   No.
18    Q.   Prior to the events of January 4, 2002
19 did you know anything at all about John Reyes?
20    A.   No.
21    Q.   Even after the events of January 4,
22 2002, did you know anything about John Reyes?
23    A.   No.
24    Q.   Were you at the Hinton residence on the
25 night of January 16, 2002 when the search warrant was

PAGE 100

WITHAM   100

1 executed?
2    A.   Yes.
3    Q.   What was your job in relation to the
4 events at the Hallwood residence on January 16?
5    A.   I was the affiant and case agent of the
6 search warrant. I gave everybody on the squad that
7 was at the location a particular assignment for, to
8 serve a search warrant. Beckler was in charge of
9 searching, he could search rooms. I can't remember
10 who was in charge of identifying the individuals, but
11 each squad member is given an assignment to search,
12 they are responsible for that area. If they locate
13 items of evidence, they inform me. I go out and
14 observe the location of it, and depending on the
15 value of the evidence, he'll either wait for ID techs
16 to come and photograph and process those items, or
17 I'll be the one that recovers the items found. I
18 conduct the interviews and subsequently I do the
19 booking into jail, if the suspects are going to get
20 arrested.
21    Q.   You said depending on the value, you
22 have the ID techs come and photograph things?
23    A.   If it's a dime bag of marijuana, and if
24 it's a stolen gun, both of them have different
25 values, as far as their evidentiary value. And if

DEPOSITION OF SHANE WITHAM

SHEET 26   PAGE 101

WITHAM   101

1    I'm not going to, may not even press charges for the
2    quantity of marijuana, but I'm going to press charges
3    for the guns, we'll go ahead and indicate where it
4    was located and give a description where its location
5    was in the search warrant officer's report, and if
6    it's ID, they may come in and photograph or try to
7    lift prints or so forth off of evidence.
8        Q.   What were you authorized by the search
9    warrant to search for at the Hallwood house?
10       A.   Narcotics.
11       Q.   What do you mean by narcotics?
12       A.   Methamphetamine, paraphernalia and
13   persons involved at that location.
14       Q.   Did you find any methamphetamine in the
15   house at 1919 Hallwood?
16       A.   At a later time, yes.
17       Q.   During the search that you conducted on
18   January 16th did you find any methamphetamine in the
19   house at 1919 Hallwood?
20       A.   There was none found inside the house
21   at the time of the search with the search warrant.
22       Q.   Did you find any methamphetamine
23   paraphernalia in the house at 1919 Hallwood?
24       A.   I don't recall.
25       Q.   Did you find any records or documents

PAGE 102

WITHAM   102

1    that related to the sale of methamphetamine in the
2    house at 1919 Hallwood?
3        A.   I don't recall, unless it's on the
4    inventory in the search warrant report.
5        Q.   Did you take any of the individuals
6    that were in the house into custody?
7        A.   SWAT took them into custody.  Three of
8    four people there were taken down to the jail and
9    arrested.
10       Q.   Where were the individuals when you saw
11   them?
12       A.   They were out in the front yard.
13       Q.   Doing what?
14       A.   They were sitting on the ground.
15       Q.   In the front yard of the Hallwood
16   house?
17       A.   Yes.
18       Q.   Were they cuffed?
19       A.   Yes.
20       Q.   Did you take any of them to the Clark
21   County jail?
22       A.   I think one of my partners took them
23   down, and then I think I showed up later.  I don't
24   remember if I had one of them with me or not.  To be
25   honest with you, I can't remember.

PAGE 103

WITHAM   103

1        Q.   What were the three individuals who
2    were taken to jail wearing?
3        A.   I don't recall.
4        Q.   Were rifles or handguns evidence in the
5    alleged sale of paraphernalia -- or the alleged sale
6    of methamphetamine that was described in the search
7    warrant?
8        A.   No.
9        Q.   Were rifles or handguns identified in
10   any way in the search warrant?
11       A.   I believe there's a sentence in there
12   that references guns, but I can't recall.
13       Q.   Were you searching for rifles or
14   handguns?
15       A.   No.
16       Q.   Was anyone searching for rifles or
17   handguns?
18       A.   No.
19       Q.   Did you conduct a thorough search of
20   the premises at 1919 Hallwood?
21       A.   Yes.
22       Q.   Do you believe that you found
23   everything that was evidence of a crime?
24       A.   No.
25       Q.   Why not?

PAGE 104

WITHAM   104

1        A.   Because of the nature of the bars on
2    the doors and the time it took SWAT to get to the
3    residence, they went tactical and therefore it does
4    not allow us to make the entry that we would like for
5    their safety and get into the residence, therefore
6    the suspects were called out and that gave them a
7    large amount of time to destroy any evidence such as
8    the small evidence that's as easy to dispose of as
9    narcotics.
10       Q.   Do you have any evidence at all that
11   the persons in the house disposed of or destroyed
12   methamphetamine while SWAT was calling them out of
13   the house?
14       A.   We did have one that had time to at
15   least conceal methamphetamine on his person.  It was
16   found later on at the jail.
17       Q.   Do you have -- perhaps you didn't hear
18   my question.  Do you have any information or evidence
19   that any methamphetamine was disposed of or destroyed
20   while SWAT was calling individuals out of the house?
21       A.   No.
22       Q.   And so why do you believe that you did
23   not find everything at the Hallwood residence that
24   was evidence of a crime?
25       A.   Well, we did find methamphetamine on

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF SHANE WITHAM

SHEET 27   PAGE 105

WITHAM   105

1   one of the suspects later on, and it didn't get
2   disposed of, because we found it.  But obviously the
3   attempt of concealing it would be the beginning
4   portion of disposing it.  So in that regard, there is
5   somewhat of some evidence of attempting to keep
6   methamphetamine from being found by us.
7        Q.   Anything else?  Is there any other
8   information that you have that would indicate that
9   methamphetamine was disposed of or destroyed?
10       A.   No.
11       Q.   I want to show you what's numbered page
12   000015.  Do you recognize what that is?
13       A.   Yes, sir, a search warrant return.
14       Q.   Is that your handwriting on that search
15   warrant return?
16       A.   No, it's not.
17       Q.   Are those, does that document list all
18   of the things that were seized at the Hallwood house?
19       A.   It doesn't individually itemize it.
20   Detective Kraft remained behind with the amount of
21   guns and so forth.  They concluded the service of the
22   warrant for me as I went down to the jail.
23       Q.   So does that document, document 15,
24   list all of the things that were seized at the
25   Hallwood residence on January 16?

PAGE 106

WITHAM   106

1        A.   I would have to look at the search
2   warrant officer's report, or the impound report from
3   the search warrant to see if all of the items of
4   evidence seized fall into these categories.
5        Q.   Is that what page 000031 is?
6        A.   And the front one.  This is the second
7   page.
8        Q.   And page 30?
9        A.   The only thing not listed on here is
10   the ammunition, miscellaneous ammunition.
11       Q.   So what then is on pages 30 and 31,
12   what does that list?
13       A.   It lists 3.6 grams of marijuana, a vile
14   with residue.
15       Q.   No, I'm not asking you to read me the
16   list, what does that list contain?  Is that
17   everything that was seized from the Hallwood house?
18       A.   Yes.
19       Q.   Now why were all of these rifles
20   seized?
21       A.   There was narcotics found in there,
22   marijuana.  I received, through talking to the elder
23   Hinton, that he was an ex-felon.  I was not able to
24   confirm that, but based on his information he had
25   given to me and for follow-up investigation of

PAGE 107

WITHAM   107

1   ex-felon in possession of firearm, they were taken.
2   One of the firearms was stolen, one of the firearms
3   had the serial numbers defaced.  One of the suspects
4   had a warrant for carrying a concealed weapon, and we
5   found a ripped up $20.00 bill from the robbery, which
6   led more evidence to the robbery that occurred that a
7   firearm was used in.  And based on those
8   circumstances, we took the firearms from the
9   residence.
10       Q.   Are you the one who made the decision
11   to take the firearms from the residence?
12       A.   Yes, sir.
13       Q.   Before taking the firearms from the
14   residence did you make any attempt to determine the
15   ownership of the rifles and handgun?
16       A.   I'm sorry?
17       Q.   Before seizing all of the firearms, did
18   you make any attempt to determine who owned the
19   rifles and handguns that were found in the attic?
20       A.   No.
21       Q.   Were the rifles and handguns that were
22   found in the attic of the house at 1919 Hallwood
23   evidence of a crime?
24       A.   Two of them were and they were
25   accompanied by the rest and I had information that he

PAGE 108

WITHAM   108

1   was an ex-felon.
2        Q.   Which guns that were found in the attic
3   were evidence of a crime?
4        A.   I would have to verify in the report
5   that the one with the defaced serial number was
6   found.  I know it was stolen when it was found on the
7   Hinton bed, but the one with the defaced serial
8   number, I have to confirm whether that was in the
9   attic or whether that was in Donald's room.
10       Q.   If you did not determine who owned the
11   17 rifles and four handguns found in the attic, why
12   did you seize them?
13       A.   Because I had an individual that was
14   possibly a robbery suspect with the use of a gun.  I
15   had a person who was admitting to me that he was an
16   ex-felon, and because they were together with other
17   firearms that were used in illegal activity or were
18   stolen and had the serial number defaced, and I think
19   it would be wrong to leave those weapons in that
20   residence.
21       Q.   How did you determine that one of the
22   guns was stolen?
23       A.   We conducted a records check on the
24   serial number.
25       Q.   On the spot you did that?

DEPOSITION OF SHANE WITHAM

SHEET 28   PAGE 109

PAGE 111

WITHAM   109

1   A.   One of the officers informed me of
2   that.  They would have done that.
3   Q.   Before you seized the gun you
4   determined that it was stolen?  Is that your
5   testimony?
6   A.   Yes.
7   Q.   And before you seized the gun with the
8   defaced serial number, you determined that it was a
9   defaced serial number?
10   A.   Yes.
11   Q.   And was that a rifle or a handgun?
12   A.   I believe they were both handguns.
13   Q.   Okay, and what crime is it that you
14   think was committed with respect to the 17 rifles
15   that were found in the attic?
16   A.   Ex-felon in possession of a firearm.
17   Q.   And that conclusion you reached without
18   having determined the ownership of the guns?
19   A.   Yes.
20   Q.   You regard all of those as serious
21   crimes?
22   A.   Yes.
23   Q.   Did you regard those people in the
24   house at Hallwood as dangerous people?
25   A.   Extremely.

WITHAM   111

1   (Whereupon Deposition Exhibit
2   18 was marked for identification.)
3   MR. BOOKE:
4   Q.   I'm going to show you now what's marked
5   as Exhibit 18.  Do you recognize that as the
6   application and affidavit for a search warrant in
7   this case?
8   A.   Yes.
9   Q.   Do you see anything in the application
10   for a search warrant that is intended to state that
11   the occupants of the place to be searched are armed
12   or dangerous?
13   A.   There's one small paragraph on page
14   four, beneath the 000011 that just briefly states
15   it's your affiant's experience that persons who sell
16   narcotics frequently carry guns on their person and
17   at locations used for selling narcotics to protect
18   their money or narcotics.
19   Q.   Is there anything in the application
20   for search warrant, Exhibit 18, that you intended to
21   state that weapons were involved in committing any of
22   the crimes described in the application for the
23   warrant?
24   A.   No.
25   Q.   Did you prepare this application for

PAGE 110

WITHAM   110

1   Q.   Why was David Hinton never prosecuted
2   in this case?
3   A.   I had left, I had left during the
4   prosecution part and I don't know where or how or
5   what stands with the case up there, but it falls
6   under the administrative portion of narcotics and
7   whatever the DA's office and narcotics decided, or
8   whether it was lack of communication, I have no idea.
9   To be honest with you, I don't know what happened to
10   the charges up there.
11   Q.   Why was Donald Hinton never prosecuted
12   in this case?
13   A.   I don't know.
14   Q.   Why was John Reyes never prosecuted in
15   this case?
16   A.   I don't know.
17   Q.   In the course of doing undercover work
18   have you ever given false identification to someone?
19   A.   Yes.
20   Q.   Have you ever deceived someone about
21   your job?
22   A.   Yes.
23   Q.   And would you agree that a part of your
24   work as a narcotics agent involves deceiving people?
25   A.   Yes.

PAGE 112

WITHAM   112

1   search warrant?
2   A.   Officer Jordan Harrison, upon giving
3   the information and the notes, typed it up as I typed
4   some others up and I reviewed it and signed it.  It
5   was my deal, I just asked him to conduct, or to do
6   the typing of the search warrant.
7   Q.   So the content of this application for
8   a search warrant was given by you?
9   A.   The content, yes.
10   Q.   Did you read the application for search
11   warrant before you signed it?
12   A.   Yes.
13   Q.   How many times did you read this
14   application before you signed it?
15   A.   One time.
16   Q.   Where did you read the application for
17   a search warrant?
18   A.   At the narcotics office.
19   Q.   Did you make any edits or changes from
20   the first draft of the application to the finished
21   product that was submitted to the court?
22   A.   No.
23   Q.   Did you verify the truth of all of the
24   statements made in the application before you signed
25   it?

DEPOSITION OF SHANE WITHAM

SHEET 29    PAGE 113

WITHAM    113

1    A.    Yes.
2    Q.    Where were you when you signed the
3    application for the search warrant?
4    A.    I believe it was Judge Abbatangelo's,
5    so I would have to verify that.
6    Q.    Were you sworn under oath at the time
7    you signed the application?
8    A.    Yes.
9    Q.    Are all of the statements that are made
10    in this application the truth, the whole truth and
11    nothing but the truth?
12    A.    Yes.
13    Q.    Do you recall whether you were, in
14    fact, in the presence of Judge Abbatangelo?
15    A.    Yes.
16    Q.    And you were?
17    A.    Yes.
18    Q.    Page two of the application,
19    Exhibit 18, says that if you are ordered by the court
20    to reveal the identity of the confidential informant
21    that you would do so. My question is: Have you ever
22    revealed the identity of the confidential informant?
23    A.    No.
24    Q.    On page three of the application the
25    last full paragraph that begins "it is your affiant's

PAGE 114

WITHAM    114

1    opinion," and it goes on over to the next page four?
2    A.    Uh-huh.
3    Q.    And the following paragraph that begins
4    "because narcotics are extremely valuable," do you
5    see those two paragraphs?
6    A.    Uh-huh.
7    Q.    Are those, is that language that is
8    identical to language that you have used in other
9    search warrants?
10    A.    Yes.
11    Q.    That's form language?
12    A.    Yes, it's on a template.
13    Q.    And where is that template located,
14    where was it when you used it?
15    A.    Actually, I have my own disks, and as
16    we all do, that have our own templates on it. This
17    particular template would be Detective Harrison's and
18    some of that is a little bit different, based on the
19    writing of officers, but somewhat the same.
20    Q.    But it's essentially form language?
21    A.    Yes, sir.
22    Q.    Looking on page four of Exhibit 18, the
23    paragraph that says "based on the surveillance done
24    by your affiant and by fellow LVMPD officers it
25    appears that persons in control of the suspected

PAGE 115

WITHAM    115

1    premises are heavily engaged in the selling of
2    amphetamines during nighttime hours and therefore
3    your affiant prays that this warrant authorize a
4    nighttime search." Do you see that paragraph?
5    A.    Yes.
6    Q.    Did you do any surveillance of 1919
7    Hallwood other than on January 4, 2002 prior to the
8    time this application was submitted?
9    A.    No, just on these two times.
10    Q.    And you personally, the only
11    surveillance that you did was drive by once with the
12    informant in your car?
13    A.    Yes.
14    Q.    And the only surveillance that was done
15    by any other LVMPD officers was what Beckler and
16    Kraft were unable to describe to you because it was
17    too dark?
18    A.    The identity of the individual, yes.
19    Q.    And based on -- and that's all the
20    surveillance there was, Beckler, Kraft, and you;
21    correct?
22    A.    (Witness nods.)
23    Q.    And so based on that information you
24    made the statement that the persons in control of the
25    premises are heavily engaged in the selling of

PAGE 116

WITHAM    116

1    methamphetamine during nighttime hours?
2    A.    Yes.
3    Q.    And that was -- okay.  So all of the
4    things that narcotics officers observed at the
5    Hallwood residence on January 4, 2002 were observed
6    during nighttime hours; is that right?
7    A.    In the evening, yes.
8    Q.    I would like to show you Exhibit 5.
9    I'm showing you what's marked as Exhibit 5 and I'm
10    going to open the exhibit to pages that are numbered
11    000092 and 93.  Please take a look at those, if you
12    would.
13    A.    All right.
14    Q.    And then I would also like to put in
15    front of you Exhibit 7.  Now, did you have Exhibit 7
16    available to you at the time that you sent the
17    request for warrant service to SWAT?
18    A.    I believe I got this after the service
19    of the search warrant.  I contacted Sergeant Borgano
20    after the search warrant because we had located the
21    ripped up -- he's in robbery, after we found the
22    ripped up $20.00 bill, gave him the information,
23    because it was now more confirmed, and then he sent a
24    copy of that over to me and I sent him the
25    information that I had on the identity of Hinton.

DEPOSITION OF SHANE WITHAM

WITHAM 117

1    Q.   All right.  Now I would like you to
2  look up in the upper corner of Exhibit 7.  Do you see
3  the date and time registered there?
4        A.   Yes.
5        Q.   It shows January 11; correct?
6        A.   Correct.
7        Q.   And so is it your testimony that you
8  did not have that information at the time the search
9  warrant was executed on January the 16th?
10        A.   I don't believe I had gotten that until
11  afterwards.  I talked to Sergeant Borgano afterwards.
12  I don't know if he -- I can't remember if I talked to
13  him about my suspicions before and then he pulled it
14  up and sent it to me after I confirmed it or what,
15  but I don't believe I had this with me until
16  afterwards.
17        Q.   Who is Sergeant Borgano?
18        A.   Sergeant Paul Borgano in robbery.  That
19  unit up there.
20        Q.   And what did you understand this
21  Exhibit 7 to be?
22        A.   An incident crime report for a robbery
23  at an ATM.
24        Q.   Did you then look through this incident
25  report to find out the identity of the suspect?

WITHAM 118

1        A.   I went through the details.  It still
2  matched and I sent up the identity and information to
3  Sergeant Borgano and in the hopes that they would do
4  follow up on it.  I do narcotics, I don't do
5  robberies and that's where that would have,
6  hopefully.  I don't know what the outcome came out of
7  this either.  I don't know if they did any follow up.
8        Q.   So in other words, your testimony is
9  that you did look at Exhibit 7 when you got it?
10        A.   Yes.
11        Q.   But you think you got it sometime after
12  the warrant was executed at the Hallwood address?
13        A.   Correct.
14        Q.   And after you looked at Exhibit 7 you
15  did believe that it matched up to the David Hinton --
16        A.   I thought that, you know, there was no
17  individual specific identity of the suspect, but as a
18  thumbnail description, they could have matched and
19  some of the details could have very well -- they
20  matched up to what I had learned.
21        Q.   So based on the fact that you had the
22  information from the confidential informant about the
23  ATM robbery and the information that you saw in
24  Exhibit 7, you thought that robbery should
25  investigate further?

WITHAM 119

1        A.   It's possible, yes.
2        Q.   Now, you requested that this warrant on
3  the Hallwood address be executed as a category four
4  or a Class Four warrant?
5        A.   Correct.
6        Q.   Can you list all the reasons why you
7  requested that it be served as a Class Four warrant?
8        A.   First of all, there was the inference
9  that there was a large amount of firearms in the
10  residence, that the suspects were allegedly out
11  committing robberies with firearms.
12        Q.   Anything else?
13        A.   The residence was fortified with bars.
14  Allegedly the group set and we haven't gotten into
15  this, that I learned to be dealing with is possibly
16  the Peckerwoods, which is a prison gang, and they are
17  violent, and for personal experiences I took them to
18  be very violent.
19        Q.   What's the name of the group?
20        A.   Peckerwoods.
21        Q.   Is that P-E-C-K-E-R-W-O-O-D-S?
22        A.   Yes.
23        Q.   Anything else?
24        A.   That's pretty much it.
25        Q.   Now did you communicate to the SWAT

WITHAM 120

1  squad or team that there were large amounts of
2  firearms involved or suspected to be involved in this
3  search?
4        A.   I think, yeah, I think I did.  I may
5  not have, I don't know.  Oh, yeah, here, other
6  information is that he had CCW priors and firearm
7  priors, David did.  So the prior arrest record of the
8  suspect involved.
9        Q.   Did you inform the SWAT squad when you
10  were requesting service of a search warrant that you
11  suspected there would be large numbers of firearms
12  involved?
13        A.   No, I didn't do it on the piece of
14  paper, I may have on the phone before I sent it over
15  and just didn't write it down, I don't recall.
16        Q.   Did you notify SWAT that there were
17  suspects expected to be found who were thought to be
18  committing robberies with firearms?
19        A.   Yes.
20        Q.   You did?  Where is that?
21        A.   Suspect possibly involved with recent
22  robberies.  I didn't put with firearm, but I put
23  recent robberies.
24        Q.   Did you inform SWAT that you suspected
25  involvement with the Peckerwoods gang?

DEPOSITION OF SHANE WITHAM

SHEET 31   PAGE 121

WITHAM   121

1    A.   I don't recall if I told them that.  I
2  don't recall the conversation on the phone.  The
3  conversation on the phone would have been, you know,
4  more of an in-depth conversation as to that, but I
5  can't testify to the fact that I told him that.  My
6  inferences were that they were violent people, yes.
7    Q.   Who did you talk to on the phone at
8  SWAT?
9    A.   Probably Officer Warren, since that's
10  who I faxed the warrant to.
11    Q.   Do you have any recollection of
12  actually having talked with Officer Warren?
13    A.   No, I don't.
14    Q.   And where did you get information that
15  David Hinton had anything to do with the Peckerwood
16  gang?
17    A.   That Joker was a Peckerwood that killed
18  himself.
19    Q.   And this was what the confidential
20  informant told you?
21    A.   Yes.
22    Q.   And did the confidential informant tell
23  you this on January 4, 2002?
24    A.   It was during the conversation in
25  regards to doing the buy at Hallwood and, which is

PAGE 122

WITHAM   122

1  the same conversation that this Joker suicide came up
2  in.
3    Q.   So this would have happened on
4  January 4?
5    A.   Yes, and for the record, my officer
6  involved shooting was with one of these guys.  So on
7  personal knowledge of the seriousness with the way
8  these guys operate, believe me, it was a Class
9  Four, my anticipation of giving it to them.
10    Q.   Were you present at the premises at
11  Hallwood when SWAT actually broke into the house?
12    A.   I was on my way.  I was en route to it.
13  I think I had gotten there within moments.
14    Q.   Were the individuals who had been in
15  the Hallwood house outside by the time you arrived?
16    A.   They were -- no, they weren't.  They
17  were still getting pulled out, called out.
18    Q.   Were any of the individuals who had
19  been in the house outside when you arrived?
20    A.   Well, I can't testify to that because
21  we stay approximately a block away while, that's
22  their whole thing.  We don't, when we leave the entry
23  up to them we're totally out of it and isolated from
24  it.  So when I get called up I can't tell you if they
25  were in the front corridor in one of the vehicles,

PAGE 123

WITHAM   123

1  but when I was called up to come in they was sitting
2  out on the front yard.
3    Q.   That's what I was trying to find out.
4  When you first had line of sight to the individuals
5  who had been in the house, they were already outside?
6    A.   Correct.
7    Q.   So are you aware of whether the SWAT
8  team encountered any force or resistance or threat at
9  all?
10    A.   I was informed by my supervisor, Kim
11  Anderson, who was there, that they were having
12  problems with the entry and therefore had to call the
13  people out and that was just, that's what I was
14  informed.  She being a supervisor, they may have had
15  the SWAT channel on and heard it going on, or been
16  contacted by the supervisor, but I was informed by
17  her that they were having difficulty.  They had
18  difficulty with the entry and called the people out.
19    Q.   Was it described to you what difficulty
20  SWAT had in making the entry?
21    A.   I don't know if they had a difficulty
22  in the breach of the bars or what the difficulty was.
23  I believe that's what it was.
24    Q.   Are you aware of whether the SWAT team
25  encountered any force or violence or threat of

PAGE 124

WITHAM   124

1  violence in entering the house?
2    A.   No.
3    Q.   Did you personally conduct any of the
4  search of the Hallwood house?
5    A.   I was talking and doing interviews and
6  I would be called off after I conduct an interview
7  and told where the evidence was.  So in that aspect I
8  didn't go digging through things or was the ones
9  opening the doors, but I was involved in the
10  locations where things were found.  I was not
11  looking, but because I was the one responsible for
12  the reports, I went and identified the locations of
13  the items and so forth.
14    Q.   Did you personally observe any of the
15  items that were seized in the place from which they
16  were seized?
17    A.   The guns were all out of the attic by
18  the time I got in, so I didn't see their location.
19    Q.   Okay.  How about the item listed as
20  paperwork, did you see paperwork in the location from
21  which it was seized?
22    A.   I don't recall.  So some of it, yes,
23  because when I go around, if I saw -- I was looking
24  -- if I was looking for bills or so forth, I don't
25  remember what I saw, but I do remember in the

## DEPOSITION OF SHANE WITHAM

SHEET 32    PAGE 125

WITHAM    125

1  adjacent bedroom, which I think was Donald's, to the
2  living room, I saw a piece of paperwork on a
3  nightstand that I told them that I would like to have
4  included, and I can't remember what it was, or what.
5  But all the items of paperwork, they piled them up
6  and brought them out in that particular situation and
7  told me where their location was.
8       Q.   Did you see any marijuana inside the
9  house?
10      A.   Yes, in one of the bedrooms.
11      Q.   Where was it in the bedroom?
12      A.   I would have to review my report, but I
13  remember seeing it.  I remember it being pointed out
14  to me.
15      Q.   By whom, who pointed it out?
16      A.   I can't remember.  I was told to come
17  in here and look and I went and I did and I found it.
18      Q.   So all of the guns were out before you
19  got into the house?
20      A.   All the guns in the other room, there
21  were guns in, I believe it was Donald's room that was
22  -- Donald's that were out, but that's where they
23  were kept, it looked like.  So the ones, the only
24  ones that I know of that were moved were the ones out
25  of the attic.  The gun underneath the pillow case,

PAGE 126

WITHAM    126

1  the pillow was moved.  It was still laying there
2  where it was.  The ones in the bedroom, I think there
3  was one under a bed or in a safe, I can't recall, but
4  that one was pulled out and the other one placed on
5  the bed where I saw it.
6       Q.   Did you call for a crime lab technician
7  to come to the premises?
8       A.   Yes, I did.
9       Q.   What was your purpose in calling for a
10  crime lab technician to come to the premises?
11      A.   We always, we have them come in on any
12  forced entry to photograph any damage that is done,
13  and once they get there, if we have evidence of value
14  that we would like to process, then we ask them
15  to.  In this particular case, if we have one or two
16  guns, it would have been viable for them to do that,
17  but we went ahead and took them and for them to be
18  processed at a later time.
19      Q.   So what did the crime lab technician do
20  at the Hallwood premises?
21      A.   I know they took photographs, I know,
22  of the damage.  I released them from doing any of the
23  processing of any of the firearms and they don't do
24  any narcotics tests, so they came and photographed
25  the damage.

PAGE 127

WITHAM    127

1       Q.   Why did you release them from
2  processing any of the firearms?
3       A.   There was quite a few of them.  There
4  was a lot of them and it's that I'd rather get them
5  in a stagnant place and have them do that and I was
6  still wanting to identify the suspect as an ex-felon
7  and there was a lot of -- a lot of on-going
8  investigative stuff to happen after the service of
9  the warrant.
10      Q.   Is it your understanding that if those
11  rifles and firearms were not in the possession of
12  Mr. Hinton, that they should have been returned to
13  Mr. Hinton?
14      MR. ANDERSON:  Objection, vague.
15      MR. BOOKE:  Yes, correct.  That's a proper
16  objection?
17      Q.   Is it your understanding that if
18  Mr. Donald Hinton was not a felon in possession of
19  firearms, that those weapons should all have been
20  returned to him, or to their proper owner, rather?
21      A.   If he's not an ex-felon, then yes.
22      Q.   If those weapons did not belong to
23  Donald Hinton, then they should have been returned?
24      MR. ANDERSON:  Objection, calls for a legal
25  conclusion.  Go ahead and answer.

PAGE 128

WITHAM    128

1       THE WITNESS:  Returned to the proper owner, not
2  Donald Hinton, yes.
3       MR. BOOKE:
4       Q.   Right.  Because you did not develop any
5  evidence that any of those weapons were used in the
6  commission of a crime, did you?
7       A.   No.
8       Q.   Did you have a chemist or a criminalist
9  conduct any investigation for the presence of the
10  manufacture of methamphetamine in the house?
11      A.   No.
12      Q.   Do you recall a chemist arriving at the
13  search?
14      A.   I don't recall a chemist being there.
15      Q.   Do you recall anyone conducting a
16  search for residue of methamphetamine or from the
17  manufacture of methamphetamine?
18      A.   No.
19      Q.   Did you suspect that methamphetamine
20  was being made or manufactured at the premises?
21      A.   No.
22      Q.   Look, please, at page 92, I believe it
23  is, within Exhibit 5.  Do you have that in front of
24  you?
25      A.   Yeah.

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF SHANE WITHAM

WITHAM   129

1    Q.   Do you see that that's a fax cover
2  sheet in your handwriting?
3    A.   Yes.
4    Q.   And do you see that you have made
5  reference to three different search warrant
6  applications in the notes section of page 92?
7    A.   Yes.
8    Q.   Did you send three search warrant
9  packages over for service?
10   A.   Yes.
11   Q.   And were all three of those search
12 warrant packages the result of work you were doing
13 with the confidential informant that was involved in
14 the Hallwood search?
15   A.   Yes.
16   Q.   Were all three of those search warrants
17 to be executed on January 16, 2002?
18   A.   No.  One of them was not.
19   Q.   Which is the other that was to be
20 conducted on January 16, 2002?
21   A.   Wilmington.
22   Q.   And did you do a controlled buy at the
23 Wilmington location on January 4, 2002 also?
24   A.   Yes.
25   Q.   Did you do --

WITHAM   130

1    A.   Wait, I can't remember if I
2  successfully did one that date or if I did one before
3  or after, because at that residence there was times
4  when the suspects were not home.  And so on that date
5  I would have to recollect on the reports from that
6  event on whether it was done on that same day, the
7  buy was done on that same day.
8    Q.   But it did involve the same
9  confidential informant?
10   A.   Yes.  Yes, sir.
11   Q.   And the search warrant for 6204, is
12 that Agua?  Is that what it is?
13   A.   Yes.
14   Q.   Was that executed after January 16?
15   A.   No.  We ended up not even executing.
16 The service expired and we actually did not buy at
17 that location, and just the amount of work we were
18 doing, just this one expired also, we never even
19 served it.
20   Q.   When does a search warrant expire, by
21 the way?
22   A.   After the ten days of the signing by
23 the judge.
24   Q.   Is it your understanding that the clock
25 on service of a search warrant begins to run at the

WITHAM   131

1  time the judge signs the warrant?
2    A.   That's my understanding -- that's not
3  my understanding.  My understanding is it's a daily
4  thing.  I don't know about the specific time, there
5  is no time on the affidavit, the application or the
6  search warrant.
7    Q.   There's not?
8    A.   Not where the signatures, at the time
9  the signatures are made, the time.
10   Q.   Have you ever given a deposition
11 before?
12   A.   No, sir.
13   MR. ANDERSON:  This is a good one to start
14 with.
15   MR. BOOKE:
16   Q.   Have you ever been disciplined by Metro
17 for on-the-job activity?
18   A.   No.
19   Q.   Has there ever been a disciplinary
20 action commenced against you?
21   A.   Yes.
22   Q.   How many times have disciplinary
23 actions been commenced against you?
24   A.   Three.
25   Q.   When was the first such action?

WITHAM   132

1    A.   I can't remember the dates, probably --
2  two were in March of 2002 and one was April of 2003.
3    Q.   The disciplinary actions that were
4  commenced against you in March of 2002 occurred while
5  you were a narcotics officer?
6    A.   Correct.
7    Q.   And what was each of those -- what was
8  the first of those two disciplinary actions for?
9    A.   It was an oral reprimand.
10   Q.   For what?
11   A.   For a situation that a girlfriend that
12 got rowdy at a casino and identified herself as a
13 police officer and I was brought into the
14 investigation because of my mere presence and they
15 ended up sustaining it and I have no idea -- I have
16 no idea why, but it was for that.
17   Q.   And what was the second disciplinary
18 action in March of 2002?
19   A.   I got a DUI.
20   Q.   From the time the informant handed you
21 a plastic bag containing a white powdery substance
22 that he told you he got on January 4, 2002 at 1919
23 Hallwood, until that plastic bag was deposited into
24 the evidence vault, how much time elapsed?
25   A.   I don't know, sir.  I don't even recall

DEPOSITION OF SHANE WITHAM

SHEET 34   PAGE 133

WITHAM   133

1  making the deposit, I don't recall.  In the evening
2  hours or after work concluded.
3       Q.   From the time that you came into
4  possession of that plastic bag until it was placed in
5  the evidence vault, where did you go?
6       A.   I don't recall everything that we did
7  that evening.
8       Q.   It's quite possible that you conducted
9  another controlled buy after the buy at 1919 Hallwood
10 before you put the Hallwood evidence in the evidence
11 vault; correct?
12      A.   It's possible, yes.
13      Q.   And when you first came into possession
14 of whatever it was the confidential informant gave
15 you from the Hallwood address, you did not label or
16 mark that plastic bag in any way, did you?
17      A.   The plastic bag that the
18 methamphetamine came in?  I don't recall if I did on
19 the baggy, but I would have placed it in the
20 envelope, in which it had its label with the property
21 sheet and indicating its whereabouts or location came
22 from.
23      Q.   Well, you didn't fill out the property
24 sheet until you came --
25      A.   Didn't complete it until I got back.

PAGE 134

WITHAM   134

1  As I said before, I'll do an initial starting of it
2  so that I have everything individualized there and
3  then put it up, but I need to have a witness present
4  to complete the test.
5       Q.   Where was the plastic bag at the time
6  you got back to the station?
7       A.   I don't recall where I kept it.  I have
8  a box, I had a box in the back of my vehicle that I
9  kept all that in and --
10      Q.   That you kept all what in?  All
11 evidence seized?
12      A.   Either evidence, my paperwork, small
13 items that are paper, you know, documents.
14      Q.   Are you talking about a banker's box
15 sized thing?  Do you know what a banker --
16      A.   Like that file box, something like
17 that.  Maybe a little thinner, more for files.
18      Q.   You mean like a cardboard box?
19      A.   Yes.
20      Q.   Okay, and during the course of a shift,
21 whatever items you collect you put in the box; is
22 that correct?
23      A.   Correct.
24      Q.   And when you get to the, back to the
25 office, then you take the box in and sort it out?

PAGE 135

WITHAM   135

1       A.   Correct.
2       Q.   And that's what you did on January 4?
3       A.   That's what I typically do.  I can't
4  recall what I did with it, I mean.
5       Q.   Now is the envelope that you placed
6  evidence in when you first took it into your
7  possession the same evidence that you put into the
8  evidence vault?
9       A.   Yes.
10      Q.   And at what point do you give it an
11 event number?  Do you write an event number on the
12 envelope?
13      A.   Yes.
14      Q.   As soon as you get it, as soon as you
15 get the event number?
16      A.   Like I said before, typically yes.  But
17 if I've got three of them going on, I may get three
18 event numbers and then have them all already and I
19 may get the event numbers after they are done.
20 That's -- in narcotics we don't show, we don't get
21 assigned our locations, because of the nature of the
22 job, and people have got scanners and that sort of
23 thing, and we get our event numbers over the phone.
24 Sometimes we may get them before, sometimes you may
25 get them after.

PAGE 136

WITHAM   136

1       Q.   How many different ways could you have
2  gotten a new event number on January 4, 2002?
3       A.   I could have called up on the radio and
4  gave them a location of Clark County and just have
5  them initiate one, or I could have called up the
6  records section.  Two different ways.
7       Q.   So either by telephone to the records
8  section?
9       A.   Or by radio to dispatch.
10      Q.   Or by radio to dispatch?
11      A.   Right.
12      Q.   If you radioed to dispatch for an event
13 number, would there be a radio log of that?
14      A.   Yes.
15      Q.   And if you made a phone call to the
16 records section, it would have been by cell phone?
17      A.   The event number and either way -- it
18 would indicate on there how I did it.  If it was a
19 records tech, or whether it was the dispatcher, by
20 their P number who initiated, that's how they would
21 know.
22      Q.   Where would that indication be?  What
23 document?
24      A.   It would be in the Metro communication
25 archives, wherever the tapes and the transcriptions

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF SHANE WITHAM

SHEET 35   PAGE 137 _____

_____ WITHAM   137

1  of the computer terminal calls are.  They are all
2  held in an archive.
3          Q.   Who issues the event number?
4          A.   Dispatch.  Actually, anybody can
5  initiate one that has the ability to gain access to
6  the computer.
7          Q.   So the computer generates it?
8          A.   Correct.
9          Q.   Are you 100 percent certain that your
10  confidential informant was truthful with you when he
11  told you that he bought methamphetamine from David
12  Hinton?
13          A.   Yes.
14          Q.   Have you been provided any information
15  to the effect that David Hinton was not at the 1919
16  Hallwood residence on January 4, 2002 between 5:00
17  and 5:21?
18          A.   I have never been given that
19  information.
20          Q.   Did you conduct any investigation to
21  determine whether David Hinton was at the Hallwood
22  residence between 5:00 and 5:21 on January 4, 2002?
23          A.   No.
24          Q.   Did you ever ask David Hinton if he was
25  at the Hallwood house between 5:00 and 5:21 on

PAGE 138 _____

_____ WITHAM   138

1  January 4, 2002?
2          A.   No.
3          Q.   Did you attempt to gather any records
4  to determine where David Hinton was between 5:00 and
5  5:21 p.m. on January 4, 2002?
6          A.   No.
7          Q.   Why not?  Why did you not investigate
8  that?
9          A.   Because the controlled buy is covert
10  and confidential and I don't want to allude to any
11  fact that that would be a time frame where I was
12  investigating him and why he wouldn't be there if he
13  had correlated that he hadn't seen a friend in some
14  time and at that particular time he puts him in that
15  location.
16          Q.   No, I understand that.  Maybe it wasn't
17  a good question.
18               After the bust has already gone down,
19  it would certainly be a significant fact to you to
20  learn that David Hinton was not even at the Hallwood
21  residence at the time the alleged controlled buy
22  happened?  That would be significant to you?
23          A.   No.
24          Q.   That wouldn't be significant to you?
25          A.   No, I wasn't prosecuting on the

PAGE 139 _____

_____ WITHAM   139

1  controlled buy.
2          Q.   What were you prosecuting on?
3          A.   The evidence of the search warrant as a
4  result of the controlled buy.
5          Q.   It was never your intention to
6  prosecute based on the controlled buy?
7          A.   Not to prosecute for the sale of
8  controlled substance for that case, no.
9          Q.   Why not?
10          A.   The same reasons I mentioned before.  I
11  don't want to -- that opened up my informant to go
12  testify in court that he purchased this as a witness
13  to the crime.
14          Q.   Okay.
15          A.   As to the search warrant portion, he
16  allowed me to get probable cause for the search
17  warrant, therefore I'll be prosecuting for the
18  information that I get out of the search warrant,
19  which is not opened up for the CI.
20          Q.   So Officer Witham, it was never your
21  intention to prosecute David Hinton for sale of a
22  controlled substance or sale of methamphetamine based
23  on the controlled buy made by the informant; is that
24  correct?
25          A.   That's correct.

PAGE 140 _____

_____ WITHAM   140

1          Q.   And it was never your intention to
2  offer evidence that David Hinton had allegedly made a
3  sale of methamphetamine to your confidential
4  informant?
5          A.   That's correct.
6          Q.   Your only intention was to prosecute
7  David Hinton for whatever crimes the search warrant
8  revealed?
9          A.   Correct.
10          Q.   And you don't know why David Hinton was
11  not prosecuted for anything that happened as a result
12  of the search warrant?
13          A.   I wish our DA's office would prosecute
14  a lot more.  I have no idea why they didn't do it.
15          Q.   Well, after you conducted the search
16  did you request that David Hinton be charged with a
17  crime?
18          A.   After the search did I request?
19          Q.   Yes.
20          A.   Yes.
21          Q.   What crime did you request that David
22  Hinton be charged be?
23          A.   Well, what was it, possession of
24  firearm with altered serial number and possession of
25  stolen property.  I'm not sure if I put both of them

— DEPOSITION OF SHANE WITHAM —

SHEET 36   PAGE 141

WITHAM   141

1  on there, both charges.
2      Q.   I'm sorry?
3      A.   Oh, go ahead.
4      Q.   But you did not request that David
5  Hinton be prosecuted for possession of
6  methamphetamine?
7      A.   No.
8      Q.   Because David Hinton was not found to
9  be in possession of methamphetamine?
10     A.   That's correct.
11     Q.   And had you known that David Hinton was
12  not at the residence at 1919 Hallwood on January 4,
13  2002, would you ever have requested that a search
14  warrant be issued for the premises?
15     A.   If I would have purchased narcotics out
16  of the residence, yes, yes.
17     Q.   Well, let me just ask you a
18  hypothetical question.  If you had known on January
19  the 5th, 2002 that Dave Hinton was not at the 1919
20  Hallwood house at the time your confidential
21  informant told you that he bought methamphetamine
22  from David Hinton, would you have requested a search
23  warrant?
24     A.   Yes, if I would have had the evidence
25  of the buy, if somebody is in there selling the

PAGE 142

WITHAM   142

1  narcotics.
2      Q.   It wouldn't have led you to question
3  the truthfulness or the credibility of your
4  informant?
5      A.   You are talking if my informant came
6  back the next day and told me he had lied to me the
7  prior day?
8      Q.   No.  If you had the meeting at the
9  Pizza Hut that you had?
10     A.   Uh-huh.
11     Q.   And if you sent the confidential
12  informant in January 4, 2002 to make a controlled
13  buy?
14     A.   Uh-huh.
15     Q.   And if the confidential informant came
16  back to you with a plastic bag that he said had
17  methamphetamine in it?
18     A.   Yes.
19     Q.   And if the next day, January the 5th,
20  2002, you learned that David Hinton was not at the
21  house where the informant told you that he had just
22  made this buy, or the day before?
23     A.   I would have still typed up the search
24  warrant, yes.
25     Q.   You would have attempted to get a

PAGE 143

WITHAM   143

1  search warrant anyway?
2      A.   Yes.
3      Q.   It wouldn't have caused you to question
4  the truthfulness and credibility of your informant?
5      A.   No, that somebody other than David was
6  in the house selling methamphetamine and David wasn't
7  in there and somebody else was selling.
8      Q.   If you had discovered that all the
9  things the confidential informant had allegedly told
10  you about David Hinton and his history, and the
11  confidential informant told you that David Hinton was
12  there and sold him methamphetamine and you discovered
13  that wasn't so?
14     A.   So I could talk about the reliability
15  of the CI, so we're talking just because of
16  happenstance that this guy isn't there and yet the CI
17  has been reliable on other situations where search
18  warrants and buys have been confirmed, no, I would
19  not.  I would still have faith in what, that there
20  was narcotics being sold from the residence, yes.
21     Q.   I want to make sure that we have the
22  answer right, and then I think we're probably done.
23         If you had learned on January the 5th,
24  2002 that the confidential informant lied to you
25  about having purchased methamphetamine from David

PAGE 144

WITHAM   144

1  Hinton at 1919 Hallwood the night before, you would
2  still have gone and applied for the search warrant?
3      A.   You are asking me if he lied -- I'm
4  asking if the narcotics came from the residence, they
5  came from the residence, or did it come from David
6  Hinton?  I'm talking about if I've got evidence that
7  the buy occurred at the residence, the narcotics came
8  out of that residence with my CI, I would still type
9  up the search warrant.
10     Q.   Okay, but we have a new fact, the new
11  fact is that you have learned now on January the 5th
12  that your confidential informant lied to you,
13  specifically he lied to you when he told you that he
14  bought methamphetamine from David Hinton at the 1919
15  Hallwood residence the night before.
16     A.   Now if my CI, if I had knowledge that
17  my CI lied to me at the time after the search
18  warrant, I would not have.
19     Q.   Okay.  All right, and if you had known
20  on January the 5th, 2002, or any time until
21  January the 16th, 2002, that the confidential
22  informant had lied to you, you would not have
23  executed that arrest warrant?
24     A.   Not that one.  Maybe an arrest warrant
25  for a CCW warrant.

## DEPOSITION OF SHANE WITHAM

SHEET 37   PAGE 145

WITHAM   145

1    Q.   If you had learned at any time prior to
2  January 16, 2002 that your confidential informant
3  lied to you in that David Hinton wasn't even at the
4  Hallwood house at the time the informant told you he
5  bought methamphetamine, you would not have executed
6  that search warrant on January 16?
7    A.   **If I knew that my informant lied to me
8  in any case, I would have to confirm that the
9  activity was going on before I went and tore
10  somebody's house apart.**
11    Q.   You bet, you would need to do
12  something?
13    A.   **That's right, with that knowledge, yes.**
14    Q.   Okay.  Now my question to you is this:
15  What did you do between January the 4th, 2002, and
16  January the 16th, 2002 to determine whether your
17  confidential informant had told you the truth about
18  buying methamphetamine from David Hinton on January
19  4, 2002, anything?
20    A.   **Nothing.**
21    MR. BOOKE:  All right.  I don't think I have
22  any other questions at this time and I thank you very
23  much.
24    MR. ANDERSON:  Really quick I want to clear up
25  a couple of things.

PAGE 146

WITHAM   146

1           EXAMINATION
2  BY MR. ANDERSON:
3    Q.   When we were talking about the
4  confidential informant and payment of the
5  confidential informant, I think there was some
6  confusion about the payment of a confidential
7  informant.  Under what circumstances do you obtain a
8  confidential informant?
9    A.   **Under circumstances that they want to
10  work off charges, want to be paid, just want to be a
11  good samaritan, sometimes they are just sources and
12  don't really want to get involved with anything.**
13    Q.   Then correct me if I'm wrong, your
14  testimony regarding the confidential informant
15  involved in this case was that he was initially
16  retained to work off charges but eventually you also
17  paid him?
18    A.   **Correct.**
19    Q.   Did you begin to pay him after he had
20  worked off his charges?
21    A.   **We started paying him -- he had a
22  couple cases that were pretty large fairly quick, so
23  he worked off some of the charges in my regard fairly
24  quick and we substantiated some of the smaller ones
25  by giving smaller payments.**

PAGE 147

WITHAM   147

1    Q.   Would you pay a confidential informant
2  who is working off charges?
3    A.   **Yes.**
4    Q.   That's all I wanted to know.  And one
5  more question with regard to the confidential
6  informant, you testified that you searched his shoes
7  and socks, and then you later testified that you did
8  not take off any of his clothing --
9    A.   **That's correct.**
10    Q.   -- To search him?  Did you take off his
11  shoes and socks?
12    A.   **No, I thumbed around the side, check
13  the socks and the pockets and all his clothing.**
14    MR. ANDERSON:  That's all I have.
15       (Whereupon the deposition was
16       concluded at 4:50 p.m.)

PAGE 148

WITHAM   148

1           CERTIFICATE OF DEPONENT
2  PAGE    LINE     CHANGE
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
            *   *   *   *   *
17    I, SHANE WITHAM, deponent herein, do hereby
   certify and declare under penalty of perjury the
18  within and foregoing transcription to be my
   deposition in said action; that I have read,
19  corrected and do hereby affix my signature to said
   deposition.
20
21           SHANE WITHAM
             Deponent

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# OFFICER'S REPORT

**EVENT #:**     020104-2240

CONTROLLED BUY
## SUBJECT

**DIVISION REPORTING:**     NARCOTICS          **DIVISION OF OCCURRENCE:**     NARCOTICS

**DATE AND TIME OCCURRED:**     01/04/02 1646 HOURS     **LOCATION OF OCCURRENCE:**     1919 HALLWOOD DR
LAS VEGAS, NV 89119

## DETAILS:

On 01/04/02 at approximately 1500 hours, I, Det. S. Witham, met with a Confidential Informant hereinafter referred to as CI. CI stated to me CI was aware of an individual who was actively involved in the sales of controlled substance and firearms from his residence at 1919 Hallwood, Las Vegas, NV 89119. CI identified the white male adult as David Henton and stated CI was aware he had been recently involved in at least two Walgreen Robberies and an Attempt Robbery at an ATM in the intersection of Spencer/Tropicana. CI stated Henton sells cocaine at times and marijuana, but the majority of the sales he conducts are methamphetamine.

CI described Henton as a white male adult approximately 20 years of age and being tall and slender with a shaved head. CI stated Henton, in the recent Attempt Robbery at Tropicana/Spencer, pistol whipped his vehicle and the victim and Henton were engaged in a fight in which Henton and the victim tore the $20 bill. CI stated Henton returned to his residence with the half ripped $20 and framed it and has it sitting in a bedroom in his residence.

To confirm the information supplied by the CI, a controlled buy of methamphetamine was conducted at 1919 Hallwood Dr., Las Vegas, NV 89119, from suspect David Henton.

1656 HOURS          Surveillance was established on 1919 Hallwood, Las Vegas, NV 89119, and I, Det. S. Witham, did a complete and thorough search of the CI and found CI not to be in possession of any contraband, money or narcotics. I provided the CI with $100 U.S. currency in the denomination of a $100 bill, serial number AD51257074B, to be used solely for the purpose of purchasing methamphetamine from the residence at 1919 Hallwood Dr.

LVMPD adv. Hinton
FRCP 26(f)   000001

Date and Time of Report:     01/05/02 1919 HOURS     Officer:     S. WITHAM     P#:   4594

Approved:                         Officer:                 P#:

MPD 82 (REV. 1-91) - AUTOMATED          **SIGNATURE:**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# CONTINUATION REPORT

**ID/Event Number:    020104-2240**

Page 2 of

1700 HOURS        CI was dropped from a nearby location to 1919 Hallwood and
                  surveilled to go directly to 1919 Hallwood. CI was observed to meet
                  with an unknown subject in between a barred gate in front of the front
                  door. CI appeared to have a conversation with this unknown subject.
                  CI was then observed to enter the residence and remain inside for
                  approximately 21 minutes.

1721 HOURS        CI then exited and was surveilled to walk directly back to myself, Det.
                  Witham.   Upon arriving, CI handed me a clear plastic baggy
                  containing an off white crystal substance, which through my training
                  and experience, I thought resembled methamphetamine.

I, Det. Witham, conducted an ODV test on this substance which weighed 1.8 grams and
tested positive for methamphetamine.

At the conclusion of the controlled buy, CI provided me with the following information. CI
left me and walked directly to David's residence. CI stated he rang the door bell and met
David at the front door. CI stated David allowed him to enter. CI stated David's father was
there who was just recently released from prison and engaged him in conversation for the
next 20 minutes. CI gave Henton $100 buy money and Henton proceeded down a hallway
into an unknown room and returned back with the purported amount of methamphetamine
and handed it to the CI. CI then concluded the conversation with the father and left and
walked directly back to myself, Det. Witham.

No further contact was made with the suspect Henton at this time.

SW/sb
JOB#87819
DICT: 01/05/02 1919 HOURS
TRAN: 01/09/02 1825 HOURS

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# PROPERTY REPORT

| | | |
|---|---|---|
| Date Prepared | Time Prepared | |
| 010402 | 1800 | **PAGE 1 OF** 1 |

☐ **Firearms Impounded**   Incident: Controlled Buy

☑ Felony   ☐ Gross   ☐ Misd.   Event # O20104-2240

☐ Recovered   ☑ Evidence   ☐ Found
☐ Safekeeping   ☐ Seizure   ☐ Other

Gang Alleg. ☐ Yes ☑ No   Name _____   CCW Permit ☐ Yes ☐ No

Reporting Officer: S. Witham   Unit A55   P# 4484   Supervisor Approving   P#

Property Physically Impounded By: SW   Unit   P#   Property Checked Through: ☐ Pawn ☐ NCIC ☐ SCOPE

Property Physically Impounded By: (Signature) SW   Connecting Reports - Type & Event #: 0/2

| Last Name | First Name | MI | DOB | ID# | AKA |
|---|---|---|---|---|---|
| Hinton, David | | | 01-13-80 | 1528967 | |
| Street Address: 1919 Hallwood, Lond 89149 | | Arrest Date | | Charge: Sales C/S-mstr | |
| Last Name | First Name | MI | DOB | ID# | AKA |
| | | | | | |
| Street Address | | Arrest Date | | Charge | |
| Last Name | First Name | MI | DOB | ID# | AKA |
| | | | | | |
| Street Address | | Arrest Date | | Charge | |
| Last Name | First Name | MI | DOB | ID# | AKA |
| | | | | | |
| Street Address | | Arrest Date | | Charge | |

Recovered By ☑ ☐ Owner   Reporting Officer ☐ Finder   Last Name   First Name   MI   DOB   SS#

Street Address   Home Phone   Business Phone

Location Of Recovery   (Number & Street) 1919 Hallwood   Bldg.#   Apt.#   City LV   State NV   Zip Code 89119

Owner Notified: ☐ Yes ☐ No   By   Date   VIA   Rlsd. to Owner? ☐ Yes ☐ No   Owner's Signature

Circumstances: Item 1 Purchased From Suspect Hinton David Controlled Buy

| | | | | | |
|---|---|---|---|---|---|
| 1 | 1 | | | 1 | 1.8 gams our mstr |
| | | | | | |

I.VMPD adv. Hinton
FRCP 26(f)   000003

⊙ **Corresponds to Incident Report**

LVMPD 67A (REV 1-91)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# ODV FIELD TESTS FOR METHAMPHETAMINE
## CHECKLISTS AND RESULTS

| Subject  *Hinton, David* | Event #  *020104-2240* | |
|---|---|---|
| ID #  *1528867* | Date  *01/04/02* | |
| Examiner  *S. Widin* | P #  *4554* | Date Certified  *7/98* |

**EXAMINER SHALL READ, PERFORM, AND CHECK EACH APPLICABLE STEP**

**WEIGHT:** _____ *0.8* _____ grams / ☐ NET  ☑ GROSS *(check one)*

| MARQUIS REAGENT | METHAMPHETAMINE REAGENT |
|---|---|
| ☑ 1. Lot # of Marquis Reagent _*08*_ | ☑ 1. Lot # of Methamphetamine Reagent _*1K114*_ |
| ☑ 2. The physical appearance of the evidence is consistent with illicit methamphetamine and is not a tablet, capsule, or liquid. | ☑ 2. Result of Marquis Reagent indicates sample may contain methamphetamine. |
| ☑ 3. Hold the pouch such that writing faces the operator. Backing of pouch is white. | ☑ 3. Hold the pouch such that writing faces the operator. Backing of pouch is white. |
| ☑ 4. Examine the ampule. It is intact and the liquid is colorless. | ☑ 4. Examine the ampules. There are 3 intact ampules. Reading from left to right, the liquids are colorless, light tan, and colorless. |
| ☑ 5. Remove the clip. | ☑ 5. Remove the clip. |
| ☑ 6. Insert a small amount of sample using an uncontaminated instrument. | ☑ 6. Insert a small amount of sample using an uncontaminated instrument. |
| ☑ 7. Replace the clip and tap the pouch to drive the sample to the bottom. | ☑ 7. Replace the clip and tap the pouch to drive the sample to the bottom. |
| ☑ 8. Break the ampule. Agitate pouch. | ☑ 8. Break the left ampule. Agitate pouch. Break the middle ampule. Agitate pouch. Break the right ampule. Agitate pouch. |
| ☑ 9. Observe for a color change. | ☑ 9. Observe for a color change. |
| ☑ 10. Development of an orange color that changes to brown within 12 seconds: the sample may contain methamphetamine. Proceed to Methamphetamine Reagent. | ☑ 10. Immediate development of a dark blue or blue-violet color: test is positive for methamphetamine. |
| ☐ 11. Any other color reaction: result is inconclusive for methamphetamine. Terminate testing. | ☐ 11. Any other color reaction: result is inconclusive for methamphetamine. |

**SIGNATURES**

| Signature  *[signature]*  *4554* | Witness  *[signature]* |
|---|---|

LVMPD adv. Hinton
FRCP 26(f)   000004

Page: 1 Document Name: untitled

```
  M8K4-03207 -  IT14      01/04/02 16:46:58 - 01/04/02 16:46:57 8CH1W9ZPFCYC
RR.NVDMVPS00.NV0020035.TXT
                    ***VEHICLE CANDIDATE LIST***


LIC: 263MNP LIY:
 VIN: 1NXBR18EXWZ115187 VMA: TOYOTA        VMO:
 NAM: RIVAS , ROBERT Y
       DOB: 05221978 SOC: 530271649
       ADDRESS: 3001W WARM SPRINGS 1822  COUNTY: CLARK
       CITY/STATE/ZIP: HENDERSON            NV 89014
 NAM: RIVAS , VERONICA JEAN
       DOB: 08031981 SOC: 563697433
       ADDRESS: 3001W WARM SPRINGS 1822  COUNTY: CLARK
       CITY/STATE/ZIP: HENDERSON            NV 89014

LIC: 263MNP LIY:
 VIN: 1G1JC54G4M7184803 VMA: CHEVROLET     VMO:
 NAM: WEST , ROBERTA LYNN
       DOB: 02111963 SOC: 570212580
       ADDRESS: 822 CHERRY              COUNTY: CLARK
       CITY/STATE/ZIP: HENDERSON           NV 89015

ORIGINAL DOCUMENT PER NRS 52.205(3)
```

LVMPD adv. Hinton
FRCP 26(f)  000005

RR.NVDMVPS00.NV00200Z7.TXT

### ***VEHICLE INFO***

REG STATUS: ACTIVE              LAST TRANS DATE: 04232001
LIC: 752MEH      EXP DATE: 04212002
PLT TYPE: STANDARD       PLT STYLE: SUNSET
VIN: 1G8ZH5283SZ361067  VYR: 1995  MAKE: SATURN
MODEL: SL1   STYLE: VEH-SEDAN 4 DR
AXLES:   FUEL: GASOLINE  WGT: 000000000  CYLINDER:

### ***CURRENT REGISTERED OWNER INFO***

DANE ,JOHN
  SOC: 526359225  DOB: 05081957
  ADDRESS: 2734 PALA DURA   COUNTY: CLARK  EFFECTIVE DATE: 12011998
CITY/STATE/ZIP: HENDERSON          NV 89074

### ***PREVIOUS REGISTERED OWNER INFO***

### ***VEHICLE INSURANCE INFO***

EFF DATE: 07102000 EXP DATE:  COMPANY: HAWKEYE-SECURITY INS CO
  VIN:  VMA:  VMO:

te: 1/4/02 Time: 8:47:40 PM

LVMPD adv. Hinton
FRCP 26(f)  000006

```
NM-DANE         SEAN        MICHAEL       SID-03122718  000 SS-530314943
DR NUMBER   BD-02021981 RC-  SX-M HT-    WT-    HR-    EY-
3P-UNK                   FB-          SI-           O1-         O2-
A1-2734 PALA DURA DR, HENDERSON, NV                 052097
2254 MPD 091900 VEH IMP R/O                               000919-0120
2255 HEN 052097 T/C PRIMERO & ELGANTE                     97-7861
```

LVMPD adv. Hinton
FRCP 26(f)  000007

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

STATE OF NEVADA   )
                  ) ss:
COUNTY OF CLARK  )

Detective S. Witham, P# 4594 being first duly sworn, deposes and states that he is the affiant herein, and that he is a Police Officer with the Las Vegas Metropolitan Police Department (LVMPD), currently assigned to the Narcotics Bureau having been employed by the Department for 8 years.

That there is probable cause to believe that certain property hereinafter described will be found at the following described premises, to-wit: (1) 1919 Hallwood Dr. Las Vegas, Clark County, Nevada. Further described as a one-story, single-family residence with a tan stucco exterior with green trim. There are black wrought iron security bars on the windows and a black wrought iron security gate in front of the door. The numbers 1919 are affixed to the right side of the garage in white., (2) and the persons of adults located at the premises at the time of the execution of this search warrant.

The property referred to and sought to be seized consists of the following:

A) Methamphetamine

B) The paraphernalia commonly associated with the ingestion and distribution of the controlled substance methamphetamine, such as scales, packaging materials, and "cut", grinders, customer and source lists, recordations of purchases and sales, including "owe sheets" reflecting transactions in the controlled substance methamphetamine.

C) Limited items of personal property which would tend to establish a possessory interest in the items seized pursuant to this search warrant, such as personal identification, photographs, utility company receipts or addressed envelopes.

The property hereinbefore described constitutes evidence which tends to demonstrate that the criminal offenses of Possession of Controlled Substance have been and continue to be committed in violation of Chapter 453 of the NRS.

1

In support of your affiant's assertion to constitute the existence of probable cause, the following facts are offered: That Detective S. Witham, P# 4594, did meet with a Confidential Informant hereafter referred to as CI. The true identity of the CI is known to your affiant, but will not be revealed in this affidavit due to fear for the CI's safety if the persons at whom this investigation is directed learn the CI's identity.    If ordered to do so by this court at a subsequent time, your affiant will provide to the court the identity of the CI.

That on the 04 day of Jan. of the year 2002, the CI told Affiant the following: CI stated that CI knows an individual by the name of David Hinton who sells Methamphetamine. CI stated that CI could go to Hinton's house, located at 1919 Hallwood Dr., and buy Methamphetamine. CI stated that CI has been buying Methamphetamine from Hinton for more than one year.

In order to confirm the information supplied to the affiant, a controlled buy of methamphetamine was conducted at 1919 Hallwood Dr., with the assistance of the CI. The CI was thoroughly searched to insure the absence of any controlled substances, monies or property, and was provided with LVMPD buy money to be used solely for the purchase of methamphetamine.  The serial numbers of the buy money were recorded in order that they may be readily identifiable at a later time.

On the 04 day of Jan., 2002,  affiant surveilled CI from a nearby location.  CI was observed to go directly to the residence at 1919 Hallwood Dr. and enter. The CI then exited the residence approximately 10 minutes later and returned directly to your affiant.  CI did return with the purchased, purported methamphetamine which was immediately handed to your affiant.  Through your affiant's prior experience and knowledge of controlled

2

substances, your affiant recognized the substance to be consistent with the controlled substance, methamphetamine. CI was again thoroughly searched in order to confirm the absence of any controlled substances, monies or property, and was found to have none.

After the purchase, CI told affiant the following: That CI was allowed into the residence by Hinton. CI then produced the LVMPD buy money that had been provided to the CI and gave it to Hinton. Hinton then handed the CI a plastic baggie containing a white crystalline substance. CI stated that Hinton then told him that he had done two separate robberies at Walgreen's stores in the last two months. Hinton also told the CI that he had attempted to do a robbery of a citizen at an atm machine at the intersection of Tropicana and Spencer. During this robbery attempt he struggled with the victim and during the fight a 20 dollar bill got ripped in half, Hinton keeping half and framing to hang on the wall in his house.

Your affiant, conducted a field test using the narcotics identification system distributed by ODV Company. Your affiant was trained and certified to use the below listed test in July of 1998, by representatives of the company. Your affiant, using the ODV NARCOPOUCH System, tested the purported methamphetamine purchased at 1919 Hallwood Dr. and received a positive test result indicating the substance to be methamphetamine.

It is your affiant's opinion, based on personal experience and having worked as a police officer for the past 8 years, and having attended training seminars, and having interacted on a professional basis with numerous fellow narcotics detectives, that almost all persons who sell narcotics for profit maintain records of the transactions including records of their suppliers and customers as well as "owe" sheets. These records on occasion are extremely sophisticated and elaborate, however more often than not, these

LVMPD adv. Hinton
FRCP 26(f)   000010

records tend to be cryptic and coded but nevertheless readily identifiable as records maintained as part of the narcotics business. These records would provide proof of narcotics dealing as well as identify individuals from whom the suspects obtained their narcotics and to whom the suspects sold.

Because narcotics are extremely valuable sellers will carefully weigh the substance before packaging it for resale. The re-packaging is sometimes done in plastic baggies and sometimes in paper containers or foil wrappers. Narcotics are frequently "stretched" in quantity by use of "look-alike" adulterants. Therefore it is likely that there will be scales, baggies, other containers, mixers and adulterant agents at the premises.

It is your affiant's experience that persons who sell narcotics frequently carry guns on their person and at the locations used for selling narcotics to protect their money and narcotics.

Based on the surveillance done by your affiant and by fellow LVMPD officers, it appears that the persons in control of the suspected premises are heavily engaged in the selling of methamphetamine during the night time hours, and therefore, your affiant prays that this warrant authorize a night time search.

Also, persons involved in selling drugs will frequently have at least some amount of drugs on their persons and will utilize confederate agents and runners to assist them and for this reason and also because it appears that methamphetamine is notoriously being sold from the suspect premises, your affiant prays that this warrant authorize a search of the persons of adults located at the premises at the time of the execution of this search warrant.

It is further requested that this affidavit should be sealed by the Order of the Court because of the following reasons.  There is currently an ongoing narcotics investigation involving persons believed connected to the premises sought to be searched.  Also, from reading the affidavit, the identity of the CI will probably be deduced by persons involved in the narcotics activity alleged.  Should the facts contained in this affidavit become known, the ongoing narcotics investigation and/or the safety of the CI would be jeopardized.

**WHEREFORE, Affiant requests that a Search Warrant be issued directing a search for and seizure of the aforementioned items at the location set forth herein.**

_____
AFFIANT

**SUBSCRIBED and SWORN to before me this 06 day of Jan., 2001.**

_____
JUDGE

LVMPD adv. Hinton
FRCP 26(f)   000012

SW 2002 _2/_

## SEARCH WARRANT

FILED

JAN 22 10 58 AM '02

BY LAS VEGAS JUSTICE COURT NEVADA

STATE OF NEVADA )
) ss:
COUNTY OF CLARK )

The State of Nevada, to any Peace Officer in the County of Clark, proof by Affidavit

having been made before me by Detective S. Witham, P# 4594, said Affidavit attached

hereto and incorporated herein by reference, that there is probable cause to believe certain

property, namely:

A) Methamphetamine

B) The paraphernalia commonly associated with the ingestion and distribution of the controlled substance methamphetamine, such as scales, packaging materials, and "cut", grinders, customer and source lists, recordations of purchases and sales, including "owe sheets" reflecting transactions in the controlled substance methamphetamine.

C) Limited items of personal property which would tend to establish a possessory interest in the items seized pursuant to this search warrant, such as personal identification, photographs, utility company receipts or addressed envelopes.

is presently located at: (1) 1919 Hallwood Dr. Las Vegas, Clark County, Nevada. Further

described as a one-story, single-family residence with a tan stucco exterior with green trim.

There are black wrought iron security bars on the windows and a black wrought iron

security gate in front of the door. The numbers 1919 are affixed to the right side of the

garage in white., (2) and the persons of adults located at the premises at the time of the

execution of this search warrant.

And as I am satisfied that there is probable cause (a controlled buy was conducted

at the location), to believe that said property is located as set forth above and that based

1

upon the Affidavit attached hereto there are sufficient grounds for the issuance of the search warrant.

Further, upon good cause shown in the affidavit and application for search warrant, the affidavit is ordered sealed and a copy of the affidavit need not be left with this search warrant.

You are hereby commanded to search forthwith said premises for said property, serving this warrant at anytime day or night, and if the property is there to seize it, prepare a written inventory of the property seized, and make a return to me within ten days.

**DATED THIS 06 day of Jan., 2001.**

_Tony Abbatangelo_
JUDGE

2

CERTIFIED COPY

The document to which this certificate is attached is a full, true and correct copy of the original on file and of record in Justice Court of Las Vegas Township, in and for the County of Clark, State of Nevada.

By _____ Deputy

Date _____ JAN 2 2 2002

LVMPD adv. Hinton
FRCP 26(f)  000014

SW 2002 _____ 020116-2509 _

Page _FILED_ of _1_

## **RETURN**

(Must be made within 10 days of issuance of Warrant)

JAN 22  10 58 AM '02
AT JUSTICE COURT
BY LAS VEGAS NEVADA
DEPUTY

The Search and Seizure Warrant authorizing a search and seizure at the following described location(s):

_1919 HALLWOOD DR   LVN 89119_

was executed on _01-16-2002_ ,
(month, day, year)

A copy of this inventory was left with _AT THE PLACE OF SEARCH_

(name of person or "at the place of search")

The following is an inventory of property taken pursuant to the warrant:

_MARIJUANA_

_GUNS_

_PARAPHERNALIA_

_PAPERWORK_

_MONEY_

This inventory was made by: _J WITHAM 4594_ ,

_R KRAFT 4554_ ,
(at least two officers including affiant if present. If person from whom property is taken is present include that person.)

LVMPD adv. Hinton
FRCP 26(f)   000015

LVMPD adv. Hinton
FRCP 26(f)   000016

REPORTER'S CERTIFICATE


STATE OF NEVADA   )
                  )  ss.
COUNTY OF CLARK   )




    I, Lori M. Judd, CCR #233, RMR, a duly commissioned Notary Public, Clark County, State of Nevada, do hereby certify:

    That I reported the taking of the deposition of WILLY GRAHAM, on Tuesday, November 4, 2003, commencing at the hour of 1:30 p.m.

    That prior to being examined, the witness was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth.

    That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true and accurate transcription of my said shorthand notes taken down at said time.

    I further certify that I am not a relative or employee of an attorney or counsel involved in said action, nor a person financially interested in said action.

**Lori M. Judd, CCR #233, RMR**

1               IN WITNESS WHEREOF, I have hereunto set

2  my hand and affixed my official seal in my office in

3  the County of Clark, State of Nevada, this _____

4  day of _____, 2003.

5

6

7

8

9

10

11

12

13

14                      _____
                           LORI M. JUDD

15                           CCR #233, RMR

16

17

18

19

20

21

22

23

24

25

DEPOSITION OF WILLY GRAHAM

SHEET 1   PAGE 1

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF NEVADA
 3
 4   DONALD HINTON, DAVID HINTON )
     and JOHN REYES,             )
 5                               )
          Plaintiffs,            )
 6                               )
 7   vs.                         ) CASE: CV-S-03-0057
                                 )         PMP-PAL
 8                               )
     CLARK COUNTY, NEVADA, a     )
 9   Political subdivision, acting)
     By and through the LAS VEGAS)
10   METROPOLITAN POLICE DEPARTMENT)
     JOHN DOES 1-30 and ROE      )
11   ENTITIES 1-10,              )
                                 )
12        Defendants.            )
13
14
15            DEPOSITION OF WILLY GRAHAM
16
17   Taken at the Law Offices of Bradley L. Booke, Esq.
              7251 West Lake Mead Blvd
18                   Suite 530
                Las Vegas, Nevada 89128
19             Tuesday, November 4, 2003
                     1:30 p.m.
20
21
22
23
24
25   REPORTED BY: LORI M. JUDD, CCR #233, RPR, RMR
```

PAGE 2                                          GRAHAM    2

```
 1   APPEARANCES:
 2   For the Plaintiffs:BRADLEY L. BOOKE, ESQ.
                        7251 W. Lake Mead Blvd.
 3                      Suite 530
                        Las Vegas, Nevada 89128
 4
 5
 6   For the Defendants:CRAIG R. ANDERSON, ESQ.
                        Marquis & Aurbach
 7                      10001 Park Run Drive
 8                      Las Vegas, Nevada 89145
 9
10                      INDEX
11                    EXAMINATION
     By Mr. Booke              3
12
13   DEPOSITION EXHIBITS            IDENTIFIED
     Exhibit 1 - SWAT packet               78
14
15
16               CERTIFIED QUESTIONS
                       (NONE)
17
18
19          INFORMATION TO BE SUPPLIED
                       (NONE)
20
21
22
23
24
25
```

PAGE 3                                          GRAHAM    3

```
 1                  WILLY GRAHAM,
 2   called as a witness, and having been first duly sworn
 3   to testify to the truth, the whole truth, and nothing
 4   but the truth, was examined and testified as follows:
 5
 6                   EXAMINATION
 7   BY MR. BOOKE:
 8       Q.   Would you please state your full name
 9   and spell your name for the court reporter?
10       A.   Full name is Willy Graham, middle
11   initial of E, as in Earl, that's G-R-A-H-A-M is the
12   last name.
13       Q.   What is your date of birth, sir?
14       A.   1/30/62.
15       Q.   If you heard the phrase "the SWAT team
16   went tactical," what would that mean to you?
17       A.   It would depend on the scenario in
18   which it was said that they went tactical.
19       Q.   In the course of conducting a search,
20   if you heard the phrase "the SWAT team went
21   tactical," what would that mean to you?
22       A.   In doing a search?
23       Q.   Yes.
24       A.   That would mean that they were possibly
25   doing what is referred to in SWAT terminology as a
```

PAGE 4                                          GRAHAM    4

```
 1   slow methodical, which is you go very slow and
 2   methodical, room by room, inch by inch, quarter by
 3   quarter, of a room or a building or an area.
 4       Q.   That is what you would, that's the
 5   meaning that you would attribute to the phrase "the
 6   SWAT team went tactical"?
 7       A.   If they were doing a search.
 8       Q.   Let me, and I may get the same answer,
 9   but let me ask the question a slightly different way.
10   If the SWAT team were executing a search warrant,
11   what would the phrase "the SWAT team went tactical"
12   mean to you, the same or something different?
13       A.   It would all depend on the scenario,
14   what stages of the execution of the search warrant
15   that are tactical.  Physically being there, if they
16   are searching a physical room, a physical house or a
17   physical geographical area, it would all depend on
18   the scenario given when they say that.  Because when
19   they say "going tactical," it can mean a number of
20   different things.
21            You can go tactical in a car, with just
22   a regular patrolman doing a car stop.  There are
23   tactics involved in just a regular patrolman doing a
24   car stop versus a SWAT team going tactical on a car.
25            So if I'm making myself clear, so it
```

DEPOSITION OF WILLY GRAHAM

GRAHAM   5

1  would all depend on the circumstances or the
2  situation when you use that phrase, the terminology,
3  which sometimes may be of use out of, I guess out of
4  context.
5          I guess the best example I can give you
6  is someone says I got robbed, when actually they got
7  burglarized.  When they come home and say my house
8  got robbed, well, technically they got burglarized
9  and not robbed.  So it all depends on the
10  circumstances.
11         Q.  I understand the difference in
12  terminology and that's exactly why I'm asking you the
13  question.
14         A.  Okay.
15         Q.  If, in the course of executing a search
16  warrant, at the beginning of the execution of the
17  search warrant, the phrase "the SWAT team went
18  tactical" were used, what would it mean in that
19  context?
20         A.  On a house?
21         Q.  Yes.
22         A.  That would mean to me going to the
23  location and beginning the execution of the tactics
24  that you spoke about in a prior briefing.
25         Q.  Does the word "tactical" have any

GRAHAM   6

1  special meaning to a SWAT team?
2          A.  I would have to say it does, yeah.
3          Q.  What is the special meaning of
4  "tactical" to a SWAT team?
5          A.  I guess in a nutshell, heads up, game
6  time, whatever you like.  Like I said before,
7  whatever you have trained, practiced, now it's time
8  to put your training, your practice into execution.
9          Q.  Time to execute your plan?
10         A.  Right.
11         Q.  Does every tactical SWAT operation have
12  a pre-arranged plan?
13         A.  Pre-arranged plan?
14         Q.  And please don't get bogged down on the
15  word "pre-arranged."  By that, all I mean is a plan
16  that was made before it was executed?
17         A.  Well, I'm not hung up on pre-arranged,
18  I want to answer precisely, I guess every part.  You
19  train to deal with situations or circumstances as
20  they arise.  So there may be a time to where you
21  don't have a time to go back, here's the game plan.
22  There comes a time where you need to react, then,
23  versus a tactical, where it's on a certain location
24  to where you know the layout of the terrain, of the
25  area you are going, versus at the spur of the moment

GRAHAM   7

1  where you need to react, or spontaneous where you
2  need to deal with it then and there.
3          Q.  Is -- withdraw that question.
4              Is there a plan created every time a
5  SWAT team is going to execute a search warrant?
6          A.  There's some planning, yes.
7          Q.  Maybe I could ask it a slightly
8  different way.  In the ordinary course would there be
9  a plan of some kind every time a SWAT team was going
10  to execute a search warrant?
11         A.  Yes.
12         Q.  According to the policy and procedure
13  of the Metro SWAT team here in Las Vegas, should
14  there be a plan every time a SWAT team goes to
15  execute a search warrant?
16         A.  According to the policy?  I can't say
17  yes.  I couldn't say yes to it, I couldn't say no.  I
18  would say it's practice, it's the common practice,
19  that yes.
20         Q.  And I want to ask a question that may
21  not make particular sense, but please bear with me
22  because I'm not familiar with SWAT procedures.  Does
23  going "tactical" signify that the circumstances have
24  reached a certain level where a change in approach is
25  required to be made?  In other words, what I'm trying

GRAHAM   8

1  to find out is if there are levels of activity that
2  you encounter as a SWAT team member, and one of those
3  levels being tactical?
4          A.  The way I understand your question, no.
5  And let me clarify, help you out a little bit.  Any
6  time a SWAT team is together, in my opinion, having
7  been a former team leader, whether it's something
8  that you feel is very, very dangerous versus
9  something that's minor, when the team is together
10  they are all tacticals.  They have different, I
11  guess, levels of awareness or levels of threat, but
12  they are all tacticals.
13         Q.  Okay, what was your job at Metro as of
14  January 16, 2002, which is the date of the event
15  we're here to talk about?
16         A.  I would say LVMPD sergeant assigned to
17  the SWAT team.
18         Q.  Did you have a particular role or
19  position within the SWAT team?
20         A.  I was the, what we refer to as the red
21  team leader.
22         Q.  How many SWAT teams were there at that
23  time?
24         A.  Two.
25         Q.  What was the other one?

## DEPOSITION OF WILLY GRAHAM

GRAHAM            9

1      A.    Blue, blue team.
2      Q.    How many members on the red team at
3  that time?
4      A.    I believe it was 13.
5      Q.    And what was your job in relation to
6  the events at the Hinton residence at 1919 Hallwood?
7  Were you the leader of the SWAT team?
8      A.    I was the red team leader.  It was my
9  team that was executing the warrant.  I was the red
10  team leader.
11      Q.    Were you the person in the position of
12  greatest authority with respect to that team at that
13  time?
14      A.    In the field, yes.  I would have to say
15  yes.
16      Q.    Were any photos taken at the time of
17  the search on the Hinton residence of any of the SWAT
18  team members that conducted the search?
19      A.    I couldn't say that there was.  If
20  there were, they weren't a post picture or anything,
21  where they might have been taking a picture of
22  something and the cop may have been one of the things
23  on that, but to take a photo of an actual SWAT team
24  member, during the time or after a procedure is not
25  common practice.

GRAHAM           11

1  on.  For example, a lot of times we may not do any
2  damage and we get a report through the risk
3  management that the guy kicked a hole in our wall or
4  tore up the coffee table or took something and the
5  officers that were assigned will take digital
6  photographs, report to me the damage, insure that the
7  photographs were taken, and then to double-check with
8  each person that is and/or taken into custody or
9  handcuffed about any damage that they want to report
10  to me specifically as a team leader.  That way when
11  we leave there, we have a clear record of what
12  actually took place.
13      Q.    So there was a person on the SWAT team
14  assigned to take photographs?
15      A.    I wouldn't say specifically assigned.
16  Most officers know when the execution of a warrant is
17  complete.  One of the officers that is clear, in
18  other words, one that is kind of not doing anything,
19  will go back to the mode of transportation, get the
20  digital camera, come back in and take pictures room
21  by room of what damage has been reported.
22      Q.    Who is it that took the photographs of
23  the damage to the Hinton house?
24      A.    I have no idea.
25      Q.    Is there any particular procedure that

GRAHAM           10

1      Q.    Have you seen the photographs that were
2  taken of the search that was conducted at the Hinton
3  residence?
4      A.    I think so.
5      Q.    So you are aware that there were photos
6  taken of the Hinton household?
7      A.    Yes.
8      Q.    Was all of the damage that was done at
9  the Hinton household photographed in the photos that
10  were taken by Metro?
11      MR. ANDERSON:  I'm going to object.  All the
12  damage done by the officers, or all the damage that
13  occurred in the house?
14      MR. BOOKE:  Well, let me see if I can ask the
15  question a little more completely.
16      Q.    Was all of the damage that was done at
17  the Hinton house in the course of executing the
18  search warrant photographed?
19      A.    To the best of my knowledge, yes.
20      Q.    And was it standard procedure to
21  photograph damage that had occurred during the course
22  of a search?
23      A.    Yes, we take photographs to, I guess to
24  quell inappropriate claims by the persons or the
25  subjects' house that the warrant is being executed

GRAHAM           12

1  the person taking photographs of damage following a
2  SWAT search is supposed to follow?
3      A.    I'm not understanding that question.
4      Q.    Well, is there some set of rules or
5  guidelines that the photographer is supposed to
6  follow in taking pictures of damage done during a
7  search?
8      A.    The officers, if they were involved in
9  damaging anything in the house, will report to that
10  photographer.  They report basically on the air,
11  which is on their -- the radios, photos need to be
12  taken of a wall in the master bedroom, or you know,
13  and most officers will know to check with whoever may
14  enter into certain rooms, to check with them, any
15  report of any damage here, or there, and they would
16  take photographs of it.
17      Q.    Is there any designated procedure that
18  the person who takes the photographs is supposed to
19  follow or is required to follow in documenting by
20  photograph all of the damage that was done?
21      A.    If you are asking me is there any
22  written procedures, no, there wasn't, that I'm aware
23  of.  It was just a common practice that we would do.
24  Like I said, prior, to avoid the false claims of
25  damage after the fact when we leave the premise, some

DEPOSITION OF WILLY GRAHAM

GRAHAM   13

1   of the procedures would be you go back to the office,
2   go to the computer, download and/or print the
3   pictures and put it in a packet, you know, for the
4   after action report, report on the damage that was
5   done. But other than that, that was about it, that
6   I'm aware of.
7          Q.   And the common practice for the
8   photographer was to check with each of the team
9   members who was engaged in the search to find out
10  where there was damage so that the photographer could
11  go and photograph it?
12         A.   It would go over the air on the radio,
13  he would know where to go and where to check or to
14  come to me because I had to physically see it as
15  well, what damage was done, and was to be able to
16  justify or be able to account for my man's actions.
17         Q.   Okay, I don't want to split this hair
18  too fine, but was it the photographer's job to
19  initiate contact with each of the officers involved
20  in the search in order for him to ask where should I
21  photograph, or was it just a matter of him listening
22  to what had gone on and making his own judgment about
23  where to photograph?
24         A.   Okay. A lot of time the common
25  knowledge was, for example, if we had to make

GRAHAM   14

1   entrance in a door, if we have to ram the door,
2   that's common knowledge, so we didn't have to go to
3   nobody to ask that. If you ram the door, you know
4   there's damage.
5          So it wasn't like this guy was new to
6   the unit to where he didn't have a clue what was
7   going on. So he pretty much would see what was
8   happening as we executed the warrant. The question
9   may have been raised, and I can't say on this
10  particular incident, but normally over the air by
11  myself, report damage, or one of the assistant team
12  leaders would ask for a report of damage or one of
13  the other officers would know to get with the
14  photographer and report the damage to him. So it
15  wasn't specifically his job to go to each officer,
16  nor was it specifically an officer's job to get to
17  the photographer. It was just common knowledge.
18  Everyone knows that it needed to be documented.
19         Q.   All right. Let me see if I can
20  summarize this. There was no particular SWAT team
21  member who was assigned to be the photographer; is
22  that correct?
23         A.   I can't say that there was in this
24  particular one.
25         Q.   Is there ever a specific officer who is

GRAHAM   15

1   assigned to be the photographer on a SWAT search?
2          A.   In preparation of a search warrant
3   photographing damage is one of the last things that
4   is on the officer's mind or briefing. It's
5   subsequent procedure that we would do after the fact
6   because we don't anticipate and/or do we go with a
7   plan to tear up anything. So, but if it happens,
8   okay, whoever is available, grab the camera, take
9   pictures.
10         Q.   Okay, and I appreciate that
11  information, but my question was actually a little
12  simpler than that. On the Hinton search there was no
13  specific officer assigned to do the photographing?
14         A.   I don't know.
15         Q.   On any search that SWAT conducts is
16  there a person who is specifically assigned to take
17  the photographs to assess damage?
18         A.   No, I can't say that. Sometimes in the
19  briefing someone says I'll get the pictures, but
20  sometimes if he says I'll get them, he ends up doing
21  something else, so somebody else ends up doing it.
22         Q.   All right. Why were there no
23  photographs taken of any of the SWAT team members
24  that conducted the search at the Hinton residence?
25         A.   Could you ask me that again?

GRAHAM   16

1          Q.   Sure. Would you read the question
2   back?
3          (Record read by reporter.)
4   THE WITNESS: There was no reason to.
5   MR. BOOKE:
6          Q.   Were all of the SWAT team dressed in
7   identical gear?
8          A.   I would say like gear, I wouldn't say
9   identical, like gear.
10         Q.   Is there any paperwork -- withdraw that
11  question.
12         Is there any policy or procedure for
13  what SWAT team members are required to wear at the
14  time of executing a search warrant?
15         A.   Yes.
16         Q.   Is it a written policy?
17         A.   I believe it is.
18         Q.   What is your best estimate as to what
19  the name of that policy may be?
20         A.   It is a LVMPD uniform policy, is the
21  best I can recollect to that. And as in regards to
22  SWAT, the section of the bureau where the SWAT team
23  is assigned, we have different uniforms than a
24  regular patrolman. So you have your regular
25  department manual and you have your section manual

DEPOSITION OF WILLY GRAHAM

GRAHAM  17

1  for that particular unit.
2      Q.  So there is something called a section
3  manual for the SWAT section?
4      A.  Yes.
5      Q.  And included in that section manual for
6  the SWAT section is a uniform policy for SWAT?
7      A.  Yes.
8      Q.  Is there, are there additional things
9  in the SWAT section manual, additional policies that
10  relate specifically to SWAT?
11      A.  Yes, that's what it's for, particularly
12  for SWAT personnel.
13      Q.  And again, pardon my ignorance, but is
14  the SWAT section manual sort of the Bible, if you
15  will, for SWAT operations, or for the SWAT
16  department?  Are those the rules you follow?
17      A.  It's in addition to the additional
18  rules.
19      Q.  In addition to the --
20      A.  The LVMPD overall policy, standard
21  policy, which is in the LVMPD policy is standard
22  uniform.  That's what it's called, standard uniform.
23      Q.  Does the policy require that any
24  paperwork be filled out before, during, or after a
25  particular SWAT operation to identify the uniforms or

GRAHAM  18

1  clothing or gear that was worn by the officers during
2  the operation?
3      A.  You are going to have to be a little
4  bit more clear on that one.
5      Q.  What I would like to know is if
6  somewhere in the paperwork involved in any particular
7  operation you are required to write down the gear or
8  the uniforms that people were wearing during the
9  course of the operation?
10      A.  No.
11      Q.  Do you have a recollection of what any
12  of the individuals involved in the Hinton search were
13  wearing?  I'm talking about the SWAT team, not the
14  people in the house.
15      A.  Okay, if you are asking if they were
16  wearing uniforms, yes, they were.  If they were
17  wearing something other than uniforms, no, they were
18  not.
19      Q.  And how many choices of uniforms, if
20  you will, did SWAT team members have at the time of
21  the Hinton search?
22      A.  How many choices?
23      Q.  Yes.  Was there a uniform or were there
24  two, three?
25      A.  I'm trying to figure out how to answer

GRAHAM  19

1  that one.  There was one choice, and that's the
2  uniform of the day, which is the SWAT uniform.
3      Q.  If one were looking at the front of a
4  person wearing that uniform of the day, what would
5  one see?
6      A.  It depends on which one of them he was
7  looking at.  Start from the top to bottom, he may see
8  a guy wearing a Kevlar helmet; he may have seen a guy
9  wearing clear goggles; a balaclava; a tactical vest
10  with an LVMPD yellow star on it; you may see a guy
11  with just a helmet, no balaclava; may see one with a
12  Metro star that says "police" on the opposite side;
13  may see one with "police" down the middle of his
14  chest; may see a gun on the left or right; you may
15  see a gun on his light, tactical light, flashlight.
16      I mean it's a number of things.  It all
17  depends on how the guy chooses to wear his gear.  You
18  may see a guy with a gun across his vest for his
19  back-up.  It's just different things.  Guys have
20  different preferences what operates better for them.
21  But if the question is leading towards did they,
22  would they know if it was an officer, absolutely.
23      Q.  Well, I didn't ask you that.
24      A.  That's the only way where we would be
25  going because we talked about the uniform, whether

GRAHAM  20

1  it's similar or identical.
2      Q.  So I take it that all of the members of
3  the SWAT team that went to the Hinton household had
4  their choice of how they wore their particular
5  uniform?
6      A.  Like I said, some guys would wear --
7      Q.  Whatever suited them?
8      A.  I wouldn't say whatever suited them.
9  It had some procedures, some standards, nothing
10  outlandish.  But like I say, guys would wear a
11  handgun or back-up gun in the tac vest, which is the
12  vest that goes over here, versus some guy that's more
13  to the side.  Or guys wear them on their left side or
14  right side, but depended on if they're left-handed or
15  right-handed, or cross draw.  There's different ways
16  to wear your weapons.
17      Q.  Was every SWAT officer at the Hinton
18  house required to wear a vest?
19      A.  Required to wear a vest?  Yes.
20      Q.  Was every vest black in color?
21      A.  I don't know.
22      Q.  What other choices would there have
23  been for the color of the vest?
24      A.  Might have been black, might have been
25  green, or may not have even seen a vest.

SHEET 6   PAGE 21

GRAHAM   21

1    Q.   Did every vest have a yellow Metro star
2 on it?
3        A.   Let me back up a little bit.  The vest
4 is covered by a tactical vest, where the radio fits
5 and all the other things that you need to acquire.
6 So the vests, some of them are a little bit different
7 than others.  All with a Metro star?  I would have to
8 say I'm not sure.
9        Q.   Did every SWAT officer at the Hinton
10 house wear a tactical vest?
11       A.   I don't know.
12       Q.   Was every SWAT officer at the Hinton
13 house required to wear a tactical vest?
14       A.   No.
15       Q.   Was every, did every SWAT officer have
16 a yellow Metro star on their tactical vest?
17       A.   Like I said before, I don't remember
18 that.
19       Q.   Did every SWAT officer at the Hinton
20 house have the word "police" across the middle of
21 their chest on their tactical vest?
22       A.   I don't remember.
23       Q.   Would it be fair to say then that you
24 don't remember what specific gear any individual was
25 wearing?

PAGE 22

GRAHAM   22

1        A.   That would be fair to say.
2        Q.   And so in fairness, you don't remember
3 whether any of the SWAT team members at the Hinton
4 house had anything on the front of their gear that
5 said "police"?
6        A.   Say that one more time?
7        Q.   You don't remember whether any of the
8 SWAT team members at the Hinton house had something
9 that said "police" on the front of their gear?
10       A.   Any of them?  I would say that they
11 didn't.
12       Q.   Nor could you say that they did, could
13 you?
14       A.   Yeah, they did.
15       Q.   Well, name one that had "police" on the
16 front of his gear.
17       A.   Name one?
18       Q.   One SWAT team member at the Hinton
19 house that had "police" on the front of his gear,
20 visible to someone looking at the individual from the
21 front?
22       A.   Other than myself?
23       Q.   Anyone there?
24       A.   Me.
25       Q.   Anyone else you can name?

PAGE 23

GRAHAM   23

1        A.   No.
2        Q.   And what did you have on that was
3 visible, that bore the word "police" visible to
4 someone who saw you from the front?
5        A.   A patch that says police.
6        Q.   Anything else?
7        A.   A patch that says, like our regular
8 badge, but it's in a patch form, it's yellow.
9        Q.   Anything else?
10       A.   No, not that I can think of.
11   MR. ANDERSON:  Are those two separate patches
12 that you are talking about?
13   THE WITNESS:  Two separate, yes.
14   MR. BOOKE:
15       Q.   Where were those patches attached to
16 your clothing, if they were?
17       A.   I want to say the star was on the -- on
18 one side and "police" on the other.
19       Q.   I can't help but ask, on which side did
20 it say "police" on your clothing?
21       A.   I'm going to have to say towards the
22 right, towards the upper right, not all the way to
23 the right, but towards the right.
24       Q.   The star on your left breast?
25       A.   I would have to say that's the way it

PAGE 24

GRAHAM   24

1 was, yeah.
2        Q.   And how big was the star, top to
3 bottom?
4        A.   Like the normal size of your regular
5 Metro badge that's on the standard uniform.
6        Q.   And how big was the printing on it that
7 said "police"?
8        A.   I want to say it was maybe, and it's
9 just a guess, two inches wide and about five inches
10 long.
11       Q.   That's the word "police"?
12       A.   Yes.
13       Q.   And in what color?
14       A.   We have them in different colors,
15 yellow and black and subdued green and black.
16       Q.   And on the night of the Hinton search
17 which jacket were you wearing?
18       A.   I don't remember.
19       Q.   Was there a SWAT policy in effect on
20 the night of the Hinton search that required SWAT
21 team members to wear uniforms that bore the word
22 "police" on the front of the uniform?
23       A.   Was there a policy that required them
24 to wear the word "police" on the front?
25       Q.   Correct, that's the question.

DEPOSITION OF WILLY GRAHAM

SHEET 7   PAGE 25

GRAHAM 25

1    A.   I don't have a recollection of the
2 policies on that one.
3    Q.   How many Metro police -- I'm sorry, let
4 me withdraw that question and I want to ask you one
5 more question on the uniform.
6         Does the SWAT section manual contain
7 something that addresses whether there is a
8 requirement about having the word "police" on the
9 front of your uniform, do you know?
10    A.   I'm not recalling that one.
11    Q.   Okay.  How many Metro police officers
12 were assigned in some form another, some task or
13 another, to the search on the Hinton house?
14    A.   I don't know.
15    Q.   How many SWAT members were assigned to
16 the search on the Hinton house?
17    A.   I don't know.
18    Q.   You said that the red team was 13
19 members.  Were all of you, did all of you participate
20 in the Hinton search?
21    A.   I don't know.  I would have to look at
22 the paperwork to tell you who was there or wasn't.  I
23 mean guys could have been on vacation, could have had
24 a number of reasons why maybe one member was not
25 there.  I don't know.

PAGE 26

GRAHAM 26

1    Q.   Is there a document that identifies
2 which SWAT team members were or participated in the
3 search on the Hinton house?
4    A.   There should be.
5    Q.   What's the name of that document?
6    A.   The name of that specific document?  I
7 couldn't tell you the exact name, but it's included
8 in the after action report.  It's part of the whole
9 packet that starts from the briefing, notification of
10 doing the search warrant, to release the residence.
11    Q.   So it's in the SWAT documentation?
12    A.   That packet, right.
13    Q.   And whose responsibility is it to fill
14 out the SWAT document that lists all of the team, the
15 SWAT team members who participated in a given
16 operation?
17    A.   That would be the officers that are
18 assigned to do a recognisance of the target location.
19    Q.   The reconnaissance officer is the one
20 who lists all of the team members who will
21 participate in the operation?  Did I understand you
22 correctly?
23    A.   No, you didn't.
24    Q.   Okay.
25    A.   The question was who lists those names,

PAGE 27

GRAHAM 27

1 who put those names in.  That would be the officer
2 that went out and did the recognizance of it, because
3 when he comes back, the briefing goes and he sits and
4 fills in the paperwork as we brief.
5    Q.   Does the briefing occur before a SWAT
6 operation or after?
7    A.   Before.
8    Q.   And so when does the list of SWAT team
9 members who participate in an operation get filled
10 out?
11    A.   During the briefing.
12    Q.   And all of the team members, SWAT team
13 members are required to be at the briefing?
14    A.   Yes.
15    Q.   All of the ones who are going to
16 participate in the operation?
17    A.   Yes.
18    Q.   Were there individuals from the
19 narcotics squad at the search of the Hinton house?
20    A.   After it was completed, yes.
21    Q.   Were there any medical personnel, Metro
22 medical personnel involved or present at the Hinton
23 house?
24    A.   I believe there was.
25    Q.   How many?

PAGE 28

GRAHAM 28

1    A.   At minimum, one.  Usually one.
2    Q.   How many narcotics squad people were
3 present at the Hinton house?
4    A.   After the warrant was executed and/or
5 served, I couldn't give you a number of who was
6 there.
7    Q.   Half a dozen?
8    A.   No number.
9    Q.   None at all?
10    A.   I don't know.  I don't have a number
11 for you.
12    Q.   Were there individuals from the crime
13 lab present at the Hinton house?
14    A.   I don't know.
15    Q.   Were there -- what are containment
16 officers, in the context of a SWAT operation?
17    A.   Containment officers are officers who
18 strategically position themselves on the location to
19 prevent persons from running from the residence or
20 persons from running to the residence.
21    Q.   Were there containment officers
22 involved in the Hinton operation?
23    A.   I would have to say there was.
24    Q.   How many?
25    A.   I don't know.

DEPOSITION OF WILLY GRAHAM

SHEET 8  PAGE 29

GRAHAM  29

1  Q. Was there somebody who was in charge of
2  execution of the Hinton search warrant?
3  A. I was in charge of executing the search
4  warrant.
5  Q. I don't know if this question will make
6  any sense, but was there somebody who was in charge
7  of the entire operation, a part of which was
8  executing the search warrant?
9  A. Maybe I'm not following the question.
10  Q. The question may not make sense, to be
11  honest with you.
12  A. It don't make sense then.
13  Q. That's fair enough. And again, I'm not
14  familiar with these things. There were SWAT
15  officers, there were narcotics officers, there were
16  containment officers, there was at least one medical
17  officer. I'm not sure whether there were crime lab
18  people there or not, but was there somebody who was
19  in charge of coordinating that entire effort?
20  A. You have to be a little bit more clear
21  on your question. That's not making sense to me.
22  Q. Well, I understand from your testimony
23  that there were officers from different Metro
24  departments who had roles in the events that happened
25  at the Hinton house on the night of January 16, 2002;

PAGE 30

GRAHAM  30

1  is that correct?
2  A. SWAT officers were there, and narcotics
3  officers arrived, if that's what you mean, you're
4  correct.
5  Q. And there were containment officers?
6  A. That's SWAT officers.
7  Q. That's SWAT officers also?
8  A. Yes.
9  Q. So the containment officers --
10  A. Are SWAT officers.
11  Q. So you were in command of the
12  containment officers?
13  A. Yes.
14  Q. Who was in command of the narcotics
15  officers?
16  A. Sergeant Anderson.
17  Q. And as between you and Sergeant
18  Anderson, was one or the other of you the commander
19  of the operation?
20  A. The tactical side, the actual
21  execution, getting into the house, making it safe,
22  taking subjects into custody, handcuffing, that was
23  the SWAT team's tactical role in ensuring that the
24  house was safe, and clear of threats of harm to the
25  narcotics officers who had the less experience in

PAGE 31

GRAHAM  31

1  executing the search warrants. After that is done,
2  the pictures are taken, people were checked to make
3  sure they didn't have any medical issues. That's the
4  reason why the medic was there with the SWAT team.
5  Then it's handed over to the narcotics to finish
6  their investigation.
7  Q. I appreciate that answer. Does the
8  SWAT team conduct any of the search for the items
9  identified in the search warrant?
10  A. Conduct the search, yes and no.
11  Q. In the case of the Hinton house, did
12  the SWAT team conduct a search for any of the items
13  in the search warrant or did you simply end your task
14  at making sure that the house was safe, that there
15  were no threats?
16  A. Ended at making it safe.
17  Q. Then you turned it over to the
18  narcotics officers to search for the items listed in
19  the search warrant, in the case of the Hinton house?
20  A. That's fair to say, yes.
21  Q. Was there a chain of command within the
22  SWAT team?
23  A. Yes, there's a chain of command.
24  Q. What was the chain of command of the
25  red team of the SWAT team that conducted the Hinton

PAGE 32

GRAHAM  32

1  search?
2  A. I was the team leader, the sergeant,
3  and I had 12, 13 officers assigned to me.
4  Q. Were all 13, 12 or 13 of those officers
5  then reporting to you at the same level?
6  A. I had what we call an assistant team
7  leader, but that's not part of the chain of command.
8  Q. What was the job of the assistant team
9  leader, of the red team in the Hinton search?
10  A. On that particular incident he
11  basically assisted me in reviewing the pre-planning
12  of the briefing and ensured that the documentation,
13  the after action report were -- which is part of the
14  documentation that you asked earlier about the
15  reports or the line-ups, who was in it, where people
16  were briefings, make sure that documentation is
17  accurate.
18  Q. Who was the assistant team leader on
19  the night -- for the SWAT team on the night of
20  Hinton search?
21  A. I'm not sure.
22  Q. How about Darrell Hixson?
23  A. That's possible.
24  Q. And the assistant team leader's
25  responsibility included making sure all the paperwork

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF WILLY GRAHAM

GRAHAM   33

PAGE 35

GRAHAM   35

**PAGE 33**

1   was taken care of?
2         A.   Yes.
3         Q.   Have you given a deposition before?
4         A.   Yes.
5         Q.   How many, would you estimate?
6         A.   Three.
7         Q.   Have you ever given a deposition in a
8   case where a Metro or any of its individuals were
9   sued because of a search or an arrest?
10        A.   Yes.
11        Q.   All three?
12        A.   I believe so.
13        Q.   Have you been a team leader in a case
14   where Metro was sued because of a search or an
15   arrest?
16        A.   Yes, sir.
17        Q.   On how many occasions?
18        A.   Once, I think once.
19        Q.   Do you remember the name of that case?
20        A.   Yes, I remember the name of one of the
21   complainants.
22        Q.   What was the name of one of the
23   complainants?
24        A.   It's still on-going.
25        Q.   Is it filed in the District Court or in

**PAGE 34**

GRAHAM   34

1   the Federal Court?  Is it a pending case?
2        A.   I haven't heard from the attorneys on
3   it, whether it's over or not.
4        Q.   What's the name of the complainant?
5        A.   I'm trying to think of the last name,
6   the first name is Jan.  Roberts.
7        Q.   Is the case in State Court or Federal
8   Court, if you know?
9        A.   I don't know.
10        Q.   Was the SWAT team acting on written
11   orders in conducting the search at the Hinton house
12   on January 16, 2002?
13        MR. ANDERSON:  I'm going to object as vague,
14   but go ahead and answer it, if you can, if you know
15   what he's asking.
16        THE WITNESS:  I'm not getting it, I mean
17   written orders?
18        MR. BOOKE:
19        Q.   Well, did somebody direct SWAT to
20   conduct a search at the Hinton house on January 16,
21   2002?
22        A.   A search warrant application affidavit,
23   is typed by a narcotics officer.  A copy of that
24   search warrant was given to either myself and/or the
25   assistant team leader, which may have been Hixson or

**PAGE 35**

1   one of the other guys, whoever was there that was
2   acting in that capacity that particular day, evening,
3   night.  So I would have to say a judge signed a
4   search warrant and they executed a search warrant, if
5   that helps.  It's a written order, I wouldn't say
6   it's an order, it was actually a request.
7        Q.   SWAT didn't go get a search warrant to
8   search the Hinton house?
9        A.   No.
10        Q.   Somebody else got a search warrant?
11        A.   Absolutely.
12        Q.   In this case it was the narcotics
13   squad, okay.
14        A.   Yes.
15        Q.   And so who is it that asked SWAT to
16   execute a search warrant at the Hinton house on
17   January 16, 2002?
18        A.   Narcotics detail.
19        Q.   Who?
20        A.   I don't know.
21        Q.   Was the request from the narcotics
22   detail to SWAT to conduct the search at the Hinton
23   house made in writing?
24        A.   The search warrant request was
25   delivered and/or faxed to the SWAT office.  Then the

**PAGE 36**

GRAHAM   36

1   plan was put into motion from there.
2        Q.   When you say search warrant request,
3   you are not talking about a request to get a search
4   warrant, are you?
5        A.   No, I'm not.
6        Q.   You are talking about a search warrant
7   has been obtained and the request is for SWAT to
8   execute it?
9        A.   Right.
10        Q.   And the procedure is that the search
11   warrant and the search warrant request are faxed from
12   whoever obtained the search warrant to SWAT?
13        A.   No, I didn't say that.  The request is
14   faxed, a copy of the search warrant itself is given
15   to one of the officers that does the recon, to
16   confirm and/or ensure that the location that the
17   officer or the affiant requests is the same one that
18   the officer goes and recons and makes sure it's the
19   same house.  So it's like if you say I want ABC
20   Street and this house on ABC Street, that officer
21   ensures that it's the red house on ABC Street.
22        Q.   Let me make sure I've got it right.
23        SWAT gets a request from one of the
24   Metro departments to execute a search warrant.
25   That's step one; right?

# DEPOSITION OF WILLY GRAHAM

GRAHAM   37

1    A.   Yes.
2    Q.   So SWAT sends a recon officer to make
3  sure that the address for which the request is made
4  is a correct address?
5    A.   Sometimes.
6    Q.   In the case of the Hinton search?
7    A.   I couldn't tell you exactly how the
8  steps, you know, you put steps to it like that.  I
9  can't tell you that's what happened on the Hinton
10  case.  I can tell you common practice is this, versus
11  when you ask me for steps.
12    Q.   Is there anyone who would know exactly
13  what steps were followed in the case of the Hinton
14  search?
15    A.   The individual officers who talked to
16  the narcotics detail would be able to tell you better
17  what they did step by step.
18    Q.   Is there any single individual at SWAT
19  who could address all of the steps that were followed
20  in conducting the Hinton search?
21    A.   Absolutely not.
22    Q.   It would be necessary to ask each of
23  the individuals piece by piece?
24    A.   Yes, only because everybody has
25  different roles.

---

PAGE 38

GRAHAM   38

1    Q.   So, for example, you do not know who
2  first received the search request?
3    A.   Right.  For example, the secretary
4  could have got it off the fax machine and put it in
5  my mailbox or put it in the Hixson mailbox with a
6  phone call or the narcotics detective could have
7  called, we've got a warrant coming, I'm faxing over,
8  so anticipate, look for it.  I mean there's a number
9  of things that could have, you know, not be the norm,
10  I guess, procedure for in the real world, for sterile
11  and right by the letter.  No, it never happens.
12    Q.   In the case of the Hinton search, who
13  at SWAT received the initial request for the search?
14    A.   I don't know.
15    Q.   In the Hinton case who sent a recon
16  officer out to verify the Hinton house was the place
17  identified in the search request?
18    A.   I don't know.
19    Q.   In the Hinton case who was the recon
20  officer that went out to verify the address?
21    A.   I don't know.
22    Q.   Are all of those people SWAT officers
23  though?
24    A.   Yes.
25    Q.   In the Hinton case, when did SWAT first

---

PAGE 39

GRAHAM   39

1  receive the request to conduct the search?
2    A.   We don't receive a request to
3  conduct -- maybe it's semantics, play on words.
4    Q.   I understand your point.  Then let me
5  ask the question differently.  In the Hinton case
6  when did SWAT first receive the request to execute a
7  search warrant?
8    A.   I don't know.
9    Q.   Is there a document that would identify
10  the time at which, the date and time at which SWAT
11  received the first request to execute a search
12  warrant?
13    A.   There should be.
14    Q.   What's that, what would that document
15  be called?
16    A.   Give me a minute here.  I believe a
17  search warrant request service.
18    Q.   Is the search warrant request service
19  the first notification of any kind that SWAT receives
20  that it's being requested to execute a search
21  warrant?
22    A.   No.
23    Q.   In the Hinton case, did SWAT get some
24  notice that it was being requested to conduct a
25  search, to execute a search warrant at the Hinton

---

PAGE 40

GRAHAM   40

1  house before the search warrant request service?
2    A.   I don't know.
3    Q.   Who at SWAT first received a request to
4  execute a search warrant at the Hinton house?
5    A.   I don't know.
6    Q.   Are you sure -- well, I'm sorry.  That
7  was going to be a sarcastic question.  Let me
8  withdraw it before I ask it.
9        Were you the first person who received
10  notice that somebody wanted you to execute a search
11  warrant at the Hinton house?
12    A.   I don't know.
13    Q.   Is it possible that you were?
14    A.   Yeah.
15    Q.   If the written fax document, the search
16  warrant request service is not the first way that
17  SWAT learns that it's being asked to conduct a
18  search, how would you learn?
19    A.   Phone call.
20    Q.   From the department?
21    A.   From the detail that wants the warrant
22  served, executed.  I may see you at lunch, I'm
23  probably going to have a warrant going tomorrow, I'll
24  give you a call and let you know what's up.
25    Q.   How would I determine, if you know,

DEPOSITION OF WILLY GRAHAM

SHEET 11   PAGE 41

GRAHAM   41

1   what the first notification was to SWAT in the Hinton
2   case, as to the fact that somebody was requesting, or
3   the narcotics detail was requesting that SWAT execute
4   a search warrant?
5        A.   You say how would you determine that?
6        Q.   Yes.  How could it be determined?
7        A.   How could it be determined?  I guess
8   you would have to have been there, been the one
9   requesting it and/or the one that it was requested
10  of.
11       Q.   What is the best way to determine today
12  when SWAT first got notice that it was being
13  requested to execute a search warrant at the Hinton
14  house?
15       A.   I would have to say on the service, the
16  warrant service request.
17       Q.   That would be likely the first written
18  indication?
19       A.   Yes.
20       Q.   Describe the steps that are followed at
21  SWAT, once that written request to execute a search
22  warrant is sent to SWAT?
23       A.   The steps are, it possibly was faxed, a
24  request comes over the fax, myself and/or the
25  assistant team leader reviews the fax, or one of the

PAGE 43

GRAHAM   43

1   documented who actually did the recon, but who
2   actually physically handled the request when it came
3   in, there's no documentation of that.
4        Q.   So the only documentation of who did
5   each one of these steps is the entire SWAT packet?
6        A.   The entire packet, exactly, with me
7   being the team leader approving the operation.
8        Q.   In the Hinton, in the case of the
9   Hinton search, did you review the fax making the
10  request for the execution of the search warrant?
11       A.   I believe I did.
12       Q.   Are you the person to whom the fax and
13  the request was directed when it was received at
14  SWAT?
15       A.   It's just directed to the SWAT detail
16  itself, not specifically to me.
17       Q.   Yes, and then you said that somebody
18  picks it up off the fax and gives it to the leader,
19  assistant leader, or a senior officer; correct?
20       A.   That's usually how it goes.
21       Q.   Yes.  And my question is:  Are you the
22  person to whom the fax was delivered in the Hinton
23  case?
24       A.   And I said I don't know.  I don't know
25  if it was delivered physically to me.  I reviewed it,

PAGE 42

GRAHAM   42

1   other officers assigned to SWAT notifies myself or
2   the assistant team leader or one of the senior
3   officers, recon officers are assigned to contact the
4   detective and/or detail that is requested in the
5   service.  Recon is conducted by the recon officers, a
6   drawing is gone over of the recon location in a
7   briefing and the warrant is executed.
8        Q.   Is there a SWAT document that lists or
9   identifies when each of these steps that you have
10  just described has been done?
11       A.   When?  No.
12       Q.   Is there a SWAT document that lists or
13  describes whether each of these steps has been done?
14       A.   No.
15       Q.   Is there a SWAT document that lists or
16  describes who did each of these steps?
17       A.   Yes.
18       Q.   What document is that, or is that a
19  collection of documents?
20       A.   That's a collection.  A lot of them are
21  not, like I said, the officer that may have taken the
22  fax, looked at it.  That's not documented who took it
23  because it goes to the team leader or assistant team
24  leader, or one of the senior officers who will then
25  go out and do the recon.  That's going to be

PAGE 44

GRAHAM   44

1   but if it was physically delivered to me, I can't say
2   that.
3        Q.   Well --
4        A.   In other words, I'll help you out on
5   that one, sometimes the information comes.  I
6   physically may not read it, and I say what are they
7   asking for, what are they on, what do they have.  I
8   don't have to physically see it because I know.  If I
9   know and the officer knows, if he explains it to me,
10  I'll ask certain questions to come to a determination
11  so I don't have to physically look at it.
12       Q.   Whether or not you looked at the
13  written request for search warrant service, was the
14  fact that a request to execute a search warrant was
15  made for the Hinton house directed to you?
16       A.   I was aware of it, if that's what you
17  are asking.  Yes, I was aware that a request has been
18  made to execute a warrant at the Hinton residence.
19       Q.   Okay.  Did you assign a recon officer
20  to contact the detail or the detective that was
21  requesting the service?
22       A.   I don't remember.
23       Q.   Was -- withdraw that question.  Did a
24  recon officer contact the detail or detective that
25  had requested the service in the Hinton case?

DEPOSITION OF WILLY GRAHAM

GRAHAM   45

1    A.   I don't know.
2    Q.   What is the purpose of the recon
3    officer contacting the detail or the detective who is
4    requesting the service, what is he supposed to learn?
5    A.   Again, he is to learn the facts of what
6    he has gathered from his investigation.  Is the
7    suspect armed, does he have a criminal history, the
8    location of the house, is it on the north side of the
9    street, the east side of the street, has it got bars.
10   Again, like I say, to learn the intimate details of
11   the house to ensure that the house that he says
12   and/or anticipates on putting and faxing over or
13   handing to us on the written documentation, is it in
14   fact the same house that the officer gets in his head
15   to go and do the recon, to ensure that we do not hit
16   the wrong residence.
17   Q.   And another purpose is to assure that
18   you go to the place you are going to search with a
19   proper plan; correct?
20   A.   Absolutely.
21   Q.   To go to the place you are going to
22   search with a safe plan?
23   A.   Absolutely.
24   Q.   To go to the place you are going to
25   search with a proper amount of force?

PAGE 47

GRAHAM   47

1    was conducted?
2    A.   Usually there would be a date.  Exact
3    time, he probably wouldn't get it, but we got what we
4    call an event number.  He'll do the recon under an
5    event number, a Metro event number, and that will
6    come back up, we need to pull it up or something,
7    what was the exact time he requested it, but a lot of
8    time the exact time he may be, say, here, requesting
9    event number, he's going to 215, so the exact time he
10   actually conducts it may not be the exact time he
11   pulls the event number itself, it's just assigned to.
12   Q.   I want to make sure I understand you.
13   The recon for a SWAT search has an event number, is
14   that what you are saying?
15   A.   Sometimes, most times they do, yes.
16   Q.   And that event number has a time
17   attached to it; is that correct?
18   A.   Yes.
19   Q.   And the time is not necessarily the
20   time when the recon itself was conducted, but when
21   the recon officer set out to conduct the recon?
22   A.   Yeah, kind of, sort of.
23   Q.   So it would give you the closest idea
24   you can get?
25   A.   Exactly.  For example, if you get a

PAGE 46

GRAHAM   46

1    A.   Okay, yes.
2    Q.   Said another way, one purpose of the
3    recon officer contacting the detail or the detective
4    is to make sure that you are not blowing up gnats
5    with hand grenades, you are not engaged in overkill,
6    wouldn't you agree?
7    MR. ANDERSON:  I'm going to object, vague.  Go
8    ahead and answer, if you can.  Object to the form, as
9    well.
10   THE WITNESS:  I'll let him read a little bit,
11   do it again.
12   MR. BOOKE:
13   Q.   I'll ask you that question at a later
14   date.
15        Now in the Hinton case, when was the
16   recon conducted?
17   A.   When was it conducted?
18   Q.   Yes.
19   A.   I don't know.
20   Q.   And who conducted the recon in the
21   Hinton case?
22   A.   I'm not sure.  It would be in the
23   documentation.  That's all in the packet.
24   Q.   Is the person who conducted the recon
25   required to note the date and time at which the recon

PAGE 48

GRAHAM   48

1    call as a patrol officer that you have to respond to
2    a fight at Rainbow and Smoke Ranch, you know, and you
3    are here at, you know, you got the call at, say,
4    4:00, but you got to the call at 4:05, so that's what
5    I'm saying.
6    Q.   Okay, and is there a policy about how
7    long after you receive a request to execute a search
8    warrant it is until you are supposed to conduct your
9    recon?
10   A.   No, not that I know of.
11   Q.   Is there a policy between how much time
12   can elapse between when the recon occurs and when the
13   actual search warrant is executed?
14   A.   No.
15   Q.   Does SWAT have, or in January of 2002
16   did SWAT have some sort of regular practice as to how
17   close in time it conducted its recon to when it was
18   going to conduct its searches?
19   A.   No, I can't say that it did.
20   Q.   In January of 2002 did SWAT do anything
21   at all to verify the accuracy or the truthfulness of
22   the information contained in the search request?
23   A.   I can't say that we didn't.
24   Q.   In January of 2002 did SWAT do anything
25   to verify the accuracy of the information contained

DEPOSITION OF WILLY GRAHAM

GRAHAM   49

1  in the search warrant service request for the Hinton
2  house?
3      A.  Did we do anything?  Can you be a
4  little bit more clear on your question?
5      Q.  I'm not sure if I can, I'll try.
6      A.  All right.
7      Q.  In the case of the Hinton search, when
8  SWAT got the request for SWAT warrant service, did
9  SWAT do anything to verify the truth or the accuracy
10 of the information that was contained in the request
11 for SWAT warrant service?
12     A.  I don't know.
13     Q.  Who would know that?
14     A.  I don't know.
15     Q.  Is there anybody at SWAT that would
16 know whether SWAT did anything to verify the accuracy
17 of the information contained in the request for a
18 warrant service?
19     A.  Like I say, I don't know.
20     Q.  Did SWAT prepare or create a plan for
21 how to conduct the execution of the search warrant at
22 the Hinton house?
23     A.  Yes.
24     Q.  Who at SWAT developed the plan for
25 executing the search warrant at the Hinton house?

GRAHAM   50

1      A.  Like I said earlier, myself, assistant
2  team leader and/or some of the senior officers, but
3  normally it's myself and assistant team leader.
4      Q.  At the time that you prepared the plan
5  for executing the Hinton search warrant, did you have
6  the written request from the narcotics detail?
7      A.  Like I said earlier, I don't know if I
8  physically handled the written request.
9      Q.  At the time you prepared the plan for
10 executing the Hinton search warrant did you have any
11 recon information?
12     A.  To put the plan together?
13     Q.  Yes.
14     A.  Absolutely.
15     Q.  At the time that you put the plan
16 together -- withdraw the question.
17         At the time you made the plan for
18 executing the Hinton search warrant, list all of the
19 information that you had about the Hinton house and
20 the occupants of the Hinton house?
21     A.  I don't remember that.
22     Q.  Do you remember any of it?
23     A.  From reviewing the pictures I believe
24 it was barred, it had bars on the front door.  From
25 looking at the pictures, it all runs together.

GRAHAM   51

1      Q.  Well, you didn't have pictures at the
2  time you made the plan to execute the search warrant?
3      A.  No, absolutely not.  So you are asking
4  me to remember back January 2002, it ain't going to
5  happen.
6      Q.  Okay.  Well, you know, let's just make
7  our record then.  At the time that you made the plan
8  to execute the Hinton search warrant I would like you
9  to list all of the things you knew at that time about
10 the Hintons, the Hinton house, and the search warrant
11 you were going to execute?
12     A.  I don't remember.  I can't tell you
13 what I remember from that.
14     Q.  All right, and what written information
15 did you have at the time that you made the plan to
16 execute the search warrant?
17     A.  I don't recall.
18     Q.  At the time that you made the plan to
19 execute the Hinton search warrant, did you do
20 anything to verify the accuracy or the truth of the
21 information that you were provided by the narcotics
22 detail?
23     A.  I can't say I did.
24     Q.  Was the information provided to SWAT by
25 the narcotics detail prior to the time the search

GRAHAM   52

1  warrant was executed true and accurate in all
2  respects?
3      A.  I would have to assume so.
4      Q.  Is it only an assumption?  In other
5  words, do you have any personal knowledge as to
6  whether the information that was provided by the
7  narcotics detail was true and accurate?
8      A.  No, I wouldn't say I had no personal
9  knowledge, but basically at the time the decision was
10 made, depending on what the records, I mean that's
11 the best way to answer that question, according to
12 the records.
13     Q.  And what records are you talking about
14 when you --
15     A.  The SWAT package, the package for the
16 Hinton residence, that's all.  The only thing I have
17 is the record.
18     Q.  If I were to give you the SWAT package,
19 would you be able to identify what you had at the
20 time you made the plan to execute the warrant?
21     A.  I can tell you what the SWAT detail,
22 the unit should have had.  I can't tell you what I
23 physically would have had myself.
24     Q.  All right, that's fair enough.  Let's
25 take a short break and then we'll do some other

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF WILLY GRAHAM

GRAHAM   53

1  things, and then I'm going to ask you to do that.
2         (Recess taken.)
3     MR. BOOKE:  Let's go back on the record.
4     Q.  I want to go back one step and then
5  we'll pick up where we were.  In the Roberts versus
6  Metro case, have you given a deposition in that case
7  yet?
8         A.  I think I have.  I think it was like,
9  that was just one name I remember.  It was like more
10  than one person involved.
11        Q.  I understand.  Was there a written plan
12  prepared for executing the search warrant on the
13  Hinton house?
14        A.  Was there a written plan?  Yes.
15        Q.  When was the written plan for executing
16  the search on the Hinton house prepared?
17        A.  During the briefing.
18        Q.  The search itself, according to
19  documents, occurred on January 16, 2002 in the range
20  of 2100 to 2200 hours.  When was the briefing?
21        A.  I don't remember.
22        Q.  Was the briefing on the same day as the
23  search warrant was executed?
24        A.  I don't remember.
25        Q.  Is there any written documentation that

GRAHAM   54

1  would show when the briefing was conducted?
2         A.  I don't know.
3         Q.  Is there any written documentation that
4  would show the date and time of the plan, the written
5  plan for executing the search warrant on the Hinton
6  house?
7         A.  I can't think of one.
8         Q.  Are you and the assistant team leader
9  the drafters or the authors of the written plan for
10  executing the search warrant on the Hinton house?
11        A.  The briefing is conducted in a briefing
12  room on the board.  The drawing is done -- can we
13  kill that?
14        Q.  Sure.
15        (Short break.)
16    THE WITNESS:  The briefing is conducted and
17  during the briefing the recon officer is usually
18  filling out the documentation of what and who is
19  assigned where, as he's being briefed.  So the exact
20  time may or may not be on there, and I don't think it
21  would be on there, the particular date.  We may brief
22  tonight, for example, and execute it tomorrow.  So
23  I'm trying to give some clarity.  Just because it was
24  reconed or faxed today doesn't necessarily mean you
25  are going to do it that particular day.

GRAHAM   55

1     MR. BOOKE:
2         Q.  I think my question was, although I'm
3  not sure, I think my question was:  Were you and the
4  assistant team leader the authors, the writers of the
5  written plan for the search of the Hinton house?
6         A.  And I did answer, I said the recon
7  officer would fill out the paperwork as it's being
8  done.  The recon officer would do that.
9         Q.  All right, thank you.  You were talking
10  about drawing on a board, and so I wasn't sure.
11        A.  Well, I was trying to get you to say,
12  when you say author, when you are talking about the
13  actual physical packet, sometimes we draw on the
14  board, so I was trying to --
15        Q.  But the document that goes in the
16  packet is what the recon officer fills out?
17        A.  The recon officer and guys that are
18  assigned to different details, some of the recon
19  officers may do part of the drawing of the house, the
20  interior of the house, the outside of the house,
21  there are other officers that may take the pictures,
22  so everybody has a separate role and a role that's
23  not specifically assigned, just they know what needs
24  to go into the packet itself.
25        Q.  In January of 2002 was it the common

GRAHAM   56

1  practice with the SWAT team to conduct the briefing
2  within 24 hours of the time the search warrant was
3  executed?
4         A.  No.
5         Q.  In January of 2002 what was the common
6  practice in terms of how much time elapsed between
7  briefing and execution?
8         A.  There was no number set.  There were
9  variables, circumstances dictated when a warrant
10  would be executed, so there was no specific time, as
11  long as it was within the amount of time that's
12  allowed by law to execute it.
13        Q.  What was the maximum amount of time
14  permitted by law in January of 2002 to execute a
15  warrant?
16        A.  You had ten days.
17        Q.  And the warrant in the Hinton case --
18  by the way, what is the source of that legal
19  authority, to your knowledge?
20        A.  The Federal revised statute.
21        Q.  And in the Hinton case, when was the
22  warrant that you executed on January 16, 2002 issued?
23        A.  I don't know.
24        Q.  In January of 2002 was there someone at
25  SWAT whose job responsibility it was to verify that

DEPOSITION OF WILLY GRAHAM

SHEET 15   PAGE 57

GRAHAM   57

1  the warrant was being executed within the time
2  permitted by law?
3        A.   I'm sure there was.
4        Q.   Who was it in the Hinton case?
5        A.   That would be the officers that were
6  handling the actual warrant itself, which possibly
7  was the recon officer.  That was the purpose of him
8  seeing it again, to make sure that everything was
9  straight.
10       Q.   That's another one of their tasks they
11 are supposed to do?
12       A.   Yeah, somewhat.
13       Q.   In other words, when the recon officer
14 communicates with the detail that's requesting the
15 search, one of the things that the recon officer is
16 to do is to make sure that the search warrant is
17 within the time permitted?
18       A.   Yes.
19       Q.   Today in November of 2003 how can --
20 I'm sorry, withdraw the question.  What is the best
21 way right now to determine when the briefing for the
22 Hinton search took place?
23       A.   From the packet itself.
24       Q.   And where do you look in the packet?
25 What is it in the packet that will tell you what time

PAGE 58

GRAHAM   58

1  the briefing was conducted?
2        A.   When the -- I don't remember the name
3  of the document.  I'm familiar with them but I have
4  been out of there for a while.
5        Q.   That's okay.  Was the written plan for
6  executing the Hinton search -- I'm sorry, withdraw
7  that question, I apologize.  I'm a little rummy here.
8             Who was the final authority on what the
9  content of the written plan for executing the Hinton
10 search would be?
11       A.   I was.
12       Q.   Was the final plan for executing the
13 Hinton search warrant reviewed by anyone higher up
14 the chain in SWAT before the plan was executed?
15       MR. ANDERSON:  Higher up than him?
16       MR. BOOKE:
17       Q.   Yes.
18       A.   I can't say it was.
19       Q.   Was the final plan for executing the
20 Hinton search warrant reviewed by anyone at Metro
21 before the plan was executed?  Anyone other than you?
22       A.   I can't say it was.
23       Q.   Are there different classes of search
24 warrants?
25       A.   Yes.

PAGE 59

GRAHAM   59

1        Q.   What are the classes of search
2  warrants?
3        A.   Different classes are one, two, three,
4  four.
5        Q.   What is a Class One search warrant?
6        A.   I would have to look at the packet to
7  regurgitate and give it to you.
8        Q.   Is it written down somewhere?
9        A.   Yeah, it's in the packet.
10       Q.   In the SWAT packet?
11       A.   Yes.
12       Q.   Who is it at Metro or the District
13 Attorney's Office or the court who decides into which
14 class any particular search warrant falls?
15       A.   At that time it was policy and planning
16 of the Las Vegas Metropolitan Police Department.
17       Q.   Is that a department?  I didn't
18 understand your answer.
19       A.   It was policy and planning, the
20 division of the Metropolitan Police Department.
21       Q.   Is who decided whether it was Class
22 One, Two, Three or Four?
23       A.   That comes with the policies and
24 procedures of the policy manual itself.
25       Q.   Okay, now I understand your point.  In

PAGE 60

GRAHAM   60

1  other words, there is a policy and procedure manual
2  that tells you how you execute a Class One, how you
3  execute a Class Two, how you execute a Class Three,
4  how you execute a Class Four?
5        A.   It don't tell you how, it tells you
6  which one falls into that particular category.
7        Q.   I see.  And for any specific search
8  warrant or any particular search warrant, who is it
9  that decides into which category a particular search
10 warrant falls?
11       A.   To save some time in this one, I did.
12       MR. ANDERSON:  Answer the question who would
13 normally make it.
14       THE WITNESS:  The team leader, the team leader
15 of SWAT.
16       MR. BOOKE:
17       Q.   In other words, the person who is in
18 charge of executing the search warrant is the one who
19 would decide which class it goes into?
20       A.   The team leader and assistant team
21 leader concur, based on the information they receive
22 from the recon, from the detail requesting the
23 warrant.  The totality of the situation and
24 circumstances dictate which class it falls under.
25       Q.   And in making that decision, you as the

DEPOSITION OF WILLY GRAHAM

GRAHAM    61

1  team leader in the Hinton case were required to
2  follow the rules and procedures that are outlined in
3  the Metro manual?
4      A.   Absolutely.
5      Q.   Now in the Hinton case, what
6  information did you rely on in making the decision
7  about which class the search warrant would fall into?
8      A.   The totality of the information that
9  was given, which was from the recon officers, the
10 history of the subject, the situation or the
11 predicament the house was sitting, whether it was
12 barred, types of crime the guy or girl had committed,
13 so many variables to determine that.
14     Q.   Let's talk first about the sources of
15 your information for determining into which class the
16 search warrant would fall.  The recon officer was one
17 source?
18     A.   The sources come from everybody who has
19 a part or role in it, which would be any of the SWAT
20 team members, the narcotics detail, and any of the
21 information that they might receive additional from a
22 computer-aided information.
23     Q.   So you have three sources, if I
24 understand correctly.  You have recon officers, other
25 members of the SWAT team, and the narc detail?

GRAHAM    62

1      A.   Is that -- recon officers are SWAT
2  officers.
3      Q.   All right.
4      A.   It would be the recon officers,
5  narcotics detail, if those officers tell what they
6  give as to how they came up with the warrant itself,
7  and my own knowledge and experience and training.
8      Q.   So in the case of the classification
9  that you gave to the Hinton search warrant, you
10 relied on recon, the narcotics detail, and your own
11 training and experience; is that correct?
12     A.   Yes.
13     Q.   Anything else?
14     A.   I'm sure there is things aren't coming
15 to light right now.
16     Q.   Did you have any experience with the
17 Hinton household in determining what class the
18 warrant would fall into, did you have any personal
19 experience with that location?
20     A.   No.
21     Q.   Did you have any personal experience
22 with any of the subjects, David Hinton, Donald Hinton
23 or John Reyes, in coming up with the classification?
24     A.   No.
25     Q.   What information did you have from

GRAHAM    63

1  recon in developing a classification for the Hinton
2  search warrant?
3      A.   I don't remember what information
4  specifically that any of them gave me.
5      Q.   Okay, and whatever reason you had is
6  written in the packet?
7      A.   Yes, if I look at it and go over it, I
8  could possibly explain why or what was there, but to
9  give you details on what was said about the specific
10 location and/or subjects that were in the house or
11 whatever, no.
12     Q.   And what is the name of the policy or
13 procedure that tells you which class is which?  What
14 was the name of that document?
15     A.   I don't think I gave you that, but
16 search warrant request service.
17     Q.   Yes, I'm sorry.  You then described a
18 document or a policy and procedure that describes how
19 you decide what is Class One, Class Two, Class
20 Three --
21     A.   It's listed on there.
22     Q.   And is there a corresponding policy
23 somewhere in the Metro policy manual?
24     MR. ANDERSON:  I'm just going to object that it
25 misstates testimony, it was the policy and planning

GRAHAM    64

1  committee at LVMPD that defines them.
2      MR. BOOKE:
3      Q.   Okay.  Did they define that in writing?
4      A.   Yeah, yes.
5      Q.   Is that definition contained in writing
6  somewhere other than on the form?
7      A.   Yes.
8      Q.   Where is it defined in writing?
9      A.   I don't know.
10     Q.   Policy and planning, okay?
11     MR. ANDERSON:  Is that policy and planning
12 committee?
13     THE WITNESS:  Yeah.  They don't even exist
14 anymore.  That was before it changed.
15     MR. BOOKE:
16     Q.   What's the new name?  Does it have a
17 new name?
18     A.   I don't recall.  I don't know.
19     Q.   Do you have any recollection at all
20 about what occurred in the briefing before the
21 execution of the Hinton search warrant?
22     A.   No.
23     Q.   Do you even have a recollection as to
24 whether a briefing actually took place in the case of
25 the Hinton search warrant?  Do you have a picture in

DEPOSITION OF WILLY GRAHAM

```
                                      GRAHAM   65
1   your mind's eye that it actually happened?
2        A.   Yeah, but no specifics.  I mean I'm
3   sure we had a briefing.
4        Q.   Are you sure that you had a briefing
5   simply because that's the regular practice?
6        A.   Yes.
7        Q.   But in terms of actually being able to
8   call up some picture, do you have a picture at all in
9   your mind's eye?
10       A.   Nah.
11       Q.   What is your present position at Metro?
12       A.   Patrol lieutenant.
13       Q.   How long have you been a patrol
14  lieutenant?
15       A.   A little over a year.
16       Q.   Did you request the transfer from SWAT
17  to patrol lieutenant?
18       A.   Absolutely not.
19       Q.   What was the occasion of moving you
20  from SWAT to patrol lieutenant?  Why did that happen?
21       A.   There was a testing procedure for the
22  position.  I tested for it and was promoted out.
23       Q.   That's what I thought my original
24  question was, you requested the move?
25       A.   No, I tested out.  You can request to
```

```
                                      GRAHAM   66
1   leave, but I tested out.  It was a promotion, I
2   promoted out.
3        Q.   Okay, and before you were a patrol
4   lieutenant, how long were you in SWAT?
5        A.   As a sergeant, approximately a year.
6        Q.   And were you in SWAT before you were a
7   sergeant?
8        A.   Yes.
9        Q.   What was your position in SWAT before
10  you were a sergeant?
11       A.   I was an officer.
12       Q.   How long were you a SWAT officer?
13       A.   About three years.
14       Q.   What was your job before SWAT officer?
15       A.   Internal affairs sergeant.
16       Q.   How long were you an internal affairs
17  sergeant?
18       A.   A year.
19       Q.   What was your job before internal
20  affairs sergeant?
21       A.   A problem-solving unit sergeant at
22  southeast, plain clothes sergeant, basically.
23       Q.   How long were you in that position?
24       A.   About a year, I think, about a year.
25       Q.   I'm curious, what was that job,
```

```
                                      GRAHAM   67
1   problem-solving?
2        A.   You address particular problems in a
3   specific area.
4        Q.   Problems of what type?  I mean are they
5   internal police problems?
6        A.   No, criminal, crooks, you are assigned
7   to patrol, but there was special projects, burglary
8   capers and stuff like that.  That's what PSU meant,
9   problem-solving unit.
10       Q.   What did you do before problem-solving
11  unit sergeant?
12       A.   Patrol sergeant.
13       Q.   How long were you a patrol sergeant?
14       A.   One year.
15       Q.   And before that what was your job?
16       A.   SWAT officer.
17       Q.   For how long?
18       A.   Three years.
19       Q.   Before that?
20       A.   Gang officer.
21       Q.   For how long?
22       A.   Two years, I think.
23       Q.   Before that?
24       A.   Wow.
25       Q.   We're almost at the beginning of time.
```

```
                                      GRAHAM   68
1        A.   Almost, work with me here.
2   Problem-solving unit officer.
3        Q.   How long did you do that?
4        A.   About a year.
5        Q.   Did you have any other police jobs
6   before that?
7        A.   Stay on the roll, patrol officer, and
8   I'm going to say about a year, corrections officer,
9   two years.
10       Q.   You started as a corrections officer?
11       A.   Yes.
12       Q.   Are all of jobs that you have just
13  listed with the Las Vegas Metropolitan Police
14  Department?
15       A.   Yes.
16       Q.   Did you attend college?
17       A.   Some college, yes.
18       Q.   Where did you attend college?
19       A.   It was the Clark County Community
20  College, which is now --
21       Q.   Something else?
22       A.   Yeah.
23       Q.   Community College of Southern Nevada.
24       A.   Right.
25       Q.   Is there a document that would list all
```

DEPOSITION OF WILLY GRAHAM

SHEET 18   PAGE 69

GRAHAM   69

1  of the weapons that SWAT had at the execution of the
2  Hinton search warrant?
3     MR. ANDERSON: Like SWAT brought personally?
4     MR. BOOKE:
5     Q.  Yes.
6     A.  Did you say all of the weapons?
7     Q.  Yes.
8     A.  No.
9     Q.  Is there a document that would list all
10 of the devices that SWAT used in executing the search
11 warrant, such as ram bars, and other types of
12 devices?
13    A.  Yes, there should be, yes.
14    Q.  And that would be in the packet also?
15    A.  They should be.
16    Q.  All right. Was there a standard issue
17 of weapons for each SWAT officer that was involved in
18 executing the Hinton search warrant?
19    A.  Standard issue of weapons? A weapon is
20 not issued each time you execute a warrant.
21    Q.  That's not what I meant, and it was a
22 poor question. What weapons were carried by the
23 officers who executed the Hinton search warrant?
24    A.  I don't know.
25    Q.  Was each officer similarly equipped

PAGE 70

GRAHAM   70

1  with weapons?
2     MR. ANDERSON: I think what he's asking is
3  there standard weaponry, or is there discretion for
4  the officers to use.
5     THE WITNESS: There's discretion, I guess,
6  you've got a handgun, you've got a nine millimeter,
7  you've got a .45.
8     MR. BOOKE:
9     Q.  Every SWAT officer at the Hinton
10 residence had a handgun?
11    A.  I would have to say yes.
12    Q.  Did every officer at the Hinton
13 residence have a rifle?
14    A.  No.
15    Q.  Did any of the officers have rifles?
16    A.  Rifles?
17    Q.  Let me ask the question a different
18 way. Did any of the officers at the Hinton residence
19 have firearms other than, or in addition to handguns?
20    A.  Yes.
21    Q.  What firearms in addition to handguns
22 were there?
23    A.  A shotgun, and that's based on looking
24 at the photographs, and that's about all I could tell
25 you, as far as that.

PAGE 71

GRAHAM   71

1     Q.  Did every SWAT officer have a shotgun?
2     A.  No.
3     Q.  How many shotguns were there at the
4  Hinton residence?
5     A.  I don't know.
6     Q.  Do you have any idea?
7     A.  At least one.
8     Q.  I've read in these documents the Hinton
9  residence being described as being "fortified." Have
10 you heard that term used in connection with --
11    A.  Yes.
12    Q.  What does fortified mean?
13    A.  In this context it would be barred,
14 doors and/or windows, wrought iron doors and windows.
15    Q.  So as used in the SWAT packet documents
16 the word "fortified" means wrought iron doors or
17 windows?
18    A.  Yeah. In this context for this
19 particular incident, yeah, that's wrought iron bars.
20    Q.  On doors and windows?
21    A.  On doors and/or windows.
22    Q.  Is it necessary that all of the doors
23 and windows in a house be covered with wrought iron
24 doors in order for the house to be classified as
25 "fortified"?

PAGE 72

GRAHAM   72

1     A.  No.
2     Q.  If a house had, for example, a wrought
3  iron security door on the front of the house, would
4  it be labeled as "fortified"?
5     A.  Yes.
6     Q.  What is the significance of the term
7  "fortified" as it relates to planning or execution of
8  a search warrant by SWAT?
9     A.  In a nutshell, it just means it's an
10 extra door or an extra obstacle to go through the
11 main entry entrance. There should be a slash in
12 there, entry/entrance.
13    Q.  To your knowledge did any of the SWAT
14 team members conduct any of the search for any of the
15 items listed in the search warrant in the Hinton
16 case?
17    A.  I'm not sure because I'm not
18 remembering what was the items listed on the search
19 warrant.
20    Q.  Do you have a recollection of any of
21 the events of executing the Hinton search warrant?
22    A.  Yes.
23    Q.  In planning to execute the Hinton
24 search warrant were you operating on the assumption
25 that the occupants of the Hinton house were armed?

DEPOSITION OF WILLY GRAHAM

SHEET 19   PAGE 73

GRAHAM   73

1   A.   That I don't remember.
2   Q.   In executing the search warrant on the
3   Hinton house were you operating on the assumption
4   that you would not be given consensual entrance into
5   the house?
6   A.   I would have to say yes.
7   Q.   What was your basis for believing that
8   you would not be given consent to enter the house?
9   A.   My recollection was the fact that there
10   was bars on the doors, wrought iron, whatever you
11   call them, and there was weapons found there.  That's
12   about the only thing I can recall, and on any warrant
13   you have to assume that you are not going to be
14   allowed entry.  That's one of the reason why the
15   police are there, you never know.
16   Q.   As a SWAT team leader did you make the
17   assumption in executing search warrants that you
18   would never be permitted entry?
19   A.   No, you plan for the worst and hope for
20   the best.
21   Q.   So before you went into the Hinton
22   house you didn't know that there were weapons there,
23   did you?
24   A.   I can't say what I knew then.
25   Q.   Can you remember?

PAGE 74

GRAHAM   74

1   A.   No.
2   Q.   Well, did you have any information
3   prior to going into the Hinton house that there would
4   be weapons?
5   A.   I don't remember what I was doing on
6   that particular idea.
7   Q.   Is there any written information that
8   you had prior to beginning execution of the search
9   warrant that led you to the conclusion that you would
10   not be given consent to enter?
11   A.   Like I said before, I wasn't, I can't
12   say that I was or was not given written information,
13   based on the intelligence and/or information I
14   received from the officer relating information to me
15   up the chain.  I made the decision based on what was
16   told to me at that particular time and/or what I saw,
17   but I can't say I did or didn't see written
18   information.
19   Q.   And you made the decision that you
20   would not be given consent to enter; correct?
21   MR. ANDERSON:  Objection, misstates testimony.
22   Go ahead.
23   THE WITNESS:  No.  I said you plan for the
24   worst and hope for the best.
25   MR. BOOKE:

PAGE 75

GRAHAM   75

1   Q.   I understand, and I'm asking you a
2   different question.  Did you make the assumption?
3   A.   I answered that before.  No, I made the
4   assumption that we may or may not be given, allowed,
5   allotted access to going into the house.
6   Q.   Did you request consent to enter the
7   Hinton house in the course of executing the search
8   warrant?
9   A.   Yes.
10   Q.   You did personally?
11   A.   The team did, yeah, the team did, yeah.
12   Q.   Okay, let's take it one piece at a
13   time.  Did you, Willy Graham, team leader, request
14   consent to enter the Hinton house to execute a search
15   warrant?
16   A.   Myself, the team, yelled, "police,
17   search warrant."
18   Q.   Was your yelling "police, search
19   warrant" the only means by which you requested
20   consent to enter the Hinton house to execute the
21   search warrant?
22   A.   I believe so.  I think that was all
23   that was said.
24   Q.   Was the team yelling "police, search
25   warrant" the only request that was made of the

PAGE 76

GRAHAM   76

1   Hintons for consent to enter the Hinton premises to
2   execute the search warrant?
3   A.   The only -- I can't say that it was.
4   Q.   To your knowledge was there any request
5   made for consent to enter the Hinton house other than
6   the team yelling "police, search warrant"?
7   A.   No.
8   Q.   And how was entry into the Hinton
9   household actually achieved?
10   A.   I believe the wrought iron door was
11   breached and the front wooden door was breached.
12   Q.   How was the wrought iron door breached?
13   A.   It was breached with the shok-lok, or
14   the shotgun and frangible rounds from that shotgun.
15   Q.   What are those rounds, in other words,
16   somebody fired a shotgun into the --
17   A.   Into the locking mechanism, exactly.
18   Q.   Who was that?  Who did that?
19   A.   I don't know.
20   Q.   And how many times did they fire a
21   shotgun into the metal door?
22   A.   It was fired into the locking
23   mechanism, I believe the deadbolt and the actual
24   knob.
25   Q.   So at least two rounds?

DEPOSITION OF WILLY GRAHAM

GRAHAM   77

1    A.   At least two, I believe.
2    Q.   What's a shot?
3    A.   Okay.  By the way, that's just a
4  terminology for the frangible round.
5    Q.   I'm not familiar with the term
6  "frangible," what's that?
7    A.   That means once the round hits the
8  metal, it somewhat, I guess fries it, and
9  disintegrates the metal that it comes in contact
10  with.
11    Q.   Then how was the wooden door breached?
12    A.   I believe with a ram, based on just a
13  glance at the photos.
14    Q.   Okay.  How much time elapsed between
15  when the team yelled "police, search warrant" until
16  the first frangible round was fired by the shotgun
17  into the metal door?
18    A.   I don't know.
19    Q.   Do you have any recollection at all of
20  how much time elapsed after the team yelled "police,
21  search warrant" until a shotgun was fired into the
22  metal door?
23    A.   No.
24    Q.   Let me show you what have been marked
25  as documents LVMPD 000071 through 110, and if you

PAGE 78

GRAHAM   78

1  would please take a look at these documents and tell
2  us whether that is the SWAT packet that we have
3  referred to in the testimony of this deposition.
4    A.   It looks like the packet.
5    MR. ANDERSON:  Is anything missing?
6    THE WITNESS:  I don't know.
7    MR. BOOKE:
8    Q.   And I want to ask, is there anything
9  contained in documents 71 through 110 that is not a
10  part of the SWAT packet?
11    A.   No.
12    Q.   And is there anything that is a part of
13  the SWAT packet that is not contained in documents 71
14  through 110?
15    A.   Not that I can recall.
16    Q.   I'll make a quick copy of this.
17    (Whereupon Deposition Exhibit
18    1 was marked for identification.)
19    MR. BOOKE:
20    Q.   Lieutenant Graham?
21    A.   Yes, sir.
22    Q.   We've marked as Exhibit 1 the SWAT
23  packet with regard to the execution of the search
24  warrant on the Hinton house; is that correct?
25    A.   Correct.

PAGE 79

GRAHAM   79

1    Q.   And the SWAT packet is a collection of
2  documents that are made in the ordinary course of
3  SWAT work, or were at least in January of 2002.  In
4  other words, you made those as a part, those records
5  were made as a part of the SWAT work?
6    A.   Yes, sir.
7    Q.   Can you put documents 71 through 110,
8  in other words, the components of Exhibit 1, in the
9  order in which they would have been created -- I'll
10  tell you what, let me withdraw that question and let
11  me walk you through and we'll do it a different way.
12    Please go to pages 93 through 99.
13    A.   Okay, all right.
14    Q.   Do you have 93 through 99 in front of
15  you?
16    A.   Yes, sir.
17    Q.   Do you see that all of those pages 93
18  through 99 on the bottom of them bear a fax legend of
19  January 16, 2002, 6/23 p.m., 6:24 p.m.?
20    MR. ANDERSON:  I think it's cut off from his,
21  I'll give him mine.  Do you see where he's talking
22  about here?
23    MR. BOOKE:  Then I'll make a better copy.
24    Q.   Are those pages, 93 through 99, the
25  request for SWAT warrant service that would have

PAGE 80

GRAHAM   80

1  initiated SWAT's involvement?
2    A.   Yes.
3    Q.   In the Hinton house?
4    A.   Yes.
5    Q.   So would it be correct to say then that
6  the date and time on this fax legend, January 16,
7  6:23 p.m., would have been probably when SWAT first
8  got notice of a request to be involved in executing
9  this search warrant?
10    A.   Yes.
11    Q.   And when 93 through 99 came to SWAT,
12  what information would have been filled out on page
13  93?  Would it have been filled out just as it appears
14  there?
15    A.   Yes, sir.
16    Q.   So in fact, it was whoever sent this
17  request over to SWAT that designated this as a Class
18  Four search warrant; is that correct?
19    A.   That's correct.
20    Q.   Does this refresh your recollection as
21  to whether you were the one who decided that this was
22  a Class Four search warrant?
23    A.   No.
24    Q.   Well, does it -- can you tell from
25  looking at pages 93 through 99 who it is that sent

DEPOSITION OF WILLY GRAHAM

GRAHAM      81

1  this request for SWAT warrant service to SWAT?
2        A.   Requesting officer at the bottom of
3  that page, requesting detective/officer was S --
4        Q.   Why don't you just spell it?
5        A.   It looks like W-I-T-H-A-M.
6        Q.   Is that somebody that you knew prior to
7  this event?
8        A.   I can't say I do.  I know him if I see
9  him.  I'm familiar with the face, but didn't know
10 him, no.
11       Q.   Now, who at SWAT received this request
12 for SWAT warrant service, can you tell that?
13       A.   No.
14       Q.   Is there anything in the entire SWAT
15 packet, Exhibit 1, that tells you who received this
16 request for SWAT warrant service that is pages 93
17 through 99?
18       A.   No.
19       Q.   Other than what is contained in this
20 Exhibit 1, did you have any other source of
21 information about the search warrant or the house or
22 the occupants of the house in doing your planning to
23 go execute this search warrant?
24       A.   Yes.  Like I said before, this is only
25 part of it.  The recon officers, the information that

GRAHAM      82

1  they received from the narcotics detail or whomever
2  is requesting the warrants would give them
3  information.  The officers themselves, once they
4  complete the reconnaissance of the location, and then
5  based on my knowledge and experience.
6        Q.   Doesn't the reconnaissance officer have
7  to write down the information that is provided to
8  you?  Isn't that contained in here somewhere?
9        A.   In 93 through 99?
10       Q.   No, in Exhibit 1?
11       A.   He writes it, yes.
12       Q.   Okay, so then would you be kind enough
13 to put this back together and let's just put it back
14 in numerical order.  Those go on top of there and
15 that goes on top of there, all right.
16            Now pages 71 and 72, that is a document
17 that is prepared after all of the events have already
18 occurred; is that right?
19       A.   Right.
20       Q.   Pages 73 through -- well, I'll tell you
21 what, let's just take one at a time, page 73.  Is
22 that prepared --
23       A.   You named these first, leave that?
24       Q.   You said 71 and 72 are prepared after
25 the fact; right?  Is that correct?

GRAHAM      83

1        A.   Yes, that's right.
2        Q.   Page 73, is page 73 prepared in the
3  course of planning before the search warrant is
4  executed?
5        A.   Page 73 is --
6        Q.   Is page 73 prepared before the search
7  warrant is executed?
8        A.   Some of it.
9        Q.   What on page 73 is prepared before the
10 search warrant was executed?
11       A.   The date; the category; the event
12 number; the time of service; the supervisor approving
13 it, and sometimes that's left blank; warrant served
14 for; target location; sector beat; description;
15 fortification; evidence sought; will CI or UC be
16 present at time of service?  If yes, description;
17 children, elderly, dogs, weapons, sometimes that is
18 not filled out at the time, that's filled out after
19 the fact.
20       Q.   So weapons are filled out after the
21 fact?
22       A.   Sometimes, and after the fact,
23 sometimes before and sometimes afterwards.
24       Q.   All right.
25       A.   Because you don't know.  Dogs,

GRAHAM      84

1  sometimes before, sometimes after.  Is the target a
2  known meth lab.  If we know, it's filled out as yes.
3  If we filled out after the fact, it's filled out as
4  yes.  If we don't know, then it's no.  That's why I
5  say sometimes it's before, sometimes it's not.  It's
6  filled out afterwards.
7            Suspect insight, photos ordered.
8  Sometimes it is, sometimes it isn't.  Suspect -- I'm
9  sorry, received on, which would be the date of the
10 suspect insight, if they were ordered, of the
11 targeted persons.  Suspect printouts attached,
12 sometimes they are, sometimes they are not, so the
13 answer to that question is yes or no.  Distracts
14 used?  Sometimes we do, sometimes we don't.  Type of
15 distracts, how many.  Forced entry --
16       Q.   Is there any of the handwriting on page
17 73 that's yours?
18       A.   No.
19       Q.   None?
20       A.   No.
21       Q.   Do you recognize any of the handwriting
22 on page 73?
23       A.   As far as whose it is, no.  I mean I
24 kind of assume the recon officer.
25       Q.   On the second line on page 73 where it

DEPOSITION OF WILLY GRAHAM

GRAHAM   85

1  says SWAT event number?
2       A.   Uh-huh.
3       Q.   There's a one number indicated for
4  service, what does that mean?
5       A.   That would be the date that the recon
6  was served -- I mean that would be the date the
7  warrant was executed.
8       Q.   All right, and there is a SWAT event
9  number for recon.  Do you see that?
10      A.   Yes.
11      Q.   What does that mean?
12      A.   That was the day that the warrant was,
13 the location was looked at.
14      Q.   And is this number 020109-3115, does
15 that indicate to you a specific date?
16      A.   Yes.
17      Q.   What date does that indicate?
18      A.   It indicates January the 9th, 2002.
19      Q.   So this means to you that the recon for
20 the Hinton search was conducted on January 9, 2002?
21      A.   Yes.
22      Q.   What does the 3115 mean?
23      A.   It's just the sequence of numbers
24 that's used, how many calls came out on that
25 particular date so far.

GRAHAM   86

1       Q.   Is there anything that appears on page
2  73 that indicates to you advance knowledge that you
3  would encounter weapons, in other words, prior to the
4  search knowledge?
5       A.   On page 73, no.
6       Q.   At the bottom of page 73, the next to
7  the last line, it says "distract used" and someone
8  has written in "yes."  Do you see that?
9       A.   Yes, sir.
10      Q.   What does that mean?
11      A.   That means a distract was used.
12      Q.   What is a distract?
13      A.   A distract is, in the context of this,
14 it's a device used to divert attention and/or
15 disorient.
16      Q.   Is it a percussion weapon?  Is
17 percussion bomb another word for distract?
18      A.   I guess some would use it that way, or
19 use that terminology.
20      Q.   I'm more interested in trying to find
21 out what the thing is.  Is it a device that makes a
22 very loud noise?
23      A.   Exactly.
24      Q.   And the type of distract used in this
25 case is a Dftec 25?

GRAHAM   87

1       A.   Yes.
2       Q.   What does that mean?
3       A.   Dftech 25, just a brand, a model type.
4       Q.   This indicates that there were two of
5  them used?
6       A.   Yes, but also this distract was used,
7  it has a light.
8       Q.   So it's both light and sound?
9       A.   Yes.
10      Q.   On page 75 there is in the center a
11 section entitled containment.  Is that a list of the
12 officers who were involved in the containment effort?
13      A.   Yes.
14      Q.   On page 76 there's a list of 11
15 officers that were all involved in the entry into the
16 premises?
17      A.   Yes.
18      Q.   That means that's the SWAT team that
19 went inside the Hinton house?
20      A.   That means those was the ones that were
21 initially during the briefing set up to go in, yes.
22      Q.   And at the bottom of page 76, the
23 breaching officers, those are the ones whose job it
24 was to actually break into the house; is that
25 correct?

GRAHAM   88

1       A.   To breach the house, yes.
2       Q.   They are also listed in the entry team;
3  correct?
4       A.   Yes, sir.  Some of them, yes.
5       Q.   They would all be included within that
6  larger group, wouldn't they?
7       A.   Yes.
8       Q.   I'm trying to figure out a way to get a
9  total of how many people were involved.  So those
10 four at the bottom are already in the entry group;
11 right?
12      A.   Yes, sir.
13      Q.   Then on page 77 I take it that's the
14 officer who was in charge of the distraction devices?
15      A.   Yes, sir.
16      Q.   Page 78 are two people who were on the
17 scene for medical purposes?
18      A.   Yes, sir.
19      Q.   So then, Lieutenant Graham, would it be
20 correct that there were a total of 19 SWAT personnel
21 involved in one fashion or another in executing the
22 search warrant on the Hinton premises, the Hinton
23 house?  Have I added that up correctly?
24      MR. ANDERSON:  18.  I think you've got one
25 twice.

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF WILLY GRAHAM

GRAHAM   89

```
 1        MR. BOOKE:
 2        Q.  18, okay.
 3        A.  And the medical that you referred to on
 4   page 78, they are and are not a part of the SWAT team
 5   itself.  They are support to our team in case
 6   something happens to the suspects and/or individuals
 7   in the house.
 8        Q.  Did something happen to any of the SWAT
 9   team members during the execution of this search
10   warrant, was anyone injured?
11        A.  According to the records, yes.
12        Q.  How many officers were injured?
13        A.  Three.
14        Q.  What do you understand their injuries
15   to be?
16        A.  According to the documentation here,
17   shortness of breath from dust and insulation fibers
18   in attic.
19        Q.  Do you have a recollection of those
20   injuries, other than what appears on this piece of
21   paper?
22        A.  Yes -- with the exception of Sheahan, I
23   don't remember him, and I spelled it S-H-E-A-H-A-N, I
24   can't remember that officer's -- I don't remember him
25   being in the attic.
```

GRAHAM   90

```
 1        Q.  Okay.  Do you remember anyone falling
 2   through the attic?
 3        A.  Falling through the attic?
 4        Q.  To the area below?
 5        A.  No.  No one fell through to the area
 6   below, that I remember.
 7        Q.  Who is it that prepared pages 73
 8   through, it looks like 85?  Would that be Hixson?
 9        A.  No, that would be different officers,
10   if you can see the different handwriting, it was a
11   team effort, one officer --
12        Q.  Then let me ask you this, is any of the
13   handwriting on 73 through 85 your handwriting?
14        A.  No.
15        Q.  On page 76 at the bottom in the section
16   marked breaching, Officer 1, Vesp, had what looks to
17   me like the word "hook"; is that right?
18        A.  Yes.
19        Q.  What's that?
20        A.  A large hook.
21        Q.  For what purpose?
22        A.  A large metal tool.
23        Q.  Is that a grappling hook?
24        A.  I don't know what a grappling hook is.
25   A large tool used to, I guess I'm trying to find the
```

GRAHAM   91

```
 1   proper word, to grab or that would use to catch the
 2   wrought iron door.
 3        Q.  To pull it open?
 4        A.  Yes, sir.
 5        Q.  On page 76 there is, in the top
 6   section, marked entry, there is a category for
 7   weapons.  Do you see that?
 8        A.  Yes, sir.
 9        Q.  What does HG mean, as it's used on this
10   form?
11        A.  Handgun.
12        Q.  What does MP 5 mean, as used on this
13   form?
14        A.  A sub machine gun.
15        Q.  What does BU shok-lok mean?
16        A.  Back up shok-lok.
17        Q.  Is that a shotgun?
18        A.  Yes.
19        Q.  And so having now looked at this page
20   76, does it appear to you that everyone on the
21   breaching and entry team had a handgun?
22        A.  No.
23        Q.  No, two people on the breaching and
24   entry team had submachine guns; correct?
25        A.  Yes, two people had submachine guns.
```

GRAHAM   92

```
 1        Q.  And all the rest of the people on the
 2   breaching and entry team had handguns; is that
 3   correct?
 4        A.  That's correct.
 5        Q.  And two people on the breaching and
 6   entry team had shotguns?
 7        A.  That's correct.
 8        Q.  Plus there were two Dftech 25
 9   distraction devices; correct?
10        A.  That's correct.
11        Q.  One battering ram; is that correct?
12        A.  That's correct.
13        Q.  One hook?
14        A.  That's correct.
15        Q.  Were any shots fired from inside the
16   house?
17        A.  No.
18        Q.  Do you have any recollection that any
19   of the occupants of the house represented any danger,
20   or I should say presented any danger to any of the
21   breaching or entry team?
22        A.  The first part of that question was
23   what?
24        Q.  Do you have any recollection that any
25   of the occupants of the Hinton house presented or
```

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF WILLY GRAHAM

GRAHAM    93

1   demonstrated any danger to the breaching or entry
2   team?
3          A.   No.
4          Q.   On page 78, is Tom Higgins actually an
5   M.D. doctor?
6          A.   Yes.
7          Q.   Page 81, I guess that indicates that
8   there were two recon officers?
9          A.   Yes, sir.
10         Q.   That was Warren and Roberra; correct?
11         A.   Yes, sir.
12         Q.   On page 82, the bottom entry on the
13  page, does that mean that SWAT entered at 2130 and
14  SWAT exited at 2235?
15         A.   Yes, sir.
16         Q.   So when the narc team actually left is
17  not indicated here?
18         A.   No.
19         Q.   And did SWAT take the occupants into
20  custody and take them away from the premises, let me
21  ask that -- that's a poor question.  SWAT took the
22  occupants into custody; correct?
23         A.   Yes, sir.
24         Q.   Did SWAT transport the occupants away
25  from the premises?  What's your best recollection?

GRAHAM    94

1          A.   Took them down the street, maybe a
2   house or two, I believe it was a cul-de-sac.  I
3   believe they took them down a couple doors.
4          Q.   Who took the occupants down and booked
5   them at the detention center?
6          A.   That would be narcotics.
7          Q.   On page 83 there's a reference to
8   photos being taken.  Is there anything there that
9   tells you who took the photos?
10         A.   On 83?  I don't have 83.  That's 82.
11  MR. ANDERSON:  That's 83, you are cut off at
12  the bottom.
13  MR. BOOKE:
14         Q.   I'm just wondering if there's anything
15  that enables you to identify who took the
16  photographs?
17         A.   Not from here.
18         Q.   Okay.  On page 84 the entry says COR.
19  What does that mean?
20         A.   According to the document we talked
21  about initially, which was last officer's report.
22         Q.   And that is pages 71 and 72?
23         A.   Yes.
24         Q.   On page 85 in the center, or roughly
25  the center of the page there's a section entitled

GRAHAM    95

1   "Category of Warrant."  Do you see that section?
2          A.   Yes, sir.
3          Q.   Below the words "category of warrant"
4   there's a section for pre and post.  Do you see that?
5          A.   Yes, sir.
6          Q.   Is the purpose of that section to fill
7   in what the category of the warrant was before it was
8   executed and then to fill in what the category of the
9   warrant was after it was executed?
10         A.   I'm not sure that was a question, but I
11  think it's yes.
12         Q.   Well, pre, as it's used in the category
13  of warrant section on page 85, means what?  Does that
14  mean before the warrant was executed?
15         A.   Yes.
16         Q.   And post means after the warrant was
17  executed?
18         A.   Yes.
19         Q.   So who filled in the pre and post
20  entries on page 85?
21         A.   I don't know.
22         Q.   In the bottom section it says warrant
23  downgraded.  Do you see that on page 85?
24         A.   Yes, sir.
25         Q.   What does that mean, warrant

GRAHAM    96

1   downgraded?
2          A.   It came in as, according to this
3   document came in as a four, downgraded to a three.
4          Q.   Did you downgrade the warrant from a
5   four to a three?
6          A.   I believe I did.
7          Q.   When did you do that?
8          A.   Prior to executing it.
9          Q.   Why?
10         A.   Let's see, in answer to your question
11  earlier, I didn't see this.  It was faxed to Officer
12  Warren, according to that, page 92.
13         Q.   So he was likely then the original
14  recipient?
15         A.   Yeah.  He was likely the officer, if
16  you look at the dates.
17  MR. ANDERSON:  Just to clarify, is what we are
18  referring to what Detective Witham faxed to the SWAT
19  team?
20  MR. BOOKE:  Which is page 92?
21  THE WITNESS:  Yes, which will explain the dates
22  of the 9th.  Which like I said earlier, he may have
23  spoken to the officer.  That's maybe why he
24  specifically got with Officer Warren on the 9th and
25  Warren did the recon on the 9th and the fax may have

## DEPOSITION OF WILLY GRAHAM

GRAHAM    97

1   got there the following day.
2      MR. BOOKE:
3      Q.   So the question, just to take us back
4   on the record, the question is:  Why did you
5   downgrade the warrant from a category four to a
6   category three?
7      A.   I can't recollect no more than -- I
8   don't remember receiving information that the
9   suspects had a history of violence or known to be
10  armed and highly dangerous.
11     MR. ANDERSON:  Let me refresh your
12  recollection, those first two paragraphs there.
13     THE WITNESS:  Then the suspects with priors for
14  burglaries.
15     MR. ANDERSON:  Just answer his question.  Read
16  the two paragraphs to help you answer his question.
17     THE WITNESS:  Because of the details that I
18  received, the suspect, David Hinton, had priors for
19  burglary, carrying concealed weapon, possession,
20  unregistered firearms and two counts of possession of
21  controlled substance.  It also had notes to say the
22  suspect also was possible suspect in three recent
23  robberies.  The information showed that it could be a
24  Class Four, but we did not have a definite history on
25  David Hinton showing the history of violence, so I

GRAHAM    98

1   opted to lower it.
2      MR. BOOKE:
3      Q.   It said possibly even a Class Two, do
4   you see that?
5      A.   Yes.
6      Q.   Why did you not list it as a Class Two?
7      MR. ANDERSON:  Can we take a bathroom break?
8         (Recess taken.)
9      MR. BOOKE:
10     Q.   Let me withdraw the last question,
11  because in answering the previous question you were
12  referring to information that appears on pages 71 and
13  72; correct?
14     A.   Yes.
15     Q.   But as we discussed earlier, you did
16  not have pages 71 and 72 available at the time you
17  were making the decision to downgrade the warrant,
18  did you?
19     A.   I didn't have the document, 71 and 72,
20  but I had the information.
21     Q.   Right.  And other than what appears on
22  pages 71 and 72, do you have any independent
23  recollection of what information you had that led you
24  to downgrade the warrant from four to three, other
25  than what appears on these documents?

GRAHAM    99

1      A.   This is what happened, this is how it
2   happened, that's why it was downgraded.  So I got
3   that information from someone as I read from here,
4   that information came to me prior to making that
5   decision.  So that's how he came up with the
6   officer's report as a recollection of what happened.
7      Q.   I understand that, and my question to
8   you is:  Other than what appears in this first
9   paragraph under the section details on page 71 in
10  Exhibit 1, other than what's written on this piece of
11  paper, do you have any independent memory or any
12  recollection of any information you had, other than
13  what's written down on this page?
14     A.   Your question, to be honest with you,
15  Mr. Booke, ain't making sense to me because the
16  information for me to make that decision at that
17  time, or if you mean before today, absolutely not, I
18  mean it's refreshing my memory.
19     Q.   I understand.  Let me just try it
20  again.  At some point in the planning process for
21  executing the Hinton search warrant you made the
22  decision to downgrade the warrant from a Class Four
23  warrant to a Class Three warrant; is that correct?
24     A.   Correct.
25     Q.   And apparently you even considered

GRAHAM    100

1   downgrading it to a Class Two warrant; correct?
2      A.   Correct.
3      Q.   And the reason why you downgraded it
4   from a Class Three -- or four to a Class Three, and
5   considered downgrading it to a Class Two, is what
6   appears here in the first paragraph on page 71;
7   correct?
8      MR. ANDERSON:  This information led you to
9   downgrade it?
10     THE WITNESS:  Yes.
11     MR. BOOKE:
12     Q.   But at the time you downgraded it, you
13  didn't have this piece of paper, page 71, in front of
14  you?
15     A.   Right.
16     Q.   And so my question to you is, other
17  than what appears on this piece of paper, other than
18  the information that appears on this piece of paper,
19  did you have any other information that you can
20  recall that led you to downgrade the warrant from a
21  four, Class Four to Class Three, and consider
22  downgrading it to Class Two?
23     A.   Any other information?  Not other than
24  my experience, no.
25     Q.   Fair enough.

DEPOSITION OF WILLY GRAHAM

SHEET 26   PAGE 101

GRAHAM   101

1     Now I'm curious about something, if you
2  would look at page 73, it's the page that's entitled
3  SWAT warrant service planning sheet?
4     A.   All right.
5     Q.   It appears that at least a part of page
6  73 was prepared on January 9, 2002, would you agree?
7     A.   Yes.
8     Q.   And it appears that somebody wrote in
9  that this was a category three search warrant. Do
10  you see that?
11     A.   Yes.
12     Q.   When you were engaged in doing the
13  planning for executing the search warrant on the
14  Hinton house, did you have page 73 available to you?
15     A.   No -- well, let me answer that again.
16  When I say available, could I have gotten this, yes.
17     Q.   Did you refer to it?
18     A.   No, I didn't refer to it.
19     Q.   All right. Then let's go back to,
20  there were a couple of, there was an abbreviation
21  that I wanted to ask you about. I don't know where
22  it was. Oh, it's on page 73, just a little below
23  halfway down, it says "will CI or UC be present at
24  the time of service." Do you see that?
25     A.   Yes.

PAGE 102

GRAHAM   102

1     Q.   What does CI mean?
2     A.   CI is confidential informant.
3     Q.   And what does UC mean?
4     A.   Undercover.
5     Q.   Please look at pages 86 and 87 -- I'm
6  sorry, just 86. Please look at page 86.
7     A.   Okay.
8     Q.   What is page 86?
9     A.   A blur. It looks like a picture of a
10  handwritten note is what it looks like.
11     Q.   Would these be drawings that were made
12  by the recon officer when doing the recon work?
13     A.   Yes, sir.
14     MR. ANDERSON: I actually have color pictures,
15  if you want to look at those, if that will help you.
16     THE WITNESS: What it is is drawings of the
17  briefing on paper, rather than the grease board in
18  the briefing room.
19     MR. BOOKE:
20     Q.   Are these pictures that were taken of
21  the grease board in the briefing room?
22     A.   Pictures of the briefing paper that was
23  of the briefing.
24     Q.   Let me ask you a clumsy question.
25     A.   Go ahead.

PAGE 103

GRAHAM   103

1     Q.   I have been doing it all day, right, no
2  point in stopping now.
3     Was there -- there is a machine that
4  allows you to draw on a board and then it produces a
5  hard copy of what you have just drawn on the board.
6  Is that the kind of machine?
7     A.   No, no.
8     Q.   So if I understand you correctly,
9  what's on page 86 is someone had made these drawings
10  and then during the briefing you drew -- these things
11  were drawn up on the grease board, is that what you
12  are saying?
13     A.   A little bit different. The recon
14  officer will draw the picture or draw the layout of
15  what he saw on a board and explain to myself and
16  assistant team leader what he saw. We'll put the
17  plan together and then call the whole team in and
18  brief them on what we want them to do.
19     Q.   I see. So these drawings that appear
20  on page 86 were drawings that you used in putting the
21  plan together?
22     A.   Yes, I believe they are.
23     MR. ANDERSON: Do you want to look at these?
24  They are a little bit better.
25     MR. BOOKE: Maybe I can get color copies.

PAGE 104

GRAHAM   104

1     MR. ANDERSON: I can make them for you
2  tomorrow.
3     MR. BOOKE:
4     Q.   So Lieutenant Graham, the information
5  that appears on these drawings on page 86 then was
6  known to you before you executed the search warrant
7  on the Hinton house?
8     A.   Yes, sir.
9     Q.   And the information that appears on
10  page 86 was known to you before you prepared the plan
11  for executing the search warrant on the Hinton house;
12  is that correct?
13     A.   That's part of the plan, yes, sir.
14     Q.   And although it may seem like a foolish
15  question, the planning occurred before the execution
16  of the warrant; correct?
17     A.   Yes.
18     Q.   Looking at page 92, which is the fax
19  cover sheet by which the request for SWAT warrant
20  service was sent over to SWAT; correct?
21     A.   Yes, sir.
22     Q.   It appears that there was -- there were
23  three separate warrants sent over at the same time.
24  Is that the way that reads to you?
25     A.   It appears so.

## DEPOSITION OF WILLY GRAHAM

SHEET 27  PAGE 105

GRAHAM    105

1      Q.   Do you have any recollection as to
2  whether or not those warrants for 2809 Wilmington and
3  6204 Aqua were related in some way to the Hintons or
4  to this search that you conducted?
5      A.   No recollection.
6      Q.   Now do you see on page 95 that there
7  appears a date of January 6, 2001 for issuance of
8  this warrant?
9      A.   Yes, sir.
10      Q.   And yet it was received, this document
11  was received at SWAT on January 16, 2002, are you
12  aware of that?
13      A.   Yes, sir.
14      Q.   That would be a year and ten days from
15  the date that appears on page 95; correct?
16      A.   Yes, sir.
17      Q.   You are saying, if I understand
18  correctly, that it would have been the
19  responsibilities of Officer Warren in this case to
20  verify that this warrant that appears on pages 94 and
21  95 was, in fact, issued within ten days of the date
22  on which it was to be executed?
23      MR. ANDERSON:  I'm going to object, misstates
24  testimony.  I believe he testified the recon
25  officers, correct, would have that responsibility.

PAGE 106

GRAHAM    106

1      MR. BOOKE:
2      Q.   You did say that.  It would have been
3  the recon officer's job to make sure that the warrant
4  was to be served within ten days of when it was
5  issued?
6      A.   Yes, sir.
7      Q.   Do you have any recollection of having
8  looked at the search warrant and seen that it was
9  dated January 6, 2001?
10      A.   No.
11      Q.   Do you see page 99, that's the
12  affidavit that supports the search warrant?
13      A.   Yes, sir.
14      Q.   Do you recall having looked at that and
15  seen that it also was dated January 6, 2001?
16      A.   Do I recall?  No, sir.
17      Q.   But it would have been the recon
18  officer's job to verify that as well; is that
19  correct?
20      A.   Like I said, yeah.  It's part of the
21  duties that they do that.
22      Q.   Page 107, is that your handwriting?
23      A.   No.
24      Q.   Do the rules or guidelines that are set
25  out by the policy and planning committee for

PAGE 107

GRAHAM    107

1  classifying search warrants in categories one through
2  four provide for different means or methods of
3  executing the search warrants, depending upon how the
4  search warrant is categorized?
5      A.   What is your question?
6      Q.   My question is you mentioned earlier
7  that, if you would look at page 93, please, do you
8  see at the top of the page there, there are these
9  different classes of search warrants?  Do you see
10  that?
11      A.   Yes.
12      Q.   You said that these, I think you said
13  that these classes of search warrants were
14  established by the policy and planning committee, or
15  the policy and planning division of Metro?
16      A.   Yes, okay.
17      Q.   And I asked you if the classifications
18  for search warrants were written somewhere other than
19  just on this request for warrant service document,
20  and I believe you said that they were written?
21      A.   Yes.
22      Q.   And so in that context, my question to
23  you is, where these rules for classes of warrant are
24  written out, do they provide for different methods or
25  means of executing search warrants depending upon how

PAGE 108

GRAHAM    108

1  the warrant is classified?
2      A.   It does not tell you how to execute
3  them, it just puts you in a category or class as to
4  where they fall.
5      Q.   Okay.
6      MR. ANDERSON:  The PMK will be able to.
7      MR. BOOKE:
8      Q.   Does SWAT, in your experience, get
9  requests for service of warrants for Class One
10  warrants?
11      A.   Do they get requests to execute
12  warrants Class One?
13      Q.   Yes.
14      A.   Yes.
15      Q.   Is it as common for SWAT to get a
16  request to execute a Class One warrant as a Class
17  Four warrant?
18      A.   Absolutely not.
19      Q.   In fact, it's the degree of anticipated
20  or suspected possibility of violence that is what
21  brings SWAT into the mix, isn't it?
22      A.   Yes, that's one factor.
23      Q.   I think I may have only one more
24  question that I want to ask you, and you've probably
25  heard that before, but by god I mean it.

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF WILLY GRAHAM

SHEET 28   PAGE 109

GRAHAM   109

1      Could you go through Exhibit 1 and
2  identify which pages in Exhibit 1 comprise the
3  written plan for executing the search warrant on the
4  Hinton house, just identify by page number which
5  pages comprise the written plan for executing the
6  Hinton search warrant?
7          A.   Go through the whole packet; correct?
8          Q.   Please.
9          A.   73 through 84, number 86.
10         Q.   Excluding 85?
11         A.   Yes.  You are not following
12  instructions there, Mr. Bradley.  I guess 92 through
13  99, make that 100, that's part of it.
14         Q.   Anything else?
15         A.   Just relax, take your time here.  Don't
16  blow it at the end.
17       MR. ANDERSON:  He doesn't want it to end.
18       THE WITNESS:  Page 105 may have been part of
19  it, that's what the officers use, 106.
20       MR. BOOKE:
21         Q.   Just be careful for a second there on
22  106.  Are you sure about 106?
23         A.   Nope, not, scratch that.
24         Q.   Just so the record is clear, upon
25  reflection 106 is not?

PAGE 111

GRAHAM   111

1              CERTIFICATE OF DEPONENT
2     PAGE     LINE      CHANGE
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17       I, WILLY GRAHAM, deponent herein, do hereby
18  certify and declare under penalty of perjury the
    within and foregoing transcription to be my
    deposition in said action; that I have read,
19  corrected and do hereby affix my signature to said
    deposition.
20
21              WILLY GRAHAM
                Deponent

PAGE 110

GRAHAM   110

1          A.   It's not, it happened afterwards, and
2  108 through 110 may have been part of the pre-plan,
3  or the briefing.
4       MR. BOOKE:  All right, I'm good to my word.  I
5  said that that was the last question, and it is.
6       MR. ANDERSON:  You're done.
7          (Whereupon the deposition was
8          concluded at 5:00 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Lori M. Judd, CCR #233, RMR*

## DEPOSITION OF DARRELL HIXSON

**PAGE 1**

```
 1                                              1
 2           UNITED STATES DISTRICT COURT
 3              DISTRICT OF NEVADA
 4   DONALD HINTON, DAVID HINTON )
     and JOHN REYES,             )
 5                              )
         Plaintiffs,            )
 6                              )
     vs.                        ) CASE:  CV-S-03-0057
 7                              )        PMP-PAL
 8   CLARK COUNTY, NEVADA, a    )
     Political subdivision, acting)
 9   By and through the LAS VEGAS)
     METROPOLITAN POLICE DEPARTMENT)
10   JOHN DOES 1-30 and ROE     )
     ENTITIES 1-10,             )
11                              )
         Defendants.            )
12                              )
13
14
15
16        DEPOSITION OF DARRELL HIXSON
17   Taken at the Law Offices of Bradley L. Booke, Esq.
         7251 West Lake Mead Blvd
18              Suite 530
19         Las Vegas, Nevada  89128
         Thursday, November 6, 2003
20              9:00 a.m.
21
22
23
24
25   REPORTED BY:  LORI M. JUDD, CCR #233, RPR, RMR
```

**PAGE 2**

```
                                      HIXSON  2
 1   APPEARANCES:
 2   For the Plaintiffs:BRADLEY L. BOOKE, ESQ.
                        7251 W. Lake Mead Blvd.
 3                      Suite 530
                        Las Vegas, Nevada  89128
 4
 5
 6   For the Defendants:CRAIG R. ANDERSON, ESQ.
                        Marquis & Aurbach
 7                      10001 Park Run Drive
                        Las Vegas, Nevada  89145
 8
 9              INDEX
10           EXAMINATION
     By Mr. Booke          3
11
12
13   DEPOSITION EXHIBITS          IDENTIFIED
     Exhibit 5 - SWAT documents        78
14   Exhibit 6 - SWAT documents        81
     Exhibit 7 - crime reporter        89
15   Exhibit 8 - scope                 96
     Exhibit 9 - registration          98
16   Exhibit 10 - document            100
     Exhibit 11 - drawing             173
17   Exhibit 12 - document            198
18
19
20         CERTIFIED QUESTIONS
21              (NONE)
22
     INFORMATION TO BE SUPPLIED
23              (NONE)
24
25
```

**PAGE 3**

```
                                      HIXSON  3
 1            DARRELL HIXSON,
 2   called as a witness, and having been first duly sworn
 3   to testify to the truth, the whole truth, and nothing
 4   but the truth, was examined and testified as follows:
 5
 6              EXAMINATION
 7   BY MR. BOOKE:
 8        Q.  Please state your full name and spell
 9   your name for the court reporter?
10        A.  Darrell, D-A-R-R-E-L-L, Hixson,
11   H-I-X-S-O-N.
12        Q.  What is your date of birth, sir?
13        A.  11/8/53.
14        Q.  And what is your social security
15   number?
16        A.  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.
17        Q.  I notice that you appear to be in full
18   uniform.  Are you on duty right now?
19        A.  I'm on duty right now.
20        Q.  Does that affect your ability to
21   concentrate on the issues at hand in any way?
22        A.  Which?  Being in uniform or being on
23   duty?
24        Q.  Good question.  Being on duty?
25        A.  No.  Why would that?  It wouldn't
```

**PAGE 4**

```
                                      HIXSON  4
 1   affect anything.
 2        Q.  All right.  Are you in the middle of
 3   some particular operation at the moment or are you
 4   just sort of on call, if you will?
 5        A.  I'm on duty right now.
 6        Q.  Are you in the middle of any particular
 7   task?
 8        A.  I have cleared the hours you need for
 9   this task, so I'm here.
10        Q.  What was your job in relation to the
11   events at the Hinton residence at 1919 Hallwood on
12   January 16, 2002?
13        A.  I was the assistant team leader of the
14   red team and one of the entry men in that line up.
15        Q.  Is entry man a job title or job
16   description, if you will, for the task that was
17   performed at the Hinton residence?
18        A.  Yes, job description would be a good
19   one.
20        Q.  And what is the job of entry man in
21   relation to what was done at the Hinton residence?
22        A.  Entryman describes the people that are
23   assigned to make entry into the house, whether it's
24   done quickly or slowly, you are going inside the
25   house, there's other people that would be on the
```

## DEPOSITION OF DARRELL HIXSON

HIXSON   5

1  outside and they wouldn't be called entry men, so it
2  kind of describes that you are going to enter
3  something.
4      Q.   Does the term "entry man" describe
5  where in the lineup of personnel you are in making
6  entry into the house?
7      A.   No, there's a number put to that.
8      Q.   Okay.  Describe that, if you would,
9  please?  I don't have an understanding of that.
10     A.   You could have an entry line of five,
11 of six people and they would be numbered one through
12 six.  You could have people on the outside, which
13 would be called containment people, and they would be
14 numbered one, two, so that little job description
15 title of entry man is given a number, depending on
16 how many people are assigned to go into the house.
17     Q.   And are the entry men numbered in the
18 order in which they are assigned to enter the house?
19     A.   They are numbered and assigned of how
20 they line up outside of the house.  You may split up
21 once inside, but to line up you are in a specific
22 order, one through six.  That would be an example.
23     Q.   Okay.
24     A.   So you could enter in the house and,
25 you know, you could end up being in a different

HIXSON   6

1  configuration, but as you go up to the house, you are
2  numbered.
3      Q.   And are those the numbers that are
4  reflected in the paperwork that is later prepared
5  with respect to a given operation?
6      A.   Usually when I dictate, and I'm
7  responsible for dictating the after action.  I don't
8  know if I relate to numbers, sometimes I might say
9  entry man, but I don't think I say the numbers.  I
10 would have to see if I did on this particular report.
11     Q.   All right.  And we'll get to the report
12 in time.  Since you brought it up, I just thought I
13 would ask about that.  Are there other particular job
14 descriptions or are there labels that we could give
15 to particular tasks involved in a SWAT execution of a
16 search warrant, you know, comparable to entry man but
17 other tasks?
18     A.   I think I mentioned one, like if you
19 are in containment, there's containment for the
20 outside, front containment, rear containment.
21 Sometimes we number the corners of the house, you
22 could be a one-two containment, you could be a
23 one-four containment.
24     Q.   Any tasks or labels other than entry
25 man and containment?

HIXSON   7

1      A.   I don't know what was done on this
2  particular one.  There's -- we go on for quite a few
3  minutes and hours on specific containments or
4  positions on SWAT, call-outs of how it pertains to
5  this one I would have to see.  I don't know if we had
6  take-downs or seer units up.  We could go on.
7      Q.   Okay.
8      A.   As it relates to this one, I think we
9  had a containment team and maybe a takedown team.
10 I'm not sure.
11     Q.   How long had you been in SWAT at the
12 time of the events that occurred at the Hinton house?
13     A.   What's the date?
14     Q.   January 16, 2002.
15     A.   That would be 12 years.
16     Q.   Are you familiar with common SWAT
17 practices in executing search warrants as of January
18 2002?
19     A.   I'm familiar with LVMPD SWAT.  Is that
20 what you mean?
21     Q.   Yes.
22     A.   Yes.
23     Q.   Is it accurate to call what SWAT went
24 to do at the Hinton residence on January 16, 2002
25 executing a search warrant?

HIXSON   8

1      A.   No, I don't dictate -- I think I
2  usually say we service a search warrant.  I don't use
3  the term execution.
4      Q.   In your mind do you distinguish between
5  serving a search warrant and executing a search
6  warrant?  Do you regard those as different things, or
7  is that just the label you use?
8      A.   It's not a label, it's a term I use.
9      Q.   Is there a difference between executing
10 a search warrant and serving a search warrant, or is
11 that just the term you use?
12     A.   That's just a term I use when I dictate
13 the reports.  If you want to use the term here
14 executing a search warrant, I'm okay with that.
15     Q.   They are interchangeable?
16     A.   I said if you want to use it.  I use
17 service.
18     Q.   There are words that appear throughout
19 the documents and I want to make sure that I have an
20 understanding of the words.  That's the reason that I
21 raised question.
22     A.   I understand when you say execute, and
23 I understand what you are saying, but I don't use
24 that term, I don't think I do in my reports.
25     Q.   Okay, but it doesn't mean something

DEPOSITION OF DARRELL HIXSON

SHEET 4   PAGE 13

HIXSON   13

1  policies. In other words, these list of six things,
2  I knew they are part of our policy.
3       Q.   That was my question.
4       A.   But I don't have the book, what we call
5  the book itself. Like I have an LVMPD policy manual
6  that the department puts out. I have my own. Every
7  officer has one. I do not have a copy of the SWAT
8  policies.
9       Q.   And what is the name of that document?
10      A.   It would be SWAT policy. You would
11  have to ask the lieutenant the exact name, but it
12  would are LVMPD SWAT policies.
13      Q.   Just so I can request it, can you give
14  me the name that you would call it if you are asking
15  for it?
16      A.   I would ask for the SWAT policies.
17      MR. ANDERSON:  SWAT policies and procedures.
18      MR. BOOKE:
19      Q.   As of the time of the Hinton search did
20  SWAT give any training to its officers in the steps
21  or procedures to be followed in executing a search
22  warrant?
23      MR. ANDERSON:  I'm going to object as vague.
24  Go ahead and answer, if you can.
25      THE WITNESS:  You mean like a class?

PAGE 14

HIXSON   14

1       MR. BOOKE:
2       Q.   Well, that might be one form of
3  training, a class might be one form.
4       A.   We're instructed by our sergeant of our
5  policies and procedures. In other words, as the
6  assistant team leader he says he will do these
7  things, like the six things you talked about, so I'm
8  instructed. I wouldn't say it's a class, per se.
9  Instruction, I guess would be a better term.
10      Q.   Not specifically as related to the
11  Hinton search, but as a general matter of how to
12  conduct or execute search warrants, back in January
13  of 2002 did SWAT provide any training to its officers
14  in how to execute search warrants?
15      A.   You mean the tactics involved? I don't
16  get what you are saying. Maybe I'm missing it here.
17      Q.   No, you are not, but I'm not as
18  informed about these things as you are and so my
19  question, to be honest, is a very general one.
20  Tactics might be one aspect of it. There might be
21  other aspects as well.
22      A.   Okay, we have been given classes, gees,
23  I can't remember the structure, and you would have to
24  relate everyone's tenure up there to how many classes
25  they have attended. But we have had classes put on

PAGE 15

HIXSON   15

1  by Tom Leen as search warrant classes. I know the
2  legal part of a search warrant, we have attended
3  those kind of classes. They're three, four-hour
4  classes given through the department. Now, I know
5  I've attended them. I don't know what officers were
6  there that have or have not because you have officers
7  that come and go and I don't know the schedule of
8  those classes. We've had classes that we have to
9  take as part of the training and one of those was a
10  specific search warrant class given by Tom Leen, and
11  I think he's an attorney or judge, or whatever. So
12  we've had those kind of classes and we've had tactics
13  where we do the tactical part, the hands-on part of
14  actually doing a search warrant. So there are
15  classes, there are instructions. So as far as me
16  going, yes, I've had the from the classroom, as far
17  as the legal angle to the hands-on part. So yes,
18  I've had those.
19      Q.   Are there any written materials that
20  are used or distributed in the course of those
21  classes in which SWAT members are taught about search
22  warrant tactics or techniques?
23      A.   Well, when you take the class, if
24  there's handouts, if the instructor has handouts, he
25  gives you handouts. If they don't, they don't, so.

PAGE 16

HIXSON   16

1       Q.   Do you recall ever receiving any
2  handouts or written materials of any kind that dealt
3  with how to execute a search warrant?
4       A.   No, I don't have any handouts in my --
5  I have my own file of training records. I don't have
6  any handouts of how to service a search warrant or
7  execute a search warrant.
8       Q.   And to your knowledge is there some
9  sort of entry made in your LVMPD personnel file when
10  you receive training of the type that we're talking
11  about?
12      A.   Sure. That would be with our
13  in-service training. They have all those records.
14      Q.   As of January of 2002 did SWAT officers
15  receive any training in the steps to follow in
16  executing a search warrant?
17      A.   Yes, the classifications that are part
18  of the request, we're well aware of what the
19  classifications mean and what grounds we should
20  follow.
21      Q.   We'll talk about classifications of
22  search warrants in a bit, but you are given specific
23  training in recognizing that there are different
24  classes of search warrants?
25      A.   That's correct. That's why they are on

DEPOSITION OF DARRELL HIXSON

HIXSON   17

1 the request.
2         Q.   And you are given specific training in
3 what each of those different classifications means?
4         A.   That's correct.
5         Q.   And you are given specific training in
6 the different kinds of searches that may be called
7 for, based upon what the class of the search warrant
8 is?
9         A.   Yes, that's fair to say.
10         Q.   Are there any written materials
11 provided in connection with the instruction you get
12 about the classes of search warrants?
13         A.   That might be with the lieutenant.  You
14 would have to check that.  That's nothing that I
15 have.
16         Q.   And then you would expect that whatever
17 training was given with respect to classifications of
18 search warrants would also appear on your in-service
19 training record?
20         A.   Well, the classifications, not only are
21 they in SWAT policy, but they are in LVMPD police
22 policy.  So you would have to check with the legal
23 department where they get all that stuff.  But that I
24 know is in both policies.  In other words, it's in
25 the LVMPD police policy manual that I have a copy in

HIXSON   18

1 my desk, and I'm sure it's in the LVMPD SWAT policy.
2 Does that answer the question?
3         Q.   I think so, and whatever training you
4 got about those issues, would you expect that to be
5 reflected in your own in-service training record or
6 your training record?
7         A.   I'm not sure, no.  I'm not sure that
8 would cover, show up in in-service, that I actually
9 had a class on the classifications of warrants.  You
10 are responsible for reading LVMPD policy as they
11 changed and as they are, so that wouldn't show in
12 in-service, specifically.  It might show in the Tom
13 Leen class I took, that might be part of his -- you
14 know, each teacher.  I do instruction and I have to
15 have an outline of what I teach and it has to be
16 certified.  So Tom Leen may have that, if he covers
17 that in his classes, I wouldn't know.
18         Q.   So a part of your job as a SWAT officer
19 is to keep yourself current on what is contained in
20 the policy and procedure manual?
21         A.   That's correct.
22         Q.   And I assume that those, when new
23 policies or procedures are developed they are
24 circulated to everyone?
25         A.   That's correct, and every year you get

HIXSON   19

1 a full copy of a new policy with the changes inserted
2 in case you happen to miss during the year anything.
3 So each year you sign off on a new policy copy.
4         Q.   Okay.  Step two in the SWAT search
5 warrant process is that the team leader, assistant
6 team leader, or a senior officer review the request
7 from the detail.  What is the person who, the SWAT
8 person who reviews the request supposed to do when
9 reviewing the request?
10         A.   First thing we want to do, the reason
11 we send the two officers, and really it's the team
12 leader, the assistant team leader and the senior
13 officers.  In other words, it's all four of those
14 people look at that request and read that warrant
15 because the request is attached to the search
16 warrant, a copy of it.
17         Q.   Let's just stop there for a second.  As
18 I understand your testimony correctly, you would
19 modify step two, as I read it, because what I said
20 was that the SWAT team leader or the assistant team
21 leader or a senior officer reviews the request for
22 service.  Do you recall that's what I said?
23         A.   Yeah, but I told you that it's officers
24 that do the recon, so they would be looking at the
25 same thing up here on step two.

HIXSON   20

1         Q.   Okay.
2         A.   That's how they get the address.
3         Q.   Fair enough.  So what you are saying is
4 the team leader and the assistant team leader and the
5 recon officers review the written request for the
6 search?
7         A.   That's correct.
8         Q.   And what are those people supposed to
9 do when reviewing the written request to execute the
10 warrant?
11         A.   Well, we look at the information that
12 the affiant has supplied.  That's the first thing,
13 and of course the address and legal description is
14 one of the first and foremost things.  We want to
15 know where we're going, we want to make sure the
16 address matches, or we'd be here in court giving a
17 deposition on hitting the wrong house.  So everyone
18 reads it to make sure the addresses appear correctly
19 on both the affidavit and the search warrant and the
20 same address appears on the request, so everything
21 matches, in other words.
22         We look to make sure what we're looking
23 for, and that comes into the request and should be
24 written into what the affiant wants to search for,
25 and we check to see if it has a day or nighttime

DEPOSITION OF DARRELL HIXSON

HIXSON 21

1 clause. We need to know what time we have to service
2 the search warrant. We look for the information
3 that's supplied on the service, request for search
4 warrant service. That will help us in dealing with
5 the safety of the people inside. Do they have kids,
6 is it an apartment, is it a house, is it fortified.
7 So all that information that's on that sheet we
8 reviewed it and that's part of our planning phase.
9     Q.    What is it that the reviewing SWAT
10 officers are trying to determine from the affiant's
11 affidavit?
12     A.    Well, we're trying to see a lot of
13 things. We're trying to see what kind of building it
14 is, okay, is it a house, is it an apartment, is it a
15 trailer, is it a business. We're trying to determine
16 who resides there, adults, kids, dogs, what have you.
17 We are trying to figure out things that have to deal
18 with tactics. That's why we're looking at the cover
19 sheet, to see if it's fortified, if it has gates,
20 we're looking if the affiant knows who the suspect or
21 suspects are, if they have any prior arrests or
22 convictions, to get a profile of possible violence,
23 things like that.
24     Q.    Does SWAT ordinarily attempt to learn
25 what it can about individuals that are expected to be

HIXSON 22

1 located in the place where the search is to be
2 conducted in planning for the search?
3     A.    Yeah. Usually we're given information
4 on the persons that the affiants have been dealing
5 with, so sometimes they supply us with a scope
6 printout, a printout of their arrests or non-arrest
7 record, whatever, and that helps in us planning our
8 phases, and it should correlate to other things
9 within the request.
10         In other words, the classifications, if
11 they don't have a history of violence, and SWAT has
12 the option of changing the classification, if
13 especially the supervisor, if he thinks that this
14 thing was listed as a Class Three, but he doesn't
15 think that these people pose a threat, because of
16 whatever he deems, he can reduce it to a Class One or
17 Two. In other words, it's not stuck on that number.
18 And let's say it's a Class One but we have been to
19 that house four or five times within the past year,
20 then that could be jumped up to a Class Three because
21 we have been there so many times, even though you are
22 still dealing with the same person, yet we've done
23 four search warrant services.
24         So the classification can change and
25 that's done by the supervisor, if it's deemed

HIXSON 23

1 necessary. All those things we're reading we're
2 making sure that everything matches and everything is
3 done for the planning phase properly, mainly because
4 this is done for the safety of the people inside, as
5 well as our safety, so everyone's safety is what we
6 are thinking about.
7     Q.    How would the presence of violence or
8 the absence of violence in the history you get about
9 the individuals inside the premises affect your
10 planning?
11     A.    It would be a major part of the plan.
12     Q.    And if the facts were that the
13 individuals whom you suspected to find inside the
14 premises to be searched did not have a history of
15 violence, how would that affect your planning or your
16 tactics?
17     A.    It would affect the same way as if they
18 were violent. In other words, to the same degree, we
19 do something drastically different from the violent
20 part. Violence is tactically handled different than
21 people with non-violence, not that the other ones
22 aren't just as capable, you know, someone can become
23 violent. That's how you start your history, but we
24 would start with the non-violence tactics.
25     Q.    Okay.

HIXSON 24

1     A.    Do you follow what I'm saying?
2     Q.    I think I do. If you go in with the
3 assumption that there are violent people inside, you
4 take a different approach than if you go in with the
5 assumption that people are not violent?
6     A.    Very much so. And that approach, it's
7 not a legal term, but I'll say any time you do an
8 entry into a home it's kind of a violent thing to
9 break down a door. So we would try to be less
10 violent, and I'm not talking about our actions, I'm
11 talking about violating the door, you know, because
12 that's what we are doing. We're entering a
13 residence, without, you know -- who expects you to
14 come through the door.
15         So people that are less violent, it's
16 part of the procedure. We try to knock and announce
17 and tell them who we are. With someone that is less
18 violent, there's no such thing, at least in the
19 classes I have been giving. And you can get me -- we
20 don't have no knock search warrants in Nevada. It's
21 the totality of all the information we receive on our
22 search warrants, whether it's reasonable to actually
23 just break a door down.
24         The local jargon is you have to
25 announce and you have to, and that's up here in Class

DEPOSITION OF DARRELL HIXSON

HIXSON 25

1  One, people with no violence, we're going to knock,
2  we're going to announce ourselves, we're going to do
3  all those things because it's reasonable because they
4  haven't shown any history yet of being unreasonable.
5       Whether we start with people that have
6  shown that they are unreasonable, violent and want
7  confrontations with the police, and let's say we're
8  going after violent people that are selling guns,
9  that's where we can do the -- even though we don't
10  call them no knock, we can just announce ourselves
11  and ram the door within ten to five, ten seconds.
12  Where in other ones we want to announce ourselves 30,
13  40 seconds, and give them enough time to answer the
14  door, whatever that may be. And if my legal thing is
15  not right, because I'm not a lawyer.
16       Q.  You are pretty well trained in the law.
17  Are there written policies or guidelines that
18  identify or describe how long you should wait between
19  knock and announce and entry?
20       A.  Well, at the time of this, in the
21  classes I've taken, the term reasonable amount, I
22  didn't come up with that term. That's just what I
23  remember from the class I took from Tom Leen. It has
24  to be reasonable.
25       Now I know to this date as I sit here

HIXSON 26

1  that's already going to the Supreme Court some guy
2  was in the shower here, so at the time of that
3  warrant, it was supposed to be reasonable, and
4  usually what happens is that the team leader and
5  assistant team leader, after we look at the whole
6  thing and the classifications, we'll say okay, this
7  guy doesn't look like he's violent, we should give a
8  good 30, 45 seconds to answer the door. Because you
9  and I know if you are near the door, you will answer
10  within five seconds. If you are at the other end of
11  the house, is it a two-story house. So we take those
12  things into consideration.
13       If we think he's real violent, it's a
14  two-story house, we may give him ten seconds to
15  answer the door. So that's the request. It shows
16  everything that we want to know. The recon guys come
17  back with everything we want to know. It's always
18  the total stuff of the recon and the request that we
19  make these decisions on.
20       Q.  Is it your understanding that SWAT
21  policy at the time of the Hinton search was that you
22  should allow a reasonable period of time between your
23  knock and announce and the time that you enter the
24  premises by force?
25       A.  Yes.

HIXSON 27

1       Q.  And was that the policy that was
2  supposed to be followed in conducting the Hinton
3  search?
4       A.  Without looking at the thing, I'm
5  assuming that we knocked and announced on this one.
6  I can't remember, without reading the thing, if my
7  memory serves me, I think we knocked and announced on
8  this.
9       Q.  Are you saying knocked unannounced?
10       A.  Knocked and announced.
11       Q.  I'm sorry, I just wasn't hearing you
12  right. And you may have just answered this, but was
13  that policy reflected in writing, to your knowledge,
14  or was that simply the unwritten policy, if you will?
15       A.  That was the class that I took about
16  being reasonable?
17       Q.  Yes.
18       A.  It was just I don't think there's
19  anything written that says Class One is a 30 second,
20  Class Two is a ten, there's nothing written about the
21  time, no, there's not. Not that I know of.
22       You may talk to the lieutenant and
23  there may be something in his records, but not to
24  mine, nor have I been instructed.
25       Q.  Was there any written policy at the

HIXSON 28

1  time of the Hinton search that dealt with how your
2  entry and search tactics would be affected by whether
3  you suspected to find a violent versus a nonviolent
4  person or persons inside?
5       A.  Is there anything written specifically
6  on that? I don't know of anything specifically
7  written that tells you how to actually deal with
8  that. It doesn't sound like something I've ever
9  read.
10       Q.  Okay, and is what you are saying then
11  that the common practice at the time of the Hinton
12  search was that if what your recon told you was that
13  you did not expect to find violent people inside,
14  then you would give a longer period of time between
15  the knock and announce and the forced entry?
16       A.  Well, the only time the recon would
17  come into play, the information from the recon about
18  how long we would announce is the building. They
19  come back and tell me it's a two-story, so I try to
20  be a little more reasonable. What if you are
21  upstairs.
22       So the recon guys would tell me the
23  structure of the building, the size, we get that it's
24  a house on the cover sheet, the request, but it
25  doesn't say how many square feet, or is it a

DEPOSITION OF DARRELL HIXSON

HIXSON   29

1  one-story, two-story.  So the recon officers would
2  tell me, hey, it's a two-story, it's a big one-story,
3  it's a trailer, you know.  So when they start telling
4  me okay, let's say it's a trailer, then I know that
5  it doesn't take that long to get from point A to B,
6  unless it's a triple-wide or a single-wide.
7        So that would start playing it into how
8  long.  It's the request that we receive from the
9  affiant that says, you know, if they know.  Sometimes
10 we do a place where we don't know the suspect's name,
11 so we have no suspect history.
12       So I would have to look on this one to
13 see if we knew their names, if we had a scope
14 printout of them, and so then when the recon comes
15 back along with the team leader, the assistant team
16 leader, myself, we look at everything and we say
17 look, we have a single story house, they haven't been
18 violent, the warrant is for more important -- if it's
19 for guns, rather than paperwork.  We have done paper
20 capers, is what we call them.
21       So the totality of the information is
22 going to decide whether we're going to knock and
23 announce for 45 seconds, or if they are to that
24 degree where they are so violent, we're going to
25 knock and announce for five to ten seconds, so

HIXSON   30

1  everything takes them, it's not just one thing, it's
2  the totality of it.
3        Q.  What is the minimum amount of time that
4  you would have allowed for your knock and announce
5  time?
6        A.  Well, the only time I've ever had a
7  warrant where I didn't have to announce was a federal
8  warrant, so if it's a state warrant, for Clark County
9  or State of Nevada, we always give it five to ten
10 seconds of announcing, even, and we consider that
11 like a no knock because that's pretty quick.  No one
12 is going to answer the door usually.
13       MR. ANDERSON:  Just to be clear, that's not
14 with respect to this case, that's in the least amount
15 of time you can recall?
16       MR. BOOKE:
17       Q.  I'm asking you now general practices.
18       A.  General practice, that would be a
19 history of violence and the warrant is for guns, that
20 would be how we look at that.
21       Q.  Having suspects with a history of
22 violence and a warrant being for weapons is sort of
23 the worst end of the spectrum, if you will?
24       A.  Very accurate, yeah.
25       Q.  And the opposite end of the spectrum

HIXSON   31

1  would be no history of violence and --
2        A.  Credit card.
3        Q.  -- a search for paperwork?
4        A.  Right, exactly.
5        Q.  What time would you attach to the worst
6  end of the spectrum, the knock and announce time
7  before you make forced entry to the worst end of the
8  spectrum where you are anticipating violent people
9  and a search for weapons?
10       A.  How long would the announce be?
11       Q.  Yes.
12       A.  That's what I just said, it would be
13 like five to ten seconds.
14       Q.  And what would the opposite end of the
15 spectrum be?
16       A.  I think anywhere from 15 to 45 seconds.
17 We're fairly reasonable that someone can answer the
18 door by then, and we also use -- and I don't know if
19 we used it on this one.  You would have look at the
20 records.  We use a bullhorn, too.  So we actually
21 knock and if we don't have a bullhorn, it's not just
22 one officer going police, search warrant.  Usually
23 it's a team, and you would have to look if we had the
24 bullhorn.  If we had the team announce, I wouldn't
25 know on this one in particular, but we take a

HIXSON   32

1  bullhorn with us and have for many years and we also
2  have the whole team announce.  We usually don't ring
3  doorbells, because we're not sure that it works.  So
4  we rap on the door and use the bullhorn and the team
5  does an announce.  You would have to look how this
6  one was done.
7        Q.  All right.
8        A.  I don't remember.
9        Q.  I appreciate that explanation.
10       A.  We also knock and announce for the
11 safety of the neighborhood.  That's another reason we
12 always, even though we are doing a real violent one
13 we'll announce because we don't want anyone, you
14 know, the neighborhood is not involved, so we don't
15 want anyone hurt.
16       So we want the neighbors to know that
17 the police are here.  So that's why we do the -- even
18 though we're going after a violent, we do a quick
19 knock and announce in case people outside are
20 listening, they know we are the police so they can
21 stay away from the residence we are going into.
22       Q.  When SWAT knocks and announces itself
23 is the purpose of that to seek the consent of the
24 occupants to execute the search warrant?
25       A.  Well, I wouldn't know.  I was just

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF DARRELL HIXSON

HIXSON   33

1  instructed that we announce to let the people inside
2  know who we are and what we are there for because we
3  say "police, search warrant," so I wouldn't --
4       Q.   I mean is the purpose of the knock and
5  announce to let people know to get back away from the
6  door because you are coming in?
7       A.   No, because if we want them, there is
8  times where they have iron on the doors.  You are
9  familiar with security bars?
10      Q.   Sure.
11      A.   We don't want them near the door.  It
12  might be unsafe because if it's locked we have
13  devices that come out of a shotgun to take the lock
14  away.  So we say, "police, search warrant, stay away
15  from the door."  So on this one you have to look to
16  see if we had iron so I can accurately tell you what
17  we said.
18           But normally if it's not barred or
19  fortified, and that's part of the in the request it
20  says fortified.  So if it's not, then we'll just say,
21  "police, search warrant," so we want them to come to
22  the door, it's easier to go in when the door is open
23  and we will go in.
24      Q.   So is one of the purposes for the knock
25  and announce to see if you can simply get the

HIXSON   34

1  occupant to consent to let you come in?
2       A.   I don't know the law.  As far as I
3  know, since we have a search warrant, we can come in.
4  So we want them -- we prefer them to open the door,
5  so we can come in.  Does that answer your question?
6       Q.   Well, let me see if I can just say it
7  in simple as possible terms.  When you go up to
8  execute a search warrant or serve a search warrant,
9  is one of the things that you might do is say,
10 "Hello, I'm from Las Vegas Metropolitan Police
11 Department, I have a search warrant here and I would
12 like to come into your place to execute it, may I
13 come in?"
14      A.   We have done just that when the
15 conditions, and I can think of one as a Class One and
16 the guy had a stolen vehicle, he's not going to flush
17 the evidence down the toilet.  So all we had to do
18 was exactly that.  This evidence couldn't be flushed,
19 it couldn't be destroyed, it had to be towed away.
20           So yes, we have done exactly that, even
21 though we're in heavy gear, in case something goes
22 bad, we have done that.  If the totality meets that,
23 we'll do it.  But if it's stuff that can be
24 destroyed, because as far as I'm concerned, if I'm
25 not mistaken, the search warrant says I have a legal

HIXSON   35

1  right to enter that residence.  I have to be
2  reasonable in how I enter it.  So if he opens the
3  door for me, I'm going in; if he doesn't open the
4  door in a reasonable time, I'm going in.  I'm going
5  in.  The judge says I can go in, I'm going in.
6       MR. ANDERSON:  I think one place we are getting
7  confused, he testified sometimes they want them to
8  open it and sometimes they don't, which he explained,
9  I think.
10      MR. BOOKE:  Right.
11      Q.   But you understand as a SWAT officer
12 that your job is to act reasonable in trying to gain
13 access to the premises?
14      A.   I do understand that.
15      Q.   And that's the SWAT policy?
16      A.   Yes.
17      Q.   And it has been the SWAT policy to act
18 reasonable in entering to execute a search warrant as
19 long as you have been on the squad?
20      A.   I have been on 12 years and I have to
21 say when I first came on they tried to get more
22 reasonable.  In other words, things aren't done the
23 same way as they were 12 years ago.  It's gone to the
24 point where we want to be more reasonable, it hasn't
25 gone the other way.  So yeah, it's gone that way.

HIXSON   36

1  It's instructed that way, if that's the word you are
2  looking for.
3       Q.   So if it were possible to gain access
4  simply by asking for it and getting permission from
5  the occupant, that would be the approach you would
6  use?
7       A.   Yes, because we approach it the same
8  way.  We come up to the door, surround it, and then
9  we knock.  We wouldn't do it by telephone, we're
10 still going to go up to the door.  Is that what you
11 are asking?
12      Q.   Yes.
13      MR. ANDERSON:  I'm just going to object that it
14 misstates testimony in that he testified if there's a
15 wrought iron or some sort of fortification, then they
16 may not want them to open the door.
17      MR. BOOKE:
18      Q.   So you said that in reviewing the
19 request that you receive from the detail that
20 obtained the warrant, you would look at the
21 affidavit, make sure the address and legal
22 description match up?
23      A.   That's correct.
24      Q.   Determine what it is that you are
25 looking for --

Lori M. Judd, CCR #233, RMR

DEPOSITION OF DARRELL HIXSON

HIXSON   37

1    A.   Not that we're looking for.  We're not
2  going to do the search, per se.  In other words,
3  we're not in there to search, but what the affiant is
4  looking for, yes.
5    Q.   Determine whether there is a time
6  clause in the affidavit?
7    A.   Right, daytime or nighttime.
8    Q.   Okay, and then learn what you can about
9  the physical premises and the individuals who are
10  expected to be found in the premises?
11    A.   Yeah, that's correct.
12    Q.   When you use the term "fortified,"
13  what's your definition of fortified?
14    A.   Fortification is something that they
15  check in the request.  Our definition will come from
16  the recon officers.
17    Q.   And what is the definition of
18  fortification or fortified, as SWAT uses it?
19    A.   It's not what SWAT uses, it's how the
20  building is built.  It could have those Rolladen
21  shutters, that's considered fortification.  It could
22  have bars, it could have solar screens that are made
23  out of heavy metal, it could be a caged entry point.
24  So fortification can mean a lot of things.
25    In the request it doesn't say

HIXSON   38

1  fortification, what kind, that's what the recon
2  officers go.  Anything to deny people access, and
3  fortification usually means that you want to keep
4  "bad people" out, from getting inside your residence.
5  That's why fortification is made and that's why it's
6  sold.
7    The type would be what the recon guy
8  says.  He could say he has the Rolladen shutters all
9  over the windows and bars on the front, or he built a
10  block wall in front of his door with a steel door, so
11  you have to go through the steel door before you go
12  to the regular door.  So it could be anything.
13    Q.   So as an example, those things that you
14  just listed would qualify as fortification?
15    A.   Yeah, and in a simple term, anything
16  that would delay entry inside the main residence.  So
17  I mean you could have electrical fence.  We've had
18  that before.  You could have quite a few things.
19    Q.   Just by way of an example, do you have
20  any fortification, what would be called fortification
21  on your home?
22    A.   No.
23    Q.   None?
24    A.   No, my home is in Arizona and I don't
25  need it.  It's in Williams.

HIXSON   39

1    Q.   How about on the place where you live
2  in Las Vegas?
3    A.   You bet.  It's my mom's house.
4    Q.   What is it that's on your mother's
5  house here in Las Vegas that would be regarded as
6  fortification?
7    A.   A heavy steel door.  It's not a door
8  that you normally get, we had to buy it.
9    Q.   Williams, Arizona is a nice place.
10    A.   I know.  That's why I live there.
11    Q.   Are there any written policies or
12  procedures that list or describe what the SWAT team
13  leader or assistant team leader or recon people are
14  supposed to do in reviewing the request for service
15  that is received from the detail that obtained the
16  warrant?
17    A.   Well, my responsibility was
18  instruction.  So that written might be, again, with
19  the lieutenant's policies and procedures.  Everything
20  I've learned about those things that you have
21  mentioned I was instructed on what to do and how to
22  do them.  So that might be within the lieutenant's
23  records, but I was instructed about what it meant and
24  how it is and what to do.
25    Q.   And what to do?

HIXSON   40

1    A.   Yes.
2    Q.   To your knowledge in the case of the
3  Hinton search was this review step followed?
4    A.   Well, you would have to make, I would
5  have to look to make sure that it had the request, so
6  if all these, if the paperwork is all there, yes.
7  Then I look at all the paperwork.  That's the best
8  way I can explain it.
9    Q.   Then let me ask it in two parts.  First
10  of all, do you have any independent recollection just
11  as you sit there whether this step number two, this
12  review process was followed in the Hinton case?
13    A.   Yeah, I'm almost 99.9 percent sure I
14  read the search warrant.  I read all the search
15  warrants so I'm really sure that I read that search
16  warrant.  Whether I really read the review at that
17  time or later, I'm not sure, but -- and then did we
18  discuss the warrant, I'm sure we did.  But the
19  particulars I can't remember.  I do too many of them
20  to know the particulars.
21    Q.   In the case of the Hinton search, which
22  SWAT people reviewed the written request that was
23  received from the narc detail?
24    A.   It would be my sergeant, I think that
25  was Willy Graham, and myself and the recon officers

## DEPOSITION OF DARRELL HIXSON

SHEET 11   PAGE 41

HIXSON   41

1  and I don't know who the recon officers are without
2  looking at the paperwork.
3      Q.   As a matter of the regular practice or
4  the common practice at SWAT in January of 2002, was
5  there any written documentation or written notation
6  made about the review process when it was conducted,
7  in other words, was there any written documentation
8  that step two was conducted or what was done in step
9  two?
10     A.   No, there's no written documentation at
11 that time.  I usually dictate that we reviewed the
12 search warrant and it was proved to be true and
13 correct, I usually say something like that.  So in my
14 after action officer's report there might be
15 something that we received information from the
16 affiant, the affiant showed that it was a house, that
17 it was, you know, so in my dictation there might be
18 some sort of written documentation, but there's no
19 checklist, there you go.
20     Q.   And the dictation that you are talking
21 about is dictation that you make after the search has
22 already been performed?
23     A.   Yes, that's correct.  That's correct,
24 but it kind of tells a whole story leading up to and
25 after.

PAGE 42

HIXSON   42

1      Q.   Understood.  Did SWAT take any action
2  or do anything in the Hinton case to verify the
3  truthfulness or the accuracy of the information that
4  was contained in the written request that came from
5  the narc detail?
6      A.   Yes, we sent the recon team out to
7  verify some of the facts that they state are facts on
8  there.  We also send them out to make sure the facts
9  in the search warrant are proved out.  So in other
10 words, sometimes we've had it where they say the door
11 faces east, and the door faces west, then you wonder
12 are we hitting the correct place.  So the facts that
13 they gave us, we go out to make sure that they are
14 actual facts, in fact.  So in other words, the recon
15 guys try to verify everything that we can.
16     Q.   So one thing that SWAT did in the
17 Hinton case was to try to verify that the physical
18 premises were as described in the warrant?
19     A.   That's very true.
20     Q.   Did SWAT take any action or do anything
21 in the Hinton case to verify the truthfulness or the
22 accuracy of any other information, other than that
23 the physical premises were as described?
24     A.   The only thing that we might do, and
25 without looking at the package, if the affiant has

PAGE 43

HIXSON   43

1  their names and he supplies us with a scope, printout
2  of their past prior history, we would not verify that
3  scope printout.
4      If they didn't give us a scope printout
5  because it's part of a police investigation, we can
6  then run the names supplied on that request to see if
7  they do have any criminal history.
8      So I don't know without looking at the
9  package or any notes that might be in there if the
10 affiant supplied us with the names and the scope
11 printout or if we had to reverify that.  Also if the
12 affiant doesn't supply us with a site check, we might
13 do the site check to find out.  The site check is to
14 see who owns the house.  It's the County records and
15 we do that because a lot of times if a person, this
16 is part of the classifications that we can change.
17 We see the guy is violent but he's living in
18 grandma's house, well, do we want to jeopardize
19 grandma's safety, you know.  So we might change that
20 classification.
21     So, we do a site check to see who owns
22 the house.  So without looking at the packet or any
23 kind of notes, I wouldn't know that we looked into
24 anything other than, I know we did the recon because
25 that just has to be done and the affiants don't do

PAGE 44

HIXSON   44

1  it.
2      So I can tell you for sure that we did
3  the recon to verify the correct address and legal
4  description, but whether we scoped them, did site
5  checks or anything else, I couldn't tell you that.
6      Q.   Just for the record, please, when you
7  say "scoped them," what do you mean by scope them?
8      A.   That's our term for going to a
9  computer, running through the scope printouts, and
10 finding someone's legal arrest record or non-arrest
11 record.  It will show whether they have been arrested
12 or not.
13     Q.   Does the "scoping" show convictions?
14     A.   Yes, it does.  It shows arrests and
15 convictions, it shows traffic accidents, where you
16 have been a victim, anything that had to do with
17 LVMPD, State of Nevada, some of the legal
18 classifications that are allowed to enter into scope.
19     There's a lot of different people that
20 can enter into scope.  There's the Federal ones which
21 is a different one, NCIC, that would be the state run
22 and it can be entered by County, City, it could be
23 out of the County by the State.  So whoever is
24 allowed to put into scope.  I can't do input, but I
25 can retrieve information from scope.

## DEPOSITION OF DARRELL HIXSON

SHEET 12    PAGE 45

HIXSON    45

1    Q.   Does the scope information tell you the
2  disposition or the outcome of criminal charges?
3         A.   It will say only convictions, and
4  charges, sometimes it will say dismissed.  It gives
5  you -- to do it deeper you have to run a different
6  computer and it's called, I think C-track, or
7  something like that.
8         So I'm not an expert on that, I just
9  know that I can run the scope and that's what I get.
10 It will show convictions, it will show dismissals,
11 traffic accidents, being the victim of a crime,
12 things like that.  There are computer terminals that
13 have a deeper investigative power, let me put it that
14 way.
15         Q.   Does SWAT have those computer terminals
16 that do the deeper check?  Just leave it there, does
17 SWAT have those computers?
18         A.   I think the lieutenant's secretary has
19 the capabilities of delving into that deeper, yes.
20 In my office, no.
21         Q.   And your office being what?
22         A.   In where all the SWAT officers, other
23 than supervisors, are.  Because there's like 30 of
24 us, so it's a big office.
25         Q.   So --

PAGE 46

HIXSON    46

1         A.   And I have the power to request it, if
2  I wanted it.  Make it -- let me clarify.  If I really
3  wanted something, I could request it through my
4  supervisor.
5         Q.   The things then that SWAT did to verify
6  the truthfulness or the accuracy of the information
7  that came with the request from the narc detail would
8  be that recon verified the address and the legal
9  description, that's one thing you would have done?
10        A.   Uh-huh.
11        Q.   Is that correct?
12        A.   That's correct.
13        Q.   And you may have conducted a scope, if
14 narc detail did not provide it to you?
15        A.   That's correct.
16        Q.   And you may have done a site check?
17        A.   That's correct.
18        Q.   Are there any written records or
19 notations that would show whether you did do a scope
20 in your planning for the Hinton search?
21        A.   No, and I don't think I notated in my,
22 there's no checklist and I usually don't dictate it
23 in my reports that's the steps that we did.  So
24 there's no checklist and there's no, I don't think in
25 my report that I usually, unless it's something odd,

PAGE 47

HIXSON    47

1  that I say we did a site check and we did a scope
2  printout.  It's just part of the procedure we try to
3  do.  So there's no checklist.
4         Q.   Okay.  Do you regard the scope printout
5  as being an or providing an important piece of
6  information in your planning for executing a search
7  warrant?
8         A.   Only in that if the affiant or the
9  narcs didn't have any information concerning the
10 individuals, in other words, sometimes the narcs can
11 do an undercover buy, so they actually know the guy,
12 talk to the guy.  Sometimes they have an informant do
13 it where they don't actually have contact with the
14 person they are investigating.
15         If I can get information from them,
16 either verbally, like I said, there's telephone calls
17 involved, or by the request and they go, he has no
18 violent history, then I may not even scope it because
19 he has said it.  So there are times where if the
20 affiant tells me something, then I have no reason to
21 believe that it's not the truth so I may not
22 investigate into that any further.
23         Q.   So SWAT does not do a scope printout in
24 every case?
25         A.   Exactly, but if we have questions we

PAGE 48

HIXSON    48

1  have the ability and we have, I don't know if we did
2  on this one.  I'm just telling you we have the
3  ability and we have, without looking at the paperwork
4  I wouldn't know.
5         Q.   If SWAT did a scope printout in the
6  Hinton case, would the hard copy printout be included
7  in the SWAT packet?
8         A.   Yes, it would.  I keep it in the
9  packet.  Anything that is paperwork I'll keep,
10 whether we pulled it or whether the affiant gave it
11 to us, and usually we include our recon diagrams that
12 are real rough sketch or sometimes I include in the
13 piece of paper where the guy called me and says I
14 need the address, recon, and we may have a little
15 scratch piece of paper.  I try to include everything
16 that's in there.
17         Q.   And if you had requested the deeper
18 computer search, the C-track, or whatever the actual
19 name of it is, and had obtained some information from
20 that source, you would include that also in the SWAT
21 packet?
22         A.   Yes, I would.
23         MR. BOOKE:  Madam Reporter, do you have the
24 Exhibits from Sergeant Graham's deposition?
25         (Short break.)

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF DARRELL HIXSON

SHEET 13   PAGE 49

HIXSON   49

MR. BOOKE:

Q. I would like to show you what has been marked as Exhibit 1, which if I am mistaken I'm sure Mr. Anderson will correct me, Lieutenant Williams -- I'm sorry, Lieutenant Graham described or identified as being the SWAT packet. Please take a minute to go through that because I would like to verify if that is, in fact, the SWAT packet for the Hinton search. Let's go off the record.

(Recess taken.)

MR. BOOKE: Let's go back on the record, please.

Q. We'll talk at some length about different items contained in Exhibit 1, but at this particular moment my interest really is just in knowing whether Exhibit 1 does appear to you to be the SWAT packet for the Hinton search?

**A. Except for the photographs being copied twice on the thing, yeah, it would depict it accurately.**

Q. What do you mean, the photographs being copied twice?

**A. Well, in this packet you gave me, the same photographs appear twice.**

Q. Yes, I see.

PAGE 50

HIXSON   50

**A. But the photographs are the photographs, but they appear twice.**

Q. Okay. Now is there a scope printout in the SWAT packet?

**A. I see no scope printout. I do see a site check.**

Q. Which page or pages is the site check?

**A. It's right towards the back.**

MR. ANDERSON: At the very bottom there's numbers, if you tell them the Bates stamp numbers.

THE WITNESS: Which one?

MR. ANDERSON: It would be 108.

THE WITNESS: Okay, 108 and 109.

MR. ANDERSON: Is that how you want to do it?

MR. BOOKE: Sure, that's fine.

Q. Actually 108, 109 and 110 are the site check documents; is that correct?

**A. That's correct.**

Q. Now just so that I understand you correctly, if the narc detail had sent a scope printout to SWAT, that printout would be contained in Exhibit 1?

**A. It should be, yes, definitely should be.**

Q. In the ordinary course it would be?

PAGE 51

HIXSON   51

**A. That's correct.**

Q. I want to take that back, Exhibit 1 back from you for just a minute because I want to talk about a couple of different things or additional things before we come back to the content of that document. I would like to talk a little bit about the recon step, and I guess, let me ask probably the obvious first question first. What does recon, what is recon short for?

**A. Reconnaissance.**

Q. And what is the -- what are the persons who do the recon for a search warrant supposed to do?

**A. There's a number of things. Number one is to make sure that we're hitting the correct residence, that the address and information in the search warrant match the actual building and address.**

**Second, we're looking for things like how we are going to approach. We are looking to see how the building is constructed, whether it's fortified, whether it's not. We're looking for the best approach. We're looking to see if any neighbors might be affected. In other words, sometimes they build them so close, or the angles are so close we have to worry about the safety of the neighbors. So they are looking to see how the neighborhood lays**

PAGE 52

HIXSON   52

**out. We're looking for where rear containment can be, or containment, in case someone jumps out the back, which is quite common. So we're looking for a rear containment element to be able to get nearby or in, if they can get in someone's backyard, or if they have to stay on the street, things like that.**

**We're looking for the route to the nearest hospital in case any of us civilians or officers get injured. We also take a tactical paramedic with us and the doctor sometimes, but we still need to know the exact routes we need to take and anything else, lighting in the area. I mean it's a whole class on recon, but they are looking for these kind of things.**

Q. Item one that you just mentioned, verify that the address on the warrant matches the address on the building. That is the purpose, the purpose of that recon step is to make sure that you are going to the right place?

**A. That's correct.**

Q. The last five things that you mentioned, how to approach the building, to see how the neighborhood lays out, see what your containment elements or choices are, the route to the nearest hospital and lighting in the area, those are all

DEPOSITION OF DARRELL HIXSON

SHEET 14   PAGE 53

HIXSON   53

1  tactical considerations; correct?
2      A.  Except for the one that's the safety of
3  the residents, that's -- we call that a tactical
4  consideration.  You'd call that a humanity thing.
5      Q.  All right.
6      A.  But everything else is tactical.
7      Q.  Those last five things have to do with
8  figuring out how you are going to conduct your entry
9  into the house?
10     A.  Exactly.
11     Q.  Or into the premises, as the case may
12  be?
13     A.  That's correct.
14     Q.  Do the recon officers have any jobs or
15  tasks that they are supposed to do in their recon
16  work, other than the things you have just listed?
17     A.  Well, there could be things that they
18  saw when they were there.  They could say hey, there
19  was a lot of foot traffic, there was a lot of cars
20  pulling up when we were doing the recon, I think I
21  saw the main suspect outside.  There could be many
22  things that they come back and tell us.
23     Q.  Would it be accurate to say that the
24  two categories of job responsibilities, or the two
25  categories of tasks that the recon officers are

PAGE 54

HIXSON   54

1  supposed to perform are to verify that you have the
2  right location, number one; and number two, to get
3  whatever information is necessary in order for the
4  entry team to make entry?
5      A.  We want them to get as much information
6  as we can.  There are some neighborhoods that are so
7  warrants that are so dangerous that all we ask is
8  they verify the address.  Anything after that would
9  be a bonus.
10         So what you are saying is anything that
11 we can get or they can get on the recon, I used to do
12 the recons and I still do.  Sometimes I'm assistant
13 team leader.  So anything we can get, it just makes
14 it safer for us, for them, makes our job easier,
15 hopefully less intrusive, anything that we can think
16 of.
17         But if all we could get because of the
18 circumstances of the recon was we have to verify the
19 address and the building, that is a must.  We can't
20 even take a step forward, or I would be begging for
21 mercy here right now, instead of kind of defending
22 our position.  So that's the most important.
23     Q.  Do the recon officers do anything at
24 all to verify the truthfulness or the accuracy of the
25 information that is alleged in the affiant's

PAGE 55

HIXSON   55

1  affidavit or in the search warrant about the
2  individuals who are suspected to be found in the
3  premises?
4      A.  Let me answer this real careful because
5  I could be interpreting it wrong, but in no way do I
6  ever consider that that officer is not giving me any
7  truthfulness in his affidavit.  I have no reason to,
8  nor is it my job to suspect that he is not telling
9  the truth.  So I don't know what you are asking me by
10 that, but I cannot accuse an officer of being
11 untruthful in any shape or form unless I have
12 evidence.  And if I did, I would have to go to
13 internal affairs with it.
14         So if that affiant tells me that
15 warrant, his information is accurate, I believe it,
16 especially if it's signed by the judge.  I have no
17 reason not to, and it's not my place to question his
18 truthfulness.  Would I try to confirm information
19 about the residents or anything I could?  Yes, but
20 not about the facts and circumstances, how he got the
21 warrant.  I would never, ever do that.
22     Q.  So in doing your planning, you assume
23 that everything that is contained in the affidavit
24 that supports the search warrant is true?
25     A.  Yes, because he's a sworn officer like

PAGE 56

HIXSON   56

1  I am.  Until he's not, then I won't.
2      Q.  Would you ever, in other words, can you
3  think of any circumstance in which you would ever
4  question or challenge the truthfulness or accuracy of
5  the information that is contained in the affidavit
6  that supports the search warrant?
7      A.  Yes.
8      Q.  Under what circumstance would you
9  question or challenge the information contained in
10 the affidavit that supports a search warrant?
11     A.  It happens often.  Sometimes -- there's
12 a couple cases.  Sometimes they will say the address
13 is 123 Adams Street and it's a brown house with green
14 trim.  Well, we go there and the colors aren't
15 correct, because he may have seen it at night or we
16 may be seeing it at night.  So the description or the
17 address may be challenged.  I may actually call the
18 affiant.  Or there may be a typo.  He's put apartment
19 B and it's actually apartment eight.  So, what we do
20 if we have those discrepancies, we get the affiant in
21 one of our cars or one of their cars and we have him
22 drive by and say, as he points, that's the place.
23         So, yes, there are discrepancies, but
24 it would only be, like I told you, it would only be
25 facts that I verify and I'm supposed to verify.  So

DEPOSITION OF DARRELL HIXSON

HIXSON   57

1 it could be something like that.
2            It could be a typo or it could be the
3 colors was wrong or he couldn't find the letter. So
4 sometimes they do a description, such as it's the
5 third building west of the corner of the building,
6 because they couldn't see the letter. But maybe a
7 recon guy says hey, it's apartment C, but it doesn't
8 say C in there.
9       Q.  Can you think of any circumstance in
10 which you would question or challenge the
11 truthfulness or accuracy of allegations that are made
12 in the affidavit supporting the search warrant as to
13 the crime or the claims made against the person whose
14 premises you are searching?
15       A.  No.
16       Q.  As of the time of the Hinton search did
17 SWAT have any written policies or procedures that
18 list or describe what the recon persons were supposed
19 to do in performing recon for a search?
20       A.  Now that's a tactic. We have an actual
21 class on recon. So yes, and that's in our, that
22 would be, I think, in our tactics manual, and for
23 sure if it's not in our tactics manual it's in the
24 lieutenant's policies and procedures. But we do have
25 a class on how to recon.

PAGE 58

HIXSON   58

1       Q.  And there are some written materials
2 that exist in connection with that?
3       A.  Yes. We also teach patrol officers the
4 basic recon and that's done in the academy, so I know
5 there's a lesson plan on recon. We might have it a
6 little more refined, but we just add to it and
7 there's definite documentation on recons in our
8 tactics manual, and it could be in policy also, and
9 it could be with the academy staff, if you want to
10 get it from there.
11       Q.  Let's go back then to Exhibit 1. Did
12 SWAT do recon before executing the Hinton search
13 warrant?
14       A.  Yes, we did.
15       Q.  Who were the SWAT recon persons that
16 did the recon before the Hinton search?
17       A.  As listed on your documentation, it's
18 on page 80, it's a recon diagram sheet at the top of
19 the heading there. It's listed as recon officers K.
20 Warren, that's Kevin, and Manny Rivera. They used a
21 black Crown Victoria and wore plain clothing, and the
22 narcotics detectives -- I think this is for
23 narcotics? Were not present during the recon. In
24 other words, they didn't have to get them in the car
25 or point anything out.

PAGE 59

HIXSON   59

1       Q.  And page 80 in Exhibit 1 also indicates
2 the recon was done on January 9, 2002?
3       A.  Yes, I'm sorry. Yes, it does.
4       Q.  And what time of day was the recon
5 done?
6       A.  That may not show on this sheet, but it
7 may show a close proximity to the time on a different
8 page, and let me check to see if we have that. That
9 would be on -- there's no page number.
10       MR. ANDERSON: That one cut off. It looks like
11 page 85.
12       THE WITNESS: Page 85.
13       MR. BOOKE:
14       Q.  Would you be kind enough to just write
15 that in at the bottom so that the exhibit will
16 clearly have the page on it?
17       A.  Sure. It shows the date and time of
18 warrant served is the fourth, what am I looking for,
19 fourth thing down on the page, the thing.
20       MR. ANDERSON: The fourth line.
21       THE WITNESS: There you go.
22       MR. BOOKE:
23       Q.  Oh, I see, okay.
24       A.  Sorry about that.
25       Q.  That shows the date and time of the

PAGE 60

HIXSON   60

1 warrant served. Is there something that shows the
2 time that the recon was done?
3       A.  No. As I explained to you, it would be
4 a one or two hour time frame, most likely. In other
5 words, there's no -- I don't know the exact time, but
6 usually we try to do them, we can do them a day
7 before, but we still have to freshen them up the next
8 day, and I know we didn't do this the day before, but
9 it's usually one or two hours before because we don't
10 like things to change too much. In other words,
11 things might change from one way, people have moved
12 out, so we try to make it current and that might help
13 us on the request.
14            If you look at the request, let me find
15 that. The request was faxed to us on -- and that's
16 on page 92. We can tell if we got in a couple days
17 before so we had some time to do it, and I might be
18 able to give you some better information whether we
19 did it that day or that night. I couldn't be exact.
20 So looking at the date on the request for SWAT search
21 warrant service, and then on page 92 it shows it was
22 faxed to us on the 16th. It's kind of upside down.
23       Q.  Yes, and just to help you out, you see
24 that there's a fax legend on the bottom of page 92?
25       A.  Uh-huh.

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF DARRELL HIXSON

HIXSON   61

1    Q.   It would be upside down?
2    A.   That's what I was looking at.
3    Q.   Okay.  So it appears that the request
4  was faxed over to SWAT on January 16 at 6:23 p.m., if
5  the legend is right?
6    A.   Yes, and also the request for SWAT
7  service warrant on the next page is dated the same up
8  top.
9    Q.   On page 93, you are saying the date and
10  time at the top is January 16, 2002?
11    A.   Yes, on the request for SWAT search
12  warrant service.
13    Q.   All right.
14    A.   Now that's what I mean.  The
15  possibility is we might have done it a day or two,
16  but I know for a fact we would refresh it an hour or
17  two before, especially if we had it a couple days
18  ahead of time, because things can change.  So there's
19  just a good possibility we did it on the 16th, 17th
20  or 18th, but I know on the 19th we either did it or
21  refreshed it.  That's the best way to answer that
22  one, and I wouldn't know the exact time, but it
23  wouldn't be hours before, it would just be a couple
24  hours before we serviced the search warrant.
25    Q.   So the common practice, or the regular

PAGE 62

HIXSON   62

1  practice in January of 2002 was to conduct a recon on
2  the premises, just a matter of a couple of hours
3  before the actual search warrant was served?
4    A.   That's how we would prefer, but also if
5  it dictates, we'll do it a day or two earlier because
6  they are not nervous.  They may see us go by on the
7  17th, and I'm not saying these people, but they may
8  be nervous.  But nothing happened that night of the
9  17th, and the 18th passed.  So we may recon it a day
10  or two prior.  But the day that we're going to
11  service it, we will definitely look at it again,
12  whether it's -- and it's usually just an hour or two
13  before we do it.  So this could have been reconned on
14  the 16th, the 17th, 18th, but it was definitely
15  relooked at or re-reconned, if you want to use that
16  term, and we do.  Did you recon it, and the guys says
17  yeah, I drove by and the same car was in the
18  driveway, da, ta-da, ta-da, ta-da.
19    Q.   She can write that in there.  Based on
20  all the information that you have in the Exhibit 1,
21  the packet, how many times do you believe the Hinton
22  house was reconned?
23    A.   I would have to go from my
24  recollection, and I think we did it once.
25    Q.   And based on all the information you

PAGE 63

HIXSON   63

1  have in Exhibit 1, when is your best estimate as to
2  when that recon occurred?
3    A.   I would have to look at the recon sheet
4  and that will tell me if my recollection is correct
5  or not.
6    MR. ANDERSON:  It's page 80.
7    THE WITNESS:  So we actually reconned it on 1/9
8  and we serviced it, let me go to it.  On 1/16, so we
9  had to have re-reconned, it in other words, we had to
10  have gone by the day of the 16th.
11    MR. BOOKE:
12    Q.   So your best testimony would be that
13  the Hinton house was reconned twice?
14    A.   Yes.
15    Q.   And is there any paperwork or
16  documentation of the second recon?
17    A.   No, but, no, there's not of the second
18  recon, no, sir.  But now reading the paperwork I can
19  tell you probably what transpired, if you look at the
20  correct dates, if you look at the date of -- let me
21  go back to it, of the request.  What page was that
22  on?
23    MR. ANDERSON:  That's page 80.
24    THE WITNESS:  80.
25    MR. BOOKE:  No, the question was back further.

PAGE 64

HIXSON   64

1    MR. ANDERSON:  Oh, the request.
2    MR. BOOKE:
3    Q.   That's 93, the request?
4    A.   Okay, if you look at the date of the
5  request when it was faxed to us, it was on January
6  16.  If you look at the date of the recon, on page
7  80, it's the 9th.
8    Now, remember I told you in the
9  beginning sometimes we'll get telephone calls, so
10  what we probably got is hey, guys, we're planning on
11  doing a warrant sometime in the near future, and this
12  is the address, can you recon it.  So I'm sure on
13  1/9, because there's the date, that Kevin Warren and
14  Manny Rivera reconned it.  We finally got the request
15  and probably involving more telephone calls, hey,
16  we're ready to do this search warrant, and I said
17  well, we haven't got the request, or the copy of the
18  search warrant, which we can't service until we get
19  those.  Now you see your chain of events.  So I know
20  that specially with what, one week's difference from
21  the recon to the service of the search warrant, we
22  definitely re-reconned it.
23    Q.   Now, the testimony that you just gave,
24  is that from your memory or is that based on what you
25  are looking at in this paperwork?

*Lori M. Judd, CCR #233, RMR*

## DEPOSITION OF DARRELL HIXSON

HIXSON   65

1  A.  No, because earlier when I told you
2  what I recollect, well, I do five or six, seven
3  search warrants a week.  So from what I recollected I
4  told you how it might happen, but after I read it, I
5  can tell you 99 percent what probably happened.
6  Q.  Okay.
7  A.  Since I didn't answer the phones and do
8  all the conversations, but the dates would make sense
9  to how we operate, in other words.
10  Q.  Okay.  Now, looking at page 82 --
11  A.  82.
12  Q.  -- of Exhibit 1?
13  A.  Uh-huh.
14  Q.  Who is it that actually, whose
15  handwriting is that?
16  A.  That's Manny Rivera's.
17  Q.  And would you expect, based on looking
18  at page 82, that Manny Rivera also made the drawing
19  that appears on the top half of page 82?
20  A.  Yes -- some of it.  Some of it could be
21  Kevin's but most of it looks like Manny.  When I say
22  some of it, that doesn't look like Manny's down at
23  the bottom where it says entry and exit, but
24  everything, because I've worked with Manny for seven,
25  eight years, it looks more or less, 90 percent

HIXSON   66

1  Manny's.
2  Q.  Okay.  On the diagram that appears on
3  the top half of page 82, there are what appear to be
4  designated as windows and doors.  Do you see that?
5  A.  Yes, that's correct.
6  Q.  And on the windows and doors there
7  appear to be hash marks, you know, perpendicular to
8  the windows and doors.  Do you see that?
9  A.  That's correct.
10  Q.  What do you understand those hash marks
11  to be or to mean?
12  A.  In the way LVMPD SWAT teaches and does
13  recons, that would indicate that it's fortified.
14  These are the windows are barred up, there's iron
15  around it.  This would indicate iron bars.  Whether
16  it had mesh or not, usually we write in "mesh,"
17  because sometimes you can have iron and they have a
18  steel mesh behind it.
19  So I would just take this to be that
20  this was iron without mesh, but it could have mesh
21  because don't forget the recon officers aren't going
22  up to the house and looking, they might be driving
23  by, they might be walking.  So they might miss the
24  mesh.  It's definitely got iron, that's something you
25  could see 100 feet away, ten feet away.  So it has

HIXSON   67

1  iron.
2  Q.  So as you look at page 82 in Exhibit 1,
3  you read that diagram to say that all the windows
4  have iron bars on them?
5  A.  Expect probably the slider.  There
6  might be a slider back here.
7  Q.  The diagram up at the top of the page
8  where you see the break in the line and there's
9  another inch and a half line?
10  A.  Right.
11  Q.  That would be a designation for a
12  slider?
13  A.  If there's bars around the slider,
14  usually we draw in the same kind of thing around a
15  window, so I don't see that.
16  Q.  Other than the slider, does it appear
17  to you that the drawing indicates that all of the
18  windows have bars on them?
19  A.  No, on the part that says -- and I'll
20  tell you what, this might help.  We call this the one
21  side down here.  This is how we number.  This is the
22  one side.
23  Q.  The front of the house?
24  A.  Yes.  Then a two, three.
25  Q.  So you go clockwise?

HIXSON   68

1  A.  Yes.  On the number two side where it
2  says add on, I notice that there's two windows here,
3  and it doesn't appear to have bars.  Now, this might
4  be -- these might be windows inside the number two
5  add-on.  So the number two side may be what we call
6  dead.  In other words, there's no way to look out.
7  There may be no door, no windows, and then the add-on
8  may have window inside the house, which is probably
9  what we're looking at.  The interior diagram would
10  tell you that, but from this diagram it looks like
11  the number two side is actually dead, in other words,
12  nothing on it, no doors, no windows.
13  Q.  Okay, is there anything at all on page
14  82 that indicates what time of day the recon was
15  conducted?
16  A.  No.
17  Q.  In January of 2002 would Warren and
18  Rivera have worked specific shifts on the clock?
19  Would their shifts have been designated from start
20  time to finish time?
21  A.  Yes.  Everyone logs on when they come
22  on duty.
23  Q.  So at least we could figure out a time
24  bracket, but knowing what time, if we know what time
25  Warren and Rivera were on duty and off duty we could

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF DARRELL HIXSON

SHEET 18   PAGE 69

HIXSON   69

1  at least figure out during what shift?
2      A.  Yes, we normally work swing shift.
3      Q.  And what hours are those?
4      A.  That's 1500 hours, 3:00 to 1:00 in the
5  morning, a ten-hour shift.
6      Q.  In January of 2002 was recon work done
7  at any particular time of day?  Is it typically done
8  at a particular --
9      A.  No, it's done whenever we may have --
10  we may have done more than one warrant on this day.
11  We may have done only this one.  We have today, I've
12  got two warrants that are going to be reconned.  So
13  whatever the day or cycle brings, we do it.
14      Q.  Okay.  Who assigned Warren and Rivera
15  to do the recon on the Hinton house?
16      A.  I did.
17      Q.  Is there any documentation that shows
18  that you are the person who assigned Warren and
19  Rivera to do the recon on the Hinton house?
20      A.  That's just one of my responsibilities
21  as the assistant team leader.
22      Q.  When did you assign Warren and Rivera
23  to do recon on the Hinton house?
24      A.  After reading Exhibit A, I probably
25  assigned a week ago.  In other words, we're going

PAGE 70

HIXSON   70

1  back to the date of the original recon sheet.  I
2  think, was it the 9th?  Yes, page 80.  Since that day
3  of the 9th is on the sheet here, I probably got the
4  phone call, or someone gave me the information that
5  they wanted something served at 1919 East Hallwood
6  Drive.  So on the 9th that looks like that's when I
7  gave Warren and Rivera the information, at least the
8  address, at very minimum, to do the recon.
9      Q.  What is it that you are looking at,
10  please?
11      A.  Page 80.  That shows the date of the
12  original recon.  It doesn't show the time of the
13  original recon, it doesn't show the second recon, or
14  the second recon's time, but that shows the date.  So
15  since we know the warrant was served on the 16th and
16  I sent out a recon on the 9th, that was the day I
17  send them out on the recon.
18      Q.  Why do you believe that you sent Warren
19  and Rivera out to do recon on the Hinton household on
20  January 9th?
21      A.  Because it's on the recon sheet here on
22  page 80.
23      Q.  What shows on page 80 is that Warren
24  and Rivera did the recon on January the 9th; correct?
25      A.  That's correct.

PAGE 71

HIXSON   71

1      Q.  And what is it that makes you believe
2  that you assigned them to do the recon on January
3  9th?
4      A.  Just by looking at this sheet, I would
5  have no recollection, I do too many.  You are asking
6  me something I couldn't possibly verify.  I'm going
7  by documentation and it's a fair assumption.
8      Q.  But I'm trying to find out what you
9  know.
10      MR. ANDERSON:  He's asking you what your custom
11  and practice is.
12      THE WITNESS:  Yeah.  Well, it would be hard to
13  say.  If we were busy that day, I might say do it
14  tomorrow.  So I could have got it on the 8th and said
15  do it tomorrow, but I know they went out on the 9th.
16      MR. BOOKE:
17      Q.  Is there anything contained in
18  Exhibit 1 that tells you -- well, let me withdraw
19  that question.
20      Who is it at SWAT that got the first
21  contact from the narc detail that there was going to
22  be a warrant for this 1919 Hallwood location?
23      A.  I would have no way of knowing.
24      Q.  Is there anything in Exhibit 1 that
25  tells you who at SWAT got the first contact from the

PAGE 72

HIXSON   72

1  narc detail?
2      A.  The only written documentation I note
3  on page 71 of my after action that we would be
4  serving the warrant at 1919 via the information
5  received from the SWAT search warrant, so, and we
6  know if you go back to page 93 on the request for
7  SWAT warrant service that it's dated the 16th.  So
8  when you look at my report, that's done when
9  everything is done, and I show that via the request.
10  The request was sent, according to page 93 in this
11  packet, on the 16th.  And it shows that we serviced
12  the warrant on the 16th.  Then the 16th is when we
13  got all the written documentation that enables us to
14  do it.
15      We can do a recon on any address by
16  phone.  I don't need a search warrant to do a recon.
17  It's a public sidewalk.  I can walk by, but we can't
18  do anything until we have the documentation, per our
19  policy is a legal search warrant.  The request has to
20  be there, and we have to review it and confirm it.
21      So we may have done an early recon on
22  verbal hearsay, but we didn't do any action that is
23  needed with a search warrant until we had that in
24  hand.
25      Q.  Is there anything in Exhibit 1 that you

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF DARRELL HIXSON

HIXSON     73

1  rely on -- withdraw that question.
2          Is there anything in Exhibit 1 that
3  indicates when SWAT was first contacted regarding the
4  1919 Hallwood premises?
5      A.   I just answered that about two
6  questions ago.  I would have no way of knowing when
7  the phone call or the conversation took place.  I
8  don't know if I took it or if Sergeant Graham took it
9  or if one of the officers.  Who knows, one of the
10 narc guys said hey, I got a warrant.  It could have
11 been any time.
12     Q.   That's what I'm trying to find out.
13     A.   But I said that earlier.
14 MR. ANDERSON:  His question was: Is there
15 anything in here that tells you who got that phone
16 call?  In this paperwork is there anything that would
17 tell you who received the first phone call?
18 THE WITNESS:  No, that's what I'm saying.  If
19 you look at this page, that's the first documentation
20 of when we received hard information, hard
21 information.
22 MR. BOOKE:
23     Q.   All right.  So from looking at the SWAT
24 documentation, it cannot be determined who at SWAT
25 got the first contact concerning the Hinton matter?

HIXSON     74

1      A.   No.
2      Q.   And from looking at the SWAT paperwork
3  it cannot be determined when SWAT got the first
4  contact regarding the Hinton matter?
5      A.   Well, we know it wasn't after the 9th
6  because the recon was done on the 9th.
7      Q.   But all they know is that it was
8  January 9th or before?
9      A.   Correct.
10     Q.   But when we don't know?
11     A.   Correct.
12     Q.   And we don't know from the SWAT
13 paperwork who at the narc detail made the first
14 contact?
15     A.   Made the first contact?
16     Q.   Right, with SWAT?
17     A.   Well, that's not necessarily true.  If
18 we look at the request for SWAT search warrant,
19 usually the affiant, and I mean usually because he's
20 the one that has to swear to everything.  So if we
21 look at page 93.
22     Q.   But in fairness, I mean that's dated,
23 that is dated January the 16th, and we know there was
24 contact before January 16th; right?
25     A.   But the affiant is the investigating

HIXSON     75

1  officer and he could have been working on this case
2  one day, one month, one week.  In other words, the
3  affiant is the person that's got to contact us
4  anyway.  The affiant, he's the one that swears to the
5  search warrant.
6      Q.   So you would say from looking at the
7  affidavit that it's most likely that it was the narc,
8  Witham, whatever his first name is?
9      A.   Shane.  I haven't looked at it, but if
10 he's the affiant, most likely.  There are times where
11 we don't, maybe narcotics says hey, Shane Witham is
12 on vacation and the search warrant, which is only
13 good for ten days and is going to expire, I'm taking
14 over his investigation.  But it's already been signed
15 and usually they tell us something like that.
16         I don't recollect anything being said
17 so the odds, you know, the odds are that this is the
18 person who contacted us.
19     Q.   What is that ten day rule, by the way?
20     A.   That's rules for the how long the
21 search warrant is good for in the State of Nevada.
22     Q.   If you know, is that a statute?
23     A.   Well, that's what I was instructed, so
24 I'm sure it's got to be a statute somewhere.
25     Q.   Okay.

HIXSON     76

1      A.   It's got to be written somewhere.
2      Q.   Is it SWAT and Metro department policy
3  that search warrants are good for only ten days?
4      A.   If it's statute, then it's department
5  policy also.  We don't break the laws, try not to.
6      Q.   Is there a written department policy?
7      A.   Yes, that we won't break statutes, so
8  it's written.
9      Q.   And how do you understand that ten day
10 rule to operate, and what I mean is does the clock
11 start to run when the warrant is issued and ten days
12 thereafter?
13     A.   The warrant is dated, because the judge
14 signs the date, so it goes by the date, unless I'm
15 incorrect and you can correct me.
16     Q.   No, I'm asking you what you understand.
17     A.   I understand that the date it is
18 signed, and the date it is signed is right next to
19 the Judge's name.
20     Q.   So you understand that the clock on the
21 ten days starts to run at the time the warrant is
22 signed?
23     A.   That's correct.  Now I've had warrants
24 where the date has been crossed out by the judge
25 because they couldn't get ahold of him on that date,

## DEPOSITION OF DARRELL HIXSON

HIXSON    77

1  but he initialed that the date has been changed. But
2  usually it's typed out and it's next to where he
3  signs.
4      Q.   And to your knowledge is the time of
5  day also indicated when a warrant is signed?
6      A.   The warrant goes on the calendar date,
7  so I did a 24 hour period. When the date changes,
8  the date changes.
9          (Discussion off the record.)
10     MR. BOOKE:
11     Q.   Did SWAT videotape the search on the
12 Hinton house?
13     A.   Videotape? No, sir.
14     Q.   Was the search on the Hinton house
15 videotaped by anyone?
16     A.   No, sir, not to my knowledge.
17     Q.   Does SWAT ever videotape its field
18 operations?
19     A.   Not without the approval of lieutenant
20 and above.
21     Q.   When does SWAT, or under what
22 circumstances does SWAT videotape --
23     A.   You would have to ask the lieutenant
24 that.
25     Q.   All right.

HIXSON    78

1          (Discussion off the record.)
2          (Whereupon Deposition Exhibit
3          5 was marked for identification.)
4      MR. BOOKE: Back on the record then.
5      Q.   I'm handing you what is now marked as
6  Exhibit 5, and for the record, Exhibit 5 contains
7  what Lieutenant Graham identified as the documents
8  that would have been used by SWAT in the planning
9  phase of the Hinton search.
10         Recognizing that not all of the
11 information that is written in on some of the pages
12 on Exhibit 5 was written in before the search
13 occurred, some of it was written in on the pages on
14 Exhibit 5 after the search was conducted, with that
15 explanation, do you agree that that is what Exhibit 5
16 appears to contain?
17     MR. ANDERSON: Do you understand the question?
18     THE WITNESS: Uh-huh. Well, pages 73 to 84 are
19 interoffice, and they are stapled. This is a SWAT
20 warrant service planning, so these pages marked 73 to
21 84 are always stapled together. That is correct.
22 The pictures of the recon diagrams, and this was
23 taken in our briefing area, that is correct, that's
24 page 86. That's correct. That would be part of the
25 pre, even though some stuff on the other sheets were

HIXSON    79

1  written.
2      MR. BOOKE:
3      Q.   Okay.
4      A.   92, all the way to -- no. There should
5  be 21 pages here.
6      Q.   And I'll ask you about that. We're
7  going to go into that. But the purpose of this
8  particular question --
9      A.   You are still missing stuff.
10     Q.   No, I understand. But let me see if I
11 can ask you the question specifically enough so that
12 I can deal with your point.
13         Is everything that is contained in
14 Exhibit 5 information that SWAT did have during the
15 planning phase for the Hinton search, recognizing
16 that there may have been some additional information
17 sent to SWAT that is not contained in Exhibit 5?
18     A.   No, because in Exhibit 1 there's a
19 piece of paper that's not in Exhibit 5, and that's
20 part of the pre-planning.
21     Q.   Okay, that's precisely why I wanted to
22 ask you the question.
23     A.   If you give me Exhibit 1, I'll show it
24 to you. Let me make sure that what I saw is what I
25 saw.

HIXSON    80

1      MR. ANDERSON: Now just to make sure, this is
2  what Lieutenant Graham testified to.
3      THE WITNESS: I just wanted to make sure I
4  didn't see it. Let me make sure. No, it goes from
5  100, there's not 105.
6      MR. BOOKE:
7      Q.   You believe that page 105 would also
8  have been contained in the SWAT packet during the
9  planning phase?
10     A.   It has to. It's the recon diagram that
11 appears in the photo that's drawn up. They did, this
12 is the recon tablet they took with them. That's how
13 they got the drawing.
14     Q.   Okay.
15     A.   It has to be there.
16     Q.   All right.
17     A.   And I think there was one other. That
18 could have been done after. I'll have to look at it,
19 let's see. It was a picture that showed up, it might
20 have been a duplicate picture. Okay, it's just a
21 duplicate picture I was looking at. Yeah, that's the
22 only thing that you are actually missing.
23     Q.   All right. Give me one second and
24 we'll make a copy of this.
25         (Recess taken.)

## DEPOSITION OF DARRELL HIXSON

HIXSON    81

1  [Whereupon Deposition Exhibit
2  6 was marked for identification.]
3  THE WITNESS: Yes. All this is missing is
4  that.
5  MR. BOOKE:
6  Q. Okay. So you identified one additional
7  document that you believe was contained in the SWAT
8  packet during the planning phase and that was
9  document 105; correct?
10  **A. That's correct.**
11  Q. And we have now marked that as
12  Exhibit 6; is that correct?
13  **A. That's correct.**
14  Q. So between what is contained in
15  Exhibit 5 and Exhibit 6, that then would be the
16  information that was available to SWAT during the
17  planning phase for the Hinton search; is that
18  correct?
19  **A. That's correct, to the best of my**
20  **knowledge. In other words, there might have been a**
21  **scratch piece of paper that someone missed, but yes.**
22  Q. Okay, that's part of five.
23  Let's turn first to page 92 in
24  Exhibit 5, please.
25  **A. Okay.**

HIXSON    82

1  Q. Now, I just noticed myself this morning
2  that the cover page, which is page 92, indicates that
3  there are 21 pages transmitted with that fax and you
4  can tell from looking at the fax legend that only, I
5  think it's either eight or nine, eight pages are
6  included in this packet. Based upon looking at pages
7  92 through 99 of Exhibit 5, what is your best
8  judgment as to what the other 13 pages of that fax
9  are?
10  **A. After reading the bottom, I stopped on**
11  **Hallwood. After reading the other three lines where**
12  **it says notes on page 92, down at the bottom,**
13  **included in this fact it says application for 1919**
14  **Hallwood. Then it gives two other addresses, 2809**
15  **Wilmington and 6804, is it, or 6204 Agua. Like I**
16  **told you before, sometimes we'll do two, three search**
17  **warrants a day. It appears that the narcotics faxed**
18  **over on one fax transmission several other**
19  **information for search warrants and those being the**
20  **addresses listed below.**
21  Q. Did the red team of SWAT serve a search
22  warrant at 2809 Wilmington on January 16th, 2002?
23  **A. I would have no way of knowing without**
24  **looking at my records.**
25  Q. Did the red team of SWAT serve a search

HIXSON    83

1  warrant at 6204 or 6804 Agua on January 16, 2002?
2  **A. Same. I wouldn't have any way of**
3  **knowing without looking at the records.**
4  Q. Do you have any recollection at all of
5  the, of serving search warrants on the Wilmington
6  address or the Agua address on the same day that you
7  served the Hallwood address?
8  **A. The addresses are familiar, but I**
9  **wouldn't know. It doesn't ring a bell when I did**
10  **them.**
11  Q. Do you have the color photos of the
12  recon drawings?
13  MR. ANDERSON: Yes.
14  MR. BOOKE:
15  Q. Counsel has just given you, I think, a
16  color copy of what is page 106, I think it is -- or
17  is it 100 or 106?
18  MR. ANDERSON: These are the duplicates, these
19  are Bates stamped in the 80s, because -- which one
20  are you looking at?
21  MR. BOOKE: I'm sorry.
22  MR. ANDERSON: I'll be able to find it, okay.
23  It's 100 correlates to 86, 100 and 86 are the same
24  document, it's just that one is colored.
25  ///

HIXSON    84

1  MR. BOOKE:
2  Q. Counsel has just shown you a color
3  version of what is marked as page 86 in Exhibit 5.
4  Please take just a minute to look at those
5  photographs because I want to ask you some questions
6  about that and I'm going to come over and sort of
7  look over your shoulder because we have only one copy
8  of that.
9  **A. Okay.**
10  Q. Now, do all -- first of all, can you
11  tell me how those photographs come to exist?
12  **A. It's a digital camera and the recon**
13  **officers are responsible for photographing the**
14  **planning phase of it. So they took some photographs**
15  **of some of the diagram sheets and then they are**
16  **responsible for doing the interior diagram once we**
17  **are inside the residence and responsible for photos**
18  **of damage done to it, and we also photograph the**
19  **people usually.**
20  Q. Okay. Now the photographs that are on
21  page 86 of Exhibit 5, are these photographs that are
22  made of the recon drawings that are created during
23  the recon for the, or for a search?
24  **A. These depict drawings of different**
25  **stages of a briefing of a recon. In other words, you**

## DEPOSITION OF DARRELL HIXSON

HIXSON   85

1  see a sheet that has directions on it.  This is one
2  sheet, the other sheet could have the building, the
3  other sheet could have the line-up.  So these are
4  three separate sheets of paper with different
5  information on them.
6        Q.  Are they photographed at the time of
7  the briefing?
8        A.  They could be photographed after
9  briefings that we could do multiple warrants in a
10  day, we could photograph them later, we could have
11  multiple sheets up.
12        Q.  What's the common practice in terms of
13  photographing the, your drawing sheets?
14        A.  Just so we have a photograph of how the
15  plan was.
16        Q.  Okay.  Are all three of the drawings on
17  page 86 related to the Hallwood search?
18        A.  No.  Only two of them are.
19        Q.  What is the third one?
20        A.  That's, to the best of my guess, I
21  don't know.  It could be Agua, because I see it's
22  written down up here up at the top of the corner.
23  All I know it's not related to Hallwood because it
24  shows the line-up, and if you go to Exhibit 5 on page
25  76, you can see the line-up that's depicted on the

HIXSON   86

1  exhibit, what is this, 100?  86.
2        MR. ANDERSON:  86.
3        THE WITNESS:  It shows a breach line-up of
4  Gavin, John, Vic and Manny.  And it shows the line-up
5  on page 76 that I made for -- if I get the addresses
6  right, the Hallwood addresses.  It's a different
7  breach line.  So obviously this picture that we're
8  looking at is of a different address.  It's not of
9  the Hallwood line-up.
10        MR. BOOKE:
11        Q.  So it's part of a briefing for a
12  different search?
13        A.  That's correct.
14        Q.  And just for the record, the different
15  search and the different line-up you are talking
16  about is depicted in the lower right-hand corner.
17  It's the photograph in the lower right-hand corner?
18        A.  Yes, it is.
19        Q.  My copy of the photograph is not so
20  great, but you hang on to it because I want to ask
21  you, are any of the SWAT people who were involved in
22  the briefing for the, whatever search it is shown in
23  the lower right-hand corner of page 86, also involved
24  in the Hallwood search?
25        A.  Well, yes.  I can go over the line-up

HIXSON   87

1  and see if I see the names, but I'm sure they were.
2  And they are in different positions, different
3  responsibilities, but I see several names, if you
4  want me to --
5        Q.  Yes, because I can't read them on my
6  copy.  So who was involved in the Agua?
7        A.  We can call it Agua, for reference.
8        Q.  If you look at the photograph, that's
9  what it appears to be?
10        A.  It's also rear containment street, but
11  yeah.
12        Q.  Who was involved in the Agua search?
13        A.  If you want me to write, to give the
14  line-up, the breach was -- I'll say it as it appears.
15  Gavin, the shok-lok was John, the ram was Vic, the
16  back-up shok-lok was Manny.
17        MR. ANDERSON:  Could you give last names?
18        THE WITNESS:  Well, you told me to do it off
19  the photograph.
20        MR. BOOKE:
21        Q.  You are absolutely right, I did.
22        A.  The breach team again is Gavin Vesp;
23  the shok-lok is John Sheahan; the ram is Vic Dumas;
24  the back-up shok-lok is Manny Rivera; the entry team
25  is Dave Reid, as number one; number two is, it looks

HIXSON   88

1  like Kevin Warren with the shield; number three is
2  Darrell Hixson; myself; number four is Carlos Acosta;
3  number five is Mark Fowler; number six is Allen
4  Williams; and number seven in the line-up, and it
5  looks like he might have a bullhorn, can't quite make
6  out the initials, would be Sergeant Graham.
7        On the one-two distract team is Jess
8  Kegley, and with him on the one-two team is Pat
9  Ledbetter.  On the one-four containment distract team
10  is Bob Montes on the shield, number one; number two
11  is Joe Emery; our tactical medic is Officer Clint
12  Malburg; and our doc, he's an actual M.D., is Doc
13  Tom; and we have two Doc Toms and I don't know which
14  one it was on this -- oh, I'm sorry, we have rear
15  containment Officer Jacoby and undisclosed K-9
16  officer, just a K-9 officer.
17        Q.  You mentioned shield, as an officer
18  being assigned to the shield.  What shield are you
19  referring to?
20        A.  It's a ballistic handheld shield about
21  48 inches tall and about two and a half, three feet
22  wide.
23        Q.  Based on the fact that those drawings
24  for those two different searches appear on the same
25  piece of paper, would you think it's most probable

DEPOSITION OF DARRELL HIXSON

HIXSON    89

1  that those searches both occurred on the same day?
2       A.  No, this comes off a disk and I don't
3  know the sequence of the pictures.  It could have
4  been, because the disk holds up to 20, 30, 40
5  pictures, and I don't know how it was taken, how it
6  was printed out, and the machine obviously prints
7  three pictures at a time.  Maybe it was at the
8  beginning one, beginning of another.  I have no idea
9  of knowing.  If I had the dates of what we did
10  Agua -- maybe it's on that sheet of paper.  I could
11  tell you for sure.
12       Q.  That was going to be my next question
13  is whether there's something on that paragraph that
14  tells you when the Agua search was conducted?
15       A.  But the camera that we use is the
16  computerized disk, I think at the time it was the
17  floppy disks.  We have memory sticks now and it holds
18  quite a few pictures and we don't print them, it
19  could be busy.  It could be two, three days later.
20  So he could have forgot to cut this out and I don't
21  see a date on the lower right-hand corner drawing
22  that I have been describing that shows a date on the
23  line-up sheet there.
24       (Whereupon Deposition Exhibit
25       7 was marked for identification.)

HIXSON    90

1  MR. BOOKE:
2       Q.  Thank you.  I would like to show you
3  next what's marked as Exhibit 7.  It's four pages
4  that are marked LVMPD 000018, 19, 20, and 21.  Take
5  just a minute and look at that.
6       A.  Okay.
7       Q.  Do you recognize generally what type of
8  document that is?
9       A.  Well, it's an incident crime report.
10       Q.  Have you seen that kind of document
11  before, not this specific one, necessarily, but that
12  type of document?
13       A.  Yes, I have seen it before.
14       Q.  And what generally is that type of
15  document?
16       A.  This is used to report a crime, usually
17  patrol will -- patrol or detectives will have an
18  incident and they'll fill out the incident crime
19  report and it displays what kind of crime, who is the
20  victim, who is the suspect, the offenses and stuff.
21       Q.  All right.
22       A.  It's done by a detective or patrol
23  officer.  The one I did, I haven't been in patrol so
24  they have changed, so I don't fill this out, but this
25  is the newer form that they use.

HIXSON    91

1       Q.  I would like to open Exhibit 5 here to
2  page 98, which is a part of the affidavit in support
3  of the Hinton search warrant.  Do you see that?
4       A.  Page 98, yes.
5       Q.  Would you look at the first full
6  paragraph that appears on page 98 of that affidavit,
7  just take a second to read that, if you would.
8       A.  Okay.
9       Q.  Do you understand there to be any
10  connection between that first full paragraph on page
11  98 of Exhibit 5 and the incident report that we have
12  now marked as Exhibit 7?
13       A.  Well, according to what I read on 98,
14  this person named Hinton is telling -- let's see, is
15  telling a confidential informant that they did a
16  controlled buy together and they exchanged money for
17  the plastic bag containing a white substance,
18  crystalline substance.  And then Hinton told him he
19  had done two separate robberies.  So when I start
20  reading Exhibit 7, which is dated, according to the
21  LVMPD event number, 12/29 of 2001, and then on page
22  21 of Exhibit 7 it says on Friday 12/29 this victim
23  stated -- it looks like the story is going to
24  correlate to the incident that happened here at Pecos
25  and Tropicana at the Bank of America.

HIXSON    92

1       Q.  Right.
2       A.  It looks like maybe the stories might
3  be the same guy, might be the same story, okay.
4       Q.  Right.  Now looking at Exhibit 7, could
5  you -- just based on your own police training and
6  experience, look at Exhibit 7 and state for the
7  record your best description of the individual or
8  individuals who are believed to have committed the
9  crime that is described in Exhibit 7, give a physical
10  description, if you can, based on Exhibit 7, give a
11  physical description of the person who committed the
12  crime?
13  MR. ANDERSON:  I'm going to object that the
14  document speaks for itself.  Go ahead and answer.
15  MR. BOOKE:
16       Q.  And I'm asking him as a police officer
17  to interpret it.
18       A.  The suspect?
19       Q.  Yes, the suspect or suspects.
20       A.  The suspect is listed as unknown,
21  height 5'3"; weight, 150; age, 20; race, H, usually
22  stands for Hispanic; hair color is black.  And that's
23  all that's listed on the suspect.
24       Q.  Okay, and if you look over on the next
25  page, is there another suspect listed there?

HIXSON   93

1      A.   On page 19 we have a person number four
2  is listed as a suspect, that's people contacted.  So
3  I guess this is number four, supposedly was there, is
4  called a suspect, unknown, unnamed, 5'5"; 150; age is
5  20; sex is male; race is H for Hispanic; hair color
6  is black.  He has some shirts, I don't think I read
7  the shirts and stuff.  Grey shirt, hooded sweater and
8  black pants.  On the preceding page, if I didn't
9  notate the suspect's clothing, off the page 18, it's
10  grey shirt, sweater, with a hood again and black
11  pants.  Sounds like the same description.
12      Q.   Okay, so from looking at Exhibit 7,
13  based on your experience as a police officer, would
14  you understand that the suspect believed to have
15  committed the crime described on Exhibit 7 is five
16  foot three inches, 150 pounds, Hispanic with black
17  hair?
18      A.   Based on my police experience?
19      Q.   Yes.
20      A.   That that's a possibility.
21      Q.   Okay.  And based on that same
22  experience would you say that the another suspect in
23  that same robbery may be five foot five, 150 pounds,
24  Hispanic with black hair?
25      A.   That's another possibility.

HIXSON   94

1      Q.   And that possibility is what Exhibit 7
2  would lead you to believe?
3      A.   Yes, it would.  Exhibit 7 would lead me
4  to believe.
5      Q.   All right.  Did SWAT have Exhibit 7
6  before the time of the search of the Hinton house?
7      A.   No, this is the first time I have ever
8  seen this Exhibit 7.
9      Q.   Do you see that up in the upper
10  left-hand corner of page 18 that this document was
11  printed on 1/11/02, 2129 hours?
12      A.   Yes, I do.
13      Q.   And the Hinton search occurred on
14  January 16th, 2002, five days later; correct?
15      A.   Yes -- well, this is 111 -- yeah, five
16  days later.
17      Q.   The first entry there at the top left
18  of page 18, does that identify a person, that
19  designation, does that identify somebody, P4351P?
20      A.   It would only be a guess, yes.
21      Q.   Recognizing that it's a guess?
22      A.   The only reason I think it's a guess is
23  I have never filled out these new forms, but usually
24  you go by your initial, P number, first initial P
25  number, last initial and any time you get into a

HIXSON   95

1  computer you have to log on to it.  So it's possible
2  that this first identifier is a person's first name
3  is P, their department identification department,
4  which we call a P number, is 4351 and the last
5  initial begins with a P.  So it's possible that this
6  is an employee of the police department who logged on
7  to retrieve this and she probably, he or she is
8  probably in records.  That would be just a guess.
9      Q.   Okay, I appreciate the help with that.
10      Now -- excuse me, is the information
11  that is contained on Exhibit 7 something that would
12  have been accessible by SWAT in January of 2002?
13      A.   Anything that's dated after the date of
14  a warrant, anything would be accessible to us if it's
15  in the computer system, which this evidently is, so
16  anything is accessible to us.
17      Q.   Well, Exhibit 7 is dated January 11,
18  2002 which is five days before the warrant?
19      A.   Right.
20      Q.   Would Exhibit 7 have been accessible to
21  SWAT prior to the time SWAT conducted the search at
22  the Hinton residence?
23      A.   Since it's in the computer, yes.
24      Q.   Did SWAT search for any incident
25  reports involving any of the persons -- I'm sorry,

HIXSON   96

1  I'll withdraw the question.  You've already answered
2  it.
3          (Whereupon Deposition Exhibit
4          8 was marked for identification.)
5      MR. BOOKE:  It's 33 and 34, and I didn't make
6  enough of them.
7      MR. ANDERSON:  That's fine, I have copies.
8      MR. BOOKE:
9      Q.   I want to show you now what's marked as
10  Exhibit 8, which consists of two pages that are
11  marked LVMPD 33 and 34.  Do you recognize this form
12  or type of document?
13      A.   Yes, this is a type of scope printout.
14      Q.   This is, in fact, a scoping printout?
15      A.   Yes, it is.
16      Q.   And do you see down in the lower
17  left-hand corner of both pages that there's a date
18  and time registered there?
19      A.   Yes.
20      Q.   Based on your experience, is the date,
21  January 3, 2002, that appears on both pages 33 and
22  34, would that be the time it was printed?
23      A.   Yes.
24      Q.   And you have testified that SWAT did
25  not have Exhibit 8 or the documents contained in

DEPOSITION OF DARRELL HIXSON

HIXSON   97

1  Exhibit 8 in its packet at the time it was planning
2  the Hinton search; correct?
3      A.   That's correct.
4      Q.   As you look at Exhibit 8, are you, and
5  I want to ask you, and please, I'm not being a smart
6  aleck here, are you able to interpret what appears on
7  pages 33 and 34?
8      A.   Some of it.  Some of it is the jargon
9  I'm not familiar with.
10     Q.   Are you trained to recognize what these
11 designations are for purposes of being able to know
12 what a scoping report means?
13     A.   Some of it, and if I can't, then I can
14 call records and they, then I have the capability of
15 them answering my questions.  So some of it I
16 recognize, some of it I don't.
17     Q.   One thing I would like to ask you is
18 whether there is anything on this scoping report that
19 tells you the outcome or the disposition of any of
20 these charges that are listed here?
21     A.   Let's see, the disposition?  There's a
22 citation, I recognize, there's summons, there's a
23 traffic -- no, I don't think it shows the
24 disposition.  There's released on own reconnaissance,
25 there's some citations, there's some traffic,

HIXSON   98

1  probably a few citations.  I don't see anything that
2  says conviction, you know, must register, things like
3  that.  No dates of prison, you know, Nevada State
4  Prison time, nothing like that.  Nothing that I
5  recognize as any convictions.  These are all arrests
6  or citations or he's a victim of something, like a
7  traffic collision.
8      Q.   Just as a hypothetical question, from
9  what you read on Exhibit 8, could it be that the
10 person who is identified here was not convicted of
11 any of these charges?
12     A.   From just my knowledge, it's a
13 possibility.  Yeah, sure.
14     Q.   All right.  Now I want to show you one
15 more document.  Will you mark this as next in order.
16     (Whereupon Deposition Exhibit
17      9 was marked for identification.)
18 MR. BOOKE:
19     Q.   I would now like to show you what's
20 marked as Exhibit 9, which consists of three pages
21 that are marked as LVMPD 00005, 6 and 7.  And I hand
22 those to you.  Please take just a moment to look at
23 those, if you would, please.
24     A.   Okay.
25     Q.   Do you recognize what generally

HIXSON   99

1  Exhibit 9 contains?
2      A.   Yes, something I don't work with very
3  often.  This looks like vehicle registration
4  information, possibly from DMV, and another scope
5  printout.  The scope printout would be page seven,
6  DMV looks to be pages five and six.  It looks like
7  driver's license status and vehicle registration, I
8  think, yeah, vehicle registration, and it looks like
9  driver's license status -- no, it was just the
10 vehicle.  It's a Saturn.
11     Q.   Do pages five and six have anything to
12 do, so far as you can tell, with the Hinton search?
13     A.   I would have to check the sheet to see
14 if they listed vehicles, suspect vehicles and things
15 like that, but off the top of my head, it doesn't
16 mean anything to me.
17     Q.   Okay.  Do you see that those documents
18 are time stamped, I think down in the lower left,
19 January 4, 2002?
20     A.   Yes.  All three of them are, 1/4 of
21 2002.
22     Q.   What is it that you would refer to in
23 the SWAT packet that would tell you whether there was
24 any connection between Exhibit 9 and the SWAT packet?
25     A.   It would be the search warrant, if they

HIXSON   100

1  were listing vehicles involved in it, and also the
2  cover sheet, the SWAT search warrant cover sheet
3  would tell us if there's vehicles involved
4  specifically and the reasons why the vehicles are
5  important.
6      Q.   Okay.  All right, thanks, I'm pretty
7  sure there's nothing on any of those things.
8      (Whereupon Deposition Exhibit
9      10 was marked for identification.)
10 MR. BOOKE:
11     Q.   I want to show you now what I've marked
12 as Exhibit 10, which is a document that I've created
13 for the purposes of the deposition.  It's a part of
14 page 71 that was produced by LVMPD, but you can see
15 I've redacted all but a couple of paragraphs on page
16 71.  Do you see that?
17     A.   Yes.
18     Q.   And you can see that it's taken from
19 your report, which is pages 71 and 72 of Exhibit 1;
20 correct?
21     A.   That's correct.
22     Q.   Now the reason that I redacted and just
23 left a couple of paragraphs there is because I just
24 want to focus on the paragraphs that appear on
25 Exhibit 10.  You are the author of paragraph, or

## DEPOSITION OF DARRELL HIXSON

HIXSON   101

1  these two paragraphs?
2      A.  Yes, I am.
3      Q.  You are the one who chose the words
4  that appear there?
5      A.  Yes, I am.
6      Q.  In writing those two paragraphs were
7  you trying to accurately and truthfully describe the
8  thought process that went into planning the search on
9  the Hinton house?
10     A.  Yes.
11     Q.  I would like you to look, please, at
12  the second sentence in the first paragraph that says
13  "suspects were Hinton, David - I.D. 1528967, with
14  priors for burglaries, CCW, possession, unregistered
15  firearms and two counts of PCS."  Do you see that?
16     A.  Yes, I do.
17     Q.  What is your source of information for
18  that sentence?
19     A.  My source of information is -- we'll
20  use Exhibit 5.  I think it was in Exhibit 1 also,
21  page 93.  This came from, got to us on the 16th, as
22  we've talked about before.  It's from a detective
23  requesting Detective S. Witham, P 4594.  He lists the
24  suspects, and suspect -- I guess that's a grammatical
25  error -- as Hinton, David, which I have listed here

HIXSON   102

1  on my report on page 71, and Hinton, David, ID number
2  is listed 1528967, that's what I have listed.  We go
3  back to the request, and it says priors -- it doesn't
4  say conviction -- it's probably burglary, CCW,
5  possession unregistered firearm, and two counts of
6  PCS, and that's what I have written here.  Down here
7  it says "suspect possible suspect in three recent
8  robberies" and then I list the same thing, though the
9  information showed it could be -- notes, also says
10  suspect possible suspect in three recent robberies.
11  So the information I put in my report is the exact
12  information I received from Detective Witham, so I
13  didn't create it.
14     Q.  That appears on page 93?
15     A.  Correct.
16     Q.  And that's the only source of
17  information that you had; is that correct?
18     A.  That's correct.
19     Q.  Now as you read page 93 that you got
20  from Detective Witham, do you read that to mean that
21  David Hinton has been convicted of burglary, CCW,
22  possession, unregistered firearms and two counts of
23  PCS?
24     A.  I don't read it to be anything other
25  than what it says.  It doesn't say conviction in

HIXSON   103

1  there, so I can't read into it.
2      Q.  When you wrote on your report on
3  Exhibit 10 that David Hinton has "priors for
4  burglary, CCW, possession unregistered firearms and
5  two counts of PCS," did you mean that he was
6  convicted of those crimes?
7      A.  No, I would have put prior convictions.
8  It just says priors.
9      Q.  What did you mean by priors?
10     A.  Prior arrests.  You have to have the
11  arrest first, so I use the term priors.  You can't
12  have a conviction before arrest, so I use the term
13  "priors."  If there's a conviction, then I'll say he
14  has priors for and convicted of.  This says exactly
15  what it says, "priors."  It doesn't say arrests or
16  convictions.  So for you to understand what I'm
17  saying, when I say priors, that means arrests to me.
18  So I'll clarify, if it says convictions, and plus I
19  wrote it down exactly how it was written here.  It
20  doesn't say convictions, it just says arrests.
21     Q.  If David Hinton was not convicted of
22  any of the charges listed on Detective Witham's
23  report, would you note that fact on your report?
24     A.  That's not necessarily -- I'm not an
25  investigative officer, you have to understand that.

HIXSON   104

1  I'm not the investigator, I'm the support service.
2  He has to note that.  That's why we have the request.
3  This way I don't read into it.  He's the one that's
4  ultimately responsible for the investigation, I am
5  not.
6          So I am dictating until I get to the
7  facts where I'm actually the involved officer, in
8  other words, when we actually serve the thing and
9  things that I do I have to report, he wouldn't report
10  what I did, unless I gave him a report.  So I write
11  down what he writes down.  If I have records,
12  remember I told you we might take a scope printout.
13  If I had that in my hand I might look at that and
14  say, and scope shows that he's convicted of driving
15  recklessly or something.  So I didn't have that
16  information.  I wrote the information that I had from
17  the investigator onto the beginning part of my story,
18  which accurately depicts the information I received.
19     Q.  When you were doing the planning to
20  conduct the Hinton search, did you believe that David
21  Hinton had been convicted of the crimes that are
22  listed on Sergeant Witham's transmittal to you?
23     A.  Well, if you keep reading down here it
24  says though the information shows that it could be a
25  Class Four, and I talked to you earlier that we can

## DEPOSITION OF DARRELL HIXSON

HIXSON     105

1  reduce and direct that classification up or down, and
2  we did not have definite history on David Hinton
3  showing a history of violence, because part of the
4  classifications, as you can see, are listed on page
5  93. You can read what it entails, so you know what
6  it entails. I couldn't confirm that, so I didn't
7  want to, and neither did Sergeant Graham call it a
8  Class Four. So we called it a Class Three, since we
9  couldn't confirm it.
10           We were being reasonable in looking at
11 what we had given to us by the investigators and what
12 decision we had to make. And we went to the side of
13 safety, in other words, backing off. We didn't
14 progress more aggressively to enter. We backed away
15 to enter, which is reasonable. We took a step back
16 because, and it says in my report we couldn't confirm
17 showing a history of violence. Number four states,
18 suspect on page 93. I'm reading: "Suspects have a
19 history of violence, known to be armed and highly
20 dangerous and area is likely to be heavily
21 fortified." It is fortified, that's a fact. We saw
22 the recon, but we couldn't confirm the other
23 criteria, so we backed off a little bit.
24           I didn't go to a two, just because he
25 hasn't been convicted of a CCW. He must have had a

HIXSON     106

1  gun on him to get arrested for it, so I still thought
2  this guy could have guns, so we didn't go to a two,
3  we backed off one step to a three.
4        Q.   The fact of the matter is that when you
5  were planning the Hinton search you had no
6  information whatsoever about what happened with any
7  of David Hinton's criminal background, other than
8  just what Detective Witham wrote down; correct?
9        A.   Well, also --
10       Q.   Is that true?
11       A.   The criminal background?
12       Q.   Yes.
13       A.   That's true. Exactly what's written
14 down here, that's true.
15       Q.   All you knew about David Hinton's
16 background was what is written on page 93?
17       A.   And technically it was written where
18 his name is. This is just an assumption down lower.
19 I was going to help you out on that one. Let's go up
20 here, because I knew he had to pull that off a legal
21 document, unless he made it up, which I had no reason
22 to believe that he did. So I knew additional
23 information wasn't confirmed. It wasn't an arrest,
24 it was a possible. This is something he had been
25 arrested for, and since he didn't write down

HIXSON     107

1  conviction, he didn't?
2        Q.   When you did your planning to conduct
3  the Hinton search, did you believe that David Hinton
4  had committed the crimes that are listed on page 93
5  by Detective Witham?
6        A.   Are you talking about where it's just
7  under his name or the additional information?
8        Q.   Yes, just under his name.
9        A.   You bet. Like I told you earlier, I
10 have no reason to doubt an officer's honesty, and
11 this is information he's given me. So I have no
12 reason to doubt it. I have dealt with him before and
13 I have dealt with him prior.
14       Q.   Okay, please don't misconstrue my
15 question. I'm just trying to determine what your
16 state of mind was, what assumptions you were making
17 at the time you did the planning and --
18       A.   I'm making the assumption that if
19 Officer Witham says he's had a burglary arrest, a CCW
20 arrest, anything written in that document is true. I
21 have no reason to doubt it, so I wouldn't doubt the
22 address, but I'll go and confirm it. If I had a
23 chance to confirm like a scope printout, but I said
24 he must have got this from scope, so there's no
25 reason. I know he couldn't confirm this, he's

HIXSON     108

1  telling me it's possible. He's telling me I'm not
2  saying it's the guy, but it's something to consider.
3  So we considered those things, we considered
4  everything.
5            So everything on this page I took him
6  for his word. I took him for his word that he's only
7  a possible suspect, because it says possible.
8        MR. ANDERSON: Just to be clear, where you say
9  you considered, that's the part under the additional
10 information section?
11       THE WITNESS: Yes.
12       MR. BOOKE:
13       Q.   In doing your planning to conduct the
14 Hinton search you considered the information that
15 Detective Witham wrote in about burglary, CCW,
16 possible -- I'm sorry, possession, unregistered
17 firearm and two PCS; correct? You considered that?
18       A.   Yes. Yes, sir.
19       Q.   And you considered what Detective
20 Witham wrote: "Suspect also possible suspect in
21 three recent robberies." You considered those
22 things?
23       A.   I considered those things.
24       Q.   Did you do anything to verify whether
25 it was true or correct that David Hinton had

## DEPOSITION OF DARRELL HIXSON

```
                                      HIXSON  109
1   committed a burglary, CCW, possession, unregistered
2   firearm or two PCS's?
3        A.   No, because that's the information that
4   comes off the scope, so I did not do that.
5        Q.   Okay.  And in fact, now you have seen
6   the scope; correct?
7        A.   Yeah.
8        Q.   That would be Exhibit 8?
9        A.   Uh-huh.
10       Q.   And you are not able to determine
11  anything from Exhibit 8 as to whether David Hinton
12  has been convicted of any crimes?
13       A.   It doesn't say conviction on either of
14  them.
15       Q.   Right?
16       A.   Right.
17       Q.   So for all you know from Exhibit 8,
18  David Hinton, all those charges could have been
19  dismissed?
20       A.   Well, I knew that they were either
21  pending or dismissed because there was no convictions
22  listed on page 93 of his report, so I assumed that he
23  wasn't convicted.
24       Q.   Okay, from your point of view as the
25  SWAT officer planning a search, if Detective
```

```
                                      HIXSON  110
1   Witham -- I'm sorry, let me withdraw that question.
2        From your point of view as a SWAT
3   officer planning a search, if the suspect had been
4   convicted of any crimes you would expect to see that
5   conviction written out on the request for SWAT
6   warrant service?
7        A.   I would expect the investigator to give
8   me the details, if the details were important enough
9   that he said that it's a conviction, then I expect it
10  to be there.  Do I check to see if he's done his job
11  properly?  No.  So I can only assume, and that's what
12  we said here.
13       We didn't assume the other way, we
14  assumed that we couldn't have definite history on
15  him.  We assumed that these were just arrests.  So I
16  never assumed that they were convictions in the first
17  place.  So you are assuming that I assumed they were
18  convictions.  I did not assume they were convictions
19  and you even know so because I stated it in my report
20  since I could not have definite history, that's
21  a definite history -- I'm reading off my report on
22  David Hinton showing the history of violence, in
23  other words, convictions, violence, then we went the
24  other way with this warrant, we backed off.
25       Q.   Okay.  When you were doing your
```

```
                                      HIXSON  111
1   planning for the Hinton search you knew that David
2   Hinton did not have a history of violence?
3        MR. ANDERSON:  Objection, misstates testimony.
4   Go ahead.
5        THE WITNESS:  I knew that.  That's why in my
6   report I wrote it and I knew it from looking at this.
7        MR. BOOKE:  Okay.
8        Q.   Okay.
9        A.   So we didn't go with a Class Four.
10       Q.   Good.
11       (Noon recess taken.)
12       MR. BOOKE:  Back on the record.
13       Q.   The camera that is used to make the
14  photographs of drawings that are used in the
15  briefing, does that camera have a date and time stamp
16  on it?
17       A.   No, it's just a digital.  It's not a
18  videotape that has a memory, to my knowledge it
19  doesn't.  And that camera that we used then has
20  broken and we've long since gotten another one.  So
21  that was with the old floppy disk and now we use the
22  one with the little small -- to my knowledge, it
23  doesn't have a date and time.
24       Q.   Are the photos logged in in any way?
25       A.   No, they are just -- we just take the
```

```
                                      HIXSON  112
1   photographs and they put them on the printer, print
2   them out and put them in the, on my desk into the
3   packet that I go through and dictate.
4        Q.   Are the photos downloaded into any
5   electronic file?
6        A.   No.
7        Q.   What are the closest cross streets to
8   1919 Hallwood?
9        A.   I would have to look.
10       Q.   Can you tell me without looking at
11  anything?
12       A.   No.
13       Q.   We talked about different classes of
14  search warrants.  You recall that we started that
15  discussion?
16       A.   Uh-huh.
17       Q.   Who is it at Metro or the District
18  Attorney's Office or SWAT or the court or wherever it
19  is who decides into what class a particular warrant
20  will be designated for service?
21       A.   You mean how did they come up with it
22  or who decides in SWAT?
23       Q.   The latter, who decides in SWAT, if
24  it's SWAT.  I don't know whether it's SWAT or not.
25  My question is who is it who decides what the class
```

DEPOSITION OF DARRELL HIXSON

SHEET 29   PAGE 113

HIXSON   113

1 of warrant designation will be?
2       A.   The investigating officer is the one
3 that does the check mark on that classification.
4       Q.   And who makes the final decision about
5 what class a warrant for a particular search will be?
6       A.   Well, if we're serving it, that would
7 be a supervisor, my sergeant.  I mean I can recommend
8 changing it, but he would ultimately say yes or no.
9       Q.   Is there any review by any higher
10 authority than the SWAT sergeant before a search
11 warrant is executed on the decision as to what class
12 the warrant will be designated?
13       A.   Yes, the sergeant can actually examine,
14 it's happened on a few occasions, go to the
15 lieutenant, and they can discuss the whole parameters
16 of the search warrant, decide whether to change it or
17 not.
18       Q.   When is the sergeant required to get
19 the lieutenant's review on the class designation of a
20 warrant?
21       A.   He's not required.  That's up to his
22 discrepancy, whether he wishes to talk to the
23 lieutenant, and I'm sure the sergeant could expound
24 more upon those, but there's nothing that's required
25 of him, unless he feels they need to talk.

PAGE 114

HIXSON   114

1       Q.   Is there any written information in the
2 SWAT manual about how to designate the class or
3 classification of a warrant?
4       A.   Well, the how-to are self described in
5 the classifications themselves.  I mean they give you
6 the guidelines to determine that.  The guidelines are
7 already there and that was made up by our legal
8 department.  You would have to contact them, but it's
9 self-explanatory.  If they have a history of this,
10 it's this; if they don't, it's that.  It's
11 self-explanatory in the classification.
12       Q.   Does the class of search warrant affect
13 what method or techniques are used in executing the
14 search warrant?
15       A.   Yes, they do, sure.
16       Q.   I'll let you explain that answer, but
17 before you do, let me ask you one thing.  Is any
18 description of how the classification of a warrant
19 affects the techniques or methods used in executing
20 the warrant written down anywhere?
21       A.   No, there's nothing written down of how
22 to do it.  To make this simpler for you, I know what
23 you are saying.  No, there's nothing written down and
24 then I'll go from there.
25       Q.   Yes.  Then explain -- well, let me ask

PAGE 115

HIXSON   115

1 one other preliminary question.  Does the class or
2 classification, whatever it is you call it, the class
3 or classification of a warrant, does that affect
4 SWAT's planning for executing the warrant?
5       A.   Oh, sure.  Yes, it does.
6       Q.   Explain how the class of warrant
7 affects the methods or techniques and planning that
8 SWAT uses in executing a search warrant?
9       A.   The classifications themselves affect
10 the warrant in this way, it doesn't affect how we
11 might breach the door.  If the door is locked, we're
12 going to use a ram to open it.  But if you back away
13 from the classifications and go back to Class One
14 versus Four, what it allows is, and I talked about it
15 earlier, a complete knock and announce where you were
16 absolutely not breaching anything, you are holding on
17 the outside, you are announcing yourselves for the
18 time.
19       The classifications basically affect
20 the time lapse, to be reasonable in announcing
21 ourselves because what we are talking about in Class
22 One's and Two's is you definitely have to knock and
23 announce and wait.  You cannot breach that interior
24 of the house because you are not being reasonable in
25 the classifications of the warrant.  It would be

PAGE 116

HIXSON   116

1 unreasonable to get up there and give five seconds
2 and ram the door.
3       So the classifications as we use them,
4 it really determines how long we're going to sit
5 outside, because it has to do with safety, it has to
6 do with a recovery of the evidence.  So the longer we
7 stand out there, if they are armed and violent, the
8 more danger we're in, the more danger the public is
9 in, because we don't evacuate.  I have been in four
10 shootings in my SWAT career and bullets fly out of
11 the house and they if they don't hit us, they're
12 going down the block, and so the public is in danger
13 then.  So not only are we in danger standing out
14 there, so is the public.
15       So what we try to do in the
16 classification is to determine, we have a
17 determination that we have to be only in with the people
18 inside, we have to tell them who we are, we have to
19 be reasonable, as far as how long we're going to
20 stand out there and put ourselves at risk, and we
21 have to be reasonable to the surrounding area around
22 us.
23       So that's why we want to know about the
24 history and that's why the classifications were made.
25 I don't know how they were made, but the important

DEPOSITION OF DARRELL HIXSON

HIXSON   117

1  thing is what you are after, and what I think you are
2  after, or what I'm going to tell you is how long we
3  knock and announce, we're still going to ram a door.
4  Whether it's a One or a Four, we use a ram to open
5  it.
6       Q.   Unless somebody opens it?
7       A.   Right, unless somebody opens it, and
8  sometimes they open it and they try to close it and
9  we still ram the door.  So those things happen, but
10 we're going to stand out there and definitely not
11 touch that door.  We can't break a window, we can't
12 do anything that goes inside the house until we have
13 given that reasonable amount of time, and in the One
14 we're standing out there.  In a Four we're not out
15 there very long.
16      Q.   So as I understand your testimony, the
17 classification of a warrant affects the amount of
18 time that you allow to lapse between when you give
19 notice that you are there, your knock and announce,
20 and when you breach, force entry into the premises?
21      A.   You notice how it's the first thing on
22 the thing.  That's the first thing that will affect
23 us.  The other thing are things like children
24 present.  I mean that's the very first thing that we
25 take into account, what classification and then

HIXSON   118

1  things like that children are present, that's a big
2  one.
3           If it's a Class Three and there's
4  children present, guess what, we're still standing
5  out there taking our time.  So that's the first
6  thing.  So we take into account, so the
7  classification, then all these little checks and
8  boxes that you see here.  They have dogs, does it
9  have kids?  Is it fortified?  Is it a business?  You
10 know, those kinds of things are taken into account
11 also.
12      MR. ANDERSON:  Just for the record, you are
13 referring to page 93?
14      MR. BOOKE:
15      Q.   The sort of narrow question that I'm
16 asking you is what methods or techniques of executing
17 a search warrant are affected by the classification
18 of the warrant, and what I hear you to be saying is
19 that the amount of time you will wait before forcing
20 entry is what is affected by the classification of
21 the warrant?
22      A.   That's the major portion of it, yes.
23      Q.   That's one thing that affects the
24 length of time that you wait?
25      A.   Yes.

HIXSON   119

1       Q.   There are other things that also affect
2  the length of time?
3       A.   But not as big, except for the
4  children.
5       Q.   And then I think you said with a Class
6  One or Class Two warrant I think your words were
7  "we're definitely going to knock and wait;" is that
8  correct?
9       A.   That's correct.
10      Q.   When you say "we're definitely going to
11 knock and wait," how does that translate in terms of
12 time?
13      A.   We talked about this earlier.  Right
14 now the Supreme Court is trying to decide what is
15 reasonable.  15 seconds, and you are in the shower?
16 I think we talked about it before.
17           We're trying to be reasonable for
18 anyone to answer the door in a reasonable time, which
19 is why the recon officers go out and tell me it's a
20 large house, it's a small house.  Like I said, if
21 it's a trailer, that's the supreme smallness.  If
22 it's a single wide trailer, if the guy doesn't answer
23 the door within 15 seconds of a Class One, we're
24 being reasonable.  He should be able to answer the
25 door.  If it's a two-story house, we've got to give

HIXSON   120

1  them more than 15 seconds to answer the door, if you
2  have to come from upstairs.  That's why the recon is
3  part of the process.  So I can't give you an exact
4  time and no one has yet.
5       Q.   What information is the person who
6  makes the designation of the class of warrant
7  supposed to get before making the designation?
8       A.   One more time.  I just didn't follow.
9       Q.   What information should the person who
10 is designating the class of warrant get in order to
11 make the designation Class One, Class Two, Class
12 Three or Class Four?
13      A.   It would be like on this one, Detective
14 Witham is the investigating officer, so he should
15 know because of his investigation that he starts to
16 learn who the suspects are and what kind of deal
17 transpired.  In other words, he starts gaining
18 information to have the knowledge to say the suspects
19 have no history, the CI said he'd never seen a gun.
20 So in other words, the investigating officer has the
21 information to mark the boxes originally what
22 classification.
23           We do have the power to override that,
24 but originally it's the investigating officer because
25 this is where this SWAT, request for SWAT warrant

DEPOSITION OF DARRELL HIXSON

HIXSON    121

1  service comes from. It comes from the initiating
2  investigative officer, whether that's the vice unit,
3  narcotics, patrol, everybody sends this, the same
4  form. So they would have the information to make the
5  original checks on the boxes and then we could always
6  increase it or decrease it.
7          Q.   And my question is, what information is
8  the person who is making the designation of class of
9  warrant required to have in order to make the
10 designation, if you know?
11         A.   Well, I wouldn't know what information
12 he receives in his investigation. I wouldn't know
13 what that totality comes up to. It's whatever he
14 finds out what he's investigating.
15         Q.   Is there some specific information that
16 the person who is making the designation of the class
17 of warrant is required to get in order to make the
18 designation?
19         A.   He's expected and required to do a
20 thorough investigation. Whether or not he does that,
21 I'm not the one that grades that. So he's supposed
22 to do an investigation as he's taught and do it
23 right. Whether or not he does it is not something I
24 would question if he does it right or wrong, that
25 would be up to his supervisor and to see how his job

HIXSON    122

1  performance goes. He has a strict set of guidelines
2  that he's supposed to cover and part of those is
3  after he does his information, he asks us to do
4  something, he has to fill this out and that's the
5  extent of it, to my knowledge.
6          Q.   Do you know what guidelines the person
7  who fills out the form, which is page 93, what
8  guidelines he is required to follow?
9          A.   You would have to ask the person that
10 actually fills these out, and on this one it would be
11 Detective Witham. You would have to ask him.
12         Q.   Do you know whether the detective who
13 fills out the request for warrant service has a
14 written set of guidelines that describe the
15 investigation he's required to conduct?
16         A.   I wouldn't know. I don't do
17 investigations.
18         Q.   Okay, what information is the SWAT
19 person who is reviewing the designation made by the
20 detective required to get in order to make the final
21 decision about what the class of warrant will be
22 designated?
23         A.   We're not required by anything in
24 writing to do anything other than evaluate what we
25 have received, but a lot of times we'll delve into

HIXSON    123

1  it. Like I told you, sometimes if we don't get the
2  scope, we'll get the scope. Do we have to? No,
3  because we're saying he's getting his information
4  from the scope. Do we have to do a site check? No,
5  but sometimes we'll do one. We're not required to do
6  it because we're not an investigative arm of this,
7  he's the investigator.
8          Like I said, we're support, but
9  sometimes we'll do it, and I'll note it in my report.
10 Like this time, if you went back to one of those
11 things, you'll notice that I said we didn't confirm
12 any of the additional information and we couldn't or
13 didn't. I don't know which, couldn't or didn't, but
14 we decided since we didn't or couldn't, we'll drop it
15 back a degree on the warrant classification. Because
16 what we felt was what Detective Witham gave us wasn't
17 enough, what he gave us, to keep it as a four. We
18 don't have to keep it as a four, just because he says
19 so.
20         Q.   Let me see if I can break that down
21 into pieces, just so we have a record. Number one
22 you are saying that the SWAT officers are not
23 required to gather any specific information when
24 making the final decision about how the class of
25 warrant will be designated?

HIXSON    124

1          A.   That's correct, we do not. We are not
2  required.
3          Q.   It is the discretion of the individual
4  SWAT officer who is making the final decision about
5  the designation as to whether or not he will gather
6  additional information?
7          A.   That would be, in this case the final
8  decision would be with Sergeant Graham.
9          Q.   Correct.
10         A.   I could recommend and the recon guys
11 could recommend. The decision is with Sergeant
12 Graham.
13         Q.   And Sergeant Graham could have gone to
14 the lieutenant, if he had felt some reason to do so?
15         A.   Yes, that's correct.
16         Q.   Is the SWAT officer who is making the
17 final designation as to the class of warrant required
18 to do anything to investigate the truth or accuracy
19 of the information provided by the detective who made
20 the initial designation?
21         A.   No. We are not required to do that.
22         Q.   Does a SWAT officer who is making the
23 final designation as to the class of warrant have the
24 discretion to investigate the accuracy of the
25 information given by the detective who originally

## DEPOSITION OF DARRELL HIXSON

HIXSON  125

1  made the designation?
2      A.  Yes.
3      Q.  Under what circumstances would you
4  investigate the accuracy of the information provided
5  by the detective who originally made the designation
6  or the class of warrant?
7      A.  I can give you an example.  Is that
8  what you would like?
9      Q.  Yes.
10     A.  I would.  The only time I would check
11  something if it came in, as one example, if it was
12  checked a Class Four and the detective under the
13  suspect name didn't have any history, in other words,
14  if it was just his name and nothing else, so what I
15  would do is I would run his name, see if I could find
16  him in scope and see his history.  It would be, I
17  would be going what did you base this, I would say
18  what did you base this on, okay, and then the other
19  way it's a Class One, there's nothing on the history,
20  and I run him up again, or he gives me all the
21  history where it's violent, but yet it's a Class One,
22  what are you basing that on.  So those are the
23  extremes.
24     Q.  So in other words, if you looked at the
25  form request for SWAT warrant service when you got it

HIXSON  126

1  and on its face the document was specifically
2  internally inconsistent, that would be one
3  circumstance where you would question the accuracy?
4      A.  Right.
5      Q.  Can you think of any other circumstance
6  where you, in making the recommendation for the final
7  designation of the class of warrant would question
8  the accuracy of the information that the detective
9  had given?
10     A.  No, I wouldn't because basically I tie
11  the classifications along with -- well, that's not
12  true.  Maybe the fortification and things like that.
13         I tie these -- unfortunately they are
14  not numbered lines, but I tie in the classification,
15  and the description of the location, who is going to
16  be there, is it a house, is there children, and the
17  fortification and the suspect into one, one group.
18  So I look at those things and there's nothing else
19  below that he could tell me with additional
20  information, unless the CI had something to say in
21  this.  You have to weigh CI information because I
22  take the detective's word, I can't just take a CI's
23  word.  I can take the detective's word that this is
24  true and accurate, I couldn't take what the informant
25  would say.  The detectives can do that because they

HIXSON  127

1  know the informant, whether he's proved to be
2  reliable, in court and all the other stuff.  But I
3  can't.
4         So I try to use the upper portion of
5  this request for SWAT warrant service as the factual
6  part.  I don't go too much on the additional
7  information.
8      Q.  And just for the record, the
9  "additional information" that you are talking about
10  is the section at the bottom of the form which is
11  page 93?
12     A.  Right and it's more opinion based, I
13  guess you could say, it's more of an opinion.
14     Q.  Okay.  Now, we're comparing here --
15  that's yours, you better take that back.  Let's break
16  out the -- that's an exhibit.  We have in front of
17  you, you have right now Exhibit 5 and Exhibit 10;
18  correct?
19     A.  That's correct.
20     Q.  Exhibit 5, page 93, shows that the
21  Detective Witham from the narc detail requested that
22  SWAT treat the Hinton search as a Class Four search
23  warrant; correct?
24     A.  That's correct.
25     Q.  Which means high risk search?

HIXSON  128

1      A.  That's the highest category, that's
2  correct, for risk.
3      Q.  And you personally reviewed the request
4  for SWAT warrant service, and according to Exhibit 10
5  recommended that the warrant be reduced to a Class
6  Three and possibly even a Class Two; is that correct?
7      A.  That's correct.
8      Q.  List all of the reasons why the Hinton
9  warrant could have even been a Class Two?
10     A.  Why it could be a Class Two?
11     Q.  Yes.
12     A.  The main thing, as I recall on this
13  one, is because the history of violence was stated in
14  a Class Four, that's a history.  We didn't have a
15  history of violence, we could have gone to the two,
16  okay.  But it was also fortified, so going to a two,
17  even though a two says suspects have no history, but
18  some articulable suspicions that they may have access
19  to unknown weapons.
20         The common denominator in Class Three
21  is that suspects have a history of violence, which we
22  couldn't confirm, but capable of violence and
23  known to have access to weapons.  And I went on that
24  because of the -- the same page, because of the
25  arrests that were for firearms related things.  So a

DEPOSITION OF DARRELL HIXSON

SHEET 33  PAGE 129

HIXSON    129

1  CCW arrest, carrying a concealed weapon, even though
2  it's not a conviction, and another arrest for
3  unregistered firearm, whether he's convicted of those
4  it shows a propensity, because you have to have the
5  evidence that he had those items, it shows that
6  there's a possibility that he has access to weapons.
7         I could have kept it as a two, as I
8  explained to Sergeant Graham, but it was also
9  fortified.  So because it's fortified it takes longer
10  to get into the residence, and that means we have
11  another set of doors to go through, instead of one
12  set, we have a couple sets of doors.  So that's why I
13  recommended a Class Three, mainly because of the
14  fortification.
15         We had, we didn't have to go back up to
16  a two because the information said there was no
17  children present, so we weren't concerned for the
18  safety of the children.  So the fortification made
19  the deciding factor, whether it's going to be a two
20  or a three, because we had no history of violence on
21  this person.
22         Q.  Again, I would like to see if I can
23  break that down into pieces.
24         The Hinton warrant could have been a
25  Class Two because you had no history of violence?

PAGE 130

HIXSON    130

1         A.  That's correct.  That's correct.
2         Q.  And the Hinton warrant could have been
3  a Class Two because you thought there was some
4  articulable suspicion of access to weapons; is that
5  correct?
6         A.  That's correct.
7         Q.  And the articulable suspicion that you
8  had is what Detective Witham had indicated on the
9  request form, which is that there had been an arrest
10  of David Hinton for carrying a concealed weapon, and
11  for an unregistered firearm?
12         A.  That's correct.
13         Q.  So to you, in trying to decide what
14  classification to recommend for this warrant, you
15  took an arrest for CCW and an arrest for an
16  unregistered firearm to be a suspicion of access to
17  weapons?
18         A.  That's the access to weapons, but
19  there's other considerations within those two
20  classifications and with his arrest record, that
21  being the PCS, possession of controlled substance.
22         Q.  You also interpreted his arrest for
23  possession of controlled substance to be a suspicion
24  of access to weapons?
25         A.  It's a possibility because with my

PAGE 131

HIXSON    131

1  officer experience I know that drugs and guns always
2  have a suspicion of being nearby.  So if someone is
3  actively involved and has arrests for drugs, the
4  probability of guns is likely.  Doesn't say it has to
5  be, but again we're talking about articulable
6  suspicion, and we're talking about capable.  If
7  someone is capable of selling drugs, they are capable
8  of owning a weapon.  So with the arrest record here
9  of both, I would be remiss to ignore that there was
10  drugs involved in arrests.
11         Q.  Do you read anything on page 93 to say
12  that David Hinton had been arrested for sale of
13  drugs?
14         A.  They said possession, PCS.
15         Q.  Just so we're clear, possession of
16  controlled substance gives you a suspicion that a
17  person has access to weapons?
18         A.  Along with his arrest for weapons, it's
19  reasonable, it's right there.  I think it even showed
20  it in the scope printout that it's reasonable because
21  it's there in the printout.
22         Q.  But of course you didn't have the scope
23  printout?
24         A.  No, I have this.
25         Q.  And in making your decision to

PAGE 132

HIXSON    132

1  recommend a Class Three designation, as opposed to a
2  Class Two designation, you added to your suspicion
3  that David Hinton may have access to weapons the fact
4  that there were bars on one or more of the entry
5  points to the house?
6         A.  Yes, that kind of tipped it to the
7  Class Three.  That would be very accurate, yes.
8         Q.  Anything else that you relied on in
9  moving it from a Class Two to a Class Three?
10         A.  No, we never moved it from a Class Two,
11  we moved it from a Class Four to a Class Three.  I
12  would like to make that real apparent.
13         Q.  You are absolutely right.  I didn't
14  mean to misstate your testimony.  Is there anything
15  else that you relied on in making it a designation as
16  a Class Three as opposed to a Class Two?
17         A.  No, the reason I didn't go to the Class
18  Two was, as I stated, you could go -- you could argue
19  the weapons in both categories, but the fortification
20  is the overriding factor why I never went to two, why
21  I just recommended that Sergeant Graham bring it down
22  to a three.
23         Q.  Okay.  A question about fortification.
24  Are there degrees of fortification, in terms of your
25  analysis of how to classify a warrant?

DEPOSITION OF DARRELL HIXSON

HIXSON   133

1    A.   There's two degrees, it's either
2   fortified some way or it's not.  We don't have
3   anything that articulates degrees of, it's either
4   fortified or it's not.  There's different types of
5   fortification.
6        Q.   Okay, but as far as classifying a
7   warrant as a two or a three, as far as you're
8   concerned, a building is either fortified or not
9   fortified?
10       A.   That's correct.
11       Q.   Okay.  Now, if you had a building that
12  was, had a front door that was fortified but the
13  windows were not fortified, how would you classify
14  that?
15       A.   As fortified.
16       Q.   If you had a building where the front
17  door, there was a security door on the front door and
18  no other bars or security doors anywhere on the
19  building, is that fortified or unfortified?
20       A.   So it's really clear, windows aren't
21  designed to enter, so anything we look for the entry
22  point.  So if the door is fortified, any door is
23  fortified, because that's what they are designed for.
24  Windows aren't designed to enter so even the bars
25  could be on the windows, could not be.  We're looking

PAGE 134

HIXSON   134

1   at the doors because the doors are made for human
2   beings to enter through, so the doors is what we are
3   looking at.
4        Q.   Okay, as a matter of the definition
5   that you use, if any one door on a house is
6   fortified, then you classify the house as fortified?
7        A.   Yes, that's correct
8        Q.   In making your decision to recommend --
9        (Discussion off the record.)
10  MR. BOOKE:
11       Q.   In deciding to recommend classification
12  of the Hinton warrant as a Class Three, and possibly
13  even a Class Two, did you have any information at all
14  about Donald Hinton?
15       A.   No, I didn't know there was a Donald
16  Hinton until later.  I didn't have any information on
17  that.
18       Q.   In recommending Class Three and
19  possibly even Class Two, did you have any information
20  about John Reyes?
21       A.   The only thing I must have had, and
22  this is just I must have known that there was
23  additional people inside, because I think I talk
24  about suspects, but when I only list the history, I
25  only list one person and there's no suspects listed,

HIXSON   135

1   but again there was phone calls.  So I don't know if
2   they happened to say there was more than one people,
3   but they never knew who they were, or they never told
4   me their names.  The only name I actually knew was
5   David Hinton.
6        Q.   Did you have any information about John
7   Reyes?
8        A.   You know what, you are jogging my
9   memory here.  I may have had other information about
10  other people because I think we did a site check and
11  I think there was a site check with someone else's
12  name on it somewhere around here.
13       So I may have looked at the site check
14  because -- here it is.  I knew there was another
15  name, but I didn't know anything about it.  I saw
16  David Hinton on here and I must not have even paid
17  attention to or hit on because Donald wasn't listed
18  in here.  So I didn't know if he was going to be
19  there or not.  But this would be the only other thing
20  that mentioned a name that I have access to or privy,
21  that I can remember.
22       Q.   "This" being page 108?
23       A.   Yes, 108 on your Exhibit 5.
24       Q.   Okay.
25       A.   This does have Donald Hinton's name.

PAGE 136

HIXSON   136

1   When you said that I was thinking I heard that name
2   before, but I don't know where.  I never did, prior
3   to this, I don't think I didn't run him up.  I didn't
4   see his name or didn't register the name.  I think I
5   saw Donald's name and that's where I stopped.
6        Q.   And as to David Hinton, at the time you
7   listed it as a Class Three and possibly even a Class
8   Two, did you have any information about David Hinton,
9   other than what appears here on page 93?
10       A.   No, none that's written down, none that
11  I can remember.  That's about my extent of it.
12       Q.   On Exhibit 10 you then say "with this
13  in mind, in our planning phase, Sergeant Graham and
14  assistant team leader Darrell Hixson stated that we
15  would do a true knock and announce on this
16  residence."  What do you mean "with this in mind?"
17  Are you referring to the previous sentence?
18       A.   Yes, with bringing it from a Class Four
19  to a three, you know, and I mentioned earlier in a
20  Class Four we're not -- there's no such thing as no
21  knock in Nevada, but if the totality of the
22  information is reasonable, we still announce
23  ourselves, but who is going to answer the door in ten
24  seconds?  Nobody.
25       So what I was getting to is we do the

DEPOSITION OF DARRELL HIXSON

HIXSON   137

1  true knock and announce, meaning we're going to give
2  this person at least 15 seconds, and thereafter,
3  depending on what happens at the front door, again,
4  things change too at the front door. But when I talk
5  about the totality, that's what I'm talking about,
6  that we went from a four to a three and we're going
7  to do a true knock and announce. In other words,
8  we're going to give someone time to answer the door.
9       Q.   What is a true knock and announce, as
10 you have just used that term?
11      A.   I just explained it to you, we're going
12 to give enough time, a minimum of 15 seconds for
13 someone to answer the door. We're not just going to
14 go (indicating) wait five, ten seconds, and ram the
15 door.
16      Q.   A maximum of how much time?
17      A.   That depends what goes on. Usually 30
18 to 45 seconds. 40, 45 would be the limit and it's
19 held up, I have been in some court things where we
20 have asked and it's held up, 45 seconds has been the
21 longest I've ever held and I haven't been rebuffed
22 for it.
23      Q.   I'm not sure what you mean, you have
24 not been rebuffed?
25      A.   I have been in court cases as a witness

HIXSON   138

1  for our knock and announce and I haven't lost a case
2  because it was too short. 45 seconds was too short.
3       Q.   Oh, I see.
4       A.   So, so far that seems to be a
5  reasonable time. There may be other cases, but ones
6  I've testified in.
7       MR. ANDERSON: Just so I'm clear, 45 seconds is
8  a max?
9       THE WITNESS: That we like to go. I mean some
10 teams, other places might do it longer, some might do
11 it shorter. The longest we like to go is 45 seconds
12 and we think we're pretty reasonable under those
13 terms.
14      MR. BOOKE:
15      Q.   I understood you to be saying that you
16 had never had a 45 second wait declared unreasonable
17 in court.
18      A.   As far as classifications on one, it
19 would -- it's going to be a 45 second wait. After 45
20 we're going to do what we need to do, unless
21 something happens in front of the house that dictates
22 we can earlier.
23      Q.   Same on a two?
24      A.   Same on a two.
25      Q.   All right. On Exhibit 10, first

HIXSON   139

1  paragraph, the last sentence where you say "we did
2  not have definite history on David Hinton showing the
3  history of violence".
4            Did you have any history?
5       A.   Yes.
6       Q.   On David Hinton showing history of
7  violence?
8       A.   We had arrests for CCW, unregistered
9  firearms.
10      Q.   And in your job as a SWAT officer you
11 would interpret carrying a concealed weapon arrest
12 and unregistered firearm arrest as showing a history
13 of violence?
14      A.   Because the instrument that he's
15 carrying, that's what his intended use. So yes, I
16 look at that tool and say what is that tool for? A
17 weapon is a tool. That tool is designed only for one
18 thing: Violence. A tool is not designed not only for
19 one thing -- he didn't say carrying a hammer, didn't
20 say carrying a wrench, he said CCW, carrying a
21 concealed weapon. Unregistered firearms are designed
22 for violence. They are not designed for anything
23 else.
24      Q.   So you interpret --
25      A.   Yes.

HIXSON   140

1       Q.   -- carrying a concealed weapon and an
2  unregistered firearm as being a history of violence?
3       A.   Yes, in those terms, yes.
4       Q.   Is a weapon involved in carrying a
5  concealed weapon, is that necessarily a firearm?
6       A.   No, but I went with also possession of
7  an unregistered firearm.
8       Q.   Okay, what kinds of devices could be --
9  I'm sorry, I'm not being a smart aleck. That's a
10 place we don't need to go.
11           Did you have any information about
12 David Hinton having a history of violence other than
13 those two arrests that appeared on page 93?
14      A.   No, as I have stated before, the only
15 information I had on David Hinton was from the sheet
16 listed number 93, under names of suspects.
17      Q.   Okay.
18      A.   And that's what it notates in
19 Exhibit 10, number 71.
20      Q.   At the time you were making the
21 decision as to what to recommend for the
22 classification of the Hinton warrant, did it cross
23 your mind to run a scope or try to gather any further
24 information to learn anything further about David
25 Hinton?

DEPOSITION OF DARRELL HIXSON

SHEET 35  PAGE 137

HIXSON   137

1  true knock and announce, meaning we're going to give
2  this person at least 15 seconds, and thereafter,
3  depending on what happens at the front door, again,
4  things change too at the front door.  But when I talk
5  about the totality, that's what I'm talking about,
6  that we went from a four to a three and we're going
7  to do a true knock and announce.  In other words,
8  we're going to give someone time to answer the door.
9       Q.   What is a true knock and announce, as
10  you have just used that term?
11       A.   I just explained it to you, we're going
12  to give enough time, a minimum of 15 seconds for
13  someone to answer the door.  We're not just going to
14  go (indicating) wait five, ten seconds, and ram the
15  door.
16       Q.   A maximum of how much time?
17       A.   That depends what goes on.  Usually 30
18  to 45 seconds.  40, 45 would be the limit and it's
19  held up, I have been in some court things where we
20  have asked and it's held up, 45 seconds has been the
21  longest I've ever held and I haven't been rebuffed
22  for it.
23       Q.   I'm not sure what you mean, you have
24  not been rebuffed?
25       A.   I have been in court cases as a witness

PAGE 138

HIXSON   138

1  for our knock and announce and I haven't lost a case
2  because it was too short.  45 seconds was too short.
3       Q.   Oh, I see.
4       A.   So, so far that seems to be a
5  reasonable time.  There may be other cases, but ones
6  I've testified in.
7       MR. ANDERSON:  Just so I'm clear, 45 seconds is
8  a max?
9       THE WITNESS:  That we like to go.  I mean some
10  teams, other places might do it longer, some might do
11  it shorter.  The longest we like to go is 45 seconds
12  and we think we're pretty reasonable under those
13  terms.
14       MR. BOOKE:
15       Q.   I understood you to be saying that you
16  had never had a 45 second wait declared unreasonable
17  in court.
18       A.   As far as classifications on one, it
19  would -- it's going to be a 45 second wait.  After 45
20  we're going to do what we need to do, unless
21  something happens in front of the house that dictates
22  we can earlier.
23       Q.   Same on a two?
24       A.   Same on a two.
25       Q.   All right.  On Exhibit 10, first

PAGE 139

HIXSON   139

1  paragraph, the last sentence where you say "we did
2  not have definite history on David Hinton showing the
3  history of violence".
4       Did you have any history?
5       A.   Yes.
6       Q.   On David Hinton showing history of
7  violence?
8       A.   We had arrests for CCW, unregistered
9  firearms.
10       Q.   And in your job as a SWAT officer you
11  would interpret carrying a concealed weapon arrest
12  and unregistered firearm arrest as showing a history
13  of violence?
14       A.   Because the instrument that he's
15  carrying, that's what his intended use.  So yes, I
16  look at that tool and say what is that tool for?  A
17  weapon is a tool.  That tool is designed only for one
18  thing: Violence.  A tool is not designed not only for
19  one thing -- he didn't say carrying a hammer, didn't
20  say carrying a wrench, he said CCW, carrying a
21  concealed weapon.  Unregistered firearms are designed
22  for violence.  They are not designed for anything
23  else.
24       Q.   So you interpret --
25       A.   Yes.

PAGE 140

HIXSON   140

1       Q.   -- carrying a concealed weapon and an
2  unregistered firearm as being a history of violence?
3       A.   Yes, in those terms, yes.
4       Q.   Is a weapon involved in carrying a
5  concealed weapon, is that necessarily a firearm?
6       A.   No, but I went with also possession of
7  an unregistered firearm.
8       Q.   Okay, what kinds of devices could be --
9  I'm sorry, I'm not being a smart aleck.  That's a
10  place we don't need to go.
11       Did you have any information about
12  David Hinton having a history of violence other than
13  those two arrests that appeared on page 93?
14       A.   No, as I have stated before, the only
15  information I had on David Hinton was from the sheet
16  listed number 93, under names of suspects.
17       Q.   Okay.
18       A.   And that's what it notates in
19  Exhibit 10, number 71.
20       Q.   At the time you were making the
21  decision as to what to recommend for the
22  classification of the Hinton warrant, did it cross
23  your mind to run a scope or try to gather any further
24  information to learn anything further about David
25  Hinton?

*Lori M. Judd, CCR #233, RMR*

DEPOSITION OF DARRELL HIXSON

HIXSON   141

1      A.   No.  As I stated here, it shows here
2    that we didn't do anything other than what the
3    information received here, though the information
4    showed that it could be a class, we do not have
5    definite history, and so it doesn't state that if we
6    did an investigation I would have said, so then we
7    did this and did that.  We don't have to do that.  We
8    just have to go by what the investigator says.  So we
9    did nothing else.
10     Q.   I understand that.
11     A.   So we did nothing else.
12     Q.   I understand that you did nothing else.
13   I'm trying to ask about your state of mind at the
14   time that you decided to do nothing else.  Other than
15   looking at page 93 to learn about David Hinton, my
16   question is did it occur to you at that time or did
17   it cross your mind, did you consider the possibility
18   of scoping David Hinton or doing anything further to
19   try to learn something more about David Hinton?
20     A.   I know how the detectives get their
21   information, because they are police officers just
22   like me, and what's listed here is usually scope
23   information.  So I thought it wasn't necessary to
24   scope further, okay, so I didn't scope any further.
25   So that was my frame of mind.  I don't need to scope,

HIXSON   142

1    and plus this is not the first warrant we have done
2    for this detective or this narcotics unit.  So we
3    have had dealings with them and their investigations
4    have been fine.  I've never heard of -- so the
5    totality of my state of mind is if Detective Witham
6    says this is so, it is so.
7      Q.   So it did not cross your mind that you
8    needed to do anything further to investigate it?
9      A.   There was nothing to indicate that I
10   had to, when I'm relegated that I don't have to.
11     Q.   And you did not?
12     A.   And I did not.
13     Q.   Are you, and we may be able to deal
14   with this subject quickly, are you able to look at
15   records from the Clark County Detention Center and
16   determine the time at which somebody is first taken
17   into the detention center?
18     A.   I have no capability.  I don't know how
19   to do it.  We may have the capabilities, I don't know
20   how to do it.
21     Q.   And I was going to ask you to look at
22   some records, but we'll save the time on that.
23          Let's talk about the briefing that took
24   place prior to the Hinton search.  Do you have any
25   independent recollection of it, of the briefing?

HIXSON   143

1      A.   No, just what's kind of refreshing as I
2    look at stuff, but nothing before I arrived in here
3    and looked at everything -- I take that back.  I
4    talked to Mr. Anderson about a week ago, so he kind
5    of refreshed it.  But before I even talked to him I
6    didn't even have any recollection of it.
7      Q.   Is there anything that is contained in
8    Exhibit 5 that summarizes or describes what occurred
9    during the briefing prior to the Hinton search?
10     A.   Yeah, there was quite a few things that
11   this sheet that's filled out can relate to what went
12   on at the briefing.
13     Q.   You are talking about the warrant
14   service planning sheet?
15     A.   That's correct.
16     Q.   And that's pages 73 through 82?
17     A.   I think 84, maybe.  Yeah, 84 because it
18   will say look at my OR, officer's report, and that's
19   on page 84.
20     Q.   When was the briefing for the Hinton
21   search conducted, date and time?
22     A.   It was conducted on the 16th of,
23   January 16 of 2002.  The exact time of the briefing
24   is not known, nor is it stated in any of the
25   paperwork we have gone through.

HIXSON   144

1      Q.   Do you have any recollection of the
2    approximate time of the briefing for the Hinton
3    search?
4      A.   Yes, you can surmise an approximate
5    time, and a very close time if you go to page, let's
6    see -- you are missing a page.  You are missing a
7    page in number five.
8          MR. ANDERSON:  Is it in this group of
9    documents?  Did you see the document earlier?
10         THE WITNESS:  Yes, I saw it earlier.  That's
11   what you are missing earlier, it's in number one, in
12   Exhibit 1 that you showed.
13         MR. ANDERSON:  Page 85?
14         THE WITNESS:  Page 85, yeah, it's missing from
15   this packet, right here, I didn't pick up on that
16   earlier, either.
17         MR. BOOKE:  Okay.
18         MR. ANDERSON:  I think that's what we went over
19   with Graham, actually.
20         THE WITNESS:  There it is right there.  It will
21   show a time of warrant served and what we do is we
22   brief, and then we go driving time from our briefing
23   area to the place to be serviced.  So you will have
24   to, I think we briefed at the office.  It will say
25   our route that we took on different pages.  So we

## DEPOSITION OF DARRELL HIXSON

HIXSON   145

1 entered the residence, or approached the entrance or
2 breached the entrance, whatever time it is. Usually
3 one of the recon guys looks at his watch.
4 So it's usually when we are
5 approaching, because it can get kind of busy when we
6 start to do that. So we probably looked at that and
7 it was probably 2130 hours and we probably briefed no
8 more than an hour before that.
9 MR. BOOKE:
10 Q. Okay, and where did the briefing take
11 place?
12 A. That, we can find that out if we have,
13 we can find out if we briefed in the field or we
14 briefed at our office by the approach route to the
15 target and if we went southbound on Spencer to
16 Canterbury, it looks like we briefed in the field,
17 maybe in the parking lot, and that would correspond
18 with the items being on paper because we do have a
19 wet chalkboard in the office. So we probably
20 briefed, probably briefed somewhere in the field
21 somewhere behind the shopping center. That's quite
22 common, and we do it out of the public eye.
23 Q. When were the pictures taken of the
24 maps that are page 86?
25 A. Those can be taken at various times. I

HIXSON   146

1 could have done it -- I don't see anything that
2 shows. It's at the office. It could have been done
3 afterwards. We leave them on the van. It could have
4 been done, left on the wall at the office. It could
5 have been done after we serviced the warrant, it
6 could have been done before we serviced the warrant.
7 So it's just up to the recon guy when he gets around
8 to taking the pictures.
9 Q. Can you take pictures of the maps in
10 the field?
11 A. Yes, they are just on paper and right
12 here, they are on paper. You can see they are
13 folded. That's what leads me to believe we did it in
14 the field.
15 Q. Okay.
16 A. What else leads me to page 789 of
17 Exhibit 5. It shows we took the route to get there.
18 Q. So 75?
19 A. Oh, on 75.
20 Q. Is there a standard operating procedure
21 for how you conduct a briefing before a warrant is
22 executed?
23 A. Yes, we have the recon officers who
24 draw up the pictures that you see on page 86 of
25 Exhibit --

HIXSON   147

1 MR. ANDERSON: Either one or five.
2 THE WITNESS: One or five, they do the drawing
3 because they have actually gone by it and done the
4 rough sketch, which you also saw in the packet.
5 MR. BOOKE:
6 Q. Do they draw it there on the spot for
7 the other officers, or is it something that's created
8 that you put up and explain it?
9 A. We put everyone out of the room. We
10 just have the recon officers, the sergeant and
11 myself, they draw it up. We talk about it, then we
12 bring the whole team in to brief. So before we
13 brief, it's drawn up, and I make the plan. So we
14 don't bring in the remainder of the team, except for
15 the recon guys, the ATL and the team leader. They
16 are the only ones in the room or out by the van,
17 where we are drawing this up at, and when we are
18 ready to brief we bring the team together and the
19 recon officers start with the brief.
20 Q. Okay, and what does the recon officers
21 brief consist of, and I take it, by the way, that you
22 don't remember exactly what anybody said on this
23 particular night?
24 A. No, but they will brief from the
25 documents that we have and from telephone

HIXSON   148

1 conversations that they would have with the affiant,
2 if any. So they would use the request for SWAT
3 search warrant. We're back on what, that would be on
4 the page 93 of Exhibit 5.
5 They would list the suspect and they
6 would get that from the sheet and I know that they
7 get that from the sheet because they wouldn't know
8 his ID number and they would have to look and they
9 would list the classification, if it's a house, plus
10 they are drawing it. And so what they are going to
11 do is, like I say, they are going to talk about,
12 okay, it's a single story house, these are fortified,
13 and remember I told you about the side? Number two
14 side is this, number three side is this.
15 When they are done with the briefing
16 about whether it's kids or dogs, whatever, is covered
17 on the sheet that they maybe have gained through
18 talking with the affiant, then they turn it over to
19 me. Then I'll say okay, we're going to have a
20 containment team go here on the two side, we'll have
21 a containment team on the three side. It has bars,
22 so we're going to have a breach team.
23 So I'll talk about the tactical part
24 and when I'm done with that, we'll ask if there's any
25 questions. The sergeant, then I'll turn to the

SHEET 38  PAGE 149

HIXSON   149

1  sergeant at the time, the sergeant will say, Willy
2  Graham will say okay, sounds like the plan is good.
3  Or he'll say if there's something he doesn't like,
4  he'll say I want to change this, and if that's
5  changed or agreed to, then we go ahead and dress out
6  and we dress out into our heavy SWAT protective gear
7  and go service the search warrant.
8       Q.   Do you recall any of the things that
9  you said in giving the briefing, the part of it that
10  you gave on the night of January 16, 2002?
11      A.   I can recall it because I've seen the
12  line-ups now, I know what teams I had and who I had.
13  Up until that point I hadn't recalled anything.
14           But yes, I had a breach team because I
15  knew we had fortification.  I had an entry team that
16  was fairly large because we had a fairly large house
17  from the recon, and I knew I had a rear containment
18  and I don't know if I had containment on the one-two
19  corner or the one-four, but I know how I had a
20  containment team.
21      Q.   How big was the entry team?
22      A.   I think, without looking at it here,
23  again is going to be at least ten or eleven in.
24      Q.   And did you instruct your team as to
25  how long to wait between announcing and entering?

PAGE 150

HIXSON   150

1       A.   Yes, we were going to shok-lok, which
2  involves a shotgun that has a special round to shoot
3  a lock off iron, and we're going to use distracts
4  also.  And that would be done either on my call or
5  the sergeant's call, only.  Because we are kind of
6  standing there watching, kind of like the
7  quarterback, seeing how things are going.
8           Now I don't remember on this night if I
9  called it or if Sergeant Graham, but most likely I
10  usually do.  So I'm the one that usually, and I can't
11  say for sure this night, but I'm pretty sure that I
12  called it because Sergeant Graham is kind of on this
13  line-up was far back in line because it was a fairly
14  good sized line-up.
15      Q.   When you say you called it, you mean
16  you ordered the --
17      A.   Breaching is the word.
18      Q.   The distract explosions and the
19  shok-lok rounds?
20      A.   Uh-huh.
21      Q.   That was the first thing that happened?
22      A.   That would be the first thing that
23  happened after we announced.  Now we couldn't knock
24  on the door, door, because there's a gate.  So what
25  we had, and I'll have to look.  Usually we have the

PAGE 151

HIXSON   151

1  whole team announce then because I don't think we had
2  the bullhorn on this.  I would have to look, but
3  we're going to have the guy up front announce and the
4  whole team announce "police, search warrant," because
5  it's bars.  We'll say "step away from the door," but
6  this was -- it wasn't bars like right up against the
7  door.  It was like a, I don't know, a little
8  gated-off area.
9           So we can see that there's no one
10  behind the door, so we probably announced police
11  officers, search warrant, get down.
12      Q.   Did you instruct your breach team how
13  long to wait between announcing and that they were
14  police officers and actually ramming the door?
15      A.   They do not look to see how long it is.
16  I instructed them to wait for my call, or if that
17  particular night Sergeant Graham's call.  I think it
18  was mine that night because I'm the one that's paying
19  attention to the time.  A man carrying a shotgun
20  can't look at his wrist watch, it's impossible.  So
21  I'm the one that's looking at my watch.  And then
22  when I'm ready to see that the time has elapsed, I
23  get on the radio, because we all have headsets and
24  earphones and I'll say, breach, breach, breach.
25           So they are not looking at their

PAGE 152

HIXSON   152

1  watches or doing a count down, they are holding,
2  waiting for someone on the radio to say either breach
3  or hold.  And then they will do whatever job they are
4  supposed to do.
5       Q.   Before you started the search warrant
6  operation did you decide in your mind how much time
7  you would allow between the announcement of your
8  presence and ramming the door?
9       A.   I would have to look to see.  Sometimes
10  I put it in my reports or I put it in the back there
11  on one of those back pages.  But if I didn't, then
12  it's usually because I've done so many over the years
13  I have been in.  It's usually if we are going to
14  announce, I want to give someone 15 seconds.  It's
15  usually, if it's different than that, I'll dictate it
16  in the report so I haven't read that far into the
17  report.
18      Q.   I'll give you a chance to do that in
19  just a second, but let me just ask first, where you
20  write on Exhibit 10 here that you decided to do a
21  true knock and announce, by that you meant that you
22  would wait between 15 and 30 seconds between
23  announcing and breaching?
24      A.   15 to 45 and I knew, I knew I wasn't
25  going to 45 that night, so 15 to 30 would be very

DEPOSITION OF DARRELL HIXSON

HIXSON   153

1   accurate, unless I stated somewhere in my reports,
2   but I'm going to give the minimum of 15 seconds and I
3   knew that night that I wasn't going to 45.  I knew
4   that.  But I would have to see exactly how long, and
5   like I said, I've done almost 3,000 warrants since I
6   have been in SWAT, so I know my time.  I usually give
7   15 to 30 and I knew that night it wasn't going to be
8   45 seconds.
9          Q.   When you say 15 to 30 seconds, you mean
10  15 to 30 seconds between when the team yells "police,
11  search warrant" and when you command that the
12  distract explosions go off?
13         A.   That's correct.
14         Q.   Did you command that the distract
15  explosions and the -- well, let me get myself -- at
16  the Hinton house, when you gave the command for the
17  distract explosions to be set off, is that the only
18  thing that you ordered to happen?
19         A.   Those are distract devices and are not
20  explosions.  They are distract -- well, there are
21  distract devices.  There are explosions that are
22  things that destroy things.  They don't blow up and
23  there's no shrapnel involved.  They are distract
24  devices, yes.  The distract devices and the shok
25  would be done at the same time, and there's only two

HIXSON   154

1   people that are going to call for it that night,
2   myself or Sergeant Graham, and I'm pretty sure that
3   night was me, but Sergeant Graham might remember
4   different.
5          Q.   Did you order the distract devices and
6   the shok-lok in the same order?
7          A.   Yes.
8          Q.   Was the shok-lok round fired at exactly
9   the same time that the distract devices were ignited?
10         A.   Well, I couldn't say that for sure, but
11  let me put it this way, so you get an understanding.
12  On the radio when they get the instructions, they are
13  proceeded to go ahead.
14         The distract has a fuse delay of one
15  and a half seconds.  It's a safety thing built in.
16  So I'm sure that if they went at the same time, the
17  officer shooting the shotgun, using a trigger, goes
18  off instantaneously.  The officer using a distract
19  device is going to roll it somewhere, it has a delay
20  of one and a half seconds.  So I would say that the
21  shok-lok would be heard first, most likely.
22         Q.   And how do you launch the distract
23  device?
24         A.   You don't launch it, you roll it.  You
25  have to clear the area to where you put this

HIXSON   155

1   distract.  As a matter of fact, it's a Supreme Court
2   ruling of LA because they rolled a distract on a lady
3   and killed her.
4          So the people with the distract, I
5   would have to see who used them, but the officers I
6   assigned with the distract have to physically clear
7   the area they want to roll the distract into.  In
8   other words, if it's over a fence, they have to look
9   over a fence; if it's over a wall, they have to see
10  where it's going to land before we can roll it, or if
11  it's over a wall, they will like just drop it.  So
12  they have to physically clear that area before they
13  can use the distract.
14         Q.   What do you mean, physically clear?
15         A.   They have to visually clear.
16         Q.   What do you mean by clear?
17         A.   Make sure there's no person that this
18  thing is going to land on right there.
19         Q.   So in the ordinary course you would
20  expect that the shok-lok would be fired before the
21  distracts would be heard?
22         A.   That's correct.
23         Q.   Is there a document here that tells you
24  who handled the shok-lok?
25         A.   Yes, there is.  On page 76 it shows the

HIXSON   156

1   breaching officers.  There's an officer that sinks
2   the hook to put tension on the gate, because they
3   swing outward, for the most part, and there's the
4   number one shok-loker, which is Manny Rivera.  For
5   the door there is a ram man, this is Vic Dumas, and
6   the fourth individual in that line-up of the
7   breaching, and the B stands for back-up shok-loker,
8   in case he runs out of rounds, Officer Sheahan, who
9   is on the back-up would come and replace Officer
10  Rivera, because sometimes these bars, because of the
11  heavy metal, don't open on the first several shotgun
12  rounds.  Because again, it's meant to tear away at
13  the metal, not meant to explode anything.  Sometimes
14  they don't open right away.
15         Q.   How many shotgun rounds were fired into
16  the security door at the Hinton house?
17         A.   Sometimes that will be stated on the
18  front page.  It will be said, if we used it at all,
19  on page 73 and it says distract used; Dftech 25; how
20  many; two; forced entry, yes; method, shok-lok.
21         But a count of the rounds may not be in
22  here, but if it is, it's going to be on page 83.  And
23  it does not say how many rounds.  And the only other
24  place, if it doesn't say, would be my report but we
25  don't always put how many rounds.

DEPOSITION OF DARRELL HIXSON

SHEET 40   PAGE 157

HIXSON   157

1    Q.   Do you have any recollection of how
2  many rounds were fired?
3    A.   No, I don't.  Sometimes the photo, if
4  you want me to look at the photo, would be an
5  educated guess and I can look at the color photo and
6  give you an educated guess.
7    Q.   Sure, if counsel would be kind enough
8  to put that in front of you.
9    A.   Sometimes the size and location of the
10 holes.
11   MR. ANDERSON:  This is Bates stamp number 91.
12   THE WITNESS:  91, let's see here, okay.  It's
13 two.  And when you look at the photo don't be
14 confused with the hole in the mesh, and I guess these
15 bars ended up having mesh.  This is from the hook
16 being sunk.  This might be a better picture, and
17 these are the shok-lok rounds and the size of the
18 hole, that looks like one round, and then on the
19 lower lock, in case it was locked, it looks like one
20 round also.
21        So most likely, 90 percent, the hole
22 above it is from the hook, because the hook has a
23 sharp point.  It's a piece of metal with a strap on
24 it.
25   MR. BOOKE:

PAGE 158

HIXSON   158

1    Q.   And who fired or detonated the distract
2  devices?
3    A.   Well, let's go over here.  Number 77,
4  that would be officer Emery on the 14 position, the
5  one-four.  That's because I numbered the front door
6  one and went clockwise.  The front door is one,
7  clockwise, two, three, four.  So as you looked at the
8  house, this would be the right side of the house.
9    Q.   So one distract device went off on the
10 front of the house?
11   A.   No, two.  Two distracts went off on the
12 one-four corner.
13   Q.   That's what that means, the one-four
14 corner?
15   A.   Yes.
16   Q.   Two distract devices in the same place?
17   A.   Uh-huh.
18   Q.   Is that a yes?
19   A.   Yes.
20   Q.   Why do that?
21   A.   We want them to turn their head and pay
22 attention to anything other than the front door, once
23 we start to make entry.  That's why it's called
24 distract.  Human nature is to look at noise, so we
25 have noise at the front door, which we don't want

PAGE 159

HIXSON   159

1  people to look at once we're coming through the front
2  door, because if they have a weapon they'll aim
3  there.  Because you can't use the gun without aiming.
4  So we want them to turn their head, so we use a
5  distract on the outside to give repetitive noise, so
6  they'll pay attention to the noise and it's human
7  nature to look at noise.
8    Q.   How much time elapsed between the two
9  distract devices that were detonated?
10   A.   That's not documented.  And to run them
11 to get them out in a hurry, which he would do,
12 deploying one and deploying a second one, would take
13 about under ten seconds, maybe 15, at the most.  It's
14 very quick.
15   Q.   What do you need to do in order to
16 detonate a distract device from the stop position?
17   A.   It's described as a 25 DFTech distract.
18 That is the type and the manufacturer, is DFTech, it
19 has an M201 A1 fuse, which is just like a fuse on the
20 military style grenade.  It's a fuse, it has a one
21 and a half second delay.  So all you do is pull the
22 pin, clear the area, and let go.  And in a second and
23 a half it goes off.  You have multiple distracts on
24 your SWAT equipment vest.  You take another one out,
25 or you hang it, and pull another one.  So you can do

PAGE 160

HIXSON   160

1  it very rapidly, very rapidly.
2    Q.   Did any of the SWAT people have knives?
3    A.   We all carry some sort of knife.  I
4  have a little knife here on me now.  We all carry
5  some sort of knife.  There's no knife issued, it's
6  whatever kind of knife you want for whatever you
7  think you might need it for.
8    Q.   You are pretty confident that each of
9  the SWAT guys was carrying a knife?
10   A.   Most of them do.  Whether it's a
11 folding knife or a scabbard knife, I know there's no
12 blades exposed, so it has to be a scabbard knife, and
13 I carry a folding type knife.
14   Q.   Were all of the SWAT team wearing
15 identical gear?
16   A.   The gear is pretty much identical.
17 There's a few variations and that mainly has to do
18 with a shoulder area, maybe the groin area, and maybe
19 the face shield on a helmet.  But pretty much it's
20 standard, yes.
21   Q.   What's worn on the head?
22   A.   A ballistic helmet and it's your option
23 to wear a ballistic shield.  The helmet is made out
24 of Kevlar and the shield is a very thick laminate
25 plastic glass type stuff that's bullet resistant.

## DEPOSITION OF DARRELL HIXSON

HIXSON  161

1   Q.  Anything worn on the head under the
2   helmet?
3        A.  This was January so it was probably
4   cold.  A few people might be wearing a balaclava,
5   which is kind of a mask that covers your face.  A few
6   people just like to wear just like a handkerchief
7   tied so your hair doesn't get caught in the helmet.
8   Most of them wear one or the other, most of them wear
9   the handkerchief style, only a few wear the
10  balaclava.  It gets too warm.  It may be cold outside
11  but once you get inside, it's too hot, but I wear a
12  balaclava myself in the wintertime.
13       Q.  On the night of January 16, 2002 is
14  there any record of who was wearing what?
15       A.  No, we wouldn't go to that extreme.
16  The only time we ever photograph officers and what
17  they are wearing is if there's an officer-involved
18  shooting.
19       Q.  Was it cold on the night of January 16,
20  2002?
21       A.  To my recollection it was, and usually
22  in the wintertime I wear the balaclava so I'm pretty
23  sure I was wearing one.
24       Q.  Do you have a recollection of how many
25  guys were wearing balaclavas?

HIXSON  162

1        A.  No, I don't.  Most of them wear the
2   handkerchiefs.
3        Q.  All right, and then what was the first
4   layer of garb?
5        A.  The first layer would be the heavy
6   ballistic vests.  They are kind of a green in color.
7   The only thing that's different from one to the
8   other, some have a ballistic shoulder pad and if they
9   do, then they have a Velcro on the outside where we
10  put the police patch on the outside.  I don't wear
11  the shoulder pads, so my patch shows.  So I don't
12  have -- since I don't wear the ballistic shoulder
13  pad, it's cut here like a tank top cut, right at your
14  shoulders.  So I don't have any ballistic protection
15  on my shoulders, so my patch shows, so I don't have
16  to wear the Velcro thing.
17       Q.  What's the next layer?
18       A.  The next layer would be this green
19  uniform that you had in front of you, standard issue
20  SWAT uniform from our uniform SWAT and it has police
21  patches on both arms.
22       Q.  Just like you have there?
23       A.  Just like a star on your left and it's
24  going to say LVMPD SWAT team on the right side above
25  the pockets.

HIXSON  163

1        Q.  Is what you are wearing that night the
2   same uniform you have on right now?
3        A.  Underneath my vest, yes.
4        Q.  And over the top of what you have on
5   now, what, if anything else, what other layers did
6   you have on?
7        A.  Over this?
8        Q.  Yes.
9        A.  Probably just a T-shirt.  You mean
10  under this or over it?
11       Q.  No, I meant over?
12       A.  Just a heavy vest I just described.
13       Q.  Describe the vest, please?
14       A.  It's called a load bearing vest.  Like
15  I said, it's green in color, it has high collars.
16  This is all ballistic material.
17       Q.  Oh, I see what you are talking about.
18  I see where you --
19       MR. ANDERSON:  We went opposite ways.  He was
20  undressing and you are dressing.
21       MR. BOOKE:
22       Q.  Exactly.
23       A.  I'm sorry.
24       Q.  That's okay.
25       MR. ANDERSON:  I enjoyed it.

HIXSON  164

1   THE WITNESS:  Do you want me to back up here?
2   MR. BOOKE:
3        Q.  The layer that was visible, exposed,
4   the outermost layer is the vest?
5        A.  That's correct.
6        Q.  And does the vest have any markings on
7   it?
8        A.  Yes, it has.  It will have the star on
9   it and it's Velcro.  The back has a big police patch.
10  It's about just a little less than a foot long and
11  about three or four inches wide that says police on
12  it in yellow.  That's also on Velcro and then if you
13  wear the shoulder pads like I was describing earlier,
14  the ballistic shoulder pads will have Velcro so you
15  can take your patch that says Las Vegas Police and
16  you put it on the outside.  I don't wear the
17  ballistic shoulders so my uniform patch would show.
18       Q.  So all of the things on the outermost
19  layer that designates that you are a police officer
20  are on Velcro?
21       A.  Yes.  There is some tactical things,
22  like hostage rescue and barricade where we have to
23  sneak up on the area and we don't want the yellow
24  items to give our position away on a search warrant.
25  We want people to know who we are.  It's not a secret

DEPOSITION OF DARRELL HIXSON

HIXSON   165

1　because we are announcing ourselves. That's why they
2　are on Velcro.
3　　　　Q.　And were all of the SWAT officers who
4　were executing the search warrant at the Hinton
5　residence required to be identified with patches and
6　police on the back?
7　　　　A.　Yes, they are required, and the only
8　thing I do check, and I checked that night like I do
9　every warrant, I don't check every little patch like
10　the little star, but I make sure that the back patch
11　and some sort of shoulder is visible. And that night
12　I can attest that every big patch and shoulder, but I
13　can't attest to the little star. Sometimes guys
14　don't remember to put that on.
15　　　　Q.　Do you have a recollection of how
16　anybody was wearing any of their patches on that
17　particular night, or are you just talking about what
18　your usual practice is?
19　　　　A.　No, I always check. So that night
20　would be no different.
21　　　　Q.　When did you check?
22　　　　A.　When we all get dressed and we do a
23　line-up and a radio check. I check everyone's
24　equipment. That's part of my duties as assistant
25　team leader. I don't check for every little patch, I

---

HIXSON   166

1　just make sure that the big patches are showing.
2　　　　Q.　What would you do if somebody didn't
3　have a patch?
4　　　　A.　I just tell them to put one on.
5　　　　Q.　Suppose you don't have one?
6　　　　A.　We have extras.
7　　　　Q.　Who decided that the Hinton search
8　would be conducted at night?
9　　　　A.　We asked the -- I just told you what we
10　normally do. I have no idea who did it that night.
11　We asked what time they would like the warrant served
12　and the affiants give us a time that they are
13　available because they may have other things going.
14　So it's usually the affiant who is going to decide.
15　We rarely decide when we are going to serve it. In
16　other words, we usually don't dictate when we are
17　going to serve it. It's usually the affiant.
18　　　　Q.　In this particular case do you have any
19　recollection as to whether you just followed the
20　ordinary course in the search or were there any other
21　factors?
22　　　　A.　No, there were no factors that I
23　remember to change it from the ordinary.
24　　　　Q.　How would the SWAT team know whether
25　there were any children in a house that was going to

---

HIXSON   167

1　be searched?
2　　　　A.　That's why we send a recon team out.
3　Just because the affiant sends us, like we talked
4　about earlier, the SWAT warrant service sheet, was it
5　93? I'm getting used to it now, 92 -- 93. We check
6　on the recon. We look for the obvious. We look for
7　signs of toys outside, we look for the old Barney
8　blinds or something, a basketball hoop, the same way
9　we look for dogs. You see a dog out, a dog bowl.
10　　　　So we're looking for obvious signs,
11　just because it's on the request, we still -- that's
12　another reason we do the recon, to make sure that
13　there's no obvious signs of children present.
14　　　　Q.　On the night of January the 16th, 2002
15　at any time before you ordered the distract rounds
16　and the shotgun blast into the security door, did you
17　detect any sort of threat of violence whatsoever to
18　you or any of the SWAT team?
19　　　　A.　No, I didn't.
20　　　　Q.　You would have noted that in your
21　report if that had occurred, wouldn't you?
22　　　　A.　Yes, I sure would have.
23　　　　Q.　That would be a significant fact?
24　　　　A.　Yes, I definitely would have.
25　　　　Q.　Okay, do you need to take that?

---

HIXSON   168

1　　　　A.　Yes, I do.
2　　　　　(Recess taken.)
3　MR. BOOKE:
4　　　　Q.　At the time that you ordered your SWAT
5　team to deploy the distract devices and fire shotgun
6　rounds into the security door and to breach and enter
7　the Hinton residence, was there anything to your
8　knowledge to John Reyes had done that gave rise to
9　the search warrant?
10　　　　A.　No. I think you mentioned him earlier
11　today. No, if he was there I didn't take the names
12　of the people that were there, so I never heard of
13　Reyes until you mentioned it.
14　　　　Q.　And at the time that you ordered the
15　detonation of the distract devices and the shotgun
16　rounds into the door and the breaching and entering
17　of the premises, was there anything that Donald
18　Hinton had done that gave rise to your search into
19　the place?
20　MR. ANDERSON: To your knowledge.
21　MR. BOOKE:
22　　　　Q.　To your knowledge?
23　　　　A.　Donald was the guy, I don't know --
24　that's right. No, that's right. I'm getting Donald
25　and David mixed up.

## DEPOSITION OF DARRELL HIXSON

SHEET 43   PAGE 169

PAGE 171

```
                                    HIXSON    169
1          Q.   Now, what was the order of SWAT
2  officers in the line-up that went into the house?  Do
3  you have that written down somewhere?
4          A.   I have the order that they go into and
5  who they are teamed up with, but where they went, I
6  couldn't tell you.
7          Q.   I'm not asking where they went inside
8  the house.  I'm asking if you have it written down
9  the order in which they --
10         A.   Lined up?
11         Q.   -- lined up and went in?
12         A.   Yes, it's in here.  It's in the
13 Exhibit 5, and it has to be.  It has to be the entry
14 team.
15         Q.   What do those numbers mean?  I'll tell
16 you what, if I give you a piece of paper, can you
17 draw what those numbered positions mean?  Can you lay
18 them out?
19         A.   Yeah.
20    MR. ANDERSON:  Is it just a straight line?
21    THE WITNESS:  It's -- it's a two man team.  So
22 what you've got is position one or two, or team one,
23 position three or four.
24    MR. ANDERSON:  With your legs, look at your
25 legs --
```

```
                                    HIXSON    171
1  Vesp that day, the ram was Warren?
2     MR. ANDERSON:  No, Dumas.
3     THE WITNESS:  And Sheahan was back up.  B-U-S-L
4  is back-up shok-lok, and that was Sheahan.
5        (Discussion off the record.)
6     THE WITNESS:  That would be the line-up and the
7  reason, even though you can't see the diagram, you
8  have to line up that way because that's how the gate
9  pulls out.  So the breaching element will always be
10 on the side of the lock swinging out.  Since this is
11 right to left out they will be here.
12         The entry element, even though I can't
13 put them in front, would be in line with how the door
14 opens first.  So the entry team, and I'll put them
15 here now, will be lined up right by the door when it
16 opens.  So the door opens here, the entry would be
17 lined up here and the breach would be here.  And that
18 entry element would be at first only six guys, plus
19 the sergeant, because he'll back up and make room for
20 the breach team to join in the entry later, and they
21 work in a two man team.  It's Reid and Warren, would
22 be like the first team, even though, and I'll put a
23 number here, as one number, but they are number one,
24 technically.  Do you follow that?
25    MR. BOOKE:
```

PAGE 170

```
                                    HIXSON    170
1     THE WITNESS:  I have to borrow your --
2     MR. ANDERSON:  I have it right here.
3     THE WITNESS:  You just want their name and
4  position?
5     MR. BOOKE:
6          Q.   Yeah, that would be fine.  And perhaps
7  you could draw the, or designate where the door is?
8          A.   You want to know how they lined up?
9          Q.   Yes.
10         A.   Okay, that's easier.  I'll make it a
11 straight line and make it easy for you.  That's left
12 to right, interior door.  The breach team, I'll put
13 "breach" has to line up over here.  There's four of
14 them.
15         Q.   And could you put the numbers to
16 correspond?
17         A.   They don't have numbers but I'll put
18 their name.  I can put the shok-loker and that would
19 be Manny.
20    MR. ANDERSON:  If you have numbers on here.
21    THE WITNESS:  That's because after they
22 shok-lok, they come into the line.  This is just the
23 breaching element, they will enter later.  That's
24 Rivera -- oh, I'm sorry that's wrong.  This is
25 Rivera.  You have to sink the hook first.  It was
```

PAGE 172

```
                                    HIXSON    172
1          Q.   I do.
2          A.   And myself, and that's why I'm sure I
3  called the breach because I wanted to be up there
4  counting away.  That's usually how I do it.  That's
5  myself, and who was with me, Acosta would be team
6  number two.  Fowler and Williams would be number five
7  and six, but team three and Sergeant Willy Graham
8  would open up and allow the breach team to be part of
9  the entry.  And they are listed here, so I'll list
10 them as seven and eight.  This would be team four,
11 and that would be Vesp and Rivera.  Nine and ten,
12 team five would be Dumas and Sheahan, and since we
13 have an odd number, which we usually try to do so the
14 supervisor can see what's going on, Sergeant Graham
15 would be the post.  So Sergeant Graham is the post.
16         Q.   Post meaning what?
17         A.   Meaning he'll stop at the front door,
18 since he doesn't have a partner, and we like to do
19 that as a supervisor so he can see any problems that
20 might be going on that we don't see behind us and he
21 can call additional officers in from the outside,
22 which would be those containment people, if we needed
23 more people in.  So he's just there to kind of look
24 around and see what's going on.
25         Q.   Thanks.  Let's mark that as exhibit
```

## DEPOSITION OF DARRELL HIXSON

HIXSON    173

1  next in order.
2                  (Whereupon Deposition Exhibit
3          11 was marked for identification.)
4          MR. BOOKE:
5          Q.  You have just drawn all of the
6  positions of all the SWAT personnel on Exhibit 11.
7  Would the teams have entered the Hinton house in
8  numerical order:  Team one; team two; team three;
9  team four; team five, on the night of January 16,
10  2002?
11         A.  I would have to look further into the
12  SWAT warrant service planning sheet because that
13  line-up could have changed, and I'm sure it did
14  because we didn't make entry and find the people
15  inside, they started to come out.
16                  So some of the people in the back of
17  the line might have actually taken physical control
18  of the individuals coming out the door and would be
19  with them, handcuffing them.  So some of the people
20  at the end of the entry line might have been tied up
21  with the people that were coming out of the front
22  door.
23         Q.  Is there anything in the SWAT packet
24  that describes how that occurred?
25         A.  Yes, on page 74 of the Exhibit 5 of the

HIXSON    174

1  SWAT warrant service planning sheet, it says -- it
2  gives each person's name, a pre and a post, that
3  means who we think is in there before, being pre; who
4  we actually found inside or outside of the residence
5  as being post.  And at the end of each one says came
6  out front door, came out the front door, came out the
7  front door, there's four individuals named here and
8  that tells me that we didn't find them inside the
9  residence.  They actually came out the front door and
10  followed our commands to walk backwards and we take
11  them into custody and put plastic handcuffs on them.
12                  So they came out.  So we didn't find
13  them in.  So I know the end of my entry line, maybe
14  the last two or three guys were taking people into
15  custody and they were busy with those people and may
16  not have made entry right away.
17         Q.  Do you have an actual recollection of
18  when any of these individuals walked out of the
19  premises?
20         A.  Yes, they walked out when they opened
21  the door, actually tried to close the door, if I
22  remember right, too.  They opened not the bars, they
23  opened the exterior front door, just as we're
24  approaching the exterior front door.  We still had
25  the -- I don't know if we had the shok still up

HIXSON    175

1  there, but I know we had the ram still up there and
2  someone opened the door, and I don't remember who,
3  and it was half open and half closed, and we rammed
4  it.  It got it all the way open and stopped there.
5  We didn't make entry.  There's tactical reasons why.
6                  They know we're there now, there's no
7  reason to rush.  And so we called out who we could
8  and out came David Hinton, out came a Donald Hinton,
9  out came a John Reyes, and out came Michelle
10  Veselska, and I got that information off page 74 of
11  the Exhibit 5.
12         Q.  In what order did the individuals come
13  out of the Hinton residence?
14         A.  The only order is whoever is the older
15  gentleman, he came out first.  After that I don't
16  remember who came out, so I don't know who is older
17  here, if David or who.
18         Q.  So if I understand you correctly, you
19  are saying the distract devices went off, the
20  shok-lok, you blew open the security door, then
21  someone opened, one of the occupants opened the front
22  door?
23         A.  Uh-huh.
24         Q.  And walked out?
25         A.  Yes, they were there and we commanded

HIXSON    176

1  them to walk out.
2         Q.  But they followed your commands?
3         A.  Yes, they did.
4         Q.  At any point on the night of January
5  16, during the course of this whole Hinton search
6  warrant, did you or any of your SWAT team, were you
7  threatened by any of the occupants of the premises?
8         A.  No, they came out.  No violence.  They
9  just came out, they walked out.
10         Q.  You did not encounter any armed
11  resistance?
12         A.  Oh, no.
13         Q.  And you didn't encounter any kind of
14  physical violent resistance?
15         A.  No.
16         Q.  The occupants were compliant with all
17  of the commands they were given?
18         A.  I'm familiar with the commands at the
19  front door.  I don't know how well they reacted to
20  the commands to put your hands behind your back.  I
21  don't look behind me.  I have responsibilities in
22  front of me.
23                  They acted very good coming out of the
24  front door and I have no reason in any of the reports
25  that they acted any different when being handcuffed

DEPOSITION OF DARRELL HIXSON

HIXSON   177

1   and detained.

2   Q.   From your recollection, how much time
3   elapsed from when the front door of the Hinton house
4   was opened by one of the occupants until all four of
5   the occupants were outside?  Seconds?

6   A.   No more than a minute and a half until
7   everybody was out, you know.  They came out, no more
8   than a minute and a half.  What we do is we ask one
9   person to come out, the other one to stop there until
10  they clear the doorway.  We don't want four people
11  coming out.

12       So we probably tried to control it and
13  I don't remember them giving any problems so it
14  probably took no more than a minute and a half to get
15  everybody out.

16  Q.   Were there any of the SWAT officers
17  inside the house before all four occupants came out
18  of the house?

19  A.   No, because after that that door is
20  opened and the element of surprise is gone.  We
21  searched the remaining of the house, in other words,
22  from the front door on.  We did a slow methodical
23  search, which is a different tactic than just a raid
24  when we get in with surprise.

25       So once the door was open and the

---

HIXSON   178

1   people come out, our element of surprise is up.  So
2   we don't clear the house fast now, we clear it very
3   slow.  So that means everybody is out first.  We get
4   whoever -- we announce ourselves again and say anyone
5   else left in the house.  We ask the people is there
6   anyone else in the house.  They say no, yes,
7   whatever, and then we'll clear the house slowly.
8   We're done with the surprise factor.  It's not a
9   tactical advantage anymore.

10  Q.   I think I understand you, but I want to
11  be certain.  Once the front door of the Hinton house
12  was opened, all of the SWAT officers remained outside
13  until the four occupants came out the front door?

14  A.   That's correct.

15  Q.   And it was not until all the occupants
16  of the house were outside until the SWAT officers
17  went inside?

18  A.   That's correct.

19  Q.   And once the SWAT officers began entry
20  into the house your only purpose was to make sure
21  that there were no other occupants of the house?

22  A.   That's correct.

23  Q.   It was not your intention, not your, I
24  mean the SWAT team's intention to conduct a search
25  for the items listed in the search warrant?

---

HIXSON   179

1   A.   That's correct.  We don't do a search.
2   We may come upon things, but that's not our
3   intention.

4   Q.   The only search that the SWAT team
5   would conduct is to search for people who might be
6   threats to the persons conducting the search?

7   A.   That's very correct.

8   Q.   And is it also correct that the SWAT
9   team did not, in fact, conduct any search for any of
10  the items listed in the search warrant?

11  A.   Word that once more?  I want to make
12  sure I answer this correct.

13  Q.   I had asked you earlier if it was your
14  intention to search for anything, other than people
15  to reduce the threat to zero?

16  A.   No, it was not my intention.

17  Q.   And did you, did the SWAT team search
18  for anything listed in the search warrant?

19  A.   No, we did not search for anything
20  listed in the search warrant, nor did we intend to
21  search for anything.

22  Q.   Did the SWAT team obtain anything that
23  was listed in the search warrant?

24  A.   Not only did the SWAT team, but I did,
25  yes.

---

HIXSON   180

1   Q.   You did?

2   A.   I found something I had no intention of
3   finding but I found it.

4   Q.   I see.  What did you find?

5   A.   We went up in the attic, because there
6   was attic access.  We found an access, and with the
7   delay of getting into the house, since we didn't get
8   in fast, people have a chance to hide.

9       One of the places they hide, and we
10  have found repeatedly, is in the attic.  So we have
11  to make the house secure and safe before we turned it
12  over to narcs, we have to search every place,
13  including attics.  So we had, I don't know if we had
14  a hit by the dog or I think I found the attic access,
15  and we sent a dog and myself and I think two other
16  SWAT people up in the attic, because it was a big
17  attic, and I noticed during our time in the attic
18  that some of the fiberglass insulation had been
19  moved.

20      Well, it's common for people to lay in
21  the attic and they put the insulation over them.  I
22  have seen that happen and I have found people hiding
23  up there numerous times in the 13 years up there.  So
24  you have to physically roll that area back that you
25  think, or if it's the kind blown in you have to kind

---

## DEPOSITION OF DARRELL HIXSON

SHEET 46   PAGE 181

HIXSON   181

1  of push around.  And I found some rifles, cases and
2  rifles and some weapons in an area, and I think
3  Officer Fowler found some more in another area, doing
4  the same thing I was doing, looking to see if someone
5  had hidden under the insulation, because it was
6  disturbed.
7        Q.   Okay.  In the course of searching the
8  attic did you cause any damage to the ceiling of the
9  Hinton house?
10       A.   Oh, absolutely, I did.  I kicked it in.
11       Q.   You kicked in the ceiling?
12       A.   Yes, I did.
13       Q.   In what location in the house did you
14  kick in the ceiling?
15       A.   Somewhere, I think it was near a
16  hallway or something.  I was up in the attic, so I'm
17  not sure exactly where in the house.  I think it's
18  listed that we kicked it in and I think we took
19  pictures of it.  I kicked it in for a reason, very
20  good reason.
21       Q.   What reason did you kick in the
22  ceiling?
23       A.   If you have ever been in an attic, and
24  I assume you have been in one now, and then it's very
25  difficult to move and breathe and I'm not going to

PAGE 182

HIXSON   182

1  carry weapons that I don't know that are loaded or
2  unloaded that malfunction or not malfunction that I
3  found up in that attic.  I'm not going to carry them
4  while I'm crawling through an attic with 70 pounds of
5  equipment on my back.  I'm going to do the safest
6  thing for myself and my teammates, because the
7  weapons can go off and can go down into the rooms,
8  they can go through the walls and out the house.
9        I'm going to hand those weapons
10  straight down.  So wherever I found the weapons, the
11  closest area is where I kicked an opening in the
12  ceiling so I could pass those weapons safely from the
13  attic into the room.  And I also am a firearms
14  instructor so I know all about weapons and no one can
15  tell me that it's not loaded until I see that it's
16  not loaded.  And I'm not going to handle a weapon in
17  an attic, wearing 70 pounds of equipment and having a
18  hard time to breathe, and not knowing the weapon
19  system, this is no time to experiment.
20       So I kicked the ceiling to pass the
21  weapons down to be placed on the ground.
22       Q.   When you searched the attic did you
23  satisfy yourself that there were no people in the
24  attic?
25       A.   Yes.  Once we searched the attic, and

PAGE 183

HIXSON   183

1  we also had the K-9 come up later and run the dog
2  through.  We felt there was no one else up there, and
3  we were up there quite a long time.
4        Q.   Your first thing that you did when you
5  went up into the attic was to make sure there were no
6  people up there that presented any threat or danger;
7  correct?
8        A.   Correct.
9        Q.   So the first conclusion that you came
10  to in the attic was that there were no people there;
11  correct?
12       A.   No, the first conclusion I came to that
13  someone has disturbed the insulation in the attic.
14       Q.   Right.  And having seen that there was,
15  that the insulation was disturbed, you then made sure
16  that there were no people up there?
17       A.   By looking under the insulation.
18       Q.   Right, and so once you had determined
19  that there were no people in the attic, it would have
20  been possible for you to simply exit the attic, leave
21  the rifles and weapons there and have someone else
22  come and get them; is that true?
23       A.   That's very much true.  I asked the
24  detectives, and I don't know which one because I'm
25  relaying from top to bottom, but we asked hey,

PAGE 184

HIXSON   184

1  there's a lot of weapons up here.  It's very tight.
2  It's very unsafe, because there is a chain of
3  custody, as you know.
4        Q.   Right.
5        A.   We asked do you want us to pass the
6  weapons down or not.  We asked their permission and
7  the reason I did that is because there were so many,
8  and I didn't know if they were clear or not, that it
9  was very unsafe for someone to clear, whether they
10  tried to clear it or I did, I'm more of an expertise
11  in weapons than any of those detectives in there
12  because of what I do for a living.
13       So the expertise to clear them was up
14  there, but I wasn't about to, because it's not safe.
15  So I relayed through the guys that are, you know, in
16  the rooms, did they want us to pass them down?
17       Q.   Did you recognize that the rifles that
18  you found in the attic were not on the search
19  warrant, they were not items being sought on the
20  search warrant?
21       A.   Yes, I read the search warrant.  I knew
22  they were going after drugs.
23       Q.   Right.  You were aware of that at the
24  time you saw the rifles, weren't you?
25       A.   When I peeled back the insulation, yes,

DEPOSITION OF DARRELL HIXSON

SHEET 47   PAGE 185

**HIXSON   185**

1  and saw that they were rifles and not a person.
2       Q.   And at the time you saw those rifles
3  you didn't know whether those rifles were stolen, did
4  you?
5       A.   No.
6       Q.   You didn't know whether those rifles
7  were the fruits of a crime, did you?
8       A.   That's right.  I didn't know.
9       Q.   When you saw those rifles, one
10  choice -- well, you knew that those rifles couldn't
11  be fired by anyone because you decided there wasn't
12  anybody in the attic; right?
13       A.   No, when we found the rifles, we were
14  still in the process of clearing the attic, but
15  eventually, yes.
16       Q.   Did it cross your mind to simply leave
17  the rifles there and exit the attic and secure the
18  premises so that nobody else could get access?
19       A.   That's what I just told you.  I asked
20  the investigator what they wanted done.  I answered
21  that question.
22       Q.   I actually didn't ask it, you answered
23  it.
24       A.   Well, the same answer applies then.
25       Q.   So when you are in the attic, one of

PAGE 187

**HIXSON   187**

1  recover.
2       Q.   Did it occur to you that no one could
3  fire or even get access to those weapons if you
4  simply left the attic and secured the house?
5       A.   Yes, but it wouldn't -- our job is to
6  make the house safe and that means a lot of different
7  things and I left that weapon decision up to the
8  officers investigating.
9       Q.   Those weapons could only be fired by
10  people if there were people in the house?
11       A.   That's correct.
12       Q.   In the course of handing those weapons
13  down through the holes that you punched in the
14  ceiling did you notice that several of those rifles
15  were antique rifles?
16       A.   If the cases were closed, they were
17  kept closed.  I told you we weren't going to fiddle
18  with the weapons up there, so I don't know how they
19  came out.  You might have that record, but however I
20  found them, if I could see what kind of weapon it
21  was, because they weren't in a case, then obviously I
22  could see it.  So I don't remember seeing any antique
23  weapons.
24       Q.   Do you have any recollection at all?
25       A.   Not without looking at pictures and

PAGE 186

**HIXSON   186**

1  the things that you thought of was let's just leave
2  the rifles here, secure the house, and let somebody
3  else deal with it in whatever time they have?
4       A.   Yes.
5       Q.   And so it was one of the narc
6  detectives who made the decision to ask you to bring
7  down the rifles?
8       A.   On my recommendation, my recommendation
9  was a person can only shoot maybe two guns at a time.
10  You only have one hand on each side of your body.  We
11  ran across over ten to twelve weapons, I don't know
12  what the final count was.  It's very unusual, very
13  unusual to have that many weapons in an attic.  In 12
14  years of my 3,000 entries, it's very unusual.  People
15  hide a gun or two.  People usually don't hide --
16  what's the final count?
17       Q.   21.
18       A.   21 guns in an attic.  Usually they put
19  them in a safe, okay?  It's very unsafe to have 21
20  guns in an attic.  This was a very unusual situation,
21  very dangerous situation to the investigating
22  officers who would get up there and try to clear the
23  weapons.  So that's why I asked them, and I probably
24  encouraged from the tone of my voice, you want us to
25  recover these weapons or you, and they said you

PAGE 188

**HIXSON   188**

1  stuff.  I know there's quite a few in cases, I
2  remember quite a few cases, and I remember some
3  without cases.
4       Q.   Did you find any other items even
5  though you weren't searching for them?
6       A.   No, I just went to where the insulation
7  was disturbed.
8       Q.   Did any other SWAT team members find
9  any other items in the Hinton house?
10       A.   Well, Officer Mark Fowler was up in the
11  attic with me and he found some of the weapons, too.
12  So between the two of us handling and passing, we're
13  the only ones -- I think Sergeant Graham was up
14  there.  I don't think he handled any of the weapons,
15  he watched our backside of the area.  He hadn't
16  cleared yet of the attic, if I remember right.
17       Q.   How many square feet would you say that
18  attic was?
19       A.   This attic covers the whole house, so
20  it's a big attic.
21       Q.   When you get down to the ends of the
22  eaves of the house there's not room for it?
23       A.   Oh, yeah, there's room for people.  We
24  go to the very end of the attic.  I've found people
25  in attics.

DEPOSITION OF DARRELL HIXSON

HIXSON   189

1   Q.   All right.
2   A.   So I know where people hide in attics
3   and I know they go to the very end, because they know
4   people are lazy, they're going to crawl all the way
5   in because they think the officer is not going to
6   crawl all the way in.
7   Q.   Other than the rifles, did SWAT
8   officers find any other items that were taken from
9   the Hinton house?
10   A.   No, I don't recall any in my report and
11   I don't recall any.  I don't think we handled
12   anything or retrieved any evidence or items that
13   weren't the evidence being sought.
14   Q.   Were you involved in any way in taking
15   the individuals who had come out of the house into
16   custody?
17   A.   Me?
18   Q.   Yes.
19   A.   No, I was running the team at the front
20   door.
21   Q.   Who took the individuals into custody?
22   A.   I don't think it lists, it just said
23   they came out the front door.  Usually when we find
24   them in the house we put that such-and-such officer
25   found such-and-such person in the kitchen, but when

PAGE 190

HIXSON   190

1   they walk out we usually don't put, they were found
2   by anyone because they weren't.  They just walked
3   out.
4   Q.   How were the individuals controlled or
5   contained outside?
6   A.   They were put with their hands behind
7   their back with a nylon flex cuff and we also
8   photographed them to show they are in good health
9   prior to our departure.  Because we are the last ones
10   to have contact with them and then the investigators
11   do.
12        So we take pictures of how we left them
13   to make sure that we don't get blamed for anything
14   that happens to anybody when we are gone.  And we
15   also have the tactical paramedic and the doc and we
16   ask anybody if they need medical attention.
17   Sometimes they just get hyperventilated because they
18   are excited or sometimes they are upset or just have
19   a problem or sometimes we injure somebody.  No one
20   needed medical attention, so we took the pictures of
21   the damage of the people and left.
22   Q.   Did you take any photographs of the
23   individuals who were removed or who came out of the
24   house from head to toe?
25   A.   I think we just take facial, and I

PAGE 191

HIXSON   191

1   think that's what we did here.  I think it's just
2   facial.  I have to look at the picture.
3   Q.   Why did you not photograph these four
4   individuals taken from the house from head to toe?
5   A.   Well, we normally don't.
6   Q.   Why not?
7   A.   Because we don't.  There's no reason.
8   We just take their picture.
9   Q.   Did you see the four individuals who
10   were, who came out of the house?
11   A.   Eventually when we are getting all the
12   gear together and walking out.
13   Q.   How was the oldest man dressed?
14   A.   I don't know.
15   Q.   How was either of the younger men
16   dressed?
17   A.   I wouldn't know.
18   Q.   How was the girl dressed?
19   A.   I wouldn't know.
20   Q.   Did you notice that one or more of the
21   people who was taken out of the house had no shoes
22   on?
23   A.   I didn't notice that.
24   Q.   Did you notice that one or more of the
25   people taken out of the house had no jacket or warm

PAGE 192

HIXSON   192

1   outer wear on?
2   A.   I didn't notice that, either.
3   Q.   How long were the individuals who were
4   taken out of the house kept under guard outside the
5   house before your SWAT team left?
6   A.   They would have to be outside for
7   probably 20 to 30 minutes.  I think I was in the
8   attic for quite awhile, so I would say it's fair to
9   say 20 minutes minimum, and I don't think any more
10   than 30, but somewhere in there.
11   Q.   Where were the four individuals who
12   were taken from the house when your SWAT team left
13   the Hinton house?
14   A.   They were just by the curb in the front
15   of the house and I don't know where they were taken
16   after the narcotics unit took over, but they are
17   outside, the number one side right there.
18   Q.   Out in front of the house?
19   A.   Yes.
20   Q.   Were they seated or standing?
21   A.   I think they were seated, if I remember
22   right.  It might have been on the curb, but I don't
23   remember exactly.
24   Q.   Okay, and in terms of times am I
25   correct that there's a page here that's got some --

## DEPOSITION OF DARRELL HIXSON

HIXSON   193

1   would you look at page 82?
2       A.   Uh-huh.
3       Q.   Do you see at the very bottom, those
4   indication of entry and exit times; is that correct?
5       A.   Yes.
6       Q.   Is that what that indication is?
7       A.   Uh-huh.
8       Q.   I'm sorry, is that a yes?
9       A.   I'm sorry, yes.
10      Q.   So what does entry at 2130 mean?
11      A.   That's probably when we just approached
12  the house and started to announce.
13      Q.   What does exit at 2235 mean?
14      A.   Probably when we got all the equipment
15  together and actually left the scene.
16      Q.   Did you see the detectives take the
17  four individuals back into the house?
18      A.   No, I was busy doing what I do
19  afterwards, making sure equipment and that. I didn't
20  notice them at all.
21      Q.   Did you see whether the detectives took
22  the four individuals back in the house before you
23  left?
24      A.   No, I didn't.
25      Q.   Your last recollection of seeing the

HIXSON   194

1   individuals was sitting out on the curb?
2       A.   Yeah.
3       Q.   Did one or more of the SWAT team fall
4   through the ceiling of the Hinton house?
5       A.   I think, I don't know if Fowler or
6   myself stepped through. I think maybe Fowler might
7   have stepped through. You would have to ask him.
8       I know when we got up something
9   happened and I think it was Fowler because he's got a
10  steel thing in his leg from being shot, so I don't
11  know. I know something happened, I can't remember.
12  I don't think it was me, I think it was Fowler. I
13  know it wasn't Sergeant Graham because he came up
14  last, so it had to be one of us.
15      Q.   It had to be one of you that what, that
16  fell through the ceiling?
17      A.   Yeah, that stepped through the ceiling.
18  It would be right at the attic access. That's where
19  we had the problem, if I remember right.
20      Q.   And it actually came all the way from
21  the attic down to the floor below?
22      A.   I don't remember him falling all the
23  way to the floor. That's news to me. I don't
24  remember, and I know I didn't.
25      Q.   And you say stepped through the attic,

HIXSON   195

1   what do you mean by that?
2       A.   There's beams, two-by-four beams in the
3   attic and the drywall is attached to it. You can
4   slip off the beam and put your foot through the
5   drywall, which is what I thought happened, and you
6   don't have to necessary fall from out of the attic.
7       Q.   Were any of the SWAT team given medical
8   attention at the scene?
9       A.   Oh, yeah, that's right. Yeah, we were.
10  I forgot about that. I think, I don't know if anyone
11  took oxygen, but we had the dog and our tac look at
12  myself and Fowler and maybe Sergeant Graham because
13  you breathe that insulation up there and it's really
14  hard on your lungs and I think we were breathing kind
15  of hard. But I don't know if we took oxygen, but I
16  know we didn't get transported anywhere.
17      Q.   Was there a stretcher, a gurney rolled
18  into the Hinton household?
19      A.   Not that I saw.
20      Q.   Was there a gurney rolled up to the
21  Hinton house?
22      A.   Not that I saw. You know, you would
23  have to check with the tac paramedic or the doc on
24  the scene.
25      Q.   Who determined the specific time at

HIXSON   196

1   which the Hinton search would be conducted?
2       MR. ANDERSON:  Objection, asked and answered.
3   Go ahead.
4       THE WITNESS:  Like I said earlier, the affiant
5   would 90 percent of the time call and decide hey,
6   we're free at this time. So it's usually the
7   affiant.
8       MR. BOOKE:
9       Q.   Meaning Witham in this case?
10      A.   That's correct.
11      Q.   Was SWAT involved in any way in
12  transporting the people taken from the house down to
13  the jail?
14      A.   Not to my knowledge.
15      Q.   Was the SWAT team gone from the Hinton
16  house when the four individuals were taken to jail or
17  when any of the individuals were taken to jail?
18      A.   Well, I know they were still there
19  before we left and they were still there when we were
20  leaving. So I assume they were still there as we
21  were leaving. So I don't think anyone went to jail
22  when we were there, not to my knowledge.
23      Q.   Would there have been any reason
24  whatsoever for any of the SWAT personnel to open or
25  empty drawers?

DEPOSITION OF DARRELL HIXSON

HIXSON   197

1    A.   We'll go -- we'll open drawers.  You
2  find people hiding inside a fake drawer that's not a
3  drawer.  So we'll open the drawer.  So it's not
4  unusual for all the drawers to be open to see if it's
5  a false drawer, especially in a big dresser.  So if
6  you found dressers that were open, that's a good
7  possibility, 90 percent, sure, that we probably
8  opened them.
9    Q.   Do you close them if you find no people
10  in them?
11    A.   Sometimes we do, I mean it just depends
12  how many.  Like if I come across a big dresser and it
13  has a whole bunch, I usually don't.  I open it, open
14  it, open and examine.  I'm kind of searching and if
15  there's a lot, it could be and it couldn't be,
16  there's no definite.
17    Q.   Was there any reason for any of the
18  SWAT personnel to empty out drawers?
19    A.   No.
20    Q.   Was there any reason for any SWAT
21  personnel to tear open any cushions?
22    A.   No.
23    Q.   Was there any reason for any SWAT
24  personnel to cut open any pieces of furniture?
25    A.   No.

HIXSON   198

1    Q.   Was there any reason for any SWAT
2  personnel to damage any walls?
3    A.   Walls?
4    Q.   Yes.
5    A.   There might be some damage as we
6  climbed up on a wall towards the attic access, but if
7  it's anywhere else other than that, no.
8    Q.   Would you look at Exhibit -- I'll tell
9  you what, we need to add a page, let's mark --
10    (Recess taken.)
11    (Whereupon Deposition Exhibit
12    12 was marked for identification.)
13    MR. BOOKE:
14    Q.   Officer Hixson, marked now as
15  Exhibit 12, that's page 85 to the --
16    A.   Oh, yeah.  You want it to go to this
17  one?
18    Q.   To the LVMPD page 85.  I don't want to
19  alter Exhibit 5, but just to put on the record
20  testimony that you gave earlier, Exhibit 12 was also
21  a part of the SWAT packet?
22    A.   Right.  It should have been right there
23  and it wasn't.  It should have been right there
24  between pages 84 and 86.
25    MR. ANDERSON:  Just to be clear, when we say

HIXSON   199

1  the "SWAT packet," we're saying the documents prior
2  to the execution of the search?  Isn't that what
3  Exhibit 5 is?
4    THE WITNESS:  Right.
5    MR. BOOKE:
6    Q.   So to make the record complete then, if
7  you add or take collectively Exhibit 5, Exhibit 6,
8  and Exhibit 12, collectively those would be all of
9  the documents that would be part of the SWAT packet
10  in the planning process?
11    A.   That would be correct, yes.
12    Q.   Looking at Exhibit 5 is there anything,
13  any of the handwriting in Exhibit 5 that is your
14  handwriting?
15    A.   Page 84 on Exhibit 5.
16    Q.   Okay.
17    A.   COR.
18    Q.   Would you please take the yellow
19  highlighter and highlight anything that's in
20  Exhibit 5 that's in your handwriting?
21    A.   Here's something that's interesting,
22  the handwriting for the line-up in these photos, some
23  of it would be mine.  Are you interested in the
24  photos?
25    Q.   What page in Exhibit 5 are you

HIXSON   200

1  referring to?
2    A.   86.
3    Q.   I don't think the copy is good enough
4  to actually be able to record that.  Can you
5  identify --
6    MR. ANDERSON:  Have him put a dot about it.
7    THE WITNESS:  Oh, you know what?  This is the
8  house not in question, but that's my writing.  All
9  this is my writing here.
10    MR. BOOKE:
11    Q.   You are talking about the lower
12  right-hand corner?
13    A.   Of page 86.
14    Q.   Okay, which relates to the Agua house?
15    A.   Yes, it relates to the Agua house.
16    Q.   Is there any of your handwriting on
17  either of the other two photos?
18    A.   Do you have a better copy so I can make
19  sure?
20    MR. ANDERSON:  Yeah.
21    THE WITNESS:  I don't think there would be, let
22  me check and make sure.  No, not to my knowledge.
23  The only thing I'm questioning is who wrote that info
24  on there.  I don't think that's my writing, but no.
25    MR. BOOKE:

DEPOSITION OF DARRELL HIXSON

HIXSON   201

1   Q.   Is there anything else in Exhibit 5
2   other than page 84 that's in your handwriting?
3       A.   No, sir.
4       Q.   And on Exhibit 1, although pages 71 and
5   72 are not in handwriting, you are the author of
6   those pages; is that correct?
7       A.   Yes, sir.
8       Q.   What appears in Exhibit 5 on page 84
9   that you have highlighted, was that written after the
10  search warrant was executed?
11      A.   Yes.
12      Q.   Now looking on Exhibit 1, page 71 at
13  the bottom in the blank beside date and time of
14  report, do you see that?
15      A.   Yes.
16      Q.   That indicates that the report was made
17  out on January 16, 2002 at 2100 hours, if I'm reading
18  that correctly, would you agree?
19      A.   Yes.
20      Q.   Now that is an error?
21      A.   Yeah, I dictate on a tape recorder and
22  our secretary types it.  So she's probably confused
23  about the hours.  If you look at it, it matches the
24  date and time occurred, so she probably is confused
25  of the date and time of the report.

HIXSON   202

1   Q.   How long after the execution of a
2   search warrant at the Hinton house was it until you
3   actually dictated the report that is pages 71 and 72?
4       A.   I wouldn't remember without any kind of
5   documentation.
6       Q.   Is there any documentation of when you
7   dictated pages 71 and 72?
8       A.   No, there isn't.
9       Q.   Sometimes you'll see a notation that
10  says date and time of dictation, date and time of
11  transcription.  Is that done for SWAT records?
12      A.   Well, I don't know.  You would have to
13  ask the people who are trained to type it.  I would
14  assume that would have been done, but since I don't
15  type, I didn't type it, I wouldn't know.
16      Q.   Do you have any recollection at all of
17  when you may have dictated pages 71 and 72?
18      A.   I only know we don't let them go for
19  more than a week on my desk.  I have to wait --
20  there's a drawing done afterwards, a detailed drawing
21  that's done afterwards, and the guys usually don't
22  get to it for a day or two, but I usually have my
23  tape, and my tape dictated within a week.  It doesn't
24  mean it's necessarily going to be typed that day, but
25  I have the dictation done within a week, which is

HIXSON   203

1   what I was going to do today.
2       Q.   Did you observe any of the narcotics
3   officers searching the Hinton house?
4       A.   No, I didn't.
5       Q.   Was there any reason for your decision
6   to knock holes in the ceiling and remove the rifles
7   through the holes in the ceiling, other than the narc
8   officer made the decision for you to do so?
9       MR. ANDERSON:  I'm going to object in that this
10  misstates testimony that he only testified that one
11  hole was knocked in the ceiling intentionally.  Go
12  ahead and answer.
13      THE WITNESS:  Now I've lost track.  Go ahead,
14  one more time.
15      (Record read by reporter.)
16      THE WITNESS:  No.  He made the decision for me
17  to recover the rifles.  I made the decision to make
18  the hole because I know how much room I needed to
19  safely get those weapons down, and I knew that I
20  wasn't going to crawl back the other way with weapons
21  that weren't clear.  So he, the officer gave me --
22  the affiant, the officer, I don't know who they were
23  talking to.  I'm assuming they were talking to the
24  affiant, so I wouldn't know, but when they say go
25  ahead and retrieve them, I made the decision of how

HIXSON   204

1   to get them down and I knew I had two choices, to
2   crawl back to that attic access, which evidently
3   Fowler already accidentally went through, and now
4   that I know that, it's refreshing it that I chose
5   that, or it turned out to be 22, or whatever you
6   said, weapons through that hole that I punched and
7   for everyone's safety, that's where I was going to
8   hand them down.  I was -- I wasn't going to try and
9   crawl back through the house.  As a matter of fact, I
10  don't know if we have a diagram from where the
11  weapons were found, but where the attic access was,
12  but it's a long way.
13      Q.   Was there any reason for your decision
14  to remove the rifles from the Hinton house on the
15  night of January 16, other than the narc detective
16  directed you to do so?
17      A.   No, that's correct, that would be a
18  correct way of putting it.
19      Q.   Is there a document in Exhibit 5 that
20  lists all of the weapons that SWAT officers had on
21  the night of January 16?
22      MR. ANDERSON:  That they personally had brought
23  with them?
24      MR. BOOKE:
25      Q.   Yes.

DEPOSITION OF DARRELL HIXSON

SHEET 52   PAGE 205

HIXSON   205

1   A.   That the SWAT officers carried?
2   Q.   Yes.  Let me ask that question a little
3   bit differently.
4   A.   Yes.  Where you see on any page, like
5   on page 75 of Exhibit 5, you see a containment team
6   and it says officer and it says weapon and there's an
7   HG there.  That means a handgun.  So each one of
8   those officers on the containment team from one to
9   five carried a handgun.
10        When you go to page 76 and you see the
11  entry team line-up and you see HG, that's handgun,
12  and when you see an officer, like number four,
13  Officer Acosta; number five, Officer Fowler; MP5,
14  that's a make of a submachine gun, that's an HK MP-5,
15  so that would indicate a machine gun.
16  Q.   Okay.
17  A.   So when you go down to the breaching --
18  Q.   Okay.
19  A.   -- you will have to cross-reference the
20  breaching and then when we come in as entry, you'll
21  notice when they are breaching, the device they are
22  using is a handgun, but that means it's on their
23  person, but they are using a hook.  Number two,
24  Officer Rivera has a handgun on him, but he's also
25  using a shok-lok and Officer Three, Dumas, has a

PAGE 206

HIXSON   206

1   handgun but he's using a ram, and Officer Sheahan has
2   a handgun and using a back-up shok-lok, and the entry
3   reverts back to the entry just above that.  When they
4   aren't part of the entry team, you see that they have
5   a corresponding handgun.  So it shows that they were
6   carrying a handgun the whole time but they may have
7   other tools in their hand because they were
8   breachers.
9   Q.   When the eleven members of the entry
10  team were lined up at the front of the Hinton house,
11  were all of the weapons drawn?
12  A.   Oh, yes.  We have the weapons drawn.
13  Q.   Were all of their weapons trained on
14  the front door of the Hinton house?
15  A.   No.
16  Q.   Were any of the weapons trained on the
17  front door of the Hinton house?
18  A.   Yes, probably weapon numbers position
19  one, two, three.  The other positions might have been
20  pointing at windows that flank.  So those, probably
21  positions four, five, six, and the people in the back
22  of the line-up would not have their handguns
23  pointing.  They were probably down at the low ready.
24  Q.   Describe the ram that Officer Dumas
25  had?

PAGE 207

HIXSON   207

1   A.   It's a cylinder about two and a half,
2   three feet long.  It has two handles with neoprene on
3   it, filled with cement.  It's heavy and you swing it
4   with both hands and it hits the door and with the
5   force of the room and the energy, it pops the door
6   open.
7   Q.   It has two handles?
8   A.   It has two handles, yes.
9   Q.   How much does the ram weigh?
10  A.   Probably about 60 to 70 pounds.
11  Q.   Did you see Officer Dumas swing the ram
12  anywhere in the vicinity of a person that was inside
13  the house?
14  A.   No, I saw him swing at the door as one
15  of the persons was behind it and I don't know if he
16  was trying to close it or just posted behind it, but
17  I saw Officer Dumas use the ram on the door, but it
18  wasn't one of the full swings.  I think he thought
19  the guy was going to close the door so I know he hit
20  the door with the ram.
21  Q.   Was the door being closed or opened at
22  the time or not moving at all?
23  A.   From my position, it wasn't moving at
24  all, so I couldn't tell you either way.
25  Q.   How many times have you given

PAGE 208

HIXSON   208

1   depositions in the past?
2   A.   Concerning?
3   Q.   Anything?
4   A.   Three or four.
5   Q.   Have all of those occasions been
6   lawsuits related to your work at Metro?
7   A.   I think all but one, and let me think
8   about that one.  Yes, yes, I take that back, the
9   first one was.
10  Q.   Had you been involved in a search of
11  the premises at 1919 Hallwood at any time prior to
12  January 16, 2002?
13  A.   No, sir.
14  Q.   Had you been involved in a search
15  involving David Hinton, Donald Hinton or John Reyes
16  prior to January 16, 2002?
17  A.   I've done so many over the years, if
18  they were ever in a house that I did a search
19  warrant, it wasn't to my knowledge.
20  Q.   To your knowledge did SWAT ever search
21  the premises at 1919 Hallwood prior to January 16,
22  2002?
23  A.   Our records go back a few years.
24  Usually we check to see if we have ever done there,
25  and I don't recall any folder, so I doubt it.

Lori M. Judd, CCR #233, RMR

## DEPOSITION OF DARRELL HIXSON

SHEET 53    PAGE 209

HIXSON    209

1    Q.    Did you check to see if SWAT had ever
2    searched 1919 Hallwood prior to the time that you
3    conducted the search on January 16?
4        A.    That's why I said we checked to see if
5    we had a folder and we didn't.
6        Q.    Was there a bullhorn in use in the SWAT
7    execution of the search warrant at the Hinton house?
8        A.    No, I read that part and no, it was the
9    whole team announcing that night.  There was no
10    bullhorn.
11        Q.    Why was there no bullhorn?
12        A.    That would be up to Sergeant Graham
13    whether if he was going to bring one or not, so you
14    would have to ask him.
15        MR. BOOKE:  All right.  Well, thank you much.
16            [Whereupon the deposition was
17            concluded at 3:30 p.m.]
18
19
20
21
22
23
24
25

PAGE 210

HIXSON    210

1            CERTIFICATE OF DEPONENT
2    PAGE    LINE    CHANGE
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17        I, DARRELL HIXSON, deponent herein, do hereby
    certify and declare under penalty of perjury the
    within and foregoing transcription to be my
18    deposition in said action; that I have read,
    corrected and do hereby affix my signature to said
19    deposition.
20
21            DARRELL HIXSON
            Deponent

*Lori M. Judd, CCR #233, RMR*

REPORTER'S CERTIFICATE

STATE OF NEVADA   )
                  )  ss.
COUNTY OF CLARK   )


          I, Lori M. Judd, CCR #233, RMR, a duly

commissioned Notary Public, Clark County, State of

Nevada, do hereby certify:

          That I reported the taking of the

deposition of KEVIN WARREN, on Thursday, November 13,

2003, commencing at the hour of 5:15 p.m.

          That prior to being examined, the

witness was by me duly sworn to testify to the truth,

the whole truth, and nothing but the truth.

          That I thereafter transcribed my said

shorthand notes into typewriting and that the

typewritten transcript of said deposition is a

complete, true and accurate transcription of my said

shorthand notes taken down at said time.

          I further certify that I am not a

relative or employee of an attorney or counsel

involved in said action, nor a person financially

interested in said action.

**Lori M. Judd, CCR #233, RMR**

1           IN WITNESS WHEREOF, I have hereunto set

2    my hand and affixed my official seal in my office in

3    the County of Clark, State of Nevada, this _____

4    day of _____, 2003.

5

6

7

8

9

10

11

12

13

14                        _____
                          LORI M. JUDD
15                        CCR #233, RMR

16

17

18

19

20

21

22

23

24

25

## DEPOSITION OF KEVIN WARREN



SHEET 1  PAGE 1

PAGE 1

```
1                                                    1
2              UNITED STATES DISTRICT COURT
3                  DISTRICT OF NEVADA
4    DONALD HINTON, DAVID HINTON )
     and JOHN REYES,            )
5                               )
          Plaintiffs,           )
6                               )
     vs.                        ) CASE: CV-S-03-0057
7                               )        PMP-PAL
                                )
8    CLARK COUNTY, NEVADA, a    )
     Political subdivision, acting)
9    By and through the LAS VEGAS)
     METROPOLITAN POLICE DEPARTMENT)
10   JOHN DOES 1-30 and ROE     )
     ENTITIES 1-10,             )
11                              )
          Defendants.           )
12                              )
13
14
15
16           DEPOSITION OF KEVIN WARREN
17   Taken at the Law Offices of Bradley L. Booke, Esq.
             7251 West Lake Mead Blvd
18                    Suite 530
19              Las Vegas, Nevada  89128
             Thursday, November 13, 2003
20                    5:15 p.m.
21
22
23
24
25   REPORTED BY:  LORI M. JUDD, CCR #233, RPR, RMR
```

PAGE 2

```
                                              WARREN    2
1    APPEARANCES:
2    For the Plaintiffs:BRADLEY L. BOOKE, ESQ.
                        7251 W. Lake Mead Blvd.
3                       Suite 530
                        Las Vegas, Nevada  89128
4
5    For the Defendants:CRAIG R. ANDERSON, ESQ.
6                       Marquis & Aurbach
                        10001 Park Run Drive
7                       Las Vegas, Nevada  89145
8
9                        INDEX
10
                      EXAMINATION
11   By Mr. Booke          3
12
13   DEPOSITION EXHIBITS            IDENTIFIED
14   Exhibit 5 - SWAT packet            16
     Exhibit 7 - incident report        23
     Exhibit 8 - scope printout         25
15
16
             CERTIFIED QUESTIONS
17                  (NONE)
18
19        INFORMATION TO BE SUPPLIED
                    (NONE)
20
21
22
23
24
25
```

PAGE 3

```
                                              WARREN    3
1                 KEVIN WARREN,
2    called as a witness, and having been first duly sworn
3    to testify to the truth, the whole truth, and nothing
4    but the truth, was examined and testified as follows:
5
6                   EXAMINATION
7    BY MR. BOOKE:
8         Q.  Please state your name and spell your
9    name for the court reporter.
10        A.  Kevin Warren, first name K-E-V-I-N,
11   W-A-R-R-E-N.
12        Q.  What is your date of birth, sir?
13        A.  Date of birth is 3/13/64.
14        Q.  What was your job in relation to the
15   events that occurred at the Hinton residence or the
16   1919 Hallwood residence on January 16, 2002?
17        A.  I was one of the two recon officers
18   that went out.  I also went out with Manny Rivera to
19   recon a house that we had been requested by
20   detectives to do a search warrant on.
21        Q.  And then on the night that the search
22   warrant was actually executed what was your job that
23   night, if you recall?
24        A.  I would have to look at the packet to
25   see exactly where I was, but I was there.
```

PAGE 4

```
                                              WARREN    4
1         Q.  Before we look at documents, I would
2    like to find out what you recall from your memory as
3    opposed to what the documents say you did.
4         A.  Okay.
5         Q.  Do you have a recollection of what your
6    tasks were at the time the search warrant was
7    executed?
8         A.  I was either in the breaching element
9    or the entry element, they were both right there at
10   the front door and I recall being right there by the
11   door itself.
12        Q.  And do you recall what your task was at
13   the front door of the house on Hallwood?
14        A.  No, I don't.
15        Q.  Do you have a recollection of any of
16   the events that immediately preceded the occupant
17   coming out of the house at the Hallwood residence?
18        A.  The thing that I remember is it was a
19   slow methodical search.  It wasn't a rush-rush
20   because we called everybody out.  So right there we
21   went tactical, which is slowing it down and taking it
22   one room at a time.  And I remember being on the
23   entry stick going through the house.  Just we went
24   and took one room at a time and searched it to make
25   sure there was nobody else in the house.
```

## DEPOSITION OF KEVIN WARREN

SHEET 2   PAGE 5

WARREN   5

1  Q.   So you actually went into the house?
2  A.   Yes, I did.
3  Q.   Prior to going into the house do you
4  have a picture in your mind's eye, a present
5  recollection of any of the events that occurred prior
6  to entering the house?
7  A.   Yes, I do.
8  Q.   Describe what you recall about the
9  events that occurred before the house was entered?
10  A.   Okay, yeah.  Of course we drove up in
11  the vans.  We parked a couple of residences away from
12  our target location.  We get out and get in the
13  separate sticks: Entry, breach and containment.  We
14  just walk up to the house and when we broke off the
15  sidewalk heading to the front I guess there's a metal
16  security door that separates the main door
17  itself.  I believe it was Sergeant Graham started
18  bullhorning to the people in the residence as we were
19  approaching the security door.
20  Q.   What's the formation of the officers at
21  that point?
22  A.   We're just in our separate sticks.  The
23  breach element is by the door, because of course they
24  are the ones that are going to breach the door, the
25  security door that separates the security door from

PAGE 6

WARREN   6

1  the main door, and then the entry stick is just kind
2  of off to the side until that door is breached.
3  Q.   When you use the word "stick" what are
4  you meaning by that?
5  A.   It's just a line of officers.
6  Q.   All right.  Now I would like for you to
7  try to distinguish between what is ordinary practice
8  and what you actually recall from the Hallwood
9  residence that night, and I know that's not an easy
10  thing to do, but insofar as you are able to talk
11  about the things that you actually do have a memory
12  of, I would like you to do that.  Do you recall which
13  of those groups you were in?
14  A.   I don't recall.
15  Q.   Do you recall who was in either one of
16  those groups?
17  A.   No, I don't.  I just remember Vic Dumas
18  being on the ram, because I do remember that.
19  Q.   So you say that as the entire team
20  approached up the sidewalk to the wrought iron gate
21  that was in front of the house, that Sergeant Graham
22  was bullhorning?
23  A.   Yes.
24  Q.   And what was he bullhorning?
25  A.   I don't recall exactly what was said

PAGE 7

WARREN   7

1  but it's ordinarily said that he identifies us as the
2  Las Vegas Metropolitan Police Department, we're
3  serving a search warrant at that certain address.  He
4  calls out the numbers and the street of the residence
5  that we're standing in front of as he's bullhorning
6  and stuff so the people inside can know that it's
7  their house that we're in front of.
8  Q.   Okay, and what occurred then after the
9  bullhorning?
10  A.   Nobody came to the door.  So Sergeant
11  Graham gave the go ahead to use what we call a
12  shok-lok because the door was locked.  I shok-loked
13  the security door, and the security door came open.
14  Q.   I want to stop you right there.  Are
15  you talking about the wrought iron gate or the
16  security door that's right immediately outside the
17  front door?
18  A.   The first security gate that we came
19  to.
20  Q.   Okay, that was locked or not locked?
21  A.   I believe it was locked.
22  Q.   All right, and so your recollection is
23  that Sergeant Graham gave the order to use the
24  shotgun on the lock at the gate?
25  A.   We don't call it a shotgun, we use the

PAGE 8

WARREN   8

1  term shok-lok.  It's especially made to use on
2  locking mechanisms and stuff.
3  Q.   Is it a shotgun?
4  A.   It's a 12 gauge, yes.
5  Q.   All right, and did that occur, did
6  somebody fire the shok-lok into the gate?
7  A.   I believe so, yes.
8  Q.   And then what do you recall?
9  A.   That came open and then we moved up to
10  the, I believe there was 10 or 15 feet separating the
11  door from the front cage, so we moved up to the next
12  entry point.
13  Q.   Did anyone come out after the rounds
14  were fired into the gate?
15  A.   I don't believe so.
16  Q.   How many rounds were fired into the
17  gate?
18  A.   I don't recall.
19  Q.   And was it necessary to use any other
20  device other than the shok-lok blasts to open that
21  front gate?
22  A.   Are you inferring to what other types
23  of methods that we use to get in a security gate?
24  Q.   No.  What I'm asking is what is your
25  memory about what occurred on the night of January

DEPOSITION OF KEVIN WARREN

WARREN 9

1    16, 2002 in getting that front gate open?  Was the
2    shok-lok blast or blasts enough all by itself on
3    there or did you have to do something else to get
4    that gate open?
5         A.   We use a hook, a guy on a hook hooks
6    the door and puts tension on it while the shok-loker
7    steps up and shok-loks the gate and of course he has
8    a full tension on the door and when that door, the
9    locking mechanisms work free from the shok-lok, then
10   the guy on the hook is able to pull the door open.
11        Q.   All right.  Did that happen that night,
12   if you --
13        A.   I believe so.
14        Q.   Do you need to take that call?
15        A.   No.
16        Q.   After the front gate was opened, then
17   what happened?
18        A.   I don't remember if there was a
19   security gate on the front door itself.  The only
20   thing I can recall is when we worked up our way up to
21   that front door I remember the older gentleman
22   opening the door, looking at us, we identified
23   ourselves as the Metropolitan Police Department, for
24   him to come out, and at that time he slammed the door
25   shut.

WARREN 10

1         Q.   Which door?
2         A.   The wood door, the main entry door.
3         Q.   Okay.
4         A.   Then Sergeant Graham gave the ram guy,
5    which was Vic Dumas, permission to ram the door.
6         Q.   Did he give him permission or did he
7    give him an order to do it?
8         A.   He said, "Ram the door."
9         Q.   Okay.  Was there one or more shok-lok
10   blasts fired into the front door?
11        A.   I don't recall.
12        Q.   And was there any -- did Sergeant
13   Graham use the bullhorn again after the front gate
14   was opened?
15        A.   I don't remember if he did or not.
16        Q.   All right.  What then happened after
17   Sergeant Graham gave the order to ram the door?
18        A.   I remember his front door being panels,
19   wooden panels and I remember Vic's first hit hit one
20   of the panels and actually knocked one of the panels
21   in and then he had to take a second swing on the door
22   to get the actual door to come open.
23        Q.   And what did the SWAT team do while Vic
24   Dumas was ramming the door?
25        A.   We were just standing by until the door

WARREN 11

1    got open.
2         Q.   Okay.  Weapons drawn?
3         A.   Yes.
4         Q.   And where were your weapons trained,
5    aimed?
6         A.   The guys up front will be trained
7    towards the door and then usually the guys back would
8    kind of be offset a little bit off, so not to mask
9    anybody that's in front.
10        Q.   And what happened then next when the
11   door, the front door came open?
12        A.   The front door came open, we stayed
13   where we were and that's when we started verbalizing
14   for everybody to come out of the house.
15        Q.   And when the front door came open did
16   you see the older man?  Could you see the older man
17   from that position?
18        A.   Same gentleman that opened the door,
19   yes.
20        Q.   Where was he standing?
21        A.   If I recall, I believe there was some
22   sort of a hallway in through the front door.  He was
23   kind of standing at the end of the hallway when the
24   door came open and that's when we asked him to come
25   out.

WARREN 12

1         Q.   Did you ask him to come out or did you
2    order him to come out?
3         A.   We basically ordered him to come out.
4         Q.   Now, did the man who opened the front
5    door initially, the older man that we're talking
6    about, the occupant of the residence?
7         A.   Yes.
8         Q.   Did he say anything to the SWAT team?
9         A.   I don't recall if he did or not.
10        Q.   Did he say anything, whether it was
11   directed to the SWAT team or not, did he say anything
12   at all when he opened the door?
13        A.   I don't recall if he did or not.
14        Q.   When you ordered the older man to come
15   out of the house, did he do so?
16        A.   I believe he did, yes.
17        Q.   Were any of the SWAT officers inside
18   the house when the man came out?
19        A.   No.
20        Q.   What happened, what was done with the
21   older man when he began coming out of the house?
22        A.   He came out and we just shuffled him
23   back to the end of the line and usually some of the
24   officers at the end of the line go hands free and
25   those are the guys who did the handcuffing and take

DEPOSITION OF KEVIN WARREN

WARREN 13

1 him out of the immediate area.
2 Q. For the record, by hands free, what do
3 you mean?
4 A. Their guns are in their holsters so
5 they don't have any weapons in their hands.
6 Q. Okay, and if the picture that I'm
7 getting from what you are describing is that the
8 older man comes out of the house and he is being
9 moved between two columns of SWAT officers, is that
10 an accurate picture?
11 A. It could be, yes.
12 Q. Do you have a recollection if that is
13 an accurate picture in this particular situation?
14 A. Yeah. We would have cross coverage on
15 the front door so we would have two officers on the
16 right-hand side of the door, two officers on the
17 left-hand side of the door, one that's down low on
18 his knee and the other two which are up high. So
19 there could have been two lines and he could have
20 passed between us.
21 Q. And when you say that you shuffled the
22 older man out, what do you mean by "shuffle him out?"
23 A. Most of the times we put their hands on
24 top of their heads and usually the officers will grab
25 them by the top of the head and guide him back to the

PAGE 14

WARREN 14

1 next officer and the next officer will grab him and
2 pull him back until he gets to the hands of the line
3 where the officers that are hands free are.
4 Q. Did you observe this happening at the
5 Hallwood residence?
6 A. Yes.
7 Q. And what was the older man wearing?
8 A. I can't even recall. I can't remember.
9 Q. And what was the position of the older
10 man's hands?
11 A. I believe they were on top of his head
12 when we passed him back. Then when we handcuffed
13 him, the majority of the time we handcuff behind the
14 back.
15 Q. Now as the older man passed you, did
16 you follow his path or did you keep your attention --
17 A. I stayed with the entry line with my
18 attention to inside the house.
19 Q. What then happened next in the
20 direction in which you were focusing your attention?
21 A. I believe there were several more
22 occupants that were asked to exit the house.
23 Q. And did they do so?
24 A. Yes, they did.
25 Q. Did the SWAT team encounter any

PAGE 15

WARREN 15

1 resistance at all from any of the individuals who
2 were inside the house in exiting?
3 A. No.
4 Q. Were there any verbal threats made to
5 any of the SWAT officers by the occupants of the
6 house?
7 A. I can't remember if there was or not.
8 Q. Would that stand out in your mind if
9 that had occurred?
10 A. It probably would have, but I don't
11 recall at that moment.
12 Q. How many occupants were there totally
13 inside of the house?
14 A. I believe there were four.
15 Q. And do you remember if they were male
16 or female?
17 A. I believe there were three males and
18 one female.
19 Q. When the individuals who had been in
20 the house came out of the house, what was done with
21 each of them?
22 A. They were taken to the back of the
23 line, they were all handcuffed, and then they were
24 escorted off property and out of harm's way. If by
25 chance there was anybody else in the house that

PAGE 16

WARREN 16

1 decided to fight or fire any rounds, that they would
2 be out of the danger zone. So we usually take them
3 away from the house, up the sidewalk to the
4 neighbor's yard or something to get them out of
5 harm's way.
6 Q. Did you observe that to occur?
7 A. No, I didn't.
8 Q. Were there any shots fired by any of
9 the occupants of the house?
10 A. No, there was not.
11 Q. All right. Let's go back then to your
12 reconnaissance work in connection with the Hallwood
13 search. I would like to show you what's marked as
14 Exhibit 5 and call your attention specifically to
15 pages 92 through 99 within Exhibit 5. Page 92
16 appears to be a written request from the narcotics
17 detail to SWAT to execute the search warrant at the
18 Hallwood residence?
19 A. Is this page 92 right here?
20 Q. Yes, down in the lower right-hand
21 corner.
22 A. Oh, I'm sorry.
23 Q. Is that what you believe that to be?
24 A. It's just a cover sheet that comes with
25 the request for SWAT service.

DEPOSITION OF KEVIN WARREN

WARREN   17

1      Q.   And it transmits, appears to transmit
2 not only search warrant information for the Hallwood
3 residence, but for some other residences as well?
4      A.   Yes.
5      Q.   Now that specific fax cover sheet is
6 directed to you personally.  Do you see that?
7      A.   Yes, I sure do.
8      Q.   Why was that information that follows
9 that fax cover sheet directed to you personally?
10      A.   I can't remember.  I can't remember if
11 I talked to Officer Witham prior to this, or if on
12 the day.  I'm not positive.
13      Q.   Do you see that on page 92 there
14 appears to transmit three different search warrant
15 packages?
16      A.   Correct.
17      Q.   Were all three of those search warrant
18 packages a part of the same alleged criminal activity
19 or enterprise?
20      A.   I can't remember if it was or not.  I
21 was just responsible for the Hallwood address.
22      Q.   Is it customary to get three search
23 warrant packages all transmitted in the same set?
24      A.   Yes.
25      Q.   That's common?

WARREN   18

1      A.   Yes, it is.
2      Q.   Did you have any knowledge at all about
3 the search of the Hallwood premises before you
4 received this fax that begins at page 92?
5      A.   No.
6      Q.   Did you review the terms that were sent
7 in that fax package that begins on page 92?
8      A.   Yes.
9      Q.   When you review a search warrant
10 package that comes from an investigating detail, do
11 you make any sort of written notation that you have
12 received or reviewed the package of material?
13      A.   No, we get this and then we start what
14 we call a raid package.
15      Q.   A what page?
16      A.   It's called a raid package.
17      Q.   Yes.  Okay, R-A-I-D?
18      A.   Correct.
19      Q.   I wasn't sure whether they were R-E
20 colon, or R-A-I-D.
21      A.   Yes, raid.
22      Q.   Some places of business have a received
23 stamp or a received clock where you imprint something
24 to indicate date and time of receipt.
25      A.   Uh-huh.

WARREN   19

1      Q.   Is there any such thing at the SWAT
2 office?
3      A.   I believe there is on our fax, and
4 those pages are basically taken off the fax and set
5 aside because we usually see a big stack of them
6 sitting there.
7      Q.   Okay, I ask because if you look at the
8 bottom of page 92, upside down there's a fax legend
9 that has a date and time register.  Now I would think
10 that that register is probably put on by the sending
11 machine, not the receiving machine?
12      A.   It could be.  I wouldn't know how that
13 works.
14      Q.   All right.  But what I'm trying to
15 ascertain is exactly what time that package that
16 included the search warrant information that was sent
17 to you was received at the SWAT office?
18      A.   I couldn't tell you.
19      Q.   Are faxes that are received logged in
20 in any way?
21      A.   No.
22      Q.   Do you have a recollection or a memory
23 of receiving that package, that fax package?
24      A.   Yes, I did receive it.
25      Q.   And do you have a recollection of when

WARREN   20

1 you received the fax package that begins on page 92?
2      A.   No, I don't.
3      Q.   Once you received that fax package is
4 that the thing that causes you to create the raid
5 package?
6      A.   Yes.
7      Q.   And what does the raid package consist
8 of?
9      A.   It consists of a lot of different
10 things, and I'm sure you've got a copy there.  It
11 consists of the event, I mean it's 12 pages long.  It
12 covers the majority of different things.
13      Q.   Then I understand.  So the raid package
14 that you are talking about is an 11 or 12 page form
15 that you fill in information on?
16      A.   Yes, yes.
17      Q.   And once you have received the search
18 warrant request from the investigating detail, what
19 is your next step?
20      A.   I usually will call the detective just
21 to let him know that we received his fax of the
22 search warrant and the request and try to get any
23 further information from him on some of the
24 information that he marks on the request for the
25 search warrant, as far as like he's got bars, I

## DEPOSITION OF KEVIN WARREN

WARREN    21

1  usually ask him what kind of bars are we talking
2  about, are they straight up and down bars, do they
3  have mesh behind it, dogs, children, elderly.  If
4  there's any weapons involved, if there is, what kind
5  of weapons and stuff like that.
6      Q.   And do you make notations of whatever
7  you learn from the investigating officer?
8      A.   Yeah.
9      Q.   Where do you make those notations?
10      A.   In the raid package itself.
11      Q.   Okay.  Now did you do anything to
12  verify the accuracy of the information that is
13  contained in the request for SWAT warrant service
14  that I think is page 93?
15      A.   Well, when we get these we look at the
16  address, we go on line to do a site check of the
17  residence itself, find out who it is registered to.
18      Q.   Meaning the county recorder's office?
19      A.   Yes, to find out who the registered
20  owner of the house is.  We'll take this information
21  and go into scope and we'll do a scope search of the
22  person and we'll pull up his scope record and put it
23  with the package and stuff and then we'll drive by,
24  do a couple of drive-bys of the place to recon it,
25  looking at it, looking at the bars, the way the

WARREN    22

1  windows, which way the doors open and close,
2  vegetation, block walls, how high they are and that
3  kind of stuff.
4      Q.   So after you received this request for
5  SWAT warrant service from Detective Witham, you would
6  have done a property search on the computer, you
7  would have scoped the suspects, and you would have
8  performed reconnaissance of the property itself?
9      A.   Correct.
10      Q.   And did you do each of those things in
11  the case of this Hallwood search?
12      A.   Yes.
13      Q.   When you conduct the property search on
14  the computer do you print out the information that is
15  contained in the recorder's office?
16      A.   The majority of the time, yes, we do.
17      Q.   Do you attach that or include that
18  within the raid package?
19      A.   Yeah.
20      Q.   And when you scope the suspects do you
21  print out their scope reports?
22      A.   Yes, we do.
23      Q.   And do you include those in the raid
24  package?
25      A.   Yes, we do.

WARREN    23

1      Q.   And when you do the reconnaissance of
2  the property do you make any notes or writings of any
3  kind?
4      A.   Yes, we draw it on a note pad and we
5  usually tear that out and put it with the package
6  itself.
7      Q.   All right.  Now I want to show you
8  what's been marked as Exhibit 7, but I'll tell you
9  what, first of all, I want to make sure that I've got
10  the sequence right.  The first information that you
11  got about the intention to conduct a search at the
12  Hallwood premises is what you received by way of the
13  fax, pages 92 through 99.  Would that be correct?
14      A.   Yes, that looks like it.
15      Q.   Okay, and then once you had that
16  information, you start your raid package and you
17  start gathering up the additional information that
18  you need?
19      A.   Correct.
20      Q.   Okay.  I would like to show you what's
21  marked as Exhibit 7 and take a look at it for just a
22  second and I would like to ask you a couple of
23  questions about Exhibit 7.
24      A.   Okay.
25      Q.   Is the incident report that is

WARREN    24

1  reflected in Exhibit 7 something that would have been
2  available to you through a computer search method at
3  the time you got the request for warrant service on
4  the Hallwood premises?
5      A.   I couldn't say if it was or not.
6      Q.   You don't know whether you could have
7  pulled that information up or not?
8      A.   I don't know if I could have or not.  I
9  know there's always a long time delay between when
10  reports are submitted until they are actually
11  transcribed by records and entered into the system
12  itself.
13      Q.   Could you have accessed incident
14  reports?
15      A.   Yeah, I could have.
16      Q.   In the case of the Hallwood search did
17  you access any incident reports to try to learn more
18  information about what was going to happen at the
19  Hallwood search?
20      A.   No, I didn't.
21      Q.   Did the narcotics detail provide you an
22  incident report to give you more information about
23  either the suspects or the premises that you were
24  going to find at the Hallwood location?
25      A.   No, they didn't.

DEPOSITION OF KEVIN WARREN

WARREN   25

1  Q.   Please take a look at Exhibit 8 and
2  take just a minute to look at that.  I would like to
3  ask you a couple questions about that.
4      A.   Okay.
5      Q.   Do you recognize that form of document?
6      A.   Yes, I do.
7      Q.   Did you have a copy of Exhibit 8 prior
8  to the time you conducted the search at the Hallwood
9  residence?
10     A.   On the request the only people that I
11 run up are the people that are annotated on the name
12 of suspects side and I usually get those printed out
13 and in with the package before we even leave the
14 office to go do our recon.
15     Q.   Okay.  So did you have pages 33 and 34
16 in your SWAT raid package prior to conducting the
17 search at the Hallwood house?
18     A.   I can't recall if I did or not.
19     Q.   If you had the information that is on
20 pages 33 and 34 you would have put it in the raid
21 package?
22     A.   Yes.
23     Q.   And if pages 33 and 34 are not in the
24 raid package, would you conclude that you did not
25 have that information at the time you conducted the

WARREN   26

1  search?
2      MR. ANDERSON:  I'm going to object to the term
3  "did not have the information."  Did not have the
4  documents.
5      MR. BOOKE:  In fact, I appreciate that.  Let me
6  ask the question more specifically.
7      Q.   If the documents, pages 33 and 34 are
8  not in the raid package, would you draw the
9  conclusion that you did not have pages 33 and 34 at
10 the time the search was conducted?
11     A.   Yes.
12     Q.   Do you recall the narcotics detail
13 sending you copies of pages 33 and 34 prior to the
14 time the search was conducted?
15     A.   I don't know.
16     Q.   I'm not familiar with reading these
17 scope -- Exhibit 8 is a scope?
18     A.   It's a scope printout.
19     Q.   I'm not familiar with reading these
20 scope printouts.  Is there something on Exhibit 8
21 that will tell you what the outcome or the
22 disposition of any of these things that are listed on
23 here was?
24     A.   No, the only things that I recognize
25 for what he was arrested or cited for, like this

WARREN   27

1  would be a citation for false info to police officer,
2  this would be the event number and this would be the
3  Metropolitan Police Department and a lot of this
4  other stuff that's listed with it, I couldn't tell
5  you what it was for.
6      Q.   So as you read Exhibit 8 you are not
7  able to determine what the outcome of any of those
8  arrests was?
9      A.   No.
10     Q.   Then we're in the same boat.
11     A.   Now, just to let you know also, when
12 they send this over they do a request for.
13     Q.   This?
14     A.   Request for SWAT warrant service.
15     Q.   Thank you.
16     A.   They do their own scope and they list
17 his prior arrests, with no dispositions of course on
18 here.  But they do list the prior offenses that he's
19 either been cited or arrested for in there also.
20     Q.   Why is that, do you know?
21     A.   Just to give us as SWAT officers a
22 heads up on what kind of person that we may be
23 dealing with.  He's had priors for burglary, carrying
24 concealed weapons, possession of unregistered
25 firearms and possession of controlled substance.

WARREN   28

1      Q.   When you say that page 93 shows you
2  that the person listed there has had priors, what do
3  you mean by priors?
4      A.   He's either been arrested or he's been
5  cited for these offenses prior to us, just a record,
6  a history of this, of Mr. Hinton.  It just gives us a
7  brief history of what he's been arrested for or cited
8  for.
9      Q.   If the individual on page 93,
10 Mr. Hinton, was not convicted of any of those
11 charges, would that make a difference to you at all
12 in terms of how you process the request for warrant?
13     A.   It's unknown.  I couldn't tell you.
14     Q.   Is Exhibit 5 the SWAT raid package?
15     A.   Yes.
16     Q.   Would you take just a second to look
17 through it page by page and make sure that that is in
18 fact -- in fact, before you do that, let me give you
19 what I think is another page that somebody else
20 testified is also a part of Exhibit 5.
21     A.   Yeah, I can tell you exactly what that
22 is.
23     Q.   And if you could look at Exhibit 5 and
24 Exhibit 6 and just confirm that that is, in fact, the
25 SWAT raid package for the Hallwood search?

DEPOSITION OF KEVIN WARREN

WARREN 29

1    **A.   Yes.**
2        Q.   From others I have learned that some,
3    at least some of the handwriting that is in Exhibit 5
4    is your handwriting; is that correct?
5    **A.   Yes, it is.  That is correct.**
6        Q.   I would like you to please take this
7    pink colored highlighter, and we'll go off the record
8    for just a minute and I apologize for asking you to
9    do this, but it's the most accurate thing I can think
10   of to do.
11   **A.   Okay.**
12       Q.   Would you please take the pink
13   highlighter and just go through line by line and
14   highlight anything which is your handwriting, okay?
15   **A.   It would be the majority of it.**
16       Q.   And I appreciate that, but please take
17   your time so that you don't highlight anything that
18   is somebody else's handwriting.
19   **A.   Okay.  Do you want me to line through**
20   it?
21       Q.   Yes, just line through it, I think that
22   will work and we'll go off the record while you take
23   your time to do that.
24       (Recess taken.)
25   ///

PAGE 30

WARREN 30

1    MR. BOOKE:
2        Q.   All right.  Thank you for doing that.
3        Now, some of the things that you have
4    highlighted with the pink highlighter I assume were
5    written before the raid and some things after.  Would
6    that be an accurate statement?
7    **A.   It could be, accurate, yes.**
8        Q.   Which is the bulk, before or after?
9    **A.   After.**
10       Q.   Would you then take my blue pen and
11   draw a box around or outline around only those things
12   that were written, that you wrote before the raid was
13   conducted?
14   **A.   I couldn't tell you what I wrote before**
15   **and what I wrote after.  There's no way to tell that.**
16       Q.   Okay, fair enough.  Let's just go
17   through it then and let me ask you about a few things
18   in particular.
19   **A.   Sure.**
20       Q.   On page 73, which is the first page of
21   Exhibit 5, the top line, the very first entry is a
22   date where it's written in 1/9/02.  Do you see that?
23   **A.   Yes, I do.**
24       Q.   I assume that you wrote 1/9/02 in
25   before the date of the raid, which was 1/16/02?

WARREN 31

1    **A.   It could be, yes.**
2        Q.   Do you remember whether you wrote that
3    in 1/9/02 before the raid or not?
4    **A.   Probably yes.**
5        Q.   Can you describe a circumstance where
6    you would have written 1/9/02 in after 1/16/02?
7    **A.   No, the majority of the time our**
8    **sergeant will receive a call from these detectives**
9    **saying that they would like us to recon a place, so**
10   **they give our sergeant the address and we can even**
11   **start it days before we even do the search warrant**
12   **for the detectives and stuff.  So it's more or less**
13   **just a heads up kind of thing that kind of gives us a**
14   **head start on getting these done prior to the actual**
15   **search warrant coming in.**
16       Q.   In the case of the Hallwood search, do
17   you have a recollection of having gotten any
18   information from the investigating narcotics detail
19   prior to getting the search warrant itself?
20   **A.   Apparently we had received information**
21   **that they were going, that they wanted us to do a**
22   **search warrant for them, and that date probably would**
23   **have been on the 9th of January.**
24       Q.   And you say that because that's what
25   page 73 shows; is that correct?

WARREN 32

1    **A.   Yes, that's the date we did the recon.**
2        Q.   Understood, but do you have a memory
3    other than what appears on the piece of paper?
4    **A.   No.**
5        Q.   Also on page 73 it's written in
6    category three.  Do you see that?
7    **A.   Yes.**
8        Q.   What does category three mean?
9    **A.   If you look on the request for SWAT**
10   **service.**
11       Q.   Okay.
12   MR. ANDERSON:  I was just going to say read the
13   bottom numbers.
14   THE WITNESS:  On page 93, we get this from the
15   detective, our sergeant will look at it and he will
16   make the final determination whether it is going to
17   be a Class Four, is what the detective wanted, or a
18   Class Three.
19   MR. BOOKE:
20       Q.   Okay.
21   **A.   And according to our sergeant, Sergeant**
22   **Graham, he felt that the information was not**
23   **available to have it as a Class Four so he wanted us**
24   **as SWAT officers to do it as a Class Three.**
25       Q.   If you look on page 73 you wrote in the

## DEPOSITION OF KEVIN WARREN

WARREN   33

1  Class Three?
2       A.   Yes, I did that.
3       Q.   When did you do that?
4       A.   It would have been after Sergeant
5  Graham looked at the warrant itself and informed me
6  that he wanted it served as a Class Three.  So that's
7  why I put the three there.
8       Q.   You wouldn't fill in the category at
9  the time of getting an initial contact from a
10  detective from an investigating detail?
11       A.   Not until after the sergeant looks at
12  the warrant to see if the facts are there to serve it
13  as they have it marked.
14       Q.   Okay, and I don't mean -- I want to ask
15  you something, and please don't take offense because
16  I don't mean it that way, but do you not exercise any
17  discretion at all yourself as to what the
18  classification is?  In other words, is that the
19  sergeant's call and you don't mess with that?
20       A.   No, I usually don't.
21       Q.   On page 73 in the blank beside the
22  words evidence sought, you have written in "meth and
23  paraphernalia."  Where did you get that information?
24       A.   From the warrant.
25       Q.   Who assigned you to do the recon for

WARREN   34

1  the Hallwood search?
2       A.   It would either have been Sergeant
3  Graham or Darrell Hixson.
4       Q.   Do you remember?
5       A.   I don't remember, no.
6       Q.   When were you assigned to do the recon
7  for the Hallwood search?
8       A.   I can't recall but I would say it would
9  probably be on the 9th.
10       Q.   And is that based only on what page 73
11  is telling you?
12       A.   Yes.
13       Q.   What time of day was the recon done on
14  the Hallwood premises on January 9th?
15       A.   I know it was probably, I know it was
16  during daylight.  I can't recall the exact time, but
17  I know the sun was up.
18       Q.   Why do you recall that or how do you
19  recall that it was daylight?
20       A.   Because when I do a recon I like to
21  drive by during the day.  That way I can get a better
22  look at the place, rather than at night in the dark.
23       Q.   What was your regular shift, hours of
24  your shift in January of 2002?
25       A.   Our regular hours are swing shift,

WARREN   35

1  which is from 3:00 in the afternoon until 1:00 in the
2  morning.
3       Q.   Do you have any reason to believe that
4  you were not working the swing shift on January 9th,
5  2002?
6       A.   To tell you the truth, our times always
7  vary, being in SWAT.  A lot of times we work day
8  shift, a lot of times we work swing shift, a lot of
9  times we work graves, but our specific times are
10  swing shift.  They could have been adjusted this day,
11  it could not have been adjusted.  I just couldn't
12  tell you.
13       Q.   Are there any records to show what time
14  you worked on January 9, 2002?
15       A.   I can't recall if there was or not.
16       Q.   Do you clock in?
17       A.   No, I don't.
18       Q.   Do you get paid overtime, do you ever
19  get paid overtime?
20       A.   Yes, I do.
21       Q.   I'm not laughing at you, I just thought
22  maybe that would be a sensitive subject.  When you
23  get paid overtime how do you have to account for it,
24  how do you request it?
25       A.   Usually an overtime submittal sheet is

WARREN   36

1  done by the sergeant and from there he submits it up
2  the chain of command until it goes to payroll.
3       Q.   Do you have an actual recollection of
4  when you did the recon on January 9th or are you just
5  sort of assuming that you did it during daylight
6  hours?
7       A.   I did it during daylight hours.  I
8  remember that.
9       Q.   Did you do it by yourself?
10       A.   No, I did it with Officer Rivera.
11       Q.   And you said early that you did two, or
12  possibly three, I think, drive-by's.  Did you do them
13  all within the same time frame?
14       A.   No, probably not.
15       Q.   How far apart in time would your passes
16  have been, your drive-by passes?
17       A.   I couldn't tell you.  Every one is
18  different.
19       Q.   Do you have a recollection in this
20  particular case of how many times you drove by or how
21  much time elapsed between your drive-by's?
22       A.   I have no idea.
23       Q.   The drawing that appears on page 81,
24  did you make that drawing?
25       A.   Yes, I did.

DEPOSITION OF KEVIN WARREN

```
                                    WARREN    37
1          Q.   And by these hashed lines across all of
2   the windows, are you meaning to indicate that there
3   are bars on all of those windows where there are
4   hashed lines?
5          A.   Yes.
6          Q.   Does SWAT ever videotape its missions?
7          A.   No.
8          Q.   Are SWAT missions ever videotaped by
9   Metro?
10         A.   No.
11         Q.   Were you present at a briefing prior to
12  the Hallwood search?
13         A.   Yes, I was.
14         Q.   Where did that briefing take place?
15         A.   According to this, our staging location
16  for the warrant itself was at 1771 Flamingo, which is
17  on the southwest corner of Flamingo and Spencer.
18         Q.   What time did the briefing take place?
19         A.   I couldn't tell you.
20         Q.   Who conducted the briefing?
21         A.   It probably would have been me that
22  would have conducted the intell side of it because
23  when I look at these, these are my drawings of the
24  reconnaissance.
25         Q.   You are referring to page?
```

```
                                    WARREN    39
1   when you orient page 86 in a portrait orientation,
2   the top drawing is entirely in your handwriting?
3          A.   Yes.
4          Q.   The drawing on the lower left is
5   entirely in your handwriting?
6          A.   Yes, it is.
7          Q.   And the drawing in the lower right is
8   entirely in your handwriting, except for the list of
9   officer's names.
10         A.   Yes, it would be the bottom half of
11  that, just the directions.
12         Q.   The map in the lower right-hand drawing
13  is in your handwriting?
14         A.   Yes.
15         Q.   Okay, when did you -- and each of these
16  maps is the result of reconnaissance work that you
17  did?
18         A.   Yes.
19         Q.   When did you do the reconnaissance work
20  shown on the lower right-hand map?
21         A.   The reconnaissance was done on the 9th.
22  I couldn't tell you when those posters were actually
23  drawn up.
24         Q.   Okay.  Do you typically draw up the
25  posters during the briefing or do you do it
```

```
                                    WARREN    38
1          A.   I'm sorry, page 86.
2          Q.   Okay.
3          A.   These are the drawings that I did, that
4   we usually put up on the side of the van so everybody
5   can see as either myself or Officer Rivera were
6   briefing it.
7          Q.   In full size how big are those
8   drawings?
9          A.   They are on our old SWAT posters, I
10  would say (indicating) I couldn't tell you.
11         Q.   I mean they are like two feet by three
12  feet or something like that?
13         A.   Probably three feet by two feet.
14         Q.   Three wide, two high?
15         A.   Yes.
16         Q.   That's T-W-O.  Now looking at the color
17  version which counsel has kindly supplied on page 86,
18  are all three of those drawings yours?
19         A.   Yes, they are, except for this portion
20  right here (indicating).
21         Q.   And you are talking about, you have
22  just pointed out the orange --
23         A.   Actually, it would be the names, the
24  names of the officers that were present.
25         Q.   Okay, just so that our record is clear,
```

```
                                    WARREN    40
1   beforehand and then display them?
2          A.   It would have been done an hour or two
3   before the briefing for the warrant itself.
4          Q.   These boxes that you have drawn,
5   rectangular shaped boxes, on the picture at the top
6   of page 88, what are those boxes meant to indicate?
7          A.   Those would have been meant to indicate
8   that there were no vehicles parked there.
9          Q.   In the course of doing your
10  reconnaissance did you take down the license plate
11  numbers of the vehicles that were parked in front of
12  the Hallwood house?
13         A.   No.
14         Q.   If you would, Officer Warren, please
15  describe what you knew about the house where you were
16  going to execute the search warrant and the people
17  you thought would be in the house prior to the time
18  that you went to execute the warrant?
19         A.   You want a house description?  Is that
20  what you want?  I'm not understanding the first part
21  of your question.
22         Q.   What I would like you to do is I'm
23  trying to identify what you knew about the place you
24  were going to search and the people you were
25  expecting to find there?
```

DEPOSITION OF KEVIN WARREN

WARREN 41

1    A.   Okay.
2    Q.   Prior to the time you actually went to
3 execute the warrant?
4    A.   Okay, well, the only information we had
5 on the person was this David Hinton, six foot, 180
6 pounds, white male adult.  I can't read that, it
7 looks like brown hair, and he had prior arrests or
8 citations for carrying a concealed weapon, possession
9 of an unregistered firearm and narcotics.
10    Q.   And the narc detail was the source of
11 that information?
12    A.   I believe so.  When they sent the
13 request over, and that was also retrieved out of the
14 scope printouts.
15    Q.   Although the scope printout is not
16 contained in the raid package, I'm assuming that
17 means you didn't have the scope information at the
18 time, would that be a fair --
19    A.   I couldn't tell you.
20    Q.   Okay, and did you believe there were
21 any others at the Hallwood location other than
22 Mr. David Hinton?
23    A.   I believe on the site check it was, the
24 house itself was registered to another last name,
25 Hinton, an older gentleman, I expect to believe to be

PAGE 42

WARREN 42

1 this gentleman's father.  Unknown if he was there or
2 not.
3    Q.   Okay, and did you know anything else
4 about any of the individuals that you thought might
5 be at the house when you conducted the search?
6    A.   No.
7    Q.   And what, if anything, did you know
8 about the contents of the house, other than what was
9 identified in the search warrant?
10    A.   No.
11    Q.   Nothing?
12    A.   (Witness shakes head).
13    Q.   I'm sorry, did you --
14    A.   It says weapons, there's a question
15 mark, unknown if there is or there isn't.
16 Fortification on the house, yes.  Dogs, unknown.
17 Kids, no.  Elderly no.  And the drug of choice, which
18 is the meth, which is listed right there.
19    Q.   Did you have any information about the
20 contents within the Hallwood house, other than what
21 was listed in the search warrant?
22    A.   No.
23    Q.   And did you have any information about
24 the structure itself, other than what you had learned
25 from your own reconnaissance work?

PAGE 43

WARREN 43

1    A.   No.
2    Q.   You said that you did enter the
3 Hallwood house?
4    A.   Yes.
5    Q.   What did you do inside the Hallwood
6 house?
7    A.   I believe, if I recall, I was part of
8 the team that came over into this direction here.
9    I remember coming into this laundry
10 room from there, coming into this bedroom, clearing
11 these closets and then getting into this storage
12 place right around in here up into here.  That's
13 about all of the house.  I didn't go into any of
14 these other rooms, those were other officers that did
15 that.
16    Q.   So our record reflects what you just
17 pointed out with your finger, we're looking at the
18 drawing on page 81, and you went into the laundry
19 room and the bedroom and the storage area that is in
20 the lower left-hand corner of the drawing?
21    A.   Correct.
22    Q.   Did you conduct any search for any of
23 the items listed in the search warrant?
24    A.   No.
25    Q.   Did you find any of the items listed in

PAGE 44

WARREN 44

1 the search warrant?
2    A.   No, I didn't.
3    Q.   Did you find any other evidence of
4 criminal activity?
5    A.   Myself, no.
6    Q.   Were you inside the Hallwood house at
7 the same time that other officers were in the attic
8 of the house?
9    A.   Actually at the time that they were up
10 in the attic, I was drawing the interior of the house
11 on my scratch pad, so I was busy.
12    Q.   Is that what is reflected on Exhibit 6?
13    A.   No, this is an exterior recon.
14    Q.   Okay.  Is the drawing that you made
15 somewhere in Exhibit 5?
16    A.   I didn't see it in there, no.
17    Q.   What was your purpose in making an
18 interior diagram?
19    A.   So if we had to go serve another search
20 warrant on this place, that we would have an interior
21 of the entire house, if we had to go serve another
22 warrant on this house.
23    Q.   Did you use the rough sketch that you
24 were just describing to draw what appears here on
25 page 81?

*Lori M. Judd, CCR #233, RMR*

## DEPOSITION OF KEVIN WARREN

SHEET 12   PAGE 45

WARREN   45

1      A.   Yes, I would have.

2      Q.   This dark circle that appears just to

3 the right of the words "laundry room," what does that

4 dark circle indicate?

5      A.   Actually on the warrant itself, these

6 are different colors, and this color here there was

7 damage done to the ceiling, a hole in the ceiling

8 there, just inside the front door.

9      Q.   I see.  What was the cause of the

10 damage to the ceiling?

11      A.   I wasn't there when that happened.

12      Q.   And this says "ram closet door."  What

13 does that --

14      A.   No, this would be the attic access,

15 this would be the closet door inside this bedroom

16 that was rammed because it was locked.

17      Q.   I see.  Well, if it was locked, why ram

18 it?

19      A.   Because we need to make sure that

20 there's nobody hiding in that closet prior to us

21 turning this house over to the detectives.

22      Q.   And this attic access, does that

23 indicate a hole also?

24      A.   I believe there's a pre-existing attic

25 access that you crawl up into the ceiling through

PAGE 46

WARREN   46

1 that access.

2      Q.   So you were not inside the house at the

3 time there were officers in the attic?

4      A.   I probably was, yes, but I was

5 sketching the interior.  I was doing what I was

6 supposed to be doing and they were doing what they

7 were supposed to be doing.

8      Q.   So whatever went on in the attic you

9 are not aware of?

10      A.   Yeah, I didn't even get up in the

11 attic, so.

12      Q.   How long have you been a SWAT officer?

13      A.   I have been with SWAT for two and a

14 half years.

15      Q.   And what was your job prior to SWAT?

16      A.   I was a field training officer at

17 southeast area command.

18      Q.   For how long?

19      A.   I was an FTO for two years and I was in

20 patrol itself for eight.

21      Q.   A total of ten then, or is that a total

22 of eight?

23      A.   Actually, it would have been a total of

24 eight.  I was still on patrol when I was a field

25 training officer so it would have been eight in

PAGE 47

WARREN   47

1 patrol and then the last two and a half years is up

2 with SWAT.

3      Q.   And did you work for Metro prior to

4 that?

5      A.   No.  I was a security specialist at

6 Nellis Air Force Base.

7      Q.   Did you leave the Hallwood house before

8 any of the narcotics detail arrived?

9      A.   Actually, the majority of the time they

10 follow us in and they stand back until we are

11 absolutely completely done with the house.  Drawing

12 the interior, taking the pictures of the damage and

13 the evidence that we've come across, and only after

14 that do we turn it over to the detectives to come in.

15      Q.   Were you in the house when any crime

16 lab personnel were in the house?

17      A.   No, no.

18      Q.   Were you in the house when a chemist in

19 the narcotics detail was in the house?

20      A.   No.

21      Q.   Are you aware of anyone, any of the

22 SWAT officers falling partly or completely through

23 the ceiling while in the attic?

24      A.   I believe there was one, but I couldn't

25 tell you who it was.

PAGE 48

WARREN   48

1      Q.   And what do you understand to have

2 happened?

3      A.   What do I understand that happened?

4      Q.   Yes.

5      A.   I understand that when they were up in

6 the attic that maybe one of the officers, instead of

7 either stepping on one of the -- what would you call

8 it, the roof rafters up inside of the ceiling either

9 may have slipped off, or actually maybe accidentally

10 stepped on the ceiling itself.  I don't know how that

11 played out.

12      Q.   Did you see an ambulance come to the

13 scene at the Hallwood residence?

14      A.   Yes.

15      Q.   And what did that ambulance do?  What

16 was its purpose in being there, to the extent you

17 know?

18      A.   I believe that there were, the officers

19 that were up in the attic were treated for shortness

20 of breath due to the exposure from the insulation up

21 in the attic.

22      Q.   Do you recall actually your start date

23 at SWAT?

24      A.   Oh, it would have been April 28th of

25 2001.

*Lori M. Judd, CCR #233, RMR*

## DEPOSITION OF KEVIN WARREN

SHEET 13  PAGE 49

WARREN   49

1    Q.   Were you wearing standard, your
2  standard issue uniform on the night of this raid?
3        A.   Yes, I was.
4        Q.   Do you wear a face shield on your
5  helmet?
6        A.   Yes, I do.
7        Q.   After you left the Hallwood house did
8  you see the people who had been occupants of the
9  house outside the premises?
10       A.   Yes.
11       Q.   Where were they located?
12       A.   I believe it was one house to the east
13  of their house.
14       Q.   And how were they positioned, were they
15  sitting, standing?
16       A.   I don't remember.
17       Q.   Were they handcuffed?
18       A.   Yes, they were.
19       Q.   What were they wearing?
20       A.   I couldn't even tell you.
21       Q.   What was the temperature at the time of
22  the raid on the Hinton house?
23       A.   January, it was probably a little cool.
24       Q.   Did you have a knife with you on the
25  night of January 16th?

PAGE 50

WARREN   50

1        A.   Yeah.  I always carry one on my thigh
2  rig.
3        MR. BOOKE:  Thank you, sir.
4        THE WITNESS:  You're welcome.
5           (Whereupon the deposition was
6           concluded at 6:30 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

PAGE 51

WARREN   51

1                  CERTIFICATE OF DEPONENT
2  PAGE      LINE      CHANGE
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16
17       I, KEVIN WARREN, deponent herein, do hereby
   certify and declare under penalty of perjury the
18 within and foregoing transcription to be my
   deposition in said action; that I have read,
19 corrected and do hereby affix my signature to said
   deposition.
20
21            KEVIN WARREN
              Deponent

*Lori M. Judd, CCR #233, RMR*

 

# S.W.A.T. WARRANT SERVICE PLANNING SHEET

DATE _1·9·02_     CATEGORY _3_

S.W.A.T. EVENT# _020109-3115 RECON_   020116-2509 SERVICE   WARRANT EVENT# _____

TEAM OF SERVICE _RED_    SUPERVISOR APPROVING _SGT. GRAHAM_

WARRANT SERVED FOR _DET S WITHAM / SGT. V. ANDERSON   NARCOTICS_

TARGET _1919 HALLWOOD_    SECTOR/BEAT _H-3_

DESCRIPTION _A ONE STORY, SINGLE-FAMILY RESIDENCE WITH A TAN STUCCO EXTERIOR WITH GREEN TRIM. THE NUMBERS 1919 ARE AFFIXED TO THE RIGHT SIDE OF THE GARAGE IN WHITE._

FORTIFICATION _BLACK WROUGHT IRON SECURITY BARS ON THE WINDOWS, BLACK WROUGHT IRON GATE IN ARCH-WAY, 15 FEET FROM FRONT DOOR AND ANOTHER WROUGHT IRON GATE IN FRONT OF FRONT DOOR._

EVIDENCE SOUGHT _METH AND PARAPHERNALIA._

WILL C.I. OR U.C. BE PRESENT AT TIME OF SERVICE? _NO_

IF YES, DESCRIPTION _N/A_

CHILDREN _NO_     ELDERLY _NO_

DOGS _SMALL DOG_    WEAPONS _17·RIFLES   4·HANDGUNS IN ATTIC_

IS THE TARGET A KNOWN METHAMPHETAMINE LAB? YES ____ NO _X_

SUSPECT & SITE PHOTOS ORDERED _NO_    RECEIVED ON _____

SUSPECT PRINTOUTS ATTACHED _X_    SITE CHECK ATTACHED _X_

DISTRACT USED _YES_    TYPE _DEF. TEC 25_   HOW MANY _2_

FORCED ENTRY _YES_   METHOD _SHOK-LOK / RAM_

LVMPD adv. Hinton
FRCP 26(f)   000073

## SUSPECT INFORMATION

1. PRE _X_ POST _X_ : _HINTON, DAVID RICHARD_ ID# _1528967_
   INTELLIGENCE _PRIORS FOR BURG / BAT. DOM. VIOL / CCW / 2-COUNTS POSS._
   _UNREG FIREARM / PCS      CAME OUT FRONT DOOR_

2. PRE ___ POST _X_ : _HINTON, DONALD R._      SSAN- ~~ID#~~ _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_
   INTELLIGENCE ___ _CAME OUT FRONT DOOR_

3. PRE ___ POST _X_ : _REYES JOHN V._      SSAN- ~~ID#~~ _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_
   INTELLIGENCE ___ _CAME OUT FRONT DOOR_

4. PRE ___ POST _X_ : _VESELSKA, MICHAELA M._ SSAN- ID# _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_
   INTELLIGENCE ___ _CAME OUT FRONT DOOR_

5. PRE ___ POST ___ : _____ ID# _____
   INTELLIGENCE _____

6. PRE ___ POST ___ : _____ ID# _____
   INTELLIGENCE _____

7. MISCELLANEOUS SUSPECT INFORMATION: _____

_____

_____

_____

LVMPD adv. Hinton
FRCP 26(f)   000074

## SURVEILLANCE

| OFFICER | WEAPON/TOOL | POSITION |
|---------|-------------|----------|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |

## CONTAINMENT

| | OFFICER | WEAPON | POSITION |
|---|---------|--------|----------|
| 1. | J. REGLEY | H.G. | 1/2 |
| 2. | P. LEDBETTER | H.G. | 1/2 |
| 3. | B. MONTES | H.G. | 1/4 |
| 4. | J. EMERY | H.G. | 1/4 |
| 5. | D. JACOBY | H.G. | R/C |
| 6. | | | |
| 7. | | | |
| 8. | | | |

## PRIMARY ENTRY POINT DESCRIPTION

A SINGLE WOODEN DOOR THAT OPENS INWARD FROM RIGHT TO LEFT.

## SECONDARY ENTRY POINT

GLASS SLIDER ON THE #3 SIDE.

LVMPD adv. Hinton
FRCP 26(f)   000075

## ENTRY

| | OFFICER | WEAPON | POSITION |
|---|---|---|---|
| 1. | O. REED | H.G. | #1 |
| 2. | K. WARREN | H.G. | #2 |
| 3. | D. HIXSON | H.G. | #3 |
| 4. | C. ACOSTA | MP.5 | #4 |
| 5. | M. FOWLER | MP.5 | #5 |
| 6. | A. WILLIAMS | H.G. | #6 |
| 7. | G. VESP | H.G. | #7 |
| 8. | M. RIVERA | H.G. | #8 |
| 9. | V. DUMAS | H.G. | #9 |
| 10. | J. SHEAHAN | H.G. | #10 |
| 11. | SGT. GRAHAM | H.G. | #11 / POST. |
| 12. | | | |
| 13. | | | |
| 14. | | | |
| 15. | | | |
| 16. | | | |
| 17. | | | |
| 18. | | | |

## BREACHING

| | OFFICER | WEAPON/TOOL/DEVICE | POSITION |
|---|---|---|---|
| 1. | G. VESP | H.G. / HOOK | |
| 2. | M. RIVERA | H.G. / SHOK. LOK | |
| 3. | V. DUMAS | H.G. / RAM | |
| 4. | J. SHEAHAN | H.G. / B.U. SHOK. LOK | |

## RAKE/BREAK AND/OR DISTRACT DEVICE

| | OFFICER | WEAPON/TOOL/DEVICE | POSITION |
|---|---|---|---|
| 1. | J. Emery | H.G. / 2-Def.Tec "25 | 1/4 |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |

## SWAT VEHICLES

| | VEHICLE # | DRIVER | OFFICERS INSIDE |
|---|---|---|---|
| 1. | Large Wht. Van | M. Rivera | Breach / Entry |
| 2. | Small Wht Van | J. Emery | Containment |
| 3. | | | |
| 4. | | | |

## STAGING AREA

1771 Flamingo / S.W. Corner of Flamingo, Spencer.

LVMPD adv. Hinton
FRCP 26(f)   000077

## VEHICLE APPROACH ROUTE AND PARKING LOCATION

S/B ON SPENCER TO CANTEBURY. E/B ON CANTEBURY TO WALTETA.
S/B ON WALTETA TO HALLWOOD. W/B ON HALLWOOD TO TARGET.

## FOOT APPROACH ROUTE

FROM PARKED VANS TO TARGET.

## MEDICAL UNITS

| | OFFICER | WEAPON/EQUIPMENT | CALL-SIGN |
|---|---|---|---|
| 1. | C. MALBURG | H.G. / MED BAG | EZ.5 |
| 2. | TOM HIGGINS | TAC DOCTOR | |
| 3. | | | |
| 4. | | | |

## DOWNED OFFICER PLAN

GO BACK TO VAN AND CALL FOR MEDICAL.

LVMPD adv. Hinton
FRCP 26(f)   000078

## ADDITIONAL ASSETS

OFFICER(S)                    WEAPON/EQUIPMENT

INTELLIGENCE  _N/A_

GANG UNIT  _N/A_

PATROL  _N/A_

AIR UNIT  _N/A_

K-9  _J. JENKINS_

## INJURIES

OFFICERS  _O. HIXSON, T. SHEAHAN, M. FOWLER. SHORTNESS OF BREATH FROM DUST AND INSULATION FIBERS IN ATTIC. AMR RESPONDED TO SCENE_

SUSPECTS  _NONE_

OTHER  _NONE_

LVMPD adv. Hinton
FRCP 26(f)   000079

# RECON DIAGRAM SHEET



DATE OF RECON: __1-9-02__

RECON OFFICER(S): __V. WARREN / M. RIVERA__

VEHICLE USED: __BLK CROWN VIC.__          CLOTHING WORN: __PLAIN__

WAS DETECTIVE PRESENT ON RECON? _____YES   __X__ NO

IF YES, NAME: __N/A__

NOTES: __ARCH-WAY OPENINGS IN FRONT OF HOUSE ARE FORTIFIED.__

__ADD-ON TO THE #2 SIDE OF HOUSE.__

LVMPD adv. Hinton
FRCP 26(f)   000080

## INTERIOR RECON DIAGRAM SHEET



DATE OF RECON: 1-9-02

RECON OFFICER(S): K. WARREN / M. RIVERA

NOTES: ● - RAM CLOSET DOOR

  - ATTIC ACCESS

● - DAMAGE DONE TO CEILING

  - DOOR IS UNPASSABLE DUE TO LARGE AMOUNT OF DEBRIS BLOCKING DOOR

LVMPD adv. Hinton
FRCP 26(f)   000081

# DISTRACT DIAGRAM SHEET



DATE OF RECON: __1-9-02__

RECON OFFICER(S): __K. WARREN / M. RIVERA__

NOTES: __- 2 - DEF. TEC #25's__

__- HOOK & SHOCK · LOCK__

__- RAM__

__ENTRY - 2130 / EXIT - 2235__

LVMPD adv. Hinton
FRCP 26(f)   000082

# REPORT OF DAMAGE DONE TO STRUCTURE

PHOTOS TAKEN?          _____✓___ YES          _____ NO

PHOTOS ORDERED?          _____ YES          _____ NO

DAMAGE DONE TO FRONT FORTIFIED DOOR IN ARCH-WAY FROM HOOK AND SHOCK-LOCK.

DAMAGE TO FORTIFIED DOOR IN FRONT OF FRONT DOOR FROM HOOK AND SHOCK-LOCK.

DAMAGE TO FRONT DOOR FROM RAM.

DAMAGE TO SIDE YARD GATE FROM SHOCK-LOCK. b 4 SIDE OF HOUSE.

DAMAGE TO ONE CLOSET DOOR FROM RAM, IN THE BEDROOM ON THE 1/2 CORNER OF HOUSE.

DAMAGE TO CEILING INSIDE FRONT DOOR.

DAMAGE TO CEILING BY ATTIC ACCESS ON 4 SIDE OF HOUSE.

LVMPD adv. Hinton
FRCP 26(f)   000083

# SUMMARY OF SEARCH WARRANT EXECUTION

See. O.R.

LVMPD adv. Hinton
FRCP 26(i)   000084

# SWAT WARRANT SERVICE PLANNING SHEET
## AFTER ACTION REPORT

REQUESTING UNIT AND OFFICER: _Narcs / S. Whitman 4594_

EVENT NUMBER: _020109-3115_        _020116-2569_

TARGET LOCATION: _1919 Hallwood_

DATE & TIME WARRANT SERVED: _01-16-02_        _2130 - 2235_

TEAM OF SERVICE: _Red_

## CATEGORY OF WARRANT

PRE: _IV_        POST: _III_

## TYPE OF ENTRY

KNOCK & ANNOUNCE _Yes_     OFFICER: _Dumas / Team_

DOOR OPEN _No_        OTHER: _____

NO KNOCK _No_        DESCRIBE ALL FACTORS PRE & POST THAT

SUPPORTED A NO-KNOCK ENTRY: _Warrant Downgraded_

_____

_____

_____

**THIS PAGE MUST BE FAXED TO THE REQUESTING UNIT**

LVMPD adv. Hinton
FRCP 26(f)   000085



■ date _O11602_

■ # of pages _21_

including cover sheet

■ **Facsimile Cover Sheet**

■ to _____O.F.C.   WARREN_____

■ company _____SWAT_____

■ department _____

■ phone # _____

■ fax # _____

■ from _____S. WITHAM_____

■ department _____NARCS_____

■ phone # _____296·3105_____

■ fax # _____

■ notes _____SWAT - REQUEST  FOR  1919 HALLWOOD_____

_____S.W.  FOR  1919 HALLWOOD_____

_____APPLICATION/AFF  FOR 1919 HALLWOOD_____

_____APPLICATION/AFF  FOR 2809 WILMINGTON_____

_____APPLICATION/AFF  FOR 6704 AGUA_____

**NOTE:** If you encounter any difficulty in receiving the total number of pages indicated above, please notify us at the phone number indicated above.

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

LVMPD 198 (REV. 2-95) ● AUTOMATED

LVMPD adv. Hinton
FRCP 26(f)   000092

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# REQUEST FOR SWAT WARRANT SERVICE

Date/Time: _01-16 02_       Event #: _____       Sector/Beat _____

## Class of Warrant

☐ Class 1 - Suspects do not have a history of violence; minimal or no force entry is anticipated; and suspects are not likely to be armed.

☐ Class 2 - Suspects have no history but some articulable suspicion exists that they may have access to unknown weapons; minimal or no force is anticipated; and supervisors believe the risk to officers greater than Class 1.

☐ Class 3 - Suspects have a history of violence or are capable of violence; known to have or probably have access to weapons and are armed; and are considered dangerous. (High Risk)

☒ Class 4 - Suspects have a history of violence; known to be armed and highly dangerous; and areas likely to be heavily fortified. (High Risk)

(*) When Requesting Class 3 and 4 warrant service, circumstances creating that classification must be included in the affidavit for search warrant.

Location to be Served: _1919  E. Hollywood Dr , LV, NV 89_

Location is: ☒ House ☐ Apt/Condo ☐ Mobile Home ☐ Business   Children Present: ☐ Yes ☐ No ☐ Unknown

Location Fortified With: ☐ Dogs ☐ Cameras ☒ Bars ☒ Fence/Block Wall ☐ Shrubber ☐ Weapons

## Names of Suspects:

#1 _Hinton, David_ (Name)        (DOB) _01-13-80_        (ID#) _1528967_
_Burglary, CCW, Poss. under Firearm, + PCS_ (History of Prior Arrests/Violence)

#2 _____ (Name)        (DOB) _____        (ID#) _____
_____ (History of Prior Arrests/Violence)

#3 _____ (Name)        (DOB) _____        (ID#) _____
_____ (History of Prior Arrests/Violence)

#4 _____ (Name)        (DOB) _____        (ID#) _____
_____ (History of Prior Arrests/Violence)

Additional Information:
_Suspect also possible suspect in 3 recent robberies_
_____

Requesting Unit: _NSV_
Requesting Detective/Officer: _S. Witham_        Phone #: _256-3145_   P# _4554_

## FAX IMMEDIATELY TO SWAT SECTION

LVMPD 244 (REV. 3/98) - AUTOMATED

LVMPD adv. Hinton
FRCP 26(f)   000093

## SEARCH WARRANT

STATE OF NEVADA   )
                  ) ss:
COUNTY OF CLARK   )

The State of Nevada, to any Peace Officer in the County of Clark, proof by Affidavit having been made before me by Detective S. Witham, P# 4594, said Affidavit attached hereto and incorporated herein by reference, that there is probable cause to believe certain property, namely:

A)   Methamphetamine

B)   The paraphernalia commonly associated with the ingestion and distribution of the controlled substance methamphetamine, such as scales, packaging materials, and "cut", grinders, customer and source lists, recordations of purchases and sales, including "owe sheets" reflecting transactions in the controlled substance methamphetamine.

C)   Limited items of personal property which would tend to establish a possessory interest in the items seized pursuant to this search warrant, such as personal identification, photographs, utility company receipts or addressed envelopes.

is presently located at: (1) 1919 Hallwood Dr. Las Vegas, Clark County, Nevada. Further described as a one-story, single-family residence with a tan stucco exterior with green trim. There are black wrought iron security bars on the windows and a black wrought iron security gate in front of the door. The numbers 1919 are affixed to the right side of the garage in white., (2) and the persons of adults located at the premises at the time of the execution of this search warrant.

And as I am satisfied that there is probable cause (a controlled buy was conducted at the location), to believe that said property is located as set forth above and that based

1

LVMPD adv. Hinton
FRCP 26(f)   000094

upon the Affidavit attached hereto there are sufficient grounds for the issuance of the search warrant.

Further, upon good cause shown in the affidavit and application for search warrant, the affidavit is ordered sealed and a copy of the affidavit need not be left with this search warrant.

You are hereby commanded to search forthwith said premises for said property, serving this warrant at anytime day or night, and if the property is there to seize it, prepare a written inventory of the property seized, and make a return to me within ten days.

**DATED THIS 06 day of Jan., 2001.**

_____
JUDGE

2

Jan 16 02 06:54p   LVMPD NWRC CHEYENNE   702 229 7377   p.4

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

STATE OF NEVADA    )
                   ) ss:
COUNTY OF CLARK    )

Detective S. Witham, P# 4594 being first duly sworn, deposes and states that he

is the affiant herein, and that he is a Police Officer with the Las Vegas Metropolitan Police

Department (LVMPD), currently assigned to the Narcotics Bureau having been employed

by the Department for 8 years.

That there is probable cause to believe that certain property hereinafter described
will be found at the following described premises, to-wit: (1) 1919 Hallwood Dr. Las Vegas,
Clark County, Nevada. Further described as a one-story, single-family residence with a
tan stucco exterior with green trim. There are black wrought iron security bars on the
windows and a black wrought iron security gate in front of the door. The numbers 1919 are
affixed to the right side of the garage in white., (2) and the persons of adults located at the
premises at the time of the execution of this search warrant.

The property referred to and sought to be seized consists of the following:

A) Methamphetamine

B) The paraphernalia commonly associated with the ingestion and distribution of the
controlled substance methamphetamine, such as scales, packaging materials, and
"cut", grinders, customer and source lists, recordations of purchases and sales,
including "owe sheets" reflecting transactions in the controlled substance
methamphetamine.

C) Limited items of personal property which would tend to establish a possessory
interest in the items seized pursuant to this search warrant, such as personal
identification, photographs, utility company receipts or addressed envelopes.

The property hereinbefore described constitutes evidence which tends to demonstrate that
the criminal offenses of Possession of Controlled Substance have been and continue to
be committed in violation of Chapter 453 of the NRS.

1

LVMPD adv. Hinton
FRCP 26(f)  000096

In support of your affiant's assertion to constitute the existence of probable cause, the following facts are offered: That Detective S. Witham, P# 4594, did meet with a Confidential Informant hereafter referred to as CI. The true identity of the CI is known to your affiant, but will not be revealed in this affidavit due to fear for the CI's safety if the persons at whom this investigation is directed learn the CI's identity.   If ordered to do so by this court at a subsequent time, your affiant will provide to the court the identity of the CI.

That on the 04 day of Jan. of the year 2002, the CI told Affiant the following: CI stated that CI knows an individual by the name of David Hinton who sells Methamphetamine. CI stated that CI could go to Hinton's house, located at 1919 Hallwood Dr., and buy Methamphetamine. CI stated that CI has been buying Methamphetamine from Hinton for more than one year.

In order to confirm the information supplied to the affiant, a controlled buy of methamphetamine was conducted at 1919 Hallwood Dr., with the assistance of the CI.

The CI was thoroughly searched to insure the absence of any controlled substances, monies or property, and was provided with LVMPD buy money to be used solely for the purchase of methamphetamine. The serial numbers of the buy money were recorded in order that they may be readily identifiable at a later time.

On the 04 day of Jan., 2002, affiant surveilled CI from a nearby location. CI was observed to go directly to the residence at 1919 Hallwood Dr. and enter. The CI then exited the residence approximately 10 minutes later and returned directly to your affiant. CI did return with the purchased, purported methamphetamine which was immediately handed to your affiant.  Through your affiant's prior experience and knowledge of controlled

2

substances, your affiant recognized the substance to be consistent with the controlled substance, methamphetamine. CI was again thoroughly searched in order to confirm the absence of any controlled substances, monies or property, and was found to have none.

After the purchase, CI told affiant the following: That CI was allowed into the residence by Hinton. CI then produced the LVMPD buy money that had been provided to the CI and gave it to Hinton. Hinton then handed the CI a plastic baggie containing a white crystalline substance. CI stated that Hinton then told him that he had done two separate robberies at Walgreen's stores in the last two months. Hinton also told the CI that he had attempted to do a robbery of a citizen at an atm machine at the intersection of Tropicana and Spencer. During this robbery attempt he struggled with the victim and during the fight a 20 dollar bill got ripped in half, Hinton keeping half and framing to hang on the wall in his house.

Your affiant, conducted a field test using the narcotics identification system distributed by ODV Company. Your affiant was trained and certified to use the below listed test in July of 1998, by representatives of the company. Your affiant, using the ODV NARCOPOUCH System, tested the purported methamphetamine purchased at 1919 Hallwood Dr. and received a positive test result indicating the substance to be methamphetamine.

It is your affiant's opinion, based on personal experience and having worked as a police officer for the past 8 years, and having attended training seminars, and having interacted on a professional basis with numerous fellow narcotics detectives, that almost all persons who sell narcotics for profit maintain records of the transactions including records of their suppliers and customers as well as "owe" sheets. These records on occasion are extremely sophisticated and elaborate, however more often than not, these

3

LVMPD adv. Hinton
FRCP 26(f)   000098

It is further requested that this affidavit should be sealed by the Order of the Court because of the following reasons. There is currently an ongoing narcotics investigation involving persons believed connected to the premises sought to be searched. Also, from reading the affidavit, the identity of the CI will probably be deduced by persons involved in the narcotics activity alleged. Should the facts contained in this affidavit become known, the ongoing narcotics investigation and/or the safety of the CI would be jeopardized.

**WHEREFORE, Affiant requests that a Search Warrant be issued directing a search for and seizure of the aforementioned items at the location set forth herein.**

_____
AFFIANT

SUBSCRIBED and SWORN to before me this 06 day of Jan., 2001.

_____
JUDGE

5

LVMPD adv. Hinton
FRCP 26(f)   000099

Page: 1 Document Name: untitled

```
NM-HINTON          DAVID      RICHARD      SID-02791439  000 SS-530135118
CS-1528967    BD-01131980 RC-W SX-M HT-600 WT-180 HR-BLN EY-BRO
                                                                    SPC
BP-LVN                    FB-         SI-NV03120256 O1-      O2-
A1-1919 HALLWOOD DR, LVN 89119                    111401 #2 SHEET 012901
I254 011201 MPD**PRINT RED FBI NEXT TIME IN**
I255 072400 MPD- *** "PURE" RT FOREARM, "ANGLO" LT FOREARM ***
R252 MPD 072400 VEH IMP R/O (SPENCER/TROPICANA)           000711-2232
R253 MPD 032597 T/C NELLIS/STEWART                        970325-2102
R254 MPD 012197 T/C EASTERN/FLAMINGO                      970121-0506
R255 MPD 021694 T/C SPENCER & VIKING                      940216-0494
N255 HEN-55957
R247 MPD 010 111401 CIT     FLSE INFO T/POL      011114-1354F       MPD
R248 MPD 009 010901 SUM     BURG                 001201-2607        MPD
D248 MPD 009 010901         BURG                     MPD DKT-00F21869X
    00F21869X       CON PCN 18228677 // NOT BKD  T/APP 021301  PROC F/B 012901
R249 MPD 008 010901 SUM     BATT DOMESTIC VIOL    001201-2607        MPD
D249 MPD 008 010901         BATT DOMESTIC VIOL       MPD DKT-00F21869X
    00F21869X       CON PCN 18228677 // NOT BKD  T/APP 021301  PROC F/B 012901
R250 HEN 007 101800         CCW                  00-21636           HEN
D250 HEN 007 101800         CCW
    00FH1242        CON PCN#75395957-1
```

                    **DISPLAY CONTINUED ON NEXT PAGE**

```
        SID-02791439
AR251 MPD 006 021000 CIT      POSS UNREG F/A           000210-2565F        MPD
AR252 MPD 005 021000 CIT      POSS NARCO PARAPHERNALIA 000210-2565F        MPD
AR253 MPD 004 100399          POSS NARCO PARAPHERNALIA 991003-1516         MPD
AD253 MPD 004 100499          POSS NARCO PARAPHERNALIA
     0000            CON ROR
AR254 MPD 003 100399          POSS UNREG F/A           991003-1516         MPD
AD254 MPD 003 100499          POSS UNREG F/A
     0000            CON ROR
AR255 MPD 002 100399          POSS CONT SUB            991003-1516         MPD
AD255 MPD 002 100399          POSS CONT SUB
     99F15429X      CON PCN 17092326 // ROR
AJ255 MPD 001 042797 CIT      CURFEW                   970427-0026
```

LVMPD adv. Hinton
FRCP 26(f)  000034

# LAS VEGAS METROPOLITAN POLICE DEPARTMENT

## OFFICER'S REPORT

EVENT #: 020116-2509

AFTER ACTION - CATEGORY 3 SEARCH WARRANT
### SUBJECT

| | | | |
|---|---|---|---|
| DIVISION REPORTING: | SOD | DIVISION OF OCCURRENCE: | FSD |
| DATE AND TIME OCCURRED: | 01/16/02 - 2130 HRS. | LOCATION OF OCCURRENCE: | 1919 HALLWOOD |

**DETAILS:**

On 1/16/02, I Ofc. D. Hixson - P #3185, currently assigned to LVMPD SWAT Red Team as Asst. Team Leader was told by Sgt Graham, leader of the Red Team, that we would be serving this warrant at 1919 Hallwood. Information via the Request for SWAT Search Warrant Service showed that this was a Class 4, it was a house, barred, had a fence block around it. Suspects were Hinton, David - ID #1528967 with priors for burglaries, CCW, possession, unregistered firearms and 2 counts of PCS. Notes also say suspect also possible suspect in three recent robberies. Though the information showed that it could be a class 4 we did not have definite history on David Hinton showing the history of violence, so Sgt. Graham listed it as a class 3 and possibly even class 2.

With this in mind, in our planning phase Sgt. Graham and ATL Darrell Hixson decided that we would do a true knock and announce on this residence since it was required enough to list it as a class 4. With the information given to us, the SWAT Red Team conducted a Recon and Planning Phase in preparation for the search warrant service. A short time later we were given a copy of the signed search warrant and it was reviewed and proved to be true and correct.

The SWAT Team then serviced the warrant at 1919 Hallwood. As the team approached the door the breacher, Ofc. Dumas knocked on the door and the whole team announced " Police - Search Warrant". We continued to announce, then had a distract and the door breached at the same time. 25 distract was thrown on the right side of the house, listed in our records on the #4 side. As the door was finally hit by Ofc. Dumas with the ram, was hit once and upon the 2nd hit the door opened, prior to it being hit. Door was answered by subject later identified as Donald Hinton - SS #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. He exited through the front door, the same door that we were breaching. It should be noted that the entire SWAT Team was still on the outside, still identifying themselves and were calling people out instead of going in at this time. Also coming out the door was Hinton, David - ID 1528967, Reyes, John - SS# 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 and Veselska, Michaela - SS #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.

Once all these individuals came out we challenged the house again verbally and got no reply. The individuals were also asked if there was anyone else inside the house and they said there wasn't. They did say that there was one more inside the house. We then did a slow methodical search of the house and found no other individuals in there.

| | | | |
|---|---|---|---|
| Date and Time of Report: | 1/16/02 - 2100 HRS. | Officer: | DARRELL HIXSON | P#: 3185 |
| Approved: | | Officer: | | P#: |

MPD 82 (REV. 1-91) · AUTOMATED

**SIGNATURE:**

LVMPD adv. Hinton
FRCP 26(f)  000071

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

D/Event Number:   010227-1762

Page 2 of 2

We had our K-9 Ofc. John Jenkins come in with his dog into the attic area and the dog responded on a hit up in the attic area, so Officers Fowler, Hixson, Sheahan and Sgt. Graham went into the attic and did a thorough search, whereupon Officers Fowler and Hixson found numerous rifle cases, rifles, handguns and handgun cases hidden in the attic insulation.

Sgt. Graham then contacted Narcotics officers and Sgt. Anderson who came into the residence at that time. Due to the fact that the attic was a difficult area to get to and contained many physical hazards, including insulation it was determined that SWAT Officers Hixson and Fowler would hand down the rifles which might be used as evidence to Sgt. Anderson to keep the chain in custody a short period.  These weapons were handed down and Sgt. Anderson and her detectives took them into the final chain of custody.

It should noted that no other evidence was handled by the SWAT Officers other than the weapons mentioned.  Due to the fact of the thorough search and the condition of this house there was some extensive damage to the ceiling and some of the doors in the residence. Pictures of this damage are in this packet and were photographed at the scene. It should be noted that photographs were taken of the individuals that walked out of the house and in these photos you will see that their hands are behind their back on three of them they were cuffed and one individual the hands are in the front.  Pictures were also taken of the rifle cases and the rifles that were passed down and they are also in this packet

They were all asked if they had any injuries and needed any medical attention and all stated that they didn't.  It should be noted that Officers Fowler, Hixson, Sheahan and Sgt. Graham received medical attention from our Tac-Medic Clint Malburg and our Tac-Doc at the scene Tom Higgins and AMR responded to give oxygen and treatment to those who were up in the attic insulation area, due to the dust and fibers in the attic. Everyone at the scene seemed to response to the medical treatment and nobody was transported, either civilians or officers at the scene. .

The residence was turned over to Narcotics to further their investigation pertaining to the search warrant.

DH:hc

cc: Det. Witham - Narcotics

LVMPD adv. Hinton
FRCP 26(f)   000072

## CERTIFICATE OF REPORTER

STATE OF NEVADA   )
                  )   ss
COUNTY OF CLARK   )

I, Karen B. Nowak, CCR #476, Clark County, State of Nevada, do hereby certify:

That I reported the taking of the deposition of Donald Hinton, commencing on the 5th of November, 2003, at the hour of 9:00 a.m., and that prior to being examined the witness was by me duly sworn to testify to the truth.

That I thereafter transcribed my said shorthand notes, and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of my shorthand notes.

I further certify that I am not a relative or employee of the parties, attorneys, or counsel involved in said action, nor a person financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand in my office in the County of Clark, State of Nevada, this 18th day of November, 2003.

*Karen B. Nowak*
KAREN B. NOWAK, CCR #476

# In The Matter of:

*Hinton v.*
*Clark County, Nevada*

---

*DEPOSITION OF:*

## Donald Hinton
## Volume 1
*November 5, 2003*

---

*Associated Reporters of Nevada*
*Certified Court Reporters*
*2300 W. Sahara Avenue*
*Suite 770*
*Las Vegas, NV  89102*
*(702) 382-8778    FAX: (702) 382-2050*

**Word Index Included**

Page 1

```
1              UNITED STATES DISTRICT COURT
2                   DISTRICT OF NEVADA
3
4   DONALD HINTON, DAVID HINTON  )
5   and JOHN REYES,             )
6                Plaintiffs,    )
7          vs.                  ) CASE NO.
8                               ) CV-S-03-0057-PMP-PAL
    CLARK COUNTY, NEVADA, a     )
9   political subdivision, acting )
    by and through the LAS VEGAS )
10  METROPOLITAN POLICE DEPARTMENT;)
    JOHN DOES 1-30 and ROE ENTITIES)
11  1-10,                       )
                                )
12            Defendants.       )
    _____)
13
14
15
16           DEPOSITION OF DONALD HINTON
17         Taken on Wednesday, November 5, 2003
18                   At 9:00 a.m.
19              At 10001 Park Run Drive
20                 Las Vegas, Nevada
21
22
23
24
25  Reported by:  Karen B. Nowak, CCR #476
```

Page 2

```
1   APPEARANCES:
2   For the Plaintiff:       BRADLEY L. BOOKE, ESQ.
                             7251 West Lake Mead Blvd.
3                            Suite 530
                             Las Vegas, Nevada 89128
4
5   For the Defendant:       CRAIG R. ANDERSON, ESQ.
                             Marquis & Aurbach
6                            10001 Park Run Drive
                             Las Vegas, Nevada 89145
7
8
9
10
11              I N D E X
12  Witness       Direct    Cross    Red.    Rec.
13  Donald Hinton
14  (By Mr. Anderson)    3
15  (By Mr. Booke)              115
16
17
18
19            E X H I B I T S
20  Number        Description              Page
21  Exb. 2        Floor Plan of Home        24
22
23
24
25
```

Page 3

```
1   Thereupon--
2                 DONALD HINTON
3   was called as a witness by the Defendant and, having
4   been first duly sworn, testified as follows:
5                 DIRECT EXAMINATION
6   BY MR. ANDERSON:
7       Q.  Could I get you to state your name for the
8   record and spell it.
9       A.  I refuse to answer on the grounds it may tend
10  to incriminate me won't work today?  Donald Hinton,
11  H-i-n-t-o-n.
12      Q.  Mr. Hinton, my name is Craig Anderson, and
13  I'm an attorney who represents Las Vegas Metropolitan
14  Police Department.  As you're aware, you filed a
15  lawsuit against them.
16          Are you aware of that?
17      A.  I am aware of it.
18      Q.  Okay.  For purposes of clarity, I don't mean
19  to be rude, but I will refer to you as Donald because
20  your son David is also --
21      A.  That's fine.
22      Q.  Okay.  And you can call me Craig or whatever
23  is most convenient for you.  Have you ever had your
24  deposition taken before?
25      A.  I don't remember.  I think so.
```

Page 4

```
1       Q.  Okay.  I'm just going to go over a couple of
2   ground rules real quick so you understand what's going
3   on here.  Did you have a chance to discuss what's going
4   to happen here today with your attorney?
5       A.  I did.
6       Q.  Okay.  Pretty much I'm going to be asking
7   questions.  And you're going to be giving answers.  The
8   oath you just took from the court reporter is the same
9   as if you took an oath in court.
10          Do you understand that?
11      A.  Okay.
12      Q.  And if you were to lie or tell a mistruth,
13  you would be subject to the same penalties of perjury
14  as if you had lied in open court.  Do you understand
15  that?
16      A.  Okay.
17      Q.  The other thing I ask is that, when I ask you
18  questions, that you respond audibly with a yes or a no
19  and no shrugs or shakes of the head simply for her
20  convenience.
21      A.  But you just nodded your head.
22      Q.  Correct.  If at some point you nod or shake
23  your head and I say is that a yes or is that a no, I'm
24  not trying to be rude.  I'm just trying to keep a clear
25  record for --
```

1 (Pages 1 to 4)

Donald Hinton  1          November 5, 2003

Page 5

1    A.   That's fine.
2    Q.   -- the court reporter.  Because she takes
3  down everything that we say, the one thing that you and
4  I need to work on is that you allow me to finish my
5  questions and I allow you to finish your answers and we
6  do not talk over one another.
7        A lot of times I'm going to ask questions and
8  you're going to know exactly where I'm going and may be
9  eager to answer.  Just allow me to finish, and then
10  I'll allow you to finish your answer.  If at any time
11  you do not understand my question, don't answer it.
12  Ask me to rephrase it.  Tell me that it didn't make
13  sense.
14        If you do answer it, I will assume that you
15  understood it, and it will go on the record.  The other
16  thing is I'm not here to trick you.  I'm not here to
17  confuse you.  So if something comes across as
18  confusing, just ask me to rephrase it.
19        Do you have any questions before we start
20  here today?
21    A.   No.
22    Q.   When this is done, she will give you a copy
23  of what we talked about here today in a booklet form,
24  my questions and your answers.  You'll have a chance to
25  review that.  And then you'll have a chance to make any

Page 6

1  changes to that deposition to your testimony.
2        The only thing I caution you on is say, for
3  example, we were talking about a car accident, and you
4  said that when you went through the light it was green
5  and then later you changed it to red when you sent it
6  back to me, I would be able to comment on that at the
7  time of trial that you had changed a substantive
8  answer.  Okay?
9    A.   Okay.  And you will have that ready today?
10    Q.   It will probably be about a month or two
11  weeks to a month.
12    A.   Okay.
13    Q.   Are you on any medications that would not
14  allow you to give truthful testimony or remember?
15    A.   Well, I take Vioxx.
16    Q.   Does it affect your memory?
17    A.   I don't think so.  And I took a muscle
18  relaxant last night.
19    Q.   Will either of those affect your ability to
20  give truthful testimony?
21    A.   I don't think so.
22    Q.   What's your current address?
23    A.   1919 East Hallwood Drive, Las Vegas, Nevada
24  89119.
25    Q.   And what's your date of birth?

Page 7

1    A.   2/17/34.
2    Q.   Where were you born?
3    A.   Morristown, South Dakota.
4    Q.   What's your social security number?
5    A.   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.
6    Q.   Did you attend high school?
7    A.   I did.
8    Q.   And where did you go to high school?
9    A.   Several places.  One is Westchester High
10  School and Salinas High School.  I graduated from
11  there.
12    Q.   Salinas.  Could you spell that?
13    A.   S-a-l-i-n-a-s, California.
14    Q.   And do you recall the year you graduated?
15    A.   No, I don't.
16    Q.   But you did graduate?
17    A.   Yes.
18    Q.   Did you attend any college?
19    A.   I did.  Two years.
20    Q.   Where at?
21    A.   El Camino College in Gardena and Sacramento
22  State College.
23    Q.   Did you get any type of associates degree
24  or any --
25    A.   No.

Page 8

1        MR. BOOKE:  Mr. Hinton, let Mr. Anderson
2  finish his question before you begin your answer.  And
3  it will just be a little easier for everybody when you
4  do it that way.
5        THE WITNESS:  Okay.
6  BY MR. ANDERSON:
7    Q.   Most of the stuff I ask you, you'll know
8  right where I'm going.  So it's kind of hard.  Did you
9  have any specialty in college?  Were you majoring in
10  anything?
11    A.   Photography and English.
12    Q.   And do you recall roughly the years that you
13  attended college?
14    A.   No, I don't.
15    Q.   What's your current marital status?
16    A.   Single.
17    Q.   Ever been married?
18    A.   Yes.
19    Q.   How many times?
20    A.   Once.
21    Q.   And did that end in divorce?
22    A.   Yes.
23    Q.   How many children did you have from that
24  marriage?
25    A.   One.

2 (Pages 5 to 8)

Donald Hinton  1        November 5, 200~

---

**Page 9**

1  Q.  And what's that child's name?
2  A.  David.
3  Q.  How old is David?
4  A.  Twenty-three.
5  Q.  And where is David's mother now, if you know?
6  A.  She's in Las Vegas.
7  Q.  Do you recall the year you married?
8  A.  '79 or '80.
9  Q.  And when did you divorce?
10  A.  '83.
11  Q.  Any other children from --
12  A.  I have one other son.
13  Q.  How old is he?
14  A.  Twenty-seven.
15  Q.  Where does he live?
16  A.  In Las Vegas.
17  Q.  What's his name?
18  A.  Donald.
19  Q.  Do you know what Donald does?
20  A.  He's a convention worker.
21  Q.  Convention?
22  A.  Uh-huh.
23  Q.  Are you currently employed?
24  A.  Retired.
25  Q.  Do you do any work, any odd jobs or anything?

---

**Page 10**

1  A.  No.
2  Q.  What year did you retire?
3  A.  1999.
4  Q.  Prior to retiring, what was your most recent
5  job?
6  A.  Convention.
7  Q.  And what did you do?
8  A.  I was a steward for Local 631.
9  Q.  And how long did you work for Local 631?
10  A.  Ten years.
11  Q.  What year did you move to Las Vegas?
12  A.  1977 or '78.
13  Q.  So prior to Local 631, where did you work?
14  A.  Boilermakers union.
15  Q.  That was here in Las Vegas?
16  A.  No.  In California.
17  Q.  Did you move back to California?
18  A.  No.
19  Q.  You commuted?
20  A.  Uh-huh.
21  Q.  Okay.  And what did you do for the
22  boilermakers union?
23  A.  I was a rigger.
24  Q.  How many years did you work for them?
25  A.  1965 to 1985.  Twenty years.

---

**Page 11**

1  Q.  So when you moved to Las Vegas, you were
2  still working for the boilermakers --
3  A.  I was.
4  Q.  And would you just like go down on the
5  weekdays and come back on weekends?
6  A.  No.  They would dispatch us to jobs around
7  the country.
8  Q.  Between 1978 and 1999 any other jobs besides
9  the boilermakers union and the steward of Local --
10  A.  No.
11  Q.  -- 631?
12  A.  We overlapped them.  No.
13        MR. BOOKE:  Be patient.  Let him finish his
14  question.
15        THE WITNESS:  I didn't realize I was doing
16  it.  I will.
17  BY MR. ANDERSON:
18  Q.  I notice in some of the paperwork that you
19  were involved with like a prison reform group or
20  something along those lines; is that correct?
21  A.  Yes, I am.
22  Q.  Okay.  What is that?
23  A.  Exactly what it says, prison and parole
24  reform.
25  Q.  Prison and parole reform.  And can you

---

**Page 12**

1  explain to me what exactly that is?
2  A.  That is taking care of the complaints that
3  come to the organization from prisoners within the
4  prison system or who are on parole to act somewhat as
5  an ombudsman for them, settle out problems between the
6  prisoner and the institutions.
7  Q.  How many people are members of that group?
8  A.  Not exactly members.  They come and go.
9  Sometimes they could be working on as many as ten or
10  maybe, as a collective group, a hundred.
11  Q.  Is it like a recognized group?  Like the
12  prison system here in Nevada recognizes you?
13  A.  Oh, yes, they do.
14  Q.  So if a prisoner makes like some sort of
15  complaint, you set up a meeting with the prison system?
16  A.  We do.
17  Q.  And they give you an audience?
18  A.  Well, sometimes.  Usually it's over the
19  telephone with Jackie Crawford.  She's the director of
20  prisons.
21  Q.  How did you become involved with this group?
22  A.  My son was in prison and had a problem.
23  Q.  Which son?
24  A.  Donald.
25  Q.  And do you recall like what year you became

---

3 (Pages 9 to 12)

Donald Hinton  1          November 5, 2003

Page 13

1  involved with this, how long you've been doing it?
2      A.    Well, I've been doing it for about five
3  years.
4      Q.    So since your retirement roughly?
5      A.    Yes.
6      Q.    Are you in any like type of leadership
7  position or any title with that group?
8      A.    The executive director.
9      Q.    Who is in charge?
10      A.    I am.
11      Q.    And do you receive a salary?
12      A.    No.
13      Q.    So it's a volunteer position?
14      A.    (Witness nods.)
15      Q.    Is that a yes?
16      A.    Yes.
17      Q.    Besides handling prisoner grievances and
18  complaints, anything else the group does?
19      A.    No.
20      Q.    So at any given time you could have as many
21  as ten to more?
22      A.    Depending on the subject matter. If it's a
23  collective group thing, then I don't know how many is
24  involved, but sometimes a lot. Sometimes there's just
25  one, one complaint. Usually we like to handle them one

Page 14

1  at a time.
2      Q.    Now, I notice from your interrogatories that
3  you were arrested in 1959 for armed robbery; is that
4  correct?
5      A.    That's correct.
6      Q.    Was there a trial?
7      A.    There was.
8      Q.    And were you convicted?
9      A.    Yes.
10      Q.    Can you just briefly explain to me what that
11  was about?
12      A.    Well, it was an armed robbery conviction. I
13  was not involved in the robbery. I was the man who
14  sold the merchandise once it came to the table. And
15  they would accept nothing less than a plea bargain from
16  all the rest of us unless all of us pled guilty. And
17  they were looking at life sentences. And they got me
18  right in the middle with the rest of them.
19      Q.    What type of merchandise were you selling?
20      A.    Diamonds.
21      Q.    And that was in California?
22      A.    That was.
23      Q.    Did you actually go through an entire trial?
24      A.    We started it. And then it broke down.
25      Q.    And how long did you serve in prison?

Page 15

1      A.    I think five or six years.
2      Q.    Did you file a lawsuit as a result of that
3  arrest, a civil lawsuit?
4      A.    No.
5      Q.    Since 1959 have you been arrested on any
6  other charges?
7      A.    You know, I think I had. But I don't
8  remember if it was -- there was never a conviction and
9  nobody went further with it. I don't think it -- no.
10  I don't know. I don't remember.
11      Q.    Have you ever been arrested by the Las Vegas
12  Metropolitan Police Department prior to the
13  January 16th incident that we'll talk about later?
14      A.    You know what? I was. And I was released.
15      Q.    Do you recall what you were arrested for?
16      A.    Yeah. Kidnapping my child.
17      Q.    And would that be David?
18      A.    That would be Donald.
19      Q.    Donald. Sorry. So you were arrested, and no
20  charges were ever brought.
21      A.    No.
22      Q.    Briefly again, what --
23      A.    I went to court and won the custody.
24      Q.    How long ago was that?
25      A.    Gee, 1983. I'm not real sure.

Page 16

1      Q.    Did you bring Donald with you from California
2  to Nevada? Is that what happened?
3      A.    I did.
4      Q.    And so the police arrested you for bringing
5  him across state lines or something along those lines?
6      A.    I think they arrested me for a warrant out of
7  California.
8      Q.    And then you went to court and won custody.
9  So it became moot essentially?
10      A.    Actually I hired Stewart Bell. He went in
11  and took care of it. And I got custody.
12      Q.    With the exception of the armed robbery, the
13  prison time you served that we talked about, have you
14  spent any other time in prison?
15      A.    Not in prison.
16      Q.    What prison were you in for the armed
17  robbery?
18      A.    Well, Fulson, Chino, and San Quentin.
19      Q.    Have you had any jail time since the 1959
20  conviction?
21      A.    No.
22      Q.    When you moved to Nevada, did you register as
23  a felon?
24      A.    No.
25      Q.    Have you ever petitioned or had your rights

4 (Pages 13 to 16)

Page 17

```
1   restored?
2        A.   No.
3        Q.   Speaking just with respect to Las Vegas
4   Metropolitan Police Department, since the time you've
5   lived in Las Vegas, what interaction have you had with
6   them?  Have you had any speeding tickets?
7        A.   I don't think so.
8        Q.   And you had the one arrest we talked about
9   for the child kidnapping.
10       A.   Well, I think we got one here that they never
11  filed charges on also.
12       Q.   Yeah.  I'm sorry.  When I say this, I'm
13  talking about before the January 16th incident.
14       A.   I really don't remember.
15       Q.   Any other interaction with the Las Vegas
16  Metropolitan Police Department say between 1978 and
17  prior to this incident?
18       A.   What is an interaction?
19       Q.   Any traffic stops?  Any terry stops?
20  Anything of that nature?
21       A.   I think I got a ticket or two, but they never
22  showed up in court.
23       Q.   And any civil suits result from those stops?
24       A.   No.
25       Q.   And prior to the January 16th, 2002, search,
```

Page 18

```
1   ever had a search warrant executed on any of your
2   property, anything --
3        A.   Never.
4        Q.   Ever been interviewed by Las Vegas
5   Metropolitan Police Department as either a witness or a
6   suspect of any other crime --
7        A.   No.
8        Q.   -- prior?
9             MR. BOOKE:  I'm going to tell you one more
10  time.  And then I'm going to --
11            THE WITNESS:  I know.  And then you're going
12  to whip me.  This guy is tough.
13  BY MR. ANDERSON:
14       Q.   Well, I talk too fast.  It's making her job
15  very difficult.  Any other previous civil lawsuits you
16  filed against anybody that you can remember?
17       A.   Are we talking about an injury on the job
18  lawsuit?
19       Q.   Workers' Comp?
20       A.   Yeah.  Workers' Comp.
21       Q.   Okay.  So have you filed a Workers' Comp
22  claim?
23       A.   I did.
24       Q.   And how long ago was that?
25       A.   1999.
```

Page 19

```
1        Q.   And did that go to a trial or a board
2   meeting?
3        A.   Yes.
4        Q.   And which was it?  I'm sorry.
5        A.   Several trials.
6        Q.   More than one Workers' Comp claim?
7        A.   No.
8        Q.   What did that involve?
9        A.   It involved a back injury and the results of
10  whatever the court rendered.
11       Q.   Did you hire an attorney?
12       A.   I used a state attorney.
13       Q.   But the gist of that case was simply a
14  personal-injury matter?
15       A.   Personal injury.
16       Q.   How long have you lived at the 1919 Hallwood
17  address?
18       A.   Since 1979.
19       Q.   And when you moved here in 1979, did you
20  purchase the property?
21       A.   I moved here in '77, and I purchased the
22  property in '79.  Well, '77 or '78.
23       Q.   And so when you moved here, did you live
24  there with your wife?
25       A.   I did.
```

Page 20

```
1        Q.   And then when you divorced, you got
2   possession of the house?
3        A.   I did.
4        Q.   Okay.  Is it currently paid for?
5        A.   Absolutely.
6        Q.   And are you the sole owner?
7        A.   My son, David.
8        Q.   What interest does David have?  Is he on --
9        A.   50 percent.
10       Q.   Is he on the deed?
11       A.   He is.
12       Q.   When did David acquire 50 percent of the
13  house?
14       A.   When I gave it to him.
15       Q.   And when was that?
16       A.   Oh, I would imagine five years ago, maybe
17  longer than that.
18       Q.   Has David always lived in that house?
19       A.   Most generally.
20       Q.   In the five years that he has been a
21  50 percent owner, was there any time that he did not
22  live inside the home?
23       A.   I think he moved back with his mother for a
24  short period of time.
25       Q.   Did he ever rent an apartment or anything on
```

5 (Pages 17 to 20)

## Page 21

1  his own?

2      A.    Yes, he does.

3      Q.    Do you know why he does that when he is

4  co-owner of a home?

5      A.    I think usually it's when he and his

6  girlfriend --

7      Q.    When was the last time you recall David not

8  using the home as his permanent residence?

9      A.    Shortly after this bust.

10     Q.    Prior to the bust or the execution of the

11 search warrant, when was the last time you recall him

12 not using the 1919 Hallwood address as his permanent

13 address?

14     A.    Oh, I don't remember that.

15     Q.    Is it common for him to move out into a

16 private apartment or with his mother?

17     A.    Well, not always to -- no.  He goes into an

18 apartment.  I think one time, when he first went to

19 work for the Local 631, he and a friend got an

20 apartment together for a short period of time.

21     Q.    And on January 16th, 2002, John Reyes was

22 also living in your home?

23     A.    Yes.

24     Q.    Does he have any ownership --

25     A.    No.

## Page 22

1      Q.    -- in the home?  Okay.  Was he renting a room

2  from you?

3      A.    Never paid the rent.  But okay.  Yeah, I

4  guess he was.

5      Q.    In theory he was supposed to be paying rent?

6      A.    (witness nods.)

7      Q.    But he never paid?

8      A.    Sometimes.

9      Q.    When he paid his rent, would you split that

10 with David?

11     A.    No.

12     Q.    So you collected all the rent?

13     A.    Just went into a pot on the table.

14     Q.    Do you own any other property in Las Vegas?

15     A.    No.

16     Q.    Now, I want to direct your attention to the

17 events of January 16th, 2002, the reason why you're

18 here.  On that date who all was living in the 1919

19 Hallwood home?

20     A.    Myself, my son David, and John Reyes.

21     Q.    I notice from the video that you sent me that

22 Mr. Reyes talks about his daughter.  Was she living in

23 the home with you?

24     A.    No.  But she was there two to three days a

25 week when he wasn't working.

## Page 23

1      Q.    When he had custody, she would be with him?

2      A.    I think they had split custody or dual

3  custody of her.

4      Q.    But she was not in the home on January 16th?

5      A.    Not that night, which we're all thankful for.

6      Q.    How many bedrooms are in that home?

7      A.    Depending on how you look at it, three slash

8  four.

9      Q.    What I'm going to hand you here is by no

10 means intended to be an exact replica or to scale.

11 This is a floor plan I have of your home.  Does that

12 look accurate?

13     A.    Close enough.

14     Q.    And, I mean.  I'm not holding you to that.

15           MR. ANDERSON:  We'll mark this as Exhibit 1.

16           MR. BOOKE:  May I make a suggestion?

17           MR. ANDERSON:  Sure.

18           MR. BOOKE:  Could we mark it as Exhibit 2.

19 And we'll just --

20           MR. ANDERSON:  Exhibit A or --

21           MR. BOOKE:  No.  Let's mark it as Exhibit 2,

22 and we'll just number exhibits consecutively.  We'll

23 compile them all in a notebook.  And that way the

24 numbers will be the same throughout the depositions.

25           MR. ANDERSON:  Okay.

## Page 24

1           (Thereupon Exhibit 2 was

2            marked for identification.)

3  BY MR. ANDERSON:

4      Q.    Can you identify on this which bedroom was

5  yours on January 16th?

6      A.    This was mine.  This was a double bedroom,

7  was John's.  This was my son David's.

8      Q.    And you say possibly four, where would the

9  fourth bedroom be?

10     A.    Well, this was a double bedroom.  I took the

11 wall out.

12     Q.    So on January 16th it was a three-bedroom

13 house?

14     A.    It was.

15     Q.    And there's no basement or second story;

16 correct?

17     A.    No.

18     Q.    How many square feet is that house?

19     A.    I think 2,560.

20     Q.    So prior to January 16th -- strike that.

21           In David's interrogatories he mentions that

22 he had just recently moved back into the home with you

23 prior to this incident.  Do you agree with that?

24     A.    Yeah.  Probably within a couple months.

25     Q.    And do you know why he moved back in?

6 (Pages 21 to 24)

Page 25

1      A.   I think he was moving out of his mother's
2  house.
3      Q.   And how long had John been staying with you?
4      A.   Oh, four or five months.
5      Q.   So you and John had lived there together
6  without David for a couple of months maybe?
7      A.   Yeah.
8      Q.   How do you know John Reyes?
9      A.   He's a friend of my son's.
10     Q.   David?
11     A.   David and Donald.
12     Q.   And he just needed a place to stay, and you
13  offered to put him up?
14     A.   Well, I didn't offer.  One of the kids told
15  him to go over and talk to me, and so he did.  And nice
16  enough guy.
17     Q.   Did you ever execute like any lease agreement
18  or any paperwork regarding his staying with you?
19     A.   No.
20     Q.   How much rent was he to pay you a month?
21     A.   I think 300.
22     Q.   When David moved back in, did he often have
23  visitors over at the house?
24     A.   Did David?
25     Q.   Yeah.

Page 26

1      A.   No.
2      Q.   To your knowledge did David ever sell any
3  type of illegal drugs from the home?
4      A.   Never.
5      Q.   Did John?
6      A.   Never.
7      Q.   And did yourself?
8      A.   Never.
9      Q.   So while David stayed there, you never
10  noticed people coming to the door for short amounts of
11  time and leaving or anything of that nature?
12     A.   Well, he had visitors.  But I always asked
13  the kids to keep them outside.  I didn't like anybody
14  in the house.
15     Q.   So if David had visitors, they would remain
16  outside?
17     A.   Yeah.  They had chairs.  There were two
18  chairs outside.  The kids sit, and they gather there.
19  If there's visitors, they usually stay outside.
20     Q.   Did you make any attempt to get to know the
21  visitors or communicate with them when --
22     A.   I knew them all.  All the kids from the
23  neighborhood.
24     Q.   To your knowledge did David ever sell
25  firearms from the 1919 Hallwood residence?

Page 27

1      A.   Never.
2      Q.   Have you ever sold firearms from --
3      A.   Never.
4          MR. BOOKE:  That's it.
5          THE WITNESS:  what's that?
6          MR. BOOKE:  You're done.
7          THE WITNESS:  All right.  I'm leaving.  was
8  that too quick?
9          MR. BOOKE:  Yes.  You be patient.
10         THE WITNESS:  I will be.
11  BY MR. ANDERSON:
12     Q.   To your knowledge did John Reyes ever sell
13  firearms from your residence?
14     A.   No.
15     Q.   Did David ever tell you that he had robbed
16  any walgreen stores?
17     A.   No.
18     Q.   Do you have any knowledge as to whether David
19  robbed any walgreen stores?
20     A.   No.
21     Q.   Did John Reyes ever discuss with you robbing
22  any walgreen stores?
23     A.   No.  And I'm quite sure they never.
24     Q.   Now, on January 16th, 2002, do you have an
25  independent recollection of what occurred that day?

Page 28

1      A.   That evening?
2      Q.   Of the search warrant, yes.
3      A.   Well, I heard two very loud explosions.
4      Q.   Let me back up.  My question is just at this
5  point:  As you sit here today, do you have an
6  independent recollection of the events of January 16th,
7  2002?
8      A.   Very good.  Yes, I do.
9      Q.   Okay.  I'm going to walk you through it.  And
10  I know you want to be here to tell the story.  But
11  we'll get everything.  Do you recall what day of the
12  week it was?
13     A.   No.
14     Q.   You just stated that you heard two very loud
15  noises.  Do you recall what time when you first heard a
16  noise outside of your home?
17     A.   Approximately 11:30 p.m.
18     Q.   And what were you doing at that time?
19     A.   Baking cookies.
20     Q.   Looking at Exhibit 2, what room were you in?
21     A.   Kitchen.
22     Q.   And was David in the home?
23     A.   David was in the home.
24     Q.   And where was David?
25     A.   He was in his bedroom.

7 (Pages 25 to 28)

## Page 29

1    Q.    Was David alone?
2    A.    He was with a girl.
3    Q.    And did you know that girl?
4    A.    Can't say that I did.
5    Q.    So she wasn't someone who was at the house
6  regularly to your knowledge?
7    A.    No.
8    Q.    And was John home?
9    A.    Yes.
10   Q.    And where was he?
11   A.    I think he was asleep in his room.
12   Q.    So it's your recollection you were in the
13  kitchen, David was in his bedroom, and John was in his
14  bedroom.
15   A.    Yes.
16   Q.    And what were you doing in the kitchen?
17   A.    Baking cookies.
18   Q.    And was there any reason you were baking
19  cookies?
20   A.    I wanted to.
21   Q.    And so at 11:30 you're in the kitchen baking
22  cookies.  And what did you hear?
23   A.    I had just walked into the front room to sit
24  down, and I heard two very loud explosions.
25   Q.    So you had left the kitchen and had gone into

## Page 30

1  would it be this living room?
2    A.    No.  This is the family room, if you want to
3  label it.
4    Q.    So you walked in there to sit down?
5    A.    Uh-huh, I did.
6    Q.    Prior to hearing the loud noises, did you
7  hear any knocks on the door or any voices?
8    A.    There were none.
9    Q.    Was a TV on in the home?
10   A.    Yes.  The news was on.
11   Q.    Any radios on to your recollection?
12   A.    No.
13   Q.    Did you hear anything from David's room?
14  Like did he have the music on or --
15   A.    No.  I apologize.
16   Q.    And anything from John's room that you could
17  hear?
18   A.    No.
19   Q.    So to your recollection the only device on in
20  the home is the television?
21   A.    Yes.
22   Q.    What room is the television in?
23   A.    Family room.
24   Q.    So you had gone into the family room to sit
25  and watch the news?

## Page 31

1    A.    Yes.
2    Q.    And where did you hear these noises?
3    A.    I heard them from the family room coming from
4  outside the front door.
5    Q.    Did the noises sound like they were in the
6  front of the house, the side of the house?
7    A.    Well, I would say the front of the house.
8  But as it turned out, one was at the side.
9    Q.    I'm asking what you remember.
10   A.    The noise come from the front of the
11  building.
12   Q.    What kind of a noise was it?
13   A.    What does an explosion sound like?
14   Q.    So like a boom?
15   A.    Yeah.
16   Q.    It wasn't like a whistling noise or any --
17   A.    I don't recall a whistling noise.
18   Q.    Okay.  And I'm just trying to -- I mean, I'm
19  not saying there was.  It was like a bomb?
20   A.    Like a bomb.
21   Q.    Okay.  Did you see any flashing lights,
22  anything of that nature?
23   A.    I can't see through walls, no.
24   Q.    Now, the front of your home it looks like,
25  according to this diagram, there are two windows on

## Page 32

1  John Reyes's bedroom.  Is that accurate?
2    A.    Yes, that's accurate.
3    Q.    Any windows in front of David's bedroom?
4    A.    There is one in the entranceway right there.
5    Q.    And were there bars on those windows?
6    A.    Not on those.
7    Q.    Were there bars on the windows in front of --
8    A.    No.
9    Q.    There were no bars on any of the windows?
10   A.    Not on the windows.
11   Q.    Was there anything on the windows?
12   A.    Curtains.
13   Q.    Curtains.  Okay.  And then there's an
14  entryway and the door.  Are there any bars on the door?
15   A.    Yes.  Entranceway.
16   Q.    And what kind of bars were there on the door?
17   A.    Oh, hollow rot iron, decorative more than
18  anything else.
19   Q.    In the time that you've lived at this
20  residence, had you ever been burglarized?
21   A.    Several times.
22   Q.    When was the last time it had been
23  burglarized?
24   A.    Oh, I have no idea.
25   Q.    Months?  Days?  Years?

8 (Pages 29 to 32)

**Page 33**

1    A.   I can't answer.  I don't know.

2    Q.   Would you report the burglaries to the
3  police?

4    A.   I did.

5    Q.   But you can't recall the last time you were
6  burglarized?

7    A.   (No audible response.)

8    Q.   You say several.  So the home was burglarized
9  three to four times, ten times?

10   A.   I'd say two or three times.

11   Q.   And when you were burglarized, did you ever
12  lose anything of value?

13   A.   Of course.

14   Q.   Like what?

15   A.   I don't remember.  Television sets.  Whatever
16  that was handy.  Some jewelry probably.

17   Q.   Okay.  So there's a rot iron on the front
18  door.  Any other -- strike that.

19       Is there a fence in front of your house?

20   A.   It's not a fence.

21       Is it okay to answer this?

22       MR. BOOKE:  Sure.

23       THE WITNESS:  The roof extends out six feet.
24  And about four feet back in there's a wall with arches,
25  two arches or three.  Those are filled in with rot

**Page 34**

1  iron.  Next to that is the gate that goes from the
2  garage to the last connecting archway, which is a gate.
3  That's rot iron.

4  BY MR. ANDERSON:

5    Q.   And where is the gate?

6    A.   Entranceway.

7    Q.   Right here.  Okay.  So did you put the rot
8  iron on the areas in front of the house?

9    A.   I did.

10   Q.   Did you do that as a result of the
11  burglaries?

12   A.   No.

13   Q.   Why did you do that?

14   A.   I had children when I moved into the house.
15  And it was a good play area between the house and the
16  arches.  And it kept them off the street.

17   Q.   So for safety reasons for children?

18   A.   Uh-huh.

19   Q.   So the rot iron has been on the home since
20  the time you moved in basically?

21   A.   I had it put on the day I moved in.

22   Q.   This gate here in front, was it a locked
23  gate?

24   A.   It is.

25   Q.   Was it your custom to lock it?

**Page 35**

1    A.   Absolutely.

2    Q.   Okay.  So you hear the noises.  And then what
3  did you do?

4    A.   I got up and went to the door.

5    Q.   When you got to the door, did you hear any
6  voices, anybody shouting anything?

7    A.   Nothing.

8    Q.   What did you hear when you got to the door?
9  Was it silent?

10   A.   Silent.

11   Q.   And what did you do when you got to the door?

12   A.   I opened it.

13   Q.   Okay.  And what happened?

14   A.   Well, I saw a group of guys standing out
15  there with masks of some sort.  And I started yelling
16  to my son to get down.  And I'm hearing, Open the door.
17  And I go, Who in the hell are you?  A shotgun went off.

18   Q.   Okay.  Now, when you got to the door, how far
19  did you open it?  Did you open it all the way?  Did you
20  crack it?

21   A.   No.  I opened it all the way.

22   Q.   So when you opened your door, would there
23  still have been the rot iron door in front of you?

24   A.   Had they bent the rot iron door?

25   Q.   No.  I'm just asking if that would still be

**Page 36**

1  closed in front of you.

2    A.   Yeah.

3    Q.   Okay.  So you opened the wooden door.  And
4  there's a rot iron door in front of you.

5    A.   Well, it's a screen mesh door.

6    Q.   Okay.  And you can see out, and they can see
7  in?

8    A.   They sure can.

9    Q.   And you open the door all the way.  And you
10  see how many people?

11   A.   A group.  I have no idea.

12   Q.   Can't even estimate?

13   A.   Six, eight.

14   Q.   And you say they're wearing masks.  What kind
15  of masks?

16   A.   Well, if I were a skier, I would say a ski
17  mask, black.  They wore them all night.

18   Q.   Like a black tint to the mask?  Could you see
19  their eyes?

20   A.   I think that's all you could see.  Maybe a
21  mouth.

22   Q.   I'm sorry.  But when you say black, are you
23  referring to the outline of the mask, or are you
24  referring to the lens?

25   A.   Solid.  Lens?  There was no lens.

ASSOCIATED REPORTERS OF NEVADA - 702/382-8778
2300 W. SSaharaD Ave., R Ste. 770, E Las A Vegas, Nevada 789102

Donald Hinton 1        November 5, 2003

Page 37

```
1    Q.   Plastic?
2    A.   No plastic.  They were knitted.
3    Q.   Okay.  With the exception of the mask, did
4    you get any other looks at their attire?
5    A.   Well, besides looking like terrorists out of
6    Vietnam or Afghanistan, they looked the same.
7    Q.   Did you see any identification on any of the
8    individuals?
9    A.   None.
10   Q.   What color were their uniforms?
11   A.   Camouflage green and brown.
12   Q.   Were they all dressed the same?
13   A.   Uh-huh, they were.
14   Q.   Okay.  So you open the door, and you holler
15   out at them.  And that's when you hear a shotgun blast.
16   How long would you say you were at the front door
17   before you heard the blast?
18   A.   Seconds.  I was reaching for the door when
19   the gun went off.
20   Q.   When the gun went off, what did you do?
21   A.   I stepped back.
22   Q.   Did you shut the door?
23   A.   No.
24   Q.   So the door is sill open, and you hear --
25   A.   It was right at my shoulder.
```

Page 38

```
1    Q.   What was right at your shoulder?
2    A.   The door was right at my shoulder.  It wasn't
3    fully extended.  It was cold out there.
4    Q.   Do you know where the shotgun blast was
5    aimed?
6    A.   At the screen door.
7    Q.   Did it hit it to your knowledge?
8    A.   Absolutely.
9    Q.   Okay.  And did any residue or anything from
10   the shotgun blast come through the door?
11   A.   You know, I don't know.  I did feel some heat
12   stains, but I didn't see anything there that stayed
13   with me.
14   Q.   Heat stains?
15   A.   Stains.
16   Q.   And where did you feel those heat stains?
17   A.   On my hand as I was reaching for the door.
18   Q.   Were you reaching for the screen door or the
19   wooden door?
20   A.   Screen door.
21   Q.   So you were reaching to open it?
22   A.   I was.
23   Q.   And you heard the blast.  And you step back?
24   A.   I saw the blast also.
25   Q.   Okay.  How close was the shotgun to the door?
```

Page 39

```
1    A.   Two, three, four feet.  Close.  Very close.
2    Q.   And was the person like aiming down at the
3    handle?  Or do you recall?
4    A.   You know, I don't recall that part of it.
5    Q.   A lot going on.  So you feel the heat stains
6    on your hand.  You're backing up.  You feel the heat
7    stains on your hand.  Then what do you do?
8    A.   No.  It's what they did.
9    Q.   Okay.  What happened?
10   A.   Well, there was another shot or another
11   something went through the door very close to my head.
12   I don't know what that was all about.  Then the door
13   was jerked open, the screen door.
14   Q.   So when you say close to your head, did you
15   feel something?
16   A.   No.  I just heard a noise.
17   Q.   Okay.
18   A.   And there was a good-size hole in the screen.
19   Q.   So when you say there was a shot close to
20   your head, you're basing that upon what you heard?
21   A.   Primarily.
22   Q.   Did you feel the heat stains on your head?
23   A.   I didn't.  That was from further back.
24   Q.   Okay.  So then they jerked the door open?
25   A.   Jerked the door open.  And something came
```

Page 40

```
1    ramming through.  And it looked like they were -- I say
2    they were aiming for my leg.  They brushed it and then
3    knocked a panel out of the wooden door.
4    Q.   Now, the wooden door is open at this time;
5    correct?
6    A.   It was three quarters open.  It was right at
7    my shoulder.  I didn't open it all the way.  I told you
8    it was cold.  The wind was blowing.  It was unpleasant.
9    I heat the house.  I didn't want to cool it off.
10   Q.   Okay.  So you have the door at your shoulder.
11   And they come through with the ramming device still?
12   A.   Still, yeah.
13   Q.   Were you trying to close the door?
14   A.   Absolutely not.  I was trying to get out in
15   any direction.
16   Q.   So the ramming device comes through with the
17   door three quarters open and hits the panel.
18   A.   They hit the panel all right.
19   Q.   Do you know whether the ramming device hit
20   the door handle first and grazed through the panel or
21   went straight through the panel?
22   A.   It went straight through the panel.
23   Q.   And you say you believe they were aiming at
24   your leg?
25   A.   It hit my leg.
```

10 (Pages 37 to 40)

Donald Hinton  1        November 5, 2003

Page 41

```
1      Q.   But do you believe they were aiming at your
2 leg?
3      A.   The door is open.  I'm standing in the
4 doorway.  Yes, I think so.
5      Q.   I'm not trying to argue with you.  I'm just
6 trying to get a clear record.
7      A.   Yeah, I understand.
8      Q.   And the ramming device does indeed hit or
9 graze your leg?
10     A.   Something did.
11     Q.   Did it leave a mark?
12     A.   Oh, I don't know.  I didn't check that.
13     Q.   Like even in the days after you didn't look
14 for any bruising or anything?
15     A.   No.  I knew it was a solid object because it
16 touched me.  I'm not saying that it broke a leg or left
17 bruises.  But it was very solid, very substantial,
18 whatever it was.
19     Q.   But the hit wasn't that hard then?
20     A.   No.  It missed me, pretty much so.
21     Q.   So they ram the door or they knock out the
22 panel.  Then what happens?
23     A.   Well, they pulled me outside.  Actually they
24 pulled me outside of the house into the porch.  We
25 couldn't really go anyplace.  It was too big of a
```

Page 42

```
1 crowd.
2      Q.   How many people pull you outside?
3      A.   Well, I would assume one or two.  I don't
4 know.
5      Q.   How did they take you outside maybe is a
6 better question?
7      A.   How do you mean?
8      Q.   Did they grab you by the arms?  Did they just
9 like put their hands on your back to escort you out?
10 Did they --
11     A.   They weren't --
12     Q.   -- hogtie you?
13          MR. BOOKE:  Let him finish the question.
14          THE WITNESS:  I'm sorry.
15 BY MR. ANDERSON:
16     Q.   That's okay.
17     A.   They weren't gentle.  They grabbed the arms,
18 back of your shirt, the pushing.  And then I couldn't
19 get through the crowd.  So they stopped trying for a
20 second.  And I hear some yelling in the background.  I
21 see my son David come around the corner.  And then I'm
22 jerked the rest of the way outside.
23     Q.   So they physically jerk you from the door
24 entry out onto the porch?
25     A.   They weren't gentle.
```

Page 43

```
1      Q.   I didn't say gentle.  I said jerked.
2      A.   Yeah, they jerked.
3      Q.   Anyone say anything to you at that time,
4 identify themselves or anything?
5      A.   Never.
6      Q.   Anything said at all while you were being
7 pulled out onto the porch?
8      A.   Get down.  Get down.
9      Q.   They were yelling to get down?
10     A.   Yeah.
11     Q.   They pull you out onto the porch.  You see
12 David come around the corner.  Then what happens?
13     A.   They take me outside and stand me out in
14 front of all my neighbors.
15     Q.   Okay.  So at that point you don't see
16 anything else that happened inside the home to David or
17 John at that time?
18     A.   Actually I do.  I saw David getting guzzled
19 up.  And then the girlfriend coming around the corner.
20     Q.   Explain to me what guzzled up means.
21     A.   Jumped on.
22     Q.   And is he still inside the home?
23     A.   He's in the front part of -- well at the
24 doorjamb.
25     Q.   Okay.  So he's now come to the entranceway
```

Page 44

```
1 where you were?
2      A.   Yeah.  They got him to the entryway.
3      Q.   Do they handle David the same way they
4 handled you as far as getting him outside?
5      A.   Probably rougher.
6      Q.   Okay.  And you also see David's girlfriend?
7      A.   Yeah.  Just as she came around into the
8 hallway.  She would be coming from the bedroom to the
9 family room to here.
10     Q.   This is the door there by the laundry room.
11 They would come out here and walk around that corner?
12     A.   Yes, it would be.
13     Q.   Did you see how the girl was handled?
14     A.   I thought they put her on the ground.  I
15 don't know.  But I didn't until she got outside.
16     Q.   Okay.  So they escort you from the porch to
17 your neighbor's driveway?
18          MR. BOOKE:  Object to the question.  It
19 assumes facts not in evidence.
20 BY MR. ANDERSON:
21     Q.   After they get you out on the porch, what
22 happens?
23     A.   They stand me at the end of my lawn, the
24 walkway to the house.
25     Q.   Okay.  And how long -- so you're still on
```

11 (Pages 41 to 44)

Donald Hinton  1          November 5, 2003

Page 45

1  your property?
2      A.  At that point I'm on the sidewalk in front of
3  my property.
4      Q.  Is anyone talking to you?  Is anyone with you
5  at that time?
6      A.  No.
7      Q.  You're just alone?
8      A.  Well, with the terrorists.
9      Q.  Is anyone guarding you?
10     A.  Oh, yeah.
11     Q.  Okay.  Any weapons pointed at you?
12     A.  Oh, yeah.
13     Q.  So while you're standing there at the end of
14  the sidewalk, someone has a weapon pointed at you?
15     A.  Several.
16     Q.  And what are they saying?
17     A.  Nothing.
18     Q.  Okay.  Then what happens?
19     A.  Then they bring David out past me into my
20  neighbor's yard, bend him over the rear end of the
21  neighbor's car.
22     Q.  And you can see this?
23     A.  Oh, yeah.  Perfect.  No problem.
24     Q.  And so you're still on your property watching
25  them?

Page 46

1      A.  Yeah.  And they're giving him the old
2  kick-your-legs-apart routine and yelling at him, where
3  are the booby traps, or got any guns?  And trying to
4  shake him down.  He said something to them and raised
5  up.  And they slammed him pretty good into the deck of
6  that car.
7      Q.  David said something to them and raised up?
8      A.  Yeah.  I think he said, Hey, lighten up.
9  This isn't Vietnam.  And that caused him a little pain
10  and his legs kicked out from underneath him.  Nice
11  guys.
12     Q.  So you're standing there, and you witness
13  that.  Then what happens?
14     A.  Then the girl is marched out past me over
15  there, had her sit down.
16     Q.  At the neighbor's property?
17     A.  Yeah.  On the sidewalk.
18     Q.  Okay.
19     A.  Then John Reyes came out, no shoes on, no
20  stockings.  And they marched him past me and sat him
21  down on the concrete.  And then they brought David off
22  the trunk of the car and sat him down.  Then they moved
23  me over directly in front of them.
24     Q.  Okay.  So just let me make sure I've got this
25  right.  You're the first person out.  They take you to

Page 47

1  the end of your sidewalk on your property.  Then you
2  watch them bring the other three out.  And they end up
3  on the neighbor's property.
4      A.  Yes.
5      Q.  Okay.  They then move you to the neighbor's
6  property.
7      A.  Yes.
8      Q.  At that point had you been searched or
9  anything?
10     A.  Not at that point.
11     Q.  Okay.  So then, when you get moved to the
12  neighbor's property, what happens?
13     A.  Well, I think they stood everybody up that
14  was sitting on the ground on the cement, and they
15  searched them.
16     Q.  Does this include you?
17     A.  No.
18     Q.  Okay.
19     A.  Then they set them down again.  And one of
20  the other cops come out, big shot, and he stands John
21  Reyes up and searches him again.  Or maybe it was the
22  same one.  I don't really remember.  But he got
23  searched twice.  And he turned to the guy that just
24  approached, came up and said, Has he been searched?
25  And he goes, Yeah.  I had never been searched.

Page 48

1      Q.  I probably should have asked this earlier.
2  At the time what were you wearing?
3      A.  A T-shirt, pair of socks, and pants.
4      Q.  No shoes?
5      A.  No shoes.
6      Q.  A hat or any headwear?
7      A.  No.
8      Q.  What was David wearing, if you recall?
9      A.  T-shirt, blue jeans, may or may not have had
10  shoes on.  I don't recall.
11     Q.  And John, if you recall, what was he wearing?
12     A.  Barefooted, T-shirt, and pants.
13     Q.  And do you recall the girl's name?
14     A.  I haven't the foggiest idea.
15     Q.  Do you recall what she was wearing?
16     A.  I think she had on a black outfit, very
17  short.
18     Q.  Like a skirt?
19     A.  It was a skirt, a very short skirt.  I think
20  they were going dancing or something.
21     Q.  And do you recall the temperature?
22     A.  No.  But I would imagine it was in the
23  forties.
24     Q.  So now you're all together at the neighbor's
25  property; correct?

12 (Pages 45 to 48)

Donald Hinton  1        November 5, 2003

Page 49

1    A.   Along with all my neighbors.
2    Q.   Okay.  When you say that, what do you mean
3  all your neighbors?  There were people outside?
4    A.   Everybody is out there.
5    Q.   When you say "everybody," who was outside?
6    A.   Well, the neighbors who we were in front of
7  their house, two of those guys.  Across the street,
8  they were out and all his family.  The one man who
9  lives directly across the street was out.  The one to
10  the left of him was out.  The only one I don't think
11  was out was the older woman who lived directly west of
12  me.
13    Q.   Do you live in a cul-de-sac?
14    A.   No.
15    Q.   Okay.  These neighbors, so they're outside
16  watching.  Were the police talking to any of them to
17  your knowledge?
18    A.   No.
19    Q.   Since the incident have you talked to any of
20  your neighbors about what happened?
21    A.   Absolutely.
22    Q.   Can you give me the names of those you talked
23  to?
24    A.   Well, Dick Hoyt and his wife.
25    Q.   Okay.

Page 50

1    A.   One gentleman next door who I don't recall
2  what his name is.  He was a recent arrival.  And I
3  don't talk to him.  He sticks pretty much to himself.
4  There was the Hess kid.  I'm trying to think of his
5  first name.  It will come to me.  Anyway, there was
6  another couple, a neighbor across the street.  I don't
7  remember what their names are.
8    Q.   But you personally talked to all of these
9  people after the incident?
10    A.   Oh, yeah.  Michael Hess.
11    Q.   And so they're outside looking -- watching.
12  Sorry.  And the four of you are there.  And then what
13  happens?
14    A.   Well, we were out there for a very long time.
15  And probably about 30 minutes after we're out there,
16  another carload of men arrive.  They go inside.  One of
17  them comes out asking which key fits the closet door.
18  David tells them.  He said you gotta jiggle it just a
19  little bit.  But really I don't think you have to
20  jiggle it.  And his comment was, If this key doesn't
21  fit, the next sound you're going to hear is a shotgun
22  opening that up.
23    Q.   Now, during the 30 minutes you're out there
24  before the other men arrive, did anyone talk to you?
25    A.   No.  We were all under the barrel of a rifle

Page 51

1  with instructions not to say anything.  And these guys
2  were pretty much sphinx.  They made a couple of
3  comments with each other.
4    Q.   And what were those comments?
5    A.   Well, here comes the gang.  The ones that got
6  out of the car.
7    Q.   When you were taken outside to -- strike
8  that.
9         Did anyone ask you if you required medical
10  attention?
11    A.   No.
12    Q.   To your knowledge were any of the other three
13  individuals asked if they required medical attention?
14    A.   Never asked.
15    Q.   So there was no questioning going on during
16  this 30-minute time period?
17    A.   Nothing.  Oh, they talked to David.
18    Q.   Did they talk to him in front of you guys or
19  pull him away?
20    A.   Well, it really wasn't a conversation.  It
21  was just smart remarks.
22    Q.   Now, what type of smart remarks were they
23  making to him, if you recall?
24    A.   Well, let me see.  One of them had to do with
25  isn't it better to be working instead of stealing.  I

Page 52

1  found that amusing.  David works.
2    Q.   Okay.
3    A.   So I still -- and just snide things like
4  that.  I think they asked a couple of times for some
5  shoes or some jackets, as did I.
6    Q.   Just be clear, when you say "they," are
7  you --
8    A.   John, David, and the girl.
9    Q.   Okay.
10    A.   No answers.  They gave no answers to that.  I
11  turned to the guy.  I was standing up.  I wouldn't sit
12  down.  That concrete was cold.  And I said, well, I
13  tell you what.  I want a jacket, and I want one now.
14  So two guys there with the rifles, one said to the
15  other one, well, watch him.
16         And he went in the house and got a jacket and
17  brought it back out, and I put it on.  I said, How
18  about the rest of them?  Went back to being silent
19  again.
20    Q.   How long had you been outside when they
21  brought you a jacket?
22    A.   Oh, probably 40 minutes, 30 to 40 minutes.
23    Q.   After the other group had arrived?
24    A.   After the other group arrived.
25    Q.   What about the girl?  Did they bring her out

13 (Pages 49 to 52)

Donald Hinton  1          November 5, 2003

Page 53

1  a jacket?
2      A.   Did not.
3      Q.   Did not?
4      A.   Did not.
5      Q.   So it's your testimony they brought you a
6  jacket, but not the girl?
7      A.   My testimony is I'm the only one that was
8  wearing a jacket that I saw.
9      Q.   Okay.  Now, once again, I hate to back up.
10  But when were you handcuffed?
11      A.   When I was standing on the sidewalk after I
12  think the other kids were brought out and sat down.
13      Q.   Okay.  So when they brought the other three
14  individuals out of the home, you were not handcuffed.
15      A.   No.  They had me by the arm and a gun in my
16  back.
17      Q.   Okay.  And then you were eventually
18  handcuffed?
19      A.   I was.
20      Q.   And were you handcuffed on your property at
21  the sidewalk or once you got moved to the neighbor's
22  house?
23      A.   Now, you know, that I don't remember.  But it
24  was in that time.
25      Q.   And the handcuffs, were they metal handcuffs

Page 54

1  or were they plastic?
2      A.   Plastic.
3      Q.   And you personally, is it your claim the
4  handcuffs were too tight?
5      A.   No.
6      Q.   Okay.  So during the time that you're
7  outside, no one is really talking to you or
8  interrogating you.  You hear snide remarks.  But
9  there's really no interaction between you and the
10  officers.
11      A.   No.
12      Q.   How many officers were watching you and the
13  other three people?
14      A.   Depending, two to three.  Always at least
15  two.
16      Q.   And were they talking amongst each other?
17      A.   Sometimes.
18      Q.   Were they saying anything about what was
19  going on inside your home?
20      A.   No.
21      Q.   So the other group arrives 30 minutes after
22  you've been outside.  And do you see what they do?
23      A.   We don't see anything.
24      Q.   Okay.
25      A.   Except going in the house.

Page 55

1      Q.   Is there like a fence or anything blocking
2  your view of your home?
3      A.   No.  They had me facing one direction.  The
4  kids could see what was going on.  I couldn't.  They
5  had me facing east, and the kids were facing north.
6  But they could turn their heads and see the west
7  towards the house.
8      Q.   Were they making you stand in that direction,
9  or was that your choice?
10      A.   It wasn't my choice.  I would rather have
11  been in the house.
12      Q.   But if you had tried to turn, would they have
13  stopped --
14      A.   They were specific.  They specifically had me
15  facing east with my back to the activity.
16      Q.   Okay.  And when you refused to sit down, they
17  didn't make you sit down, did they?
18      A.   No.
19      Q.   Could you hear any of the other three
20  complaining about anything?  I'm sorry.  John, David,
21  or the girl?
22      A.   Yes.
23      Q.   What were they complaining about?
24      A.   Their ass was getting cold and their feet,
25  and they were cold.  John wanted handcuffs.  I guess

Page 56

1  they were on there pretty tight.
2      Q.   He wanted handcuffs?
3      A.   He wanted them loosened.
4      Q.   All three of them were handcuffed; correct?
5      A.   Yes, they were.  Behind their back.
6      Q.   And were there any responses to their claims
7  of being cold or John's claims of tight handcuffs?
8      A.   Nothing.
9      Q.   And after the second group arrives and goes
10  inside, did you still just remain outside on the
11  sidewalk?
12      A.   We did.
13      Q.   For how long?
14      A.   Probably 20, 30 minutes.
15      Q.   Anything happen in that 20, 30 minutes as far
16  as like discussions with the officers or any other
17  developments?
18      A.   They came out and asked about the key that
19  opened the closest door.  Said they were going to
20  shotgun it if it didn't open.  And I think one or two
21  of them made comments to David and John.  I'm not sure.
22  Maybe.  I do recall something there, but I don't know
23  what it was.
24      Q.   So you're outside for about a total of an
25  hour?

14 (Pages 53 to 56)

Page 57

1    A.    About an hour fifteen, twenty minutes.
2    Q.    Then did they take you back inside the house?
3    A.    They did.
4    Q.    Okay.  Did they say anything to you when they
5    were taking you inside the house?  Did they tell you
6    why you were going back inside?  Anything of that
7    nature?
8    A.    No, they did not.
9    Q.    What happened?
10   A.    Well, since I was standing, they escorted me
11   first.  I walked up the sidewalk to the property.  Got
12   on the entranceway.  Walked into the door.  And I see
13   this huge gaping hole in my ceiling.  So I made a
14   comment.
15   Q.    Where would that hole be?
16   A.    In the hallway, probably right across from
17   the laundry room.
18   Q.    Would you mark on there where the hole would
19   be.
20   A.    You got it marked right there.
21   Q.    We've got it marked.  Okay.  So you walk in.
22   You see this hole.  Have the other three entered the
23   home yet?
24   A.    They're right behind me.
25   Q.    So where did they take you once you entered

Page 58

1    the home?
2    A.    Well, they put me on the couch, which is just
3    right across the hallway.  And they sat the other kids
4    down here someplace.
5    Q.    Okay.  Were you facing each other?
6    A.    We were.
7    Q.    Now, you walk in.  You see this hole in the
8    laundry room.  And you say you made a comment.  What
9    did you say?
10   A.    I said, What happened?  Some fool fall
11   through the ceiling?
12   Q.    What did they say?
13   A.    Don't be a fucking wise guy or something very
14   similar to that.
15   Q.    Okay.  And how big was this hole?
16   A.    Probably was two by four foot.
17   Q.    Did they ever tell you how it happened?
18   A.    No.  But we saw a gentleman being wheeled out
19   on a stretcher going to an ambulance that had pulled
20   up.
21   Q.    Okay.  Did you see the gentleman on the
22   stretcher when you were on the couch or when you were
23   walking in?
24   A.    Actually he came out just before.
25   Q.    You went in?

Page 59

1    A.    Yeah.  If he wasn't on the stretcher, the
2    stretcher did come out.  I don't remember if there was
3    somebody on it or not.  I don't remember that.
4    Q.    You saw a stretcher come out, but you don't
5    remember if someone was on it?
6    A.    I don't remember if the guy was on it or
7    walking alongside of it.  Probably on it, but I don't
8    know.  I really don't know.  I forget.
9    Q.    Okay.  So you get inside the house.  And
10   that's the first bit of damage you see?
11   A.    Yes.  Well --
12   Q.    well, the door.
13   A.    That wasn't the first damage I saw.
14   Q.    What did you see when you walked in?
15   A.    The door was wide open.  From the sidewalk I
16   could see the house was in shambles.  They did a great
17   job.  And as I approached, I was really looking at what
18   they had done to the front room until I saw all the
19   stuff on the floor.  And I looked up, and there was the
20   hole.
21   Q.    Okay.  Let's just take it step by step as
22   you're walking.  What do you see in the front room
23   that, in your term, is in shambles?
24   A.    Well, everything overturned and scattered.
25   Q.    When you say "everything," what is

Page 60

1    overturned?
2    A.    I mean everything.  I'm talking about the
3    clothing that was on the floor, stacked in a pile.  I'm
4    talking about briefcases.  I'm talking about tools.
5    I'm talking about the paper that was on two separate
6    tables and my desk.  Everything was on the floor.
7    Q.    So in this living room you had clothing on
8    the floor?
9    A.    I had clothing we had separated out to give
10   to the Goodwill.
11   Q.    So that had been scattered?
12   A.    Totally.
13   Q.    Briefcases.  Where were the briefcases
14   located?
15   A.    They would have been located close to my desk
16   in this corner.
17   Q.    So your desk is up here?
18   A.    The desk is in that corner.
19   Q.    And that's where the paperwork was as well?
20   A.    A lot of paperwork on there.  A lot of
21   paperwork on the table was right here.  A lot of
22   paperwork on the coffee table was here in front of the
23   couch.
24   Q.    And what's been done with the paperwork?  was
25   it in stacks on -- prior to the raid, was it in stacks?

15 (Pages 57 to 60)

Donald Hinton   1        November 5, 2003

Page 61

1    A.   Yes.
2    Q.   And then where was it when you entered the
3  room?
4    A.   Yes.  It was in stacks prior.  Afterwards on
5  the floor.
6    Q.   Was some of it still on the desk like it --
7    A.   There --
8    Q.   Go ahead.
9    A.   There may have been, but not much.
10   Q.   Prior to the warrant being executed, was this
11 room clean?
12   A.   It wasn't dirty.  It was messy, but it wasn't
13 dirty.
14   Q.   Okay.  So that's what you see when you walked
15 in.  Just when you walked in, could you see the damage
16 in any other part of the house at that time?
17   A.   Only when I was in -- only from what could be
18 seen from the couch.  And I was facing this direction;
19 so I didn't see anything back here.
20   Q.   Okay.  So you were placed on the couch facing
21 the other three.  And then what happened?
22   A.   Well, I saw the family room disrupted.  I saw
23 all of that kicked around.  No.  I was -- we just
24 waited there.
25   Q.   Okay.

Page 62

1    A.   Until they had their say.  And then they
2  brought in what looked like a water spaniel.  And the
3  comment was, You want to see how well we have him
4  trained?  I didn't say anything and neither did anybody
5  else.  So he just put the dog up on the dining room
6  table where a lot of the stuff was stacked.  Some of
7  that was still stacked.  When the dog got off the
8  table, it wasn't.
9    Q.   What did the dog do on the table?
10   A.   He just scattered everything.
11   Q.   Like with his paws?
12   A.   Well, they kept him there.  It was by design.
13 They had him, What do you see?  What do you see?  What
14 do you see?  What do you see?  The dog was just going
15 nuts on the table.
16   Q.   And you're sitting on the couch while that's
17 happening?
18   A.   I'm watching it.
19   Q.   How long are you left on the couch?
20   A.   I would say about 10 or 15 minutes.
21   Q.   And during that time are there officers
22 searching the rooms?
23   A.   Yeah.  Making a lot of noise when they're
24 doing it.
25   Q.   I guess you wouldn't know.  But officers are

Page 63

1  still in the home in the other rooms?
2    A.   Yes, they are.
3    Q.   And at the conclusion of that 15 minutes,
4  what happens?
5    A.   Well, there's a little guy arrives carrying a
6  very small looks like a cosmetic case.  Came in.
7  Wasn't very happy.  Sleepy.  Grumpy.  He said, All
8  right.  Now, what am I looking for?  And one of the
9  females, the one that was, the only one at that point
10 that wasn't wearing a mask, takes him to the kitchen.
11   Q.   While you're sitting on the couch, is anyone
12 talking to you, officers?
13   A.   No.  They're talking amongst themselves.
14   Q.   Are they in the room with you?
15   A.   A lot of them are in the room with us.
16   Q.   And what are they saying amongst themselves?
17   A.   Well, when the female left, one of the
18 officers referred to her as the bitch, which I thought
19 kind of fit.
20   Q.   Why do you say that?
21   A.   Very disagreeable, frowning, snarling, ugly
22 attitude.
23   Q.   Did you have any personal interaction with
24 her?  Did she talk to you at all?
25   A.   Well, she made a couple of comments.  I

Page 64

1  didn't bother to answer.
2    Q.   Like what?
3    A.   You know, I really don't remember at this
4  time.  I do have a lot of that stuff written down.
5    Q.   Okay.  And so --
6    A.   But they were just derogatory remarks.
7    Q.   Is anybody interviewing you or interrogating
8  you while you're on the couch?
9    A.   No.
10   Q.   At that time had you been Mirandized or
11 arrested or anything?
12   A.   No.
13   Q.   Did there ever come a time when they
14 interviewed you?
15   A.   Yes.
16   Q.   When was that?
17   A.   Well, just prior to leaving, they pulled me
18 into the bathroom.  And the door to my bedroom was
19 open, and I could see what they done in there.  And I
20 walked into the bathroom with some guy who wasn't
21 wearing a mask.  And if he had been previously, he had
22 taken it off.  And he asked me a couple of questions.
23 And I didn't give him any answers.
24   Q.   Which bathroom were you taken to?
25   A.   The front bathroom down the hallway.

16 (Pages 61 to 64)

**Page 65**

1  Q. And what type of questions did he ask you?

2  A. Oh, they asked me where all the guns in the

3 attic came from. And I told him I don't know. I

4 didn't feel like I had to answer his questions at that

5 time anyway. And who they belonged to. Asked me if I

6 had been convicted of a felony. I said certainly,

7 43 years ago.

8      He said, You sign up as an ex-felon in this

9 state? I said, Absolutely not. Is there anything you

10 want to tell me? He says, You know we have a search

11 warrant. I said, Show it to me. Don't worry about it.

12 You'll see it.

13      And I said, Well, shouldn't I be with you

14 when you're going through these rooms and stuff when

15 have a search warrant? No answer. Kicked me out.

16 Went down and got John or David and the girlfriend.

17 Interviewed all three of them.

18  Q. Okay.

19  A. But I want to fill in a gap here.

20  Q. Okay.

21  A. When this female officer escorted the

22 gentleman to the kitchen, turned out to be the chemist,

23 she came back out here and leaned up against this wall

24 to continue watching us. One of the other officers

25 over at the kitchen door that leads to the living room

**Page 66**

1 said to him, What are you going to do? Arrest this guy

2 for baking cookies? 'Cause he was in the kitchen and

3 the different rooms dabbing something on the wall,

4 which didn't turn a color.

5  Q. The chemist said that?

6  A. Yeah. What are you going to arrest him for?

7 Baking cookies? And then he came over here and had a

8 few words with -- no. I'm sorry. I got ahead of

9 myself. The gentleman over here at the door of the

10 kitchen and the living room, he asked them, Is there

11 any dope or what? You going to find any dope or what?

12 No comment.

13      He come over here when he was just about

14 ready to leave, if not leaving. He asked the female,

15 What are you going to arrest this guy for? Baking

16 cookies? No answer. Smart sneer. And he left.

17      MR. BOOKE: Can we take a quick break?

18      MR. ANDERSON: Sure.

19      (A short recess was taken.)

20      MR. ANDERSON: Back on.

21 BY MR. ANDERSON:

22  Q. So they took you in the bathroom and asked

23 you questions. And they asked you questions about

24 firearms found in the ceiling?

25  A. They did.

**Page 67**

1  Q. And your answer to them is you didn't know

2 anything about them.

3  A. I did.

4  Q. Was that an accurate statement? Did you know

5 there were firearms in the attic?

6  A. Yes, I did.

7  Q. Whose firearms were they?

8  A. Originally they were mine. I gave them to my

9 son one Thanksgiving.

10  Q. Gave them to David?

11  A. I did.

12  Q. Do you recall how long ago that you gave them

13 to David?

14  A. Oh, probably two or three years before.

15  Q. Where had you acquired the guns?

16  A. Over the years, family guns, guns that were

17 purchased as gifts.

18  Q. Purchased by you or purchased for you?

19  A. Family. Family guns.

20  Q. So purchased by family members and given to

21 you?

22  A. Yeah.

23  Q. Do you know how many guns were in there?

24  A. I think there were about 24 or 26.

25  Q. Did you keep any type of records regarding

**Page 68**

1 these guns?

2  A. My mother did.

3  Q. What's your mother's name?

4  A. Zelma Ranslem.

5      MR. ANDERSON: I noticed in the interrogatory

6 answers there was a reference to an affidavit by her.

7 I never received that if you have that. Thank you.

8 BY MR. ANDERSON:

9  Q. And what type of paperwork did she keep

10 regarding these guns?

11  A. She kept a handwritten list.

12  Q. Have you seen that list?

13  A. I have.

14  Q. What type of information does that list

15 include?

16  A. It just included all the guns, where they

17 came from, her father's gun, my father's gun, shotgun,

18 rifles.

19  Q. Does she still have that list?

20  A. You know, she gave that list to me. No, she

21 doesn't.

22  Q. When did she give the list to you? Before or

23 after this?

24  A. When I picked up the guns at her home.

25  Q. And do you recall when that was?

17 (Pages 65 to 68)

Donald Hinton  1          November 5, 2003

Page 69

1    A.  No, I don't.  It was on a Thanksgiving or a
2  Christmas.  I think Thanksgiving.
3    Q.  Would it have been the same Thanksgiving that
4  you gave the guns to David?
5    A.  Yes, it was.
6    Q.  And I assume that, when you gave the guns to
7  David, you just orally gave them to him.  There wasn't
8  like any paperwork or exchange.
9    A.  No.
10    Q.  And you're aware that it's illegal for an
11  ex-felon to have a firearm; is that correct?
12    A.  I think so.
13    Q.  Did you see them taking the guns out of the
14  home?
15    A.  I did not.
16    Q.  Did you see them taking the guns out of the
17  attic?
18    A.  I did not.
19    Q.  Of the 24 to 26 guns that you believe were in
20  the attic, were they all rifles?
21    A.  The majority.  There was a couple pistols.
22    Q.  Would the pistols qualify as handguns?
23    A.  Handguns, yes.
24    Q.  Were they registered?
25    A.  No.

Page 70

1    Q.  Were these guns that you would take, prior to
2  the execution of the search warrant, that you would
3  take out and fire or shoot for sport or anything of
4  that nature?
5    A.  No.
6    Q.  So you just stored them in the attic?
7    A.  David did.
8    Q.  Did you sell or trade those guns for other
9  guns?
10    A.  No.
11    Q.  Were there any firearms in the home that were
12  not in the attic?
13    A.  You know, I don't remember.  There may have
14  been.
15    Q.  Do you recall whether there was a handgun, a
16  Beretta handgun, underneath the pillow in your bedroom?
17    A.  Underneath the pillow in my bedroom?  I don't
18  remember it being there.
19    Q.  Were you in possession of a Beretta model
20  21-A .22 caliber handgun?
21    A.  I think I was, yes.
22    Q.  And would you have kept that in your room?
23    A.  Originally I had it in my room.
24    Q.  Do you know where you received that Beretta
25  from?

Page 71

1    A.  I have no idea.
2    Q.  Don't know if someone gave it to you or you
3  bought it?
4    A.  I think somebody gave it to me.
5    Q.  But you don't recall who?
6    A.  Not offhand.
7    Q.  Could you find that out?
8    A.  I believe I can.
9    Q.  Okay.  Have you ever been told that that
10  Beretta .22, they ran the scope and it came back as
11  stolen?  Were you ever told that?
12    A.  No.
13    Q.  To your knowledge was that gun stolen?
14    A.  No.
15    Q.  I may have covered this with your mother.
16  But did she hold all the paperwork for the weapons in
17  the attic, all the receipts, that sort of thing?  Are
18  there receipts?
19    A.  No.  Some of those guns are over a hundred
20  years old.
21    Q.  Okay.
22    A.  She had a list that she kept when we first
23  gave her the guns.  That was with her.  If there was
24  any added to that, she just put it on the list.
25    Q.  Okay.  Would her list then include every gun?

Page 72

1  was it an exhaustive list of all the weapons in the
2  attic?
3    A.  The affidavit that we gave are all the guns
4  that came off that list.
5    Q.  Okay.  Did you ever deny -- well, I guess you
6  already answered this.  You denied to the police
7  officers that night any knowledge regarding the weapons
8  in the attic; correct?
9    A.  I did.
10    Q.  Are you aware as to whether there was any
11  marijuana in your home on the night of the raid?
12    A.  Not in the least.
13    Q.  Are you aware that they claim they found
14  marijuana in your home?
15    A.  No.
16    Q.  To your knowledge does David, does he use
17  drugs?
18    A.  Not that I know of.
19    Q.  How about John?  To your knowledge does he
20  use drugs?
21    A.  Not that I know of.
22    Q.  Why were the guns kept in the attic?
23    A.  Well, because that's where David wanted to
24  keep them safe.
25    Q.  To your knowledge did David have any other

18 (Pages 69 to 72)

Donald Hinton  1        November 5, 20__

Page 73

1  weapons that were not in the attic?
2      A.   I think he did.
3      Q.   And do you know what those weapons were?
4      A.   No, I don't.  They were rifles I'm pretty
5  sure.
6      Q.   I noticed in your answers to the -- you
7  recall answering the interrogatories I sent to your
8  attorney, just questions for you to answer?
9      A.   I remember something about them.
10     Q.   You stated in there that police officers took
11 ownership papers regarding the guns.  Can you explain
12 that to me?
13     A.   They took the blue cards that go with the
14 rifles that David had.
15     Q.   What's a blue card?
16     A.   That is a police permit.
17     Q.   Now, would you get a blue card for a rifle?
18     A.   I don't think so.
19     Q.   So would the blue cards involve the handguns?
20     A.   Actually you're asking me something I don't
21 know about.
22     Q.   Okay.
23     A.   You would have to ask David on that.  Those
24 were his guns and his safe.
25     Q.   Actually it's perfectly fine to say I don't

Page 74

1  know.
2      A.   I don't know.
3      Q.   I was just wondering what ownership papers
4  you were referring to being taken.  So those would have
5  been the blue cards that are actually David's and/or
6  John's.
7      A.   Or his receipts.
8      Q.   Because none of the guns were registered to
9  you; correct?
10     A.   No.
11     Q.   How long were you inside the house after you
12 returned from the outside?
13     A.   Fifteen or twenty minutes.  It wasn't very
14 long.
15     Q.   Just long enough to basically take each of
16 you into the bathroom and talk with you?
17     A.   (Witness nods.)
18     Q.   What happened after that 20 minutes?
19     A.   Come and gathered us up and put us in
20 separate cars and drove to the police station.
21     Q.   How many separate cars?
22     A.   Two.
23     Q.   Did you ever get the names of any of the
24 officers?
25     A.   Never.

Page 75

1      Q.   How about the individual who talked to you in
2  the bathroom?  What did he look like?
3      A.   Well, he was about my height.  He was
4  probably 175 pounds, white.  That's all I remember.
5      Q.   So a Caucasian, 175 --
6      A.   Yeah.
7      Q.   -- pound guy.  Who was in your vehicle during
8  the transportation to the jail?
9      A.   John Reyes.
10     Q.   At some point did they let the girl go?
11     A.   They did.
12     Q.   When did that occur?
13     A.   As we were leaving.
14     Q.   Explain to me how that happened.
15     A.   I said to one of the officers, why are you
16 taking her in?  She just arrived.  And she had.  And
17 somebody looked at each other, and one of the guys
18 standing there said let her go.
19     Q.   So they just released her?
20     A.   Yes.  She hadn't done anything.
21     Q.   To your knowledge had she arrived to your
22 home in her own vehicle?
23     A.   I think so.
24     Q.   So they just released her to drive home?
25     A.   Yes.  Well, I don't know that.  I never saw

Page 76

1  her leave.
2      Q.   To your knowledge she wasn't transported by
3  the police.
4      A.   No, no.  She was released.
5      Q.   So you and John are in one car, and they took
6  David in a separate vehicle?
7      A.   Yes.
8      Q.   How many officers were in the vehicle that
9  you and John were in?
10     A.   One.
11     Q.   How far is your home from the jail?
12     A.   Ten minutes.
13     Q.   Do you know which jail they took you to, City
14 or Clark County Detention?
15     A.   I think Clark County Detention.
16     Q.   How long was the trip?
17     A.   Well, the guy got lost.  I don't know.
18 Fifteen minutes.
19     Q.   Did you have any conversation with the guy
20 driving?
21     A.   Just to get John Reyes's handcuffs loosened.
22     Q.   What did he say?
23     A.   We'll be there in a minute.  We'll be there
24 in a minute.
25     Q.   Why were you concerned about John's handcuffs

19 (Pages 73 to 76)

Page 77

1  being loosened?
2      A.   John had been complaining about the handcuffs
3  being tight all evening.  And upon entering the car,
4  the cop checked them, this guy.  The driver did check
5  them.  He's says, You're right.  They're too tight.
6  And at that time the other car took off, and he said,
7  And I don't have the keys.  And there they go.
8      Q.   Did you believe him that he wanted to loosen
9  them?
10      A.   The man's hands was turning blue, and that
11  was obvious even at night.  Yes.
12      Q.   I guess my question is:  You didn't think the
13  officer was being facetious saying there they go?
14      A.   No.
15      Q.   When were you arrested, or were you arrested?
16          MR. BOOKE:  Object to the question to the
17  extent it calls for a legal conclusion.
18          You go ahead and answer.
19  BY MR. ANDERSON:
20      Q.   Were you ever Mirandized?
21      A.   Not to my knowledge.
22      Q.   Okay.  So no one ever read you the Miranda --
23      A.   I'm pretty sure they did not.
24      Q.   Did anyone ever tell you you were under
25  arrest?

Page 78

1      A.   Well, they told us they were going to arrest
2  us.
3      Q.   And when was the first time you were told
4  that?
5      A.   When we were getting up from the couch to go
6  to the car.
7      Q.   Did they tell you why?
8      A.   No.
9      Q.   But to your knowledge no one ever put you
10  formally under arrest?
11      A.   No.
12      Q.   Okay.  So in the vehicle you talk with the
13  officer --
14      A.   Let me back up.  I don't remember.
15      Q.   In the vehicle you talk with the officer
16  about John's handcuffs.  Any other conversation with
17  the driver of the vehicle?
18      A.   No.
19      Q.   Did you and John have any conversation?
20      A.   No.
21      Q.   So in about 15 minutes you arrive at the
22  jail.  What happens then?
23      A.   Well, John was still complaining about his
24  handcuffs.  His hands were turning blue.  I asked an
25  officer to come over in the jail.  He took one look at

Page 79

1  those handcuffs, and he started yelling at the cop that
2  brought him in.  Don't ever bring another prisoner in
3  here with handcuffs on this tight again.
4          He took them off and called a supervisor.
5  And the supervisor came over, and the cop disappeared.
6  And everybody kind of forgot about his handcuffs being
7  on too tight and hands blue.
8      Q.   Were new handcuffs placed on him?
9      A.   No.
10      Q.   So he was left free?
11      A.   Yeah.  Well, at least I think so.  I don't
12  know.  Things happened pretty fast around that time.
13      Q.   What happened at the jail?
14      A.   Put us in a cell.
15      Q.   All together?
16      A.   No.  They took the two boys and put them
17  separate.
18      Q.   When you got to the jail, was David already
19  there, or did he arrive after you?
20      A.   David arrived after, but not by much.
21      Q.   Were you fingerprinted, photographed, that
22  kind of thing?
23      A.   Hours later.
24      Q.   So you were put into a cell.  Were you alone
25  in your cell?

Page 80

1      A.   No.  I was in with a crowd of people I never
2  saw before.
3      Q.   And how long were you in the cell?
4      A.   Well, day and a half.
5      Q.   Did they ever take you out of the cell?
6      A.   To be fingerprinted.
7      Q.   Okay.  Did they tell you where they were
8  fingerprinting you?
9      A.   Did they tell me what?
10      Q.   Like did they tell you at that time that you
11  had been arrested or anything of that nature?
12      A.   Yes.
13      Q.   What did they say?
14      A.   Actually the guy was a very nice guy.  He
15  thought he was a real comedian.  I'm not being
16  facetious.  He was just funny.  And he said, Do you
17  know what you're arrested for?  I said, I haven't the
18  foggiest idea.
19          He says, Well, what does this sound like?
20  Methamphetamine.  I said, No, it doesn't sound like me.
21  He said, How about marijuana?  I said, No, not me.  He
22  said whatever else they had on that.  He says, Well,
23  here's your slip.  And they had four charges listed.  I
24  don't remember what was on there.
25      Q.   But it's your testimony that you do not

ASSOCIATED REPORTERS OF NEVADA - 702/382-8778
2300 W.SSaharaDAve.,RSte. 770,ELasAVegas,/Nevada789102

Page 81

1  recall ever being formally arrested?
2           MR. BOOKE:  Object to the question to the
3  extent it calls for a legal conclusion, and it may lack
4  foundation as well.
5           You go ahead and answer it.
6           THE WITNESS:  I don't remember.
7  BY MR. ANDERSON:
8      Q.  Okay.  And other than being fingerprinted --
9  and were you photographed?
10     A.  Yes.
11     Q.  Okay.  Other than being fingerprinted and
12 photographed, any other interaction with any police
13 officers while you were there for the day and a half?
14     A.  Yeah.  They called me out the first four
15 hours and checked my blood pressure regularly.
16     Q.  So just medical attention?
17     A.  That's all it was.
18     Q.  No interrogations, no interviews or anything
19 like that?
20     A.  I think the following day a man from, a young
21 man, from the ATF came down and asked me a question.
22 That was it.
23     Q.  Do you recall what he asked you?
24     A.  He said, Any of those guns used for criminal
25 activity?  I said, Have you seen the guns?  He said,

Page 82

1  No.  I said, They're antiques.  I said, No.
2      Q.  Now, I understand the allegations you're
3  making against the people that executed the search
4  warrant and the events at your home.  Are you making
5  any complaints regarding your treatment at the jail or
6  the officers who were involved with your detainment at
7  the jail?
8      A.  Sure, I am.
9      Q.  Okay.  And what is that?
10     A.  Well, let's talk about the things that went
11 missing out of the safe.
12     Q.  Okay.  We'll get to that.  I'm just talking
13 about your treatment at the jail.
14     A.  Oh, the treatment at the jail?
15     Q.  Yes.
16     A.  No.
17     Q.  Okay.
18     A.  Nothing about the jail.
19     Q.  Okay.  So you're in jail for a day and a
20 half.  And do you post bail?  Is that --
21     A.  By the time I got out, it was two days.  I
22 did.
23     Q.  Did you have someone come down and post the
24 bail?  How did you do that?
25     A.  No.  I think we did it on the telephone.  I'm

Page 83

1  not real sure.  I don't know.
2      Q.  But you posted bail.
3      A.  Posted bail.
4      Q.  And how did you get home?
5      A.  I got lucky.  One of the guys that got
6  released with me had someone picking him up, and I was
7  a short distance out of the way.
8      Q.  And did David return home with you?
9      A.  David did not.
10     Q.  Did John?
11     A.  John did not.
12     Q.  So you returned home alone?
13     A.  Yes.
14     Q.  And when you got to your house, what did you
15 do?  What did you see?
16     A.  Well, the first thing that struck me was
17 every light in the house was on.  Every door in the
18 house was open.  The front gate was closed, but not
19 locked.  I went into the house.  It was extremely warm.
20 Somebody had cranked the heat up to 90 degrees.  The
21 next thing I notice there's a wind blowing through the
22 house coming from the back door.  The security gate was
23 open as was the sliding glass door.  And every light in
24 the house was on.
25     Q.  And when you returned home, did you ever get

Page 84

1  a chance to see the warrant?
2      A.  I walked through the house.  And I finally
3  made my way to the kitchen thinking I was going to grab
4  a cookie or two.  And on the, what do you want to call
5  it, the deck there or the sink was taped four pieces of
6  paper.
7      Q.  Taped?
8      A.  Uh-huh.
9      Q.  So they were taped to the counter?
10     A.  Taped to the counter.
11     Q.  Okay.  And what was on those four pieces of
12 paper?
13     A.  Well, one was a copy of the search warrant,
14 and the other one was the possession of the things that
15 they took from the house.
16     Q.  So they left the search warrant and a list of
17 the items the officers took from the home?
18     A.  Well, I really wouldn't call it a list.  It
19 was something.
20     Q.  Okay.  Now, what I want to do is try to keep
21 this as clear as possible methodically.  I want to go
22 through each room.  And first of all, let's just
23 discuss the physical damage to the home.
24     A.  Okay.
25           MR. BOOKE:  You understand what he's asking

21 (Pages 81 to 84)

Donald Hinton   1          November 5, 2003

Page 85

1  about?  The structure.
2          THE WITNESS:  Yeah.
3  BY MR. ANDERSON:
4      Q.   Exactly.  We'll talk about everything else
5  that you allege is missing.  But right now let's talk
6  about the physical damage to the structure of your
7  home.  Okay?
8      A.   Okay.
9      Q.   So why don't we just walk in the door.  And
10 tell me any physical damage that was done to the
11 hallway.
12     A.   Let's go back to the gates.
13     Q.   Okay.  Yeah.  Let's start walking in.  Okay.
14     A.   On the garage door, just left of the gate,
15 someone looked like they kicked it and put a hole in
16 the garage.
17     Q.   Okay.  That was not there previously?
18     A.   No.  In fact, it's still fresh.  The gate had
19 been pulled from the anchor bolt.  Of course, the
20 screen door in there was shot up.  The front door was
21 broken, including the casing on the front door.
22     Q.   Okay.  When you say "the front door was
23 broken," what do you mean?
24     A.   That's where the panel was at.  And I don't
25 know how the casing got broke around it, but it was.

Page 86

1      Q.   So there was a hole in the front door from
2  where they rammed it?
3      A.   Yeah.
4      Q.   Was there any damage to the door handle?
5      A.   I don't think so.  But the frame around the
6  door was broken on the side where they shot it.  Into
7  the hallway, there was a hole in the ceiling.
8      Q.   And that's the hole we talked about earlier
9  where you asked if someone had fallen through?
10     A.   Uh-huh.
11     Q.   So the two-feet-by-four-feet hole that you
12 described?
13     A.   Uh-huh.
14     Q.   That's in the ceiling.  Okay.
15     A.   Then as you come out of the hallway and go to
16 your left to enter into the living -- or the family
17 room, there's a hole in the structure in the -- what do
18 you call the board that goes up on the walls?
19     Q.   It's like a pony wall?
20     A.   No.  It's like drywall.  There's a hole up
21 there.
22     Q.   How big of a hole?
23     A.   Not very big.  Big enough that it wasn't
24 there before.  Noticeable.
25     Q.   Okay.  Is it through the drywall and you can

Page 87

1  see the back of the --
2      A.   No, no.  It's just crushed in.
3      Q.   Okay.  Like someone threw a ball at --
4      A.   Could have been.
5      Q.   That's the type of dent?
6      A.   A little bit more extensive than that.
7      Q.   Okay.
8      A.   Then as you go into the laundry room and into
9  David's bedroom, you notice that the closet door was
10 beaten up pretty good.
11     Q.   David's closet door.
12     A.   The one they asked the key for.
13     Q.   Were they able to get it open with the key to
14 your knowledge?  I mean, did they try?
15     A.   We were outside.  I have no knowledge.
16     Q.   I'm sorry.  Was it pried open?
17     A.   Beaten open.
18     Q.   Okay.  Go on.
19     A.   I don't know what else in David's room.
20 You'll have to ask him.
21     Q.   Okay.
22     A.   Back out of there now and into the family
23 room where everything was turned upside down.  The
24 kitchen looked like it was all right.  I think
25 everything else was all right.

Page 88

1      Q.   Okay.  Any physical damage to the family
2  room, the structure?
3      A.   Not that I recall.
4      Q.   And the kitchen, any structural damage inside
5  the kitchen?
6      A.   I don't recall any.
7      Q.   The living room, any structural damage?
8      A.   Just the scratches on the table.
9      Q.   And like were they deep scratches?
10     A.   No.  I polished them out.
11     Q.   Okay.  Let's move to your bedroom.  Any
12 structural damage in there?
13     A.   I don't remember.  I don't think so.
14     Q.   And then go into the hallway between your
15 bedroom and John's bedroom.
16     A.   Yeah.  Down here they stomped a hole next to
17 a stairway that pulls down.
18     Q.   Is that a hole in the ceiling?
19     A.   Uh-huh.
20     Q.   Okay.  And is that next to the opening to the
21 attic?
22     A.   Yes, it is.
23     Q.   Okay.  And how big is that hole?
24     A.   Oh, foot size.
25     Q.   Like someone had stepped through there?

22 (Pages 85 to 88)

Donald Hinton   1       November 5, 2003

Page 89

1    A.   Or stomped through there.
2    Q.   Okay.
3    A.   And in John's room you'll have to ask John.
4   I know there were parts missing off my brass bed.
5    Q.   But no structural damage in John's room that
6   you know about?
7    A.   Well, the doors were knocked off the hinges
8   in the closets.  They were all pushed in.
9    Q.   Okay.
10   A.   As we're back out in the hallway, the hall
11  closet door was kicked in, too.
12   Q.   And then any structural damage to any of the
13  side bathrooms or anything like that to your knowledge?
14   A.   I don't think so.
15   Q.   Any damage to the backyard area?
16   A.   I didn't see any.
17   Q.   Okay.  Now, is there any other structural
18  damage that you remember today that we haven't talked
19  about that occurred to your home?
20   A.   Well, I don't know.  There may be.  My memory
21  is not that good on that.
22   Q.   But we've hit the high points?
23   A.   You're hitting the ones that stand out.
24  That's the high points.
25   Q.   Now let's talk about any property damage in

Page 90

1   the home, for example, TV, stereos, things of that
2   nature.
3    A.   Okay.
4    Q.   And once again, you understand what I'm
5   talking about?  Anything that's not part of the
6   structure that was damaged.  Okay.  So let's start in
7   David's bedroom.  Are you aware of anything that was
8   damaged in David's bedroom of property value?
9    A.   Yes, I do.
10   Q.   Okay.  What?
11   A.   His coin collection was ripped apart.
12   Q.   And what do you mean by that?
13   A.   Well, I would have to explain it to tell you
14  what it was about.
15   Q.   He had a coin collection?
16   A.   When you buy series of sets -- they were all
17  opened.  He kept them unopened.  They're supposed to be
18  left unopened.  Those were torn open.  You know, I
19  can't address what, you know --
20   Q.   Yeah.  I'll ask him.
21   A.   I don't know what he had in there.
22   Q.   Okay.  Let's go to the family room.  Any
23  property damage to the family room?
24   A.   I don't recall.
25   Q.   So your TV and everything was fine, couches?

Page 91

1    A.   Yeah.  I think the TV was fine.
2    Q.   Like, for example, the couches in the family
3   room, did they cut into the couches or anything like
4   that?
5    A.   Not in there.
6    Q.   The kitchen, any property damage?
7    A.   Not that I can recall.
8    Q.   Living room?
9         MR. BOOKE:  Did they take any cookies?
10        THE WITNESS:  They stole four of my cookies.
11  Is that property damage?
12  BY MR. ANDERSON:
13   Q.   How much do you value them?
14   A.   I'm hungry.  I want four of them right now.
15        MR. BOOKE:  Depends on whether they're good
16  or not.
17        MR. ANDERSON:  I could probably get you the
18  cookies.
19        THE WITNESS:  Well, I enjoyed them.
20  BY MR. ANDERSON:
21   Q.   What kind were they?
22   A.   Oatmeal, walnut, and a few raisins.  Yummy,
23  yummy.
24   Q.   Okay.  Living room, any damage to any of the
25  property in there or the furniture?

Page 92

1    A.   Just the scratches on the table if I remember
2   that.  I don't remember what all went on in there.  It
3   took me two weeks just to clean up that room.
4    Q.   Okay.  Your bedroom?
5    A.   My bedroom.  I have a very expensive, and I
6   mean it is expensive, bedspread.
7    Q.   Can you put a price on it?
8    A.   No.  Because I think $800 we bought the skins
9   separate and then had them put together.  I don't
10  remember.  All I know is it cost $800 at that point
11  just for the purchase of the skins before they were cut
12  and put together.  That was ripped in several places.
13   Q.   when you say "ripped," like someone had taken
14  a knife and cut it or --
15   A.   We'll get to the knife cuts.  This was
16  ripped.
17   Q.   Okay.  So like someone had manually ripped
18  it?
19   A.   Manually ripped it.
20   Q.   Now, would there be something -- like it was
21  a bedspread -- was there like a filling inside there or
22  something?
23   A.   No.
24   Q.   Okay.  Like it was ripped all the way
25  through?

23 (Pages 89 to 92)

Donald Hinton  1        November 5, 2003

Page 93

1    A.   It was torn into pieces.
2    Q.   How many pieces?
3    A.   They were joined pieces, but they were ripped
4 open.  Am I getting through to you there?
5    Q.   Yeah.  Do you still have the bedspread?
6    A.   I do.
7    Q.   And is the rip still in it?
8    A.   Oh, yeah.
9    Q.   Okay.
10    A.   And the cuts, some very fresh cuts, and they
11 were very smooth cuts, looked like maybe a razor knife
12 or something that was extremely sharp.  Somebody had a
13 little field day cutting on those.
14    Q.   In the bedspread?
15    A.   In the bedspread.
16    Q.   Those were like manual rips, or were they
17 like knife rips in the --
18    A.   Manual and slices, yeah.  And there was some
19 other damage in there, but I don't remember what the
20 hell it was.  I would have to go back and review.  I'm
21 not real sure.  There was so much destruction in that
22 room.
23    Q.   Like were there broken mirrors, or were your
24 dresser drawers damaged, things of that nature?
25    A.   David's room there was.  The one mirror in my

Page 94

1 room, in my bathroom -- we haven't gotten there yet --
2 that was chipped.  It was a freestanding mirror.
3    Q.   So you bathroom mirror was chipped.
4    A.   Yes.  I found the pieces.
5    Q.   How big of a chip was it?
6    A.   Slivers.  You know, I think was just one
7 corner.
8    Q.   Okay.
9    A.   Safe was pulled apart, and the contents --
10 we'll get to that.
11    Q.   Where was the safe located?
12    A.   Safe was located in my bedroom closet.
13    Q.   How big of a safe was it?
14    A.   Floor safe size, whatever size that is.  Half
15 the size of that over there.
16    Q.   Was it bolted to the ground?
17    A.   It was cemented in.
18    Q.   But it was pulled out of the cement?
19    A.   No.  The top was taken off is all.
20    Q.   Okay?
21    A.   My closet door was locked.  But it was not
22 broken into, just opened.
23    Q.   No damage?
24    A.   Not to the door.
25    Q.   Okay.

Page 95

1    A.   And it was locked.  Into John's room, they
2 had taken a leather couch that we had in there and
3 pulled, looked like they had pulled apart to get inside
4 the stuffing I think on all three of the pillows that
5 made up the seat of the couch.
6    Q.   So the pillows were ripped open?
7    A.   Ripped open, manually ripped open, not
8 sliced.  Torn apart.  There was parts missing off the
9 brass bed.
10    Q.   Do you know what parts?
11    A.   Yeah.  The little ornament balls that are on
12 the end that we never found.  John's children, his
13 little girl's toys were smashed and stepped on.  I
14 think he had a, not a closet door, but a desk drawer or
15 a chest of drawers -- drawer -- drawers.
16    Q.   And were they damaged?
17    A.   Yeah.  They were broken.  And just everything
18 just -- I don't know.
19    Q.   Now, what we've talked about with the
20 property damage and the structural damage, have you had
21 any of that repaired?
22    A.   I did.
23    Q.   Okay.  And did you do it yourself?
24    A.   Some of it.
25    Q.   All I'm getting at is do you have receipts

Page 96

1 for the work that was done?
2    A.   No.
3    Q.   So you just did it yourself or friends helped
4 you?
5    A.   Exactly.
6    Q.   Did you ever have the damage estimated by
7 anyone?
8    A.   I think it was $2,800 for what they were
9 going to cover, but that wasn't all the damage.  But
10 that was just what the homeowners would cover.
11    Q.   Okay.  So did your homeowners insurance
12 company send someone out to do the estimate?
13    A.   Yes, they did.
14    Q.   And they estimated the damage at 2,800?
15    A.   Yes.
16    Q.   Do you know the name of your homeowners
17 insurance company?
18    A.   Hartford.
19    Q.   And so they came out and gave you an
20 estimate.  But then you just pretty much did everything
21 yourself?
22    A.   Pretty much.
23    Q.   Did they ever send you a check for the 2,800?
24    A.   Yes.  Well, minus deductions or whatever.  I
25 don't know.  But they sent a check.  I don't remember

24 (Pages 93 to 96)

Donald Hinton  1       November 5, 2005

Page 97

1  what it was for.

2      Q.  Okay.  Let's move on.  Have we talked about

3  everything that you remember regarding the structure

4  and property damage?

5      A.  (Witness nods.)

6      Q.  Okay.  Let's move on to things that were

7  taken from the home or that you claim were taken.

8  Okay?  Now, we know that the rifles and the handguns

9  were taken; correct?

10     A.  Yes.

11     Q.  Have you had a chance to review the police

12 department's list of the handguns and weaponry that

13 were taken?

14     A.  No.

15     Q.  Okay.  You need to be out of here by 11:30;

16 right?

17     A.  I'd like to be out of here by 11:30.  I'm

18 meeting a horseshoer.

19     Q.  What I'll have you do is -- I've produced

20 those to your attorney -- at some point go through

21 those.  And if you can think of anything that is not

22 there, would you supplement your interrogatory answers

23 with that.  Is that okay?

24         MR. BOOKE:  Sure.  You want him to list

25 anything that is not listed on the police --

Page 98

1          MR. ANDERSON:  Of the rifles.  There's that

2  list that was produced.  I think we have 21, 4 handguns

3  and 17 rifles, is what was inventoried by the officers.

4  BY MR. ANDERSON:

5      Q.  So if you could just look at that list, and

6  if you can think of any weapons on there that you

7  believe were taken, if you could just --

8      A.  Do they have a crossbow on there?

9      Q.  Yes.

10     A.  Just give me the list, and I'll go ahead --

11     Q.  I'll save time rather than make you look at

12 it right now.  Do you just want to tell me what else

13 was taken?

14     A.  Well, let's just start with my original

15 baptismal certificate, my original birth certificate,

16 all of my car titles.

17     Q.  Baptismal certificate?

18     A.  Uh-huh, yeah.  It's important to me.

19     Q.  And car titles.  Okay.  These were taken?

20     A.  They're gone.  Gold coins.

21     Q.  And where were the gold coins located?

22     A.  In the safe.

23     Q.  Where was your birth certificate located?

24     A.  In my armoire.

25     Q.  In your bedroom in the armoire?

Page 99

1      A.  Uh-huh.

2      Q.  And baptismal certificate?

3      A.  Same place.

4      Q.  And your car titles?

5      A.  Same place.

6      Q.  So all of those were in your armoire in your

7  bedroom?

8      A.  Uh-huh.

9      Q.  Gold coins in the safe.  What else was in the

10 safe that was taken?

11     A.  A lot of silver dimes, the original, you

12 know, the old timers.  1934 silver dollars, 10 or 12 of

13 those.  Half dollars and quarters.

14     Q.  Do you know how many gold coins?

15     A.  There was three $20 gold coins, pieces.

16     Q.  How many silver dimes?

17     A.  Jesus, I have no idea.  Two or three hundred.

18 Lots of them.  I was going to use them for decorations

19 on belts, bridles, saddles.

20     Q.  Okay.

21     A.  Probably a hundred quarters or two rolls of

22 quarters broken apart.

23     Q.  Just regular quarters?

24     A.  No.  They were the old -- regular quarters,

25 no.  They were the real silver.

Page 100

1      Q.  Were they collector's items?

2      A.  I don't know.

3      Q.  I just wonder if their value was greater than

4  25 cents.

5      A.  Oh, yeah.  Absolutely.  As with the half

6  dollars, there was probably 10 or 12 of those.  And

7  then a silver dollar my grandfather gave me in 1934,

8  gone.  And I had some extras in there from 1934, and

9  they're gone.  There is a diamond tennis bracelet.

10     Q.  That's missing?

11     A.  It's gone.  There was a companion watch,

12 diamond bracelet and the watch.

13     Q.  And it's missing?

14     A.  They're gone.

15     Q.  Okay.

16     A.  There was a couple of turquoise men's rings,

17 silver and turquoise, and just a bunch of paraphernalia

18 jewelry.  My grandfather's white gold watch, silver

19 watch fob, pocket watch fob.  My dad's gold silver --

20 gold pocket watch fob is gone.  I found some diamond

21 rings scattered around the house.  And as far as I

22 know, they're fine.

23         There was one heavy gold men's ring, mine, in

24 the safe, which has diamonds, three or four diamonds

25 and a star sapphire in it, and that's gone.  There was

25 (Pages 97 to 100)

Donald Hinton   1          November 5, 2003

Page 101

1  my father's ring made out of a nut from the U.S.S.
2  Arizona. I guess that was stainless steel. That's
3  gone. And God knows how many letters was taken out of
4  my files.
5      Q.  Okay. Let's stop. We talked about the
6  jewelry and watches and that. I know probably not.
7  But is there anything you have that would tell me the
8  value of these items? Any receipts? Any appraisals?
9  Anything of that nature?
10     A.  I wouldn't have any idea.
11     Q.  Okay. Do you have pictures of these things?
12     A.  No.
13     Q.  Okay. As far as you can recall today, is
14  that pretty much all the jewelry, metal valuables, and
15  things that were taken or that are missing?
16     A.  Well, the only things I'm excited about are
17  those three gold coins and the silver things. And I
18  think that watch was my grandmother's, and the tennis
19  bracelet was somebody's. I think I gave it to my
20  mother, and she returned it. I don't know. They were
21  all old, but they were real diamonds.
22     Q.  I understand. And you gave me quite an
23  exhaustive list. But did you --
24     A.  It probably goes on.
25     Q.  Okay.

Page 102

1      A.  Truth of the matter is I don't know all the
2  stuff that's gone. But I haven't been able to find a
3  lot of stuff.
4      Q.  But as you sit here today, you've told me
5  everything that you remember?
6      A.  I'll tell you everything that I remember.
7      Q.  Yeah. I mean, I'm not holding you to it.
8  You can supplement this at a later date. I'm just
9  asking if that's everything of the valuables that you
10 can remember.
11     A.  I think my grandfather had a pearl-handled
12 knife that we can't seem to find, a little small
13 pocketknife.
14     Q.  Do you recall when the last time you had
15 looked at the gold coins was? How often would you take
16 them out and look at them?
17     A.  I didn't. They've probably been in there
18 several years.
19     Q.  Okay. And the same thing with the
20 pearl-handled knife? Did you ever --
21     A.  No. I don't go in that safe very often.
22     Q.  But it was in the safe as well, the knife?
23     A.  Yeah. In was in a plastic sack.
24     Q.  Okay. Was there anything left in the safe?
25 Or were the contents completely taken?

Page 103

1      A.  Totally gone.
2      Q.  So the safe was empty when you saw it. Okay.
3  Let's move on to the paperwork. What paperwork is
4  missing?
5      A.  Prison and parole reform stuff. Some of the
6  research papers that we had pulled out of the law
7  books. Letters from the prisoners requesting help or
8  thanking us or whatever, just general correspondence.
9      Q.  And these documents would have been located
10 in the living room on the desk?
11     A.  Those would have been on the desk, right next
12 to the desk, and on this table, and on this right here,
13 the coffee table.
14     Q.  And earlier you testified that, when you
15 entered the home the night of the incident, they had
16 been scattered; correct?
17     A.  Correct.
18     Q.  Okay. And so you've collected that paperwork
19 that's been scattered. And have you reorganized it?
20     A.  I have reorganized it to the point where I
21 can. Some of the paperwork, in-between pages, they're
22 gone. Some of the letters are gone. What we had left
23 I did put back in some semblance of organization.
24     Q.  Can you estimate for me how much paperwork
25 was taken? Like are we talking hundreds of pages or

Page 104

1  like four or five?
2      A.  Well, I'm probably talking about maybe
3  50 envelopes with letters in them. The pages on the
4  research work is just stuff that was removed making it
5  incomplete. And there was a list of names of all the
6  people that we had helped and the results of not
7  helped, couldn't help, did help, got pardoned, didn't
8  get pardoned.
9      Q.  And those were missing?
10     A.  Those are gone. And I would like to have
11 those.
12     Q.  Anything else missing from the home that you
13 can think of today?
14     A.  No.
15     Q.  Like I say, if you think of something, tell
16 your attorney, and he'll supplement your answers.
17     A.  He may not be my attorney after today. He's
18 kind of fuming over here.
19     Q.  Okay. Now, a couple of days, if I recall,
20 after the incident, you videotaped this.
21     A.  Yes.
22     Q.  Who videotaped that with you?
23     A.  A retired attorney.
24     Q.  What's his name?
25     A.  Joe Williams.

26 (Pages 101 to 104)

Donald Hinton  1        November 5, 2003

## Page 105

1    Q.  Joe or Joel?

2    A.  Joe.  And Mercedes Maharris.

3    Q.  What's your relationship with Joe?

4    A.  Friend.

5    Q.  And your relationship with Mercedes?

6    A.  Friend.

7    Q.  And how soon after the search was that

8  videotape taken?

9    A.  That afternoon.

10    Q.  So it would had been the 18th?

11    A.  I don't know the dates.  I got out at

12  1:00 o'clock in the morning.  Woke up the next morning.

13  Called the two people.  And whatever day that was, that

14  afternoon we videotaped it.

15    Q.  So within one to three days of the actual

16  search?

17    A.  Of the actual search?

18    Q.  Yeah.

19    A.  Probably.

20    Q.  And had you done any cleaning up or any

21  repairs prior to taking that videotape?

22    A.  Well, some things had to be picked up, but no

23  repairs.

24    Q.  Okay.  So I know you turned off the lights.

25  I know you shut the doors.  I know you turned down the

## Page 106

1  heat.

2    A.  Yeah.

3    Q.  But as far as the condition of the home, that

4  was a pretty accurate representation of how --

5    A.  Yeah.  That was pretty accurate except for

6  the paths we made to go through.

7    Q.  Now, prior to the search did you already have

8  paths in the home to get around like books stacked up

9  and things of that nature?  Was the home quite

10  cluttered?

11    A.  Yeah, it was.  But not that cluttered.

12    Q.  No.  I understand.  What type of items were,

13  prior to the search, what type of items were on your

14  floor?  I know there was clothing.  I know there were

15  books.

16    A.  Tools.

17    Q.  And to you was it organized?  Do you

18  understand what I'm saying?

19    A.  I knew where everything was.

20    Q.  Okay.

21    A.  It was organized to me.

22    Q.  And you had paths throughout the rooms to

23  walk into other rooms; is that correct?

24    A.  Paths?

25    Q.  I don't mean to testify for you.  My

## Page 107

1  understanding is that like your books and tools were

2  put in certain areas but that there was distinctive

3  paths throughout the room so that people who entered

4  the home could walk into other places without, I guess,

5  disrupting the books or the tools or the paperwork.

6    A.  Tools and books and that nature were against

7  the wall.  I had no paths.

8    Q.  Okay.  It was probably a bad question.  I was

9  just curious.  Okay.  So after you get out, although --

10  you're aware there were charges against you; right?

11  Because you had a court date.  Is that accurate?

12    A.  Yes.

13    Q.  Okay.  Do you recall how soon after the

14  search your first court date was?

15    A.  February 19th.

16    Q.  So roughly a little over a month?

17    A.  Yes.

18    Q.  Did you retain an attorney to handle the

19  criminal aspects of this?

20    A.  No.

21    Q.  And do you recall what the February 19th

22  court date was for?

23    A.  For the charges they left on my kitchen

24  counter.

25    Q.  And were John and David also supposed to

## Page 108

1  appear on that day?

2    A.  Yes.

3    Q.  Did you?

4    A.  Yes.

5    Q.  And was that a Clark County just the District

6  Court, just the courthouse down --

7    A.  Yes.

8    Q.  And did you go?

9    A.  Yes.

10    Q.  What happened?

11    A.  They wouldn't let us in.

12    Q.  They wouldn't let you in where?

13    A.  In the courtroom.

14    Q.  Okay.  So you got through the metal

15  detectors, and you went to the courtroom in order to be

16  heard.

17    A.  Yes.

18    Q.  And someone physically stopped you from

19  entering the courtroom?

20    A.  Bailiff.

21    Q.  What did he say to you.

22    A.  I asked him if we were in the right

23  courtroom.  And he said go over there and check the

24  list.  We went and checked the list, and we were in the

25  right courtroom.  He said, You're the one with the star

27 (Pages 105 to 108)

Donald Hinton  1        November 5, 2003

## Page 109

1 or whatever it was behind your name? And I said, Yeah.
2 And he said, Well, go on home. And I said, Oh, no.
3 We're going to court. And he said, Well, not here
4 you're not.
5     Q.   Okay. So you went and checked this list.
6 There was a star behind your name?
7     A.   Yeah.
8     Q.   So it said Donald Hinton with a star?
9     A.   Donald Hinton, David Hinton, John Reyes with
10 a star or some marking behind it. He identified it.
11 And he says, If they want you, they're call you.
12     Q.   Okay. So he told you not to enter. You said
13 you were going to. What did he say to that?
14     A.   Well, he had a couple of friends backing him
15 up. So rather than making an issue out of it, I went
16 home.
17     Q.   Okay. So then you just left. Hear anything
18 after that?
19     A.   Nothing.
20     Q.   Okay. Were you ever told the charges against
21 you were dropped or anything of that nature?
22     A.   No.
23     Q.   Ever contacted by anyone from the police
24 department regarding this incident after that?
25     A.   Never.

## Page 110

1     Q.   Ever contacted by anyone from the district
2 attorney's office?
3     A.   No. But I contacted them.
4     Q.   Okay. And when did you contact them?
5     A.   Shortly before I went and spoke to Mr. Booke.
6     Q.   And do you recall when that would have been?
7     A.   Well, it would have been in December or so.
8     Q.   So December of 2002?
9     A.   Yeah.
10     Q.   And what did they tell you?
11     A.   Said they were going to destroy the guns, and
12 they were going to notify me. And I said, You haven't
13 done it yet? Never heard another word.
14     Q.   Did you tell them not to destroy the guns?
15     A.   Uh-huh.
16     Q.   Ever send anything in writing?
17     A.   No. Never asked for it.
18     Q.   Did you ever make any attempt to get the guns
19 back?
20     A.   No.
21     Q.   Did you ever go to either the police
22 department or district attorney's regarding the items
23 that you claim are missing?
24     A.   No.
25     Q.   Did you ever send them a list saying, you

## Page 111

1 know, where are my gold coins, that sort of thing?
2     A.   No.
3     Q.   Did you ever make an attempt to get the
4 reports from the search -- the --
5     A.   I did.
6     Q.   I'm sorry. I'll clarify it. You answered my
7 question, though. Did you ever go to the police
8 department in an attempt to get the paperwork regarding
9 the search?
10     A.   I did.
11     Q.   And when was that?
12     A.   I would imagine at the end of December or
13 somewhere around there.
14     Q.   So between February and December were you
15 just kind of like in a holding pattern waiting to see
16 if anything else was going to happen with this like as
17 far as the charges against you, the criminal charges?
18 Is there any reason why you didn't do anything between
19 February and December?
20     A.   I was waiting for charges to be brought.
21     Q.   So basically you were just in a holding
22 pattern then?
23     A.   I was.
24     Q.   And then in December I guess you realized
25 nothing was going to happen or didn't seem likely.

## Page 112

1     A.   It didn't seem likely.
2     Q.   Okay. So when you went to get the police
3 reports of the incident, what happened?
4     A.   Well, the girl searched and searched and
5 searched. No records of it.
6     Q.   Do you recall where you went?
7     A.   I went to Stewart and Las Vegas Boulevard at
8 the office there where you claim police reports.
9     Q.   Did you tell her that it had been a SWAT team
10 that had executed the warrant?
11     A.   Told her there was a house arrest with a
12 search warrant and gave her the date.
13     Q.   And she told you there were no records; is
14 that correct?
15     A.   As a matter of fact, she said none were ever
16 filed.
17     Q.   Did she tell you that the records may have
18 been filed at a different location?
19     A.   Did not say that.
20     Q.   They didn't direct you to any other place?
21     A.   Did not.
22     Q.   Was that the only attempt you made to get the
23 records?
24     A.   Yes, it was.
25     Q.   Let me just check real quick. Then I'll be

28 (Pages 109 to 112)

Donald Hinton   1        November 5, 2003

Page 113

1  done.  You never received any medical attention as a
2  result of your treatment by the officers, did you?
3       A.   No.
4       Q.   Are you claiming any personal injuries as a
5  result of this lawsuit?
6       A.   No.  Well, I don't know.  I don't know.
7       Q.   Okay.  You know what I mean when I say
8  personal injury?  Like any injury to your body.
9       A.   No.  I never made a complaint on that.
10      Q.   And you agree to provide me with an affidavit
11 that has already been prepared by Zelma Ranslem?
12      A.   Yes.
13      Q.   Okay.  What did your neighbors ever tell you,
14 the ones who witnessed you sitting out on the sidewalk?
15 When they talked to you, what did they say?
16      A.   Well, they hauled extensively out of the
17 home, items.
18      Q.   Sorry.  This is what the neighbors saw?
19      A.   Yes.
20      Q.   Okay.  Go ahead.  I'm sorry to interrupt.
21      A.   They said they loaded a lot of stuff up out
22 of that house, some of which I'm sure I haven't even
23 recognized as being gone yet.  The one man directly
24 across the street stayed up all night watching the
25 house because it was wide open.

Page 114

1       Q.   Who was that?
2       A.   Michael Hess.
3       Q.   Did any of them talk to you regarding the
4  treatment of the officers of you and the other
5  suspects?  I'm sorry.  You and --
6       A.   I never talked to them.
7       Q.   Okay.  To your knowledge did anyone enter the
8  house while you were in jail?
9       A.   Not according to the neighbors.  Nobody saw
10 anybody.  Cold have they?
11      Q.   Just to your knowledge no one has; correct?
12      A.   To my knowledge, no.
13      Q.   Your vehicles weren't searched, were they?
14      A.   No.
15      Q.   Are you aware that they found meth -- it said
16 in the police report that they found methamphetamine on
17 John Reyes at the jail?
18      A.   No.
19      Q.   Are you aware that the records indicate that
20 they found marijuana in your home during the search?
21      A.   There was -- yeah.  Do you know the quantity?
22      Q.   Actually I do.  I think it's a gram or
23 something.
24      A.   No.  It was a roach, which was given to him.
25 I'm sorry.

Page 115

1       Q.   What do you mean by given to him?
2       A.   I think they asked John if he had anything,
3  and he said yeah.
4       Q.   Were you aware that John smoked marijuana?
5       A.   No.
6            MR. ANDERSON:  I'm good.
7                CROSS-EXAMINATION
8  BY MR. BOOKE:
9       Q.   Two or three questions, sir, just so that the
10 list is not incomplete.  I don't know, but was there
11 any damage to the carpet anywhere in your home?
12      A.   You know, I don't remember.  I don't think
13 so.
14      Q.   Did it require getting shampooed or cleaned?
15      A.   No.
16      Q.   And just so the record is clear, I can't
17 remember exactly what question it was that was asked of
18 you, but you were detained at the Clark County jail.
19      A.   Yes.
20      Q.   You were not there willingly?
21      A.   I was not there willingly.
22      Q.   You were not transported there willingly?
23      A.   I was not.
24      Q.   And for approximately how long a period of
25 time were you detained at the jail?

Page 116

1       A.   I think about two days, at least a day and a
2  half.  Got arrested at 1:00 o'clock.  One day went by,
3  two days.  So in two days I got out at 1:00 o'clock.
4            MR. BOOKE:  Thank you.
5            THE WITNESS:  That's a.m.
6            MR. BOOKE:  Okay.  I have nothing further.
7            MR. ANDERSON:  Okay.  We're gone.  I
8  appreciate your time.
9            (Thereupon the taking of the
10           deposition was concluded at
11           11:11 a.m.)
12               *   *   *   *   *
13
14
15
16
17
18
19
20
21
22
23
24
25

29 (Pages 113 to 116)

Donald Hinton   1        November 5, 2003

```
                                              Page 117
1               CERTIFICATE OF DEPONENT
2   Page   Line   Change                    Reason
3   ____   ____   _____
4   ____   ____   _____
5   ____   ____   _____
6   ____   ____   _____
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12              *    *    *    *
13          I, Donald Hinton, deponent herein, do hereby
    certify and declare the within and foregoing
14  transcription to be my deposition in said action; that
    I have read, corrected, and do hereby affix my
15  signature to said deposition.
16
                    _____
17                      Donald Hinton
18
19  STATE OF NEVADA    )
                       SS:
20  COUNTY OF CLARK    )
21
22          Subscribed and sworn to before me this
    _____ day of _____, 2003.
23
24
                    _____
25                      Notary Public
```

```
                                              Page 118
1               CERTIFICATE OF REPORTER
2   STATE OF NEVADA  )
                     )  SS
3   COUNTY OF CLARK  )
4          I, Karen B. Nowak, CCR #476, Clark County,
5   State of Nevada, do hereby certify:
6          That I reported the taking of the deposition of
7   Donald Hinton, commencing on the 5th of November, 2003,
8   at the hour of 9:00 a.m., and that prior to being
9   examined the witness was by me duly sworn to testify to
10  the truth.
11         That I thereafter transcribed my said shorthand
12  notes, and that the typewritten transcript of said
13  deposition is a complete, true, and accurate
14  transcription of my shorthand notes.
15         I further certify that I am not a relative or
16  employee of the parties, attorneys, or counsel
17  involved in said action, nor a person financially
18  interested in the action.
19         IN WITNESS WHEREOF, I have hereunto set my hand
20  in my office in the County of Clark, State of Nevada,
21  this 18th day of November, 2003.
22
23
24
                    _____
25                  KAREN B. NOWAK, CCR #476
```

30 (Pages 117 to 118)

## CERTIFICATE OF REPORTER

STATE OF NEVADA  )
                   )   ss
COUNTY OF CLARK  )

     I, Karen B. Nowak, CCR #476, Clark County, State of Nevada, do hereby certify:

     That I reported the taking of the deposition of David Hinton, commencing on the 5th of November, 2003, at the hour of 12:52 p.m., and that prior to being examined the witness was by me duly sworn to testify to the truth.

     That I thereafter transcribed my said shorthand notes, and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of my shorthand notes.

     I further certify that I am not a relative or employee of the parties, attorneys, or counsel involved in said action, nor a person financially interested in the action.

     IN WITNESS WHEREOF, I have hereunto set my hand in my office in the County of Clark, State of Nevada, this 19th day of November, 2003.

*Karen B. Nowak*

KAREN B. NOWAK, CCR #476

# In The Matter of:

*Hinton v.*
*Clark County, Nevada*

---

## *DEPOSITION OF*:

## David Hinton
## Volume 1
*November 5, 2003*

---

*Associated Reporters of Nevada*
*Certified Court Reporters*
*2300 W. Sahara Avenue*
*Suite 770*
*Las Vegas, NV  89102*
*(702) 382-8778    FAX: (702) 382-2050*

**Word Index Included**

**Page 1**

1              UNITED STATES DISTRICT COURT
2                  DISTRICT OF NEVADA
3
4    DONALD HINTON, DAVID HINTON    )
     and JOHN REYES,                )
5                                   )
6                Plaintiffs,        )
                                    )
7         vs.                       ) CASE NO.
8                                   ) CV-S-03-0057-PMP-PAL
     CLARK COUNTY, NEVADA, a        )
9    political subdivision, acting  )
     by and through the LAS VEGAS   )
10   METROPOLITAN POLICE DEPARTMENT;)
     JOHN DOES 1-30 and ROE ENTITIES)
11   1-10,                          )
                                    )
12               Defendants.        )
     _____)
13
14
15
16           DEPOSITION OF DAVID HINTON
17        Taken on Wednesday, November 5, 2003
18               At 12:52 p.m.
19           At 10001 Park Run Drive
20              Las Vegas, Nevada
21
22
23
24
25   Reported by: Karen B. Nowak, CCR #476

**Page 2**

1    APPEARANCES:
2    For the Plaintiff:      BRADLEY L. BOOKE, ESQ.
                             7251 West Lake Mead Blvd.
3                            Suite 530
                             Las Vegas, Nevada 89128
4
5    For the Defendant:      CRAIG R. ANDERSON, ESQ.
                             Marquis & Aurbach
6                            10001 Park Run Drive
                             Las Vegas, Nevada 89145
7
8
9
10
11              I N D E X
12   Witness     Direct    Cross    Red.    Rec.
13   David Hinton
14   (By Mr. Anderson)      3
15
16
17
18
19           E X H I B I T S
20   Number       Description         Page
21   Exb. 3       Floor Plan of Home   20
22
23
24
25

**Page 3**

1    Thereupon--
2                    DAVID HINTON
3    was called as a witness by the Defendant and, having
4    been first duly sworn, testified as follows:
5                  DIRECT EXAMINATION
6    BY MR. ANDERSON:
7         Q.   Could I get you to state your name for the
8    record.
9         A.   David Richard Hinton.
10        Q.   And spell your last name.
11        A.   H-i-n-t-o-n.
12        Q.   David, I'm Craig Anderson.  I'm an attorney
13   who represents the Las Vegas Metropolitan Police
14   Department.  Are you aware that you filed a lawsuit
15   against the police department?
16        A.   Yes, I am.
17        Q.   And you're aware that you're a party to that
18   lawsuit?
19        A.   Yes, I am.
20        Q.   Okay.  Have you ever had your deposition
21   taken before?
22        A.   Yes, I have.
23        Q.   Okay.  What type of --
24        A.   I was involved in a personal injury lawsuit.
25        Q.   Were you actually suing?

**Page 4**

1         A.   Yes.
2         Q.   And what did that case involve?
3         A.   I was in a hunting accident in '93, and we
4    settled it out last year.
5         Q.   Who was your attorney?
6         A.   Bradley Kenny.
7         Q.   Since you've already had it done before, I'll
8    just explain to you briefly what's going to happen
9    here.  I'm going to ask questions.  You're going to
10   give answers.  I'm not here to trick you or confuse
11   you.  So if I ask a bad question, which I will at some
12   point, just ask me to rephrase it.  The only thing I
13   ask is that, when you answer my questions, answer them
14   verbally with a yes, with a no.  Don't shake your head.
15   Don't nod.  And that's for --
16        A.   I understand.
17        Q.   Okay.  And that's for her benefit.  What
18   she's doing is she's going to take down everything you
19   and I say.  When we're all done, she'll provide your
20   attorney with a copy of it.  You'll come in, read your
21   deposition, and make any changes.  If she did something
22   wrong or if you recall something differently, you'll be
23   able to make that change.
24        A.   Okay.
25        Q.   The other thing I ask, which is again for her

David Hinton   1      November 5, 2003

Page 5

1  benefit, a lot of times I'm going to be asking
2  questions that you're going to know where I'm going.
3  But let me finish asking the questions, and I'll let
4  you finish your answers so that she can get it all
5  down.
6      A.  Okay.
7      Q.  Are you on any medication or alcohol that
8  would prevent you from giving truthful testimony?
9      A.  No.
10     Q.  Have you had a chance to discuss with your
11 attorney what's going to happen here?
12     A.  Yes, I have.
13     Q.  Do you have any questions before we start?
14     A.  No, not really.
15     Q.  What's your current address?
16     A.  6117 Rosalita Avenue.
17     Q.  Is that here in Las Vegas?
18     A.  Yes, it is.
19     Q.  And is that a house?
20     A.  It is.
21     Q.  And are you owning? renting?
22     A.  I'm staying with my -- I rent a room from my
23 mom.
24     Q.  So that's your mother's address?
25     A.  Yes.

Page 6

1      Q.  What's your mother's first name?
2      A.  Debra.
3      Q.  And what's her last name?
4      A.  Emerson.
5      Q.  And how long have you been staying with your
6  mom?
7      A.  Oh, since '99.
8      Q.  And do you pay her monthly rent?
9      A.  Yeah.  I give her $200.
10     Q.  Anyone else stay at that house with you and
11 your mom?
12     A.  My stepdad and my little brother and sister.
13     Q.  What's your date of birth?
14     A.  1/13/80.
15     Q.  And your social security number?
16     A.  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.
17     Q.  Did you attend public schools here in
18 Las Vegas?
19     A.  Yes, I did.
20     Q.  Did you graduate from high school?
21     A.  Yes, I did.
22     Q.  What year?
23     A.  1998.
24     Q.  What high school did you go to?
25     A.  Okay.  It's a Horizon School.  I think it's

Page 7

1  Horizon North.
2      Q.  Did you attend any other high schools?
3      A.  I went to Valley High School before that.
4      Q.  What type of school is Horizon?
5      A.  It's a -- it's not an opportunity school, but
6  it's where you go when you don't like school.  And they
7  just try to get you in your classes, in and out, and
8  they help you graduate.
9      Q.  Did you choose to go there?
10     A.  No.
11     Q.  How did you end up at Horizon?
12     A.  I got kicked out.  I had a pocketknife in my
13 pocket.  And when I got caught with it at school, they
14 moved me there.
15     Q.  What grade were you in when you got sent to
16 Horizon?
17     A.  I would have went my 12th grade -- I did do
18 my 12th grade year there.  And I was expelled from
19 school my 11th grade, the last week of 11th grade.
20     Q.  So you got expelled from Valley the last week
21 of your 11th grade school year?
22     A.  Yes.  And then I went to Horizon my senior
23 year.
24     Q.  And you actually graduated?
25     A.  Yes, I did.

Page 8

1      Q.  Did you attend any college after?
2      A.  No, I didn't.
3      Q.  Did you go straight into the working --
4      A.  Yes, I did.
5      Q.  And after you graduated, where did you go to
6  work?
7      A.  Same place I was working in high school,
8  Teamsters Local 631.
9      Q.  And when did you begin employment with the
10 teamsters?
11     A.  August of 1996.
12     Q.  So you started working there when you were
13 16?
14     A.  Uh-huh.  Correct.
15     Q.  And are you currently employed?
16     A.  Yes, I am.  Same place.
17     Q.  So since 1996 you've worked for the same --
18     A.  Yes.
19     Q.  Ever been married?
20     A.  No.
21     Q.  Between 1996 and the current date, have you
22 held any other jobs?
23     A.  No.
24     Q.  Did --
25     A.  Oh, wait.  I did have a temporary service job

2 (Pages 5 to 8)

David Hinton   1          November 5, 2003

**Page 9**

1  for moving cars for Manheim's Auto Auction.  It was
2  through a temporary service staffing agency called TLC.
3       Q.   When did you have that job?
4       A.   It would have been in '98.
5       Q.   Did you do that in addition to your
6  teamsters --
7       A.   Yes.
8            -- union?
9            MR. BOOKE:  Let him finish his question
10  before you begin.  Maybe it's in the genes.
11  BY MR. ANDERSON:
12       Q.   Real quick I want to discuss your police
13  record history.  Okay?  Have you been arrested before?
14       A.   Yes, I have.
15       Q.   Let's go in chronological order beginning
16  with the first time you were arrested.  Okay?
17       A.   Okay.
18       Q.   Do you recall the first time you were
19  arrested?
20       A.   Yeah.  It was for possession of drug
21  paraphernalia.  I had a marijuana pipe on me.
22       Q.   Do you recall what year that was?
23       A.   '99.
24       Q.   And where were you arrested?
25       A.   I was at my mom's house.

**Page 10**

1       Q.   So the police came to your mom's house?
2       A.   Yeah.
3       Q.   Were they called there?
4       A.   A neighbor called them for some reason.  I
5  just happened to get caught up in something.
6       Q.   So were they called to the house for a
7  different reason?
8       A.   I don't know what they were called there for.
9  I just got harassed outside.  And they found my
10  marijuana pipe on me.  And I was taken to -- and then
11  they also found -- they searched my house for some
12  reason, and they found a .32 pistol.  And I got an
13  unregistration of a firearm ticket.
14       Q.   Was the .32 pistol yours?
15       A.   Yeah.  It was an old rusted antique thing
16  that I found in the desert years and years ago.  And I
17  just had it.
18       Q.   Did they have a search warrant on that day?
19       A.   No.
20       Q.   So they came.  And you were outside?
21       A.   Yes.
22       Q.   So they kind of shook you down?
23       A.   Yeah.
24       Q.   What was the result of those charges?  Did
25  you ever go to court?

**Page 11**

1       A.   Yeah.  I got a ticket.  And it was dropped as
2  far as I know.
3       Q.   So as far as you know, you never pled guilty
4  or never had a jury trial or anything?
5       A.   No.  It was dropped.  They just told me go
6  home.
7       Q.   No probation or anything?
8       A.   (No audible response.)
9       Q.   Did you hire an attorney?
10       A.   No.
11       Q.   And would that have been October of 1999?
12       A.   It could have been, yes.
13       Q.   And then when was the next time you were
14  arrested?
15       A.   Let me see.  It was a little while after
16  that.  I got another unregistration of a firearm
17  ticket.
18       Q.   I can cheat here because I actually have a
19  copy of your sheet.  So that's what I'm looking at.
20  Does February of 2000 sound correct?
21       A.   For?
22       Q.   Possession of an unregistered firearm.
23       A.   Yes.
24       Q.   I also have on that date that you were
25  arrested for possession of an unregistered firearm and

**Page 12**

1  possession of narcotics paraphernalia?
2       A.   It was another marijuana pipe.
3       Q.   Okay.  Where did that occur?
4       A.   Where did it occur?  It was here in Clark
5  County.
6       Q.   Do you recall the physical location where you
7  were arrested?
8       A.   No.  I got pulled over coming home from work
9  one day.  And there was a pipe in the car.  It was my
10  partner's.  I was giving a ride home to him.  And we
11  both got a ticket for it.  And the pistol was mine.  It
12  just wasn't registered.
13       Q.   What caliber gun was --
14       A.   Nine millimeter.
15       Q.   And did the police search your vehicle?  Or
16  did you voluntarily tell them?
17       A.   I told them I had it.
18       Q.   And what was the result of those tickets?
19  Anything?
20       A.   I think I had to take a class for the
21  paraphernalia thing.  They dropped the unregistration
22  charge because it was just unregistered.  It wasn't
23  stolen.
24       Q.   So you never did any jail time?
25       A.   No.

3 (Pages 9 to 12)

David Hinton   1        November 5, 2003

Page 13

1    Q.   Any probation?
2    A.   No.
3    Q.   Did you hire an attorney for that?
4    A.   No.
5    Q.   And then, according to my records, the next
6    time you were arrested was October 18th, 2000, for a
7    concealed weapon?
8    A.   Yeah.  In Henderson.
9    Q.   What happened with that?
10   A.   I got pulled over.  I had just bought a brand
11   new .357 Magnum.  I put it in my pocket.  I got pulled
12   over with it.
13   Q.   What were you pulled over for?
14   A.   My buddy's plates, something was wrong with
15   his truck.  So they pulled me over.
16   Q.   So it was a .357 that you had purchased?
17   A.   I just purchased it that day.  I was coming
18   back from the guy's house.
19   Q.   So they got you for carrying a concealed
20   weapon?
21   A.   Yes.
22   Q.   Whatever happened with that?
23   A.   I got a 90-day suspended sentence.
24   Q.   Did you ever go to court for that?
25   A.   Yeah.  And I pleaded guilty, and they gave me

Page 14

1    90-day suspended.
2    Q.   I take it you didn't plead guilty to a
3    felony; correct?
4    A.   No.  It was a misdemeanor they dropped it
5    down to.
6    Q.   Did you have an attorney?
7    A.   No, I did not.  I had a public defender.
8        MR. BOOKE:  Well, that's an attorney.
9        THE WITNESS:  Well, that's your opinion of an
10   attorney.  I talked to the guy.  He didn't really sound
11   like an attorney.
12   BY MR. ANDERSON:
13   Q.   Take the plea, huh?
14   A.   Yeah.
15       MR. BOOKE:  I started as a public defender,
16   although not out here.
17       THE WITNESS:  Okay.  Well, then they have
18   different rules here I guess.
19       MR. BOOKE:  This was in Wyoming.
20       THE WITNESS:  You have to fail the bar at
21   least three times before they can make you a public
22   defender; right?
23   BY MR. ANDERSON:
24   Q.   Okay.  Then I'll just tell you, according to
25   my records, the next time was January 9th of 2001 for

Page 15

1    battery and domestic violence.
2    A.   Yeah.
3    Q.   Okay.  What happened there?
4    A.   They dropped all those charges on me.
5    Q.   Okay.  Well, how did the charges come about?
6    A.   I went over to my friend's house.  And I was
7    dropping a few things off.  And someone at her house I
8    didn't like, we got into an altercation, and there was
9    some pushing.  And then I was charged.  He made me turn
10   myself in.
11   Q.   So pushing a female?
12   A.   No.  He's male.
13   Q.   And on that same date there's also a charge
14   for burglary.
15   A.   It was the same incident.
16   Q.   And all those charges were dropped?
17   A.   All of them.
18   Q.   Did you ever have to go to court?
19   A.   I had to go to court, and they dropped those
20   charges when I went to court.
21   Q.   Okay.  So no probation, no jail time?
22   A.   No.  Nothing.
23   Q.   And then the next time I have is November 4th
24   of 2001, which is false information to a police
25   officer.

Page 16

1    A.   Yeah.  I gave them the wrong ID number or
2    something like that, wrong name.  I had a warrant.
3    Q.   From the concealed weapon?
4    A.   Yes.
5    Q.   And how did that come about?
6    A.   I paid a ticket, $95, and showed them my ID.
7    Q.   What happened the day of the incident,
8    though?  Were you like on the street?  Were you --
9    A.   They were looking for that guy that was
10   robbing 7-Elevens.  He was a bald-headed white boy.
11   The guy pulled me over and said exactly what he was
12   looking.  There was someone robbing a lot of 7-Elevens
13   around here and he wanted to check my name and my ID.
14   Q.   And you gave him a false name?
15   A.   Because I had a warrant.  Then I ended up
16   coming clean.  He just wrote me a ticket for giving him
17   the wrong name.  It was $95.
18   Q.   Okay.  So you just paid that ticket off?
19   A.   Yep.
20   Q.   Any prior to the January 16th incident, which
21   we're going to talk about later?  That's the search
22   warrant date.  Okay?
23   A.   Okay.
24   Q.   Any other arrests prior to that date we
25   haven't talked about?

4 (Pages 13 to 16)

David Hinton    1         November 5, 2003

**Page 17**

1   A.   That should cover everything.
2   Q.   Okay.  Did you file any civil lawsuits as the
3   result of any of these arrests?
4   A.   Oh, no.
5   Q.   Okay.  Now, you have filed a civil lawsuit as
6   a result of a hunting accident?
7   A.   Yes.
8   Q.   And that's been resolved?
9   A.   Yes.
10   Q.   And that just involved personal injuries?
11   A.   Yes.
12   Q.   Any other lawsuits?
13   A.   No.
14   Q.   Have you ever done any jail time?
15   A.   Just traffic warrants, a day here and a day
16   there.
17   Q.   Have you received traffic tickets from the
18   Las Vegas Metropolitan Police Department?
19   A.   Yes.
20   Q.   How many?
21   A.   A lot.  Of speeding tickets?
22   Q.   Yeah.
23   A.   Yeah.  A couple.
24   Q.   Is it like over five?
25   A.   Yeah.  I'd say about five.  Not ten.  I hope

**Page 18**

1   not.
2   Q.   During these traffic stops and during the
3   arrests we've talked about, have you ever had any
4   complaints about how you were treated by the police
5   officers?
6   A.   Oh, no.
7   Q.   Now, on January 16th, 2002, which I'll
8   represent to you is the date of the search warrant that
9   we're talking about.  Does that date sound correct to
10   you?
11   A.   Yes.
12   Q.   Where were you living?
13   A.   With my father at the 1919 address.
14   Q.   Now, you testified earlier that you had been
15   living with your mother at the Rosalita address.
16   A.   I moved out for three months at that time
17   because I was having trouble with, you know, personal
18   things.  I moved out for three months and moved back
19   into my dad's house.
20   Q.   When you say your dad's house, do you have
21   any ownership interest in that home?
22   A.   I'm part owner with my dad.  I'm on the
23   lease.  My name is on the mortgage or whatever you want
24   to call it.  I'm not sure what it is.
25   Q.   And how long has your name been on the --

**Page 19**

1   A.   I'm not too sure about that.
2   Q.   How did that come about?  Did he offer to --
3   A.   My dad put me on.
4   MR. BOOKE:  Let him finish his question.
5   Okay?  Just take your time.
6   THE WITNESS:  Sorry.
7   BY MR. ANDERSON:
8   Q.   Did he just tell you one day he was going to
9   put you on the deed?
10   A.   Yes.
11   Q.   Have you ever seen the deed?
12   A.   No.
13   Q.   But it's your understanding you're part owner
14   of that house?
15   A.   Yes.
16   Q.   And I'm sorry.  Why had you moved out and in
17   with your dad?
18   A.   It was a personal problem between me and my
19   mother.
20   Q.   Okay.  When you moved in, how many months
21   prior to January 16th did you move in?
22   A.   I moved in October 11th.  So it would be
23   October, November, December.  Three.
24   Q.   So October 11th of 2001?
25   A.   Yeah.

**Page 20**

1   Q.   And --
2   A.   Yeah.  Or was it -- yeah, 2001.  Right.
3   Q.   And were you like renting a room or anything?
4   A.   I was renting the spare room.
5   Q.   Okay.  Were you paying your dad for it?
6   A.   Yes, I was.
7   Q.   How much were you paying a month?
8   A.   $200 a month.
9   Q.   Okay.  To live in your own house?
10   A.   Isn't it great.
11   Q.   What I'm going to show you here we're going
12   to mark this as Exhibit 3.
13   (Thereupon Exhibit 3 was
14   marked for identification.)
15   BY MR. ANDERSON:
16   Q.   This is like a scale model.  But is this an
17   accurate representation of your dad's home?
18   A.   Pretty close.
19   Q.   Okay.  On January 16th, 2002, what room was
20   yours?
21   A.   I was in this bedroom right here.
22   Q.   Okay.  And if I refer to you in this
23   deposition, I'll refer to you as David.  Not to be
24   rude, but because your dad is also involved.
25   A.   I understand.

5 (Pages 17 to 20)

David Hinton   1        November 5, 2003

## Page 21

1    Q.    So your room was the one right below the
2  kitchen. Was there anyone else staying there besides
3  your dad and you?
4    A.    John Reyes.
5    Q.    Who is John Reyes?
6    A.    A roommate that rented my dad's room.
7    Q.    Was he also paying rent?
8    A.    Yeah.
9    Q.    And do you know what his rent was?
10   A.    No idea.
11   Q.    Were you given any part of that because
12  you're part owner of the house?
13   A.    No.
14   Q.    You've got to talk to your dad. You're suing
15  the wrong people.
16   A.    I wouldn't go so far as to say that.
17   Q.    I'm just kidding you. Was John Reyes a
18  friend of yours?
19   A.    He was a friend of my brother's. I've known
20  him for a while, but not a friend of mine, no.
21   Q.    So an acquaintance?
22   A.    An acquaintance, yeah.
23   Q.    Do you know how long John had been living
24  there?
25   A.    Not exactly, no.

## Page 22

1    Q.    Before you went in?
2    A.    Yeah.
3    Q.    And when John lived there, would you two hang
4  out and do things together socially?
5    A.    I would see him on the street every once in a
6  while, and that would be about it.
7    Q.    Okay.
8    A.    He might come to my house and say hello or
9  something. But he didn't stay long.
10   Q.    So basically you were just roommates?
11   A.    Pretty much, yes.
12   Q.    Now, when you were living at your father's
13  house at 1919 Hallwood, did you ever sell drugs from
14  that home?
15   A.    No, I didn't.
16   Q.    I don't mean to be redundant. But did you
17  ever sell marijuana?
18   A.    No, I didn't.
19   Q.    Ever sell cocaine?
20   A.    No, I didn't.
21   Q.    Every sell methamphetamine?
22   A.    No, I didn't.
23   Q.    Did you ever sell firearms?
24   A.    No, I didn't.
25   Q.    Prior to moving in with your dad, had you

## Page 23

1  ever sold drugs?
2    A.    No, I haven't.
3    Q.    Never sold metamphetamine?
4    A.    No, I haven't.
5    Q.    Never sold cocaine?
6    A.    No, I haven't.
7    Q.    Never sold --
8    A.    Marijuana?
9    Q.    -- marijuana?
10   A.    No, I haven't.
11   Q.    Had you ever sold firearms?
12   A.    No, I haven't.
13   Q.    while you were staying with your dad that
14  three months, would you have friends come and visit
15  you?
16   A.    Very few. And if they did, they weren't
17  allowed in the house.
18   Q.    Okay. where were they allowed?
19   A.    To talk to me at the gate. And if I wanted
20  to leave, I could.
21   Q.    Any reason why they weren't allowed in the
22  house?
23   A.    My dad doesn't like people coming in and
24  picking things up like little things, whatever would go
25  missing.

## Page 24

1    Q.    Was your dad home all the time to enforce
2  those rules?
3    A.    I can't vouch for what he was doing when I
4  was at work, but he was home most of the time when I
5  was there, yes.
6    Q.    Okay. It was not uncommon for him to be at
7  home.
8    A.    No, not at all.
9    Q.    And so you could meet with your friends at
10  the gate.
11   A.    Unless I had been friends with them, and
12  every few people might be able to come in. But, yeah,
13  I would mostly meet people at the gate. And they were
14  never allowed in my back room.
15   Q.    Are you aware as to whether your dad's and
16  your house has ever been burglarized?
17   A.    I'm sure it's been burglarized a few times,
18  yeah.
19   Q.    Okay. Do you know the last time it was
20  burglarized?
21   A.    I have no idea.
22   Q.    Was it burglarized while you were staying
23  there?
24   A.    No.
25   Q.    So when your friends or visitors would come,

6 (Pages 21 to 24)

David Hinton   1        November 5, 2005

Page 25

1  would you stay in this area here?
2      A.   I would just stay out -- I have a front gate
3  right here, and there's my front yard.  If I'd want to
4  come out and speak to them, I could speak with them.
5  That was pretty much it.
6      Q.   Okay.  So there's a gate here.  Then this is
7  your front yard?
8      A.   Yeah.  I have a driveway, grass yard, front
9  gate, second gate, door.
10     Q.   Okay.  To your knowledge did John Reyes ever
11 sell methamphetamine from the house?
12     A.   No.
13     Q.   Are you aware of anyone ever selling any type
14 of illegal narcotic from this home?
15     A.   None whatsoever.
16     Q.   Aware of anyone ever selling firearms?
17     A.   No.
18     Q.   Were you ever involved in any robberies
19 involving Walgreen stores?
20     A.   No.
21     Q.   Did you ever rob an individual at an ATM
22 where part of what was taken was a ripped $20 bill?
23     A.   No.
24     Q.   Now, I want to take you to the actual day of
25 the search warrant.  Okay?

Page 26

1      A.   Okay.
2      Q.   When did you first learn that someone was
3  outside your home?
4      A.   When I heard a whole bunch of loud banging
5  sounds and people coming in through my door --
6      Q.   Okay.  So --
7      A.   -- my gate.
8      Q.   Okay.  When you say loud banging noises,
9  where were you hearing those noises?
10     A.   Outside of my front yard I heard a couple
11 loud explosions, and I heard a couple pops, and I heard
12 a whole bunch of commotion out in the front.
13     Q.   And where were you at that time?
14     A.   I was in my bedroom.
15     Q.   Were you alone?
16     A.   I was with a girl.
17     Q.   What was the girl's name?
18     A.   I don't remember.  It's been a long time.
19     Q.   So you have not kept in contact with that
20 girl?
21     A.   No.
22     Q.   Do you know where she stays?
23     A.   No.
24     Q.   Was she a friend?
25     A.   She was a friend.  Someone I was trying to

Page 27

1  get to know a little better.  But she didn't come
2  around too much after that.  Actually that was the last
3  time I saw her.
4      Q.   Okay.  But she was with you in the bedroom?
5      A.   Yes, she was.
6      Q.   And about what time was it?
7      A.   Sometime after 11:00, maybe before -- I'm not
8  too sure of the time.
9      Q.   Okay.  But at 11:00 o'clock at night?
10     A.   Yeah, it was at night.
11     Q.   So between 11:00 p.m. and midnight?
12     A.   Yeah.
13     Q.   And what were the two of you doing?
14     A.   Fooling around.
15     Q.   Okay.  And so you're in your bedroom, and you
16 hear noises.
17     A.   I heard a lot of loud banging and popping
18 sounds and a lot of commotion and then yelling.
19     Q.   And from what side of the house was it coming
20 from?
21     A.   It's coming from this front hallway.
22     Q.   So from the front.  Okay.  Did you hear any
23 like explosion type devices?
24     A.   Oh, yeah.  I heard -- those were the two loud
25 bangs I heard, then the popping sounds.

Page 28

1      Q.   Okay.  So they made this bang and the popping
2  noises.
3      A.   Yeah.
4      Q.   And did they come through the front or side
5  or back or where else?
6      A.   Just the front on that, you know, on this
7  area over here around the front.
8      Q.   Does your bedroom have any windows?
9      A.   Yeah.  It has a window right here where this
10 is.
11     Q.   Okay.  So you don't have any windows to the
12 front yard; correct?
13     A.   No, not at all.
14     Q.   So you couldn't see what was going on out
15 there?
16     A.   No.
17     Q.   Did you see anything through this side window
18 in the --
19     A.   I had a curtain in front of my window.  So I
20 just heard yelling.  That's why I went out to the
21 hallway.
22     Q.   When you say "yelling," were you able to make
23 out what was being yelled?
24     A.   Get down.
25     Q.   Did you hear anyone yell police search

7 (Pages 25 to 28)

David Hinton   1        November 5, 2003        —

Page 29

1  warrant?
2      A.   No.
3      Q.   Okay.  So you hear the yelling.  You're in
4  your bedroom fooling around.  What do you do?
5      A.   I got dressed and ran out to the hallway to
6  see what was going on.
7      Q.   Okay.  How long did it take you to get
8  dressed?
9      A.   Not long.
10     Q.   Was your girlfriend with you?
11     A.   Well, the girl I was -- yeah, she was with
12  me.
13     Q.   I'm sorry.  So she got dressed, too, and
14  followed you?
15     A.   Well, she came out later.  She was still
16  getting dressed.
17     Q.   Okay.  So you walk out into the hallway.  And
18  what do you see?
19     A.   A whole bunch of lights.  People yelling at
20  my dad to get down.  They told me to come down the
21  hallway and to go outside.
22     Q.   Okay.  Where was your dad located?
23     A.   He was in front of the wooden door right
24  here, which is actually more of a hallway.  There's
25  more of a hallway down here like this.  Let me see your

Page 30

1  pen.  It goes way in here.  And here's my gate, my
2  first and second gate, and then this would be my front
3  door.  And this hallway goes back more.
4      Q.   Okay.  So it's a longer hallway.
5      A.   So he was in the front of the hallway as I
6  was coming around the back of the hallway.
7      Q.   Okay.  So did you walk out of your door here
8  by the laundry room and then come around into the
9  hallway?
10     A.   Yeah.
11     Q.   Okay.  What were you wearing?
12     A.   Blue jeans and a gray shirt.
13     Q.   Did you have your shoes on?
14     A.   Yes, I did.
15     Q.   And you see your dad.  He's still at the
16  door.
17     A.   He's at the front door.  And I saw a whole
18  bunch of like flashlights in front of him.  And they
19  were telling him to move outside.  And they told me to
20  come down the hallway and move outside, and who else
21  was in the house.
22     Q.   Okay.  Did you see them place their hands on
23  your dad?
24     A.   They kind of shuffled him out in front of --
25  yeah.  They grabbed him by the shoulder, and they

Page 31

1  pulled him out, pushed him out.
2      Q.   Did he fall to the ground or anything?
3      A.   He kind of stumbled a little bit.  And I told
4  the guy that they need to be careful because he's got
5  bad feet.  He told me to shut up and keep on moving.
6      Q.   Were there any officers, what we now know to
7  be officers, in the home at that time?
8      A.   They were coming in as I was going out.
9      Q.   Okay.  But they were all, when you first saw
10  them, they were all still at the door pretty much?
11     A.   Pretty much.
12     Q.   So they call you down the hallway.  Did you
13  go?
14     A.   Yes.
15     Q.   And what did they do?
16     A.   They shuffled me outside just like my dad and
17  asked me who was in the house.  Took me in my
18  neighbor's yard and searched me and dropped me to my
19  knees.
20     Q.   Okay.  Did they physically pull you outside?
21     A.   They grabbed me by my shoulder, pulled me,
22  and threw me to another cop that grabbed me by both
23  shoulders, threw me against the car in my neighbor's
24  yard, patted me down, kicked both my knees out from
25  underneath me, threw me to my knees, and made me sit

Page 32

1  Indian style.
2      Q.   Okay.  I'll get to that.  But I'm just
3  talking about right now as far as getting you outside.
4  You get to the door.  And they pull you out?
5      A.   Yeah.  He pulled me out by my shoulder
6  through the threshold.
7      Q.   Okay.  Do you know whether John was out of
8  the house by then or not?
9      A.   I don't know.
10     Q.   You don't remember?
11     A.   There was a lot of commotion.  I was just
12  really paying attention to myself.
13     Q.   I understand.  And just so you know.  It's
14  perfectly fine to say I don't know or I don't remember.
15     A.   I don't remember.
16     Q.   So they pull you outside.  What happened to
17  the girl?
18     A.   At that time I really wasn't concerned.  I
19  don't really remember.  I know she was eventually
20  standing next to me outside.
21     Q.   But you exited the house before she did?
22     A.   Yes.
23     Q.   Okay.  So whatever happened to her, you don't
24  know.  Okay.  So they take you out onto the walkway,
25  and they walk you down to the neighbor's house?

8 (Pages 29 to 32)

David Hinton   1        November 5, 2003

## Page 33

1   A.   The neighbor's driveway.
2   Q.   Okay.  And how many officers were escorting
3   you?
4   A.   Two.
5   Q.   Were you handcuffed at that time?
6   A.   No.  I was handcuffed once I got thrown
7   against the car.
8   Q.   So they walk you to the neighbor's house, and
9   they put you against the car and search you?
10   A.   He threw me against the car and searched me,
11   put my hands behind my back, put me in handcuffs, and
12   kicked my knee out from under me and dropped me to the
13   ground.  And then he said face forward Indian style.
14   Q.   Okay.  And as a result of that kick or any of
15   the handling, did you have any bruises or any objective
16   signs that you had been manhandled?
17   A.   Just little red spots on my skin I noticed
18   when I got to County, but no bruises.
19   Q.   Did you say anything to the officers about
20   the force they used?
21   A.   No.  I was pretty much just concerned of what
22   was going on at the time.
23   Q.   How long would you estimate it took them to
24   get you from the front door to where you were sitting
25   Indian style?

## Page 34

1   A.   I couldn't remember.  It wasn't long.
2   Q.   It was all pretty quick?
3   A.   Pretty quick, yeah.
4   Q.   So then you're sitting Indian style in your
5   neighbor's driveway?
6   A.   (Witness nods.)
7   Q.   Who was there initially when they first put
8   you down?
9   A.   Me and some SWAT officer.  Then they walked
10   up.  My dad came next, and then John Reyes came next.
11   And they all sat us in a line in front of each other.
12   Q.   Did the girl eventually join you?
13   A.   She did.
14   Q.   Now, I'm sorry.  I need to go back to when
15   you were inside the room before you were even taken
16   out.  Did you hear anyone knock on the door?
17   A.   No.  Like I said before, I heard some loud
18   bangs, a couple popping noises, and some commotion.
19   Q.   Okay.  Your room, is it situated so, if
20   someone had knocked on the door, you would hear it?
21   A.   Well, you would have to ring the doorbell
22   from the gate that he was at.  And there's either a
23   physical bell that you can hit and ring or a doorbell.
24   Q.   Okay.
25   A.   And I didn't hear either one of those.

## Page 35

1   Q.   Okay.  You didn't hear any knocking or --
2   A.   I didn't hear a thing.
3   Q.   Okay.  No doorbells?
4   A.   No doorbells.
5   Q.   You were in the room with the girl.  Was
6   there any music on, a TV, or anything?
7   A.   I wouldn't have anything on, probably not
8   even the lights at that point in time.
9   Q.   So there was nothing that would block the
10   sound of someone knocking?
11   A.   No.
12   Q.   Do you know whether your dad had the TV on in
13   what would be in this family room?
14   A.   I have no idea.
15   Q.   So now we're back outside.  So you're all
16   sitting down; correct?
17   A.   Yes.
18   Q.   And your dad was standing?
19   A.   For a while he was standing.
20   Q.   Did he eventually sit?
21   A.   When they brought him inside, I guess they
22   sat him down.  But the whole time we were outside, he
23   stood.
24   Q.   And he was standing by choice; correct?  I
25   mean, did you hear him ask to sit, and they wouldn't

## Page 36

1   let him?
2   A.   Like I said, I don't remember.  I wasn't
3   paying attention to anyone else but myself at that
4   point in time.
5   Q.   Okay.  While you were outside with your dad,
6   John, and the girl, did any of the SWAT officers talk
7   to you or interrogate you?
8   A.   Yeah.  One asked me where the booby traps
9   were.  And that was the only thing they said to me.
10   Q.   When did they ask that?  Before or after you
11   were handcuffed?
12   A.   It was when I was handcuffed sitting on the
13   ground.
14   Q.   Were there any booby traps?
15   A.   No.
16   Q.   How did you respond?
17   A.   I told him this wasn't Vietnam.
18   Q.   Did he have any response to that?
19   A.   None whatsoever.  I couldn't even get him to
20   crack a smile.
21   Q.   Were you able to talk to John, your dad, or
22   the girl?
23   A.   No.  We weren't allowed to say anything.
24   Q.   No one was saying anything?
25   A.   (No audible response.)

9 (Pages 33 to 36)

David Hinton   1      November 5, 2003

Page 37

1    Q.   Was the girl crying?
2    A.   She was upset. I don't know if she was
3  tearing up crying, but she was a little upset.
4    Q.   How long were you sitting outside?
5    A.   The exact time I don't know. But if I had to
6  take a guess, I would say 45 minutes to an hour.
7    Q.   And during that 45 minutes to an hour, the
8  only conversation you had with any of the officers was
9  the conversation regarding the booby traps?
10   A.   Yes.
11   Q.   So no one came and separated you away or
12 anything?
13   A.   A detective come by and said something, but
14 he didn't say anything to me personally.
15   Q.   How many officers were watching the four of
16 you?
17   A.   I couldn't even tell you.
18   Q.   Were they talking amongst themselves?
19   A.   I couldn't remember that either. I was not
20 concerned about any of that stuff.
21   Q.   What was the temperature outside?
22   A.   Cold.
23   Q.   You were wearing a T-shirt, jeans, and shoes?
24   A.   Yes.
25   Q.   Did you ever ask for a coat?

Page 38

1    A.   I did when I went to leave. But they said,
2  when you get in the house, you'll be warm.
3    Q.   What do you mean when you went to --
4    A.   Well, when I went outside, I asked if I could
5  get a coat after sitting out there so long. And they
6  said, when you go inside, you'll be cold -- I mean,
7  you'll be warm.
8    Q.   Okay.
9    A.   And before I went to jail, I asked for a
10 jacket.
11   Q.   So while you were outside for this 45 minutes
12 to an hour, you never asked for a coat?
13   A.   No. Well, I asked if I could go get
14 something to put on because it was cold out there. And
15 the guy told me that it would be warm when we go
16 inside.
17   Q.   Okay. So you were sitting out there, and you
18 asked for a coat, and they basically told you to wait
19 until you got inside?
20   A.   Yes.
21   Q.   To your knowledge did your dad or John or the
22 girl ever ask for a coat?
23   A.   I don't know. I don't know what they asked.
24   Q.   Do you know if the officers ever brought
25 anyone a coat?

Page 39

1    A.   No, they didn't bring anyone anything.
2    Q.   Never brought your dad a coat?
3    A.   No.
4    Q.   Never brought the girl a coat?
5    A.   No.
6    Q.   Did any of the officers ask you if you needed
7  medical attention?
8    A.   Yeah. When I first was outside, they asked
9  me if I needed an ambulance.
10   Q.   What did you say?
11   A.   No.
12   Q.   Do you know if they asked everybody that
13 question?
14   A.   I don't know if they asked anyone else.
15   Q.   At that point in the night, in your opinion
16 were any of the officers -- had any of the officers
17 been physically abusive to you up to that point?
18   A.   Explain physically abusive? Like
19 excessively?
20   Q.   Yeah.
21   A.   Well, they manhandled me a little bit. But I
22 don't know. I can't tell you if they were excessive or
23 not because I don't know what force they're allowed to
24 use.
25   Q.   Okay. Were you in any pain?

Page 40

1    A.   My handcuffs were tight, and they were
2  uncomfortable. Pretty much after all that, no, I
3  wasn't in any pain.
4    Q.   Were you having any knee pain or leg pain
5  from them separating your legs, kicking them out, that
6  sort of thing?
7    A.   No. They were uncomfortable when I hit the
8  ground. But that's pretty much it.
9    Q.   How about verbally? Anyone verbally abusive
10 to you to that point?
11   A.   A couple of people told me to shut up when I
12 wasn't even talking. But that's pretty much it.
13   Q.   Just tough-guy stuff?
14   A.   Yeah. You know, stuff like that I guess you
15 could say.
16   Q.   Before you went back in the house, were you
17 ever Mirandized, read your Miranda rights?
18   A.   No.
19   Q.   You know what the Miranda rights are?
20   A.   Sure.
21        (Telephone interruption.)
22        (Off the record.)
23        MR. ANDERSON: Back on.
24 BY MR. ANDERSON:
25   Q.   So you were not Mirandized?

10 (Pages 37 to 40)

## Page 41

1      A.   No, I wasn't.

2      Q.   In your opinion had you been arrested at that

3   time?

4      A.   I was cuffed up.

5      Q.   Had anybody told you that you were being

6   arrested?

7      A.   Not at that time, no.

8      Q.   While you were outside, did any of the

9   officers ask you whether there were any firearms in the

10   house?

11      A.   No.  The only question I got was towards the

12   end of when I was sitting there when they wanted to

13   open the closet door.  They wanted to know what key it

14   was.

15      Q.   Okay.  And did you show them?

16      A.   Yes, I did.

17      Q.   Did they say anything when you showed them

18   the key?

19      A.   They said thanks, but we just got it open.

20      Q.   What was in that closet?

21      A.   A couple fishing poles, a few jackets, and

22   tools and stuff.

23      Q.   Okay.  So no one ever asked whether you had

24   any firearms in the home while you were outside?

25      A.   No.

## Page 42

1      Q.   Were there any firearms located in your

2   bedroom?

3      A.   Yes.

4      Q.   What firearms were those?

5      A.   Oh, I had a couple rifles and couple

6   handguns.  I'm not too sure which ones they were,

7   though.

8      Q.   According to the reports I have from the

9   police officers, you told them where to find them.  The

10   rifles were in a safe under your bed?

11      A.   No.  I have a gun safe in my closet.  And

12   they asked, when they were searching my house and room,

13   they asked me what was in it.  I told them it was my

14   rifles and guns and ammo.

15      Q.   And when did you tell them that?  After you

16   were inside the house or while you were still outside?

17      A.   While we were inside.

18      Q.   Okay.  Did you tell any of the officers about

19   any drugs that were in the house?

20      A.   They asked me if I had any.  And I said, if I

21   did, it would be in a coat pocket in my room.

22      Q.   And was that marijuana?

23      A.   Yeah.  And I didn't have not a single nothing

24   on me.

25      Q.   Okay.  Was there marijuana in your coat,

## Page 43

1   though?

2      A.   No.  I said if there was anything that I

3   would have, it would be in my coat pocket.  And when

4   they pulled out my coat, there was nothing in there.

5      Q.   Do you use marijuana regularly?

6      A.   Not anymore.

7      Q.   When did you quit?

8      A.   The day after I got out of jail to be honest

9   with you.

10      Q.   Okay.  Prior to January 16th, 2002, this

11   date, did you use methamphetamine?

12      A.   No.

13      Q.   And cocaine?

14      A.   No.

15      Q.   So it's your understanding that there were no

16   drugs found in your room.

17      A.   None at all.

18      Q.   Do you know whether they asked John if he had

19   any drugs?

20      A.   They might have asked him.  I don't know.

21      Q.   Not to your knowledge?

22      A.   Not to my knowledge.

23      Q.   Okay.  So after the 45 to 60 minutes outside,

24   did they eventually move you back into the house?

25      A.   Uh-huh.

## Page 44

1      Q.   Did they tell you why they were taking you

2   in?

3      A.   No.

4      Q.   What did they do?

5      A.   They just came in and grouped us all up, told

6   us not to talk to each other, and kind of left us there

7   with two guys sitting next to us.

8      Q.   When you were outside and they were moving

9   you, did they pick you up off the ground physically?

10      A.   Well, one guy grabbed my arm and helped me

11   stand up 'cause I couldn't stand myself up.

12      Q.   And then they walked you in?

13      A.   Yes.

14      Q.   And where did they place you once you got in

15   the house?

16      A.   In the living room.

17      Q.   How many couches are in the living room?

18      A.   I think there's two.

19      Q.   Okay.  And did they sit you all on the same

20   couch?

21      A.   After a while.  We kind of just stood there

22   for a minute.  And then they sat us down one by one.

23   And they took me into the bathroom and questioned me

24   before I sat down.

25      Q.   Okay.  Let's go back to when you were coming

11 (Pages 41 to 44)

David Hinton    1         November 5, 2003

**Page 45**

1  into the house.  So you were coming into the house
2  after you had been sitting at the neighbor's.  Now,
3  when you were at the neighbor's, could you see anything
4  that was going on inside your house?
5      A.   No.  I had to look forward to across the
6  street.
7      Q.   Okay.  So you didn't see any activity?
8      A.   No.
9      Q.   When you came in the house, what did you see?
10     A.   Complete pandemonium.  They just destroyed my
11 dad's house.
12     Q.   Your house, too, though; right?
13     A.   Yeah.  Well, I consider it -- I refer to it
14 as my dad's.
15     Q.   Okay.  So when you walked into this front
16 door -- we'll just walk through this -- did you see any
17 damage the minute you walked in?
18     A.   Yeah.  There was a gigantic hole in my
19 ceiling.
20     Q.   And that was directly above the entryway?
21     A.   Directly above the entryway.
22     Q.   How big was that hole?
23     A.   Oh, I'd say two or three feet wide and about
24 four and a half feet long.  It was a good size, four
25 feet by two.

**Page 46**

1      Q.   Could you look up into the --
2      A.   You could see the skylight and everything.
3  You could see the top of the roof.
4      Q.   Anybody tell you how that hole happened?
5      A.   Eventually I found out that a SWAT officer
6  fell through the roof.
7      Q.   Okay.  That's what someone told you?
8      A.   Yes.
9      Q.   Did anyone tell you that that night?
10     A.   It was when I got to jail.  They said I had
11 to pay for it.
12     Q.   So at the time you were entering the house,
13 you do not know how the hole happened, though.
14     A.   No.
15     Q.   Could you see any other physical damage?  I'm
16 not talking about like your dad's paper being scattered
17 or messed.  I mean damage to the structure of the
18 house.
19     A.   That's all I saw then.  I didn't see the rest
20 of the house till I got up.
21     Q.   Okay.  And so then they seat you down in the
22 living room.  What was going on in the living room?
23     A.   Police walking in and out, talking amongst
24 themselves.  And they just told us to be quiet and sit
25 there.

**Page 47**

1      Q.   Okay.  Did you see any of the searching going
2  on?
3      A.   No.  You can't see much from the living room.
4  You can just see them walking in and out, making
5  comments to each other.
6      Q.   So no one was searching that room?
7      A.   It looked like it had already been searched
8  pretty well.
9      Q.   Okay.  And when you say that, what do you
10 mean?
11     A.   I mean everything that was stacked nice and
12 neatly, everything that was in drawers was on the
13 floor, you know, on the floor just thrown around,
14 clothes scattered, boxes of paperwork that my dad had
15 tipped over and dumped out.
16     Q.   And did there ever come a time when a police
17 canine was brought into the room?
18     A.   There was dogs there.  But I don't know when
19 they brought them in or when they got there.
20     Q.   Okay.  Was there a police dog ever in the
21 living room when you were in there?
22     A.   While I was in there?
23     Q.   Yeah.
24     A.   I don't remember if there was or not.
25     Q.   Do you recall ever seeing a police dog being

**Page 48**

1  placed on a table with your dad's papers?
2      A.   It's been a while.  I don't remember any of
3  that.
4      Q.   Okay.  So you're in there.  And then you said
5  that someone took you away to interview you?
6      A.   (Witness nods.)
7      Q.   Were you the first person they took to
8  interview?
9      A.   Yes, I was.
10     Q.   Where did they take you?
11     A.   To the bathroom.
12     Q.   Which bathroom?
13     A.   The one right down here at the end of this
14 hall.
15     Q.   How many officers took you to the bathroom?
16     A.   One, one detective.
17     Q.   I'm sorry.  I've got to back up again.  When
18 you were first taken outside when the raid started,
19 what were the officers wearing?
20     A.   Black gear.  That's all I really remember.
21 They were all dressed in black, all black from head to
22 toe.
23     Q.   Did they have helmets on?
24     A.   I'm sure they would have, all black, head to
25 toe, masks, everything.

12 (Pages 45 to 48)

David Hinton   1        November 5, 2003

Page 49

1    Q.   Okay.  So masks.  Did you see anything on any
2   of the officers that indicated that they were police
3   department?
4        A.   I don't remember.
5        Q.   Do you remember seeing any shields on their
6   vests or anything?
7        A.   I don't remember.  I just remember that they
8   were dressed in all black.
9        Q.   Do you remember the first time you found out
10  it was Las Vegas Metropolitan Police Department
11  officers?
12       A.   No, I don't.
13       Q.   Okay.  Sorry for that digression.  Now we're
14  back to the bathroom.  The officer that took you to the
15  bathroom, he was still wearing black from head to toe?
16       A.   This was a detective.  His was plain clothed
17  and had a vest that had his badge hanging.
18       Q.   Do you recall what he looked like?
19       A.   He was a white guy.
20       Q.   So a Caucasian guy?
21       A.   Yeah.
22       Q.   Do you know how big?
23       A.   No, I don't remember.
24       Q.   What did he ask you?
25       A.   Where the meth was at.

Page 50

1        Q.   Tell him?
2        A.   I said, Down the street, wherever the hell
3   you can find it.  It's not here.
4        Q.   This neighborhood that your dad lives in, are
5   there drug dealers in that neighborhood that you know
6   of?
7        A.   I have no idea.
8        Q.   Okay.
9        A.   It's an old-person neighborhood.  You know,
10  all old people live on that street.  So I wouldn't
11  imagine so.
12       Q.   Okay.  So he asked you where the drugs were
13  located, and you told him you weren't aware of any.
14  Did he ask you anything else?
15       A.   That was it.
16       Q.   How long would you say that interview lasted?
17       A.   Probably two minutes, maybe three minutes.
18       Q.   Did you ever tell him you weren't going to
19  talk to him, that you were going to invoke your fifth
20  amendment rights?
21       A.   Well, I asked for my lawyer to be present.
22       Q.   What did he say to that?
23       A.   He said there will be plenty of time for that
24  later.
25       Q.   Okay.  So then he walked you back down to the

Page 51

1   couch?
2        A.   Yes.
3        Q.   To your knowledge were the other
4   individuals -- your dad, the girl, and Mr. Reyes --
5   interviewed?
6        A.   They were taken out of the room.  I don't
7   know if they were interviewed or not.  I just know that
8   they left the room.
9        Q.   Okay.  How long were you guys inside the
10  house after they returned you?
11       A.   Thirty minutes or so.
12       Q.   Did you talk to any other officers besides
13  the one who interviewed you in the bathroom?
14       A.   No.
15       Q.   And I think you already testified you weren't
16  allowed to speak to the other people.  So you just sat
17  there in silence?
18       A.   Yes.
19       Q.   Did you hear any conversations between
20  officers while you were sitting there?
21       A.   The only thing I really paid attention to
22  them was they were hooting and hollering, going
23  woo-hoo, woo-hoo.  About what, I don't know.  But I
24  just heard it in the background.
25       Q.   Okay.  Your dad has testified about I think a

Page 52

1   crime-scene guy who came who was in charge of finding
2   the drugs.  Do you recall that?
3        A.   I remember some guy coming in with a little
4   kit that swabbed something on the wall.  And when he
5   got done swabbing something on the wall, he walked over
6   to the lead detective, and they had a little heated
7   argument towards each other.  What was said, I don't
8   know.
9        Q.   Okay.  When you say "lead detective," male or
10  female?
11       A.   I don't even know if it's the lead detective
12  or not.  I just know he walked over to a detective.
13  They had a little bit of a conversation.  They both got
14  loud with each other.
15       Q.   Do you know whether it was actually a
16  detective or just an officer?
17       A.   He was a plainclothes officer.  So I would
18  just assume he was a detective.
19       Q.   And could you hear any of this heated
20  conversation?
21       A.   No.  It was just between the two of them.
22       Q.   Any other conversations you heard between
23  officers that stand out in your mind while you were
24  inside?
25       A.   None.  Like I said, it's almost two years

13 (Pages 49 to 52)

David Hinton   1         November 5, 2003

Page 53

1  ago, and I really can't remember.
2       Q.   Okay.  And so then they decided to -- did
3  they tell you you were going to leave the house?
4       A.   They said, You're all going to jail.
5       Q.   Who told you that?
6       A.   One of the cops that was standing there.
7       Q.   Were there any female officers there?
8       A.   There was one towards the end.
9       Q.   And who was the officer that told you you
10  were going to all go to jail?
11       A.   Just the guy that told us to get up.  We're
12  all going to jail, I guess.  I don't know.  I'm not too
13  sure.
14       Q.   Did he tell you why?
15       A.   We'll find out when we get there.
16       Q.   Did he say at what time I'm putting you under
17  arrest, Mirandize you, anything like that?
18       A.   We were just going to jail.  He said the
19  girl, she could go.  She could take her dog, but she
20  couldn't take mine.  And then I was carted off into a
21  car.
22       Q.   Did the girl actually have the dog there?
23       A.   She had her little whatever it was, like
24  five-pound kind of ankle-biter-type dog.
25       Q.   Was that dog in the room with you when all

Page 54

1  this began?
2       A.   It was in, yeah, in my bedroom.
3       Q.   Now, to go back to the girl again, was this
4  the first time you spent time with her?
5       A.   This was the first time I had her over to my
6  house, yeah.
7       Q.   Had you known her outside socially?
8       A.   Known her?  I had met her and gave her my
9  phone number is what it was.  I met her and gave her my
10  phone number.  And I was trying to get some action
11  maybe that night.
12       Q.   She got some action.
13       A.   Didn't quite work out my way, though.
14            MR. BOOKE:  That wasn't the action you had in
15  mind.
16            THE WITNESS:  No.  It was some action,
17  though.
18  BY MR. ANDERSON:
19       Q.   You can call her back and tell her, I
20  promised you action.  What's your problem?  I got you
21  some action.  Okay.  So were you transported to jail?
22       A.   Yes.
23       Q.   Were you taken in a police car?
24       A.   I guess you would call it a police car.  It
25  was an unmarked little purple thing or black thing.  It

Page 55

1  was a little sports car type thing.
2       Q.   How many officers were in the car with you?
3       A.   Just one.
4       Q.   Was there like bars or anything in the car?
5       A.   No.
6       Q.   Were you sitting in the front seat, back --
7       A.   Front seat.
8       Q.   This gets stranger and stranger.  Your dad
9  and John, were they taken in a different vehicle?
10       A.   Yes, they were.
11       Q.   Did you see them get into the vehicle?
12       A.   No.
13       Q.   During the trip to the jail, did you have any
14  conversations with this officer?
15       A.   Yeah.  The guy told me I was going to tell
16  him something today.
17       Q.   Did he tell you what?
18       A.   I told him what I was going to tell him.  I
19  told him I'll give him a name.  He said, Go ahead and
20  give it to me.  And I said, Bill Skupa.  He said, who
21  is that?  And I said, That's the attorney that I would
22  like to represent me.  Go ahead and give him a call
23  whenever you want.
24       Q.   Had Bill represented you before?
25       A.   Yes.

Page 56

1       Q.   In what type of a case?
2       A.   Well, I asked him for legal -- on that
3  burglary-battery thing, he was, I guess, the attorney
4  for that.
5       Q.   So the January 9th, 2001, burglary-battery
6  incident?
7       A.   Yes.
8       Q.   You just went to him for like advice?
9       A.   He went with me actually.  But he only showed
10  up once.  And then it was over.
11       A.   He sues me all the time, too.
12       A.   This guy must love me then.
13       Q.   Was that the only conversation you had?
14       A.   That was it.  Then I was booked.
15       Q.   Did he ever like pull over and interrogate
16  you or anything?
17       A.   Well, that was -- he -- when we drove up,
18  when we went around the corner, he had pulled off of
19  the road.  And that's what he asked me.  He said,
20  You're going to give me something today.  And I said
21  what I had to say to him, and we went on to jail.
22       Q.   Did he respond to you in any way?
23       A.   Not really.  Just turned the car on and kept
24  driving.
25       Q.   Okay.  And do you know what jail you were

14 (Pages 53 to 56)

David Hinton   1       November 5, 200⎯

**Page 57**

1  taken to?
2       A.    County.
3       Q.    Clark County Detention Center?
4       A.    Uh-huh.
5       Q.    When you got there, what happened?
6       A.    I was fingerprinted and put into a holding
7  cell.
8       Q.    Were you fingerprinted as soon as you got in?
9       A.    No.  I sat there for a minute on the bench.
10      Q.    Were your dad and John there?
11      A.    Not then, no.  They came a couple of minutes
12  after.  The only person I really got to see was John
13  sitting at the other end of the bench.
14      Q.    So did you ever see your dad while at the
15  jail?
16      A.    Just in passing.
17      Q.    So you sit at the bench.  And they
18  fingerprint you and take your picture?
19      A.    Uh-huh.
20      Q.    Anyone try to interrogate or talk to you
21  there?
22      A.    No.
23      Q.    And then they place you in the holding cell?
24      A.    Uh-huh.
25      Q.    Was either John or your dad in the holding

**Page 58**

1  cell?
2       A.    No.
3       Q.    Anyone else in the holding cell?
4       A.    Thirty or forty other people, however many
5  there were there.
6       Q.    And how long were you kept in the holding
7  cell?
8       A.    A while.  Until I was -- it was a couple of
9  hours.  I remember that because they had to take me out
10  and fingerprint me.  And then an ATF agent come out and
11  talk to me.  And then they moved me to Stewart and
12  Mojave.
13      Q.    What did the ATF agent talk to you about?
14      A.    Asked me about the guns I had in my house.
15      Q.    When did you learn that they had found guns
16  in the attic?
17      A.    I didn't know anything about that that's
18  where I had -- see, my dad put them there.  I didn't
19  know they were in the attic.  So I didn't know.
20      Q.    Did anyone ever ask you, while you were still
21  at your house, either outside or inside, about the guns
22  in the attic?
23      A.    No.
24      Q.    So did any officers ever say to you -- did
25  you ever deny that you knew about the guns in the attic

**Page 59**

1  to any police officers?
2       A.    I might have denied knowing that they were in
3  the attic, but not know that the guns -- I mean, the
4  guns were all mine.  They had been given to me years
5  ago.
6       Q.    Who gave you the guns?
7       A.    My father.
8       Q.    How many years ago?
9       A.    At least 18 when I became legal age to own
10  them.
11      Q.    Oh, so when you were 18 years old?  Not 18
12  years ago.
13      A.    No.  When I was 18.
14      Q.    Or about five or six years ago?
15      A.    Yeah.
16      Q.    But you didn't put them in the attic?
17      A.    I didn't, no.
18      Q.    Your father put them in the attic?
19      A.    Someone put them in the attic.
20      Q.    So you don't know who put them in the attic?
21      A.    I don't know.
22      Q.    Do you know how many guns you owned?
23      A.    Exactly, no.
24      Q.    Can you estimate for me?
25      A.    In the twenties.

**Page 60**

1       Q.    Do you recall how many guns were in your room
2  that they found?
3       A.    Five.
4       Q.    So those five guns then 20-something in the
5  attic?
6       A.    The five guns they found in my room I
7  purchased separately on my own.
8       Q.    How many of those five guns you purchased
9  were handguns?
10      A.    I think one.
11      Q.    Did you have it registered?
12      A.    No.
13      Q.    Okay.  Now, you don't register rifles;
14  correct?
15      A.    No, you don't.
16      Q.    Do you have any type of ownership document
17  for a rifle?
18      A.    Do I?
19      Q.    Typically.
20      A.    I had the 15-minute background check receipt
21  for a couple of my rifles and few hand receipts for my
22  rifles.
23      Q.    And those would have been rifles that you
24  purchased, that your dad didn't give to you?
25      A.    Yes.

15 (Pages 57 to 60)

David Hinton   1      November 5, 2003      —

## Page 61

1    Q.   And would those be the ones that were in your
2  room?
3    A.   Yes.
4    Q.   The guns in the attic, did you have any
5  ownership documents like appraisals of the guns,
6  anything like that?
7    A.   No.
8    Q.   Do you know where your dad got the guns from?
9    A.   Family.  A lot of them were family heirlooms
10  that were given by my grandmother to him.
11   Q.   So gifts?
12   A.   Yes.
13   Q.   Did you ever go out with your dad shooting
14  those guns?
15   A.   No.
16   Q.   When was the last time you had seen those
17  weapons?
18   A.   I don't know.
19   Q.   So you don't know how long they had been in
20  the attic?
21   A.   No.
22   Q.   If you didn't know your guns were in the
23  attic, where did you believe they were?
24   A.   Somewhere in the house in storage.  Probably
25  in a closet or something.

## Page 62

1    Q.   So when did you first find out the guns were
2  located in the attic?
3    A.   The ATF officer asked me about the guns in
4  the attic.  I told him I didn't know about any guns in
5  the attic.
6    Q.   Okay.  So --
7    A.   'Cause I didn't know that they were in the
8  attic.  I didn't -- it's not that I was saying, no, I
9  didn't know the guns.  I just didn't know they were in
10  the attic.
11   Q.   Don't let me misstate your testimony.  Your
12  attorney will stop me.  Now, did you tell me earlier
13  that you had told the officers about the guns in your
14  bedroom?
15   A.   When they asked me what was in that gun safe,
16  yeah.
17   Q.   Okay.  Did you ever tell them that they would
18  find these 20 other guns somewhere in the house?
19   A.   No.  'Cause they never asked.  They just
20  asked me what was in that closet.
21   Q.   Okay.  So they just asked specifically about
22  the closet.
23   A.   Yes.
24   Q.   So you were never asked if there were any
25  other firearms in the house?

## Page 63

1    A.   No.
2    Q.   So the one handgun you had wasn't registered,
3  and the rest were rifles?
4    A.   Uh-huh.
5    Q.   Where did you purchase that handgun?
6    A.   A neighbor.
7    Q.   To your knowledge did your dad have a
8  handgun, a Beretta model 21-A .22 caliber?
9    A.   I have no idea.
10   Q.   Did you ever have a Beretta model?
11   A.   No.  I have no idea.  I don't think so at
12  least.
13   Q.   Was one of your guns a Colt .22
14  semiautomatic?
15   A.   Yeah.
16   Q.   Were you aware that the serial number was
17  filed off that?
18   A.   Yes.
19   Q.   Did you do that?
20   A.   No.  I purchased it like that.
21   Q.   Where did you purchase that gun?
22   A.   A friend.
23   Q.   So did you just buy these guns off the
24  street?
25   A.   Yeah.

## Page 64

1    Q.   Now, did you ever sell guns to --
2    A.   No.  I don't buy them to sell them.
3    Q.   Now, the records that were given to me by the
4  police department indicate that they seized a small
5  quantity of marijuana from your room.
6    A.   Not from mine.  From John's.
7    Q.   From John's.  Did they seize any
8  paraphernalia from your room?
9    A.   I don't know.  I don't think so.  Everything
10  we were charged with, we were all three charged the
11  same.
12   Q.   So the ATF guy comes and talks to you.  What
13  did you tell him?
14   A.   He said, Were the guns in the house yours?  I
15  said, Yes.  He said, Well, what about the guns in the
16  attic?  I said, I don't know.  You'd have to give me a
17  little more information.  And that's all I said, and I
18  was back in my holding cell.  He told me they shouldn't
19  have got him up this early in the morning.
20   Q.   Do you have any list of all the guns you own?
21   A.   I have a list, yeah.  I don't have it on me.
22  But I do have a list.
23   Q.   Would you be willing to give me a copy of
24  that?
25   A.   Yeah.

16 (Pages 61 to 64)

David Hinton   1      November 5, 200—

## Page 65

1    Q.   Just give it to your attorney. He'll give it
2  to me. Okay. So you talked to the ATF guy. And he
3  says they shouldn't have got him up that early.
4    A.   Yes.
5    Q.   Then did they return you to your cell?
6    A.   Yes, they did.
7    Q.   And how long did you stay there?
8    A.   A couple hours. And then they moved me and
9  got dressed out and showered and moved me to Stewart
10  and Mojave.
11    Q.   So then they put you like in jail clothes?
12    A.   Uh-huh.
13    Q.   What did they do with your Levi's and shirt?
14    A.   Bagged it and tagged it, I guess. whatever
15  they do with it.
16    Q.   Did you ever get it back?
17    A.   Uh-huh.
18    Q.   Why did they move you to Stewart and Mojave?
19    A.   I have no idea.
20    Q.   How long were you there?
21    A.   A day and a half.
22    Q.   Were you just in the cell the whole time?
23    A.   Yeah.
24    Q.   Anyone else come talk to you?
25    A.   Come talk to me, no.

## Page 66

1    Q.   Was there ever a time when someone formally
2  told you you were under arrest?
3    A.   I just assumed that I was under arrest once I
4  was going to jail.
5    Q.   Okay. But no one ever said, You are under
6  arrest.
7    A.   And they never told me what my charges were
8  being arrested for.
9    Q.   When were you Mirandized?
10    A.   Never.
11    Q.   When did you learn the charges against you?
12    A.   When they book you, they give you a slip of
13  paper after they fingerprint you. And all your stuff
14  is on there.
15    Q.   Okay. So right after you got to CCDC?
16    A.   Not right after. They book you, and they
17  fingerprint you. Then they give you your paper of what
18  you're charged with.
19    Q.   Okay. So at Stewart and Mojave you really
20  just sat in the cell the whole time?
21    A.   Unless I went to shower or to eat.
22    Q.   No conversations, nothing like --
23    A.   No.
24    Q.   Were you sharing a cell with someone?
25    A.   There was three other people in there.

## Page 67

1    Q.   Did they talk to you about what you were in
2  for?
3    A.   No.
4    Q.   How did you get out?
5    A.   Bail.
6    Q.   Do you know who bailed you out?
7    A.   Yes.
8    Q.   Who?
9    A.   John Maystek.
10    Q.   How do you spell that?
11    A.   M-a-y-s-t-e-k.
12    Q.   And who is he?
13    A.   A friend of mine.
14    Q.   Is he your age roughly?
15    A.   Yeah. He's a year younger than me.
16    Q.   Did you call him?
17    A.   No. I never called him.
18    Q.   Do you know how he found out you were in
19  jail?
20    A.   John's daughter's mother found out that John
21  was in jail, and they were all mutual friends. And she
22  informed them.
23    Q.   Did he bail John out, too, to your knowledge?
24    A.   I think so, yeah.
25    Q.   Do you know how much the bail was?

## Page 68

1    A.   No.
2    Q.   Did he give you a ride home?
3    A.   No. I walked home.
4    Q.   How long a walk was it?
5    A.   County jail to Tropicana and Eastern.
6    Q.   How long did it take you?
7    A.   A couple of -- a while. At least an hour and
8  a half, two hours.
9    Q.   Why didn't you call your dad?
10    A.   I didn't have any money for a phone. I just
11  was me and my thoughts, and I walked home.
12    Q.   So it was a choice to walk home.
13    A.   (No audible response.)
14    Q.   You could have called someone for a ride?
15    A.   I didn't have no money to use a pay phone.
16  How could I have called anyone?
17    Q.   Did you ask the jail for money?
18    A.   They're not going to give you no money.
19  They're going to send you out your way.
20    Q.   So when you get home after walking, who's
21  there?
22    A.   My dad.
23    Q.   And this would have been two days after the
24  warrant?
25    A.   (witness nods.)

17 (Pages 65 to 68)

David Hinton   1        November 5, 2003

Page 69

1    Q.   I'm sorry.  Is that a yes?
2    A.   Yes.  Sorry.
3    Q.   And when you went into the house, what did
4  you see?
5    A.   Just a destroyed house.
6    Q.   Okay.  What we're going to do is walk through
7  each room.  First of all, what I'm going to ask you
8  about is structural property damage, damage to the
9  physical building.  Okay?  That's all I want to know
10  right now.  Okay?
11    A.   Okay.
12    Q.   So when you get home, starting at the gate,
13  what's the first damage you see?
14    A.   A big hole in all the locks in all the gates.
15  And then the door, the wooden door, had a big giant
16  hole in it where the battering ram hit.  There was a
17  hole here.  My closet door was banged out by a hammer
18  here.
19    Q.   Okay.  I'll walk you through each room.  Now,
20  when you get there, did you notice a hole here at the
21  front of the house?  Is there a hole where it looked
22  like someone kicked and put a foot through it?
23    A.   There's a hole out there.  I don't know what
24  it's from.
25    Q.   Okay.  And then the gate locks all had holes

Page 70

1  in them?
2    A.   Uh-huh.
3    Q.   From the shotgun blast probably?
4    A.   Yes.
5    Q.   There's a hole in the door from where they
6  rammed it.
7    A.   Yes.
8    Q.   And then we enter the hallway here, and
9  there's a hole you described where the person
10  supposedly fell through.
11    A.   Yes.
12    Q.   Any other damage in this hallway?
13    A.   Not as far as I can remember.
14    Q.   Okay.  Then we move here into the family
15  room.  Is there any physical damage to the family room
16  you remember?
17    A.   Just drawers thrown about.  All the stuff
18  that was out there kicked around.
19    Q.   Okay.  We'll talk about that.  Right now just
20  any like damage to the walls and structure of the
21  house.
22    A.   Not as far as I can remember.
23    Q.   Your room?
24    A.   I remember in my room there was the closet
25  door.

Page 71

1    Q.   What was wrong with it?
2    A.   The whole middle of it was beat out.
3    Q.   Like someone had kicked it? shot it?
4    A.   No.  They left the hammer hanging halfway in
5  and halfway out of my door.  They beat it in with a
6  hammer.
7    Q.   Was it your hammer?
8    A.   Yes, it was.  Out of my toolbox.
9    Q.   Where was your toolbox located?
10    A.   Somewhere in my room.
11    Q.   So the first closet door is beat up.  What
12  else happened in your room?
13    A.   The pull-out drawers, I noticed that one was
14  smashed.  Just a couple miscellaneous little holes.
15    Q.   Any damage to the window or the walls?
16    A.   I think there's a little bit of damage over
17  here on the wall from something.  But I'm not sure what
18  it was from.  It was from them.  I know that.  'Cause
19  it wasn't there.
20    Q.   What does it look like?
21    A.   Just a hole.
22    Q.   Okay.  Into the kitchen.  Did you ever see
23  any damage to the kitchen walls or windows?
24    A.   I don't remember about the kitchen or the
25  living room.

Page 72

1    Q.   In the living room any damage to the walls?
2    A.   I don't remember.
3    Q.   Did you ever go in your dad's --
4    A.   No, I don't go in there.
5    Q.   This hallway between your dad's bedroom and
6  John's bedroom --
7    A.   There was a hole somewhere in that wall along
8  there.
9    Q.   Hole in the ceiling or wall?
10    A.   Well, it's actually the ceiling where you go
11  to the attic, there's the wooden frame is pulled away
12  from it and there's a hole.
13    Q.   Okay.  So the entry to the attic, there's a
14  hole next to it.
15    A.   Yeah.  And the frame where you know how your
16  piece of roof comes back down -- you know what I'm
17  talking about? -- to cover the hole?  The frame that
18  holds that in there was yanked off.
19    Q.   Do you know now where in the attic the guns
20  were located?
21    A.   No.  Somewhere up there.
22    Q.   Okay.  So there was a hole there.  And then
23  do you go into John's room?
24    A.   Do I go in there?
25    Q.   Yeah.  Did you go in --

18 (Pages 69 to 72)

David Hinton    1        November 5, 200—

Page 73

1    A.   I probably been in there.  But I don't know
2  what damage was caused by them because I don't know if
3  there was any damage in there before.
4    Q.   Okay.  Now, with respect -- we'll move away
5  from the structural damage.  Oh, pardon me.  Any
6  structural damage to the back of that house that you
7  know of?
8    A.   I've not been back there.  I don't know.
9    Q.   Any damage to the sides of the house?
10   A.   I don't know about the sides.
11   Q.   Now we'll talk about the property damage; so
12 TVs, drawers, stereos, you know, ownership items.
13 Okay?  In your bedroom were there any items that were
14 destroyed?  You mentioned a drawer.
15   A.   The chest of drawers was broken in half.
16   Q.   What do you mean by broken in half?
17   A.   Well, broke in pieces, just not in half, just
18 all into pieces.
19   Q.   Okay.
20   A.   It's like they pulled it out and dropped it,
21 and it just broke into pieces.
22   Q.   Okay.  Do you still have that chest of
23 drawers?
24   A.   Probably.
25   Q.   How soon after this did you move back in with

Page 74

1  your mother?
2    A.   Within a week I moved out.  I moved into
3  Henderson.  I didn't move back to my mom's for a
4  minute.  And then I left and went back to my mom's.
5    Q.   Okay.  So you were for like a week in the
6  house.  So the chest of drawers were broke in half.
7  Any other damage in your room?
8    A.   I had a police scanner that was broken into
9  bits.
10   Q.   Like smashed?
11   A.   Like just smashed.  And there were just
12 pieces of that thing left.
13   Q.   Do you still have that?
14   A.   Probably the pieces of it, yeah.
15   Q.   Any photographs of the chest of drawers or
16 the --
17   A.   Oh, I've got photographs of all the damage
18 and stuff, yes.
19   Q.   I think I have those.  Any other items in
20 your room that were damaged?
21   A.   Not that I can remember.  But I'm sure if I
22 sat and thought about it, I could --
23   Q.   If you do sit and think about a couple of
24 other things, just tell your attorney, and he'll let me
25 know.

Page 75

1    A.   Okay.
2    Q.   In the family room, were there any items
3  damaged?
4    A.   I wouldn't know about any of my dad's stuff.
5  I wouldn't know what was damaged.  I know everything
6  was thrown about, tipped over, dumped, boxes ripped
7  open.
8    Q.   So as far as like the family room, kitchen,
9  living room, your dad's bedroom, John's bedroom, it's
10 best to ask your dad and --
11   A.   Yeah.  'Cause it's all their stuff, yes.
12   Q.   You're not aware of anything that was broken
13 in any of those rooms?
14   A.   I know that some stuff was broken in John's.
15 But the specifics I wouldn't know.
16   Q.   Did your dad ever mention to you about
17 anything of his that was broken or destroyed?
18   A.   He could have, but I don't remember.
19   Q.   Did your dad ever mention to you anything
20 that was taken out of his room?
21   A.   He mentioned something, but I don't remember
22 what it was.
23   Q.   So he never told you of anything that he
24 believed of value like jewelry or anything was taken?
25   A.   Well, he mentioned some stuff was taken.  But

Page 76

1  I don't remember what it was.
2    Q.   Did you ever see the search warrant?
3    A.   No.
4    Q.   Did you ever see the officers' list of items
5  that were taken?
6    A.   Not as far as I know.
7    Q.   Is there anything that you own that you
8  believe was taken by these officers?
9    A.   Probably.  But I'd have to go back and --
10 I've got things written down.  So I don't know.  I
11 really don't know offhand.
12   Q.   But you have written it down?
13   A.   Yes.
14   Q.   And would you give me a copy of that list?
15   A.   Yes, I'll give it to my attorney.
16   Q.   Any money missing, anything like that?
17   A.   They confiscated like 30 bucks out of my
18 wallet.  Whatever my paycheck stub didn't cover for
19 that week, they took the remainder of it, which was
20 only a few dollars, like 30 bucks.
21   Q.   So you had a paycheck stub that was for --
22   A.   For that week that I had just cashed.  And
23 they said whatever didn't add up to the paycheck stub
24 was evidence.
25   Q.   Okay.  Just so I won't misunderstand you.  So

19 (Pages 73 to 76)

David Hinton   1      November 5, 2003

Page 77

1  say, for example, your paycheck was $100, and you had
2  $105.  They took the $5?
3      A.  Yes.
4      Q.  To your knowledge was there a ripped $20 bill
5  in your room that they took?
6      A.  I don't know.
7      Q.  Did you have a ripped $20 bill in a frame?
8      A.  I could have had a ripped $20 bill.  I don't
9  remember.
10     Q.  Did you have one that you had framed?
11     A.  No.
12     Q.  Just so we're clear.  Is there anything that
13 you can think of today that you were missing after the
14 search?
15     A.  That I can think of right now, no.  I would
16 have to go back and check my list.
17     Q.  Did there come a time when your dad asked you
18 to videotape the damage?
19     A.  Yeah.  The day we got out of jail.
20     Q.  Okay.  And you didn't do the videotaping, did
21 you?
22     A.  No, I didn't.
23     Q.  Did you participate in the videotape?
24     A.  Yeah.  I pointed my room out and broken
25 things and stuff.

Page 78

1      Q.  Why did you decide to move out of your dad's
2  house?
3      A.  To be honest with you, I couldn't sleep in
4  there no more.  Every little thing was waking me up.
5  It just made me nervous to be in there.
6      Q.  Did you help your dad at all with the cleanup
7  or anything?
8      A.  Yeah.  I cleaned my room up, and I helped him
9  clean the house a little bit.
10     Q.  What areas did you help clean?
11     A.  Just the front room, the living room, little
12 things that really -- it took a big -- he had other
13 people come in after I had helped to help him clean.
14     Q.  So he had outside people come in to help?
15     A.  (Witness nods.)
16     Q.  Did you help repair any of the holes in the
17 walls?
18     A.  No.  I don't know how to do any of that.
19     Q.  Did you and your dad ever discuss why you
20 were moving out?
21     A.  I'm pretty sure he knew that I couldn't stay
22 in that house anymore.
23     Q.  Did he try to talk you out of it or --
24     A.  No.  He understood I couldn't stay in that
25 house anymore.

Page 79

1      Q.  were you given a court date to answer for the
2  charges that were levied against you?
3      A.  Yes.
4      Q.  Do you recall that date?
5      A.  It was in February sometime.
6      Q.  About a month after?
7      A.  (Witness nods.)
8      Q.  Did you go to court?
9      A.  Yeah.
10     Q.  what happened when you went to court?
11     A.  Nothing.  Our name wasn't on the ticket to be
12 seen that day.  And they told us to go home.
13     Q.  Your name wasn't on it?
14     A.  Well, it had some -- our name was there.  But
15 it had something after our name.  So we didn't know.
16 We went in and asked the bailiff.  And he said, if you
17 have that next to your name, that you just can go home.
18 They're not going to see you today.
19     Q.  Okay.  So you walked through the metal
20 detectors.  You went to the courtroom, looked at your
21 name.  There was something by it.  You went to the
22 bailiff who said you --
23     A.  Yeah.  He said, If you have that by your
24 name, you're not being seen today.
25     Q.  Did your dad say anything to the bailiff?

Page 80

1      A.  No.
2      Q.  Was there more than one bailiff?
3      A.  I just remember the one.
4      Q.  So you all just left?
5      A.  Uh-huh.
6      Q.  Did you ever go to court any more regarding
7  this incident?
8      A.  No.
9      Q.  Did you ever get a letter in the mail from
10 either the police department or the district attorney
11 saying that the charges were dropped?
12     A.  No.
13     Q.  Did you ever make any attempts to get your
14 guns back?
15     A.  Just what I tried to do right here.  And they
16 said, I guess, I couldn't have them back right now.  I
17 don't know if it was an investigation or evidence or
18 what.  I'm not sure.  But they told me, no, I wasn't
19 allowed to have my guns back.
20     Q.  Okay.  Who is they?
21     A.  The police department when I called to check
22 to see if I could get my firearms back.
23     Q.  So you called them?
24     A.  Yes.
25     Q.  Did you ever physically go to the police

20 (Pages 77 to 80)

David Hinton   1        November 5, 200—

---

Page 81

1  building?

2     A.  No.  I didn't know I had to.

3     Q.  Okay.  So you called and asked for your guns

4  back.  And they said something to the effect it was

5  part of the investigation.

6     A.  Yeah.  And I needed a number.  And I gave

7  them the number.  And they said they couldn't be

8  released to me at this time.

9     Q.  Okay.  And prior to filing this lawsuit,

10  that's the only attempt you made to get those back?

11     A.  Uh-huh.

12     Q.  Do you recall when that was?

13     A.  Shortly after it happened.

14     Q.  Okay.  Did you ever go to the police

15  department and attempt to get the written reports of

16  this incident?

17     A.  Just from what the lawyer got me.

18     Q.  But you didn't --

19     A.  Other than my attorney, no.

20     Q.  Have you ever written any letters to the

21  district attorney or the police department regarding

22  this incident?

23     A.  No, I haven't.

24     Q.  Besides your deposition today, have you ever

25  been interviewed by anyone?

---

Page 82

1     A.  No.

2     Q.  So as you sit here today, you've never been

3  told the charges against you were dropped.  So for all

4  you know they're still going or they have been?

5     A.  Pretty much, yeah.  I don't know.  Maybe I

6  should check it out.  It would be nice to know, huh?

7     Q.  I think we're almost done.  Let me just look

8  real quick.  Have you talked to the girl since the date

9  of this incident?

10     A.  (No audible response.)

11     Q.  Do you still have her phone number?

12     A.  No.

13     Q.  Would you know where to find her?

14     A.  No.

15     Q.  Have you read any of the reports by the

16  police officers in this case that have been given to

17  your attorney?

18     A.  No, I haven't.

19     Q.  You're aware that the search warrant was

20  issued based upon the allegation that you were selling

21  methamphetamine.  Are you aware of that?

22     A.  I'm pretty much to that conclusion, yeah.

23     Q.  And you deny that you ever sold drugs out of

24  that house?

25     A.  Correct.

---

Page 83

1     Q.  According to the police paperwork, a control

2  buy -- do you know what a control buy is?

3     A.  Yes, I do.

4     Q.  -- occurred at your residence on January 4th,

5  12 days before this search.  And you deny that ever

6  happened?

7     A.  Sure do.

8     Q.  So as you sit here today, the only items of

9  property that you claim of yours that were taken and

10  not returned were the guns?

11     A.  As best I can remember.  I'm just going to

12  have to leave that subject open and get back with you

13  on that.

14     Q.  And I'm just talking about as you sit here

15  today.

16     A.  Yeah.

17     Q.  Now, do you recall going to your attorney's

18  office or getting questions that I sent to your

19  attorney for you to answer?

20     A.  Are you talking about my interrogatories?

21     Q.  Exactly.

22     A.  Yes.

23     Q.  One of the things you stated is that your

24  ownership papers for the guns were taken.

25     A.  Yes.

---

Page 84

1     Q.  What ownership papers were taken?

2     A.  Like I said before, my handwritten receipts

3  from the gun stores where I bought them from and my

4  15-minute background check receipts.

5     Q.  Did you typically buy guns from local stores?

6     A.  Yes.

7     Q.  From the same stores?

8     A.  I bought -- yes, I have actually.

9     Q.  Which stores?

10     A.  I think it's called The Gun Store.

11     Q.  That would be a good name for it.

12     A.  Yeah.  It's The Gun Store on Tropicana.

13     Q.  On Trop.  Okay.  Now, in one of the

14  interrogatories, I asked you to please identify all the

15  firearms that were seized that belonged to you.  And

16  you stated an M-1 Granada 30.06?

17     A.  Okay.

18     Q.  Okay.  A bolt action 30.06.

19     A.  Uh-huh.

20     Q.  An SR-1, a .22 rifle, and a .38 pistol.

21     A.  That was what was taken out of my room.

22     Q.  Is there any reason you didn't list the other

23  guns taken out of the attic?

24     A.  I thought I did.

25     Q.  Okay.  Did you ever receive any medical

21 (Pages 81 to 84)

## Page 85

1  attention as a result of the injuries from this
2  incident?
3      A.  No.
4      Q.  You ever seen a psychiatrist or anyone?
5      A.  No.
6      Q.  Who is Sandra Estrada?
7      A.  Sandy would have been the lady.  Estrada?
8      Q.  Uh-huh.
9      A.  I think that's John Maystek's wife if it's
10  Sandy.  She was the one that finally came to the house
11  a day later to lock everything up for us.
12      Q.  Okay.  And who's Veronica Rivas, R-i-v-a-s?
13      A.  That would be John Reyes's daughter's mother.
14      Q.  Do you know a Robert Cleveland?
15      A.  Yeah.
16      Q.  Who is that?
17      A.  A friend of my dad's.
18      Q.  And would he, to your knowledge, have any
19  information regarding this case?
20      A.  I have no idea.
21      Q.  Okay.  Anything that we haven't talked about
22  regarding this case that you would like to tell me?
23      A.  It was really a bummer that I got arrested,
24  and I didn't like it at all.
25      Q.  Okay.

## Page 86

1      A.  But that's about it.
2          MR. ANDERSON:  I'm done.
3          MR. BOOKE:  I don't have any questions to
4  ask.  So we're done.
5              (Thereupon the taking of the
6              deposition was concluded at
7              2:07 p.m.)
8                  *   *   *   *   *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 87

1          CERTIFICATE OF DEPONENT
2  Page  Line  Change                    Reason
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12              *   *   *   *
13          I, David Hinton, deponent herein, do hereby
   certify and declare the within and foregoing
14  transcription to be my deposition in said action; that
   I have read, corrected, and do hereby affix my
15  signature to said deposition.
16
17              _____
                   David Hinton
18
19  STATE OF NEVADA   )
                      )  SS:
20  COUNTY OF CLARK   )
21
22          Subscribed and sworn to before me this
23  _____ day of _____, 2003.
24
25              _____
                   Notary Public

## Page 88

1          CERTIFICATE OF REPORTER
2  STATE OF NEVADA  )
                     )  SS
3  COUNTY OF CLARK  )
4          I, Karen B. Nowak, CCR #476, Clark County,
5  State of Nevada, do hereby certify:
6          That I reported the taking of the deposition of
7  David Hinton, commencing on the 5th of November, 2003,
8  at the hour of 12:52 p.m., and that prior to being
9  examined the witness was by me duly sworn to testify to
10  the truth.
11          That I thereafter transcribed my said shorthand
12  notes, and that the typewritten transcript of said
13  deposition is a complete, true, and accurate
14  transcription of my shorthand notes.
15          I further certify that I am not a relative or
16  employee of the parties, attorneys, or counsel
17  involved in said action, nor a person financially
18  interested in the action.
19          IN WITNESS WHEREOF, I have hereunto set my hand
20  in my office in the County of Clark, State of Nevada,
21  this 19th day of November, 2003.
22
23
24
25              _____
                   KAREN B. NOWAK, CCR #476

22 (Pages 85 to 88)

1                     CERTIFICATE OF REPORTER

2   STATE OF NEVADA   )
                      )   ss
3   COUNTY OF CLARK   )

4        I, Karen B. Nowak, CCR #476, Clark County,

5   State of Nevada, do hereby certify:

6        That I reported the taking of the deposition of

7   John Reyes, Jr., commencing on the 5th of November,

8   2003, at the hour of 2:52 p.m., and that prior to being

9   examined the witness was by me duly sworn to testify to

10  the truth.

11       That I thereafter transcribed my said shorthand

12  notes, and that the typewritten transcript of said

13  deposition is a complete, true, and accurate

14  transcription of my shorthand notes.

15       I further certify that I am not a relative or

16  employee of the parties, attorneys, or counsel

17  involved in said action, nor a person financially

18  interested in the action.

19       IN WITNESS WHEREOF, I have hereunto set my hand

20  in my office in the County of Clark, State of Nevada,

21  this 19th day of November, 2003.

22

23

24

25                         *Karen B. Nowak*
                    KAREN B. NOWAK, CCR #476

# In The Matter of:

*Hinton v.*
*Clark County, Nevada*

---

### *DEPOSITION OF:*

## John Reyes, Jr.
## Volume 1
*November 5, 2003*

---

*Associated Reporters of Nevada*
*Certified Court Reporters*
*2300 W. Sahara Avenue*
*Suite 770*
*Las Vegas, NV  89102*
*(702) 382-8778    FAX: (702) 382-2050*

**Word Index Included**

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF NEVADA
 3
 4   DONALD HINTON, DAVID HINTON   )
 5   and JOHN REYES,               )
                                   )
 6           Plaintiffs,           )
                                   )
 7         vs.                     ) CASE NO.
                                   ) CV-S-03-0057-PMP-PAL
 8   CLARK COUNTY, NEVADA, a       )
 9   political subdivision, acting )
     by and through the LAS VEGAS  )
10   METROPOLITAN POLICE DEPARTMENT;)
     JOHN DOES 1-30 and ROE ENTITIES)
11   1-10,                         )
                                   )
12           Defendants.           )
     _____)
13
14
15
16           DEPOSITION OF JOHN REYES, JR.
17        Taken on Wednesday, November 5, 2003
18                   At 2:52 p.m.
19             At 10001 Park Run Drive
20                 Las Vegas, Nevada
21
22
23
24
25   Reported by:  Karen B. Nowak, CCR #476
```

---

**Page 2**

```
 1   APPEARANCES:
 2   For the Plaintiff:      BRADLEY L. BOOKE, ESQ.
                             7251 West Lake Mead Blvd.
 3                           Suite 530
                             Las Vegas, Nevada 89128
 4
 5   For the Defendant:      CRAIG R. ANDERSON, ESQ.
                             Marquis & Aurbach
 6                           10001 Park Run Drive
                             Las Vegas, Nevada 89145
 7
 8
 9
10
11              I N D E X
12   Witness    Direct    Cross    Red.    Rec.
13   John Reyes, Jr.
14   (By Mr. Anderson)     3
15
16
17
18
19            E X H I B I T S
20   Number     Description              Page
21   Exb. 4     Floor Plan of Home        19
22
23
24
25
```

---

**Page 3**

```
 1   Thereupon--
 2                  JOHN REYES, JR.,
 3   was called as a witness by the Defendant and, having
 4   been first duly sworn, testified as follows:
 5              DIRECT EXAMINATION
 6   BY MR. ANDERSON:
 7       Q.   Can I get you to state your name for the
 8   record and spell your last name?
 9       A.   John Vincent Reyes, Jr.  My last name is
10   spelled, R-e-y-e-s.
11       Q.   Mr. Reyes, have you ever had your deposition
12   taken before?
13       A.   I believe.  Yes, I have.  For a personal suit
14   against Lincoln Properties a couple of years back.
15       Q.   Was that the construction defect case --
16       A.   Yes.
17       Q.   -- your family brought?
18       A.   Yes.
19       Q.   Real quick I'm going to explain to you what's
20   going to happen and go over the rules.  Have you had a
21   chance to speak with your attorney?
22       A.   Yes.
23       Q.   Did he kind of tell you what to expect?
24       A.   Yes.
25       Q.   Okay.  My name is Craig Anderson.  I
```

---

**Page 4**

```
 1   represent the Las Vegas Metropolitan Police Department.
 2   This is a lawsuit that the Hintons and yourself have
 3   filed against the police department.  You're aware that
 4   you're a plaintiff in that lawsuit?
 5       A.   Yes, I am.
 6       Q.   What we're doing here today is what's called
 7   a deposition, which is real simple.  I'm going to ask
 8   questions, and you're going to give answers.  The only
 9   thing that I ask is that, when I ask a question, you
10   give me time to finish asking the question, then I'll
11   give you time to give an answer.
12            It's important that we don't talk over one
13   another for her benefit.  Okay?  She is here to take
14   down everything you and I say.  And when done, she's
15   going to put it all in a booklet, give you that
16   booklet, and you'll be able to read my questions, read
17   your answers.  And at that time you'll be able to make
18   any changes or any corrections to that transcript.
19   Okay?
20       A.   Okay.
21       Q.   The other thing that I ask is that, when I
22   ask a question, you answer audibly yes, no.  Don't
23   shake your head.  Don't nod.  Don't shrug.  That's
24   because she can't take that down.
25       A.   Okay.
```

ASSOCIATED REPORTERS OF NEVADA - 702/382-8778
2300 W.SSaharaDAve.,RSte. 770,ELasAVegas,/Nevada789102

John Reyes, Jr.   1        November 5, 2003

---

**Page 5**

1   Q.   Okay.  So if at some point in the deposition
2   I say was that a yes, I'm not trying to be rude.  I'm
3   just trying to make a clear record for her.
4   A.   Okay.
5   Q.   Do you have any questions before we start?
6   A.   No, I don't.
7   Q.   What's your current address?
8   A.   1372 Elizabeth Avenue, No. 12.
9   Q.   And I take it you're renting?
10  A.   Yes.
11  Q.   And do you live with anybody?
12  A.   No.
13  Q.   How long have you lived at the Elizabeth
14  Avenue address?
15  A.   About 14 months.
16  Q.   Now, you're aware that the incident we're
17  here talking about occurred on January 16th, 2002?
18  A.   Yes.
19  Q.   How soon after that date did you move?
20  A.   I believe, I'm not too sure, maybe about
21  three months.  I'm not too sure.
22  Q.   So you remained at that address for about
23  three additional months?
24  A.   Yes.
25  Q.   What's your date of birth?

---

**Page 6**

1   A.   5/24/78.
2   Q.   Social security number?
3   A.   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.
4   Q.   Where were you born?
5   A.   Downey, California.
6   Q.   What city?
7   A.   Excuse me?
8   Q.   What city?
9   A.   Downey.
10  Q.   I'm sorry.  I thought you said down in
11  California.
12  A.   No.
13  Q.   Okay.  The other thing I would tell you,
14  which I forgot to mention, at some point during this
15  I'm going to ask a really bad question that doesn't
16  make sense.  I don't know when.  When I do, if you
17  don't understand my question, just please ask me to
18  rephrase it.  Okay?
19       I'm not here to trick you.  I'm not here to
20  confuse you.  So if I ask a question that doesn't make
21  sense, just say I don't understand what you're asking,
22  and I'll try to ask it in a more clear form.  However,
23  if you answer my question, I'm going to assume that you
24  understood what I was asking.  Okay?
25       Does that make sense?

---

**Page 7**

1   A.   Yeah, I guess.
2   Q.   That may have been the question right there.
3   All I'm saying is, if you don't understand what I'm
4   asking, just don't answer, and ask me to rephrase it.
5   Okay?  How long did you live in Downey, California?
6   A.   Not too long.  I was a boy.  I've lived out
7   here for about 14, 15 years.  I'm not really sure how
8   long I lived there.  Maybe six years, maybe.
9   Q.   Do you recall what year you moved to
10  Las Vegas?
11  A.   It was '88 or '89.
12  Q.   And did you move out here with your family?
13  A.   My mother, yes.
14  Q.   Did you attend high school in Las Vegas?
15  A.   Yes.
16  Q.   Which high school?
17  A.   Valley High School.
18  Q.   Did you graduate?
19  A.   No.
20  Q.   What grade did you leave school?
21  A.   Eleventh grade.
22  Q.   Did you finish the eleventh grade?
23  A.   No.
24  Q.   Is there any reason you left the school?
25  A.   Having had a kid, I had to go to work.

---

**Page 8**

1   Q.   So would that have been 1995?
2   A.   '96 is when she was born.  But '95 I did
3   leave school, yes.
4   Q.   Okay.  And have you ever obtained your GED?
5   A.   No.
6   Q.   In 1995 where did you go to work?
7   A.   I worked basically it was under the table for
8   a floor company.  And then I worked for Terrible Herbst
9   Car Wash for about six or seven months.
10  Q.   And was that in 1995, both of them?
11  A.   No.  Excuse me.  I'm sorry.  1996 I worked
12  for Terrible Herbst Car Wash.  In 1995 I worked doing
13  floors.  I'm sorry.
14  Q.   And did you work full time?
15  A.   No.
16  Q.   Did you have any other sources of income in
17  1995 and '96?
18  A.   No.
19  Q.   After Terrible Herbst where did you work?
20  A.   Houston Stafford Electric.
21  Q.   Houston and Stanford?
22  A.   Yeah.
23  Q.   How long did you work for them?
24  A.   Six months.
25  Q.   Was that in 1996?

---

2 (Pages 5 to 8)

Page 9

1      A.   No.  I believe that was 1997.
2      Q.   After Houston and Stanford where did you
3  work?
4      A.   ABC Electric.
5      Q.   Are you an electrician?
6      A.   No, not no more.
7      Q.   Did you ever -- are there any certifications
8  or tests --
9      A.   No.
10     Q.   How long did you work at ABC Electricians?
11     A.   Maybe three months.
12     Q.   Was that in 1997 as well?
13     A.   Yes.
14     Q.   Where after ABC Electricians?
15     A.   I went back to Terrible Herbst Car Wash.
16     Q.   What did you do there?
17     A.   I was detailing cars.
18     Q.   Which Terrible Herbst?
19     A.   The first one I worked at, it was on
20  Tropicana and Harrison.  The second time I worked there
21  was on Sunset and Annie Oakley.
22     Q.   And how long was your second stint at
23  Terrible Herbst?
24     A.   Maybe two months.
25     Q.   And then where did you go?

Page 10

1      A.   Titan Stairs, Stairs & Trims it was called.
2      Q.   Was that in 1998?
3      A.   I believe that was 1997 also.
4      Q.   And how long did you work at Titan Stairs?
5      A.   Maybe about off and on for five months.  I
6  had an injury on my knee and stuff from Houston
7  Stafford.  And I was always out of work off and on
8  because of the injury.
9      Q.   What did you do at Titan Stairs?
10     A.   Warehouseman, just basically set up certain
11  jobs and stuff for the guys to take.
12     Q.   After Titan Stairs where did you work?
13     A.   I worked at Teamsters Local 631.  That's when
14  I first started that.  And I did that off and on for a
15  couple of years 'cause you only work when you get
16  called.
17     Q.   Okay.  And what did you do for them?
18     A.   Booth assembly and dismantling.
19     Q.   Is that like for conventions?
20     A.   Yes.
21     Q.   And so you worked off and on for two years
22  for them?
23     A.   No.  Off and on maybe almost four years.
24     Q.   Do you still work for them?
25     A.   No.  I work for Anderson Dairy right now.

Page 11

1      Q.   Okay.  When did you start working for
2  Anderson Dairy?
3      A.   July of 2002.
4      Q.   And you're currently still employed?
5      A.   Yes.
6      Q.   Okay.  And what do you do with them?
7      A.   I basically fill the milk orders for all the
8  convenience stores and casinos.
9      Q.   So do you drive the truck?
10     A.   No.  I just put the stuff on the line.
11     Q.   Okay.  Did you work anywhere between the
12  Teamsters Local 631 and Anderson Dairy, any other jobs?
13     A.   Yes.  I did.  Herda's Appliance Store.
14     Q.   What did you do there?
15     A.   I was just a warehouseman.
16     Q.   How long did you work for Herda's?
17     A.   Maybe two months.
18     Q.   Any other jobs?
19     A.   Let me see here.  No, I can't remember at
20  this time.
21     Q.   Of all the jobs that we talked about, were
22  you ever fired from any of them?
23     A.   Hold on.  One more job I do remember.  It's
24  called Bellini Company.  I got fired from that job.
25     Q.   What type of work was that?

Page 12

1      A.   It was a warehouse job.  I was cutting
2  carpet.
3      Q.   When did you work with Bellini?
4      A.   I believe it was 2000.  I worked there for
5  maybe three months.
6      Q.   Why did you get fired?
7      A.   A forklift accident.
8      Q.   That will do it.  You were driving a forklift
9  that was involved in an accident?
10     A.   Yes.
11     Q.   Okay.  Any other jobs that you terminated
12  from involuntarily?
13     A.   No, not that I can remember.
14     Q.   So all the others you quit?
15     A.   Yes.
16     Q.   Are you married?
17     A.   No.
18     Q.   Ever been?
19     A.   No.
20     Q.   How many children do you have?
21     A.   One.
22     Q.   And how old is your child?
23     A.   She's seven.
24     Q.   Seven.  Do you have custody?
25     A.   No.

3 (Pages 9 to 12)

Page 13

1    Q.   Have you ever had custody?
2    A.   No.
3    Q.   Prior to the January 16th, 2002, search
4  warrant that we'll talk about a little later, had you
5  ever been arrested by the Las Vegas Metropolitan Police
6  Department?
7    A.   Yes, I did.  It was for possession of a
8  marijuana pipe.
9    Q.   Do you recall when that was?
10   A.   I believe it was October or November of 2001
11 or 2000 -- 2001, I believe.
12   Q.   Just briefly explain to me what happened.
13   A.   I was riding my bicycle.  And a Metro officer
14 came up behind me and said that I fit the description
15 of a suspect and stuff, and he needed to search me.
16 And he asked if I had anything in my pocket.  And I
17 said, yes, I do.  And I handed it to him, and that was
18 it.
19   Q.   You didn't try to get away with your bike or
20 anything?
21   A.   No.  He was a little faster than the bike.
22   Q.   Okay.  But he searched you and found the
23 marijuana pipe?
24   A.   Yes.
25   Q.   Did you have any marijuana on you?

Page 14

1    A.   No.
2    Q.   Any other arrests?
3    A.   No, none that I can think of right now.
4    Q.   Is it possible there's others?
5    A.   When I was a juvenile, yes, I was arrested.
6    Q.   Okay.  You don't have to tell me about that.
7  Your only adult arrest you remember is the October,
8  2001, possession of a marijuana pipe?
9    A.   Oh, yes.  I have been arrested again.  I
10 can't remember how long.  Maybe two years ago.  I was
11 arrested for a handgun of mine, .45 caliber.
12   Q.   Unregistered?
13   A.   It was registered, yes.
14   Q.   It was registered?
15   A.   Yes.
16   Q.   What were you arrested for?
17   A.   Security guard claimed that it was concealed
18 when I was at a phone booth.  And it wasn't.  It was on
19 my side.  The Metro officers even flipped him off when
20 he turned his back because they knew that he was lying
21 through his teeth.
22   Q.   So did they arrest you?
23   A.   Yeah.  They took me in because they said it
24 was a citizen's arrest.  They had to take me in.
25   Q.   Where was this at?

Page 15

1    A.   Harbor Islands at the Hard Rock.  I
2  completely forgot about that.
3    Q.   Anything ever happen as a result of that?
4    A.   They gave me a fine.  That's it.  They never
5  gave my gun back, though.
6    Q.   They kept your .45?
7    A.   Yeah.  They never gave it back.
8    Q.   Did you ever try to get it back?
9    A.   No.  They said I can't.  It was going to be
10 destroyed.
11   Q.   What about the marijuana pipe?  Did you ever
12 go to court on that?
13   A.   Yeah.  That was dropped.
14   Q.   So never did any time or anything?
15   A.   No.
16   Q.   Ever done any jail time prior to
17 January 16th, 2002?
18   A.   No.  I'm sorry.  The question you asked me
19 when I told you about the gun, that was after
20 January 16th, 2002.
21   Q.   Okay.
22   A.   Let's get that clear.
23   Q.   Okay.  Have you been arrested since --
24   A.   No.
25   Q.   Okay.  So the only two arrests that you can

Page 16

1  remember is the possession of a marijuana pipe and then
2  the citizen's arrest for a concealed weapon?
3    A.   Yes.
4    Q.   Have you had any motor vehicle tickets issued
5  by the Las Vegas Metropolitan Police Department?
6    A.   No.
7    Q.   Have you ever sued the Las Vegas Metropolitan
8  Police Department before?
9    A.   No.
10   Q.   Excluding the construction defect litigation
11 that your family was involved in, have you been
12 involved in any other civil lawsuits?
13   A.   I had one of the attorneys on TV.  I had
14 Adam --
15   Q.   Kutner?
16   A.   Kutner.  Yeah.  Some guy was driving by in
17 his car.  Some guy hit me and ran.  And he found his
18 license plate in the street.  And I got him as an
19 attorney.  That was a personal suit.  And I had an SIIS
20 case on right knee years ago and had two different
21 surgeries on it.  Those are the only suits I can think
22 of.
23   Q.   Did the case in which Adam Kutner provided
24 representation to you, did that give you a settlement?
25   A.   Yeah, I got settlement.

4 (Pages 13 to 16)

John Reyes, Jr.   1      November 5, 200-

Page 17

```
 1      Q.   Did you ever go to court or do a deposition?
 2      A.   No.
 3      Q.   I think I asked you this.  How long have you
 4   lived at the Elizabeth Avenue?
 5      A.   About 14 months.
 6      Q.   On January 16th, 2002, the date of the
 7   incident which you're suing, where were you living?
 8      A.   1919 Hallwood Drive.
 9      Q.   And how long had you lived there?
10      A.   Maybe about a year, maybe.
11      Q.   Who else lived at the residence on that date?
12      A.   The old man, Don Hinton, and his son David.
13      Q.   Were you renting a room, or were you staying
14   for free?
15      A.   I paid rent.  Not every month, but I paid
16   rent off and on.
17      Q.   Who would you pay it to?
18      A.   The old man, Don.  I'm sorry.  I'm so used to
19   calling him that.
20      Q.   So you paid the rent to Don?
21      A.   Yes.
22      Q.   And did you have an agreement of how much the
23   rent was?
24      A.   It was about $300.
25      Q.   But you didn't sign any paperwork with Don,
```

Page 18

```
 1   did you?
 2      A.   No.
 3      Q.   Prior to moving in with old man Don, did you
 4   know him?
 5      A.   Yes, I did.
 6      Q.   How did you know him?
 7      A.   Through his older son Don, Jr.
 8      Q.   And how did you know Donald, Jr.?
 9      A.   Just around.  When I was growing up, just
10   around as kids.  Just met him through friends.
11      Q.   Did you go to school with him or anything?
12      A.   Yeah.  He went to Valley.  Never hung out at
13   Valley, though.  But he went to Valley with me.  Saw
14   him there a few times.
15      Q.   Are you the same age?
16      A.   He's about maybe a year older than me.
17      Q.   And where were you living prior to moving
18   into the Hallwood address?
19      A.   6805 Rancho Santa Fe.  My mother's home.
20      Q.   Why did you decide to leave your mother's
21   home?
22      A.   I had a car that was about to break down.
23   And my job was closer to Don's side of town.  And I
24   figured, if my car's gonna break down, I would be
25   closer to the job and take a bus there.
```

Page 19

```
 1      Q.   Which job was that?
 2      A.   Bellini's.
 3      Q.   Did you approach Donald about renting a room,
 4   or did he offer?
 5      A.   I approached him.
 6      Q.   And he just agreed for 300 a month?
 7      A.   Yeah.
 8      Q.   But he never really enforced you paying that?
 9      A.   No.
10      Q.   What I'm going to show you here is --
11      MR. ANDERSON:  I guess we're now at 4.
12           (Thereupon Exhibit 4 was
13            marked for identification.)
14   BY MR. ANDERSON:
15      Q.   This is a rough diagram of the Hinton home.
16   Does that look close to accurate as to what the floor
17   plan looks like?
18      A.   Yeah.  That looks about right.  I'm not used
19   to where Don's room was, his layout and stuff.  But,
20   yeah, I remember my room being -- where I stayed was in
21   the front.
22      Q.   Now, on January 16th, in addition to you, was
23   anyone else staying with you and Don?
24      A.   Inside the home?
25      Q.   Yeah.
```

Page 20

```
 1      A.   David.
 2      Q.   Where was his room?
 3      A.   His room is right here, right across from
 4   mine.
 5      Q.   Did you know David prior to moving in?
 6      A.   Yes.
 7      Q.   What was your relationship with David?  Are
 8   you friends or acquaintances?
 9      A.   We were mostly acquaintances because of his
10   older brother.  After a while we became friends, not
11   really close but --
12      Q.   Did you do things socially together?
13      A.   No.  No, not really.
14      Q.   And where was Don's room?
15      A.   The old man?
16      Q.   Yeah.
17      A.   His was right across from me there.
18      Q.   Now, the agreement you had with Donald in
19   renting this house, did you have free access to the
20   rest of the house?
21      A.   Except for his room and the room -- before
22   David moved in, that room was locked up always, too.
23   So not really, not the entire house.
24      Q.   Do you know why it was locked up?
25      A.   'Cause he had that place -- he had a lot of
```

John Reyes, Jr.  1        November 5, 2003

**Page 21**

1  stuff in there, personal stuff.
2      Q.   But you could use the living room and
3  kitchen?
4      A.   Yeah.  I always went in and out of there.
5      Q.   Did you get along with Donald?
6      A.   Yeah.  We got along.
7      Q.   And you and David, did you get along?
8      A.   Yes.
9      Q.   How long prior to the search warrant incident
10  did David move back into the home?
11      A.   I'm not sure.  I believe it was maybe three
12  months maybe, four months.  I'm not a hundred per sure.
13      Q.   So he had been there about three months or
14  so?
15      A.   Maybe.
16      Q.   How much time would you spend at the home?
17  Would you sleep there and spend your free time there as
18  well?
19      A.   Well, it was fifty-fifty.  I was out as much
20  as I could.  If I had nothing to do, I would stay home.
21  If I was working, I would be gone.  I never spent more
22  time out than another.
23      Q.   Would you have felt comfortable say watching
24  TV in the home, things like that?
25      A.   Well, yeah.  Before, yeah.

**Page 22**

1      Q.   I mean, yeah, this is before the search
2  warrant.
3      A.   Yeah.
4      Q.   So you basically felt like it was your place,
5  too.
6      A.   Yeah.
7      Q.   In addition to rent, did you pay any
8  utilities or anything like that?
9      A.   No.  I just paid rent.
10      Q.   Would you share like the grocery bill with
11  Donald?  Or would you buy your own food?
12      A.   Buy my own food.  I'd eat his sometimes.
13      Q.   Did you have visitation with your daughter?
14      A.   Yes.  A lot.
15      Q.   How often?
16      A.   I had her three times a week, maybe four
17  times a week.
18      Q.   And would you bring her to the house?
19      A.   Oh, yeah.  She stayed with me a lot.
20      Q.   Did she ever spend the night?
21      A.   Yeah.  A lot.
22      Q.   So at the time she would have been five, six?
23      A.   She was five years old.
24      Q.   And she would just stay in your room with
25  you?

**Page 23**

1      A.   Yes.
2      Q.   To your knowledge, when you were living at
3  the home, did David Hinton ever sell methamphetamines
4  from the home?
5      A.   No, not to my knowledge.
6      Q.   To your knowledge did David ever sell
7  marijuana from the home?
8      A.   Not to my knowledge at all.
9      Q.   To your knowledge did David ever sell cocaine
10  from the home?
11      A.   No.
12      Q.   To your knowledge did David ever sell
13  firearms from the home?
14      A.   No.
15      Q.   Did Donald Hinton ever sell drugs from the
16  home?
17      A.   No.
18      Q.   Did he ever sell firearms?
19      A.   No.
20      Q.   Did you ever sell methamphetamine from the
21  home?
22      A.   No.
23      Q.   Did you ever sell marijuana from the home?
24      A.   No.
25      Q.   Did you ever sell cocaine from the home?

**Page 24**

1      A.   No.
2      Q.   And did you ever sell firearms from the home?
3      A.   No.
4      Q.   Are you aware as to whether David has ever
5  sold methamphetamines at any time?
6      A.   No.
7      Q.   Have you ever sold drugs at any time?
8      A.   No.
9      Q.   Are you aware as to whether David has ever
10  sold firearms at any time?
11      A.   No.
12      Q.   When David moved back into the house, were
13  there more visitors at the home than prior to him
14  moving back in?
15      A.   I can't remember that, no.  I can't tell.
16      Q.   Did he ever have visitors over at the house?
17      A.   Which house?
18      Q.   1919 Hallwood.  David, the three months that
19  he lived there prior to the search warrant?
20      A.   I think he had maybe a couple friends.  I'm
21  not sure, though.
22      Q.   Would he have friends inside the house?
23      A.   I hardly ever saw anybody inside the house.
24  Maybe his girlfriend was in there sometimes.
25      Q.   Did you ever have visitors at the house?

6 (Pages 21 to 24)

John Reyes, Jr.   1   November 5, 200_

## Page 25

1   A.   I had friends once in a while.
2   Q.   Would Donald let them come inside the house?
3   A.   Once in a blue moon he would let them in.
4   But he didn't want them to stay too long.
5   Q.   How long would they stay?
6   A.   Maybe half an hour, 25 minutes.
7   Q.   Why did he not want people in the house?
8   A.   I guess just the way that old man is.  I
9   don't know.
10   Q.   Never gave you a reason?
11   A.   No.
12   Q.   If you had friends over, would he tell you to
13   make them leave?
14   A.   Yeah, he would.  He would tell me make them
15   leave.  Or he'd ask them, what's going on?  How long
16   are you going to stay?  Just he never liked people
17   there for some reason.  I don't know why.
18   Q.   When you --
19   A.   He had a lot of things and stuff.  I guess,
20   before he had things, and there were a lot of things
21   stolen from him.  So he didn't really trust anybody at
22   all in his home like strangers.  He liked me because
23   for the fact his son liked me a lot.  That's one of the
24   reasons I lived there.
25   Q.   Was the home ever burglarized while you were

## Page 26

1   living there?
2   A.   No.
3   Q.   Did Don ever tell you that the home had been
4   burglarized in the past?
5   A.   Yeah.  He said things had been stolen out of
6   there.
7   Q.   Did he tell you what?
8   A.   Tools.  That's the only thing I remember that
9   he told me.
10   Q.   While you lived in the home at 1919 Hallwood,
11   did you ever use recreational drugs?
12   A.   No.
13   Q.   Never smoked marijuana in the house?
14   A.   No.
15   Q.   Never took methamphetamine in the house?
16   A.   No.
17   Q.   Did you ever bring drugs into the house?
18   A.   No.
19   Q.   Did David ever tell you that he had robbed
20   Walgreen stores?
21   A.   No.
22   Q.   Did he ever discuss any robberies with you?
23   A.   No.
24   Q.   Did he ever tell you that he had held up any
25   individual at an ATM machine?

## Page 27

1   A.   No.
2   Q.   Are you aware of any illegal activities that
3   David did?  Did he ever tell you about any illegal
4   activities?
5   A.   No.
6   Q.   Now, I want to direct your attention to the
7   actual search.  Okay?  Do you recall the date of the
8   week the search warrant was executed?
9   A.   I believe it was maybe the second or third
10   week of January.
11   Q.   Do you agree with the date of January 16th?
12   A.   Yeah.  I could agree with that.
13   Q.   Do you recall what day of the week that was?
14   Monday?  Tuesday?
15   A.   No.
16   Q.   Do you recall what time?
17   A.   It was at night.  I can't remember exactly
18   maybe 11:00, maybe 10:30, 11:00.
19   Q.   So around 11:00 o'clock at night?
20   A.   Yeah.
21   Q.   What were you doing at the time?
22   A.   Kicked off my shoes.  And I went to lay down
23   on my bed.
24   Q.   Was your daughter staying?
25   A.   No.  Thank God.

## Page 28

1   Q.   So were you still dressed without shoes?
2   A.   Yes.
3   Q.   Do you know who else was in the home?
4   A.   To my awareness, it was only the old man
5   making cookies.
6   Q.   So you don't remember David being there?
7   A.   No.
8   Q.   Do you now know that David was home?
9   A.   Yes.
10   Q.   And did he have anyone with him?
11   A.   Yeah.  He had a girlfriend.
12   Q.   Do you know what that girl's name is?
13   A.   No.
14   Q.   Had you ever seen her before?
15   A.   No.
16   Q.   Have you seen her since?
17   A.   No.
18   Q.   Do you remember the girl?  As you sit here
19   today, can you picture her?
20   A.   I remember she had died hair.  She was white.
21   And that's about it.  I can't remember.
22   Q.   So it was someone who David brought over.
23   And you had never seen her there before, though?
24   A.   No.
25   Q.   Okay.  So you kick off your shoes, and you

7 (Pages 25 to 28)

John Reyes, Jr.   1        November 5, 2003

Page 29

```
 1   lie down on the bed.
 2       A.  Uh-huh.
 3       Q.  What happens next?
 4       A.  A couple of explosions go off.  The window
 5   lights up, flashing.
 6       Q.  Okay.  What did the explosion sound like?
 7       A.  They sounded like shotguns.
 8       Q.  And you say lights went off?
 9       A.  Yes.  My bedroom windows lit up.
10       Q.  You have two windows facing the yard, front
11   yard?
12       A.  Uh-huh.
13       Q.  So those windows lit up?
14       A.  Yeah.  From the flashes.
15       Q.  In front of these windows, is this the front
16   yard?  Or is there a wall?  What's in front of your two
17   windows?
18       A.  There's kind of like a border, a sidewalk.
19       Q.  You can draw on it.
20       A.  (Drawing.)  There's a sidewalk.  There's an
21   iron gate that separates the yard from the house.  In
22   between is like is a walking space.  And you can see
23   through those iron bars and stuff.
24       Q.  Do you know why the iron bars are there?
25       A.  No.
```

Page 30

```
 1       Q.  They were there when you moved in; right?
 2       A.  Yes.
 3       Q.  Can you see from your window, can you see
 4   over the bars, through the bars?
 5       A.  During the day you can barely see.  There's a
 6   lot of -- there was a lot of brush at the time.
 7       Q.  So plants and stuff?
 8       A.  Yeah.  There was a rose bush out there that's
 9   a little overgrown.
10       Q.  Okay.  So you remember your windows lighting
11   up; correct?
12       A.  Yeah.
13       Q.  Like a fire or a strobe light?
14       A.  Like a flash.
15       Q.  And what did you do?
16       A.  Pretty much I froze.  When the bang went off,
17   I got up.  And then some more bangs went off again, and
18   I froze.  And then after a while, I heard the old man
19   running through the house saying, Get down.  David,
20   they're shooting the house up.  Get down.  Who the hell
21   are you?  Get down.  And I heard another bang.
22       Q.  And during all of that, you were still in the
23   room; correct?
24       A.  Yes, I was still in the room.
25       Q.  And you told me what Donald Hinton said.  Did
```

Page 31

```
 1   you hear any voices from the people outside?
 2       A.  I can't remember.  I was in shock.  I can't
 3   remember.
 4       Q.  Did you know there were people outside?
 5   Could you hear people outside moving or anything?
 6       A.  I think I heard --
 7           MR. BOOKE:  Time reference is when he's still
 8   in his room?
 9           MR. ANDERSON:  Still in his room, correct.
10   BY MR. ANDERSON:
11       Q.  When you heard the explosion and saw the
12   flash of light, did you hear any activity outside?
13       A.  Yeah, I did.  I did hear people outside.
14       Q.  Did you hear them talking?
15       A.  I heard them tell Don, I think they were
16   talking to the old man saying, Who else is in the
17   house?
18       Q.  Did you hear anyone knock on the door?
19       A.  No.
20       Q.  Did you hear the doorbell?
21       A.  No.
22       Q.  Did you hear anyone announce police search
23   warrant?
24       A.  No.
25       Q.  And so the first voices you hear are Don's
```

Page 32

```
 1   voice and then the individuals from outside speaking to
 2   Don; is that correct?
 3       A.  I believe so, yes, as I can remember.
 4       Q.  Were you asleep?
 5       A.  No.
 6       Q.  So you're in your room.  You hear these
 7   voices.  What did you do next?
 8       A.  I went out to the hallway.  I got up.  I went
 9   and laid down after I heard someone, who else is in the
10   house?  Tell everybody to get down.  And I got up after
11   that.  And then they told me to come out and then walk
12   backwards.  First, before I turned around, I saw two
13   columns of guys with helmets instead of the ski masks,
14   army boots, the whole works.  And they took me and
15   passed me back and forth to one another, as I can
16   remember.
17       Q.  In your room, when you were still in your
18   room, did you have like a stereo or a TV on?
19       A.  No.
20       Q.  Was there any noises in the house prior to
21   you hearing the booms?  Did you hear any noises?
22       A.  No.
23       Q.  So is this the door you would exit right here
24   from the room?
25       A.  Yes.
```

8 (Pages 29 to 32)

## Page 33

1    Q.   And my understanding is this hallway is
2  actually a little bit longer than what is shown here.
3    A.   Yes, it is.
4    Q.   So you come out of the room.  And what can
5  you see?
6    A.   Nothing.  Just flashlights.  The lights from
7  the flashlights.
8    Q.   Were there lights on in the living room or
9  anything?
10    A.   I can't remember.
11    Q.   But you don't see any officers, do you?
12    A.   No.
13    Q.   Do you see Don?
14    A.   No.
15    Q.   Can you hear Don?
16    A.   As I was walking out, no.
17    Q.   Okay.  Do you see David?
18    A.   I believe I saw David.  I can't remember if I
19  saw David or not.
20    Q.   Did you see --
21    A.   I saw him outside.  That's all I can
22  remember.
23    Q.   Did you see his lady friend in the house?
24    A.   Before that happened?  No.
25    Q.   He told us he basically left her.  He had

## Page 34

1  come around the corner.  So as far as you know, they
2  were already outside, the other three people?
3    A.   Yeah.
4    Q.   So do you walk down this hallway?
5    A.   Yes.
6    Q.   So you walk towards the front door.  And when
7  is the first time that you see anybody or anything?
8    A.   When I peeked around this corner.  Actually I
9  didn't peek.  I turned around this corner and looked
10  down.  And that's when they told me to step out, turn
11  around, and walk backwards.
12    Q.   Okay.  So you look around this corner towards
13  the door.  And you see two columns; correct?
14    A.   Uh-huh.
15    Q.   Do you see David, Donald, or the girl?
16    A.   Not that I can remember.
17    Q.   What do you recall the columns of men
18  wearing?
19    A.   Army helmets, black suits, ski masks, combat
20  boots.
21    Q.   When you say suits, do you mean like what I'm
22  wearing?
23    A.   No.  Something like you see the guys on CNN
24  looking for Osama bin Laden.
25    Q.   Did you see any identification on any of the

## Page 35

1  officers like badges or police --
2    A.   No.  It was dark.  It was dark.
3    Q.   So you look around this corner and you see
4  them.  Do they see you?
5    A.   Yeah.
6    Q.   And they tell you to turn around?
7    A.   (Witness nods.)
8    Q.   Okay.  And then do you walk towards them
9  backwards?
10    A.   Yes.
11    Q.   What happens when you get to them?
12    A.   They pass me back from column to column till
13  I get all the way outside.  And I remember one officer
14  searching me, and he searched me twice.  And they put
15  me in the plastic things, and they sent me outside.
16    Q.   Okay.  When they're passing you back, are
17  they doing it violently? gently?
18    A.   They were throwing me back pretty much, yeah.
19    Q.   Did you ever fall down?
20    A.   No.
21    Q.   Okay.  Did you suffer any injuries as a
22  result of them throwing you or passing you back?  I'm
23  sorry.
24    A.   No.
25    Q.   Was anyone talking to you?

## Page 36

1    A.   No.
2    Q.   Anyone ask you if there was anybody else
3  inside?
4    A.   They asked if there was booby traps in the
5  house.
6    Q.   And what did you say?
7    A.   I said I don't know what you're talking
8  about.
9    Q.   Okay.  So you get out the front door.  You
10  get past this walkway.  And where do they handcuff you
11  and search you?
12    A.   It was in front of the house somewhere.
13    Q.   Was it before they took you to the neighbor's
14  yard?
15    A.   Yes.  It was before they took me to the
16  neighbor's yard.
17    Q.   And they handcuff you in the front or in the
18  back, your hands in the front or the back?
19    A.   The back.
20    Q.   Okay.  Did they say anything to you while
21  they were searching you or handcuffing you besides the
22  booby trap comment?
23    A.   I remember who else was in the house.  I
24  believe they said something about the dog in the
25  backyard.  I hope we don't have to kill your dog.  And

9 (Pages 33 to 36)

John Reyes, Jr.   1       November 5, 2003

## Page 37

1   that's about it.  And I remember a German shepherd was
2   running in the house.
3         Q.   Okay.  So after you get handcuffed and
4   searched, what did they do with you?
5         A.   Just leave us out there.
6         Q.   Did they take you anywhere past the front of
7   the house?
8         A.   They took us to like a neighbor's yard.  We
9   just sat next to the sidewalk.  They made us sit on the
10  ground on the sidewalk.
11        Q.   Do you recall any of the other neighbors in
12  the neighborhood coming outside?
13        A.   I remember people across the street came
14  outside to look.  That's the only ones I could really
15  recall.  Oh, and the neighbors, actually the other
16  neighbors I think came out, too.
17        Q.   Did they ask you to leave for trespassing?
18  I'm just kidding.  So you get handcuffed, taken to the
19  neighbor's yard.  And what do they do with you there?
20        A.   Just sit us there.
21        Q.   At this time what are you wearing?
22        A.   T-shirt, pants, and that's it.
23        Q.   Socks?
24        A.   No.
25        Q.   Was it cold?

## Page 38

1         A.   Really cold.
2         Q.   Do you know what the temperature was?
3         A.   Cold.
4         Q.   Do you recall what Donald was wearing?
5         A.   No, I don't.
6         Q.   David?
7         A.   No, I don't.
8         Q.   The girl?
9         A.   No.
10        Q.   Okay.  At any time did you ask for a coat?
11        A.   No.  I can't remember asking for a coat.  I
12  can't remember.
13        Q.   Did you ask for shoes?
14        A.   No.  I can't remember.  Yes, I did ask for
15  shoes.  I'm sorry.  I did ask for shoes.  And they said
16  give us a minute.
17        Q.   And that's while you were outside at the
18  neighbor's?
19        A.   Yeah.
20        Q.   To your knowledge did they bring anyone, any
21  of you four, any coats or shoes or any clothing?
22        A.   No, not to my knowledge.
23        Q.   So you don't recall Donald being brought a
24  coat?
25        A.   No.  I can't remember that.

## Page 39

1         Q.   Do you recall the girl being brought a coat?
2         A.   No.
3         Q.   When you get put out there, who were you
4   sitting by?  Did they make you sit down?
5         A.   Yeah.  All of us were sitting down.
6         Q.   Was Donald sitting down?
7         A.   Yeah, I believe so.  It's been so long.
8         Q.   If you don't know, that's a fine answer.
9         A.   Yeah.
10        Q.   Who were you sitting next to?
11        A.   I don't remember who exactly.
12        Q.   Were there SWAT officers watching you?
13        A.   Yeah, there were.  SWAT was standing around.
14        Q.   Did they have their guns pointed?
15        A.   Yeah.
16        Q.   And did they talk to you at all while you
17  were at the neighbor's house?
18        A.   They didn't say nothing much to us.  I heard
19  them talking amongst each other about some cars came
20  by.  And I saw some of them go and run behind cars and
21  point his weapon out there at the car as if it was
22  going to be a drive-by.  But that was about it and
23  stuff.
24        Q.   So they didn't talk to you at all?  They
25  didn't interrogate or ask any questions?

## Page 40

1         A.   No.
2         Q.   Did they ever take any of your group away to
3   separately interrogate them at that time?
4         A.   While we were outside?
5         Q.   Uh-huh.
6         A.   No.  I can't remember that.
7         Q.   Were you able to see what was going on inside
8   the Hinton residence?
9         A.   No.  I heard certain noises.
10        Q.   Did they tell you to face a certain way?
11        A.   I can't remember them telling me to face a
12  certain way.  I don't remember that, no.
13        Q.   Were you able to talk to the other three
14  individuals?
15        A.   No.
16        Q.   Did they tell you not to talk to each other?
17        A.   Yes.
18        Q.   What noises were you hearing from the house?
19        A.   Crashing noises.  Breaking noises.  I believe
20  that's about it.  That's all I can remember at this
21  time.
22        Q.   How long were you outside?
23        A.   About an hour maybe.
24        Q.   And so pretty much during that hour you just
25  sat silent?

10 (Pages 37 to 40)

**Page 41**

1  A.   Yeah.  Oh, yeah.
2  Q.   None of the SWAT officers attempted to talk
3  to you or anything?
4  A.   No.
5  Q.   Did anyone ask you if you required medical
6  attention?
7  A.   I can't remember.
8  Q.   Did you require medical attention?
9  A.   No, I didn't require.  My wrists and my
10  shoulder were really hurt for a while the way they had
11  me handcuffed and put in the detective car.
12  Q.   This was after that day?
13  A.   This was while I was going to jail.
14  Q.   When you were sitting outside, was your
15  shoulder hurting?
16  A.   No.
17  Q.   Were your wrists tight at that time?
18  A.   Yes.
19  Q.   Did you ever ask anyone to loosen your
20  handcuffs?
21  A.   No.
22  Q.   While were you sitting outside, did anyone
23  ask you about drugs?
24  A.   No.  I can't remember.
25  Q.   Did they ask you about firearms while you

**Page 42**

1  were outside?
2  A.   I think so.  I think they did ask if there
3  were weapons in the house.
4  Q.   Did you tell them about any weapons?
5  A.   No, I didn't.
6  Q.   Did you have any weapons in the house?
7  A.   No.
8  Q.   There were no weapons in your room?
9  A.   No.  I had bullets from a weapon of mine, but
10  they weren't there.
11  Q.   So you had ammunition in the room?
12  A.   Yes.  That's all I had.
13  Q.   But you had no guns in the room?
14  A.   No.
15  Q.   Were you aware of any weapons that were in
16  the house?
17  A.   I think the old man had mentioned he had some
18  antique guns.  I never saw none in the house, though,
19  no.
20  Q.   Did you ever see any handguns in the house?
21  A.   No.
22  Q.   To your knowledge did David have any handguns
23  in the house?
24  A.   No.
25  Q.   Did he have any rifles in the house?

**Page 43**

1  A.   Yeah, he had a rifle.
2  Q.   Do you know where he kept that?
3  A.   It was a rifle safe.  He bragged about his
4  rifle safe.
5  Q.   On that date did you own any weapons?
6  A.   Yes, I did own weapons.
7  Q.   Okay.  What did you own?
8  A.   A Heckler and Koch .45 and a Romak ak .74.
9  Q.   Romak?
10  A.   It's Romanian.
11  Q.   How do you spell it?  R-o-m-a-k?
12  A.   Yeah.
13  Q.   Ak .47?
14  A.   .74.
15  Q.   .74.  Sorry.  And where were those weapons on
16  the date of this search?
17  A.   My aunt's house.
18  Q.   Is the Hecker and Kooch -- what was the first
19  thing you mentioned?
20  A.   Heckler and Koch.
21  Q.   Sorry.  I didn't write it very clearly.  Was
22  that a handgun?
23  A.   Yes.
24  Q.   And did you have that registered?
25  A.   Yes, I do.

**Page 44**

1  Q.   Do you still have the blue card?
2  A.   No.  They took it that night.
3  Q.   Okay.  Any other weapons that you owned on
4  that date?
5  A.   No.
6  Q.   And those two weapons were not in the house?
7  A.   No.
8  Q.   Any weapons you didn't own in your room?
9  A.   No.
10  Q.   Was there any marijuana in your room?
11  A.   Yeah.  There was a roach left in my room by
12  somebody.  And I showed the officers it, a marijuana
13  roach.
14  Q.   Where was that roach left?
15  A.   On a desk that was in my room.
16  Q.   And it was a roach that someone else had
17  brought into the house?
18  A.   Yeah.
19  Q.   So did Donald know that person had come into
20  the house?
21  A.   No.
22  Q.   How long had the marijuana roach been left in
23  your room?
24  A.   Maybe a few days.
25  Q.   Just sitting on the desk?

11 (Pages 41 to 44)

John Reyes, Jr.   1      November 5, 2003      —

Page 45

```
1      A.   Yeah.
2      Q.   To your knowledge were there any other drugs
3  in the house?
4      A.   No.
5      Q.   Was there any methamphetamine in your room?
6      A.   No.
7      Q.   So you eventually are taken back into the
8  house after about an hour?
9      A.   Yes.
10     Q.   What did they do with you then?
11     A.   They sit us on a couch. And these detectives
12  came in. They had ski masks on. And then they took
13  them off and stuff. They looked like young kids, bald
14  heads and tattoos. You wouldn't even think they were
15  cops. But they came in and said, oh, what a shit hole.
16          And they said -- the old man asked them, what
17  are you guys looking for? And one of the guys says,
18  Dope, meth, one of those two. And the old man's like,
19  You won't find that here. And they continued their
20  search.
21     Q.   And you're sitting on the couch during this?
22     A.   Yes.
23     Q.   Who else is on the couch with you?
24     A.   Don, his son, and his son's girl.
25     Q.   Were you all placed on the same couch or
```

Page 46

```
1  separate couches?
2      A.   The same couch.
3      Q.   These detectives that you're talking about,
4  where were their tattoos located?
5      A.   I just remember one. He had one on his neck.
6      Q.   Do you recall what it was of?
7      A.   No.
8      Q.   So just one of them you recall having a
9  tattoo?
10     A.   Yeah.
11     Q.   They both had shaved heads?
12     A.   Yeah. Two of them had shaved heads.
13     Q.   Caucasian?
14     A.   I couldn't tell. Maybe Hispanic.
15     Q.   Okay. Did you witness any of the searching
16  in the house while you were inside?
17     A.   No.
18     Q.   From the couch you couldn't see any of it?
19     A.   No. I remember just them having a dog come
20  in and jump over everything. That's the only thing I
21  saw.
22     Q.   Let me back up a little bit. When you were
23  first brought into the home after you had been outside,
24  did you see any damage to the home?
25     A.   Before I was brought in the home?
```

Page 47

```
1      Q.   When you were brought in. So you had been
2  outside and --
3      A.   After I walked in, there was a huge hole in
4  this hallway ceiling.
5      Q.   How big would you estimate that hole was?
6      A.   I don't know. I'd say probably a little
7  bigger than one of them squares maybe. It's been a
8  while. Big enough for a person to fit through and
9  fall. I know that.
10     Q.   At that time were you told how that hole was
11  caused?
12     A.   I believe they said one of the SWAT officers
13  fell through it.
14     Q.   Did you see any medical personnel in the
15  home?
16     A.   No. I can't remember any medical personnel.
17     Q.   Did you see any officers leave like on a
18  gurney?
19     A.   Really I can't remember that right now.
20     Q.   Did you see any SWAT officers who were
21  injured at all?
22     A.   No. I can't remember.
23     Q.   So you see the hole. You walk in, and you
24  were put on the couch. At that time did you see any
25  other damage to the home?
```

Page 48

```
1      A.   At that time, no. When they sat me down, I
2  saw the whole place was turned upside down. The things
3  that were on the floor were flipped over and stuff like
4  that. I didn't see no damage around the house yet.
5      Q.   Okay. When you say things were turned upside
6  down, what room are you talking about?
7      A.   In here. In the living room here where Don
8  sat and by the kitchen was tore up.
9      Q.   So we've been calling this the family room in
10  the other depositions. So in the family room you could
11  see some damage?
12     A.   Yes.
13     Q.   What damage did you see in the family room?
14     A.   TV was pulled out. It wasn't like attached
15  or anything, but it was rolled out. He had a couple of
16  dressers out there, and the drawers were pulled out,
17  flipped over and stuff. There was paperwork
18  everywhere.
19     Q.   And that was in the family room?
20     A.   Yes.
21     Q.   In the living room you said it was turned
22  upside down. What do you mean by that?
23     A.   He had boxes everywhere. They were piled
24  nice and neat and stuff. And they were just thrown
25  everywhere. Just a big heap of paper is all it was.
```

12 (Pages 45 to 48)

Page 49

1    Q.  By the time you were brought into the living
2 room, were they done searching it?  I mean, did you see
3 any searching going on in that room?
4    A.  They were still looking through stuff when I
5 was in the room.
6    Q.  What were they looking for?
7    A.  Just the papers, trying to find something.
8 They let the dog run over things, sniff things out.
9    Q.  Was the dog ever jumped up or placed on the
10 table?
11    A.  Yeah.  He jumped on everything.  He jumped on
12 the table.  He jumped on the couches.  He jumped on
13 paperwork.  He jumped on everything.  What he had is
14 kind of like a thing in his hand going like that, and
15 the dog would follow and sniff.
16    Q.  Did the dog scatter papers?
17    A.  Yeah.  Roscoe was his name.
18    Q.  How long were you in the house after you
19 returned in from being outside?
20    A.  Maybe about an hour or more, hour and a half.
21    Q.  And did you just sit there the whole time?
22    A.  Yeah.
23    Q.  Did anyone ever question you or interrogate
24 you.
25    A.  No.  David and his dad, the old man, were, I

Page 50

1 believe.  I remember them taken away.  I was never
2 pulled away, though.
3    Q.  You were never taken into the bathroom?
4    A.  No.  They didn't even know I lived there.
5    Q.  Were you ever asked any questions while
6 sitting on the couch?
7    A.  Yeah.  They asked me what I did for a living,
8 if I lived there, which room was mine.  That was it.
9    Q.  And do you know where David and his dad were
10 taken away to?
11    A.  I didn't know at the time.  But when we got
12 to jail, they told me they was taken to the bathroom.
13    Q.  At any time while you were in the living
14 room, were you ever placed under arrest?  Did anyone
15 tell you you were under arrest?
16    A.  I can't remember.
17    Q.  Do you recall whether anybody ever read you
18 your Miranda rights?
19    A.  I don't remember that at all.
20    Q.  You know what they are?  I mean, the ones on
21 TV.
22    A.  I know what you're talking about.
23    Q.  So you don't recall ever being read Miranda
24 rights or being arrested?
25    A.  No.

Page 51

1    Q.  Outside were you ever read your Miranda
2 rights or told you were being arrested?
3    A.  I didn't know what I was being arrested for
4 until I got the temporary charges in jail.
5    Q.  So you eventually left the living room?
6    A.  Yes.
7    Q.  Okay.  And tell me what happened.  Did
8 someone just come in and tell you you were leaving?  Or
9 what happened?
10    A.  I remember a man came in.  He had his black
11 suitcase with him.  And the detectives go up to him and
12 told him something like go ahead and start.  And he
13 started wiping the walls.  I didn't see what he was
14 doing in the kitchen.  But I remember him going in the
15 kitchen.  I remember hearing him opening the
16 refrigerator door.
17         And I just heard him scuffing through the
18 house.  And then he made a remark.  And the detective
19 said to him, Are we going to find dope in here or what?
20 The detectives were looking frustrated, kept putting
21 their hands against the wall, leaning and stuff,
22 huffing and puffing at us.  And I remember him saying,
23 There's no dope being cooked in here.  What are you
24 going to arrest him for?  Baking cookies?  And that's
25 as much as I remember.

Page 52

1         And I remember them howling through the
2 house.  They kept going woo-hoo, woo-hoo, that they
3 found something.  After I got out of jail, I saw there
4 that they had the old man's pornography, his Playboys
5 out and stuff scattered all over my room.  But that's
6 all I remember until they took us away.
7    Q.  Okay.  And how did you find out you were
8 being taken away?
9    A.  This bald-headed guy who looked like a thug
10 made me and Don follow him.
11    Q.  Now, you had a bald head at the time; right?
12    A.  A short buzz, not bald.
13    Q.  Just kidding.  So he told you you were being
14 taken away?
15    A.  He says, Follow me.  And we went to his car.
16 I knew we were going to jail.
17    Q.  Were you still handcuffed that entire time?
18    A.  Yeah.  Oh, yeah.
19    Q.  Did you ever ask to have your handcuffs
20 loosened?
21    A.  Yes, I did.
22    Q.  Okay.  When did you first ask to have your
23 handcuffs loosened?
24    A.  As we were leaving.
25    Q.  Okay.  And what was said to you?

13 (Pages 49 to 52)

John Reyes, Jr.   1      November 5, 2003

### Page 53

1    A.   Click, click.  He tightened them more.
2    Q.   The officer tightened them more?
3    A.   Yeah.  Not the one I was in the car with.
4  Some other detective.  He had hair.
5    Q.   And did he say anything to you?
6    A.   No.  Nothing.
7    Q.   And when he tighten them, did you were feel
8  them being tightened?
9    A.   Yes.
10   Q.   And you were taken and put in the vehicle?
11   A.   Uh-huh.
12   Q.   You and Don?
13   A.   Yes.
14   Q.   What happened to David?
15   A.   I have no clue.
16   Q.   What happened to the girl?
17   A.   I have no clue.  I saw David at the jail
18  later, but I don't know what they did.
19   Q.   What type of vehicle were you taken away in?
20   A.   Kind of like a sporty vehicle.  It was gray.
21  I can't remember the type.
22   Q.   Like a sedan or an SUV or --
23   A.   No.  It wasn't no SUV.  It was a little car.
24   Q.   Unmarked?
25   A.   Yes, it was an unmarked car.

### Page 54

1    Q.   Were you in the back or front seat?
2    A.   I was in the back.
3    Q.   Were there like bars or anything in the car?
4    A.   No.
5    Q.   Where was Donald?
6    A.   He was in the front.
7    Q.   And one officer drove you is all?
8    A.   Yeah.
9    Q.   And did he talk to you at all during the
10  trip?
11   A.   No.
12   Q.   Didn't ask you what was going on?
13   A.   No.
14   Q.   Had he been someone involved with the search?
15   A.   Yeah.
16   Q.   Did you talk to him at all?
17   A.   I told him my shoulder is very
18  discomfortable, and my handcuffs are hurting me or the
19  zip ties, whatever they call them, and he just turned
20  up his radio.
21   Q.   He turned up his radio like music or his
22  police radio?
23   A.   His music.
24   Q.   How long did it take you to get to the jail?
25   A.   A long time.  He got on the freeway, and it

### Page 55

1  was a traffic jam.  So it was a bad night.  So it
2  probably took us about 30 minutes, 35 minutes to get to
3  jail, maybe longer.
4    Q.   Do you know what jail you were taken to?
5    A.   Downtown, Clark County.
6    Q.   CCDC, Clark County Detention Center?
7    A.   Yes.
8    Q.   So the trip there was really uneventful.  You
9  and Don didn't talk?  The officer didn't talk?
10   A.   No.
11   Q.   You get to jail --
12   A.   I asked him about my handcuffs.  That's about
13  it.
14   Q.   And he turned up the radio.
15   A.   Yeah.
16   Q.   When you got to the jail, what happened?
17   A.   Stood there for a while and for another
18  while.  And then they came over.  One guy noticed my
19  handcuffs and stuff, and he says, oh, I guess they
20  didn't like you.  He said something like that.  And he
21  clipped them off with these little wire-cutter-type
22  things.  And then they searched me.  And then they put
23  me in the jail.
24   Q.   Were you standing or sitting on a bench?
25   A.   I was standing for a while until my snips

### Page 56

1  were cut.  And then they sat me down.
2    Q.   Do you recall Don asking someone to come look
3  at your handcuffs?
4    A.   I can't remember, no.
5    Q.   When they took your handcuffs off, did they
6  put new ones on?
7    A.   No, I don't believe they did.  I believe they
8  started processing me after.
9    Q.   What did your hands look like when the
10  handcuffs were taken off?
11   A.   Like when you lean on something for so long,
12  it leaves an imprint.  They were imprinted for good,
13  bruised for three or four days.
14   Q.   Were your hands discolored at all from --
15   A.   Yeah.  They were blue-purple.  I didn't have
16  feeling in my hand for a while like my index finger.
17   Q.   What do you mean for a while?  Like an hour?
18   A.   No.  Like a day or so it had a numb feeling
19  to it.
20   Q.   And did you take pictures of the bruising or
21  anything?
22   A.   No.
23   Q.   Did you ever seek any medical treatment as a
24  result of your hands?  Did you ever go to a doctor?
25   A.   No.

14 (Pages 53 to 56)

Page 57

```
1    Q.   So then they put you in a cell.
2    A.   Uh-huh.
3    Q.   And when did they fingerprint you?
4    A.   Maybe about two hours later.
5    Q.   Were either Don or David in the cell with
6  you?
7    A.   No.
8    Q.   Anyone else in the cell with you?
9    A.   Yeah.  There was other people there.
10   Q.   Anyone talk to you in the cell?
11   A.   No.  I didn't talk to nobody in there.
12   Q.   Did any officers come question you while you
13 were in the cell?
14   A.   Not while I was in the holding tank.
15   Q.   And then they take you out two hours later to
16 have you fingerprinted?
17   A.   Yeah.
18   Q.   Did you have a photograph taken?
19   A.   Yes.
20   Q.   Anyone come and talk to you at that point,
21 any officers?
22   A.   No, not at that time.
23   Q.   Did you ever speak with an ATF guy?
24   A.   Yes.  Like a day later.  They transferred me
25 to Stewart and Mojave, and some dude picked me up about
```

Page 58

```
1  midnight.  I thought I was being released.  I thought I
2  was getting back to the downtown Clark County Detention
3  Center.  He had his regular clothes on.  He took me to
4  some house on Charleston somewhere.  And he started
5  questioning me about armed robberies and stuff.  And I
6  had no clue what he was talking about.  But I thought I
7  was going to get my ass kicked.
8    Q.   I'll get to that.  Let me back up a little.
9  When you were in the house and taken to the jail, did
10 you have shoes on?
11   A.   No.
12   Q.   Did you have socks on?
13   A.   No.
14   Q.   When you got to the jail, were you searched?
15   A.   Yes.
16   Q.   Did they find methamphetamine on you?
17   A.   No.
18   Q.   So if the police reports indicate that they
19 found three baggies of methamphetamine on your person,
20 that would be inaccurate?
21   A.   That would be inaccurate, yes.
22   Q.   You deny that you had methamphetamine on you
23 at the jail?
24   A.   Yes.
25   Q.   Okay.  So you then get transferred to Stewart
```

Page 59

```
1  and Mojave.  And did they ever tell you why they
2  transferred you there?
3    A.   No.
4    Q.   How long were you there?
5    A.   Maybe 10 hours, 12 hours maybe.
6    Q.   And were you just in the cell?
7    A.   Yeah.
8    Q.   Were you ever questioned or interrogated
9  during that time?
10   A.   When that guy picked me up, yeah.
11   Q.   When they picked you up and drove you away to
12 the house?
13   A.   Yeah.  It's kind of like an office building
14 place.
15   Q.   Did anyone -- do you know who that officer
16 was?
17   A.   I can't remember his name.
18   Q.   Did you recognize him from the raid?
19   A.   No.
20   Q.   And what did he ask you in the drive over?
21   A.   He didn't really talk too much on the drive
22 over.  When we got to the place, then he started
23 questioning me about armed robberies.
24   Q.   Okay.  So you got taken to like an office
25 building on Charleston.
```

Page 60

```
1    A.   Yeah.
2    Q.   How many people were in the room?
3    A.   Just him and me.
4    Q.   And did he give you anything to eat?
5    A.   He gave me a Snickers bar, and he gave me a
6  soda.
7    Q.   Did you ask for them?
8    A.   No.
9    Q.   Did you eat them?
10   A.   Drank the soda.  I didn't eat the Snickers
11 bar.
12   Q.   What type of questions did he ask you?
13   A.   Armed robberies that happened at an ATM
14 machine, I think MacDonald's.  I don't know.  Other
15 places.
16   Q.   How about Walgreen's?
17   A.   I can't remember him saying Walgreen's.
18   Q.   And you told him you didn't have any
19 knowledge of any of them?
20   A.   Yeah.  No knowledge.
21   Q.   How long did that meeting last?
22   A.   Maybe about 20 minutes, maybe.  I can't
23 remember.
24   Q.   Did he talk to you about anything besides the
25 robberies and the ATM incidents?
```

15 (Pages 57 to 60)

John Reyes, Jr.  1        November 5, 2003

## Page 61

1    A.   I can't remember anything else.

2    Q.   Did he talk to you about the firearms in the

3 house or anything?

4    A.   No.  I can't remember him talking about the

5 firearms.  The main thing I remember him talking about

6 is armed robberies.

7    Q.   And when that was done, were you taken back

8 to jail or released?

9    A.   I was taken back to jail.

10    Q.   How long did you remain at the jail?

11    A.   About three more hours, and I was released.

12    Q.   Did anyone ever mention to you that they had

13 found methamphetamine on you?

14    A.   No.

15    Q.   Did they ever offer you a deal that, if you

16 testify against David, that they would reduce that

17 charge?

18    A.   No.

19    Q.   So the only drugs you're aware about that

20 were in your room or possession was the roach of

21 marijuana that was brought in by someone else?

22        MR. BOOKE:   Object to the question to the

23 extent it calls for a legal conclusion.

24        Please go ahead and answer.

25        THE WITNESS:  Yes.

## Page 62

1 BY MR. ANDERSON:

2    Q.   When were you eventually released?

3    A.   Maybe 2:30 in the morning about.

4    Q.   Do you recall what date?  If the search was

5 on the 16th at 11:00 p.m., what date would that have

6 been?

7    A.   The 16th.  Maybe the 18th I was released,

8 17th -- yeah, maybe 18th.

9    Q.   And about what time again?

10    A.   About 2:30 in the morning.

11    Q.   So it was dark outside?

12    A.   Yeah.

13    Q.   And how did you get home?

14    A.   I walked.

15    Q.   Why didn't you call Donald?

16    A.   I called everybody.  No one answered.

17    Q.   Were you still barefoot?

18    A.   I was barefoot as hell.

19    Q.   How long did it take you to walk home?

20    A.   Oh, I know the sun was coming up.  Maybe an

21 hour and a half.

22    Q.   And when you returned to the -- did you walk

23 to the 1919 Hallwood?

24    A.   (Witness nods.)

25    Q.   I'm sorry.  Is that a yes?

## Page 63

1    A.   Yes, yes.  I'm sorry.  I'm sorry.

2    Q.   When you got there, who was at the house?

3    A.   The old man.  Don.  I'm sorry.  Don.

4    Q.   Was David?

5    A.   No.  David wasn't there.

6    Q.   And was Don up?

7    A.   Yeah.  I woke him up.

8    Q.   And what did you do after you woke him up?

9    A.   He opened the door for me.  I rushed to the

10 shower, cleared out the debris that was in there.  They

11 threw all kinds of stuff everywhere.  Took a shower.

12 And I just looked at the mess that was left.

13    Q.   Okay.  When you say cleaned out the debris in

14 the shower --

15    A.   Like drywall from the ceiling and stuff.

16    Q.   Oh, in the bathroom.

17    A.   In the bathtub.

18    Q.   What I want to do real quick is have you tell

19 me everywhere in the house that you saw physical

20 structural damage.  Okay?  So right now just damage to

21 the actual house, not property damage or, you know,

22 like damage to your room.  Just damage to the walls,

23 ceilings, and that sort of thing.  Okay?

24        Did you inspect the home when you got home?

25    A.   I checked it.  Yes, I did.

## Page 64

1    Q.   Okay.  Starting here when you walk in the

2 gate, what was the first damage to the house that you

3 remember?

4    A.   I saw three big holes in the security gate

5 like bullet holes blown through.  The door itself

6 behind the security gate, there's a big hole through

7 that.

8    Q.   Through a panel?

9    A.   Yeah, through a panel.  And you open the

10 door.  When you look above, you see the hole in the

11 ceiling.

12    Q.   That's the one we already talked about;

13 right?  I'll just guide you through this.  Any other

14 damage to the hallway, the entrance hallway?

15    A.   Not that hallway that I can remember.

16    Q.   Okay.

17    A.   And as I turn right, there's a hole in this

18 hallway in the ceiling.

19    Q.   A hole in the ceiling in the hallway outside

20 your room.

21    A.   Yes.

22    Q.   How big was that hole?

23    A.   Like a foot hole.

24    Q.   Was that hole next to the attic entrance

25 access?

16 (Pages 61 to 64)

John Reyes, Jr.   1      November 5, 2000

## Page 65

1    A.   Yes.  Right on the light fixture.  The light
2  fixture itself was pushed down.
3        Q.   Any other damage in that hallway?
4        A.   Not that I remember.
5        Q.   Did you ever go to Donald's room and inspect
6  it?
7        A.   No, I didn't actually.
8        Q.   Okay.  In the living room, any physical
9  damage to any of the walls or the ceiling in there?
10       A.   No.  I can't remember any physical damage.
11       Q.   The kitchen, any physical damage to any of
12  the walls or ceilings in that room?
13       A.   No, none that I can remember.
14       Q.   Family room, any damage to any of the walls
15  or the ceilings in that room?
16       A.   No, not that I can remember.
17       Q.   Did you go into David's room?
18       A.   Yes.
19       Q.   Okay.  Any physical damage in that room?
20       A.   Yeah.  The door was smashed down, smashed in.
21       Q.   Closet door?
22       A.   Yes.
23       Q.   Could you tell how the door had been smashed?
24       A.   Looked like someone took a hammer to it, a
25  big hammer, and started beating it.

## Page 66

1        Q.   Did you see the hammer?
2        A.   No.
3        Q.   Any other damage in David's room?
4        A.   I can't remember right now.
5        Q.   Any other damage to the outside of the house
6  that you can remember?
7        A.   No.  But there's an iron gate right here.
8        Q.   Off to the side of your room?
9        A.   Yes.  The lock was blown off.
10       Q.   Now, with respect to like property damage,
11  say, for example, a TV or stereo or appliance, let's
12  talk about those damages.  Any damages to anything in
13  the family room?
14       A.   None that I can remember.
15       Q.   The kitchen?
16       A.   I can't remember.
17       Q.   Living room?
18       A.   I can't remember right now any damage.  I
19  remember stuff in my room mostly.
20       Q.   Okay.  Do you recall any damage to any
21  property in David's room?
22       A.   I can't remember right now.
23       Q.   Okay.  Let's go to your room.  What was
24  damaged?
25       A.   The couch cushions looked like they were torn

## Page 67

1  by someone's hands.
2        Q.   So they were opened?
3        A.   Yes.  Some of my daughter's toys she got for
4  Christmas were stepped on.  Her cotton candy maker was
5  broke.  The money in my wallet was tooken.  I had a
6  recliner.  One of the armrests were torn out.  Some of
7  the brass fittings on the bed were gone.
8        Q.   Let's start with the couch.  Is the couch
9  yours?
10       A.   No.
11       Q.   But the cushions were like ripped open?
12       A.   Yes.
13       Q.   Did it look like it was with a knife or --
14       A.   No.  It looked like it was pulled.
15       Q.   And then your daughter's toys?
16       A.   (Witness nods.)
17       Q.   Do you know how much the cotton candy machine
18  cost?
19       A.   No.
20       Q.   Other toys.  Did you mention some other toys?
21       A.   Yeah.  But I can't remember them right now.
22       Q.   How much money was taken out of your wallet?
23       A.   Maybe around 200-something dollars.
24       Q.   What was that money from?
25       A.   Working.

## Page 68

1        Q.   And did you ever see any of the police
2  paperwork?
3        A.   No.
4        Q.   Never saw the warrant?
5        A.   No.
6        Q.   Okay.  What parts of the bed were taken?
7        A.   Just some little round brass fittings.  They
8  were gone.  I don't know why they took them.
9        Q.   Any other damage to your room?  We have the
10  couch, your daughter's toys, money taken out of your
11  wallet, and brass fittings to the bed.
12       A.   That's all I can remember right now.
13       Q.   On the night of the search, did you tell the
14  officers that they would find a .45 semiautomatic in
15  your bedroom?
16       A.   No.
17       Q.   Did you have any drug paraphernalia in your
18  bedroom?
19       A.   I had a marijuana pipe.
20       Q.   Were you smoking marijuana in the room?
21       A.   No.
22       Q.   Were you smoking marijuana at that time?
23       A.   No, not at that time.  I was trying to find a
24  permanent job.
25       Q.   How long had you quit smoking marijuana prior

17 (Pages 65 to 68)

John Reyes, Jr.   1        November 5, 2003

Page 69

1  to this incident?
2      A.   Maybe three weeks.
3      Q.   So you hadn't smoked for around three weeks.
4  When you were smoking marijuana, how often were you
5  smoking it?
6      A.   Every couple of days.  If I went to bed at
7  night sometimes.
8      Q.   Have you ever taken methamphetamine?
9      A.   No.
10     Q.   Never taken it?
11     A.   No.
12     Q.   As far as any other -- let's see.  Is there
13 any of your property that you're claiming was missing
14 after the search?
15     A.   I can't remember none at this time.
16     Q.   So it was just the money?
17     A.   The money, the gun registrations.
18     Q.   Okay.  Would the gun registration just be the
19 one for the --
20     A.   .45.
21     Q.   Do you still have that .45?
22     A.   No.  That's the one I got arrested for.  They
23 said it was concealed.
24     Q.   That's right.  Do you still have the other
25 firearm, the ak .74.

Page 70

1      A.   It's my stepdad's now.
2      Q.   Is that a legal weapon to have?
3      A.   Yes.  I bought it from the gun store.
4      Q.   Did you have to have a permit or any
5  paperwork for that weapon?
6      A.   No.
7      Q.   Prior to the search did Donald keep the house
8  clean?
9      A.   Yeah.  He kept it decent.  Dusty, but it was
10 decent.
11     Q.   What do you mean by decent?  Was it --
12     A.   He had a lot of things, but he had them
13 organized.
14     Q.   Was there a lot of stuff on the floors?
15     A.   Boxes, yes.
16     Q.   Was there clothing on the floors?
17     A.   No.  It was on the couch.  Some of the
18 clothing on the couch.  I can't remember a lot of
19 clothing.
20     Q.   Do you know what clothing was doing on the
21 couch?
22     A.   No.
23     Q.   Were there a lot of tools?
24     A.   Yes.  There was tools in the house.
25     Q.   Okay.  Were they in the living room?

Page 71

1      A.   No.  They're in that family room right here.
2      Q.   Okay.  And were they on shelves? on the
3  floor?
4      A.   They're in like toolboxes.  Yeah, toolboxes.
5      Q.   On the floor?
6      A.   Yeah.
7      Q.   Was it easy to walk around in the house?
8      A.   Yeah, kind of.  There was still some stuff on
9  the floor.  Yes, it was kind of easy.
10     Q.   What I've been told -- so correct me if I'm
11 wrong -- was that there were piles of things on the
12 floors, and then there were pathways so you could walk
13 in and out.
14     A.   Kind of, yeah.  That's the way it was.
15     Q.   Okay.  So it was cluttered, but it was an
16 organized clutter?
17     A.   Yeah.
18     Q.   Do you recall participating in a videotape of
19 the house after the search?
20     A.   I remember a videotape being done, yes.
21     Q.   And do you recall being on that videotape?
22     A.   I can't remember being on there.
23     Q.   Do you remember going through your room,
24 showing things that had happened?
25     A.   Yes.  Yes, I do.  I do remember that.  There

Page 72

1  was an old woman that had the camera.
2      Q.   Okay.  So you remember that?
3      A.   Yes, I do.  I remember that.
4      Q.   After you returned home, did you help Don do
5  any of the cleaning or anything?
6      A.   Yeah, I helped.  Mostly just did my room,
7  though.
8      Q.   Just left the old man on his own?
9      A.   Yeah.  He had his own things.  I didn't want
10 to touch any of his stuff.
11     Q.   Did you help with like repairing the ceilings
12 or anything?
13     A.   No.  I didn't help with that.
14     Q.   Do you know if they were ever repaired?
15     A.   Yeah.  He repaired the ceiling after a while.
16 I believe it was after I moved is when I noticed the
17 ceiling repaired when I went to go visit him.
18     Q.   How long did it take you to clean your room?
19     A.   About four days, five days.
20     Q.   How many hours do you think you spent on it?
21     A.   All together, a guess, oh, man, maybe about
22 20-some hours, 24 hours, a long time.
23     Q.   Did you ever have to go to court as a result
24 this incident?
25     A.   We had a court date.  But we went, and then I

18 (Pages 69 to 72)

**Page 73**

1 guess we didn't have to go.
2    Q.    All three of you go together?
3    A.    Yeah.
4    Q.    What happened when you went?
5    A.    Some officer told us that we're not supposed
6 to be there today. If our names were on the wall and
7 had a star next to it, that means they'll mail us a
8 letter for a later court date.
9    Q.    Did you hire an attorney?
10    A.    I didn't, no.
11    Q.    Did Don hire an attorney?
12    A.    No.
13    Q.    Did Don say anything to the bailiff or the
14 gentleman who told you you didn't need to appear?
15    A.    I think he said something, but I can't
16 remember what.
17    Q.    Did you ever go back to court?
18    A.    No.
19    Q.    Did you ever get a letter in the mail?
20    A.    No.
21    Q.    Have you ever received a letter from the
22 police department regarding this incident?
23    A.    No.
24    Q.    Ever received a letter from the district
25 attorney?

**Page 74**

1    A.    No.
2    Q.    Have you ever tried to check on the status of
3 the criminal charges against you?
4    A.    No, I never checked. No, I never checked. I
5 never bothered with it. We talked about it and stuff.
6 I was mostly afraid to tell you the truth.
7    Q.    Did you ever --
8    A.    I didn't want to bring it back up again to
9 tell you the truth.
10    Q.    Did you ever try to get the money back, the
11 $200?
12    A.    No. I didn't try, no.
13    Q.    None of the firearms seized were yours;
14 correct?
15    A.    No.
16    Q.    Were you aware that there were firearms in
17 the attic?
18    A.    No.
19    Q.    So you had never seen those guns before?
20    A.    No.
21    Q.    You didn't own any of them?
22    A.    No.
23    Q.    Did you ever see Don with a handgun in the
24 house?
25    A.    No.

**Page 75**

1    Q.    Did he ever tell you whether he had one in
2 the house?
3    A.    (No audible response.)
4    Q.    Is that a no?
5    A.    That's a no, yes. I'm sorry.
6    Q.    Did you ever make any attempts to obtain the
7 police reports as a result of this incident?
8    A.    No.
9    Q.    Do you remember answering interrogatories
10 that I sent to your attorney, questions for you to
11 answer?
12    A.    Yes.
13    Q.    Okay. It says in here that, you answered one
14 of my questions that all of your money and blue cards
15 for the firearms were taken. If I understand you
16 correctly, it was just one blue card that was taken?
17    A.    No. Two blue cards. But they were old. I
18 didn't have the weapons from them anymore.
19    Q.    Okay. So the blue cards for weapons you no
20 longer owned?
21    A.    Yeah.
22    Q.    And you have not seen any healthcare
23 providers like doctors or psychiatrists as a result of
24 this incident?
25    A.    No. Too expensive.

**Page 76**

1    Q.    Do you feel like you need to see a doctor?
2 Let's start with just your physical condition for your
3 shoulder or your hands.
4    A.    No.
5    Q.    Any other physical injuries you suffered?
6    A.    No. Nothing hurts.
7    Q.    Okay. How long did your hands hurt after the
8 incident? Was it a day you said?
9    A.    Yeah.
10    Q.    And your shoulder, when did that pain go
11 away?
12    A.    When I was in jail later on that night.
13    Q.    At the jail were you ever made aware of what
14 the charges against you were? You said when you got
15 that sheet?
16    A.    I got a sheet, yes.
17    Q.    What were those charges?
18    A.    Possession of firearm. Possession of
19 marijuana. And another charge was possession of
20 file -- altered serial numbers.
21    Q.    Do you know who Sandra Estrada is?
22    A.    Yes, I do.
23    Q.    Who is that?
24    A.    It is a friend of mine's wife.
25    Q.    What information would she have about this

ASSOCIATED REPORTERS OF NEVADA - 702/382-8778
2300 W.SSaharaDAve.,RSte. 770,ELasAVegas,/Nevada789102

Page 77

1  case?
2      A.   I have no idea.
3      Q.   Do you intend to call her as a witness if
4  this goes to trial?
5      A.   I don't see no reason why I should.
6      Q.   Did she come over to the house or anything
7  after?
8      A.   Oh, yes she did.  Her and my baby's mom both
9  came over, Veronica.
10     Q.   Is your baby's mom Veronica Rivas?
11     A.   Yes.
12     Q.   Did they bail you out?
13     A.   No.  Sandra's husband bailed me out.
14     Q.   What is his name?
15     A.   John Maystek.  Maybe it was in her name,
16  though.
17     Q.   Do you know John Maystek?
18     A.   Yes, I do.
19     Q.   How do you know him?
20     A.   Through when we were kids.  We grew up
21  together and stuff.
22     Q.   So just a friend?
23     A.   Yeah, just friends.
24     Q.   Anything that you remember about this
25  incident that we haven't talked about that you would

Page 78

1  like to tell me?
2      A.   Not at this time, no.  I can't remember.
3      MR. ANDERSON:  That's all I've got.
4      MR. BOOKE:  Thank you very much.
5      THE REPORTER:  Mr. Booke, would you like a
6  copy of these depositions?
7      MR. BOOKE:  Yes, ma'am.
8           (Thereupon the taking of the
9            deposition was concluded at
10           4:12 p.m.)
11                *   *   *   *   *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 79

1              CERTIFICATE OF DEPONENT
2   Page  Line  Change                      Reason
3      ____  ____  _____
4      ____  ____  _____
5      ____  ____  _____
6      ____  ____  _____
7      ____  ____  _____
8      ____  ____  _____
9      ____  ____  _____
10     ____  ____  _____
11     ____  ____  _____
12              *   *   *   *
13          I, John Reyes, Jr., deponent herein, do hereby
    certify and declare the within and foregoing
14  transcription to be my deposition in said action; that
    I have read, corrected, and do hereby affix my
15  signature to said deposition.
16
17                    _____
                          John Reyes, Jr.
18
19  STATE OF NEVADA    )
                       )  SS:
20  COUNTY OF CLARK    )
21
22          Subscribed and sworn to before me this
    _____ day of _____, 2003.
23
24
25                    _____
                          Notary Public

Page 80

1              CERTIFICATE OF REPORTER
2   STATE OF NEVADA   )
                      )  ss
3   COUNTY OF CLARK   )
4          I, Karen B. Nowak, CCR #476, Clark County,
5   State of Nevada, do hereby certify:
6          That I reported the taking of the deposition of
7   John Reyes, Jr., commencing on the 5th of November,
8   2003, at the hour of 2:52 p.m., and that prior to being
9   examined the witness was by me duly sworn to testify to
10  the truth.
11         That I thereafter transcribed my said shorthand
12  notes, and that the typewritten transcript of said
13  deposition is a complete, true, and accurate
14  transcription of my shorthand notes.
15         I further certify that I am not a relative or
16  employee of the parties, attorneys, or counsel
17  involved in said action, nor a person financially
18  interested in the action.
19         IN WITNESS WHEREOF, I have hereunto set my hand
20  in my office in the County of Clark, State of Nevada,
21  this 19th day of November, 2003.
22
23
24
25                    _____
                      KAREN B. NOWAK, CCR #476

20 (Pages 77 to 80)

## LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# OFFICER'S REPORT

EVENT #: 020116-2509

SERVICE SEARCH WARRANT

SUBJECT

| | | |
|---|---|---|
| DIVISION REPORTING: | NARCOTICS | DIVISION OF OCCURRENCE: NARCOTICS |
| DATE AND TIME OCCURRED: 01-16-02/2140 HRS | | LOCATION OF OCCURRENCE: 1919 E HALLWOOD, LVN |

**SUSPECT(S):**   **DAVID HINTON**
**WMA, 600/180, BRO/BRO**
**ID#: 1528967**
**DOB: 01-13-80**
**SOC: 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**
**ADD: 1919 HALLWOOD, LVN 89119**

*CHARGE(S):* *POSS STOLEN PROPERTY - FIREARM*
*POSS FIREARM WITH ALTERED/REMOVED SERIAL NUMBER*
*POSS CONT SUB - MARIJUANA*
*BENCH WARRANT - HENDERSON PD*
*–       CARRY CONCEALED WEAPON*

**JOHN REYES**
**HMA, 508/135, BRO/BRO**
**ID#: 1177111**
**DOB: 05-24-78**
**SOC: 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**
**ADD: 1919 HALLWOOD, LVN 89119**

*CHARGE(S):* *POSS STOLEN PROPERTY - FIREARM*
*POSS FIREARM WITH ALTERED/REMOVED SERIAL NUMBER*
*POSS CONT SUB - MARIJUANA*

*POSS CONT SUB - METHAMPHETAMINE (PENDING)*
*ATTEMPT TO SELL CONT SUB - METHAMPHETAMINE (PENDING)*

**DONALD HINTON**
**WMA, 510/220, GRY/BLU**
**ID#: 482533**

LVMPD adv. Hinton
FRCP 26(f)   000048

| | | | |
|---|---|---|---|
| e and Time of Report: 01-24-02/1314 HRS | Officer: S. WITHAM | P#: 4594 |
| roved: | Officer: | P#: |

D #2/REV. 1.91) - AUTOMATED                    SIGNATURE:

TAN POLICE DEPARTMENT
TION REPORT

NORK WITH NAMES AND ADDRESSES OF
E OF THE SUSPECTS AND FIREARM BLUE

D, LVN 89119

TY - FIREARM
ALTERED/REMOVED FIREARM
RIJUANA

.C1006079L
VALUE IN ROBBERY AT ATM MACHINE IN
/SPENCER, EARLY DEC 01 - POSSIBLE
ATED TO EVENT 011229-0179, WHICH
ES MATCH)

IME

RIEND OF DAVID HINTON BUT NOT A
SIDENCE.

SERIAL 266 - LOCATED IN THE CLOSET OF
ER BEDROOM

IFLE, SERIAL K28531 - LOCATED IN THE

3360            NARCOTICS SQ 8

RIFLE, BLK, MODEL 1600, .22 CAL, SERIAL
VID HINTON'S BEDROOM

RIFLE, SERIAL 4297E/53406 - LOCATED IN

LVMPD CSA

SWAT LEADER & SQUAD

- 180D, BOLT ACTION SHOTGUN, NO
VID HINTON'S BEDROOM

O SHOTGUN, SERIAL 30615 - LOCATED IN

UNDED UNDER EVENT 020116-2509)

-AUTO RIFLE, SERIAL 2592992 - LOCATED

JUANA

GLE SHOT SHOTGUN, MODEL SB100B, .20
ATED IN THE ATTIC BY SWAT

(METHAMPHETAMINE)

, BOLT ACTION RIFLE, SERIAL 72175 -
N'S BEDROOM

, .22 CAL, PUMP RIFLE, SERIAL 588190 -
SWAT

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/Event Number:   020116-2509

Page 4 c

18   18   WINCHESTER MODEL 1870, .22 CAL, PUMP RIFLE, SERIAL 169122 - LOCATED IN THE ATTIC BY SWAT

19   19   WINCHESTER, 12 GAUGE PUMP SHOTGUN, SERIAL 1189207 - LOCATED IN THE ATTIC BY SWAT

20   20   MARLIN MODEL 20, .22 CAL, BOLT ACTION RIFLE, SERIAL 24616170 - LOCATED IN THE ATTIC BY SWAT

21   21   WINCHESTER 67, .22 CAL, BOLT ACTION RIFLE, NO SERIAL# - LOCATED IN THE ATTIC BY SWAT

22   22   WINCHESTER 1866, LEVER ACTION RIFLE, SERIAL 433727B - LOCATED IN THE ATTIC BY SWAT

23   23   MARLIN 60, .22 CAL, SEMI-AUTO RIFLE, SERIAL 14323367 - LOCATED IN THE ATTIC BY SWAT

24   24   AMADEO ROSSI, DOUBLE BARREL SHOTGUN, NO SERIAL# - LOCATED IN THE ATTIC BY SWAT

25   25   MARLIN MODEL 366, 30-30, DOUBLE ACTION RIFLE, SERIAL AD38446 - LOCATED IN THE ATTIC BY SWAT

26   26   UNKNOWN MAKE, MODEL 1940, .22 CAL, BOLT ACTION RIFLE, SERIAL AR9374 - LOCATED IN THE ATTIC BY SWAT

27   27   MARLIN 60, SEMI-AUTO RIFLE, .22 CAL, SERIAL 17307328 - LOCATED IN THE ATTIC BY SWAT

28   28   SAVAGE MODEL 103, .22 CAL LEVER ACTION RIFLE, SERIAL D720934 - LOCATED IN THE ATTIC BY SWAT

29   29   ROMA ARMS MODEL APCUGIR, SEMI-AUTO RIFLE, SERIAL S1217972000 - LOCATED IN DAVID HINTON'S BEDROOM

30   30   TAURUS .38 SPECIAL, .38 CAL REVOLVER, SERIAL KD14915 - LOCATED IN DAVID HINTON'S BEDROOM

31   31   JP SAWYER & SON MONTANA MARSHAL, .44 CAL REVOLVER, SERIAL 2559314 - LOCATED IN THE ATTIC BY SWAT

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/Event Number:   020116-2509

Page 5 c

| 32 | 32 | BERETTA MODEL 21A, .22 CAL PISTOL, SERIAL BES17768U - LOCATED UNDER THE PILLOW IN DONALD HINTON'S MASTER BEDROOM |
|----|----|--|
| 33 | 33 | H&R MODEL 949, .22 CAL REVOLVER, SERIAL AD85807 - LOCATED IN THE ATTIC BY SWAT |
| 34 | 34 | COLT, .22 CAL PISTOL, SERIAL# FILED OFF - LOCATED IN THE ATTIC BY SWAT |
| 35 | 35 | RUGER BEARCAT, .22 CAL REVOLVER, SERIAL 9136447 - LOCATED IN THE ATTIC BY SWAT |

NOTE 1:    UPON RECORDS CHECK PKG 32, ITEM 32 WAS REVEALED TO HAVE BEEN STOLEN UNDER EVENT 961113-1813, NIC/ G721913546 - STOLEN IN A BURGLARY AT 4221 PASTERNEK, LVN 89119.  R/O: ROBERT ROBERSON (V)

### SYNOPSIS:

On 01-06-02 became the Affiant of a search warrant to be served at 1919 HALLWOOD, LVN 89119, which was signed by the Honorable Judge T. Abbatangelo.

On 01-16-02 at approximately 2140 hrs, members of LVMPD SWAT under the direction of Sgt W. Graham, served the CLASS IV search warrant at the address of 1919 HALLWOOD, LVN 89119. The residence which was fortified made it difficult for SWAT to make initial entry therefore they went tactical in calling out four individuals from the residence.  They took out and contacted the above listed suspects.

Upon securing the residence, they turned the residence over to myself, Det S. Witham, the Affiant of the search warrant and through a subsequent search of the residence, the above listed items of evidence was located.

Based on the fact that 3.6 grams of NIK positive MARIJUANA was located in the residence along with (27) firearms, (2) of which were immediately recognizable as being illegal firearms i.e. a stolen firearm and a firearm with an altered/defaced serial number; coupled with paperwork and evidence located at the residence indicating the fact that suspects, DONALD & DAVID HINTON, JOHN REYES are all residents of the residence, they were placed under arrest for POSSESSION STOLEN PROPERTY - STOLEN FIREARM, POSSESSION FIREARM WITH ALTERED/DEFACED SERIAL NUMBER and POSSESSION CONTROLLED SUBSTANCE - MARIJUANA LESS THAN 1 OZ.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

**ID/Event Number:**   020116-2509

Page 6 c

During the booking phase, JOHN REYES, ID# 1177111, was found to be in possession of (3) clear plastic baggies containing 2.1 grams of ODV positive METHAMPHETAMINE. This was located by C/O A. Feher in REYES sock during a search at CCDC. This was impounded under event 020117-0160.

At the time of the booking, I, Det S. Witham did not book REYES in on POSSESSION CONTROLLED SUBSTANCE WITH INTENT TO SELL, due to the fact that these individuals are possible suspects in robberies, allowing REYES leniency for cooperation in pending robbery investigations.

All evidence of evidentiary value were impounded under events 020116-2509 and 020117-0160.

**DETAILS:**

**SEARCH PHASE:**

On 01-06-02, I, Det S. Witham, P# 5494, became the Affiant of a search warrant to be served at 1919 E HALLWOOD DR. LVN 8911 which was signed by the Honorable Judge T. Abbatangelo.

On 01-16-02 at approximately 2140 hrs, all officers assigned to SWAT TEAM under the command of Sgt R. Graham, dressed in Police identification tactical equipment served a search warrant at 1919 E HALLWOOD DR, LVN 89119.

During the entry phase of the search warrant, LVMPD SWAT went tactical and called (4) suspects from the residence and took them into custody. They were identified as DAVID HINTON, DOB 01-13-80 (who was the subject of my preliminary investigation), JOHN REYES, DOB 05-24-78 and DONALD HINTON, DOB 02-17-34. These subjects were all identified later to be residences of the suspect premises. MICHELLE VESELSKA, DOB 12-27-79, was also located in the residence however not found to be a resident of that address but was the girlfriend of DAVID HINTON.

While the suspects were in custody, a K-9 unit assigned to SWAT detected a hit in the attic portion of the residence. SWAT Officers then proceeded to the attic portion and located (21) firearms. The firearms appeared to be fairly clean and recently stored due to the lack of dust or markings on them.

**CUSTODY PHASE:**

During this phase, I, Det Witham read Miranda rights to JOHN REYES, DAVID HINTON and DONALD HINTON to which they all stated they understood.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/Event Number:   020116-2509

Page 7 c

A records check was conducted on all three subjects were conducted and revealed that DAVID HINTON, had an outstanding warrant for CARRYING CONCEALED WEAPON, out of HENDERSON P.D.  This was an electronic warrant and did not need to be confirmed. A records check also showed that DAVID HINTON had prior arrests for BURGLARY and POSSESSION UNREGISTERED FIREARM as well as POSSESSION CONTROLLED SUBSTANCE.

JOHN REYES was found to have been arrested for POSSESSION NARCOTICS PARAPHERNALIA and to reside at 1919 E HALLWOOD DR.  MICHELLE VESELSKA had priors for SOLICITING PROSTITUTION and DONALD HINTON had an arrest for OBSTRUCTION POLICE OFFICER and FUGITIVE VIOLATION - CHILD CUSTODY.

DONALD HINTON also stated that he was convicted and did prison time for robbery.  We were unable to verify this fact due to the fact that the computer system did not date back to that time frame.  He also stated that he never applied to have his rights restored due to being an ex-felon however due to us being unable to verify this charge, he was not arrested immediately for the subsequent charges of EX-FELON POSSESSION FIREARM until later follow-up investigations conducted into the matter of his FELON status.

## SEARCH PHASE:

During this phase, 3.6 grams of NIK positive MARIJUANA was located by myself in the south bedroom on the top of the desk.  Located in DAVID HINTON'S bedroom were (5) of the (27) firearms.  Also found was a vial containing an off-white brownish crystal residue which through my training and experience resembled that of METHAMPHETAMINE.

Also located in the safe of DAVID HINTON'S bedroom was a torn $20 bill bearing serial AC1006079L (the significancy of this $20 was that during a preliminary investigation, I learned through a Confidential Informant (CI) that DAVID HINTON had conducted a robbery in which that $20 bill had been torn off during a fight with the victim.  See preliminary investigation OFFICERS REPORT for probable cause under event 020104-2240.

Miscellaneous paperwork such as bills, letters and various other miscellaneous type papers were located throughout the living room, kitchen and master bedroom indicating the names of JOHN REYES, DONALD HINTON and DAVID HINTON and listing their address of 1919 E HALLWOOD, LVN 89119.

During the booking phase for the initial firearm charges and marijuana charges, JOHN REYES was searched and found to be in possession of (3) clear plastic baggies containing 2.1 grams of ODV positive METHAMPHETAMINE in his socks by C/O Feher.  He was charged at this time however pending charges could be forthcoming.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/Event Number:    020116-2509

Page 8

## INVESTIGATION PHASE:

After I Mirandized all three suspects, I conducted interviews with each one.  REYES indicated to me that he had knowledge of a .45 caliber firearm that he stated was his and located in the residence.  REYES stated that he had no knowledge of the firearms in the attic and further stated that he had not idea of narcotics sales occurring from the residence however stated that he did have knowledge that there was MARIJUANA in his bedroom.

I next spoke to DAVID HINTON who stated that he owned (4) firearms and (1) pistol which were all going to be located in his bedroom.  They were located in a safe and under the bed in his bedroom.  He stated that he had no knowledge of these firearms located in the attic portion of the residence.  HINTON further stated that he had a small quantity of MARIJUANA located in the residence for his personal use.   He also confirmed inadvertently that he is a residence of the 1919 HALLWOOD and lives there with JOHN REYES and his father, DONALD HINTON.

I then spoke to DONALD HINTON who allowed me to speak with him shortly then invoked his rights to remain silent.  Prior to doing so, he stated that he was an ex-felon for ROBBERY out of CALIFORNIA but as previously indicated this could not be verified at this time.  DONALD further stated that he had no knowledge of the firearms located in his attic however, paraphernalia and firearms throughout the residence were located in plain view and DONALD stated that he had no knowledge of those items present as well.

One of the firearms located under the pillow of DONALD HINTON'S master bedroom was a BERETTA MODEL 21A, .22 cal, black, semi-auto pistol bearing serial BES17768U.  A records check on this firearm revealed it to have been stolen under event 961113-1813, NIC/ G721913546 and indicated that the firearm was stolen in a burglary and belonged to ROBERT ROBERSON at 4221 PASTERNEK, LVN 89115.

Another firearm located in the attic was a COLT .22 cal, semi-auto firearm that had its serial number filed off the receiver portion of the firearm.

## ARREST & CHARGING PHASE:

Based on the above facts and circumstances at this time, DAVID HINTON, DONALD HINTON and JOHN REYES were all booked into CCDC for POSSESSION STOLEN PROPERTY - STOLEN FIREARM, POSSESSION FIREARM WITH ALTERED/DEFACED SERIAL NUMBER and POSSESSION CONTROLLED SUBSTANCE - MARIJUANA.

Information related to the robberies were forwarded to ROBBERY section and the LVMPD FIREARMS Detail was notified at the beginning phase of the service of search warrant however they elected not to respond at this time.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/Event Number:   020116-2509

Page 9 o

Other charges pending are EX-FELON POSSESSION FIREARM against DONALD HINTON once confirmation of his past felon status is confirmed.   POSSESSION CONTROLLED SUBSTANCE WITH INTENT TO SELL - METHAMPHETAMINE under event 020117-0160 against JOHN REYES is pending due to him having been in possession of METHAMPHETAMINE during the booking phase at CCDC as his money was also taken and impounded.

All items of evidentiary value were impounded as evidence.

DONALD HINTON, DAVID HINTON and JOHN REYES were all booked into CCDC on the above listed charges.

SW/ask
Job#: 89662

Date/time dictated: 012402/1314 hrs
Date/time transcribed: 012402/1440 hrs





LVMPD adv. Hinton
FRCP 26(f)   000101

LVMPD adv. Hinton
FRCP 26(f)   000103





LVMPD adv. Hinton
FRCP 26(f)   000104



**ORIGINAL**

1   Bradley L. Booke #2662
2   7251 W. Lake Mead Boulevard #530
    Las Vegas, NV  89128
3   702-947-7000
4   702-932-8025 Fax

5
    Edward P. Moriarity
6   J. Douglas McCalla
7   SPENCE, MORIARITY & SHOCKEY
    15 Jackson Street
8   Box 548
9   Jackson, Wyoming 83001
    (307) 733-7290
10  (307) 733-5248 Fax

11
    Attorneys for Plaintiffs
12

13              **UNITED STATES DISTRICT COURT**
14                  **DISTRICT OF NEVADA**
15
16  DONALD HINTON, DAVID HINTON        ) Case No.: CV-S-03-0057-PMP-PAL
    and JOHN REYES,                    )
17                                     )
           Plaintiffs,                 )
18                                     )   **PLAINTIFF DONALD HINTON'S**
        vs.                            )   **ANSWERS TO DEFENDANTS' FIRST**
19                                     )   **SET OF INTERROGATORIES**
    CLARK COUNTY, NEVADA, a political  )
20  subdivision, acting by and through the )
    LAS VEGAS METROPOLITAN POLICE      )
21  DEPARTMENT, et al.                 )
                                       )
22         Defendants.                 )

23      Donald Hinton answers Defendants' First Set of Interrogatories to Plaintiff
24  Donald Hinton, pursuant to Rule 33, Federal Rules of Civil Procedure, as follows:
25  INTERROGATORY NO. 1.        State Plaintiff's full name, address, date of birth, and
26  Social Security Number.
27  ANSWER TO INTERROGATORY NO. 1:      Donald  Roy  Hinton,  1919  Hallwood
28  Avenue, Las Vegas, Nevada 89119; DOB: 2/17/34; SS#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.

RECEIVED
AUG 1 4 2003
MARQUIS & AURBACH

INTERROGATORY NO. 2.        Please state whether Plaintiff has ever been convicted or pled guilty to a felony or offense which was punishable by death or imprisonment for one (1) year or more or involve dishonesty or false statements.    If Plaintiff is answering the affirmative [sic] please state the nature of the crime, date of the conviction, title of the court in which the conviction is on file and the sentence you received.

ANSWER TO INTERROGATORY NO. 2:        Objection.  Not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving this objection, and subject to this objection, in 1959, I was convicted of armed robbery in Los Angeles, California.

INTERROGATORY NO. 3:        State all of Plaintiff's present and prior employers for the past five (5) years, including the dates of employment, the name of the employer and the Plaintiff's immediate supervisor, the rate of pay, the job title, and the brief description of the duties involved.

ANSWER TO INTERROGATORY NO. 3:        I retired in 1999. For the 12 prior years, I worked for Teamsters Local #631.  For twenty-two years prior to that, I worked for Local 92 of the Boilermakers Union.

INTERROGATORY NO. 4:        For the past five (5) years, state each and every residence of the Plaintiff, indicating whether or not such residence was owned or rented by the Plaintiff and the person or persons with whom the Plaintiff resided in such residence.

ANSWER TO INTERROGATORY NO. 4:        I have lived at 1919 Hallwood Avenue, Las Vegas, which I own with my son, David, for approximately 25 years.

INTERROGATORY NO. 5:        Identify by name and number each and every lawsuit in which Plaintiff was a named party, whether a plaintiff or defendant, and state with particularity the substance of the lawsuit.

1   ANSWER TO INTERROGATORY NO. 5:        To the best of my knowledge, I have not
2   been a party to a lawsuit.
3   INTERROGATORY NO. 6:        With specificity, and in narrative form, please state
4   Plaintiff's recollection of the events of the evening of January 16, 2002, beginning at
5   around 11:15 p.m. and concluding after your alleged release from jail.
6   ANSWER TO INTERROGATORY NO. 6:        This is a summary of what happened,
7   from my point of view: At approximately 11:30 p.m. on 1/16/02, I took a tray of cookies
8   from my oven and placed them on my kitchen counter for cooling.
9         My son, David, and a girlfriend of his, walked into the kitchen and asked when
10  the cookies would be ready to eat. I told them in about 30 minutes. They left the
11  kitchen, and I thought they had gone outside.
12        Shortly thereafter, I heard two very loud explosions at the front of my home. I
13  got up immediately to go to the front door thinking there was a drive-by shooting in
14  progress, because the news has been full of this type of bad behavior. I pulled my front
15  door open yelling to my son to get down. I saw, silhouetted against the street lights,
16  about eight men in ski masks with rifles or shotguns. It was too dark to tell for sure
17  exactly what kind of weapons they had. I kept yelling for my son to get down thinking
18  he was outside with his friend.
19        At this time, two or three more shotgun blasts went off immediately in front of
20  me and into my security gate. The gate was jerked out of my hand and something very
21  hard brushed my leg and broke open a front door panel in my front door. The men in
22  ski masks were screaming "get down" and "who else is in the house?" They pulled me
23  outside from my hallway and into the night onto my front sidewalk.
24        At this time, I could see my son, David, coming around the corner of the hallway.
25  Then, the masked men yelled again and took David outside and into the next door
26  neighbor's driveway, where they slammed him into the back of our neighbor's car
27  trunk. They searched him then kicked his legs out from under him and slammed him
28  one more time into the trunk of our neighbor's car. They put my son on the ground

1   facing the street, sitting on cold concrete and dressed in only pants and a tee shirt. It

2   was January and very cold, possibly 40 degrees or colder.

3        Next to come around the corner was David's girlfriend and they had her lay

4   down in the hallway. She was then picked up and taken outside to be placed on the

5   sidewalk in a cross-legged position, next to my son. John Reyes, a friend of my son's,

6   who was then living with us, was then taken outside in his bare feet, and was told to sit

7   on the sidewalk. Everyone was sitting on the sidewalk except me. I refused! I have

8   severe arthritis in my shoulders, back, and knees. Risking getting knocked down would

9   have been no worse than volunteering to stoop and crouch while handcuffed in plastic

10  straps, as all of us were at this time.

11       About thirty minutes later, some differently dressed men arrived. Several

12  minutes, possibly ten minutes later, one of the men came outside and asked if we had a

13  key to a closet door. We did, and showed them which one it was and said: "you have to

14  jiggle it a bit." They told us if this key doesn't work the next sound you hear will be a

15  shotgun blast opening the closet door.

16       I complained several times that we needed jackets, that it was very cold, and that

17  I also had only a tee shirt for warmth. One of the men went inside and brought me a

18  jacket, but my son, his girlfriend, and John Reyes were not given anything to protect

19  them from the cold. I felt extreme sympathy for the young girl, who obviously was

20  sitting on her bare bottom on the cold concrete. John Reyes was complaining that the

21  plastic straps were too tight and cutting off circulation to his hands. The men never

22  made an adjustment to his restraints.

23       After about an hour, or possibly longer, of being observed by many people in the

24  neighborhood, we were taken back into my home. Upon entering, I saw a huge hole in

25  my ceiling and asked: "What happened? Someone fall through the ceiling?" The men

26  explained there was an ambulance arriving, then someone was wheeled out on a

27  stretcher to the ambulance. I don't know what happened to the person on the stretcher,

28  as I was not permitted to see the ambulance leave.

-4-

After entering the home and walking through the hallway and into the front room, I was overwhelmed by the devastation and havoc committed upon my home. The men acted as if they thought it was funny. We were placed on the floor of my front room, except myself, I was placed on my couch facing the others. However, as outside, we were told to not speak to one another.

A person I was told was a chemist arrived. He was dabbing the walls and I heard him speak another man and ask: "Well, are you going to find any drugs, or what?" I didn't hear the answer. Later the chemist asked one of the men: "What are you going to charge this man with – baking cookies?" At this point, when the chemist was asking about drugs, was the first time that I had any idea what these police were doing at my home. When I asked I was told: "None of your fucking business."

One by one, we were photographed by the chemist and told to be reseated and shut up. After a short conversation with a woman, the chemist gathered his tools and left. I never saw him again.

I was then ordered to go into my front bathroom. One of the men questioned me about guns found in my home. I was returned to the front room, and one by one, everyone was questioned by the man and all were returned very shortly to the front room.

At this time, while we were seated in the front room, one of the men said that we should see how well his dogs were trained. I had several tables with Prison & Parole Information in properly aligned stacks on those tables. The man ordered his dog to jump up on the tables and ran him around until the papers were scattered throughout the two adjoining rooms. To this day, I still haven't been able to find, and did have in proper order, all the paperwork I needed for reference in my work for Prison & Parole Reform Research.

We were later told we were going downtown for arrest. I questioned why the girl (who was scared to death) was going to be arrested. One of the men said: "Let her go." At this time, a discussion of where my dog was to go came up. The girl volunteered to

keep my dog until we were released. The police would not agree and called the dog pound to come get her. The girl was released and she left.

At this time, John Reyes and I were taken to an unmarked police car. John asked for relief from the plastic straps on his wrists, and we were put into handcuffs. Again, John's restraints were placed too tightly on his wrists. He asked to have them loosened. The police checked the cuffs and agreed to loosen them, but he didn't have a key. John was in pain, and it showed when we got to the jail. His hands were blue. I called a jailer and he checked the cuffs and took them off immediately. The jailer started yelling at the police: "Who put these cuffs on this man?" No one spoke up.

We were taken into the county jail, photographed, and fingerprinted printed. We posted bail and were let out of the jail between 11:00 p.m. and 1:00 a.m. the next day. When we arrived home, the front gate was closed, but not locked. The front security gate was wide open. The front door was wide open. Upon entering the home, I discovered that the heat was turned up to a full 90 degrees. The back door was wide open. The security gate in the rear of the home was wide open.

After securing my home, I went in the kitchen and found some paperwork informing me of a search warrant, which was the first I heard about a search warrant. Many articles of value were gone or misplaced. The following day I spent over four hours at the Dewey Animal Center trying to locate my dog. I finally found her and paid the $60.00 and took her home.

I called a retired attorney friend, and another friend, and we photographed and videotaped the destruction of my home and its contents. Later that evening, John Reyes walked home from the county jail – without shoes. John could not call home for a ride because the police had torn my phone lines out in the ceiling of my home and the phones were inoperable. John's feet were blue and bleeding when he got home. My son, David, was later released and he returned home.

We went to court on February 19, 2002, as ordered, to answer the charges. We were denied entry into the courtroom and told by the bailiff to go home, and that we

1  would be notified if charges were ever filed on us.  I objected, but left rather than face
2  arrest for demanding my case be heard.

3  INTERROGATORY NO. 7:        State with specificity and list, all damages Plaintiff
4  alleges to have incurred as a result of the allegations in Plaintiff's Complaint.

5  ANSWER TO INTERROGATORY NO. 7:        My  damages  include  the  following
6  things:  my home was fired upon, invaded, ransacked and literally destroyed, and I was
7  struck, threatened, handcuffed, searched, arrested and held for a long period of time
8  without any reason.  Many items of my personal property were taken, destroyed or
9  damaged, and have never been returned or repaired.  All of these things violate my
10 constitutional rights.

11 INTERROGATORY NO. 8:        Identify the legal owner of the real property located at
12 1919 Hallwood Drive, Las Vegas, NV.  State whether you have any legal ownership
13 interest in the property.

14 ANSWER TO INTERROGATORY NO. 8:        Donald Hinton and David Hinton.

15 INTERROGATORY NO. 9:        With reference to the allegation contained in ¶23(A)
16 in Plaintiff's Complaint, state with specificity all facts which support your statement
17 that "Defendants herein made false representations to obtain the search warrant that
18 was issued on January 6l, 2001" to search the residence located at 1919 Hallwood Drive,
19 Las Vegas, Nevada.  Specifically, identify each statement in the search warrant Plaintiff
20 alleges to be false.

21 ANSWER TO INTERROGATORY NO. 9:        Plaintiff objects to this interrogatory to
22 the extent that it confuses the representations made to obtain the search warrant with
23 the language in the search warrant itself.  Without waiving this objection, and subject to
24 this objection, according to police documents that have been produced, the police got a
25 search warrant based on statements made by a detective to a judge that my son, David,
26 had sold methamphetamine, at my house, to a confidential informant.  The statements
27 made by the detective are on the officer's report that has been produced in this case,
28 and  they  are  false  statements.      My  son  has  told  me  that  he  did  not  sell

1  methamphetamine, on January 4, 2002, or any other day, at my house or anywhere else,

2  to a confidential informant or anyone else.

3  INTERROGATORY NO. 10:      With reference to the allegation contained in ¶23(A)

4  of Plaintiff's Complaint, state with specificity all facts which support the statement that

5  the search of the residence at 1919 Hallwood Drive, Las Vegas, Nevada was

6  "unreasonable".

7  ANSWER TO INTERROGATORY NO. 10:      The facts include the following:   there

8  was no basis for obtaining a search warrant or conducting a search in the first place.

9  The entry into our house, the search itself, and the way we were treated, generally as

10  described in my answer to interrogatory number 6, was more like ransacking and

11  destruction than it was searching, and it went way beyond anything that was necessary

12  to find what the police claimed to be looking for.  Nothing the police claimed to be

13  searching for was at the house and nothing was found.  The police destroyed many

14  items of property, took and never returned many items of property, and never repaired

15  any of the property that was damaged.

16  INTERROGATORY NO. 11:      With specificity, please identify all areas of the real

17  property located at 1919 Hallwood Drive, Las Vegas, Nevada, which were allegedly

18  damaged by the LVMPD Swat and Narcotics officers on January 6, 2001.  Please specify

19  the room in which the damage occurred and the nature of the damage.

20  ANSWER TO INTERROGATORY NO. 11:      For the most part, the damage is shown

21  in the photographs and videotape that are produced with these answers.

22  INTERROGATORY NO. 12:      With respect to this answering Plaintiff, please

23  identify all "valuable items of personal property" that were seized by the Defendants as

24  referenced in ¶23(B) of Plaintiff's Complaint.  Please state the Plaintiff's ownership

25  interest in the personal property and current status of the identified items.

26  ANSWER TO INTERROGATORY NO. 12:      The items include the antique and

27  collectible firearms listed on the attached affidavit of Zelma Hinton Ranslem, that I

28  owned.  There are probably other items of property, as well, but, as shown in the

-8-

1  attached photographs and videotape, the house was so ransacked that I don't know if

2  I'll ever be able to make a complete list.

3  INTERROGATORY NO. 13:    Please state all facts supporting Plaintiff's claim in

4  ¶23(C) that the Defendants violated your Sixth Amendment right to affective assistance

5  of counsel.  In doing so, please identify the names and identities of the individuals

6  against whom the allegation is made.

7  ANSWER TO INTERROGATORY NO. 13:    The facts include the following:  False

8  statements were made by at least one police officer in order to get the search warrant

9  that was used to ransack our house and take us into custody.  We were then denied the

10  right to appear in front of a judge to explain what had been done to us.  Police records

11  were either hidden or destroyed.  All of these things have prevented or hindered us,

12  and our lawyers, from fully investigating and properly presenting this case.

13  INTERROGATORY NO. 14:    With specificity, please state all facts supporting

14  Plainti8ff's claim in ¶23(C) the [sic] Complaint that Defendants herein have

15  purposefully and deliberately secreted and/or destroyed all records that describe and

16  memorialize the events of January 16, 2002."  Please identify what documents the

17  Plaintiff alleges the Defendants allegedly secreted and/or destroyed.

18  ANSWER TO INTERROGATORY NO. 14:    Shortly before the complaint was filed in

19  this case, I went to the police department and made a proper request for copies of all of

20  the records that related to what had happened.  I was told that there were no records of

21  the events.

22  INTERROGATORY NO. 15:    Please identify all firearms seized by the Defendants

23  belonging to this Plaintiff as alleged in ¶23(D) of the Complaint.  State make, model,

24  serial number, date of purchase, and place of purchase for each listed firearm.

25  ANSWER TO INTERROGATORY NO. 15:    Please see the affidavit of Zelma Hinton

26  Ranslem attached to these answers.  All of the ownership papers were taken, as well,

27  and were never returned, so the serial numbers cannot be provided.  These firearms

28  were mostly family gifts.

INTERROGATORY NO. 16:    If Plaintiff received any medical or psychiatric care or treatment from any doctor, or anyone as a result of the January 16, 2002 incident, please supply answers to the following:

(a)    The date Plaintiff first received such medical care or treatment, and the name and address of the doctor, or the practitioner who treated you and where.

(b)    The name and address of such doctor, or other practitioner, indicating his specialty, if any, who you have seen for medical care and treatment as a result of the injuries received in this incident;

(c)    The dates and care of treatment by each such person; and

(d)    The treatment given and the treatment by such person.

ANSWER TO INTERROGATORY NO. 16:    None.

INTERROGATORY NO. 17:    Please identify the charge or charges made against the Plaintiff in support of his arrest on January 16, 2003.[sic]

ANSWER TO INTERROGATORY NO. 17:    None.

INTERROGATORY NO. 18:    Identify the status of the criminal charge or charges made against the Plaintiff on January 16, 2001 [sic] including the date of any preliminary hearing, arraignment, or criminal trial.

ANSWER TO INTERROGATORY NO. 18:    None.

INTERROGATORY NO. 19:    State each and every act committed by the Defendant or Defendants, agent or agents, servant or servants and/or employer employees which constituted a deprivation of your constitutional rights together with the manner in which Plaintiff was taken into custody, as set forth in Plaintiff's Complaint.

ANSWER TO INTERROGATORY NO. 19:    These acts are described in detail in the answers above, including answer to number 6, 7, 9, 10, 12, 13, 14, 15, 17, and 18. Those answers are incorporated into this answer.

INTERROGATORY NO. 20:    Identify all witness [sic] this Plaintiff intends to call at the time of trial and give a description of that witnesses anticipated testimony.

-10-

1   ANSWER TO INTERROGATORY NO. 20:      Plaintiffs expect to call all of the
2   witnesses listed in section I of "Defendant's FRCP 26(f) Initial Disclosure Statement."
3   The police officers and detectives are expected to testify concerning the meetings in
4   advance of, the planning for, and the events of, January 16, 2002. Plaintiff expects to call
5   the confidential informant as a witness, if he exists, and he will be asked about the
6   events described in the officer's report. Plaintiffs expect to call the custodian of records
7   of the Justice Court that issued the search warrant in question to verify the alleged acts
8   of the detectives identified in section I of "Defendant's FRCP 26(f) Initial Disclosure
9   Statement."   Plaintiffs expect to call Sandra Estrada and Veronica Rivas to testify
10  concerning their observations of the condition in which Defendant's agents left the
11  Hinton home following the raid on January 16, 2002. Plaintiffs expect to call Michael
12  Hess to testify concerning the conduct of the Defendant's agents during the raid on
13  January 16, 2002. Plaintiffs expect to call an employee of $MC^2$ to authenticate David
14  Hinton's employment records.   Plaintiffs expect to call Zelma Ranslem to testify
15  concerning Donald Hinton's ownership of many antique and collectible firearms that I
16  gave to him as gifts. Plaintiffs expect to call Robert Cleveland to testify concerning
17  Donald Hinton's ownership of many collectible and antique firearms. Plaintiffs may
18  call additional witnesses identified during discovery.

19  INTERROGATORY NO. 21:      State whether the Plaintiff has ever been involved in
20  the selling of methamphetamine or any other narcotic from the residence located at 1919
21  Hallwood, Las Vegas, Nevada. If answered in the affirmative, please state whether the
22  Plaintiff was involved in any methamphetamine sales on January 6, 2003. [sic]

23  ANSWER TO INTERROGATORY NO. 21:      I have not.

24  . . . . .

25  . . . . .

26  . . . . .

27  . . . . .

28  . . . . .

Dated August 13, 2003.

AS TO OBJECTIONS:

*Bradley L. Booke*

Bradley L. Booke #2662
7251 W. Lake Mead Boulevard #530
Las Vegas, NV  89128
(702) 947-7000
(702) 932-8025 Fax

Edward P. Moriarity
J. Douglas McCalla
SPENCE, MORIARITY & SHOCKEY
15 Jackson Street
Box 548
Jackson, Wyoming 83001
(307) 733-7290
(307) 733-5248 Fax

Attorneys for Plaintiffs

1

## VERIFICATION

2

3       I certify that I am a Plaintiff named in the above-captioned matter, that I have

4   personal knowledge of the facts concerning this case, that I have read the foregoing

5   answers to interrogatories, and that the answers are true and correct to the best of my

6   knowledge.

7       Dated this 13th day of _August_, 2003.

8

9

10                                          Donald R. Hinton

11      Donald R. Hinton

12

STATE OF NEVADA        )

13                             ) ss.

14  CLARK COUNTY           )

15

16      Subscribed and sworn to before me this 13th day of _August_, 2003, by

17  Donald Hinton.

18

19      
        BARBARA J. BANKS
        Notary Public, State of Nevada
20      Appointment No. 94-4033-1              _____
        My Appt. Expires May 8, 2006            Notary public

21

22

23

24

25

26

27

28

-13-

# CERTIFICATE OF SERVICE

I certify that I served the foregoing pleading by mail/fax/hand delivery this _13th_ day of _August_____, 2003, to:

Albert G. Marquis
Craig R. Anderson
10001 Park Run Drive
Las Vegas, NV 89145

_Barbara J. Bb_

-14-

ORIGINAL

RECEIVED
AUG 14 2003
MARQUIS & AURBACH

Bradley L. Booke #2662
7251 W. Lake Mead Boulevard #530
Las Vegas, NV 89128
702-947-7000
702-932-8025 Fax

Edward P. Moriarity
J. Douglas McCalla
SPENCE, MORIARITY & SHOCKEY
15 Jackson Street
Box 548
Jackson, Wyoming 83001
(307) 733-7290
(307) 733-5248 Fax

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DONALD HINTON, DAVID HINTON
and JOHN REYES,

        Plaintiffs,

        vs.

CLARK COUNTY, NEVADA, a political
subdivision, acting by and through the
LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, et al.

        Defendants.

Case No.: CV-S-03-0057-PMP-PAL

**PLAINTIFF DAVID HINTON'S
ANSWERS TO DEFENDANTS' FIRST
SET OF INTERROGATORIES**

    David Hinton, pursuant to Rule 33, Federal Rules of Civil Procedure, answers Defendants' First Set of Interrogatories as follows:

INTERROGATORY NO. 1.    State Plaintiff's full name, address, date of birth, and Social Security Number.

ANSWER TO INTERROGATORY NO. 1:    David Richard Hinton, 6117 Rosalita Avenue, Las Vegas, Nevada 89108; DOB 1/13/80; SS#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.

CLA
File No. 5166-104
Amicus:
Calendar:

1

2  INTERROGATORY NO. 2.      Please state whether Plaintiff has ever been convicted

3  or pled guilty to a felony or offense which was punishable by death or imprisonment

4  for one (1) year or more or involve dishonesty or false statements.   If Plaintiff is

5  answering the affirmative [sic] please state the nature of the crime, date of the

6  conviction, title of the court in which the conviction is on file and the sentence you

7  received.

8  ANSWER TO INTERROGATORY NO. 2:      I have not.

9  INTERROGATORY NO. 3:      State all of Plaintiff's present and prior employers for

10 the past five (5) years, including the dates of employment, the name of the employer

11 and the Plaintiff's immediate supervisor, the rate of pay, the job title, and the brief

12 description of the duties involved.

13 ANSWER TO INTERROGATORY NO. 3:      I have worked through Teamsters Local

14 #631 since 1996 on assignment to the companies that provide installation and

15 dismantling services to exhibitors at conventions in Las Vegas.

16 INTERROGATORY NO. 4:      For the past five (5) years, state each and every

17 residence of the Plaintiff, indicating whether or not such residence was owned or rented

18 by the Plaintiff and the person or persons with whom the Plaintiff resided in such

19 residence.

20 ANSWER TO INTERROGATORY NO. 4:      I have lived at 1919 Hallwood, Las

21 Vegas, Nevada (an owned residence), with my father and, for a time, with John Reyes;

22 3125 Warm Springs Road, Henderson, Nevada (a rented apartment) alone; 6117 Rosalita

23 Avenue, Las Vegas, Nevada (a rented home) with my mother; currently I can be

24 reached in care of Bradley L. Booke, 7251 W. Lake Mead Boulevard, #530, Las Vegas,

25 NV 89128.

26 INTERROGATORY NO. 5:      Identify by name and number each and every lawsuit

27 in which Plaintiff was a named party, whether a plaintiff or defendant, and state with

28 particularity the substance of the lawsuit.

1  ANSWER TO INTERROGATORY NO. 5:        I was a plaintiff in a case in Clark
2  County entitled Hinton v. Gaskil, that resulted from an injury I suffered in a hunting
3  accident when I was thirteen years old. I do not remember the number of the case. My
4  lawyer was Bradley Kenney.

5  INTERROGATORY NO. 6:        With specificity, and in narrative form, please state
6  Plaintiff's recollection of the events of the evening of January 16, 2002, beginning at
7  around 11:15 p.m. and concluding after your alleged release from jail.

8  ANSWER TO INTERROGATORY NO. 6:

9        This is a summary of what happened, from my point of view: Around 11:30 p.m.
10  on January 16, 2002, a girl I knew for a short time stopped by to visit at my house on
11  Hallwood. We went into the kitchen where my dad was baking cookies – and had just
12  taken a batch out of the oven. We asked if we could have some cookies and he said no,
13  not for about 30 minutes until the cookies had cooled enough to eat without crumbling.
14  We left the kitchen to go to my room to talk.

15        After a short time, I heard two very loud noises at the front of the house, and
16  then I heard banging on my window. A few seconds later, I heard my dad yelling
17  "GET DOWN! GET DOWN!" and "who the hell are you?" I ran out to the front room
18  and, on my way, I heard three shotgun blasts at the front door. I ran toward the door
19  and saw my dad swarmed by hooded men with guns. The men ordered me out of the
20  hallway with my hands up. They treated me roughly and ordered me to go out to my
21  neighbor's driveway. They slammed me into the trunk of my neighbor's car and
22  searched me. While I was being searched, they slammed my head on the trunk of the
23  car and said: "where are the booby traps? One of the hooded men kicked my feet out
24  from under me and, again, my face was slammed into the trunk of the car. I was then
25  asked if I was hurt and did I need an ambulance. I said no. I was then put on the
26  sidewalk in a cross-legged position while everyone else was taken out of our house.

27        After about 30-plus minutes on the ground outside, some men came out of the
28  house and asked me which keys went to a closet door, and if there were any surprises

-3-

1    waiting for them. I showed them the keys and said no surprises. One man said that
2    they had a warrant to search, but he didn't say for what, and then he went inside. He
3    said that if the key didn't fit, I was going to hear a shotgun opening the door.

4         After spending about thirty more minutes outside in my neighbor's driveway,
5    we were ordered to go inside. When we were inside, the men walked us through what
6    was left of my dad's home. It was totally destroyed. There was a gaping hole in the
7    hallway ceiling, all the doors of the closets were pushed in, or kicked in. I saw shotgun
8    holes in our security gate. One of the men was carried out on a stretcher to an
9    ambulance that had pulled up without its siren on. A female told me I was going to
10   have to pay for this man's injuries. The condition of the front room of our house defies
11   description.

12        They had all of us sit on the floor, except my father, who sat on the couch facing
13   us. The couch was almost the only thing not overturned, torn apart, or thrashed. After
14   watching a dog rummage through all of my dad's research papers, I was told to go into
15   the front bathroom for questioning by a man who had taken off his hood. I went with
16   him and he questioned me about manufacturing of meth and a meth lab.

17        His attitude then changed instantly and he changed into a good guy and said:
18   "Just give me anything: pills, baggies with meth residue, anything at all so I can get out
19   of here quicker". I said: "You'll find none of that here because I don't fuck with that
20   shit." Immediately, he took me back into the front room, sat me down, and told me to
21   shut up! Everyone else was then taken into the bathroom and questioned, and then we
22   we're told we were going to jail, except for my ladyfriend. They let her go home, but
23   she wasn't allowed to take my dog with her. The dog had to go to the pound.

24        I said goodbye to my friends and my dad, when I heard my dad state he had
25   arthritis and needed some relief from the handcuffs. One of the men answered: "That's
26   the beauty of those straps – they only get tighter." I was then taken to a black
27   unmarked police car and was told I was being taken to jail. About a half-block down
28   the street, the car stopped and one of the men asked me if I wanted my dad set free. I

1  said: "yes." I was then told if I would give them something to justify this raid, or give

2  them a name or number of a dealer, my dad would go free. I said okay. They took out

3  paper and pen. I have them a number and a name. They asked me who this guy was. I

4  told them: "My attorney, Bill Skupa." The car was slammed into gear and they took

5  off.

6  When I was released on bond, I went home. I can't remember how I got home,

7  but my wallet was empty. They had taken my money. It has never been returned.

8  I appeared at court in February, 2002, as I had been ordered to do. The bailiff

9  would not allow myself, my dad, or John Reyes into the courtroom. We were told: "If

10  they file charges on you, you'll be notified." We were never notified of any charges.

11  INTERROGATORY NO. 7:     State with specificity and list, all damages Plaintiff

12  alleges to have incurred as a result of the allegations in Plaintiff's Complaint.

13  ANSWER TO INTERROGATORY NO. 7:

14  My damages include the following things: my home was fired upon, invaded,

15  ransacked and literally destroyed, and I was struck, threatened, handcuffed, searched,

16  arrested and held for a long period of time without any reason. Many items of my

17  personal property were taken, destroyed or damaged, and have never been returned or

18  repaired. All of these things violate my constitutional rights.

19  INTERROGATORY NO. 8:     Identify the legal owner of the real property located at

20  1919 Hallwood Drive, Las Vegas, NV. State whether you have any legal ownership

21  interest in the property.

22  ANSWER TO INTERROGATORY NO. 8:     My father, Donald Hinton, and I own

23  the property.

24  INTERROGATORY NO. 9:     With reference to the allegation contained in ¶23(A)

25  in Plaintiff's Complaint, state with specificity all facts which support your statement

26  that "Defendants herein made false representations to obtain the search warrant that

27  was issued on January 6, 2001" to search the residence located at 1919 Hallwood Drive,

28

1   Las Vegas, Nevada.  Specifically, identify each statement in the search warrant Plaintiff

2   alleges to be false.

3   ANSWER TO INTERROGATORY NO. 9:       Plaintiff objects to this interrogatory to

4   the extent that it confuses the representations made to obtain the search warrant with

5   the language in the search warrant itself.  Without waiving this objection, and subject to

6   this objection, according to police documents that have been produced, the police got a

7   search warrant based on statements made by a detective to a judge that I had sold

8   methamphetamine, at my house, to a confidential informant.  The statements made by

9   the detective are on the officer's report that has been produced in this case, and they are

10  false statements.  I did not sell methamphetamine, on January 4, 2002, or any other day,

11  at my house or anywhere else, to a confidential informant or anyone else.

12  INTERROGATORY NO. 10:      With reference to the allegation contained in ¶23(A)

13  of Plaintiff's Complaint, state with specificity all facts which support the statement that

14  the search of the residence at 1919 Hallwood Drive, Las Vegas, Nevada was

15  "unreasonable".

16  ANSWER TO INTERROGATORY NO. 10:

17      The facts include the following:  there was no basis for obtaining a search

18  warrant or conducting a search in the first place.  The entry into our house, the search

19  itself, and the way we were treated, generally as described in my answer to

20  interrogatory number 6, was more like ransacking and destruction than it was

21  searching, and it went way beyond anything that was necessary to find what the police

22  claimed to be looking for.  Nothing the police claimed to be searching for was at the

23  house and nothing was found.  The police destroyed many items of property, took and

24  never returned many items of property, and never repaired any of the property that

25  was damaged.

26  INTERROGATORY NO. 11:      With specificity, please identify all areas of the real

27  property located at 1919 Hallwood Drive, Las Vegas, Nevada, which were allegedly

28

1 | damaged by the LVMPD Swat and Narcotics officers on January 6, 2001. Please specify
2 | the room in which the damage occurred and the nature of the damage.
3 | ANSWER TO INTERROGATORY NO. 11:    For the most part, the damage is shown
4 | in the photographs and videotape that are produced with these answers.
5 | INTERROGATORY NO. 12:    With respect to this answering Plaintiff, please
6 | identify all "valuable items of personal property" that were seized by the Defendants as
7 | referenced in ¶23(B) of Plaintiff's Complaint. Please state the Plaintiff's ownership
8 | interest in the personal property and current status of the identified items.
9 | ANSWER TO INTERROGATORY NO. 12:    Many things were taken and never
10 | returned. These include five or six guns that I owned, all of my ownership papers for
11 | those guns, and the money that was in my wallet. There may have been other things,
12 | but the house was so ransacked, as shown in the photographs and videotape, that I'll
13 | probably never be able to figure out all of the things that are missing.
14 | INTERROGATORY NO. 13:    Please state all facts supporting Plaintiff's claim in
15 | ¶23(C) that the Defendants violated your Sixth Amendment right to affective [sic]
16 | assistance of counsel. In doing so, please identify the names and identities of the
17 | individuals against whom the allegation is made.
18 | ANSWER TO INTERROGATORY NO. 13:    The facts include the following: False
19 | statements were made by at least one police officer in order to get the search warrant
20 | that was used to ransack our house and take us into custody. We were then denied the
21 | right to appear in front of a judge to explain what had been done to us. Police records
22 | were either hidden or destroyed. All of these things have prevented or hindered us,
23 | and our lawyers, from fully investigating and properly presenting this case.
24 | INTERROGATORY NO. 14:    With specificity, please state all facts supporting
25 | Plainti8ff's claim in ¶23(C) the [sic] Complaint that Defendants herein have
26 | purposefully and deliberately secreted and/or destroyed all records that describe and
27 | memorialize the events of January 16, 2002." Please identify what documents the
28 | Plaintiff alleges the Defendants allegedly secreted and/or destroyed.

ANSWER TO INTERROGATORY NO. 14:

I am told that, shortly before the complaint was filed in this case, my father went to the police department and made a proper request for copies of all of the records that related to what had happened. He was told that there were no records of the events.

INTERROGATORY NO. 15:    Please identify all firearms seized by the Defendants belonging to this Plaintiff as alleged in ¶23(D) of the Complaint.  State make, model, serial number, date of purchase, and place of purchase for each listed firearm.

ANSWER TO INTERROGATORY NO. 15:

The following firearms were taken and never returned:  an M1 Granada 30-06, a bolt-action 30-06, an SR 1, a .22 rifle, and a .38 pistol.  I can't identify all of the detailed information requested at this time because all of my ownership papers were also taken and never returned.

INTERROGATORY NO. 16:    If Plaintiff received any medical or psychiatric care or treatment from any doctor, or anyone as a result of the January 16, 2002 incident, please supply answers to the following:

(a)    The date Plaintiff first received such medical care or treatment, and the name and address of the doctor, or the practitioner who treated you and where.

(b)    The name and address of such doctor, or other practitioner, indicating his specialty, if any, who you have seen for medical care and treatment as a result of the injuries received in this incident;

(c)    The dates and care of treatment by each such person; and

(d)    The treatment given and the treatment by such person.

ANSWER TO INTERROGATORY NO. 16:    I have not.

INTERROGATORY NO. 17:    Please identify the charge or charges made against the Plaintiff in support of his arrest on January 16, 2003.[sic]

ANSWER TO INTERROGATORY NO. 17:    None.

1   INTERROGATORY NO. 18:     Identify the status of the criminal charge or charges
2   made against the Plaintiff on January 16, 2001 [sic] including the date of any
3   preliminary hearing, arraignment, or criminal trial.
4   ANSWER TO INTERROGATORY NO. 18:     No charges were ever brought.
5   INTERROGATORY NO. 19:     State each and every act committed by the Defendant
6   or Defendants, agent or agents, servant or servants and/or employer employees which
7   constituted a deprivation of your constitutional rights together with the manner in
8   which Plaintiff was taken into custody, as set forth in Plaintiff's Complaint.
9   ANSWER TO INTERROGATORY NO. 19:     These acts are described in detail in the
10  answers above, including answer to number 6, 7, 9, 10, 12, 13, 14, 15, 17, and 18.  Those
11  answers are incorporated into this answer.
12  INTERROGATORY NO. 20:     Identify all witness [sic] this Plaintiff intends to call at
13  the time of trial and give a description of that witnesses anticipated testimony.
14  ANSWER TO INTERROGATORY NO. 20:     Plaintiffs expect to call all of the
15  witnesses listed in section I of "Defendant's FRCP 26(f) Initial Disclosure Statement."
16  The police officers and detectives are expected to testify concerning the meetings in
17  advance of, the planning for, and the events of, January 16, 2002.  Plaintiff expects to call
18  the confidential informant as a witness, if he exists, and he will be asked about the
19  events described in the officer's report.  Plaintiffs expect to call the custodian of records
20  of the Justice Court that issued the search warrant in question to verify the alleged acts
21  of the detectives identified in section I of "Defendant's FRCP 26(f) Initial Disclosure
22  Statement."  Plaintiffs expect to call Sandra Estrada and Veronica Rivas to testify
23  concerning their observations of the condition in which Defendant's agents left the
24  Hinton home following the raid on January 16, 2002.  Plaintiffs expect to call Michael
25  Hess to testify concerning the conduct of the Defendant's agents during the raid on
26  January 16, 2002.  Plaintiffs expect to call an employee of MC² to authenticate David
27  Hinton's employment records.  Plaintiffs expect to call Zelma Ranslem to testify
28  concerning Donald Hinton's ownership of many antique and collectible firearms that I

gave to him as gifts.  Plaintiffs expect to call Robert Cleveland to testify concerning Donald Hinton's ownership of many collectible and antique firearms.  Plaintiffs may call additional witnesses identified during discovery.

INTERROGATORY NO. 21:      State whether the Plaintiff has ever been involved in the selling of methamphetamine or any other narcotic from the residence located at 1919 Hallwood, Las Vegas, Nevada.  If answered in the affirmative, please state whether the Plaintiff was involved in any methamphetamine sales on January 6, 2003.  [sic]

ANSWER TO INTERROGATORY NO. 21:      No.

Dated August 13, 2003.

AS TO OBJECTIONS:

*Bradley L. Booke*

Bradley L. Booke #2662
7251 W. Lake Mead Boulevard #530
Las Vegas, NV  89128
(702) 947-7000
(702) 932-8025 Fax

Edward P. Moriarity
J. Douglas McCalla
SPENCE, MORIARITY & SHOCKEY
15 Jackson Street
Box 548
Jackson, Wyoming 83001
(307) 733-7290
(307) 733-5248 Fax

Attorneys for Plaintiffs

1

## VERIFICATION

2

3      I certify that I am a Plaintiff named in the above-captioned matter, that I have

4 personal knowledge of the facts concerning this case, that I have read the foregoing

5 answers to interrogatories, and that the answers are true and correct to the best of my

6 knowledge.

7      Dated this *13th* day of *August*        , 2003.

8

9

10                                              

11                                              David R. Hinton

12

13 STATE OF NEVADA           )

14                           ) ss.
   CLARK COUNTY              )

15

16      Subscribed and sworn to before me this *13th* day of *August*         , 2003, by

17 David Hinton.

18

19      
   BARBARA J. BANKS
   Notary Public, State of Nevada
20 Appointment No. 94-4033-1
   My Appt. Expires May 9, 2006                Notary public

21

22

23

24

25

26

27

28

-11-

# CERTIFICATE OF SERVICE

I certify that I served the foregoing pleading by mail/fax/hand delivery this _13th_ day of _August_____, 2003, to:

Albert G. Marquis
Craig R. Anderson
10001 Park Run Drive
Las Vegas, NV  89145

_Barbara J. Bb_

-12-

1 | **Marquis & Aurbach**
Albert G. Marquis, Esq.
2 | Nevada State Bar No. 1919
Craig R. Anderson, Esq.
3 | Nevada State Bar No. 6882
10001 Park Run Drive
4 | Las Vegas, Nevada  89145
(702) 382-0711
5 | Attorneys for Defendants

6

7

8 | **UNITED STATES DISTRICT COURT**

9 | **DISTRICT OF NEVADA**

10 | DONALD HINTON, DAVID HINTON and
JOHN REYES,
11 |                                              Case No.      CV-S-03-0057-PMP-PAL

12 |                              Plaintiffs,

13 |             vs.

14 | CLARK COUNTY, NEVADA, a political
subdivision, acting by and through the LAS
15 | VEGAS METROPOLITAN POLICE
DEPARTMENT; JOHN DOES 1-30 and
16 | ROE ENTITIES 1-10,

17 |                              Defendants.

18 | **DEFENDANTS' ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

19 | Pursuant to Fed.R.Civ.P. 33, Defendants, by and through their attorneys, Marquis & Aurbach,

20 | hereby respond to Plaintiffs' First Set of Interrogatories as follows:

21 | **INTERROGATORIES**

22 | **INTERROGATORY NO. 1:**         Please identify by name, job title, job description, and last known

23 | address and telephone number the person identified by the designation "p4351p" as it appears in the

24 | upper left hand corner of document number 000018 of documents produced by defendant pursuant

25 | to FRCP 26(f).

26 | **ANSWER:** Sergeant Paul Pagano.  Sergeant Paul Pagano can be contacted through Defense counsel.

27 | **INTERROGATORY NO. 2:** Please identify by name, job title, job description, and last know

28 | address and telephone number the male person who took John Reyes and interviewed John Reyes

*(left margin vertical text)* **MARQUIS & AURBACH** 10001 Park Run Drive Las Vegas, Nevada 89145 702-382-0711 FAX: 382-5816

M&A:235365.1 05166-104 01604 15:43:43

D: 1-7-04

1  away from the jail facility at Stewart and Mojave on January 17, 2002, as described by John Reyes in

2  his deposition on November 5, 2003.

3  **ANSWER:** LVMPD's records indicate that Mr. Reyes was removed from the jail and taken to

4  Robbery on January 17, 2002. According to the jail log, Mr. Reyes was taken from the jail at 17:50

5  and returned at 19:05. (A true and correct copy of the log sheet is attached hereto as Exhibit 1 and

6  is bate stamped LVMPD 003519. The names of uninvolved inmates have been redacted.) As of this

7  date, LVMPD has been unable to identify the officers that took Mr. Reyes from the jail or the officers

8  who interviewed Mr. Reyes. LVMPD reserves the right to supplement this answer as new information

9  becomes available.

10  **INTERROGATORY NO. 3**: Please list and identify with specificity the present location of each

11  item taken by LVMPD from the premises at 1919 Hallwood on January 16 or 17, 2002.

12  **ANSWER:** For a list of all items taken from the premises of 19119 Hallwood on January 16 or 17,

13  2002, please see LVMPD's initial Rule 26 disclosures. All items are located at the LVMPD evidence

14  vault. The only exception is the $151.00 which was deposited in LVMPD's General Fund on January

15  23, 2002. The specific location of the impounded items/evidence within the LVMPD Evidence Vault

16  cannot be revealed due to security reasons.

17

18                              MARQUIS & AURBACH

19

20                              By: _____
                                    Craig R. Anderson, Esq.
21                                  Nevada Bar No. 6882
                                    10001 Park Run Drive
22                                  Las Vegas, Nevada 89145
                                    Attorneys for Defendants
23

24

25

26

27

28

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

M&A:235365.1 05166-104 01604 15:43:43

1

## CERTIFICATE OF MAILING

2    I hereby certify that on January 6, 2004, I served a copy of the foregoing <u>DEFENDANTS'</u>

3  <u>ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES</u> upon each of the parties by

4  depositing a copy of the same in a sealed envelope in the United States Mail, Las Vegas, Nevada,

5  First-Class Postage fully prepaid, and addressed to:

6             Bradley L. Booke, Esq.
              7251 W. Lake Mead Blvd., #530
7             Las Vegas, NV 89128
              Attorneys for Plaintiff
8
9  and that there is a regular communication by mail between the place of mailing and the place(s) so

   addressed.
10

11

12    _____
      an employee of Marquis & Aurbach
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*MARQUIS & AURBACH*
10001 Park Run Drive
Las Vegas, Nevada 89145
702-382-0711  FAX: 382-5816

M&A:235365.1 05166-104 01604 15:43:43

1 | **VERIFICATION**

2 | STATE OF NEVADA )
3 | COUNTY OF CLARK ) ss.

4 |     Lt. Brett Primas, being first duly sworn, deposes and says:

5 |     That I am the Risk Manager for Las Vegas Metropolitan Police Department, the Defendant

6 | in the above-entitled action; that I have read the foregoing DEFENDANTS' ANSWERS TO

7 | PLAINTIFFS' FIRST SET OF INTERROGATORIES and know the contents thereof; the same is

8 | true of my own knowledge except as to those matters therein stated on information and belief and,

9 | as to those matters, I believe them to be true.

10 |

11 | _____
             Lt. Brett Primas

12 |

13 | SUBSCRIBED AND SWORN to before me this ___6___ day of ___JANuary___, 2004.

14 |

15 | _____

16 | NOTARY PUBLIC in and for said County and State



NOTARY PUBLIC
STATE OF NEVADA
County of Clark
PATRICIA L. DIAMOND
Appt. No. 02-73354-1
My Appt. Expires Jan. 5, 2006

17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

# EXHIBIT 1

01/17/01

| Time | Entry | | |
|------|-------|---|---|
| 100 | D PLT ON DECK | 2822 | 1140 |
| 1715 | FACE/CARD | 2822 | 1101 |
| 1750 | I/M REYES 1177141 @UT TO ROBBERY | 282 | 830 |
| / | DETAIL | 2822 | 1000 |
| 1855 | I/M ___ TO SEE P&P OFFICER | C6885 | 1015 |
| 1902 | I/M ___ P&P VISIT COMPLETE | C6886 | 1050 |
| 1905 | I/M REYES 1177111 BACK FROM ROBBERY VISIT | C6886 | 1103 |
| 1906 | NURSE ON DECK (MED-PASS) | U0690 | 1205 |
| 1920 | NURSE OFF DECK | U0690 | 300 |
| 1930 | SHAKE DOWN STARTED | 2822 | 340 |
| 2030 | SHAKE DOWN FINISHED | 2822 | 340 |
| 12:40 | FREE TIME STARTED / SHOWERS OPEN | U0690 | 500 |
| 2150 | FIGHT CARRASCO, CELL 1415, WARD 13/4 | | 533 |
| 2230 | SHOWERS CLOSED | 2822 | 615 |
| 2300 | LOCK DOWN | U0690 | 165 |
| 2340 | RAZOR PASS | 2822 | 700 |
| 0005 | RAZORS PICKED UP | C6885 | 705 |
| 0010 | WALKTHROUGH ALL APPEARS SECURE | C6886 | |
| 0045 | WALK THRU APPEARS SECURE | 2822 | |
| 0130 | WALK THRU APPEARS SECURE | 2822 | 735 |
| 0223 | WALK THROUGH, ALL APPEARS SECURE | U0690 | 04 |
| 0300 | (12) INTAKE FROM CCDX | U0690 | |
| 0335 | LIGHTS ON / COUNT | 2822 | 15 |
| 0400 | CHOW ON DECK | 2822 | 125 |
| 0430 | CHOW FINISHED | 2822 | 250 |
| | | | 300 |
| | | | 315 |
| 0515 | B PLT ON DECK | 5924 | 333 |
| 0530 | WDT COMPLETE | 5924 | 237 |
| 0600 | WDT COMPLETE | 5924 | 06 |
| 0630 | WDT COMPLETE | 5924 | |
| 0720 | WDT COMPLETE | 5924 | |

LVMPD adv. Hinton
003519

01/17/01

| Time | Entry | | |
|------|-------|---|---|
| 100 | D PLT ON DECK | 202 | 949 |
| 1715 | FACE/CARD | 2822 | 1001 |
| 1750 | I/M REYES 1177111 OUT TO ROBBERY | 282 | 330 |
| | DETAIL | 2822 | 1000 |
| 1855 | I/M SKINNER TO SEE P&P OFFICER | C6880 | 1015 |
| 1902 | I/m SKINNER'S P&P VISIT COMPLETE | C6880 | 1050 |
| 1905 | I/M REYES 1177111 BACK FROM ROBBERY VISIT | C6880 | 1103 |
| 1906 | NURSE ON DECK (MED - PASS) | UU6902 | 1205 |
| 1920 | NURSE OFF DECK | UU6908 | 300 |
| 1980 | Shake DOWN STARTED | 2822 | 340 |
| 2030 | shake DOWN finished | 2822 | 340 |
| 2040 | FREE TIME STARTED/SHOWERS OPEN | UU6908 | 3 |
| 2150 | Fight CARRASCO, CELL 1415, WARD 13/4 | | 530 |
| 2230 | showers chosen | 2822 | 615 |
| 2300 | LOCK DOWN | UU6908 | 165 |
| 2340 | RAZOR PASS | 2822 | 700 |
| 0005 | RAZORS PICKED up | C6880 | 705 |
| 0010 | WALKTHROUGH ALL APPEARS SECURE | C6880 | 706 |
| 0045 | walk thru Appears Secure | 2822 | 909 |
| 0130 | walk thru appears secure | 2822 | 933 |
| 0223 | WALK THROUGH, All APPEARS SECURE | UU6908 | 946 |
| 0300 | (12) INTAKE FROM CCDX | UU6908 | |
| 0335 | Lights on / count | 2822 | 15 |
| 0400 | Chow on Deck | 2822 | 125 |
| 0430 | chow finished | 2822 | 200 |
| | ▬▬▬▬▬ | | 300 |
| | | | 365 |
| 0515 | B PLT ON DECK | 5921 | 333 |
| 0530 | WDT COMPLETE | 5921 | 237 |
| 0600 | WDT COMPLETE | 5921 | 06 |
| 0630 | WDT COMPLETE | 5921 | |
| 0771 | WDT COMPLETE | 5921 | |

NF

**ORIGINAL**

1  **COMP**
2  STEWART L. BELL
   Clark County District Attorney
3  Nevada Bar #000477
   J. TIMOTHY FATTIG
4  Deputy District Attorney
   Nevada Bar #006639
5  200 South Third Street
   Las Vegas, Nevada 89155-2211
6  (702) 455-4711
   Attorney for Plaintiff

**FILED**

Oct 21  4 58 PM '02

*Shirley B. Parraguirre*

CLERK

7

8                    DISTRICT COURT
9                 CLARK COUNTY, NEVADA

10

11  LAS VEGAS METROPOLITAN POLICE    )
    DEPARTMENT,                      )
12                                   )   Case No. A A458046
                   Plaintiff,        )
13                                   )   Dept No. XIV
         -vs-                        )
14                                   )   Priority Civil NRS 179.1173, 453.301,
    MISCELLANEOUS FIREARMS and/or    )   202.340
15  WEAPONS and/or AMMUNITION        )
    (Per Attached Property Schedule),)
16                                   )
                   Defendant.        )
17

18              COMPLAINT FOR FORFEITURE

19       Plaintiff alleges as follows:

20                         I

21       This is a civil action for the forfeiture of Defendant firearms and/or weapons and/or

22  ammunition pursuant to the provisions of NRS 179.1173, 453.301 and 202.340.

23                         II

24       Plaintiff is a Metropolitan Police Department organized under the laws of Chapter

25  280 of the Nevada Revised Statutes, and officers of Plaintiff seized the Defendant firearms

26  and/or weapons and/or ammunition sought to be forfeited herein.

27                        III

28       Defendant firearms and/or weapons and/or ammunition which are listed in the

1 attached schedule were seized by officers of the Las Vegas Metropolitan Police Department
2 from various persons in Clark County, Nevada, between January 16, 2002 to July 3, 2002,
3 inclusive. All Defendant firearms and/or weapons and/or ammunition are now in the actual
4 and/or constructive possession and custody of the Sheriff of Clark County, Nevada.

**FIRST CAUSE OF ACTION**
(NRS 453.301)

I

8 All Defendant firearms and/or weapons and/or ammunition were taken from the
9 actual and/or constructive possession of persons charged with a public offense or crime
10 and/or who were found to be consuming and/or manufacturing and/or transporting and/or
11 selling and/or under the influence of a controlled substance in violation of the provisions of
12 NRS 453.011 to 453.552, inclusive.

II

14 Upon information and belief, no person has contacted the Las Vegas Metropolitan
15 Police Department and demanded the return of any firearms listed in the instant complaint. If
16 any of the persons from whom the said firearms were seized by officers of the Las Vegas
17 Metropolitan Police Department should be acquitted of the underlying drug offense with
18 which the person was charged and that person does demand the return of the said firearm
19 from the Las Vegas Metropolitan Police Department, said firearm will be returned or, if the
20 firearm cannot be returned, the Las Vegas Metropolitan Police Department will pay the fair
21 market value of the said firearm to any such potential claimant.

III

23 All Defendant firearms and/or weapons and/or ammunition taken from the actual
24 and/or constructive possession of persons who were found to be consuming and/or
25 manufacturing and/or transporting and/or selling and/or under the influence of a controlled
26 substance in violation of the provisions of NRS 453.011 to 453.552 inclusive, are forfeited
27 pursuant to NRS 453.301(10).
28 //

2

## SECOND CAUSE OF ACTION
### (NRS 202.340)

#### I

Plaintiff realleges and incorporated by reference herein all of the allegations in the preceding paragraphs of this complaint and states further that Nevada Revised Statute 202.340 provides in pertinent part, that whenever any weapon such as a firearm is taken from the possession of any persons charged with the commission of any public offense or crime, the weapons must be surrendered to the Sheriff of the Metropolitan Police Department for the county in which the weapon or firearm was taken. All the firearms and weapons listed in the instant Complaint fall in this category and were all seized from the possession of persons committing a public offense under the respective event numbers set forth in the attached schedule.

#### II

NRS 202.340 also provides that the Las Vegas Metropolitan Police Department Committee on Fiscal Affairs shall at least once a year order the sheriff who is in possession of such weapons or firearms to retain the weapons for use by the seizing law enforcement agency, sell the weapons to another law enforcement agency, trade the weapons to a properly licensed retailer or wholesaler in exchange for equipment necessary for the performance of the agency's duties, or donate the weapons for use which furthers a charitable or public interest. Nevada Revised Statute 202.340 further authorizes the destruction of such weapons or firearms if they are determined to be dangerous to the interest of public safety.

#### III

NRS 202.340 also provides that the sheriff or officer acting under his authority shall return any such firearms and/or weapons and/or ammunition which has not been destroyed, upon demand, to the person(s) from whom the weapons were confiscated if the person(s) is/are acquitted of the public offense with which he/she was charged. Upon information and belief, no person has contacted the Las Vegas Metropolitan Police Department and demanded the return of any firearms and/or weapons and/or ammunition listed in the instant

3

I:\FORFEIT\ONEGUN\02011602_ONEGUN.DOC

1  Complaint. If any of the persons from whom the said Defendant firearms and/or weapons

2  and/or ammunition were seized by officers of the Las Vegas Metropolitan Police Department

3  should be acquitted of a public offense with which said person was charged and that person

4  does demand the return of said firearms and/or weapons and/or ammunition from the Las

5  Vegas Metropolitan Police Department, said firearms and/or weapons and/or ammunition

6  will be returned or, if the firearms and/or weapons and/or ammunition cannot be returned,

7  the Las Vegas Metropolitan Police Department will pay the fair market value of the said

8  firearms and/or weapons and/or ammunition to any such potential claimant.

9       WHEREFORE PLAINTIFF Prays that this Honorable Court declare that this

10  Plaintiff, the Las Vegas Metropolitan Police Department, is the legal owner of Defendant

11  MISCELLANEOUS FIREARMS and/or WEAPONS and/or AMMUNITION (Per Attached

12  Property Schedule); that this Honorable Court decree the forfeiture of Defendant firearms

13  and/or weapons and/or ammunition, free of all claims of all persons pursuant to the

14  provisions of NRS 453.301 and 202.340, and order said Defendant firearms and/or weapons

15  and/or ammunition to be distributed in the manner set forth in NRS 179.1175 and 179.118;

16  that Plaintiff recover its costs and attorneys fees against any party, person, or entity opposing

17  the forfeiture of Defendant firearms and/or weapons and/or ammunition as prayed for herein;

18  that Plaintiff have such other and further relief as the Court deems just and proper.

19       DATED this _21st_ day of October, 2002.

20                    STEWART L. BELL
                        Clark County District Attorney

21                    Nevada Bar #000477

22

23

24            BY

25                    J. TIMOTHY FATTIG
                  Deputy District Attorney

26                    Nevada Bar #006639

27

28  csv

| Event Number | Weapon(s) | Serial Number(s) |
|---|---|---|
| 020116-2509 | Thomson, Funt lock Rifle; | K28531 |
| | Arms Corp, .22 cal rifle; | A4526386 |
| | Budapest, bolt action rifle; | 4297E/53406 |
| | Coast to Coast shotgun; | N/A |
| | Foremost, semi auto shotgun; | 3051615 |
| | U.S. Rifle; | 2592992 |
| | Montgomery Ward, 20GA shotgun; | N/A |
| | Remington, bolt action rifle; | 72175 |
| | Winchester, .22 cal pump rifle; | 588190 |
| | Winchester, .22 cal pump rifle; | 169122 |
| | Winchester, 12 GA pump shotgun; | 1189207 |
| | Marlin, .22 Cal bolt action rifle; | 24616170 |
| | Winchester, .22 cal bolt action rifle; | N/A |
| | Winchester, lever action rifle; | 433727B |
| | Marlin, .22 cal semi auto rifle; | 14323367 |
| | Amadeo Rossi, double barrel shotgun; | N/A |
| | Marlin, 30/30 lever action rifle; | AD38446 |
| | Unknown, .22 cal. bolt action rifle; | AR9374 |
| | Marlin, .22 cal semi auto rifle; | 17307328 |
| | Savage, .22 cal lever action rifle; | 0720934 |
| | Roma Arms, semi auto rifle; | S1217972000 |
| | Taurus, .38 cal revolver; | KD14915 |
| | J.P. Sauer & Son, .44 revolver; | 2559314 |
| | H&R, .22 cal revolver; | AD85807 |
| | Colt, .22 cal pistol; | FILED OFF |
| | Ruger, .22 cal revolver; | 9136447 |
| | Misc. ammo and crossbow | |
| 020512-2469 | F.I.E., .25 cal handgun | B60554 |

| | Stevens, 12 GA shotgun | E700743 |
|---|---|---|
| 020517-1423 | J&R, 9MM pistol;<br>Colt, .223 cal rifle w/magazine & scope;<br>Winchester, 12 GA shotgun;<br>Smith & Wesson, .357 pistol;<br>Remington, .22 cal rifle | 03206<br>07216<br><br>L601797<br><br>38K9770<br><br>Unknown |
| 020526-2249 | Beretta, .40 cal pistol;<br>Lorcin, /L380 cal pistol w/ magazine | A12064M<br>089649 |
| 020606-1128 | Marlin, .22 cal rifle w/ scope;<br>Marlin, 30/30 lever action rifle;<br>Misc. Ammo and 2 handgun magazines; | 69274629<br><br>174356 |
| 020606-1580 | Smith & Wesson, 12 GA shotgun; | FB99026 |
| 020610-2390 | Glock, 9MM pistol, w/ magazine; | CAV427US |
| 020613-1172 | Colt, .22 cal revolver | 37731 |
| 020619-2062 | Witness, .45 handgun w/ magazine;<br>Unknown, .380 handgun w/ magazine; | EA16464<br><br>H2910 |
| 020622-0875 | Squires, .22 semi auto rifle | A07231 |
| 020624-0708 | Marlin, .22 cal rifle w/ bag;<br>Davis, .380 cal handgun;<br>Cobray, 9MM handgun;<br>SKS 7.69 rifle;<br>Taurus, 9MM handgun;<br>Misc. ammo and magazines; | 03255023<br>AP166292<br>940021280<br>21807500<br>TMB968290 |
| 020627-2207 | Remington, 12 GA shotgun;<br>Ammo; | 1011712V |
| 020629-0226 | Sundance, .25 semi auto pistol w/ 2 rounds & magazine; | 036923 |
| 020703-0213 | Savage, 30/30 pump rifle | 0205615 |
| | | |
| | | |
| | | |
| | | |

ORIGINAL

FILED

Nov   1   06 PM '02

~~~~~~~~~~~~

CLERK

1   **AFFT**
    STEWART L. BELL
2   Clark County District Attorney
    Nevada Bar #000477
3   J. TIMOTHY FATTIG
    Deputy District Attorney
4   Nevada Bar #006639
    200 South Third Street
5   Las Vegas, Nevada 89155-2211
    (702) 455-4711
6   Attorney for Plaintiff

7

                    DISTRICT COURT
8                 CLARK COUNTY, NEVADA

9

10  LAS VEGAS METROPOLITAN POLICE      )
    DEPARTMENT,                        )
11                                     )    Case No.    A 4580 46
                  Plaintiff,           )
12                                     )    Dept No.    XIX
         -vs-                          )
13                                     )
    MISCELLANEOUS FIREARMS and/or      )
14  WEAPONS and/or AMMUNITION          )
    (Per Attached Property Schedule),  )
15                                     )
                  Defendant.           )
16  _____)

17                  AFFIDAVIT FOR PUBLICATION

18

19  STATE OF NEVADA      )
                         )ss:
20  COUNTY OF CLARK      )

21       J. TIMOTHY FATTIG, being first duly sworn, deposes and says:

22       1.  I am an attorney duly licensed to practice law in the State of Nevada, and am a

23  Deputy District Attorney employed by the Clark County District Attorney's Office.  I am the

24  attorney assigned to prosecute forfeiture cases on behalf of the Las Vegas Metropolitan

25  Police Department (hereinafter referred to as LVMPD).

26       2. This Affidavit is made in support of an order directing service by publication in a

27  forfeiture case involving a number of firearms and/or weapons and/or ammunition seized by

28  officers of the LVMPD acting under the authority of the Sheriff of Clark County.  Said

RECEIVED
NOV 0 1 2002
COUNTY CLERK

1  firearms and/or weapons and/or ammunition were all seized in Las Vegas, Clark County,

2  Nevada, between January 16, 2002 and July 3, 2002, inclusive, from persons who, at the

3  time the firearms and/or weapons and/or ammunition were seized, were committing a public

4  offense.

5  WHEREFORE, your Affiant prays for an order of this Court directing a notice of the

6  intended forfeiture of the said firearms and/or weapons and/or ammunition be served by

7  publication for four (4) consecutive weeks, with demand that a claim be made within 20 days

8  of the termination of the publication.

9  I declare under penalty of perjury that the foregoing is true and correct.

12  Executed on ___10-21-02___
                    Date                    J. TIMOTHY FATTIG

28  csv

2

I:\FORFEIT\ONEGUN\02011602_ONEGUN.DOC

| Event Number | Weapon(s) | Serial Number(s) |
|---|---|---|
| 020116-2509 | Thomson, Funt lock Rifle; | K28531 |
| | Arms Corp, .22 cal rifle; | A4526386 |
| | Budapest, bolt action rifle; | 4297E/53406 |
| | Coast to Coast shotgun; | N/A |
| | Foremost, semi auto shotgun; | 3051615 |
| | U.S. Rifle; | 2592992 |
| | Montgomery Ward, 20GA shotgun; | N/A |
| | Remington, bolt action rifle; | 72175 |
| | Winchester, .22 cal pump rifle; | 588190 |
| | Winchester, .22 cal pump rifle; | 169122 |
| | Winchester, 12 GA pump shotgun; | 1189207 |
| | Marlin, .22 Cal bolt action rifle; | 24616170 |
| | Winchester, .22 cal bolt action rifle; | N/A |
| | Winchester, lever action rifle; | 433727B |
| | Marlin, .22 cal semi auto rifle; | 14323367 |
| | Amadeo Rossi, double barrel shotgun; | N/A |
| | Marlin, 30/30 lever action rifle; | AD38446 |
| | Unknown, .22 cal. bolt action rifle; | AR9374 |
| | Marlin, .22 cal semi auto rifle; | 17307328 |
| | Savage, .22 cal lever action rifle; | 0720934 |
| | Roma Arms, semi auto rifle; | S1217972000 |
| | Taurus, .38 cal revolver; | KD14915 |
| | J.P. Sauer & Son, .44 revolver; | 2559314 |
| | H&R, .22 cal revolver; | AD85807 |
| | Colt, .22 cal pistol; | FILED OFF |
| | Ruger, .22 cal revolver; | 9136447 |
| | Misc. ammo and crossbow | |
| 020512-2469 | F.I.E., .25 cal handgun | B60554 |

| | | |
|---|---|---|
| | Stevens, 12 GA shotgun | E700743 |
| 020517-1423 | J&R, 9MM pistol;<br>Colt, .223 cal rifle<br>w/magazine & scope;<br>Winchester, 12 GA<br>shotgun;<br>Smith & Wesson, .357<br>pistol;<br>Remington, .22 cal rifle | 03206<br>07216<br><br>L601797<br><br>38K9770<br><br>Unknown |
| 020526-2249 | Beretta, .40 cal pistol;<br>Lorcin, /L380 cal pistol w/<br>magazine | A12064M<br>089649 |
| 020606-1128 | Marlin, .22 cal rifle w/<br>scope;<br>Marlin, 30/30 lever action<br>rifle;<br>Misc. Ammo and 2<br>handgun magazines; | 69274629<br><br>174356 |
| 020606-1580 | Smith & Wesson, 12 GA<br>shotgun; | FB99026 |
| 020610-2390 | Glock, 9MM pistol, w/<br>magazine; | CAV427US |
| 020613-1172 | Colt, .22 cal revolver | 37731 |
| 020619-2062 | Witness, .45 handgun w/<br>magazine;<br>Unknown, .380 handgun w/<br>magazine; | EA16464<br><br>H2910 |
| 020622-0875 | Squires, .22 semi auto rifle | A07231 |
| 020624-0708 | Marlin, .22 cal rifle w/ bag;<br>Davis, .380 cal handgun;<br>Cobray, 9MM handgun;<br>SKS 7.69 rifle;<br>Taurus, 9MM handgun;<br>Misc. ammo and<br>magazines; | 03255023<br>AP166292<br>940021280<br>21807500<br>TMB968290 |
| 020627-2207 | Remington, 12 GA shotgun;<br>Ammo; | 1011712V |
| 020629-0226 | Sundance, .25 semi auto<br>pistol w/ 2 rounds &<br>magazine; | 036923 |
| 020703-0213 | Savage, 30/30 pump rifle | 0205615 |
| | | |
| | | |
| | | |
| | | |
| | | |

ORIGINAL

**ORDR**
STEWART L. BELL
Clark County District Attorney
Nevada Bar #000477
J. TIMOTHY FATTIG
Deputy District Attorney
Nevada Bar #006639
200 South Third Street
Las Vegas, Nevada 89155-2211
(702) 455-4711
Attorney for Plaintiff

*FILED*

Nov 1 1 06 PH '02

CLERK

DISTRICT COURT
CLARK COUNTY, NEVADA

LAS VEGAS METROPOLITAN POLICE )
DEPARTMENT,                     )
                               )
                Plaintiff,      )          Case No.   A 458046
                               )
        -vs-                    )          Dept No.   XIX
                               )
MISCELLANEOUS FIREARMS and/or   )
WEAPONS and/or AMMUNITION       )
(Per Attached Property Schedule),)
                               )
                Defendant.      )
_____)

ORDER FOR PUBLICATION

    The Court having been presented with an Affidavit for Publication of the forfeiture of firearms and/or weapons and/or ammunition, by counsel for Plaintiff, and good cause appearing therefor,

    IT IS HEREBY ORDERED that notice of forfeiture of said Defendant firearms and/or weapons and/or ammunition, be published in the Nevada Legal News, and that

//
//
//
//
//

RECEIVED

'' 0 1 2002

COUNTY CLERK

3

I:\FORFEIT\ONEGUN\0201602_ONEGUN.DOC

1   publication be made for a period of four (4) consecutive weeks, once a week for said period

2   of time, a total of four (4) times.

3        DATED this 29ᵀᴴ day of October, 2002.

4

5                                    _____
                                     DISTRICT JUDGE

6

7

8

9   Submitted by:

10

11  STEWART L. BELL
    Clark County District Attorney
12  Nevada Bar #000477

13

14

15  BY _____
    J. TIMOTHY FATTIG
16  Deputy District Attorney
    Nevada Bar #006639
17

18

19

20

21

22

23

24

25

26

27

28  csv

                        4

                                            I:\FORFEIT\ONEGUN\02011602_ONEGUN.DOC

| Event Number | Weapon(s) | Serial Number(s) |
|---|---|---|
| 020116-2509 | Thomson, Funt lock Rifle; | K28531 |
| | Arms Corp, .22 cal rifle; | A4526386 |
| | Budapest, bolt action rifle; | 4297E/53406 |
| | Coast to Coast shotgun; | N/A |
| | Foremost, semi auto shotgun; | 3051615 |
| | U.S. Rifle; | 2592992 |
| | Montgomery Ward, 20GA shotgun; | N/A |
| | Remington, bolt action rifle; | 72175 |
| | Winchester, .22 cal pump rifle; | 588190 |
| | Winchester, .22 cal pump rifle; | 169122 |
| | Winchester, 12 GA pump shotgun; | 1189207 |
| | Marlin, .22 Cal bolt action rifle; | 24616170 |
| | Winchester, .22 cal bolt action rifle; | N/A |
| | Winchester, lever action rifle; | 433727B |
| | Marlin, .22 cal semi auto rifle; | 14323367 |
| | Amadeo Rossi, double barrel shotgun; | N/A |
| | Marlin, 30/30 lever action rifle; | AD38446 |
| | Unknown, .22 cal. bolt action rifle; | AR9374 |
| | Marlin, .22 cal semi auto rifle; | 17307328 |
| | Savage, .22 cal lever action rifle; | 0720934 |
| | Roma Arms, semi auto rifle; | S1217972000 |
| | Taurus, .38 cal revolver; | KD14915 |
| | J.P. Sauer & Son, .44 revolver; | 2559314 |
| | H&R, .22 cal revolver; | AD85807 |
| | Colt, .22 cal pistol; | FILED OFF |
| | Ruger, .22 cal revolver; | 9136447 |
| | Misc. ammo and crossbow | |
| 020512-2469 | F.I.E., .25 cal handgun | B60554 |

| | | |
|---|---|---|
| | Stevens, 12 GA shotgun | E700743 |
| 020517-1423 | J&R, 9MM pistol;<br>Colt, .223 cal rifle w/magazine & scope;<br>Winchester, 12 GA shotgun;<br>Smith & Wesson, .357 pistol;<br>Remington, .22 cal rifle | 03206<br>07216<br><br>L601797<br><br>38K9770<br><br>Unknown |
| 020526-2249 | Beretta, .40 cal pistol;<br>Lorcin, /L380 cal pistol w/ magazine | A12064M<br>089649 |
| 020606-1128 | Marlin, .22 cal rifle w/ scope;<br>Marlin, 30/30 lever action rifle;<br>Misc. Ammo and 2 handgun magazines; | 69274629<br><br>174356 |
| 020606-1580 | Smith & Wesson, 12 GA shotgun; | FB99026 |
| 020610-2390 | Glock, 9MM pistol, w/ magazine; | CAV427US |
| 020613-1172 | Colt, .22 cal revolver | 37731 |
| 020619-2062 | Witness, .45 handgun w/ magazine;<br>Unknown, .380 handgun w/ magazine; | EA16464<br><br>H2910 |
| 020622-0875 | Squires, .22 semi auto rifle | A07231 |
| 020624-0708 | Marlin, .22 cal rifle w/ bag;<br>Davis, .380 cal handgun;<br>Cobray, 9MM handgun;<br>SKS 7.69 rifle;<br>Taurus, 9MM handgun;<br>Misc. ammo and magazines; | 03255023<br>AP166292<br>940021280<br>21807500<br>TMB968290 |
| 020627-2207 | Remington, 12 GA shotgun;<br>Ammo; | 1011712V |
| 020629-0226 | Sundance, .25 semi auto pistol w/ 2 rounds & magazine; | 036923 |
| 020703-0213 | Savage, 30/30 pump rifle | 0205615 |
| | | |
| | | |
| | | |
| | | |
| | | |

**DFJD**
STEWART L. BELL
Clark County District Attorney
Nevada Bar #000477
J. TIMOTHY FATTIG
Deputy District Attorney
Nevada Bar #006639
200 South Third Street
Las Vegas, Nevada 89155-2211
(702) 455-4711
Attorney for Plaintiff

FILED

FEB 7  1 53 PM '03

CLERK

DISTRICT COURT
CLARK COUNTY, NEVADA

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT,

    Plaintiff,

  -vs-

MISCELLANEOUS FIREARMS and/or
WEAPONS and/or AMMUNITION
(Per Attached Property Schedule),

    Defendant.

Case No. A 458046

Dept No. XIX XXI

## JUDGMENT BY DEFAULT

  That a Complaint for Forfeiture of Defendant firearms and/or weapons and/or ammunition having been filed on the ___21ST___ day of ___October___, 2002, and potential claimant(s), having been served by publication on ___November 6,13,20,27, December 4, 2002___ and having failed to appear and answer Plaintiff's Complaint filed herein, the legal time for answering having expired, and no answer or motion by defense having been filed, and no other claimant(s) having come forward as it pertains to the Defendant firearms and/or weapons and/or ammunition, and the Default pertaining to the Defendant firearms and/or weapons and/or ammunition having been fully entered according to law upon application of Plaintiff to the Clerk of the Court on the ___5 th___ day of ___February 2003___, Judgment is hereby entered against Defendant firearms and/or weapons and/or ammunition as against potential claimant(s), and any other claimants

//

LVMPD adv. Hinton
FRCP 26(f)   000112

1   to said Defendant firearms and/or weapons and/or ammunition pursuant to the prayer of said

2   Complaint.

3   　　　　WHEREFORE, by virtue of the law and reason of the premises aforesaid, it is hereby

4   Ordered, Adjudged, and Decreed that Defendant MISCELLANEOUS FIREARMS and/or

5   WEAPONS and/or AMMUNITION (Per Attached Property Schedule), be forfeited free of

6   all claims of all persons to the Las Vegas Metropolitan Police Department pursuant to the

7   provisions of NRS 453.301 and 202.340 and to be disposed of pursuant to NRS 179.118 and

8   179.1175.

9   　　　　DATED this ___7___ day of ~~October 21, 2002~~ _Feb. 2003_.

10

11

12   　　　　　　　　　　　　　　　　　　　　**VALERIE ADAIR**

13   　　　　　　　　　　　　　　　　　　　　DISTRICT JUDGE

14

15   Submitted by:

16   STEWART L. BELL
    Clark County District Attorney

17   Nevada Bar #000477

18

19

20   BY _____

21   J. TIMOTHY FATTIG
    Deputy District Attorney

22   Nevada Bar #006639

23

24

25

26

27

28   csv

　　　　　　　　　　　　　　　　　　　　　　　LVMPD adv. Hinton
　　　　　　　　　　　　　　　　　　　　　　　FRCP 26(f)   000113

I:\FORFEIT\ONEGUN\02011602_ONEGUN.DOC

| Item Number | Weapons | Serial number(s) |
|---|---|---|
| 020116-2509 | Thomson, Funt lock Rifle; | K28531 |
| | Arms Corp, .22 cal rifle; | A4526386 |
| | Budapest, bolt action rifle; | 4297E/53406 |
| | Coast to Coast shotgun; | N/A |
| | Foremost, semi auto shotgun; | 3051615 |
| | U.S. Rifle; | 2592992 |
| | Montgomery Ward, 20GA shotgun; | N/A |
| | Remington, bolt action rifle; | 72175 |
| | Winchester, .22 cal pump rifle; | 588190 |
| | Winchester, .22 cal pump rifle; | 169122 |
| | Winchester, 12 GA pump shotgun; | 1189207 |
| | Marlin, .22 Cal bolt action rifle; | 24616170 |
| | Winchester, .22 cal bolt action rifle; | N/A |
| | Winchester, lever action rifle; | 433727B |
| | Marlin, .22 cal semi auto rifle; | 14323367 |
| | Amadeo Rossi, double barrel shotgun; | N/A |
| | Marlin, 30/30 lever action rifle; | AD38446 |
| | Unknown, .22 cal. bolt action rifle; | AR9374 |
| | Marlin, .22 cal semi auto rifle; | 17307328 |
| | Savage, .22 cal lever action rifle; | 0720934 |
| | Roma Arms, semi auto rifle; | S1217972000 |
| | Taurus, .38 cal revolver; | KD14915 |
| | J.P. Sauer & Son, .44 revolver; | 2559314 |
| | H&R, .22 cal revolver; | AD85807 |
| | Colt, .22 cal pistol; | FILED OFF |
| | Ruger, .22 cal revolver; | 9136447 |
| | Misc. ammo and crossbow | |
| 020512-2469 | F.I.E., .25 cal handgun | B60554 |

LVMPD adv. Hinton
FRCP 26(f)   000114

Cont. N

| | Stevens, 12 GA shotgun | E700743 | |
|---|---|---|---|
| 020517-1423 | J&R, 9MM pistol;<br>Colt, .223 cal rifle w/magazine & scope;<br>Winchester, 12 GA shotgun;<br>Smith & Wesson, .357 pistol;<br>Remington, .22 cal rifle | 03206<br>07216<br><br>L601797<br><br>38K9770<br><br>Unknown | |
| 020526-2249 | Beretta, .40 cal pistol;<br>Lorcin, /L380 cal pistol w/ magazine | A12064M<br>089649 | N |
| 020606-1128 | Marlin, .22 cal rifle w/ scope;<br>Marlin, 30/30 lever action rifle;<br>Misc. Ammo and 2 handgun magazines; | 69274629<br><br>174356 | F/A |
| 020606-1580 | Smith & Wesson, 12 GA shotgun; | FB99026 | F/A |
| 020610-2390 | Glock, 9MM pistol, w/ magazine; | CAV427US | N |
| 020613-1172 | Colt, .22 cal revolver | 37731 | N |
| 020619-2062 | Witness, .45 handgun w/ magazine;<br>Unknown, .380 handgun w/ magazine; | EA16464<br><br>H2910 | N |
| 020622-0875 | Squires, .22 semi auto rifle | A07231 | N |
| 020624-0708 | Marlin, .22 cal rifle w/ bag;<br>Davis, .380 cal handgun;<br>Cobray, 9MM handgun;<br>SKS 7.69 rifle;<br>Taurus, 9MM handgun;<br>Misc. ammo and magazines; | 03255023<br>AP166292<br>940021280<br>21807500<br>TMB968290 | N |
| 020627-2207 | Remington, 12 GA shotgun; Ammo; | 1011712V | N |
| 020629-0226 | Sundance, .25 semi auto pistol w/ 2 rounds & magazine; | 036923 | N |
| 020703-0213 | Savage, 30/30 pump rifle | 0205615 | N |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# LAS VEGAS METROPOLITAN POLICE DEPARTMENT

## REQUEST FOR FORFEITURE

| | | |
|---|---|---|
| TO | : | Clark County District Attorney Forfeiture Unit |
| FROM | : | Shandell Auten, LVMPD Forfeiture Unit |
| EVENT NUMBER(S) | : | **020116-2509** |
| POTENTIAL CLAIMANT(S) | : | **DAVID HINTON, ID# 1528967** |
| | | **DONALD HINTON, ID# 482533** |
| | | **JOHN REYES, ID# 1177111** |
| DATE | : | June 27, 2002 |

The Las Vegas Metropolitan Police Department is interested in pursuing forfeiture proceedings on the attached package for:

**26-GUNS (THOMSON, S/N: K28531 // ARMS CORP., S/N: A526386 // BUDAPEST, S/N: 4297E/53406 // COAST TO COAST, S/N: (UNKNOWN) // FOREMOST, S/N: 3051615 // U.S. RIFLE, S/N: 2592992 // MONTGOMERY WARD, S/N: (UNKNOWN) // REMINGTON, S/N: 72175 // WINCHESTER, S/N: 588190 // WINCHESTER, S/N: 169122 // WINCHESTER, S/N: 1189207 // MARLIN, S/N: 24616170 // WINCHESTER, S/N: (UNKNOWN) // WINCHESTER, S/N: 433727B // MARLIN, S/N: 14323367 // AMADEO ROSSI, S/N: (UNKNOWN) // MARLIN, S/N: AD38446 // BOLT ACTION RIFLE, S/N: AR9374 // MARLIN, S/N: 17307328 // SAVAGE, S/N: D720934 // ROMA ARMS, S/N: S1217972000 // TAURUS, S/N: KD14915 // JP SAWER & SON, S/N: 2559314 // H&R, S/N: AD85807 // COLT, S/N: (FILED OFF) // RUGER, S/N: 9136447); AMMO; CROSSBOW**

Submitted for your review and recommendation is the attached record file which has been compiled since the date of seizure, **JANUARY 16, 2002.**

The estimated value of the above vehicle(s) is $.  The lien(s) as of this date is $.